MARC J. WINTHROP – State Bar No. 63218
mwinthrop@wghlawyers.com
PETER W. LIANIDES – State Bar No. 160517
plianide@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone:    (949) 720-4100
Facsimile:     (949) 720-4111

Counsel for Pilot Power Group LLC.

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>WESTERN COMMUNITY ENERGY,<br><br>                    Debtor. | 6:21-bk-12821-SY<br><br>Chapter 9 Proceeding<br><br>**DECLARATION OF DENIS VERMETTE IN SUPPORT OF EMERGENCY MOTION FOR ORDER COMPELLING IMMEDIATE REJECTION OF EXECUTORY CONTRACT, AND FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>DATE:        [To Be Set]<br>TIME:<br>PLACE:     Courtroom 302<br>                   3420 Twelfth Street<br>                   Riverside, California 92501 |

I, Denis Vermette, declare as follows:

1.       I am the Chief Financial Officer and President of Pilot Power Group, LLC ("Pilot Power"), and am authorized to make this declaration on its behalf.  I am also the President and CFO of Energy Data Management Services, LLC, a sister-company to Pilot Power.  All of the matters set forth in this Declaration are true of my own personal knowledge, except for matters stated on information and belief, which matters I believe to be true.

2.      I commenced working as an officer of Pilot Power on or about February 1, 2016. As CFO, my duties naturally include responsibility for the past, present and future financial situation of the company.  As President, my duties include business strategy, market development, and business development.  Since joining Pilot Power, I have taken the lead in Pilot Power's efforts to expand the company's product and service offerings in markets outside of California.  I have also taken the lead in efforts to penetrate the Community Choice Aggregation market within California.

3.      Pilot Power is a registered Electric Service Provider ("ESP") in California and has been serving commercial and industrial Direct Access ("DA") electricity customer load since 2001. Pilot Power is also a certified Scheduling Coordinator ("SC") with the California Independent System Operator ("CAISO").

4.      In 2004, I am informed and believe that Pilot Power began providing back office services to other ESPs, including services such as (a) submission of Direct Access Service Requests to qualify and enroll customers in DA service, (b) arranging for metering, meter reading and meter maintenance, (c) obtaining meter data, (d) preparation of customer bills, (e) providing customer support, (f) calculation of applicable Utility Users Taxes and the Energy Resources Surcharge for inclusion on customer bills.  Back office services also often included various Scheduling Coordination services such as (a) preparation and submission of schedules to the CAISO for the delivery of energy to the end-use customers of the LSE, (b) preparation and submission to the CAISO of Settlement Quality Meter Data ("SQMD") (SQMD is the data the CAISO uses to calculate charges due from, or payments due to, CAISO market participants), and (c) breakdown, analysis and development of reports of all settlement costs and charges received from the CAISO on a charge-code by charge code basis to enable accurate pass-through of CAISO charges to customers.  In or about 2007, I am informed and believe that the founders of Pilot Power created a sister company called EDMS, LLC (now known as "Energy Data Management Services, LLC") to provide the above described back office and Scheduling Coordination services to other ESP's.

5.      Pilot Power began providing services to Community Choice Aggregators in 2017.

6.      In 2019, I was one of the primary points of contact between Pilot Power and

MAINDOCS-#251907-v3-WCE_Vermette_Dec_Mtn_Reject

Western Community Energy ("WCE") when WCE issued its Request for Proposal seeking competitive bids for the provision of various products and services including, but not limited to (a) energy procurement, (b) schedule coordination, and (c) the provision of financing and credit support for WCE.  Pilot Power was ultimately awarded the contract, and Pilot Power and WCE entered into that certain Professional Services Agreement (inclusive of amendments thereto, the "Agreement") by and between WESTERN COMMUNITY ENERGY and PILOT POWER GROUP, dated August 15, 2019.  A true and correct copy of the Agreement is attached hereto as Exhibit A.

7.      The main part of the Agreement consists of general terms and conditions.  The specific products and services, together with specific rights and obligations of the parties are set forth in Schedule 1 to the Agreement, along with Exhibits A, B, and C to Schedule 1.  I will focus on three elements of Schedule 1 to the Agreement: 1) Energy Procurement; 2) Scheduling Coordination; and 3) Financing of the CCA.

8.      Section 1(c) of Schedule 1 to the Agreement states that Pilot Power will procure "all products and services required to serve the WCE CCA electricity load," including resource adequacy capacity, renewable energy, energy, and ancillary services from the CAISO.  Section 2 of Schedule 1 to the Agreement states that Pilot Power "shall submit, or cause to be submitted, to the CAISO all schedules and meter data reports required to be filed by the designated SC for the meters enrolled to receive energy service from WCE within WCE's service territory."  Section 2 also identifies several other scheduling services including preparation and submission of SQMD to the CAISO, analysis of CAISO settlements to verify CAISO charges, and participation in the Congestion Revenue Rights ("CRR") market on behalf of WCE.

9.      Section 7 of Schedule 1 to the Agreement on financing of the CCA largely determines to what extent the Agreement is a mere "services" agreement, or to what extent it is "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor,…" (11 U.S.C. § 365(c)(2)).

10.      Pursuant to Section 7(a) of Schedule 1 to the Agreement, Pilot Power agreed to waive its fees during the pre-launch period—the period leading up to WCE starting to provide

energy to its customers—"[t]o provide significant savings to WCE prior to launch of CCA

services." Thus, Pilot Power financed WCE's launch through providing essential services at no

cost.

11.    Section 7(b) of Schedule 1 to the Agreement states: "To assist WCE to generate

sufficient revenue to fund operations upon the launch of the CCA, [Pilot Power] will accrue the

first two months ('Deferred Period') of CCA operational costs associated with Consultant's service

fees, energy supply costs, and deposits described in Section 7.c below ('Deferred Financing')."

Section 7(b) goes on to describe the terms and conditions of the Deferred Financing. Pilot Power

also financed the WCE launch through the Deferred Financing.

12.    Pursuant to Section 7(c) of Schedule 1 to the Agreement: "[Pilot Power] shall

provide funding for all deposits that may be required by SCE, the CAISO or other entities to launch

and operate WCE CCA ('Deposits')." Section 7(c)(i) goes on to state, however: "Additional

Deposits, if any, or increases in Deposits that may be required after Deferred Financing amounts

are amortized pursuant to above Section 7.b of this Schedule 1, shall be paid/deposited directly by

WCE from CCA revenues and/or funds." Simply stated, Pilot Power agreed to finance the WCE

launch by providing the deposits with the CAISO and other entities that may be required during the

initial 2-months of operations. Thereafter, when WCE began to receive customer revenue, WCE

was obligated to provide any and all additional deposits/collateral required. During the initial 2-

months of operations, CAISO credit requirements for the WCE load peaked at $653,177. As

described more fully below, however, WCE has not provided the additional

deposits/credit/collateral required by the CAISO to serve the WCE load (which has recently been

as high as $2,500,000.00). All credit for the CAISO has been, and continues to be provided by

Pilot Power, constituting an ongoing provision of substantial credit, financing and/or financial

accommodations to WCE.

13.    Section 7(d) of Schedule 1 to the Agreement provides: "Consultant shall provide all

working capital, credit and collateral ('Credit Support') necessary to support all functions of

Energy Procurement as described in Section 1 of this Schedule 1; provided that WCE is in full

compliance with the terms and conditions of Exhibit A to this Schedule 1. If WCE does not

MAINDOCS-#251907-v3-WCE_Vermette_Dec_Mtn_Reject

comply fully with the provisions of <u>Exhibit A</u>, WCE agrees to employ its own capital, credit and collateral to support Energy Procurement."

14.    Among other things, Exhibit A to Schedule 1 to the Agreement requires WCE to a) deposit all revenues of any kind immediately into a fiduciary account (a "Lock Box") at City National Bank; b) grant Pilot Power a first priority security interest in the Lock Box, the Lock Box account, and any proceeds thereof; c) deliver to Pilot Power and City National Bank a deposit account control agreement and other agreements as reasonably may be required granting Pilot Power control over the Lock Box and all monies therein; d) grant Pilot Power the authority and control over the Lock Box account to make payments from the Lock Box account pursuant to the priorities established in Section B of Exhibit A to Schedule 1 to the Agreement.

15.    WCE has done nothing required in Exhibit A to Schedule 1 of the Agreement.  As a result, WCE is required to "employ its own capital, credit and collateral to support Energy Procurement."  As clarified in Section 7(d)(i) of Schedule 1, all CAISO charges are also considered Energy Procurement.

16.    After the execution of the Agreement, but before the launch of WCE services to its customers, WCE determined that it would not rely solely and completely on Pilot Power for Credit Support.  I am informed and believe that WCE entered into a revolving credit agreement with Barclays Bank.  Nevertheless, as outlined above, and as more fully described below, WCE did not undertake all the Credit Support necessary for Energy Procurement as required by the Agreement. In addition to the financing and financial accommodations described in Section 7(a) through 7(d) of Schedule 1 to the Agreement, Pilot Power has been, and continues to provide significant debt financing or financial accommodations through the provision of Scheduling Coordination services.

17.    There are essentially two ways that an entity like Pilot Power can provide Scheduling Coordination services.  When Pilot Power provides SC services to another LSE, it usually requires the LSE to make arrangements for a third-party Scheduling Coordinator to be the designated SC at the CAISO for the applicable load.  That designated SC then makes available to Pilot Power a sub-SC ID under which Pilot Power can submit schedules, SQMD and any other SC services agreed upon by the parties.  In such instances, Pilot Power is not the designated SC (even

though Pilot Power is a certified SC at the CAISO), and has no credit exposure, no credit risk, and no liability to the CAISO or to the counter-party.  Alternatively, if the LSE is certified as an SC, then the LSE acts as the designated SC with the CAISO for the applicable load and makes one of its own sub-SC-IDs available to Pilot Power for Pilot to perform all the agreed Scheduling Coordination services.  In those cases, Pilot Power is truly a service provider, providing no credit, no capital, no collateral and carrying no financial risk.

18.    The second manner in which Pilot Power can provide SC services is for Pilot Power to become the Scheduling Coordinator of record with the CAISO (employing one of its own sub-SC IDs).  When Pilot Power is the designated SC, then it provides substantial credit, capital, and collateral, essentially financing and guaranteeing the operations of the client LSE, and bearing 100 percent of the risk for all CAISO charges related to the applicable load—risk that may include providing payment for all energy consumed by the applicable load.

19.    In providing SC services to WCE, Pilot Power became the designated SC, employed one of the Pilot Power sub-SC IDs established at the CAISO, and has been scheduling and settling with the CAISO on all WCE load via a Pilot Power sub-SC ID (identified at the CAISO as "WCE1") dedicated exclusively for WCE load.  To mitigate risk, the Agreement provides that WCE is to provide all additional deposits following the initial 2-months of operations that may be required by the CAISO.  WCE has provided none of the additional deposits (credit and collateral) required by the CAISO to serve the WCE load.  Pilot Power has been compelled to provide all of the additional deposits (credit and collateral) as set forth below.

20.    No LSE, including WCE, can serve any customer load without the services of a certified Scheduling Coordinator.  SCs can directly bid or schedule resources as well as handle the settlements process with the CAISO.  Without either being a certified SC or contracting with a certified SC to act on their behalf, an LSE cannot operate in California.  Without an SC, an LSE cannot get any of the electricity it may have purchased, delivered through the grid system to its customers in California.

21.    The CAISO operates according to its FERC Tariff. Because one of the primary, if not the primary purpose of the CAISO is to ensure grid reliability, the CAISO has very strict credit

MAINDOCS-#251907-v3-WCE_Vermette_Dec_Mtn_Reject

and collateral requirements for SCs and any other participants in the CAISO market.  The CAISO

Tariff deals with creditworthiness in Section 12.  Section 12.1(a) states:

> "12.1   Credit and Minimum Participation Requirements (a) The creditworthiness and
>
> minimum participation requirements in this section apply to the CAISO's acceptance
>
> of any transaction in a CAISO Market, to the payment of charges pursuant to the
>
> CAISO Tariff (including the Grid Management Charge), and to establish credit limits
>
> for participation in any CAISO auction of CRRs and to CRR Holders for the holding
>
> of CRRs. Each Market Participant that has a direct financial relationship with the
>
> CAISO (including each Scheduling Coordinator, UDC, MSS, CRR Holder, or
>
> Candidate CRR Holder) shall secure its financial transactions with the CAISO
>
> (including its participation in any auction of CRRs and for the holding of CRRs) by
>
> maintaining an Unsecured Credit Limit and/or by posting Financial Security, the
>
> level of which constitutes the Market Participant's Financial Security Amount. For
>
> each Market Participant, the sum of its Unsecured Credit Limit and its Financial
>
> Security Amount shall represent its Aggregate Credit Limit. Each Market Participant
>
> shall have the responsibility to maintain an Aggregate Credit Limit that is at least
>
> equal to its Estimated Aggregate Liability." (Emphasis Added.)

For ease of reference, various provisions Section 12 of the CAISO Tariff are attached hereto as

Exhibit B.

22.     Under the CAISO Tariff, the CAISO can review an SC's creditworthiness and other

qualifications periodically, and at any time.  The CAISO constantly monitors SC's Estimated

Aggregate Liability ("EAL").  If as a result of such review the CAISO believes that the

participant's EAL exceeds its Aggregate Credit Limit (the sum of its Unsecured Credit Limit—if

any—plus its credit/collateral Financial Security postings with the CAISO), the CAISO can

demand that the participant post additional security (via letter of credit or cash prepayment; CAISO

Tariff 12.1.2) within 2 Business days (CAISO Tariff 12.4):

> "12.4   Calculation of Ongoing Financial Security Requirements.  Following the date
>
> on which a Market Participant commences trading, if the Market Participant's

Estimated Aggregate Liability, as calculated by the CAISO, at any time exceeds its
Aggregate Credit Limit, the CAISO shall direct the Market Participant to post an
additional Financial Security Amount within two (2) Business Days that is sufficient
to ensure that the Market Participant's Aggregate Credit Limit is at least equal to its
Estimated Aggregate Liability. The CAISO shall also notify a Market Participant if at
any time its Estimated Aggregate Liability exceeds ninety (90) percent of its
Aggregate Credit Limit. …"

23.    Failure of an SC to post the required Financial Security with the CAISO within 2
Business Days can lead to a number of penalties ranging from the CAISO withholding payments
due to the participant from the CAISO, to limitation or suspension of the participant's trading
activities, to termination of certain rights of the participant in the CAISO markets.  Section 12.5.1
of the CAISO Tariff provides:

"12.5.1 Under-Secured and Non-Compliant Market Participants.  The CAISO may
take action under this Section 12.5.1 against a Market Participant if its Estimated
Aggregate Liability, as calculated by the CAISO, at any time exceeds its Aggregate
Credit Limit, or if a Market Participant fails to satisfy all of the minimum
participation requirements set forth in Section 12.1.  However, before taking action
against a Market Participant based on failure to comply with Section 12.1(a) or
12.1(b)(i)-(iii), the CAISO must first notify the Market Participant of the failure and
allow it thirty (30) days after notification to cure the failure. The CAISO may take
any or all of the following actions:

(a) The CAISO may withhold a pending payment distribution.

(b) The CAISO may limit trading, which may include rejection of Bids, including
Self-Schedules, rejection or cancellation of Inter-SC Trades in their entirety (i.e.,
both sides of the Inter-SC Trade) at any time, and/or limiting other CAISO Market
activity, including limiting eligibility to participate in a CRR Allocation or CRR
Auction. In such case, the CAISO shall notify the Market Participant of its action and
the Market Participant shall not be entitled to participate in the CAISO Markets or

CRR Auctions or submit further Bids, including Self-Schedules, or otherwise participate in the CAISO Markets until the Market Participant posts an additional Financial Security Amount that is sufficient to ensure that the Market Participant's Aggregate Credit Limit is at least equal to its Estimated Aggregate Liability.

(c) The CAISO may require the Market Participant to post an additional Financial Security Amount in lieu of an Unsecured Credit Limit for a period of time.

(d) The CAISO may restrict, suspend, or terminate the Market Participant's CRR Entity Agreement or any other service agreement.

(e) The CAISO may resell the CRR Holder's CRRs in whole or in part, including any Long Term CRRs, in a subsequent CRR Auction or bilateral transaction, as appropriate.

(f) The CAISO will not implement the transfer of a CRR if the transferee or transferor has an Estimated Aggregate Liability in excess of its Aggregate Credit Limit.

In addition, the CAISO may restrict or suspend a Market Participant's right to submit further Bids, including Self-Schedules, or require the Market Participant to increase its Financial Security Amount if at any time such Market Participant's potential additional liability for imbalance energy and other CAISO charges is determined by the CAISO to be excessive by comparison with the likely cost of the amount of Energy reflected in Bids or Self-Schedules submitted by the Market Participant."

24.    As noted above, Pilot Power has posted all the credit, all the capital, and all the collateral required by the CAISO. EAL, as calculated by the CAISO, fluctuates over time based on several factors, including market pricing for energy, how much of the load will be served through bi-lateral contracts (also referred to as hedges) for energy scheduled for delivery through the CAISO, outstanding unpaid invoices, late invoices, and other factors. Recently, the EAL associated with WCE load has been as high as $2,500,000.00. All of the credit and collateral to secure payment of the CAISO charges has been posted by Pilot Power. WCE has posted nothing.

25.    As a result of all the services and activities of the CAISO, the CAISO renders

MAINDOCS-#251907-v3-WCE_Vermette_Dec_Mtn_Reject

invoices to all the market participants.  These invoices are issued weekly.  CAISO Tariff 11.29.10 states:

> "11.29.10 <u>Billing and Payment</u>.  The CAISO shall prepare and issue to each Scheduling Coordinator, CRR Holder, Black Start Generator, or Participating TO an Invoice or Payment Advice on Wednesday of each week, which will be deemed to have been issued on Wednesday if it is issued by 5:00 a.m. the next calendar day. If Wednesday falls on a CAISO holiday, the CAISO will issue the Invoice or Payment Advice on the next Business Day. … Payments or charges for the items referred to in an Invoice shall be made four (4) Business Days after the date on which the weekly Invoice or Payment Advice is issued. If the fourth (4) Business Day after an Invoice or Payment Advice is issued falls on a CAISO holiday, then the Payment Date for the Invoice or Payment Advice shall be the next Business Day."

26.    Under the Agreement, WCE is required to pay the CAISO charges on time. However, if WCE fails to pay the invoice when due, Pilot Power is compelled to pay the invoice, because as the SC, Pilot Power is the market participant and liable for the CAISO invoices.  This happened on May 18, 2021, when WCE's ACH payment to the CAISO failed to clear.  As a result, Pilot Power had to pay the outstanding invoice in the amount of $417,968.82.  Shortly thereafter, WCE reimbursed Pilot Power, but not before Pilot Power was forced involuntarily to make a short-term loan to WCE in the form of paying the $417,968.82 CAISO invoice.  Pilot Power was compelled to make this payment on behalf of WCE simply to protect Pilot Power's SC certification and its ability to serve all the loads for which it acts as the designated SC that are unrelated to WCE.  (Pilot Power as an ESP has residential, commercial and industrial electricity customers that it serves throughout California.  Pilot Power also provides all-inclusive services to another small CCA in California that include, without limitation, energy procurement, scheduling coordination, billing, customer service, and regulatory compliance.)

27.    If Pilot Power does not proactively pay an invoice, the CAISO will simply apply any and all of the credit and collateral previously posted by Pilot Power. As noted above, all the credit, capital and collateral supporting WCE's load at the CAISO has been posted by Pilot Power.

MAINDOCS-#251907-v3-WCE_Vermette_Dec_Mtn_Reject

CAISO Tariff Sections 11.29.13.2 and 11.29.13.3 provide that the CAISO will apply any prepayments by Pilot Power (as the SC), then will apply any financial security that Pilot Power has provided (irrevocable letters of credit).  (Because the CAISO constantly monitors an SC's EAL and demands additional Financial Security if the EAL exceeds the SC's collateral postings, generally the SC will have sufficient collateral to pay the invoiced amount.)  In the event the SC is unable to pay and does not have sufficient collateral posted, the CAISO will charge interest, demand additional Financial Security, and eventually can terminate an SC's certification, agreements with the CAISO, and the right to transact in the CAISO markets.

28.    CAISO charges for customer load (like WCE's customer load) includes, among others, ancillary services charges, grid management charges, and charges for Imbalance Energy (essentially the difference between metered consumption and hedged power scheduled by the SC to serve the load, plus line losses).  Imbalance Energy charges can be very significant, especially in a situation such as the one WCE is facing.  Imbalance Energy is the electricity that the CAISO provides to serve load if the LSE has not purchased and scheduled for delivery (through its SC), sufficient electricity to completely serve the load.  In the best of worlds, no forecast of how much electricity a group of customers will use is ever perfect.  Weather changes, even slight changes, can cause dramatic fluctuations and volatility in consumption amounts and patterns.  The CAISO then charges the SC for the amount of Imbalance Energy (both from the Day-Ahead and Real-Time CAISO markets) required to fill the needs of the load applicable to each SC.  Imbalance Energy prices are not at a fixed price and can be very volatile, especially in the Summer months, and especially when there is insufficient electricity scheduled into the grid to meet the demand of the end users.  When there is not enough electricity in the grid, even after applying the resources the CAISO maintains in reserve, rolling blackouts or brownouts are implemented to prevent a complete collapse of the grid.  If, however, the end users (the load) use less electricity than was purchased (hedged) and scheduled through the applicable SC, the CAISO will buy the extra energy at the Imbalance Energy price and issue a credit to the SC that will be a line item on the weekly CAISO invoice.

29.    A majority of the charges from the CAISO are volumetric and are settled in time

intervals as small as every 5 minutes, every hour, every day.  Imbalance Energy is one of those charges settled based on the volumes required.  It is common to see dramatic swings in pricing throughout a day, week or month.  When the system is not stressed, it is not uncommon to find electricity prices in the forward market in a range averaging $30-$40 per mega-watt hour ("MWh").  When the system gets stressed as it does every Summer, we will likely see average pricing of $150/MWh or higher.  (On an hourly or settlement period basis, prices can spike to $2,000 per MWh—the current price cap at the CAISO.)

30.    In August 2020, during a heat wave, Imbalance Energy prices in the Day-Ahead market spiked to $1,557.43 per MWh, and in the Real-Time market spiked to $1,167.17 per MWh. Attached hereto as Exhibit C, please find a chart summarizing the Day Ahead pricing at the CAISO for August 2020.  Although WCE had managed to hedge approximately 91 percent of its customer load, the hours when the hedge did not cover all the WCE customer electricity consumption, even after netting the CAISO credits for the hours in which WCE customer electricity consumption was less than the hedged energy, resulted in WCE incurring approximately $12 million in Imbalance Energy costs for August 2020.

31.    Unfortunately for WCE, 2020 turned out to be a very bad year to commence operations.  WCE commenced operations shortly after the COVID-19 pandemic hit California, shutting down the state.  With businesses shuttered and people working from home, traditional energy usage patterns were severely disrupted, making forecasts based on prior consumption patterns inaccurate.   Moreover, as a start-up CCA, WCE had no historical consumption data for any of its customers.  That data had to be requested from Southern California Edison ("SCE") according to a process approved by the California Public Utilities Commission ("CPUC"). However, the data provided by SCE was incomplete, despite repeated attempts to obtain complete and accurate historical consumption data for the WCE customers.  As a result, WCE faced Summer 2020 with incomplete data from which to forecast its energy needs, and customers whose historical consumption patterns had changed significantly as a result of COVID-19 shutdowns and restrictions.  The August heat wave on top of all that caused a spike in energy costs at the very beginning of its operations when WCE had not yet had the opportunity to build up financial

reserves to handle unexpected costs.  In many respects, WCE has never been able to recover from that "perfect storm."

32.    In the months since, WCE has struggled financially, and has defaulted on several of its agreements for energy, resource adequacy capacity, and renewable energy.  As the SC, Pilot Power must receive information on all hedges in order to submit a matching schedule with the supplier at the CAISO.  As WCE contracts have been suspended and/or terminated, Pilot Power has either received notice from suppliers when they have suspended or terminated energy product supply agreements, or has been notified by the CAISO when a schedule Pilot Power has submitted on behalf of WCE to schedule the hedged power for delivery, did not match the schedule submitted by the counter-party supplier.  As of today's date, all of WCE's hedges have been terminated.

33.    On May 24, 2021, a few hours prior to the filing of its petition in bankruptcy, WCE held a special board meeting.  A copy of the Agenda for the meeting is attached hereto as Exhibit D, and incorporated herein by this reference.

34.    WCE is a public entity.  As a public entity, its proceedings and documents are public record and must be available for public review.  According to the Special Meeting Agenda attached as Exhibit D, Items 7A and 7B were discussed in open session.  The documents and information that came out of that open session are germane to the instant proceedings.  I participated telephonically in the Special Meeting and am familiar with the discussions on Items 7A and 7B.  Attached hereto as Exhibit E, please find a copy of the WCE Staff Report (the "Staff Report") supporting the proposed Resolution No. 2021-09 identified as Item 7A in the Agenda.

35.    The Staff Report notes that starting in December 2020, "WCE began the process of re-evaluating its financial proforma in the hope of seeking additional financing from its lender to cover some of the losses in 2020 and allow it to move forward.  However, in February, the lender indicated that it would no longer allow WCE to draw under its existing line of credit…"

36.    The Staff Report noted additional concerns in the energy market.  The February 2021 freeze in Texas had a significant impact in the energy markets, and even impacted the California market.  The CAISO has increased its market cap on energy prices from $1,000 per MWh to $2,000 per MWh, dramatically increasing the risk and exposure to price spikes if and

when heat waves hit this Summer.  As a result, the Staff Report concludes that "Given the volatility in summer prices, additional cash flow in excess of $40 million could easily be required to respond to heat events."

37.    The Staff Report further notes that WCE's lender will not provide any bridge funding to get WCE through its current fiscal crisis, unless WCE member agencies provide $25 million in financing.  However, as of the date of the May 24, 2021, special meeting, "no WCE member agency has formally committed to provide funds to WCE,…"

38.    In a May 28, 2021, conference call with WCE in which I participated, WCE confirmed that it has no post-petition financing, and that none of its pre-petition lenders will provide any further financing.

39.    As a result of losing its hedges through defaults, and losing financing to purchase additional hedges, WCE is relying on the CAISO Imbalance Energy market for the majority of its electricity needs in June 2021.  Starting on June 11, 2021, WCE will be relying completely on the CAISO Imbalance Energy market for all its electricity needs.  As noted above, the Imbalance Energy market is subject to extreme volatility, and prices can spike up to $2,000 per MWh.

40.    As the SC, Pilot Power will be invoiced by the CAISO for all the Imbalance Energy that the CAISO automatically provides (at least until there is no available energy and blackouts or brownouts occur).  If WCE does not, or is unable to pay the invoice, Pilot Power will have to pay. Every Summer electricity prices skyrocket because of the increase in demand (air conditioning load).  This Summer's estimates indicate there are likely to be rolling blackouts due to insufficient supply to meet the anticipated demand.  This means we are likely to see prices hit the $2,000 per MWh cap during many hours, on many days.

41.    The WCE Staff Report attached as Exhibit E states: "WCE's projected cash flows show deficits that reach individual monthly totals of up to $40 million…"  WCE's projections recently provided to Pilot Power through its attorneys, demonstrate that WCE cannot reorganize and operate.  The CAISO charges alone that WCE projects, exceed the projected revenue by many millions of dollars.  Yet, WCE has substantial additional monthly expenses, that have to be kept current on a post-petition basis, such as, payments under the commodity contracts (energy, resource

adequacy, renewable energy), payments to lenders, and payments to service providers (including Pilot Power). Without massive amounts of post-petition financing, WCE cannot survive and will only succeed in driving Pilot Power into bankruptcy as Pilot Power is compelled to make the CAISO payments that WCE cannot make. If Pilot Power fails to make payments for the Imbalance Energy that is being delivered to WCE's customers (along with the other CAISO charges), Pilot Power will not be permitted by the CAISO to continue operating as an SC either for WCE, or for all the non-WCE load that it serves.

42.     This Court should compel WCE to reject the Agreement between WCE and Pilot Power pursuant to Bankruptcy Code Section 365(c)(2) because the Agreement is essentially a contract to make a loan, extend debt financing or financial accommodations to or for the benefit of the debtor. Since the inception of the Agreement, Pilot Power's fees for all the services it has been providing to WCE aggregate to $655,317.61. Of these fees, the sum of $154,643.42 remains outstanding and unpaid. By contrast, under the Agreement Pilot Power has been providing financial accommodations to WCE through free services, Deferred Financing, various Deposits, and serving as the designated Scheduling Coordinator. With respect to the CAISO, Pilot Power has deposited $500,000.00 with the CAISO to permit Pilot Power to participate in the Congestion Revenue Rights ("CRR") market at the CAISO on behalf WCE, and has posted irrevocable letters of credit with the CAISO in excess of $2,500,000.00 to secure payment of the EAL associated with WCE load.

43.     Because WCE has lost all of its hedges due to its payment defaults, the CAISO will start increasing the EAL as WCE will have nothing in the way of hedged energy to schedule into the CAISO market, and CAISO will have to estimate the cost of Imbalance Energy for the WCE load in its EAL calculations. WCE's own recent projections show that CAISO Imbalance Energy costs are expected to be many millions of dollars.

44.     Pilot Power should not be compelled to involuntarily finance WCE's post-petition operations by providing all the credit, capital and collateral to support the CAISO operations relating to the WCE load. Pilot Power should not be compelled to pay CAISO invoices for the benefit of WCE.

45.    Pilot Power respectfully requests the Court to order that the Agreement be rejected or deemed rejected pursuant to Bankruptcy Code Section 365(c)(2).  Pilot Power also should be granted relief from the automatic stay to: 1) terminate the Agreement, 2) take any and all actions necessary to cease providing SC services on behalf of WCE; and 3) take any and all actions necessary to recover any deposits, credit, capital or collateral it has posted with third parties to enable WCE operations.

46.    Granting Pilot Power the requested relief will not leave WCE customers without power.  At all times, as long as there is power in the grid system, everyone receives power.  This is also true for WCE customers.  In fact, WCE customers may not even be aware of any change until they receive a bill from a new provider.  Upon the withdrawal of Pilot Power as the SC, if WCE can provide the required credit and collateral, another SC can step in to provide the SC services.  If, WCE cannot provide the necessary credit and collateral to obtain another SC, WCE's customers will be returned to service with Southern California Edison Company ("SCE").  This transition will be seamless to the customers.

47.    Rule 23 of the SCE Tariff sets forth certain rules relating to CCAs operating in SCE territory.  Rule 23(T)(3) provides:

> "Change of Service Election In Exigent Circumstances.  Where continued CCA service would constitute an emergency or may substantially compromise SCE operations or service to bundled customers, SCE should seek an emergency order from the Commission. In the event a CCA or a customer has failed to meet its obligations under this Rule or CCA Service Agreement such that SCE seeks to invoke its remedies under this Section, and the failure constitutes an emergency (i.e. the failure poses a substantial threat to the reliability of the electric system or to public health and safety or the failure poses a substantial threat of irreparable economic or other harm to SCE or the customer), or the failure relates to CCA's unauthorized energy use, then SCE may initiate a change, or, in some cases, terminate a customer's CCA Service, or a CCA's ability to provide services under CCA. In such case, SCE shall seek an emergency order from the Commission. Pursuant to D.05-12-041, the assigned Administrative Law Judge

1    (ALJ), in consultation with the assigned Commissioner, is authorized to issue a ruling

2    providing interim authority for SCE to terminate a CCA's service. Upon receipt of such

3    a ruling, SCE shall initiate the change or termination by preparing a CCASR, but the

4    change or termination may be made immediately notwithstanding the applicable

5    CCASR processing times set forth in this Rule. SCE shall provide such notice to the

6    CCA and/or the affected customer as is reasonable under the circumstances of this

7    section, if any is reasonable. The CCA or the affected customer shall have the right to

8    seek an order from the Commission restoring the customer's service election and/or the

9    CCA's ability to provide services. If a customer's CCA Service is terminated because

10   the customer failed to meet its obligations under this Rule, the customer will be subject

11   to the provisions of Section L and the terms and conditions of Bundled Portfolio

12   Service. Unless expressly ordered by the Commission, these provisions do not

13   disconnect electric service provided to the customer. If the CCA's ability to provide

14   CCA Service is terminated under this Section T, such termination will result in an

15   Involuntary Return of the CCA's customers to Bundled Service, irrespective of whether

16   the CCA is a JPA, a constituent member of a JPA, or an individual CCA."

17   48.    Rule 23(T)(5) provides:

18   "Following consultation with the CCA, SCE is authorized to serve CCA customers

19   temporarily where the CAISO or the CCA has notified SCE that customers would

20   otherwise not be served. In such cases, the CCA's Service Agreement is not

21   terminated; however SCE shall immediately initiate the process to return affected

22   CCA customers to Bundled Service without prior Commission approval. SCE shall

23   initiate the service change by preparing a CCASR, but the service change may be

24   made immediately notwithstanding the applicable CCASR processing times set forth

25   in this Rule. Affected customers will be provided service temporarily under

26   Schedule PC-TBS. CCA customers receiving temporary service in this situation may

27   not seek service from other ESPs or CCAs. SCE may seek authority from the

28   Commission to terminate CCA Service pursuant to Section T.4 of this Rule at

anytime after being notified that the CCA's customers are not being served." <u>See</u> Exhibit F attached hereto.

49.      The emergency transition of WCE customers to SCE pursuant to Rule 23(T) is exactly what needs to happen at this time.  First, this would give WCE the breathing room and pause it so desperately needs.   Second, it would stop WCE from going further into debt. Third, it would prevent Pilot Power from being dragged down into bankruptcy with WCE.  Fourth, it would likely prevent WCE from becoming administratively insolvent as a result of skyrocketing CAISO charges.

50.      On May 21, 2021, Pilot Power served a Notice on WCE requesting that the parties meet and confer regarding WCE defaults under the Agreement.  A true and correct copy of the Meet and Confer Notice is attached hereto as Exhibit G.  On May 24, 2021, Pilot Power served a Notice of Default on WCE for defaults under the Agreement.  A true and correct copy of the Notice of Default is attached hereto as Exhibit H.  On June 2, 2021, Pilot Power served a request on Debtor for Post-Petition Performance of its obligations under the Agreement.  A true and correct copy of the Request for Post-Petition Performance is attached hereto as Exhibit I.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 10th day of June, 2021, at San Diego, California.

_____
DENIS VERMETTE

MAINDOCS-#251907-v2-WCE_Vermette_Dec_Mtn_Reject

# EXHIBIT A

### PROFESSIONAL SERVICES AGREEMENT BY AND BETWEEN WESTERN COMMUNITY ENERGY AND PILOT POWER GROUP, INC

1. **PARTIES AND DATE.**

This Professional Services Agreement ("**Agreement**") is made and entered into on August 15, 2019 ("**Effective Date**"), by and between WESTERN COMMUNITY ENERGY, a joint powers authority ("**WCE**") and PILOT POWER GROUP, INC., a California corporation ("**Consultant**"). WCE and Consultant are sometimes individually referred to as a "**Party**" and collectively as "**Parties**."

2. **RECITALS.**

   2.1 **Consultant.**

Consultant desires to perform and assumes responsibility for the provision of certain professional services required by WCE as part of its community choice aggregation program on the terms and conditions set forth in this Agreement. Consultant represents that it is experienced in providing power portfolio and scheduling coordinator services and is familiar with the plans of WCE.

In addition, Consultant is willing to defer the first two months of its service fees and energy supply costs ("**Deferred Financing**"), and to provide certain Deposits upfront (also part of the Deferred Financing) together with certain Credit Support to WCE, as defined in the Schedule of Services attached hereto as Schedule 1, and incorporated herein by this reference. WCE will compensate Consultant for said services as set forth herein.

   2.2 **Project.**

WCE desires to engage Consultant to render such professional services for WCE's community choice aggregation program ("**Project**"), as set forth in this Agreement.

3. **TERMS.**

   3.1 **Scope of Services and Term.**

      3.1.1 <u>General Scope of Services.</u> Consultant promises and agrees to furnish to WCE all labor, materials, tools, equipment, services, and incidental and customary work necessary to fully and adequately supply the portfolio manager and scheduling coordinator services necessary for the Project ("**Services**"), which Services are more particularly described in Schedule 1, and which are stated in the proposal to WCE (RFP No. 19-001). All Services shall be subject to, and performed in accordance with this Agreement, the schedules and/or exhibits attached hereto, and all applicable local, state and federal laws, rules and regulations.

      3.1.2 <u>Term.</u> This Agreement shall be effective on the Effective Date. Unless earlier terminated as provided herein, this Agreement shall remain in effect through December 31, 2025 ("**Initial Term**"). At the end of the Initial Term, the Agreement shall renew on an annual basis for successive one (1) year terms (each, a "**Renewal Term**"), unless a Party provides six (6) months

31249.00001\32268853.1

prior written notice of its intent not to extend the term of the Agreement. Consultant shall provide the Services within the term of this Agreement, and shall meet any other established schedules and deadlines.

### 3.2    Responsibilities of Consultant.

3.2.1 <u>Control and Payment of Subordinates: Independent Contractor.</u> The Services shall be performed by Consultant or under its supervision. Consultant will determine the means, methods and details of performing the Services subject to the requirements of this Agreement. WCE retains Consultant on an independent contractor basis and not as an employee. Consultant retains the right to perform similar or different services for others during the term of this Agreement. Any additional personnel performing the Services under this Agreement on behalf of Consultant shall also not be employees of WCE and shall at all times be under Consultant's exclusive direction and control. Consultant shall pay all wages, salaries, and other amounts due such personnel in connection with their performance of Services under this Agreement and as required by law. Consultant shall be responsible for all reports and obligations respecting such additional personnel, including, but not limited to: social security taxes, income tax withholding, unemployment insurance, disability insurance, and workers' compensation insurance.

3.2.2 <u>Schedule of Services.</u> Consultant shall perform the Services expeditiously, within the term of this Agreement, and in accordance with the terms of Schedule 1 hereto. Consultant represents that it has the professional and technical personnel required to perform the Services in conformance with such conditions. In order to facilitate Consultant's timely performance under this Agreement, WCE shall respond to Consultant's submittals in a timely manner.

3.2.3 <u>Conformance to Applicable Requirements.</u> All work prepared by Consultant shall be subject to the approval of WCE.

### 3.3    CONDITIONS TO CONSULTANT'S PERFORMANCE.

3.3.1 <u>Information and Assistance.</u> Upon Consultant's reasonable request, WCE shall provide such information and assistance as is reasonably required for Consultant to provide the Services. If WCE fails to provide Consultant with such requested information or assistance, then Consultant shall continue to provide in a timely manner any such portion(s) of the affected Services that Consultant can reasonably provide to the extent possible in the absence of such information or assistance.

3.3.2 <u>Notification.</u> WCE shall notify all other relevant parties, including, but not limited to, its data manager ("**Data Manager**"), the Utility Distribution Company ("**UDC**"), which is currently Southern California Edison, the California Independent System Operator ("**CAISO**") and WCE's lender(s), as necessary, of the existence of this Agreement and Consultant's role as contemplated in this Agreement.

3.3.3 <u>WCE's Representative.</u> Consultant acknowledges that WCE's operations are managed under contract by the Western Riverside Council of Governments **("WRCOG").** WCE hereby designates the Executive Director, or designee, of WCE to act as its representative for the

31249.00001\32268853.1

performance of this Agreement ("**WCE's Representative**"). WCE's Representative shall have the power to act on behalf of WCE for all purposes under this Agreement. Consultant shall not accept direction or orders from any person other than WCE's Representative, or designee.

3.3.4 <u>Consultant's Representative.</u> Consultant hereby designates Denis Vermette, or designee, to act as its representative for the performance of this Agreement ("**Consultant's Representative**"). Consultant's Representative shall have full authority to represent and act on behalf of the Consultant for all purposes under this Agreement. The Consultant's Representative shall supervise and direct the Services, using his or her best skill and attention, and shall be responsible for all means, methods, techniques, sequences and procedures and for the satisfactory coordination of all portions of the Services under this Agreement.

3.3.5 <u>Coordination of Services.</u> Consultant agrees to work closely with WCE staff in the performance of Services and shall be available to WCE's staff, consultants and other staff at all reasonable times.

3.3.6 <u>Standard of Care; Performance of Employees.</u> Consultant shall perform all Services under this Agreement in a skillful and competent manner, consistent with the standards generally recognized as being employed by professionals in the same discipline in the State of California. Consultant represents and maintains that it is skilled in the professional calling necessary to perform the Services. Consultant warrants that all employees and subcontractors shall have sufficient skill and experience to perform the Services assigned to them. Finally, Consultant represents that it, its employees and subcontractors have all licenses, permits, qualifications and approvals of whatever nature that are legally required to perform the Services, and that such licenses and approvals shall be maintained throughout the term of this Agreement. As provided for in the indemnification provisions of this Agreement, Consultant shall perform, at its own cost and expense and without reimbursement from WCE, any services necessary to correct errors or omissions which are caused by the Consultant's failure to comply with the standard of care provided for herein. Any employee of the Consultant or its sub-consultants who is determined by WCE to be uncooperative, incompetent, a threat to the adequate or timely completion of the Project, a threat to the safety of persons or property, or any employee who fails or refuses to perform the Services in a manner acceptable to WCE, shall be promptly removed from the Project by the Consultant and shall not be re-employed to perform any of the Services or to work on the Project.

3.3.7 <u>Laws and Regulations.</u> Consultant shall keep itself fully informed of and in compliance with all local, state and federal laws, rules and regulations in any manner affecting the performance of the Project or the Services, and shall give all notices required by law. Consultant shall be liable for all violations of such laws and regulations in connection with Services. If the Consultant performs any work knowing it to be contrary to such laws, rules and regulations and without giving written notice to WCE, Consultant shall be solely responsible for all costs arising therefrom. Consultant shall defend, indemnify and hold WCE, its officials, directors, officers, employees and agents free and harmless, pursuant to the indemnification provisions of this Agreement, from any claim or liability arising out of any failure or alleged failure to comply with such laws, rules or regulations.

/ / / / /

<div align="center">Professional Services Agreement – Page 3</div>

3.3.8 <u>Insurance</u>.

              3.3.8.1        <u>Time for Compliance</u>. Consultant shall not commence the Services under this Agreement until it has provided evidence satisfactory to WCE that it has secured all insurance required under this section, in a form and with insurance companies acceptable to WCE.

              3.3.8.2        <u>Minimum Requirements</u>. Consultant shall, at its expense, procure and maintain for the duration of the Agreement insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the Agreement by the Consultant, its agents, representatives, employees or subcontractors. Consultant shall also require all of its subcontractors to procure and maintain the same insurance for the duration of the Agreement. WRCOG shall be named as an additional insured. Such insurance shall meet at least the following minimum levels of coverage:

              (A)        <u>Minimum Scope of Insurance</u>. Coverage shall be at least as broad as the latest version of the following: (1) *General Liability*: Insurance Services Office Commercial General Liability coverage (occurrence form CG 0001 or exact equivalent); (2) *Automobile Liability*: Insurance Services Office Business Auto Coverage (form CA 0001, code 1 (any auto) or exact equivalent); and (3) *Workers' Compensation and Employer's Liability*: Workers' Compensation insurance as required by the State of California and Employer's Liability Insurance.

              (B)        <u>Minimum Limits of Insurance</u>. Consultant shall maintain limits no less than: (1) *General Liability:* $2,000,000 per occurrence for bodily injury, personal injury and property damage. If Commercial General Liability Insurance or other form with general aggregate limit is used, either the general aggregate limit shall apply separately to this Agreement/location or the general aggregate limit shall be twice the required occurrence limit; (2) *Automobile Liability:* $1,000,000 per accident for bodily injury and property damage; and (3) *Workers' Compensation and Employer's Liability:* Workers' Compensation limits as required by the Labor Code of the State of California. Employer's Liability limits of $1,000,000 per accident for bodily injury or disease.

              3.3.8.3        <u>Professional Liability</u>. Consultant shall procure and maintain, and require its sub-consultants to procure and maintain, for a period of five (5) years following completion of the Services, errors and omissions liability insurance appropriate to their profession. Such insurance shall be in an amount not less than $1,000,000 per claim. This insurance shall be endorsed to include contractual liability applicable to this Agreement and shall be written on a policy form coverage specifically designed to protect against acts, errors or omissions of the Consultant. "Covered Professional Services" as designated in the policy must specifically include work performed under this Agreement. The policy must "pay on behalf of" the insured and must include a provision establishing the insurer's duty to defend.

              3.3.8.4        <u>Insurance Endorsements</u>. The insurance policies shall contain the following provisions, or Consultant shall provide endorsements on forms supplied or approved by WCE to add the following provisions to the insurance policies:

31249.00001\32268853.1

(A)    General Liability.

(i)    Commercial General Liability Insurance must include coverage for (1) Bodily Injury and Property Damage; (2) Personal Injury/Advertising Injury; (3) Premises/Operations Liability; (4) Products/Completed Operations Liability; (5) Aggregate Limits that Apply per Project; (6) Explosion, Collapse and Underground (UCX) exclusion deleted; (7) Contractual Liability with respect to this Agreement; (8) Broad Form Property Damage; and (9) Independent Consultants Coverage.

(ii)    The policy shall contain no endorsements or provisions limiting coverage for (1) contractual liability; (2) cross liability exclusion for claims or suits by one insured against another; or (3) contain any other exclusion contrary to the Agreement.

(iii)    The policy shall give WCE, its directors, officials, officers, employees, and agents insured status using ISO endorsement forms 20 10 10 01 and 20 37 10 01, or endorsements providing the exact same coverage.

(iv)    The additional insured coverage under the policy shall be "primary and non-contributory" and will not seek contribution from WCE's insurance or self-insurance and shall be at least as broad as CG 20 01 04 13, or endorsements providing the exact same coverage.

(B)    Automobile Liability.

(i)    The automobile liability policy shall be endorsed to state that:  (1) WCE, its directors, officials, officers, employees, agents and volunteers shall be covered as additional insureds with respect to the ownership, operation, maintenance, use, loading or unloading of any auto owned, leased, hired or borrowed by the Consultant or for which the Consultant is responsible; and (2) the insurance coverage shall be primary insurance as respects WCE, its directors, officials, officers, employees, agents and volunteers, or if excess, shall stand in an unbroken chain of coverage excess of the Consultant's scheduled underlying coverage. Any insurance or self-insurance maintained by WCE, its directors, officials, officers, employees, agents and volunteers shall be excess of the Consultant's insurance and shall not be called upon to contribute with it in any way.

(C)    Workers' Compensation and Employers Liability Coverage.

(i)    Consultant certifies that he/she is aware of the provisions of Section 3700 of the California Labor Code which requires every employer to be insured against liability for workers' compensation or to undertake self-insurance in accordance with the provisions of that code, and he/she will comply with such provisions before commencing work under this Agreement.

(ii)    The insurer shall agree to waive all rights of subrogation against WCE, its directors, officials, officers, employees, agents and volunteers for losses paid under the terms of the insurance policy which arise from work performed by the Consultant.

Professional Services Agreement – Page 5

(D)    <u>All Coverages</u>.

(i)    Defense costs shall be payable in addition to the limits set forth hereunder.

(ii)    Requirements of specific coverage or limits contained in this section are not intended as a limitation on coverage, limits, or other requirement, or a waiver of any coverage normally provided by any insurance. It shall be a requirement under this Agreement that any available insurance proceeds broader than or in excess of the specified minimum insurance coverage requirements and/or limits set forth herein shall be available to WCE, its directors, officials, officers, employees and agents as additional insureds under said policies. Furthermore, the requirements for coverage and limits shall be (1) the minimum coverage and limits specified in this Agreement; or (2) the broader coverage and maximum limits of coverage of any Insurance policy or proceeds available to the named insured; whichever is greater.

(iii)    The limits of insurance required in this Agreement may be satisfied by a combination of primary and umbrella or excess insurance. Any umbrella or excess insurance shall contain or be endorsed to contain a provision that such coverage shall also apply on a primary and non-contributory basis for the benefit of WCE (if agreed to in a written contract or agreement) before WCE's own insurance or self-insurance shall be called upon to protect it as a named insured. The umbrella/excess policy shall be provided on a "following form" basis with coverage at least as broad as provided on the underlying policy(ies).

(iv)    Consultant shall provide WCE at least thirty (30) days prior written notice of cancellation of any policy required by this Agreement, except that the Consultant shall provide at least ten (10) days prior written notice of cancellation of any such policy due to non-payment of premium. If any of the required coverage is cancelled or expires during the term of this Agreement, the Consultant shall deliver renewal certificate(s) including the General Liability Additional Insured Endorsement to WCE at least ten (10) days prior to the effective date of cancellation or expiration.

(v)    The retroactive date (if any) of each policy is to be no later than the effective date of this Agreement. Consultant shall maintain such coverage continuously for a period of at least three years after the completion of the work under this Agreement. Consultant shall purchase a one (1) year extended reporting period A) if the retroactive date is advanced past the effective date of this Agreement; B) if the policy is cancelled or not renewed; or C) if the policy is replaced by another claims-made policy with a retroactive date subsequent to the effective date of this Agreement.

(vi)    The foregoing requirements as to the types and limits of insurance coverage to be maintained by Consultant, and any approval of said insurance by WCE, is not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by the Consultant pursuant to this Agreement, including but not limited to, the provisions concerning indemnification.

(vii)    If at any time during the life of the Agreement, any policy of insurance required under this Agreement does not comply with these specifications or is

31249.00001\32268853.1

canceled and not replaced, WCE has the right but not the duty to obtain the insurance it deems necessary and any premium paid by WCE will be promptly reimbursed by Consultant or WCE will withhold amounts sufficient to pay premium from Consultant payments. In the alternative, WCE may cancel this Agreement. WCE may require the Consultant to provide complete copies of all insurance policies in effect for the duration of the Project.

(viii) Neither WCE nor any of its directors, officials, officers, employees or agents shall be personally responsible for any liability arising under or by virtue of this Agreement.

3.3.8.5    Separation of Insureds; No Special Limitations.   All insurance required by this Section shall contain standard separation of insureds provisions.  In addition, such insurance shall not contain any special limitations on the scope of protection afforded to WCE, its directors, officials, officers, employees, agents and volunteers.

3.3.8.6    Deductibles and Self-Insurance Retentions.  Any deductibles or self-insured retentions must be declared to and approved by WCE. Consultant shall guarantee that, at the option of WCE, either:  (1) the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects WCE, its directors, officials, officers, employees, agents and volunteers; or (2) the Consultant shall procure a bond guaranteeing payment of losses and related investigation costs, claims and administrative and defense expenses.

3.3.8.7    Acceptability of Insurers.  Insurance is to be placed with insurers with a current A.M. Best's rating no less than A:VII, licensed to do business in California, and satisfactory to WCE.

3.3.8.8    Verification of Coverage.  Consultant shall furnish WCE with original certificates of insurance and endorsements effecting coverage required by this Agreement on forms satisfactory to WCE. The certificates and endorsements for each insurance policy shall be signed by a person authorized by that insurer to bind coverage on its behalf, and shall be on forms provided by WCE if requested. All certificates and endorsements must be received and approved by WCE before work commences. WCE reserves the right to require complete, certified copies of all required insurance policies, at any time.

3.3.8.9    Subconsultant Insurance Requirements.  Consultant shall not allow any subcontractors or subconsultants to commence work on any subcontract until they have provided evidence satisfactory to WCE that they have secured all insurance required under this section.  Policies of commercial general liability insurance provided by such subcontractors or subconsultants shall be endorsed to name WCE as an additional insured using ISO form CG 20 38 04 13 or an endorsement providing the exact same coverage. If requested by Consultant, WCE may approve different scopes or minimum limits of insurance for particular subcontractors or subconsultants.

3.3.9  Safety.  Consultant shall execute and maintain its work so as to avoid injury or damage to any person or property.  In carrying out its Services, the Consultant shall at all times be in compliance with all applicable local, state and federal laws, rules and regulations, and shall exercise all necessary precautions for the safety of employees appropriate to the nature of the work and the conditions under which the work is to be performed.  Safety precautions as

Professional Services Agreement – Page 7

applicable shall include, but shall not be limited to: (A) adequate life protection and life saving equipment and procedures; (B) instructions in accident prevention for all employees and subcontractors, such as safe walkways, scaffolds, fall protection ladders, bridges, gang planks, confined space procedures, trenching and shoring, equipment and other safety devices, equipment and wearing apparel as are necessary or lawfully required to prevent accidents or injuries; and (C) adequate facilities for the proper inspection and maintenance of all safety measures.

**3.4    Fees and Payments.**

3.4.1    Compensation.    Consultant    shall    receive    compensation,    including authorized reimbursements, for all Services rendered under this Agreement at the rates set forth in Section 8 of Schedule 1. Extra Work may be authorized, as described in Section 3.4.4 below; and if authorized, said Extra Work will be compensated at the rates and manner set forth in this Agreement.

3.4.2    Payment of Compensation. Consultant shall submit to WCE a monthly itemized invoice which shall include all fees related to Services during the previous month. WCE shall, within 30 days of receiving such invoice, review the invoice and pay all approved charges thereon.

3.4.3    Reimbursement for Expenses. Consultant shall not be reimbursed for any expenses unless authorized in writing by WCE. For all authorized expenses, Consultant shall submit to WCE a monthly itemized invoice which shall include all expenses paid by Consultant on behalf of WCE during the previous month. WCE shall, within 30 days of receiving such invoice, review the invoice and pay all approved charges thereon.

3.4.4    Extra Work. At any time during the term of this Agreement, WCE may request that Consultant perform Extra Work. As used herein, "Extra Work" means any work which is determined by WCE to be necessary for the proper completion of the Project, but which the Parties did not reasonably anticipate would be necessary at the execution of this Agreement. Consultant shall not perform, or be compensated for, Extra Work without written authorization from WCE's Representative.

3.4.5    Prevailing Wages. Unless otherwise agreed to in writing, Consultant agrees to not undertake any work which requires the payment of prevailing wage rates under California Labor Code §§ 1720 *et seq.,* 1170 *et seq.,* and 8 Cal. Code of Regulations § 16000 *et seq.*

**3.5    Accounting Records.**

3.5.1    Maintenance and Inspection. Consultant shall maintain complete and accurate records with respect to all costs and expenses incurred under this Agreement. All such records shall be clearly identifiable. No more than once per year, Consultant shall allow a representative of WCE, at WCE's sole cost and expense, during normal business hours to examine, audit, and make transcripts or copies of such records and any other documents created pursuant to this Agreement. Consultant shall allow inspection of all work, data, documents, proceedings, and activities related to the Agreement for a period of three (3) years from the date of final payment under this Agreement. Any audit or inspection shall, at Consultant's exclusive option, take place off of Consultant's premises.

31249.00001\32268853.1

**3.6     General Provisions.**

3.6.1 <u>Termination and Expiration of Agreement: Meet and Confer.</u>

3.6.1.1 <u>Termination for Convenience.</u> WCE may, by providing six (6) months written notice to Consultant, terminate the whole or any part of this Agreement at any time and without cause by giving written notice to Consultant of such termination, and specifying the effective date thereof. Upon termination, Consultant shall be compensated in accordance with this Section 3.6.1.  Consultant may not terminate this Agreement except for cause.

3.6.1.2 <u>Termination for Cause</u>. If any one of the following events (each an "Event of Default") occurs with respect to a Party, then the other Party may terminate this Agreement (inclusive of Schedules, Exhibits and Addenda) upon written notice to the defaulting Party: (i) with respect to WCE, WCE fails to pay amounts due hereunder, and such failure continues for seven (7) business days following written notice from Consultant; (ii) either Party defaults in the observance or performance of any of its material covenants or agreements in this Agreement and such default continues uncured for twenty (20) business days following written notice to the defaulting Party; (iii) either Party makes an assignment for the benefit of creditors (other than a collateral assignment to an entity providing financing to such Party), files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause under any bankruptcy or similar law for the protection of creditors or has such a petition filed against it or otherwise becomes bankrupt or insolvent (however evidenced), or is unable to pay its debts as they become due; or (iv) with respect to WCE, WCE fails to satisfy UDC's credit-worthiness requirements set forth in the UDC tariffs and such failure continues uncured for twenty (20) business days following written notice to WCE from UDC.

3.6.1.3     <u>Effect of Termination.</u> Upon the date of expiration or termination of this Agreement (whether terminated for convenience or for cause, or whether expiring at the end of a term): **(i)** Consultant shall cease providing Services and Extra Work hereunder except as required or authorized in Section 3.6.1.4 below; **(ii)** Consultant shall issue an invoice (the "**Termination Invoice**") to WCE for a) all outstanding fees for Services rendered by Consultant through and including the date of expiration or termination, b) all authorized expenses outstanding and unpaid as of the date of expiration or termination, c) monies paid by Consultant on behalf of WCE, if any, as described in Section 7.a of Schedule 1 hereto, d) unpaid or unreimbursed Deferred Financing (defined in Section 7.b of Schedule 1 hereto) and Deposits (defined in Section 7.c of Schedule 1 hereto), if any, e) unpaid or unreimbursed Credit Support (defined in Section 7.d of Schedule 1 hereto), if any, f) unreimbursed CAISO charges, if any, g) unpaid or unreimbursed Revenue Shortfall Payments (defined in Section 7.e of Schedule 1 hereto), if any, h) the Termination Fee, if applicable, described in Section 3.6.1.3(A) below), and i) the net cost, if any, of the liquidation of outstanding agreements and contracts, including but not limited to energy procurement contracts (including, energy, RA, and RPS) entered into by Consultant on behalf of, and authorized by WCE (collectively the forgoing fees and costs described in this Section 3.6.1.3(ii) shall be referred to as the "**Termination Payment**"); and **(iii)** WCE shall pay the Termination Payment within sixty( 60) days of the date of expiration or termination of the Agreement.

(A)     If the date of expiration or termination of this Agreement occurs prior to the Power Start Date, WCE shall additionally pay Consultant a "Termination Fee

equal to the sum of $100,000. For purposes of this Agreement, the "**Power Start Date**" is the day on which WCE begins to supply power to one or more of its CCA customers, which date is projected to be no sooner than July 1, 2020, and no later than the fourth quarter of 2020.

       3.6.1.4     Transition of Services Upon Termination or Expiration. Upon such expiration or termination, and upon request of WCE, Consultant shall reasonably cooperate with WCE to ensure a prompt and efficient transfer of all data, documents and other materials to WCE or a new services provider, in an industry standard format or formats, and in a manner such as to attempt to minimize the impact of expiration or termination on WCE's customers. Consultant shall develop with reasonable assistance from WCE a written transition plan specifying in detail all activities, and the timing of such activities, necessary to facilitate an orderly and effective transition of Services. Consultant shall provide to WCE data and documentation, and other Consultant non-proprietary information reasonably requested by WCE in connection with the transition that is reasonably sufficient to enable a new services provider to fully assume the provision of the transitioning services. Consultant shall provide transition assistance in such a manner as to attempt to reasonably: (a) ensure the uninterrupted performance of the services, (b) with no degradation in quality, and (c) to avoid disruption in the operation. If WCE is the defaulting Party, WCE agrees to pay Consultant reasonable compensation for additional services performed in connection with such transfer, to the extent not otherwise provided for or contemplated in the Agreement, and not otherwise included in the Termination Payment. Consultant shall (1) return all documents and other materials received from WCE and all copies (if any) of such documents and tangible materials, and (ii) destroy all other documents or materials in Consultant's possession that contain WCE customer data; provided, however, that Consultant may retain copies of information necessary for Consultant's tax, billing or other financial purposes, to be used solely for such purposes.

       (A)     Under no circumstances shall Consultant cease providing Services to WCE under this Agreement until clear and unequivocal arrangements for (i) WCE to assume provision of the Services under this Agreement, (ii) a third party provided to assume provision of the Services under this Agreement, or (iii) a return to Utility electric procurement, is established.

       (B)     If WCE lacks sufficient funds to pay Consultant the Termination Payment, and Consultant is not the defaulting party, Consultant shall continue providing Services under this Agreement until sufficient revenue is collected to pay Consultant its full Termination Payment, plus any additional fees and expenses incurred from the date of expiration or termination of the Agreement, and that date of full payment of all sums due to Consultant.

       3.6.1.5     Additional Services. In the event this Agreement is terminated in whole or in part as provided herein, WCE may procure, upon such terms and in such manner as it may determine appropriate, services similar to those terminated.

       3.6.1.6     Power Start Delay. If at any time WCE elects to delay the Power Start Date by more than six (6) months, or such a length of time as mutually agreed upon by the Parties, WCE shall pay Consultant all outstanding principal balances of the costs and expenses described in Section 7 of Schedule 1 (including, without limitation, Deferred Financing,

31249.00001\32268853.1

Deposits, and Credit Support) paid by Consultant on behalf of WCE. The moneys herein stated shall be due and payable thirty (30) days after the date of invoice by Consultant to WCE. If the aggregate amount due is greater than $150,000, then WCE will commence making payments of any moneys advanced, plus accrued interest at an APR equal to the published Wall Street Journal current prime rate plus 2.0%, in six (6) equal monthly installments on that date, or the number of installments mutually agreed upon by the Parties. This paragraph shall not apply to delays to the Power Start Date of six (6) months or less.

Consultant may, at its sole discretion, upon complete repayment by WCE of all moneys due as outlined herein, reinstate the availability of the Deferred Financing, Deposits and Credit Support to WCE to use as provided for in this Agreement once the Power Start Date delay expires.

In the event of a delay, the Parties agree to extend the Initial Term of this Agreement automatically by the same length of time as the delay to the Power Start Date.

3.6.2    Dispute Resolution. The Parties shall meet and confer together in good faith regarding any dispute, controversy or claim (each, a **"Dispute"**) arising out of or relating to this Agreement, or any breach or alleged breach hereof, prior to either Party declaring a breach of the Agreement. A meet and confer shall occur within ten (10) business days of any Dispute whereby the Parties agree to cooperate in good faith to resolve the Dispute, and may use a mutually agreeable third party to resolve such Dispute. In no event shall either Party be delayed or impeded from exercising any of its rights at law or equity, including, without limitation, petitioning a court for provisional relief, including injunctive relief, prior to invoking the meet and confer resolution process.

3.6.3    Delivery of Notices. All notices permitted or required under this Agreement shall be given to the respective Parties at the following address, or at such other address as the respective parties may provide in writing for this purpose:

>   **Consultant:**  Pilot Power Group, Inc.
>   Attn: Legal Dept.
>   8910 University Center Lane, Suite 520
>   San Diego, CA 92122
>   (858) 678-0118 phone
>   (858) 678-0353 fax

>   **WCE:**  Western Community Energy
>   3390 University Ave., Suite 450
>   Riverside, CA 92501
>   Attn: Executive Director
>   (951) 405-6700 phone
>   (951) 223-9720 fax
>   rbishop@wrcog.us

Professional Services Agreement – Page 11

31249.00001\32268853.1

Such notice shall be deemed made when personally delivered or delivered by nationally recognized courier that renders a receipt for delivery.

### 3.6.4. Ownership of Intellectual Property; and Confidentiality.

3.6.4.1.      Intellectual Property. WCE owns all right, title and interest in and to all WCE Materials. Upon the expiration of this Agreement, or in the event of termination, WCE Materials and all WCE customer data, in whatever form and in any state of completion, shall remain the property of WCE and shall be promptly returned to WCE. Upon termination, Consultant may make and retain a copy of such contract materials if permitted by law. WCE Materials shall mean any and all data created by Consultant specifically for WCE in the performance of the Services and Extra Work pursuant to this Agreement ("**WCE Materials**").

For the avoidance of doubt, Consultant's intellectual property, including, but not limited to, Consultant's trademarks, service marks, trade names and other designations, web site(s), web design(s), internal systems, computer systems, programs, software (including software code), ideas, know-how, work product, copyrights, patents, trade secrets and other proprietary and/or intellectual property shall remain the exclusive property of Consultant.

3.6.4.2      Confidentiality. All memoranda, specifications, plans, procedures, drawings, descriptions, computer program data, input record data, written information, and other documents and data either created by or provided to Consultant specifically in connection with the performance of this Agreement shall be held confidential by Consultant. Such materials shall not, without the prior written consent of WCE, be used by Consultant for any purposes other than the performance of the Services. Nor shall such materials be disclosed to any person or entity not connected with the performance of the Services or the Project. Nothing furnished to Consultant which is otherwise known to Consultant or is generally known, or has become known, to the related industry shall be deemed confidential. Consultant shall not use WCE's name or insignia, photographs of the Project, or any publicity pertaining to the Services or the Project in any magazine, trade paper, newspaper, television or radio production or other similar medium without the prior written consent of WCE.

3.6.5 Cooperation; Further Acts. The Parties shall fully cooperate with one another, and shall take any additional acts or sign any additional documents as may be necessary, appropriate or convenient to attain the purposes of this Agreement.

3.6.6 Attorney's Fees. If either Party commences an action against the other Party, either legal, administrative or otherwise, arising out of or in connection with this Agreement, the prevailing party in such litigation shall be entitled to have and recover from the losing party reasonable attorney's fees and all other costs of such action.

3.6.7 Indemnification. Consultant (including its officials, officers, employees, agents, sub-consultants and contractors, collectively the "Indemnifying Party") shall, to the extent of its own willful, reckless or negligent misconduct, defend, indemnify and hold WCE, its officials, officers, consultants, employees, and volunteers ("**Indemnified Party**") free and harmless from any and all claims, demands, causes of action, costs, expenses, liability, loss, damage or injury, in law or equity, to property or persons, including wrongful death, in any manner arising out of or incident, arising out of or in connection with the performance of the Services, the Project or this Agreement, including

reasonable attorney's fees and other related costs and expenses. Consultant's obligation to indemnify shall not be restricted to insurance proceeds, if any, received by WCE, its directors, officials, officers, consultants, employees, agents or volunteers. Consultant's indemnification obligations herein are conditioned upon the Indemnified Party: (i) promptly notifying the Consultant of any claim in writing; and (ii) cooperating with Consultant in the defense of the claim.

3.6.8 Entire Agreement. This Agreement contains the entire Agreement of the Parties with respect to the subject matter hereof, and supersedes all prior negotiations, understandings or agreements. This Agreement may only be modified by a writing signed by both Parties.

3.6.9 Governing Law. This Agreement shall be governed by the laws of the State of California. Venue shall be governed by a court of competent jurisdiction in Riverside County.

3.6.10 Time of Essence. Time is of the essence for each and every provision of this Agreement.

3.6.11 WCE's Right to Employ Other Consultants. WCE reserves right to employ other consultants in connection with this Project.

3.6.12 Successors and Assigns. This Agreement shall be binding on the successors and assigns of the Parties.

3.6.13 Assignment or Transfer. Consultant shall not assign, hypothecate, or transfer, either directly or by operation of law, this Agreement or any interest herein without the prior written consent of WCE. Any attempt to do so shall be null and void, and any assignees, hypothecates or transferees shall acquire no right or interest by reason of such attempted assignment, hypothecation or transfer. Notwithstanding the foregoing, the Parties agree that in the absence of a merger, the sale or transfer of all or substantially all of the shares of the Consultant shall not constitute an assignment or transfer of this Agreement.

3.6.14 Construction: References; Captions. Since the Parties or their agents have participated fully in the preparation of this Agreement, the language of this Agreement shall be construed simply, according to its fair meaning, and not strictly for or against any Party. Any term referencing time, days or period for performance shall be deemed calendar days and not work days. All references to Consultant include all personnel, employees, agents, and subcontractors of Consultant, except as otherwise specified in this Agreement. All references to WCE include its elected officials, officers, employees, agents, and volunteers except as otherwise specified in this Agreement. The captions of the various articles and paragraphs are for convenience and ease of reference only, and do not define, limit, augment, or describe the scope, content, or intent of this Agreement.

3.6.15 Amendment; Modification. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing and signed by both Parties.

31249.00001\32268853.1

3.6.16 <u>Waiver</u>. No waiver of any default shall constitute a waiver of any other default or breach, whether of the same or other covenant or condition. No waiver, benefit, privilege, or service voluntarily given or performed by a Party shall give the other Party any contractual rights by custom, estoppel, or otherwise.

3.6.17 <u>No Third Party Beneficiaries</u>. There are no intended third party beneficiaries of any right or obligation assumed by the Parties.

3.6.18 <u>Invalidity; Severability</u>. If any portion of this Agreement is declared invalid, illegal, or otherwise unenforceable by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect.

3.6.19 <u>Prohibited Interests</u>. Consultant maintains and warrants that it has not employed nor retained any company or person, other than a bona fide employee working solely for Consultant, to solicit or secure this Agreement. Further, Consultant warrants that it has not paid nor has it agreed to pay any company or person, other than a bona fide employee working solely for Consultant, any fee, commission, percentage, brokerage fee, gift or other consideration contingent upon or resulting from the award or making of this Agreement. For breach or violation of this warranty, WCE shall have the right to rescind this Agreement without liability. For the term of this Agreement, no member, officer or employee of WCE, during the term of his or her service with WCE, shall have any direct interest in this Agreement, or obtain any present or anticipated material benefit arising therefrom.

3.6.20 <u>Equal Opportunity Employment</u>. Consultant represents that it is an equal opportunity employer and it shall not discriminate against any subcontractor, employee or applicant for employment because of race, religion, color, national origin, handicap, ancestry, sex or age. Such non-discrimination shall include, but not be limited to, all activities related to initial employment, upgrading, demotion, transfer, recruitment or recruitment advertising, layoff or termination.

3.6.21 <u>Labor Certification</u>. By its signature hereunder, Consultant certifies that it is aware of the provisions of Section 3700 of the California Labor Code which require every employer to be insured against liability for Workers' Compensation or to undertake self-insurance in accordance with the provisions of that Code, and agrees to comply with such provisions before commencing the performance of the Services.

3.6.22 <u>Authority to Enter Agreement</u>. Consultant has all requisite power and authority to conduct its business and to execute, deliver, and perform the Agreement. Each Party warrants that the individuals who have signed this Agreement have the legal power, right, and authority to make this Agreement and bind each respective Party.

3.6.23 <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall constitute an original.

**3.7    Subcontracting.**

Consultant shall not subcontract any portion of the work required by this Agreement, except as expressly stated herein, without prior written approval of WCE. Subcontracts, if any,

Professional Services Agreement – Page 14

shall contain a provision making them subject to all provisions stipulated in this Agreement. Notwithstanding the foregoing, Consultant may subcontract any portion of the work required by this Agreement to EDMS, LLC, without the prior written approval of WCE, which approval is deemed provided through this sub-section of the Agreement.

**4.      LIMITATION ON DAMAGES.**

FOR ANY BREACH HEREOF, LIABILITY SHALL BE LIMITED TO DIRECT, ACTUAL DAMAGES ONLY, SUCH DIRECT, ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING LOST PROFITS OR BUSINESS INTERRUPTION DAMAGES, WHETHER BASED ON STATUTE, CONTRACT, OR TORT, INCLUDING ANY CLAIMS FOR MONETARY PENALTIES ASSESSED BY A FEDERAL OR STATE AGENCY, OR BY THE CALIFORNIA INDEPENDENT SYSTEM OPERATOR ASSOCIATED WITH THE SETTLEMENT QUALITY METER DATA REPORTING OR OTHERWISE, INCLUDING ANY CLAIMS FOR MONETARY PENALTIES ASSESSED BY THE CALIFORNIA PUBLIC UTILITIES COMMISSION ASSOCIATED WITH RESOURCE ADEQUACY OR RENEWABLE PORTFOLIO STANDARDS, OR OTHERWISE, WITHOUT REGARD TO CAUSE OR THE NEGLIGENCE OF ANY PARTY, WHETHER SOLE, JOINT, ACTIVE OR PASSIVE, AND EACH PARTY HEREBY RELEASES THE OTHER PARTY FROM ANY SUCH LIABILITY, EVEN IF DURING THE TERM HEREOF IT ADVISES THE OTHER OF THE POSSIBILITY OF SUCH DAMAGES. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS. THE FOREGOING LIMITATIONS ON DAMAGES SHALL NOT APPLY TO ANY CLAIM ARISING FROM A BREACH OF THE CONFIDENTIALITY PROVISIONS OF SECTION 3.6.4.2, OR THE INDEMNIFICATION PROVISION UNDER SECTION 3.6.7 OF THE AGREEMENT. IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT EXCEED FOUR MILLION DOLLARS AND NO CENTS (US \$4,000,000.00), NOT INCLUDING ANY APPLICABLE INSURANCE PROCEEDS .

**5.      FORCE MAJEURE EVENT.**

A Party shall be excused from performance under this Agreement and shall not be considered in default with respect to any obligation hereunder (other than obligations to pay money), if, and to the extent, its failure of, or delay in, performance is due to a Force Majeure Event; provided, however, that (a) such claiming Party gives written notice and full particulars of such Force Majeure Event to the other Party promptly after the occurrence of the event relied on, (b) such notice shall estimate the expected duration and probable impact on the performance of such Party's obligations hereunder, (c) such affected Party shall continue to furnish timely regular reports with respect thereto during the continuation of the delay in the affected Party's

performance, (d) the suspension of such obligations sought by such Party is of no greater scope and of no longer duration than is required by the Force Majeure Event, (e) no obligation or liability of either Party which became due or arose before the occurrence of the event causing the suspension of performance shall be excused as a result of the occurrence; (f) the affected Party shall exercise all commercially reasonable efforts to mitigate or limit the interference, impairment and losses to the other Party by promptly taking appropriate and sufficient corrective action; (g) when the affected Party is able to resume performance of the affected obligations under this Agreement, the affected Party shall give the other Party written notice to that effect, and (h) the affected Party promptly shall resume performance under this Agreement. The term "Force Majeure Event" means the occurrence of any event beyond the reasonable control of the Party affected that results in the failure or delay by such Party of some performance under this Agreement, in full or part, including but not limited to the following: drought, flood, earthquake, storm, fire, volcanic eruption, lightning, epidemic, war, pests, riot, civil disturbance, sabotage, terrorism or threat of terrorism, accident or curtailment of supply or equipment, total casualty to equipment, or restraint, order or decree by a governmental authority. Notwithstanding the foregoing, Force Majeure Events shall expressly not include strike or labor difficulty, lack of financial resources, material cost increases in commodities or labor, or other economic conditions.

6.    **COMPLIANCE WITH LAW.**

Each Party shall be responsible for compliance with all laws or regulations applicable to the Services being provided under this Agreement.

<center>**[SIGNATURES ON FOLLOWING PAGE]**</center>

**SIGNATURE PAGE**
**TO**
**WESTERN COMMUNITY ENERGY**
**PROFESSIONAL SERVICES AGREEMENT**

     IN WITNESS WHEREOF, the Parties hereby have made and executed this Agreement as of the date first written above.

WESTERN COMMUNITY ENERGY         PILOT POWER GROUP, INC.

By: _____       By: _____
    Rick Bishop                      Denis Vermette
    Executive Director               President and CFO

APPROVED AS TO FORM:           ATTEST:

By: _____       By: *Thomas R. Darton*
    General Counsel               Thomas R. Darton
    Best Best & Krieger, LLP        Secretary and General Counsel

\* A corporation requires the signatures of two corporate officers.

One signature shall be that of the chairman of board, the president or any vice president and the second signature (on the attest line) shall be that of the secretary, any assistant secretary, the chief financial officer or any assistant treasurer of such corporation.

If the above persons are not the intended signators, evidence of signature authority shall be provided to WCE.

20

Professional Services Agreement – Page 17

**SCHEDULE 1**
**OF THE**
**PROFESSIONAL SERVICES AGREEMENT BY AND BETWEEN WESTERN**
**COMMUNITY ENERGY AND PILOT POWER GROUP, INC.**

**SCHEDULE OF SERVICES/TERMS AND CONDITIONS**

Consultant and WCE agree that the following products and services ("**CCA Services**") shall be provided by Consultant for the benefit of the WCE under the terms and conditions as described herein. The services to be provided under this Schedule will commence upon execution of the Agreement.

1. **Energy Procurement**

   a. Load Forecasting. Consultant shall perform all annual, seasonal, and monthly and day ahead forecasting needed to serve the WCE CCA electric load. Such forecasting shall be adjusted for historic data, weather, seasonal variations, and changes in the WCE CCA load due to customers choosing Utility electric energy procurement service instead of the WCE electric energy procurement service ("**Opt-Outs**"), addition of new customers and terminations of service. Consultant shall provide to WCE a long-term load forecast model outlining total energy consumption and peak demand by rate class. This model will be used for planning and budgeting purposes. Consultant shall also provide a short-term load forecast model for monthly, weekly, daily, and hourly load consumption. This model will be used for the scheduling of resources and load.

      i. In connection with the development of these forecasts, Consultant will work with WCE to develop assumptions regarding the number of customers in each rate class, expected load and/or customer growth, and expected opt-out. These assumptions will inform the expected customer loads in each rate class.

   b. Procurement Protocols. Consultant shall ensure that the WCE CCA electric load is served in a least cost, best fit, and reliable manner, as determined by electric industry standards. Consultant shall conduct electric procurement in a manner consistent with the directives set during WCE rate-setting described in Section 5 of this Schedule 1.

   c. Energy Product Procurement. Consultant shall procure all products and services required to serve the WCE CCA electric load, including but not limited to:

Schedule 1, Page-1

31249.00001\32268853.1

    i. <u>Ancillary Services</u>.   Consultant will provide and assist with the procurement of all ancillary services from the CAISO required to supply energy products to the delivery point associated with WCE's electric load.

    ii. <u>Resource Adequacy Capacity</u>.   Consultant will provide and assist with the procurement of all Resource Adequacy ("**RA**") capacity necessary to meet the requirements of the CPUC, and applicable California law.   This may include procurement from Southern California Edison ("**SCE**"), from other sellers of RA capacity, or from Consultant's own portfolio of RA products.

    iii. <u>Renewable Energy</u>. Consultant will provide and assist with the procurement of all renewable energy products necessary to comply with the requirements of California's Renewables Portfolio Standard ("**RPS**") program, and applicable California law.   Consultant will manage and transfer renewable energy product volumes to WCE through the Western Renewable Energy Generation Information System ("**WREGIS**").

    iv. <u>Energy</u>.   Consultant will provide and assist with the procurement of all energy necessary to serve WCE's electric load.

d.    <u>Scheduling</u>.   As described in Section 2 below, all energy products necessary to serve WCE's CCA electric load shall be scheduled through the CAISO and will be subject to applicable CAISO charges and fees.

e.    <u>Energy Procurement Costs</u>.   In the event and to the extent that Consultant pays any energy procurement costs on behalf of WCE, Consultant shall invoice WCE for such costs and WCE shall reimburse Consultant for such costs

## 2. **CAISO Scheduling Coordination**

a.    Consultant shall submit, or cause to be submitted, to the CAISO all schedules and meter data reports required to be filed by the designated SC for the meters enrolled to receive energy service from WCE within WCE's service territory.   Such schedules and reports shall include, without limitation, schedules for the delivery of energy to the applicable delivery point(s), ancillary services, bids, RA plans, and any other information required in connection with the delivery and/or utilization of energy products, renewable energy products, and RA products serving WCE's electric loads, consistent with and according to the obligations of an SC under the applicable CAISO tariffs, rules and regulations.

<div align="center">Schedule 1, Page-2</div>

b.  Consultant shall schedule load on a short-term basis and submit schedules for resources in the day-ahead market.

c.  Consultant shall review and analyze CAISO settlements to validate the settlements and charges.  CAISO charges incurred and paid by Consultant as the SC shall be invoiced separately from the energy scheduling charges as a component of the energy procurement costs and shall be paid by WCE pursuant to Section 3.4.3 of this Agreement. Consultant shall provide WCE with a statement of CAISO charges settlement activities on a monthly basis consistent with the CAISO's settlement calendar.  Based on CAISO information availability, each month Consultant shall provide WCE with an aggregate or estimate of the CAISO charges applicable to WCE's CCA activities.  As required by the CAISO, Consultant shall make timely payment of all CAISO charges, and WCE hereby approves of the payment of said CAISO charges by Consultant on WCE's behalf.

d.  Consultant shall compare the schedules submitted with the actual consumption to inform future schedules to better manage real-time imbalance energy exposure.

e.  Consultant shall prepare and submit regulatory and/or compliance filings with the CAISO, including, without limitation, monthly RA plan compliance filings.

f.  Consultant shall receive from WCE's data manager, Settlement Quality Meter Data ("**SQMD**") and submit it to the CAISO in compliance with applicable CAISO tariffs, rules and regulations.

      i.  Consultant shall receive from SCE, WCE load consumption data to verify and validate the SQMD prior to submission of SQMD to the CAISO.

g.  If requested by WCE, Consultant shall participate in the Congestion Revenue Rights ("**CRR**") market on behalf of WCE.

      i.  Consultant shall develop strategies and submit bids into the annual and monthly CRR auctions to obtain CRR allocations on behalf of WCE.

     ii.  Consultant shall post the $500,000 deposit required to participate in the CAISO CRR market. In consideration of Consultant posting the deposit and performing all the services necessary to participate in the CRR market, Consultant shall receive 20 percent of the revenues generated through the CRR allocation process, which percentage shall increase to 25 percent beginning at the commencement of the third year from

Schedule 1, Page-3

the Effective Date. The remaining percentage of revenues generated through the CRR allocation process shall be credited to WCE.

iii. WCE understands and agrees that once Consultant posts the deposit described in Section 2.g.ii above, participation in the CRR market must continue for term of this Agreement.

## 3. Risk Management Strategy

a. Consultant shall work with WCE to develop power procurement and power supply risk management policies.

b. Consultant shall provide to WCE a written Risk Analysis containing the following sections and recommendations for measures to address, reduce and mitigate the risks:

    i. Financial Risks;
    ii. Energy Market Risks;
    iii. Counterparty Credit and WCE Credit Risks;
    iv. Legal, Regulatory, and Legislative Risks;
    v. Customer Retention (and rate competiveness) Risks.

## 4. Financial Planning

a. Working with WCE, Consultant shall establish the annual revenue requirement needed to cover WCE CCA costs.

b. The revenue requirement will be allocated ("**Revenue Allocation**") to the various rate classes to assist in the development of rates for each rate design.

## 5. Rate Setting

a. Consultant will consult with WCE to determine if the CCA will offer generation rate designs that mimic SCE rate designs, or provide alternative rate designs, or both.

b. On no less than an annual basis, Consultant shall assist the WCE in conducting a public rate-setting process ("**Rate-Setting**") guided by electric industry standards. Rate-Setting shall be based on a revenue requirement sufficient to fully meet forecasted WCE CCA expenditures and any prior Rate-setting revenue shortfalls.

c. Consultant shall accommodate all Utility rate schedules, plans and programs that can be feasibly offered under WCE CCA protocols, including but not limited to feed in tariff ("**FIT**") offerings, Net Energy

Metering ("**NEM**"), balanced payment plans, and California Alternate Rates for Energy.

d. Consultant will provide WCE with a review of various FIT offerings then currently in operation, their success rates, and provide recommendations for the development of a best practice FIT for WCE.

  i. If WCE determines to move forward with a FIT, Consultant will develop and implement the program.

e. Consultant will provide WCE with an overview regarding NEM, including SCE's NEM program, to assist in the development of a WCE NEM program, should WCE have interest in developing a NEM program.

  i. Upon WCE's request, Consultant can suggest a direct incentive program funded through rates, which can encourage new NEM installations. Consultant can also suggest other programmatic choices and assist in the strategic planning and development such programs.

f. Upon WCE's request, Consultant will assist in the development of an opt-up rate choice(s) that provides 100% renewable energy. Consultant will also assist in the development and implementation of a 100% renewable energy standard service rate plan, if WCE decides to pursue that option.

6. **Schedule**

a. <u>Phase I, Pre-Launch Activities</u>. Consultant anticipates engaging in the following activities and performing the following services during the period prior to the "**WCE Launch Date**" (defined as the first day that WCE begins serving CCA accounts through the provision of energy):

  i. Coordinate with other selected data manager, vendors, WCE staff and become familiar with the project timeline, and implementation plan;
  ii. Prepare monthly load and supply forecasts;
  iii. Design and develop Rate Setting structure for various rate classes;
  iv. Prepare for CAISO market participant requirements, agreements between WCE and CAISO;
  v. Prepare for CCA Service Agreement with SCE;
  vi. Posting of credit collateral with SCE;
  vii. Prepare the Binding Notice of Intent with SCE;

<div align="center">Schedule 1, Page-5</div>

       viii.  Register with CARB on behalf of WCE;

       ix.  Register with WREGIS on behalf of WCE;

       x.  Prepare risk management policies;

       xi.  Assist with negotiation and contracting services;

       xii.  Identify and establish potential procurement counterparties;

       xiii.  Design and develop FIT and NEM rates.

b.     <u>Phase II, Post-Launch Activities</u>.  Following the launch of CCA services, Consultant will engage in the following activities and provide the following services on an ongoing basis:

       i.  Manage RFPs for power procurement (power, RPS and RA);

       ii.  Negotiate terms and conditions for power procurement (power, RPS, and RA);

       iii.  Monitor the regulatory and legislative processes for items related to CCAs;

       iv.  Prepare and submit annual and monthly RA filings with the CAISO;

       v.  Prepare and submit annual and monthly load forecasts to CEC, CPUC, and CAISO;

       vi.  Prepare and submit annual RPS reports and plans to CPUC;

       vii.  Prepare and submit annual EPS attestation;

       viii.  Prepare and submit annual SSP filings;

       ix.  Provide data required for financial accounting—work with WCE Financial Advisor;

       x.  Perform SC services;

       xi.  Maintain credit facilities with CAISO;

       xii.  Provide weekly forecasting of hourly forecast loads;

       xiii.  Submit demand bids into Day-Ahead market;

       xiv.  Submit supply bids into Day-Ahead market;

       xv.  Perform settlement validation and allocation of costs; and

       xvi.  Develop and implement annual and monthly CRR bid strategy.

## 7. <u>CCA Financing</u>

a.     To provide significant savings to WCE prior to launch of CCA services, Consultant shall waive any fees associated with the preparation of the WCE CCA launch in Phase I identified in Section 6.a of this Schedule 1 above.  This waiver does not extend to monies paid by Consultant on behalf of WCE during Phase I (including, without limitation, security deposits, posting of collateral, procurement of energy products, etc.), for which WCE shall remain obligated to reimburse to Consultant.

b.     To assist WCE to generate sufficient revenue to fund operations upon the launch of the CCA, Consultant will accrue the first two months

<center>Schedule 1, Page-6</center>

("**Deferred Period**") of CCA operational costs associated with Consultant's service fees, energy supply costs, and deposits described in Section 7.c below ("**Deferred Financing**").

    i.  Deferred Financing will be amortized into equal monthly installments over a 24-month period ("**Deferred Financing Payment Period**"). The Deferred Financing Payment Period, and the first payment will be due, during the month following the Deferred Period.

    ii.  As described in Section 8 below, until the Deferred Financing is paid in full, a deferred financing fee ("**Deferred Financing Fee**") of $0.350 per MWh shall be charged each month based on the energy consumed in the given month.

    iii.  WCE has the option to pay the Deferred Financing in full, or portions of the Deferred Financing in advance, at any time during the Deferred Financing Payment Period without any pre-payment penalties or costs. Upon full repayment of the Deferred Financing, the Deferred Financing Fee shall be eliminated.

c.    Consultant shall provide funding for all deposits that may be required by SCE, the CAISO or other entities to launch and operate WCE CCA ("**Deposits**"). .

    i.  Additional Deposits, if any, or increases in Deposits that may be required after Deferred Financing amounts are amortized pursuant to above Section 7.b of this <u>Schedule 1</u>, shall be paid/deposited directly by WCE from CCA revenues and/or funds. If payment of such deposits by WCE would foreseeably result in a WCE CCA financial shortfall, any shortfalls paid by Consultant (in its sole and exclusive discretion) on WCE's behalf, shall accrue interest at an APR equal to the published Wall Street Journal current prime rate plus 2.0%. Consultant shall be reimbursed for these deposits and related accrued interest as soon as sufficient WCE CCA funds are available.

d.    Consultant shall provide all working capital, credit and collateral ("**Credit Support**") necessary to support all functions of Energy Procurement as described in Section 1 of this <u>Schedule 1</u>; provided that WCE is in full compliance with the terms and conditions of <u>Exhibit A</u> to this <u>Schedule 1</u>. If WCE does not comply fully with the provisions of <u>Exhibit A</u>, WCE agrees to employ its own capital, credit and collateral to support Energy Procurement.

31249.00001\32268853.1

      i. Notwithstanding anything in the foregoing, CAISO payments made by Consultant on WCE's behalf prior to WCE's payment to Consultant of the applicable CAISO charges shall be considered Credit Support regardless of whether the Lock Box described in <u>Exhibit A</u> to this <u>Schedule 1</u> is established.

      ii. As described in Section 8 below, a Credit Support fee ("**Credit Support Fee**") of $0.250 per MWh shall be charged each month based on the energy consumed in the given month.

     iii. WCE has the option to eliminate the Credit Support Fee by substituting its own capital, credit and collateral in the place and stead of Consultant in connection with the procurement of energy products. Upon the full substitution and/or repayment to Consultant of capital, credit and collateral posted, pledged, or paid on behalf of WCE (including, without limitation CAISO charges), the Credit Support Fee shall be eliminated.

e. If after Deferred Costs are amortized pursuant to Section 7.b above, the WCE CCA does not have sufficient revenue/funds to pay its ongoing expenses, any shortfalls paid by Consultant (in its sole and exclusive discretion) on WCE's behalf ("**Revenue Shortfall Payments**"), shall accrue interest at an APR equal to the published Wall Street Journal current prime rate plus 2.0%. Consultant shall be reimbursed for these Revenue Shortfall Payments and related accrued interest as soon as sufficient WCE CCA funds are available.

## 8. <u>Fees</u>

a. Beginning in the calendar month of the WCE Launch Date, and continuing every calendar month thereafter until the later of 1) the termination of this Agreement, or 2) the cessation of services by Consultant hereunder, WCE shall pay to Consultant the following fees:

| Service | Billing Frequency | Price |
|---|---|---|
| Energy Procurement | Monthly | $11,500 |
| Scheduling Coordination | Monthly | $23,500 |
| Financial Planning | Monthly | $1,000 |
| Deferred Financing Fee | Monthly | $0.350/MWh |
| Credit Support Fee | Monthly | $0.250/MWh |
| SQMD Services | Monthly | $2,000 |

      i. Charges for the Deferred Financing Fee and the Credit Support Fee shall be based on MWh of energy consumed by CCA customers during the relevant calendar month, as measured at the respective meters.

Schedule 1, Page-8

      ii.  As described in Section 7.b.iii above, the Deferred Financing Fee may be eliminated by WCE.

      iii.  As described in Section 7.d.iii above, the Credit Support Fee may be eliminated by WCE.

b.    Beginning in the calendar month of the WCE Launch Date, and continuing once every 12 months thereafter until the later of 1) the termination of this Agreement, or 2) the cessation of services by Consultant hereunder, WCE shall pay to Consultant the following fees:

| Service | Billing Frequency | Price |
|---|---|---|
| Risk Management Strategy | Annually | $5,000 |
| Rate Setting | Annually | $5,000 |

c.    Extra Work. The Fees defined in this Section 8 include only the services and items expressly set forth in this Agreement. Unless otherwise agreed to by the Parties in an amendment to the Agreement, Extra Work will be invoiced on a time and materials basis. Costs associated with Extra Work provided by Consultant to WCE shall be passed through directly to WCE without mark-up. The following hourly labor rates will be utilized for labor costs based upon the experience of the individual providing services unless otherwise agreed upon in writing by both parties prior to the commencement of Extra Work:

| | |
|---|---|
| Executive Consultant | $250/hour |
| Consultant | $160/hour |
| Analyst | $90/hour |

d.    Invoices under Sections 8.a, 8.b, and 8.c of this Schedule 1 shall be issued and paid pursuant to the terms of Section 3.4 of this Agreement

Schedule 1, Page-9

**EXHIBIT A TO SCHEDULE 1**
**OF THE**
**PROFESSIONAL SERVICES AGREEMENT BY AND BETWEEN WESTERN**
**COMMUNITY ENERGY AND PILOT POWER GROUP, INC.**

**CREDIT SUPPORT PROTOCOL**

Providing Credit Support pursuant to Section 7.d of <u>Schedule 1</u> is subject to the following lock box requirements and WCE obligations:

A.    All WCE CCA revenues of any kind, including, without limitation, refunded Deposits ("**CCA Revenue**"), regardless of the source, shall be immediately deposited into the fiduciary account at City National Bank ("**Lock Box**").

1.    <u>The WCE CCA DBA</u>.  The WCE CCA shall establish a "doing business as" ("**DBA**") under which all WCE CCA banking will be processed.

2.    <u>Security Agreement and Security Interest</u>.  WCE hereby grants, pledges, conveys, transfers and assigns to Consultant a present and continuing first priority security interest in and to, and a general first lien upon and right of setoff against, (a) the Lockbox and the Lockbox Account, and (b) the Proceeds of the Lockbox and the Lockbox Account, whether such proceeds are now existing or hereafter arising (hereinafter (a) and (b) are collectively referred to as the "**Collateral**").  The security interest granted herein shall be a purchase money security interest, but if for any reason the law will not regard it as a purchase money security interest, then nevertheless as a security interest. WCE authorizes Consultant to take any and all steps necessary to perfect its security interest granted herein, including, without limitation, the filing of a financing statement in the appropriate filing office, and/or the taking of possession or control of the Collateral pursuant to the Control Agreement, and WCE agrees to take such action as Consultant may reasonably request in order to perfect Consultant's security interest in and lien on and right of setoff against such Collateral.  As used herein, "**Proceeds**" means any of the following property: (A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) Whatever is collected on, or distributed on account of, collateral; (C) Rights arising out of collateral; (D) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; and (E) To the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

3.    Prior to Consultant entering into transactions on WCE's behalf, WCE shall execute and deliver a deposit account control agreement,

Exhibit A to Schedule 1, Page-1

substantially in the form of <u>Exhibit B</u> of <u>Schedule 1</u> ("**Control Agreement**"), and other agreements as reasonably may be required.

B.     On a monthly basis, provided the protocol for authorizing payment of the WCE CCA expenses ("**Payment Protocol**"), included as <u>Exhibit C</u> to <u>Schedule 1</u>, is followed, Consultant shall make payments from the Lock Box in the following order:

1.     Bank fees per the Control Agreement

2.     Governmental taxes and fees for which the WCE CCA is responsible, including, but not limited to, the statewide Electric Energy Surcharge and local Utility Users Taxes ("**Taxes and Fees**").

3.     Energy related costs incurred pursuant to and consistent with the Energy Procurement and Risk Management Protocol, including, but not limited to, energy, capacity, ancillary services, CAISO charges and fees (including, but not limited to, congestion and wheeling), and renewable and carbon free energy ("**Energy Costs**"). Energy Costs do not include the forecasting and scheduling services covered under Consultant's fees as governed by Section 8 of <u>Schedule 1</u>.

4.     Consultant's fees and costs, as governed by Section 3.4 of the Agreement and Section 8 of <u>Schedule 1</u>.

5.     All other expenses and costs billed to Consultant on behalf of the WCE CCA.

6.     If all monthly payments under Sections B.1 through B.5 of this <u>Exhibit A</u> to <u>Schedule 1</u> are paid and the ending monthly Lock Box balance is at least $15,000,000.00, WCE CCA may withdraw funds in excess of $15,000,000.00 ("**Excess Funds**"), provided that a minimum balance of $15,000,000.00 is maintained at all times. Upon withdrawal from the Lock Box, Excess Funds are not subject to any term, condition or provision of this Agreement. WCE takes sole and full responsibility for the subsequent processing, use and disposition of the Excess Funds.

C.     On a monthly and annual basis, Consultant shall provide a full accounting to the WCE of all WCE CCA financial activities ("**CCA Accounting**"). The WCE CCA Accounting shall include, but is not limited to, a line-by-line presentation of revenues, expenses, and cumulative Financial Support Agreement amounts.

D.     Upon reasonable notice and provided Consultant has reasonable access to the data needed for the additional reporting, Consultant shall accommodate requests for any additional financial and accounting reporting regarding the WCE CCA.

E.     Upon reasonable notice, WCE staff may request a review of all the WCE CCA Accounting data and processes.

Exhibit A to Schedule 1, Page-2

31249.00001\32268853.1

F.      Consultant shall arrange for an independent annual audit of the WCE CCA
Accounting ("**Audit**").  Payment for the Audit shall be processed pursuant to Section
B.5 of this Exhibit A to Schedule 1.

Exhibit A to Schedule 1, Page-3

31249.00001\32268853.1

**EXHIBIT B TO SCHEDULE 1**
**OF THE**
**PROFESSIONAL SERVICES AGREEMENT BY AND BETWEEN WESTERN**
**COMMUNITY ENERGY AND PILOT POWER GROUP, INC.**

**FORM OF CONTROL AGREEMENT**

**[THE PARTIES TO FIND AN ACCEPTABLE BANK AND**
**LOCKBOX ACCOUNT AGREEMENT TO INSERT HERE**
**PRIOR TO THE POWER START DATE]**

Exhibit B to Schedule 1, Page-1

31249.00001\32268853.1

**EXHIBIT C TO SCHEDULE 1**
**OF THE**
**PROFESSIONAL SERVICES AGREEMENT BY AND BETWEEN WESTERN**
**COMMUNITY ENERGY AND PILOT POWER GROUP, INC.**

**PAYMENT PROTOCOL**

I.    **Applicability**

The Payment Protocol ("**Payment Protocol**") applies to all Consultant employees, contractors and consultants ("**Payment Participants**") engaged in financial and accounting transactions for and on behalf of WCE.  All Payment Participants are required to follow the Payment Protocol in any circumstance in which payments or transfers from the Lock Box are initiated.

II.   **Roles and Responsibilities**

   a.    Accounting Department

   Consultant's Accounting Department shall process all transfers from the Lock Box ("**Transfers**").  Except for Transfers pursuant to Section B.6 of Exhibit A to Schedule 1, all Transfers must be for payment of products or services meeting the following criteria:

   1.    The products or services are covered under this Agreement; and
   2.    The payment will not foreseeably result in a WCE CCA financial shortfall; and
   3.    The products or services are consistent with the overall direction set forth by WCE.
   4.    The payments have been authorized pursuant to Section III of this Exhibit C to Schedule 1.

   If Sections II.a.1, II.a.2 and II.a.3 of this Payment Protocol are not met, prior to executing the non-compliant Transfer, the Accounting Department must first obtain, in writing, the approval of the Risk Officer and the WCE CCA Staff.

   Transfers requested by WCE pursuant to Section B.6 of Exhibit A to Schedule 1 shall be executed by Consultant's Accounting Department in the ordinary course of business.

b.      Risk Officer

The Risk Officer shall audit the functions of the Accounting Department, ensuring compliance with this Payment Protocol.

## III. Authorizing Transactions

On a monthly basis, the Accounting Department shall prepare an itemized report of all WCE CCA accounts payable due within 60 days or less for submission to WCE CCA ("**Payables Report**").  Within 5 business days of receipt of the Payables Report, WCE CCA Staff shall:

1.      Confirm in writing a finding of no exceptions to the Payables Report, and include the Payables Report in the next possible WCE Consent Agenda for approval; or

2.      Contact the Accounting Department to resolve any discrepancy or dispute ("**Dispute**").  If the Dispute cannot be reconciled, or WCE fails to approve the Payables Report, either Party may initiate action under Section 3.6.2 of this Agreement.

Exhibit B to Schedule 1, Page-3

31249.00001\32268853.1

# EXHIBIT B

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

## 12.    Creditworthiness

### 12.1    Credit and Minimum Participation Requirements

(a)    The creditworthiness and minimum participation requirements in this section apply to the CAISO's acceptance of any transaction in a CAISO Market, to the payment of charges pursuant to the CAISO Tariff (including the Grid Management Charge), and to establish credit limits for participation in any CAISO auction of CRRs and to CRR Holders for the holding of CRRs.  Each Market Participant that has a direct financial relationship with the CAISO (including each Scheduling Coordinator, UDC, MSS, CRR Holder, or Candidate CRR Holder) shall secure its financial transactions with the CAISO (including its participation in any auction of CRRs and for the holding of CRRs) by maintaining an Unsecured Credit Limit and/or by posting Financial Security, the level of which constitutes the Market Participant's Financial Security Amount.  For each Market Participant, the sum of its Unsecured Credit Limit and its Financial Security Amount shall represent its Aggregate Credit Limit.  Each Market Participant shall have the responsibility to maintain an Aggregate Credit Limit that is at least equal to its Estimated Aggregate Liability.

(b)    In order to participate in the CAISO Markets, each prospective Market Participant or existing Market Participant with a direct financial relationship with the CAISO must satisfy all of the following minimum participation requirements:

(i)    Provide the CAISO annually, as detailed in the Business Practice Manual, a certified statement executed by an officer of the prospective or existing Market Participant certifying that the prospective or existing Market Participant has met the following criteria and relevant requirements consistent with these criteria set forth in the Business Practice Manual:

(1)    Has undergone training commensurate and proportional in sophistication, scope, and frequency to the volume of transactions and the nature and extent of the risk taken by the prospective or existing Market Participant, including but not limited to any applicable CAISO training requirements as specified in Sections 4.5.1.1.10.1 and 36.5.2;

September 28, 2019
Section 12

2

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

    (2)    Has and maintains written policies, procedures, and controls approved by the appropriate officer or corporate authority of the prospective or existing Market Participant's governing body which provide an appropriate, comprehensive risk management framework that, at a minimum, clearly identifies and documents the range of risks to which the prospective or existing Market Participant is exposed, including, but not limited to, legal risk, credit risk, liquidity risk, risk of loss of financial security amounts held and invested by the CAISO, investment risk, concentration risk, default risk, operation risk, market risk, and business risk;

    (3)    To the extent the Market Participant engages in the CRR market, the Market Participant must demonstrate that it has policies in place that are consistent with generally accepted industry risk management standards;

    (4)    Has appropriate personnel resources, operating procedures and technical abilities to promptly and effectively respond to all CAISO communications and directions, including, but not limited to, the CAISO's issuance of invoices and collateral requests to the prospective or existing Market Participant; and

    (5)    Satisfies the requirements of Section 12.1(b)(iv).

(ii)    Provide annually for CAISO review and verification, as detailed in the Business Practice Manual, the risk management policies, procedures, and controls applicable to the CRR trading activities of the prospective or existing Market Participant, if the prospective or existing Market Participant has a CRR portfolio that meets the applicable risk criterion set forth in the Business Practice Manual.

(iii)    Satisfy the following capitalization requirements:

    (1)    Pursuant to Sections 12.1 and 12.1.1, the prospective or existing Market Participant or its guarantor must have at least $1 million in Tangible Net Worth or $10 million in total assets, or post Financial Security using one

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

or more of the forms specified in Section 12.2 in the amounts set forth below. In the event the prospective or existing Market Participant must post Financial Security, that financial security will not be added to Market Participant's Aggregate Credit Limit and, therefore, cannot be used to meet Market Participant's minimum credit requirements to participate in a Congestion Revenue Rights auction or to offset any market obligations as reflected in Market Participant's Estimated Aggregate Liability. However, all Financial Security in any form may be used to satisfy any financial obligation of the Market Participant.

(2)    $500,000 for a prospective or existing Market Participant with fewer than six (6) months of CAISO Market activity; $100,000 for an existing Market Participant with six (6) months or more of CAISO Market activity and whose highest Estimated Aggregate Liability for the preceding six (6) months is less than or equal to $100,000; or $500,000 for an existing Market Participant with six (6) months or more of market activity and whose highest Estimated Aggregate Liability for the preceding six (6) months is greater than $100,000.

(3)    The CAISO will review whether the prospective or existing Market Participant continues to satisfy the capitalization requirements set forth in Section 12.1(iii)(a). The CAISO will conduct such a review every six (6) months, when new financial statements are posted for the prospective or existing Market Participant, or when an increase in CAISO Market activity causes the Market Participant's Estimate Agreement Liability to exceed $100,000.

(iv)    At all times satisfy the requirements to be one or more of the following:

(1)    An "appropriate person" as defined in sections 4(c)(3)(A) through (J) of the Commodity Exchange Act;

(2)    An "eligible contract participant," as defined in section 1a(18)(A) of the

September 28, 2019
Section 12

4

EXHIBIT B - PAGE 3

Commodity Exchange Act and in 17 CFR 1.3(m); or

(3)    In the business of generating, transmitting, or distributing electric energy
as defined in the Final Order of the Commodity Futures Trading
Commission at 78 Fed. Reg. 19879.

As an alternative to satisfying (1), (2) or (3), a Market Participant that participates as a
Scheduling Coordinator only and not as a CRR Holder, Candidate CRR Holder or a
Convergence Bidding Entity, satisfies this Section 12.1(b)(iv) if it is in the business of
providing electric energy services that are necessary to support the reliable operation of
the transmission system, as defined in the Final Order of the Commodity Futures Trading
Commission at 78 Fed. Reg. 19879.

(c)    The CAISO will review and verify that prospective Market Participants satisfy the
minimum participation requirements set forth in this Section 12.1, and the CAISO will
request any information from prospective Market Participants that is needed to complete
the CAISO's review and verification. Further, the CAISO will annually select, on a
random basis, up to ten (10) percent of the Market Participants that are not already
subject to annual verification as set forth in Section 12.1(b)(ii), and the CAISO will
request any information from those randomly selected Market Participants that is needed
to review and verify whether the Market Participants continue to satisfy the minimum
participation requirements set forth in this Section 12.1. Each Market Participant
randomly selected for annual verification and satisfactorily verified will be exempted from
such random verification for the subsequent two (2) years, unless within that two-year
period the Market Participant undergoes a Material Change in Financial Condition as set
forth in Section 12.1.1.5, in which case the Market Participant will remain subject to
random verification within the two-year period. In addition, the CAISO may at any time
select any Market Participant for review to determine whether the Market Participant
continues to satisfy the minimum participation requirements set forth in this Section 12.1,
based on identified risk factors that include, but are not limited to, the CAISO Markets in
which the Market Participant is transacting or seeks to transact, the magnitude of the

Market Participant's transactions or potential transactions, or the volume of the Market Participant's open positions in the CAISO Markets. Such review by the CAISO based on identified risk factors will not be subject to the two-year period of exemption from random verification.

(d)   Each Market Participant shall respond to any CAISO request for information within five (5) Business Days. Failure to provide the requested information within the specified time period may result in the CAISO taking enforcement actions pursuant to Section 12.5. The CAISO may review and verify the information either with or without the assistance of a third party, at the CAISO's discretion, subject to confidentiality and non-disclosure restrictions, as applicable. The CAISO will provide the Market Participant with a written explanation of any deficiencies in the information provided. For purposes of Section 12, any documentation provided by a prospective or existing Market Participant in compliance with this Section shall be treated as confidential and the CAISO shall maintain the confidentiality of all such documents. Any CAISO review and verification of the Market Participant's risk management policies, procedures, and controls will be conducted according to generally accepted risk management standards that may be developed from time to time and shall include but not be limited to confirmation that:

- The Market Participant's risk management framework is documented in a risk policy addressing market, credit, and liquidity risks that has been approved by the Market Participant's risk management governance function, which includes appropriate corporate persons or bodies that are independent of the Market Participant's trading functions, such as a risk management committee, a designated risk officer, a board or board committee, or a board or committee of the Market Participant's parent company;

- The Market Participant maintains an organizational structure with clearly defined roles and responsibilities that segregate front-, middle-, and back-office functions to as high a level as is practicable;

- Delegations of authority specify the transactions in which traders are allowed to

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

enter;

- The Market Participant ensures that traders have adequate training and experience relative to their delegations of authority in systems and the markets in which they transact;

- As appropriate, risk limits are in place to control risk exposures;

- Reporting is in place to ensure risks are adequately communicated throughout the organization;

- Processes are in place for independent confirmation of executed transactions; and

- As appropriate, there is periodic evaluation or mark-to-market of risk positions.

(e)  For the minimum participation requirements set forth in Section 12.1(b)(iv), each Market Participant that has a direct financial relationship with the CAISO (including each Scheduling Coordinator, CRR Holder, or Candidate CRR Holder, and any applicant seeking to become a Scheduling Coordinator, CRR Holder, or Candidate CRR Holder) must demonstrate compliance with Section 12.1(b)(iv) by submitting to the CAISO by the deadline specified in the Business Practice Manual an officer's certificate, in a form acceptable to the CAISO, stating under penalty of perjury that

   (i)  the Market Participant is in compliance with this requirement, and

   (ii)  if the certifying entity no longer satisfies the requirements set forth in Section 12.1(b)(iv) it shall immediately notify the CAISO and immediately cease all participation in the CAISO Markets.

A Market Participant that fails to submit the officer's certificate by the deadline specified in the Business Practice Manual shall not be entitled to participate in the CAISO Markets until after the Market Participant submits the certificate required by this Section 12.1(e), as detailed in the Business Practice Manual.

(f)  Each prospective Market Participant that does not satisfy all of the minimum participation requirements set forth in Section 12.1 will be prohibited from participating in the CAISO Markets. Each prospective Market Participant taking part in the Scheduling Coordinator

EXHIBIT B - PAGE 6

certification process pursuant to Section 4.5.1 or the Candidate CRR Holder application process pursuant to Section 4.10.1 that does not satisfy all of the minimum participation requirements set forth in this Section 12.1 will be ineligible to become a Market Participant or CRR Holder.  Each existing Market Participant that does not satisfy all of the minimum participation requirements set forth in this Section 12.1 will be out of compliance with the CAISO Tariff.  Any failure of a Market Participant to satisfy the minimum participation requirements set forth in Section 12.1(b) will subject the Market Participant to CAISO enforcement actions as set forth in Section 12.5 provided that, for any failure to comply with the minimum participation requirements set forth in Section 12.1(b)(i)-(iii), the Market Participant shall have thirty (30) days to cure after CAISO notification that a failure occurred.  In the event a Market Participant no longer satisfies the minimum participation requirements set forth Section 12.1(b)(iv), the Market Participant shall immediately notify the CAISO of this change and immediately cease all participation in CAISO Markets.  A Market Participant that no longer satisfies the minimum participation requirements set forth Section 12.1(b)(iv) shall be subject to CAISO enforcement actions as set forth in Section 12.5.

### 12.1.1 Unsecured Credit Limit

Each Market Participant requesting an Unsecured Credit Limit shall submit an application to the CAISO in the form specified on the CAISO Website. The CAISO shall determine the Unsecured Credit Limit for each Market Participant in accordance with the procedures set forth in the applicable Business Practice Manual. The maximum Unsecured Credit Limit for any Market Participant, and group of Market Participant Affiliates, shall be $50 million. In accordance with the procedures described in the applicable Business Practice Manual, each Market Participant requesting or maintaining an Unsecured Credit Limit is required to submit to the CAISO or its agent financial statements and other information related to its overall financial health as directed by the CAISO. Each Market Participant is responsible for the timely submission of its latest financial statements as well as other information, including, but not limited to, information concerning all entities that are Affiliates or become Affiliates, that may be reasonably necessary for the CAISO to conduct its evaluation. The CAISO shall determine the Unsecured Credit

EXHIBIT B - PAGE 7

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

## 12.1.2  Financial Security and Financial Security Amount

A Market Participant that does not have an Unsecured Credit Limit, or that has an Unsecured Credit Limit that is less than its Estimated Aggregate Liability, shall post Financial Security that is acceptable to the CAISO and that is sufficient to ensure that its Aggregate Credit Limit (i.e., the sum of its Unsecured Credit Limit and Financial Security Amount) is equal to or greater than its Estimated Aggregate Liability. The Financial Security posted by a Market Participant may be any combination of the following types of Financial Security provided in favor of the CAISO and notified to the CAISO under Section 12.3:

(a)    an irrevocable and unconditional letter of credit issued by a bank or financial institution that is reasonably acceptable to the CAISO; or

(b)    a prepayment to the CAISO.

Financial Security instruments as listed above shall be in such form as the CAISO may reasonably require from time to time by notice to Market Participants, or in such other form as has been evaluated and approved as reasonably acceptable by the CAISO. The CAISO shall publish and maintain standardized forms related to the types of Financial Security listed above on the CAISO Website. The CAISO shall require the use of standardized forms of Financial Security to the greatest extent possible.

### 12.1.2.1    Additional Procedures Regarding Certain Types of Financial Security

Prepayments to the CAISO will be held in an interest-bearing account or another investment acceptable to the Market Participant and the CAISO, and interest on the investment will accrue at the rate as provided for in the investment. Interest will accrue to the Market Participant's benefit and will be added to the Market Participant's prepayment account on a monthly basis. Due to the additional administrative effort involved in tracking and posting interest on such prepayments, the use of this option is not encouraged.

### 12.1.2.2    Process for Evaluating Requests to Use Non-Standardized Forms of Financial Security

A Market Participant that seeks permission to use a form for Financial Security other than one or more of the standardized forms posted on the CAISO Website shall seek such permission in a written request to the CAISO that explains the basis for the use of such non-standardized form. The CAISO shall have ten (10) Business Days from receipt of such request to evaluate it and determine whether it will be approved

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

as reasonably acceptable. If the CAISO does not respond to such request within the ten (10) Business

Day period, the request shall be deemed to have been denied. Until and unless the CAISO approves the

use of a non-standardized form for Financial Security, the Market Participant that submitted such request

shall be required to use one of the standardized forms for Financial Security described in this Section

12.1.2.

### 12.1.2.3    Expiration of Financial Security

Each Market Participant shall ensure that the financial instruments it uses for the purpose of providing

Financial Security will not expire and thereby cause the Market Participant's Aggregate Credit Limit to fall

below the Market Participant's Estimated Aggregate Liability. The CAISO will treat a financial instrument

that does not have an automatic renewal provision and that is not renewed or replaced within seven (7)

days of its date of expiration as being out of compliance with the standards for Financial Security

contained in this Section 12 and will deem the value of such financial instrument to be zero, and will draw

upon such Financial Security prior to its stated expiration if deemed necessary by the CAISO.

### 12.1.2.4    Risk of Loss of Financial Security Amounts Held and Invested by the CAISO

In accordance with the CAISO's investment policy, the CAISO will invest each Financial Security Amount

of a Market Participant only in bank accounts, money market accounts, and/or U.S. Treasury/Agency

securities unless a specific written request is received from the Market Participant for a different type of

investment and the CAISO provides its written consent to such alternative investment. A Market

Participant that provides a Financial Security Amount that is held and invested by the CAISO on behalf of

the Market Participant will bear all risks that such Financial Security Amount will incur a loss of principal

and/or interest as a result of the CAISO's investment of such Financial Security Amount.

### 12.1.3  Estimated Aggregate Liability

The CAISO will periodically calculate the Estimated Aggregate Liability of each Market Participant, based

on all charges and settlement amounts for which such Market Participant is liable or reasonably

anticipated by the CAISO to be liable for pursuant to the CAISO Tariff. The Estimated Aggregate Liability

for each Market Participant shall be determined and applied by the CAISO consistent with the procedures

set forth in the applicable Business Practice Manual. The CAISO shall upon request provide each Market

Participant with information concerning the basis for the CAISO's determination of its Estimated

EXHIBIT B - PAGE 9

Aggregate Liability, and the CAISO's determination may be disputed in accordance with the procedures set forth in the applicable Business Practice Manual. The CAISO shall compare each Market Participant's Estimated Aggregate Liability against its Aggregate Credit Limit on a periodic basis.

### 12.1.3.1     Calculation of Estimated Aggregate Liability

### 12.1.3.1.1     Calculation of the EAL Amount

Except as described in Section 12.1.3.1.2, the CAISO shall use the method described in this Section 12.1.3.1.1 to calculate each Market Participant's Estimated Aggregate Liability (EAL). The Estimated Aggregate Liability represents the amount owed to the CAISO for all unpaid obligations, specifically, the obligations for the number of Trading Days outstanding at a given time based on the CAISO's Payments Calendar plus five (5) Trading Days based on the allowable period for Market Participants to respond to CAISO requests for additional Financial Security collateral (two (2) Business Days), and other liabilities including the value of a Market Participant's CRR portfolio, if negative. The charges the CAISO shall use to calculate Estimated Aggregate Liability shall be charges described or referenced in the CAISO Tariff. The CAISO shall calculate the Estimated Aggregate Liability for each Market Participant by aggregating the following obligations, including CRR liabilities even though such liabilities are secured separately:

    (a)    invoiced amounts, i.e., any published but unpaid amounts on Invoices;

    (b)    published amounts, i.e., amounts for Trading Days for which Settlement Statements have been issued;

    (c)    estimated amounts, i.e., amounts based on estimated Settlement amounts calculated by the Settlement system using estimated meter data, and other available operational data;

    (d)    extrapolated amounts, i.e., amounts calculated for Trading Days for which neither actual nor estimated Settlement Statements have been issued;

    (e)    CRR portfolio value, i.e., the prospective value of the CRR portfolio, if negative, as described in Section 12.6.3;

    (f)    CRR Auction limit, i.e., the maximum credit limit for participation in a CRR Auction;

    (g)    CRR Auction awards (prior to invoicing), i.e., amounts to cover winning offers at the completion of the CRR Auction bur prior to invoicing;

EXHIBIT B - PAGE 10

(h)     Estimated Aggregate Liability adjustments resulting from Virtual Bid Submission Charges and the submission of Virtual Bids and/or receipt of Virtual Awards pursuant to Section 12.8;

(i)     past-due amounts, i.e., any unpaid or past due amounts on Invoices;

(j)     FERC Annual FERC Charges, i.e., FERC Annual Charges for a Market Participant that has elected to pay such amounts on an annual basis that are owed and outstanding and not already captured in any other component of Estimated Aggregate Liability;

(k)     WAC Charges, i.e., WAC amounts for the current year or future years as specified in Section 36.9.2;

(l)     Estimated Aggregate Liability adjustments, i.e., adjustments that may be necessary as a result of analysis performed as a result of Section 12.4.2; and

(m)     extraordinary adjustments, i.e., adjustments to Settlement amounts related to FERC proceedings, if known and estimated by the CAISO, as described in Section 12.1.3.1.3.

For a Market Participant that maintains multiple BAID numbers, the Estimated Aggregate Liability of the Market Participant as a legal entity shall be calculated by summing the Estimated Aggregate Liabilities for all such BAID numbers and comparing the sum of the Estimated Aggregate Liabilities to the Aggregate Credit Limit of the Market Participant.  Market Participants may recommend changes to the liability estimates produced by the CAISO's Estimated Aggregate Liability calculation through the dispute procedures described in Section 12.4.2.

### 12.1.3.1.2     Calculation Methodology Applicable to New Market Participants

Each new Market Participant (and each Market Participant that has previously been inactive) is required to have an initial Aggregate Credit Limit that is sufficient to cover a minimum of forty-five (45) Trading Days of estimated obligations.  This initial credit requirement is based on anticipated transactions in the CAISO Markets, and shall be considered to be equal to the Market Participant's Estimated Aggregate Liability until the CAISO obtains sufficient data from its automated calculation of Estimated Aggregate Liability as described in Section 12.1.3.1.1 to begin relying on that calculation.

### 12.1.3.1.3     Special Circumstances

### 12.1.3.1.3.1     Daily Adjustments and Disputes

September 28, 2019
Section 12

## 12.3.1 Self-Supply of UDC Demand

Notwithstanding anything to the contrary in the CAISO Tariff, a Scheduling Coordinator or UDC that is an Original Participating Transmission Owner or is a Scheduling Coordinator for an Original Participating Transmission Owner shall not be precluded by Section 12.3 from scheduling transactions that serve a UDC's Demand from

(1)   a resource that the UDC owns; and

(2)   a resource that the UDC has under contract to serve its Demand.

## 12.4   Calculation of Ongoing Financial Security Requirements

Following the date on which a Market Participant commences trading, if the Market Participant's Estimated Aggregate Liability, as calculated by the CAISO, at any time exceeds its Aggregate Credit Limit, the CAISO shall direct the Market Participant to post an additional Financial Security Amount within two (2) Business Days that is sufficient to ensure that the Market Participant's Aggregate Credit Limit is at least equal to its Estimated Aggregate Liability. The CAISO shall also notify a Market Participant if at any time its Estimated Aggregate Liability exceeds ninety (90) percent of its Aggregate Credit Limit. For the purposes of calculating the Market Participant's Estimated Aggregate Liability, the CAISO shall include (1) outstanding charges for Trading Days for which Settlement data is available, and (2) an estimate of charges for Trading Days for which Settlement data is not yet available. To estimate charges for Trading Days for which Settlement data is not yet available, the CAISO will consider available historical Settlement data, and other available operational and market data as described in the applicable Business Practice Manual.

## 12.4.1   Resolution of a CAISO Request for Additional Security Amount

A Market Participant has two (2) Business Days to resolve a CAISO request for additional Financial Security. Within the two (2) Business Days, the Market Participant must either demonstrate to the CAISO's satisfaction that the CAISO's Financial Security request is entirely or partially unnecessary, or post the required Financial Security Amount calculated by the CAISO. If the CAISO and the Market Participant are unable to agree on the appropriate level of Financial Security during the two (2) Business Day review period, the Market Participant must post the additional Financial Security and may continue with the dispute process described in Section 12.4.2. Any excess Financial Security Amounts will be

EXHIBIT B - PAGE 12

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

Participant; equity and consistency of treatment of Market Participants in the dispute process; and the
evidentiary value of the information provided by the Market Participant in the dispute process.

## 12.5    CAISO Enforcement Actions

### 12.5.1  Under-Secured and Non-Compliant Market Participants

The CAISO may take action under this Section 12.5.1 against a Market Participant if its Estimated
Aggregate Liability, as calculated by the CAISO, at any time exceeds its Aggregate Credit Limit, or if a
Market Participant fails to satisfy all of the minimum participation requirements set forth in Section 12.1.
However, before taking action against a Market Participant based on failure to comply with Section
12.1(a) or 12.1(b)(i)-(iii), the CAISO must first notify the Market Participant of the failure and allow it thirty
(30) days after notification to cure the failure.  The CAISO may take any or all of the following actions:

    (a)    The CAISO may withhold a pending payment distribution.

    (b)    The CAISO may limit trading, which may include rejection of Bids, including Self-
Schedules, rejection or cancellation of Inter-SC Trades in their entirety (i.e., both sides of
the Inter-SC Trade) at any time, and/or limiting other CAISO Market activity, including
limiting eligibility to participate in a CRR Allocation or CRR Auction.  In such case, the
CAISO shall notify the Market Participant of its action and the Market Participant shall not
be entitled to participate in the CAISO Markets or CRR Auctions or submit further Bids,
including Self-Schedules, or otherwise participate in the CAISO Markets until the Market
Participant posts an additional Financial Security Amount that is sufficient to ensure that
the Market Participant's Aggregate Credit Limit is at least equal to its Estimated
Aggregate Liability.

    (c)    The CAISO may require the Market Participant to post an additional Financial Security
Amount in lieu of an Unsecured Credit Limit for a period of time.

    (d)    The CAISO may restrict, suspend, or terminate the Market Participant's CRR Entity
Agreement or any other service agreement.

    (e)    The CAISO may resell the CRR Holder's CRRs in whole or in part, including any Long
Term CRRs, in a subsequent CRR Auction or bilateral transaction, as appropriate.

    (f)    The CAISO will not implement the transfer of a CRR if the transferee or transferor has an

EXHIBIT B - PAGE 13

California Independent System Operator Corporation
Fifth Replacement Electronic Tariff

Estimated Aggregate Liability in excess of its Aggregate Credit Limit.

In addition, the CAISO may restrict or suspend a Market Participant's right to submit further Bids, including Self-Schedules, or require the Market Participant to increase its Financial Security Amount if at any time such Market Participant's potential additional liability for imbalance energy and other CAISO charges is determined by the CAISO to be excessive by comparison with the likely cost of the amount of Energy reflected in Bids or Self-Schedules submitted by the Market Participant.

### 12.5.2  Late Posting Of Financial Security

Each Market Participant that is late in posting Financial Security within two (2) Business Days as required by Section 12.4 will be subject to the following enforcement actions:

(a)     After each of the first two (2) times during a rolling twelve (12) month period that a Market Participant is late in posting additional Financial Security within two (2) Business Days as required by Section 12.4, the CAISO will send the delinquent Market Participant a warning notice.

(b)     After the third time during a rolling twelve (12) month period that a Market Participant is late in posting additional Financial Security, the CAISO may require the Market Participant to post an additional Financial Security Amount that is as high as the highest level of the Market Participant's Estimated Aggregate Liability during the preceding twelve (12) months.  The CAISO will hold such additional Financial Security Amount for no fewer than twelve (12) months following the month in which the Market Participant's third delinquency occurs, and the CAISO may then return to the Market Participant all or a portion of such additional Financial Security Amount if, during the intervening time, the Market Participant has timely posted all further additional Financial Security Amounts requested by the CAISO and has timely paid all of the amounts set forth in the Invoices from the CAISO.

(c)     After the third time and each subsequent time during a rolling twelve (12) month period beginning no earlier than April 7, 2010 that a Market Participant is late in posting additional Financial Security, the CAISO will assess a penalty to the Market Participant equal to the greater of $1,000 or two (2) percent of the additional Financial Security

# EXHIBIT C

## CAISO DAY-AHEAD ENERGY PRICES
## AUGUST 2020

| Hour Ending | 8/1 | 8/2 | 8/3 | 8/4 | 8/5 | 8/6 | 8/7 | 8/8 | 8/9 | 8/10 | 8/11 | 8/12 | 8/13 | 8/14 | 8/15 | 8/16 | 8/17 | 8/18 | 8/19 | 8/20 | 8/21 | 8/22 | 8/23 | 8/24 | 8/25 | 8/26 | 8/27 | 8/28 | 8/29 | 8/30 | 8/31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 25.89 | 26.13 | 23.48 | 22.77 | 23.31 | 22.98 | 21.15 | 23.03 | 24.89 | 23.44 | 23.94 | 24.89 | 26.20 | 36.68 | 50.10 | 53.34 | 52.08 | 88.27 | 49.19 | 44.06 | 41.26 | 36.75 | 37.46 | 33.65 | 38.34 | 38.41 | 35.66 | 35.51 | 36.70 | 32.96 | 29.82 |
| 2 | 25.39 | 25.62 | 22.99 | 22.37 | 22.77 | 22.68 | 21.22 | 23.18 | 24.14 | 23.39 | 22.91 | 24.35 | 25.32 | 33.67 | 47.32 | 52.74 | 48.96 | 84.58 | 46.18 | 39.60 | 36.66 | 35.20 | 35.51 | 32.70 | 35.31 | 37.00 | 33.93 | 35.43 | 34.82 | 32.99 | 29.60 |
| 3 | 24.93 | 23.79 | 21.49 | 20.45 | 21.27 | 22.16 | 19.81 | 22.41 | 24.91 | 22.28 | 22.12 | 23.41 | 24.17 | 32.40 | 43.75 | 49.55 | 46.25 | 75.41 | 40.42 | 39.49 | 36.88 | 33.26 | 34.12 | 30.13 | 32.96 | 33.71 | 29.68 | 33.72 | 33.04 | 30.84 | 28.02 |
| 4 | 24.14 | 23.42 | 21.16 | 19.88 | 20.76 | 22.06 | 20.00 | 22.57 | 24.00 | 21.65 | 21.41 | 23.28 | 24.19 | 32.25 | 42.25 | 49.67 | 45.86 | 75.72 | 38.25 | 34.15 | 36.06 | 31.51 | 31.84 | 29.65 | 31.90 | 34.43 | 28.94 | 32.54 | 33.58 | 31.37 | 28.10 |
| 5 | 23.80 | 23.00 | 21.53 | 20.24 | 21.21 | 22.32 | 20.40 | 22.76 | 24.17 | 22.31 | 22.18 | 24.06 | 24.31 | 30.97 | 39.74 | 45.50 | 46.75 | 81.50 | 40.53 | 36.60 | 33.81 | 31.31 | 30.99 | 30.99 | 32.18 | 34.03 | 30.07 | 32.11 | 32.16 | 31.95 | 29.93 |
| 6 | 24.31 | 25.61 | 24.61 | 22.24 | 23.94 | 24.55 | 22.78 | 22.95 | 24.50 | 24.49 | 25.23 | 26.60 | 28.79 | 38.13 | 43.17 | 47.88 | 46.13 | 103.38 | 42.85 | 36.63 | 34.89 | 34.30 | 34.04 | 33.83 | 34.79 | 37.86 | 34.01 | 34.34 | 33.72 | 32.39 | 32.66 |
| 7 | 26.15 | 22.91 | 25.55 | 28.10 | 32.79 | 32.69 | 30.41 | 26.46 | 25.49 | 26.78 | 28.35 | 35.76 | 34.40 | 45.25 | 75.12 | 50.18 | 91.00 | 158.41 | 63.02 | 69.77 | 61.77 | 38.05 | 35.29 | 42.94 | 45.52 | 44.18 | 42.22 | 39.90 | 35.75 | 30.79 | 37.33 |
| 8 | 18.88 | 15.24 | 19.98 | 20.38 | 21.09 | 21.93 | 21.40 | 18.08 | 15.79 | 21.50 | 21.69 | 25.67 | 30.33 | 37.32 | 39.27 | 30.98 | 56.94 | 95.95 | 54.09 | 49.69 | 42.33 | 31.75 | 29.30 | 36.78 | 36.74 | 36.90 | 36.18 | 34.48 | 30.60 | 28.05 | 32.86 |
| 9 | 13.61 | 8.17 | 13.68 | 15.27 | 16.44 | 15.34 | 14.63 | 9.94 | 7.73 | 16.20 | 13.53 | 21.66 | 25.38 | 33.44 | 34.66 | 26.25 | 46.08 | 83.37 | 44.41 | 40.45 | 36.29 | 29.57 | 25.64 | 31.53 | 32.17 | 32.95 | 31.24 | 29.80 | 18.72 | 18.73 | 23.85 |
| 10 | 14.96 | 7.66 | 13.94 | 15.79 | 15.65 | 14.82 | 13.71 | 10.12 | 8.42 | 15.72 | 15.06 | 22.81 | 26.52 | 34.68 | 41.60 | 29.03 | 47.41 | 86.52 | 46.63 | 39.82 | 35.78 | 29.18 | 26.78 | 32.04 | 32.21 | 32.44 | 31.06 | 28.57 | 19.91 | 16.66 | 19.68 |
| 11 | 18.61 | 12.59 | 15.17 | 17.52 | 16.50 | 14.26 | 15.06 | 11.17 | 10.57 | 17.20 | 15.75 | 23.48 | 29.40 | 36.89 | 48.20 | 37.66 | 54.07 | 96.89 | 49.07 | 44.15 | 37.38 | 35.57 | 28.92 | 33.99 | 36.17 | 36.71 | 35.80 | 30.80 | 20.66 | 17.37 | 21.85 |
| 12 | 21.95 | 16.59 | 18.00 | 19.79 | 17.83 | 14.54 | 17.11 | 14.20 | 15.12 | 21.37 | 18.99 | 25.94 | 31.22 | 40.76 | 55.07 | 49.69 | 61.67 | 115.47 | 53.77 | 53.69 | 42.84 | 37.28 | 34.98 | 40.37 | 42.30 | 42.93 | 37.67 | 33.38 | 23.14 | 20.52 | 26.07 |
| 13 | 25.50 | 21.24 | 22.65 | 22.09 | 20.41 | 14.81 | 18.99 | 17.50 | 18.13 | 22.89 | 21.83 | 28.06 | 36.51 | 57.07 | 65.92 | 57.71 | 82.31 | 147.41 | 68.25 | 55.42 | 44.67 | 40.12 | 47.72 | 51.73 | 46.93 | 40.86 | 37.89 | 29.08 | 25.08 | 28.99 | |
| 14 | 27.02 | 24.22 | 24.96 | 24.96 | 21.75 | 15.98 | 21.18 | 21.67 | 21.83 | 23.83 | 24.13 | 27.33 | 40.40 | 61.49 | 76.15 | 58.06 | 90.00 | 189.28 | 80.85 | 73.22 | 62.61 | 52.51 | 42.33 | 53.77 | 58.03 | 60.00 | 51.13 | 43.33 | 33.55 | 28.58 | 31.99 |
| 15 | 28.34 | 27.08 | 27.96 | 24.35 | 22.26 | 19.26 | 22.46 | 22.15 | 23.74 | 24.50 | 24.72 | 28.55 | 46.30 | 73.94 | 87.87 | 80.36 | 126.58 | 1,053.46 | 86.03 | 77.84 | 63.41 | 51.95 | 48.37 | 54.78 | 58.65 | 66.24 | 59.49 | 53.19 | 36.37 | 31.55 | 34.54 |
| 16 | 31.98 | 27.54 | 30.90 | 25.96 | 24.11 | 20.83 | 24.02 | 23.52 | 25.86 | 26.04 | 25.23 | 32.76 | 51.75 | 100.23 | 90.81 | 88.53 | 764.13 | 1,062.87 | 102.87 | 89.94 | 65.40 | 53.89 | 54.11 | 61.87 | 64.51 | 75.02 | 66.64 | 55.45 | 38.36 | 32.55 | 35.53 |
| 17 | 37.95 | 31.11 | 36.52 | 26.36 | 23.55 | 21.31 | 22.41 | 25.09 | 25.57 | 27.48 | 28.43 | 34.18 | 61.38 | 150.23 | 97.62 | 95.55 | 916.08 | 1,454.54 | 116.34 | 94.83 | 69.61 | 62.24 | 58.99 | 62.46 | 69.94 | 85.10 | 74.70 | 62.05 | 39.34 | 34.31 | 36.49 |
| 18 | 41.40 | 37.00 | 37.11 | 30.02 | 27.01 | 24.49 | 26.09 | 26.16 | 30.35 | 34.27 | 34.90 | 40.51 | 96.49 | 463.16 | 157.96 | 143.58 | 1,017.50 | 1,467.10 | 203.18 | 160.44 | 67.48 | 78.00 | 64.76 | 82.12 | 92.03 | 125.11 | 129.83 | 90.23 | 52.04 | 43.08 | 46.05 |
| 19 | 102.69 | 63.50 | 57.60 | 42.40 | 34.31 | 31.69 | 35.27 | 39.07 | 42.17 | 44.81 | 46.62 | 63.35 | 200.00 | 966.80 | 679.31 | 296.47 | 1,033.69 | 1,508.02 | 998.46 | 990.73 | 329.46 | 145.25 | 115.05 | 176.02 | 279.22 | 285.00 | 405.04 | 254.14 | 75.40 | 66.24 | 74.69 |
| 20 | 144.50 | 125.00 | 126.94 | 58.88 | 46.84 | 45.17 | 47.66 | 48.58 | 52.87 | 57.50 | 63.04 | 79.00 | 210.54 | 970.74 | 798.78 | 255.46 | 1,000.00 | 1,514.72 | 990.50 | 991.08 | 115.04 | 105.00 | 100.23 | 201.45 | 250.00 | 170.00 | 187.42 | 131.30 | 70.32 | 55.92 | 55.76 |
| 21 | 65.00 | 48.43 | 45.62 | 40.76 | 37.27 | 36.46 | 35.17 | 36.00 | 41.73 | 40.42 | 43.47 | 49.89 | 85.49 | 331.87 | 120.95 | 99.92 | 824.00 | 1,101.57 | 141.38 | 111.89 | 84.68 | 63.11 | 63.06 | 73.97 | 80.66 | 75.48 | 76.44 | 60.31 | 47.65 | 46.82 | 45.40 |
| 22 | 39.58 | 36.83 | 36.39 | 32.79 | 31.56 | 31.14 | 31.74 | 31.52 | 33.65 | 33.16 | 37.90 | 50.23 | 92.77 | 86.75 | 91.05 | 125.85 | 1,031.04 | 97.32 | 74.83 | 67.28 | 53.65 | 54.88 | 58.63 | 63.51 | 61.56 | 61.66 | 50.27 | 39.87 | 38.86 | 40.04 | |
| 23 | 29.34 | 28.44 | 28.91 | 25.51 | 24.36 | 25.63 | 25.58 | 24.65 | 26.95 | 27.28 | 27.48 | 30.83 | 34.90 | 52.79 | 67.34 | 62.64 | 90.37 | 131.59 | 61.05 | 57.64 | 59.16 | 41.54 | 41.12 | 44.71 | 42.61 | 44.88 | 44.17 | 41.06 | 37.17 | 36.51 | 35.60 |
| 24 | 28.32 | 25.73 | 25.33 | 26.66 | 23.14 | 24.79 | 24.77 | 23.70 | 24.73 | 24.75 | 26.02 | 28.91 | 31.49 | 46.75 | 59.79 | 57.34 | 62.13 | 102.72 | 53.85 | 48.67 | 47.04 | 37.85 | 39.85 | 41.86 | 38.98 | 42.08 | 44.42 | 41.40 | 36.02 | 32.98 | 31.57 |
| Grand Total | 36.01 | 30.27 | 30.99 | 25.94 | 24.63 | 23.41 | 23.88 | 23.59 | 24.81 | 26.82 | 27.09 | 32.64 | 53.03 | 158.16 | 122.69 | 79.35 | 282.40 | 496.24 | 148.69 | 139.91 | 65.11 | 49.72 | 46.16 | 57.00 | 65.85 | 65.79 | 68.47 | 54.89 | 36.92 | 33.21 | 34.85 |

EXHIBIT C - PAGE 1

**EXHIBIT D**



# Western Community Energy
# Joint Meeting of
# Western Community Energy and
# Technical Advisory Committee

## SPECIAL MEETING AGENDA

Monday, May 24, 2021
8:00 a.m.

Western Riverside Council of Governments
3390 University Avenue, Suite 200
Riverside, CA 92501

**WRCOG'S OFFICE IS CURRENTLY CLOSED TO THE PUBLIC DUE TO COVID-19
AND STAFF ARE WORKING REMOTELY**

**Members of the public are encouraged to participate in this meeting via Zoom
(see meeting information below)**

Join Zoom Meeting
CLICK HERE

Meeting ID: 874 3350 0970
Passcode: 654574

Dial by your location
+1 669 900 9128 U.S. (San Jose)
+1 253 215 8782 U.S. (Tacoma)

**SPECIAL NOTICE – COVID-19 RELATED PROCEDURES IN EFFECT**

Due to the state and local State of Emergency resulting from the threat of Novel Coronavirus (COVID-19), Governor Newsom has issued Executive Order N-29-20 (issued March 17, 2020) in which Section 3 supersedes Paragraph 11 of Executive Order N-25-20 (issued on March 12, 2020). This new order states that WRCOG does not need to make a physical location available for members of the public to observe a public meeting and offer public comment. The Order allows WRCOG to hold Committee meetings via teleconferencing and allows for members of the public to observe and address the meeting telephonically or electronically.

**To follow the Order issued by the Governor, the Special WCE Joint Meeting of the Board of Directors and Technical Advisory Committee scheduled for Monday, May 24, 2021, at 8:00 a.m. will be held by video and teleconference and any members of the public can attend electronically.** Members of the public may send public comments by emailing snelson@wrcog.us, or calling (951) 405-6703 before or during the meeting, prior to the close of public comment.

Any member of the public requiring a reasonable accommodation to participate in this meeting in light of this announcement shall contact Suzy Nelson prior to May 24, 2021, at 8:00 a.m. at (951) 405-6703 or snelson@wrcog.us.

The Board of Directors may take any action on any item listed on the agenda, regardless of the Requested Action.

# 1.    CALL TO ORDER

# 2.    PLEDGE OF ALLEGIANCE

# 3.    ROLL CALL

# 4.    PUBLIC COMMENTS

At this time members of the public can address the Committee regarding any items within the subject matter jurisdiction of the Committee that are not separately listed on this agenda. Members of the public will have an opportunity to speak on agendized items at the time the item is called for discussion. No action may be taken on items not listed on the agenda unless authorized by law. Whenever possible, lengthy testimony should be presented to the Committee in writing and only pertinent points presented orally.

# 5.    CONSENT CALENDAR

All items listed under the Consent Calendar are considered to be routine and may be enacted by one motion. Prior to the motion to consider any action by the Board of Directors, any public comments on any of the Consent Items will be heard. There will be no separate action unless members of the Board of Directors request specific items be removed from the Consent Calendar.

**A.**    Summary Minutes from the May 6, 2021, Special Joint Meeting of the Board of       P. 1
Directors and Technical Advisory Committee

   *Requested Action:*     1.      *Approve the Summary Minutes from the May 6, 2021, Special Joint Meeting of the Board of Directors and Technical Advisory Committee.*

**B.**    Summary Minutes from the May 12, 2021, Special Joint Meeting of the Board of       P. 3
Directors and Technical Advisory Committee

   *Requested Action:*     1.      *Approve the Summary Minutes from the May 12, 2021, Special Joint Meeting of the Board of Directors and Technical Advisory Committee.*

**C.**    Approval of Engagement and Legal Services Agreement with Weiland Golden       P. 5
Goodrich, LLP

   *Requested Action:*     1.      *Approve, as to form, and authorize the Executive Director to enter into an Engagement and Legal Services Agreement with Weiland Golden Goodrich, LLP.*

# 6.    CLOSED SESSION

Conference with Legal Counsel – Anticipated Litigation
Potential Initiation of Litigation pursuant to Government Code Section 54956.9(d)(4)
Two (2) potential cases

Conference with Legal Counsel---Anticipated Litigation
Significant Exposure to Litigation pursuant to Government Code Section 54956.9(d)(2)
Twelve (12) potential cases

## 7.  OPEN SESSION

**A.**   WCE Declaration of Fiscal Emergency                *David Wright, WRCOG*        P. 21

*Requested Action:*    1.    *Adopt Resolution No. 2021-09; A Resolution of the Board of Directors of Western Community Energy Declaring a fiscal emergency.*

**B.**   Discussion and Consideration of Potential Bankruptcy          *Glen Price, BB&K*    P. 29

*Requested Action:*    1.    *Adopt Resolution No. 2021-10; A Resolution of the Board of Directors of Western Community Energy authorizing the filing of a petition under Chapter 9 of the United States Bankruptcy Code.*

## 8.  NEXT MEETING:   The next WCE Joint Board of Directors and Technical Advisory Committee meeting is scheduled for June 9, 2021, at 1:15 p.m., on the Zoom platform. Committee members will have the option of attending this meeting in-person.

## 9.  ADJOURNMENT

EXHIBIT - E

Item 7.A



# Western Community Energy
## Joint Meeting of the
## Board of Directors and
## Technical Advisory Committee

### STAFF REPORT

**Subject:**     **WCE Declaration of Fiscal Emergency**

**Contact:**     **David Wright, WRCOG Consultant, dwright@wrcog.us, (951) 405-6720**

**Date:**       **May 24, 2021**

*The purpose of this item is to provide the Board an update on WCE's fiscal standing and declaration of fiscal emergency.*

REQUESTED ACTION:

1.      Adopt Resolution No. 2021-09; A Resolution of the Board of Directors of Western Community Energy declaring a fiscal emergency.

**Background:** WCE was formed in 2018 and went through a lengthy process of preparing for implementation of its Community Choice Aggregation (CCA) program in April 2020, including entering into contracts for energy, Resource Adequacy (RA), and renewable energy portfolio requirements, and obtaining a $16 million credit facility to assist with posting collateral and funding operations. In early 2020, based on the proforma that was prepared at the time and approved by its lender, WCE believed that it was in a good position for its roll out to customers and the implementation of a successful program. What WCE did not know and had no way to prepare for were the multiple and ultimately disastrous events during its first year of operation.

Concurrent with the initiation of operations, the COVID-19 pandemic created increased overall electric usage that stemmed from being on lock-down, as well as created hardships for those that could not pay their power bills. In April 2020, the Governor of California issued an order (which was later implemented by the California Public Utilities Commission) that no customers could be disconnected due to non-payment of their utility bills. Delinquencies surged to five to ten times higher than industry standards, where they remain, having an impact on WCE of approximately $6 million as of the date of this report. The order prohibiting disconnections remains in effect through June 2021.

In August 2020, California experienced an unprecedented heat event, which resulted in substantially higher power needs and a spike in the cost of energy. Although WCE had procured 90% of its electricity needs for the summer of 2020 (an industry standard for public utilities), the heat storm blew through the anticipated needs. An additional $12 million in energy costs were incurred throughout the 2020 summer season due to the unanticipated warm weather. Many of these costs were not known until November and December of 2020, as reconciliations and invoices from the California Independent System Operator (CAISO) continued to come in for payment.

In an additional hit to WCE's bottom line, a tightening of the requirements of the State of California for RA created a shortage in the market, significantly increasing the cost of regulatory compliance.

Other CCAs and utilities in California experienced similar events and challenges, however, to weather the storm, they were able to draw on reserves that were built up over years of operation. As WCE commenced operation during these shocks, it did not have the opportunity to build financial reserves and had no cushion to fall back on.

In starting in December 2020 and continuing through January 2021, WCE began the process of re-evaluating its

EXHIBIT E - PAGE 1

21

financial proforma in the hope of seeking additional financing from its lender to cover some of the losses in 2020 and allow it to move forward.  However, in February 2021, the lender indicated that it would no longer allow WCE to draw under its existing line of credit until rate adjustments were made, putting further pressure on WCE's cash flow.  In February 2021, a freeze hit Texas that had substantial repercussions on the electrical grid and energy prices and even had effects on the California energy market prices during the weather events.  This event has led to growing concern in the California market about summer energy prices in the event of a destabilizing heat event, particularly given that CAISO raised the real time market cap on energy prices from $1,000 to $2,000.  This increase substantially increases risk and exposure to price spikes in a heat event.

In early spring 2021, WCE adjusted rates to recover the unanticipated costs from 2020 and anticipated higher costs for energy in 2021.  It further determined that until those rates would kick in to provide needed additional revenue, WCE required an additional $25 million in financing to get through the next two years while the cash flow was rebuilt.  WCE sought to obtain this financing from a combination of contributions / loans from its member agencies and lenders.  The passage of the COVID-19 American Rescue Plan Act by Congress appeared particularly promising as the member agency loans could potentially be financed through these funds, particularly the losses related to the COVID-19 delinquencies.

WCE further determined that it needed to hire its own professional staff so WCE could stop relying almost exclusively on recommendations from consultants.  The reliance on consultants appeared to be a significant problem, particularly considering the decision not to purchase sufficient energy in advance for the summer 2021, which became apparent only after WCE staff conducted additional review of available power contracts.

As the lack of adequate energy supplies for the summer of 2021 became clear, WCE initiated plans to cover the shortage.  At the time that WCE was moving to make these purchases in April 2021, the market for energy for the summer of 2021 was becoming increasing volatile (in part due to the concerns of a Texas-like crisis and spike in energy prices) and the revised proforma that was completed in March now had pricing expectations that were 25% below escalating market prices.  Instead of the $90 per MWh called for in the proforma, the costs had risen to $125.  This increased the cash flow requirements of WCE from an infusion of $25 million to over $40 million to make it through another year of operations.  Given the volatility in summer prices, additional cash flow in excess of $40 million could easily be required to respond to heat events.

The final hit to WCE came in May 2021 with the release of the final Treasury Department guidelines on the use of COVID-19 American Rescue Plan funds.  While the actual legislation enacted by Congress seemed to indicate that ARPA funds could be used to assist WCE, any final decision on their actual use was dependent on the language in these guidelines.  Preliminary decisions with WCE members indicated that several of our members were amenable to using a portion of their ARPA allocation. Unfortunately, these guidelines tightened the requirements for COVID-19 relief funding, significantly limiting the portion of the contributions / loans from member entities that could be financed with these funds.  At the same time, WCE's lender indicated that it would not provide any bridge funding to get WCE through the financial crisis unless WCE member agencies agreed to provide $25 million in financing and a guarantee of repayment of the bridge funding.  At a time when many local governments are still recovering from the COVID-19 pandemic, obtaining this funding in time to keep WCE financially viable simply became untenable.  As of the time of this Board meeting, no WCE member agency has formally committed to provide funds to WCE, either through COVID-19 relief or other sources.

WCE has an overall Fiscal Year 2021 budget of $125 million.  WCE operates in a format where all revenues are deposited into a lockbox and WCE can access those funds on the 20th of each month to pay creditors.  As of May 19, 2021, WCE had $34 thousand in its operating bank account and $5.4 million in its lockbox account, the bulk of which was committed to payments to energy providers.  WCE is currently in default of more than $12 million in payment obligations to Southern California Edison (SCE) and another $5 million in payment obligations to other vendors.  This does not include the sums due to its lender for advances of $4 million and letters of credit in excess of $6 million.  WCE has over $10 million in anticipated expenses by the end of May and is unable to cover its anticipated costs.  WCE's projected cash flows show deficits that reach individual monthly totals of up to $40 million over the next two years, and even then, only after raising customer rates by 15% to 30% in each of those years.

WCE is generally not paying its debts as they become due.  Without an immediate injection of working capital, WCE will be unable to pay its bills as they become due.  Hence, a fiscal emergency exists that threatens WCE's ability to continue operations.  WCE is continuing to seek sources of working capital, but at this point, WCE is prioritizing the payment of the providers who supply energy for its customers and payments to CAISO.  There is a separate item on

today's agenda for the Board to consider authorizing its legal counsel to file a Chapter 9 Bankruptcy petition to give WCE additional time to explore remaining options to continue operations and if not, to allow WCE to wind down operations and initiate a sequenced and smooth transition of WCE customers back to SCE and an agreement with its creditors.

## PRIOR ACTION:

None.

## FISCAL IMPACT:

To be determined.

## ATTACHMENT:

1.      Resolution No. 2021-09; A Resolution of the Board of Directors of Western Community Energy declaring a fiscal emergency.

# EXHIBIT - F

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison

Rosemead, California    (U 338-E)

| | Revised | Cal. PUC Sheet No. | 70466-E |
|---|---|---|---|
| Cancelling | Revised | Cal. PUC Sheet No. | 67459-E |

Rule 23
COMMUNITY CHOICE AGGREGATION

Sheet 1

TABLE OF CONTENTS

    A. CUSTOMER SERVICE ELECTIONS

    B. GENERAL TERMS

    C. CUSTOMER INQUIRIES AND DATA ACCESSIBILITY

    D. BASIC CCA SERVICE

    E. CCA SPECIALIZED SERVICE REQUESTS, INCLUDING PHASE-IN

    F. CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT

    G. CCA SERVICE CUSTOMER ELIGIBILITY

    H. CCA CUSTOMER NOTIFICATION PROCESSES

    I. CCA CUSTOMER OPT-OUT PROCESSES

    J. CCA SERVICE MASS ENROLLMENT PROCESSES

    K. CUSTOMER RELOCATION PROCESSES FOLLOWING MASS ENROLLMENT

    L. CCA CUSTOMERS SWITCHING RULES

    M. CCA SERVICE REQUESTS (CCASR) AFTER MASS ENROLLMENT

    N. METERING SERVICES

    O. BOUNDARY METERING SPECIAL REQUESTS

    P. BILLING SERVICE OBLIGATIONS

    Q. PAYMENT AND COLLECTION TERMS

    R. LATE OR PARTIAL PAYMENTS AND UNPAID BILLS

    S. VOLUNTARY CCA SERVICE TERMINATION

    T. INVOLUNTARY SERVICE CHANGES

    U. SERVICE DISCONNECTIONS AND RECONNECTIONS

    V. CREDIT REQUIREMENTS

    W. CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS    (N)

    X. CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE
       REQUIREMENTS    (N)

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 1C12 | | Resolution | E-5059 |

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison                                      Original      Cal. PUC Sheet No.    70475-E
Rosemead, California      (U 338-E)          Cancelling    Revised    Cal. PUC Sheet No.    63380-E

Rule 23                                          Sheet 44        (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

T.    INVOLUNTARY SERVICE CHANGES                                                         (L)

1.    Service Changes

Pursuant to D.05-12-041, absent the express approval of the CCA, an order of a
court, the Commission or the FERC, SCE shall adhere to the requirements set forth
below in the event it seeks to terminate service to a CCA.

2.    SCE shall send notices of involuntary service changes or termination to the CCA, to
each affected CCA customer, and to the Commission.  The CCA shall be responsible
for all SCE costs associated with an Involuntary Service Change occurrence.  Such
costs may include, but are not limited to, system, administrative, customer         (C)
communications, legal costs and any Re-Entry Fees owed by the CCA upon an
Involuntary Return pursuant to Section W. of this Rule.  SCE has the right to withhold
and offset CCA customer payment remittance to the CCA until the CCA has paid all    (C)
such undisputed charges, including Re-Entry Fees pursuant to Section W of this Rule  (N)
that are in excess of the posted CCA FSR amount.  SCE will refund any CCA funds
that SCE has retained that are greater than the costs SCE incurred, or at the time that
the CCA fully replaces an FSR instrument because it terminated or expired or for
other reasons specified in Section W.1 of this Rule.  Pursuant to D.05-12-041, absent
the express approval of the CCA, an order of a court, the Commission or the FERC,
SCE shall adhere to the requirements set forth below in the event it seeks to
terminate service to a CCA.                                                          (L)(N)

(Continued)

(To be inserted by utility)              Issued by              (To be inserted by Cal. PUC)
Advice      4394-E                     Carla Peterman          Date Submitted    Jan 15, 2021
Decision    18-05-022              Senior Vice President       Effective          Jan 15, 2021
44C17                                                          Resolution         E-5059

EXHIBIT F - PAGE 2

**EDISON**
As EDISON INTERNATIONAL Company
Southern California Edison
Rosemead, California    (U 338-E)

Revised    Cal. PUC Sheet No.    70476-E
Cancelling    Revised    Cal. PUC Sheet No.    63380-E

Rule 23
COMMUNITY CHOICE AGGREGATION

Sheet 45    (T)

(Continued)

T.    INVOLUNTARY SERVICE CHANGES (CONTINUED)    (T)
(L)

3.    Change of Service Election In Exigent Circumstances

Where continued CCA service would constitute an emergency or may substantially compromise SCE operations or service to bundled customers, SCE should seek an emergency order from the Commission.  In the event a CCA or a customer has failed to meet its obligations under this Rule or CCA Service Agreement such that SCE seeks to invoke its remedies under this Section, and the failure constitutes an emergency (i.e. the failure poses a substantial threat to the reliability of the electric system or to public health and safety or the failure poses a substantial threat of irreparable economic or other harm to SCE or the customer), or the failure relates to CCA's unauthorized energy use, then SCE may initiate a change, or, in some cases, terminate a customer's CCA Service, or a CCA's ability to provide services under CCA.  In such case, SCE shall seek an emergency order from the Commission. Pursuant to D.05-12-041, the assigned Administrative Law Judge (ALJ), in consultation with the assigned Commissioner, is authorized to issue a ruling providing interim authority for SCE to terminate a CCA's service.  Upon receipt of such a ruling, SCE shall initiate the change or termination by preparing a CCASR, but the change or termination may be made immediately notwithstanding the applicable CCASR processing times set forth in this Rule.  SCE shall provide such notice to the CCA and/or the affected customer as is reasonable under the circumstances of this section, if any is reasonable.  The CCA or the affected customer shall have the right to seek an order from the Commission restoring the customer's service election and/or the CCA's ability to provide services.    If a customer's CCA Service is terminated because the customer failed to meet its obligations under this Rule, the    (N)
customer will be subject to the provisions of Section L and the terms and conditions of Bundled Portfolio Service.   Unless expressly ordered by the Commission, these provisions do not disconnect electric service provided to the customer. If the CCA's    (N)
ability to provide CCA Service is terminated under this Section T, such termination will    |
result in an Involuntary Return of the CCA's customers to Bundled Service,    |
irrespective of whether the CCA is a JPA, a constituent member of a JPA, or an    |
individual CCA.    (N)

(Continued)

(To be inserted by utility)
Advice    4394-E
Decision    18-05-022
45C14

Issued by
Carla Peterman
Senior Vice President

(To be inserted by Cal. PUC)
Date Submitted    Jan 15, 2021
Effective    Jan 15, 2021
Resolution    E-5059

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison
Rosemead, California     (U 338-E)

Revised     Cal. PUC Sheet No.    70477-E
Cancelling   Revised     Cal. PUC Sheet No.    63381-E

Rule 23                                                    Sheet 46     (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

T.    INVOLUNTARY SERVICE CHANGES (Continued)

4.    Change of Service Election Absent Exigent Circumstances

In the event SCE finds that a CCA has failed to meet its obligations under this Rule or
CCA Service Agreement such that SCE seeks to invoke its remedies under this
Section, but the failure does not constitute an emergency (as defined in Section T.3),
SCE shall notify the CCA and the affected customer of such finding in writing stating
specifically:

a.    The nature of the alleged non-performance;

b.    The actions necessary to cure it;

c.    The consequences of failure to cure it and the remedy SCE proposes to
invoke in the event of a failure to cure; and

d.    The name, address and telephone number of a contact person at SCE
authorized to discuss resolution of the problem.

The CCA shall have thirty (30) days from receipt of such notice to cure the alleged
non-performance or reach an agreement regarding it with SCE. If the problem is not
cured or an agreement is not reached following this 30 day period, SCE may seek
authority from the Commission to terminate CCA Service. SCE's request to the
Commission shall specify the reasons for the requested termination, the impacts of
the termination, and the expected impacts if the CCA's service is not terminated.
Upon Commission approval, SCE may initiate the CCASR process set forth in this
Rule to accomplish the remedy set forth in the notice. If a customer's CCA Service is
terminated, the customer will be subject to the provisions of Section L and the terms
and conditions of Bundled Portfolio Service, unless the customer is eligible for Direct
Access and has previously selected another ESP in accordance with Rule 22. SCE
shall suspend the exercise of such remedy if, before the end of the cure period, the
CCA has filed an application with the Commission requesting an order from the
Commission that the CCA is entitled to continue the CCA Service Agreement and
SCE is not entitled to exercise the remedy it has identified in its notice. The status of
the CCA shall not change pending the Commission's review of SCE's request
provided that an emergency, as described in Section T.3 of this Rule does not arise.
Unless expressly ordered by the Commission, these provisions do not disconnect
electric service provided to the customer. SCE's action to defer the exercise of its
remedies in accordance with this section does not constitute a waiver of any rights.

(Continued)

(To be inserted by utility)          Issued by              (To be inserted by Cal. PUC)
Advice     4394-E                  Carla Peterman          Date Submitted    Jan 15, 2021
Decision   18-05-022            Senior Vice President      Effective         Jan 15, 2021
46C15                                                      Resolution        E-5059

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 70478-E |
|---|---|---|---|---|
| Rosemead, California   (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 63382-E |

Rule 23                                    Sheet 47    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

T.    INVOLUNTARY SERVICE CHANGES (Continued)

5.    Following consultation with the CCA, SCE is authorized to serve CCA customers temporarily where the CAISO or the CCA has notified SCE that customers would otherwise not be served. In such cases, the CCA's Service Agreement is not terminated; however SCE shall immediately initiate the process to return affected CCA customers to Bundled Service without prior Commission approval. SCE shall initiate the service change by preparing a CCASR, but the service change may be made immediately notwithstanding the applicable CCASR processing times set forth in this Rule. Affected customers will be provided service temporarily under Schedule PC-TBS. CCA customers receiving temporary service in this situation may not seek service from other ESPs or CCAs. SCE may seek authority from the Commission to terminate CCA Service pursuant to Section T.4 of this Rule at anytime after being notified that the CCA's customers are not being served.

6.    Burden of Proof Before Commission

In any case before the Commission the party bearing the burden of going forward and the party bearing the burden of proof shall be established in the manner normally established at the Commission.

7.    Involuntary Returns                                                      (N)

a.    An Involuntary Return is defined in Section B.29 herein.

b.    Action in the Event of an Involuntary Return
Except for the customers eligible for Direct Access that previously selected another ESP under the procedures set forth in the Direct Access Rules 22 and 22.1., upon the Involuntary Return of a CCA Service customer, the customer shall be returned to BPS subject to the terms in Section L, but is not subject to Transitional Bundled Service as defined in SCE's rate Schedule PC-TBS.    (N)

8.    Action in the Event of Termination                                       (D)

At any time not less than three (3) years and six (6) months after termination of a CCA's CCA Service rights pursuant to this Section T, the CCA's eligibility to engage in CCA Service shall be reinstated upon a reasonable showing by the CCA that the cause(s) of the CCA's termination have been cured, all past due charges and arrearages have been paid, with interest, including any unpaid Re-Entry Fees owed    (N)
by the CCA as a result of an Involuntary Return pursuant to Section W of this Rule,    (N)
and the CCA has re-established compliance with all then-current Commission requirements, including credit requirements under Section V.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice      4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 47C18 | | Resolution | E-5059 |

EXHIBIT  - G



May 19, 2021

VIA UPS OVERNIGHT MAIL
Western Community Energy
3390 University Ave., Suite 200
Riverside, CA 92501
Attn: Executive Director

Re:    **Request of Pilot Power Group, LLC to Meet and Confer regarding disputes
under the Professional Services Agreement (the "Agreement") by and
between WESTERN COMMUNITY ENERGY and PILOT POWER GROUP,
dated August 15, 2019.**

Dear Executive Director:

Section 3.6.3 of the Professional Services Agreement (the "Agreement") by and
between WESTERN COMMUNITY ENERGY and PILOT POWER GROUP, dated August
15, 2019, states that "The Parties shall meet and confer together in good faith
regarding any dispute, controversy or claim (each a "Dispute") arising out of or
relating to this Agreement,...A meet and confer shall occur within ten (10) business
days of any Dispute..."  Pilot Power hereby notifies WCE that various Disputes have
arisen under the Agreement requiring the Parties to meet and confer within ten (10)
business days of this notice.

The Disputes arising out of the Agreement about which "The Parties shall meet and
confer together in good faith" consist of the following:

1.    Payment of Pilot Power's Service Fees, Expenses, and Special Projects or "Extra
Work."   Sections 3.4.2 and 3.4.3 of the Agreement require that "WCE shall,
within 30 days of receiving such invoice, review the invoice and pay all
approved charges thereon."  WCE has not paid Pilot Power's invoices in a
timely manner and currently is in arrears in the amount of $86,407.34. An
additional sum of $40,176.24 is required to be paid no later than June 11, 2021.

2.    Commodity Payments.   Pursuant to Section 1(d) of Schedule 1 to the
Agreement, WCE is required to reimburse Pilot Power for any and all energy
procurement costs paid on behalf of WCE.  WCE has not paid Pilot Power's
invoices for Resource Adequacy and Renewable Portfolio Standards products
in a timely manner and currently is in arrears in the amount of $271,633.50.

3.    CAISO Charges.  WCE is required to pay CAISO invoices as they become due so
that Pilot Power is not compelled to pay the CAISO invoices on WCE's behalf.
WCE failed to pay the CAISO invoice on May 18, 2021, in the amount of
$417,968.82.

4.      CRR Management Fees.  Pursuant to Section 2(g)(ii) of Schedule 1 to the Agreement, WCE is required to pay Pilot Power "20 percent of the revenues generated through the CRR allocation process."  A payment in the amount of $24,937.28 was due on May 17, 2021, and has not been made by WCE.

5.      Creation of Lock Box account at City National Bank.  Section 7(d) of Schedule 1 to the Agreement provides: Pilot Power "shall provide all working capital, credit and collateral ("Credit Support") necessary to support all functions of Energy Procurement as described in Section 1 of this Schedule 1; provided that WCE is in full compliance with the terms and conditions of Exhibit A to this Schedule 1.  If WCE does not comply fully with the provisions of Exhibit A, WCE agrees to employ its own capital, credit and collateral to support Energy Procurement."

Exhibit A requires that WCE: 1) deposit all revenues of any kind immediately into a fiduciary account (a "Lock Box") at City National Bank; 2) grant Pilot Power a first priority security interest in the Lock Box, the Lock Box account, and any proceeds thereof; 3) deliver to Pilot Power and City National Bank a deposit account control agreement and other agreements as reasonably may be required granting Pilot Power control over the Lock Box and all monies therein; 4) granting Pilot Power the authority and control over the Lock Box account to make payments from the Lock Box account pursuant to the priorities established in Section B of Exhibit A to Schedule 1 to the Agreement.

WCE has failed to comply with any of the provisions of Exhibit A.  Pursuant to Section 7(d) of Schedule 1, WCE is therefore required "to employ its own capital, credit and collateral to support Energy Procurement."  Through its agreement with Barclays Bank, WCE has employed its own capital, credit and collateral to support some of the Energy Procurement, but not all as required by the Agreement.  WCE has failed to employ its own capital, credit and collateral in the procurement of: 1) Resource Adequacy capacity products; 2) Renewable Energy; 3) Ancillary Services; and 4) Deposits with the CAISO.  Pilot Power has been procuring and paying for Resource Adequacy capacity products and Renewable Energy products and expending its own capital and credit, and posting its own deposits.  Moreover, with respect to Ancillary Services, Pilot Power has been expending its own capital, credit and deposits by performing all CAISO Scheduling Coordination functions under its own Scheduling Coordinator ID.  All load being scheduled under a Pilot Power SC ID employs Pilot Power's credit with the CAISO, together with the letters of credit and other collateral postings required by the CAISO in order for Pilot Power to continue to serve as a Scheduling Coordinator.  Moreover, when, as occurred on May 18, 2021, WCE fails to pay a CAISO invoice when due, Pilot Power (as the owner of the SC ID) is required to make the payment or be cut off by the CAISO from providing SC services for any of the load it serves.

WCE must immediately either comply fully with the provisions of Exhibit A, or employ its own capital, credit and collateral to support all Energy Procurement as described in Section 1 of Schedule 1, and in Sections 7(c) and 7(d) of Schedule 1, including without limitation, Resource Adequacy, Renewable Energy, and Ancillary Services (which also necessitates WCE providing an SC ID under which Pilot Power can perform the scheduling services required under the Agreement so that Pilot Power is not compelled to provide, or at risk to provide, capital, credit and collateral in connection with the CAISO if WCE defaults on CAISO payments).

6.     Credit Support Fee.  Pursuant to Section 7(d)(ii) of Schedule 1 to the Agreement, a Credit Support Fee of $0.250 per MWh is due from WCE to Pilot Power each month based on the energy consumed in the given month.  Pilot Power has been providing Credit Support for the procurement of Resource Adequacy capacity, Renewable Energy and Ancillary Services.  Nevertheless, Pilot Power has not invoiced WCE for the required Credit Support Fee.  Pilot Power will begin including the Credit Support Fee in its monthly invoices, and shall issue a separate invoice for Credit Support Fees due in connection with prior months.

Pursuant to Section 7(d)(iii), WCE can eliminate the Credit Support Fee by substituting its own capital, credit and collateral in the place and stead of Pilot Power.  However, the Credit Support Fee can be eliminated only "Upon the full substitution and/or repayment to [Pilot Power] of capital, credit and collateral posted, pledged, or paid on behalf of WCE (including, without limitation CAISO charges)..."  WCE must also repay in full to Pilot Power any deposits that Pilot Power has made on WCE's behalf with any third party, including, without limitation, the CAISO.

7.     Payment Protocols.  Exhibit C to Schedule 1 to the Agreement requires that Pilot Power's Accounting Department process all transfers from the Lock Box account.  In other words, Pilot Power is to have control over the disbursement of all revenues from CCA operations.  This control over the revenues is the primary means of protection and risk mitigation for Pilot Power.  WCE has prevented Pilot Power from obtaining control over and management of the CCA revenues as envisioned in the Agreement, and has prevented Pilot Power from providing various of its services to WCE to the detriment of both WCE and Pilot Power.

Pilot Power requests that the Parties Meet and Confer regarding the foregoing Disputes via a Google Meet, commencing at 9:30 am, on May 28th, 2021.

The Google Meeting ID is: https://meet.google.com/mfg-nxwa-zdm
Voice: (US) +1 419-901-8655 and meeting pin is: 442 169 736#.

WCE fails or refuses to Meet and Confer in good faith, Pilot Power will be compelled to consider WCE's refusal as an unambiguous statement that WCE intends to fully and completely breach and repudiate the Agreement. Pilot Power will then pursue all legal and equitable remedies at its disposal. Please be advised that if Pilot Power is required to pursue legal and/or equitable proceedings, this letter will be submitted as an exhibit in any such proceedings of Pilot Power's attempts to resolve the Disputes amicably without resort to legal process.

Very truly yours,

Denis Vermette
President

# EXHIBIT - H

May 24, 2021

**VIA UPS OVERNIGHT MAIL
AND VIA EMAIL**

Western Community Energy
3390 University Ave., Suite 450
Riverside, CA 92501
Attn: Executive Director

**Re:    Pilot Power Notice to WCE of Default and Termination of Professional
Services Agreement dated August 15, 2019, For Failure to Pay.**

Dear Executive Director:

Pursuant to Section 3.6.1.2(i) of the Professional Services Agreement (the "Agreement") by and between WESTERN COMMUNITY ENERGY and PILOT POWER GROUP, dated August 15, 2019, Pilot Power hereby notifies WCE that it is in default of its payment obligations to Pilot Power under the Agreement.  If WCE fails to pay the full amount owing to Pilot Power (the "Default Amount" as set forth below) on or before the close of business on June 3, 2021, then the Agreement shall terminate for cause on June 4, 2021.

WCE is in default of its payment obligations to Pilot Power under the Agreement as follows:

1.    <u>Commodity Payments</u>.  WCE has not paid Pilot Power's invoices for Resource Adequacy and Renewable Portfolio Standards products in a timely manner and currently is in arrears in the amount of $271,633.50.

2.    <u>Payment of Pilot Power's Service Fees, Expenses, and Special Projects or "Extra Work</u>." WCE has not paid Pilot Power's invoices in a timely manner and currently is in arrears in the amount of $86,407.34.

3.    <u>CRR Management Fees</u>.  Pursuant to Section 2(g)(ii) of Schedule 1 to the Agreement, WCE is required to pay Pilot Power "20 percent of the revenues generated through the CRR allocation process."  A payment in the amount of $24,937.28 was due on May 17, 2021, and has not been made by WCE.

| COMMODITY INVOICES (including CAISO Charges) | | | | |
|---|---|---|---|---|
| Invoice No. | Invoice Amt. | Invoice Date | Due Date | Description |
| 1409-IN | $45,000.00 | 4/6/21 | 4/6/21 | Feb 2021 RA |
| 1397-IN | $166,633.50 | 3/1/21 | 3/11/21 | 10,099 CAT 1 RECS (RPS) |
| 1399-IN | $60,000.00 | 3/5/21 | 3/5/21 | May 2021 RA |
| TOTAL: | $271,633,50 | | | |

| SERVICES INVOICES | | | | |
|---|---|---|---|---|
| Invoice No. | Invoice Amt. | Invoice Date | Due Date | Description |
| 1400-IN | $38,947.41 | 3/9/21 | 4/8/21 | February 2021 Services |
| 1401-IN | $7,450.00 | 3/9/21 | 4/8/21 | Special Projects—Feb 21 |
| 1406-IN | $39,149.93 | 4/2/21 | 5/2/21 | March 2021 Services |
| 1407-IN | $860.00 | 4/2/21 | 5/2/21 | Special Projects—Mar 21 |
| 1427-IN | $24,937.28 | 5/17/21 | 5/17/21 | Nov & Dec CRR Man. Fee |
| TOTAL: | $111,344.62 | | | |

| ACCRUED INTEREST | | | | |
|---|---|---|---|---|
| Invoice No. | Invoice Amt. | Invoice Date | Due Date | Description |
| 1429-IN | $3,122.56 | 5/17/21 | 5/17/21 | Interest on Aged Invoices |

| DEFAULT AMOUNT | |
|---|---|
| TOTAL: | $386,100.68 |

PLEASE TAKE NOTICE, that if the full amount of the Default Payment is not paid to Pilot Power by the close of business on June 3, 2021, then the Agreement shall be terminated effective as of June 4, 2021.

On the morning of May 24, 2021, Pilot Power received notice from the CAISO that an ACH in the amount of $417,529.16 for the invoice from CAISO due on May 25, 2021, for CAISO services rendered to WCE did not clear. If WCE does not remit payment, this amount will also immediately be due and payable to Pilot Power. Moreover, if WCE fails to make this payment to the CAISO immediately, Pilot Power will again be compelled by the CAISO to make this payment on WCE's behalf.  This is an unacceptable risk and expense that WCE is foisting on Pilot Power in complete violation of Section 7(d) of Schedule 1 to the Agreement.

EFFECT OF TERMINATION OF THE AGREEMENT.  If Pilot Power is compelled to terminate the Agreement, this could have serious impacts on WCE that may be unforeseen or under-appreciated by WCE.  WCE may be relying on Section 3.6.1.4(A) of the Professional Services Agreement, which states:

> "Under no circumstances shall Consultant cease providing Services to WCE under this Agreement until clear and unequivocal arrangements for (i) WCE to assume provision of the Services under this Agreement, (ii) a third party provided to assume provision of the Services under this Agreement, or (iii) a return to Utility electric procurement, is established."

WCE may erroneously believe that this provision compels Pilot Power to provide all the services that it has been providing.  This is not correct.  On its face, this provision purports to require Pilot Power to continue providing services, but **only** the Services required under the Agreement.  It does not require Pilot Power to continue providing services that it has been providing that are not required under the Agreement.

Moreover, this presupposes that a court would compel Pilot Power to continue providing services without being paid, even if provision of such services would threaten Pilot Power's ability to provide services to all its other customers.

Pending a ruling from a court of competent jurisdiction, please take notice that pursuant to Section 3.6.1.4(A) of the Agreement, Pilot Power intends to continue providing the Services required under the Agreement (but only the services required), to the extent not prevented from doing so as a result of WCE's breaches under the Agreement.

Very truly yours,

Denis Vermette
President

# EXHIBIT - I



June 2, 2021

**VIA UPS OVERNIGHT MAIL
AND VIA EMAIL:**

Western Community Energy
3390 University Ave., Suite 200
Riverside, CA 92501
Attn: Executive Director

**Re:    Pilot Power Request for WCE's Post-Petition Performance of
Professional Services Agreement dated August 15, 2019.**

Dear Executive Director:

Pilot Power Group LLC ("Pilot Power") hereby requests that Western Community
Energy Group ("WCE") render post-petition performance with respect to the
Professional Services Agreement (the "Agreement") by and between WESTERN
COMMUNITY ENERGY and PILOT POWER GROUP, dated August 15, 2019.  This
request is sent for informational purposes only.  Pilot Power has previously notified
WCE that it was in pre-petition default of various material covenants and/or
agreements under the Agreement.  As these defaults have continued since WCE filed
for protection under Chapter 9 of the United States Bankruptcy Code, Pilot Power
requests that WCE render full post-petition performance under the Agreement.

For information purposes only, WCE was and remains in default of its material
covenants and/or agreements as follows:

1.      Creation of Lock Box account at City National Bank.  Section 7(d) of Schedule
        1 to the Agreement provides: Pilot Power "shall provide all working capital,
        credit and collateral ("**Credit Support**") necessary to support all functions of
        Energy Procurement as described in Section 1 of this Schedule 1; provided that
        WCE is in full compliance with the terms and conditions of Exhibit A to this
        Schedule 1.  **If WCE does not comply fully with the provisions of Exhibit A,
        WCE agrees to employ its own capital, credit and collateral to support
        Energy Procurement**."  (Emphasis added.)  As defined in Section 1 of
        Schedule 1, Energy Procurement includes, without limitation, all ancillary
        services (including imbalance energy) from the CAISO, any other energy
        procurement from the CAISO (see Section 2(c) of Schedule 1 defining all CAISO
        charges as energy procurement costs), resource adequacy capacity, renewable
        energy, and energy.

Exhibit A requires that WCE: 1) deposit all revenues of any kind immediately into a fiduciary account (a "Lock Box") at City National Bank; 2) grant Pilot Power a first priority security interest in the Lock Box, the Lock Box account, and any proceeds thereof; 3) deliver to Pilot Power and City National Bank a deposit account control agreement and other agreements as reasonably may be required granting Pilot Power control over the Lock Box and all monies therein; 4) granting Pilot Power the authority and control over the Lock Box account to make payments from the Lock Box account pursuant to the priorities established in Section B of Exhibit A to Schedule 1 to the Agreement.

WCE has failed to comply with any of the provisions of Exhibit A.  Pursuant to Section 7(d) of Schedule 1, WCE is therefore required "to employ its own capital, credit and collateral to support Energy Procurement." WCE has failed to employ its own capital, credit and collateral in the procurement of: 1) Resource Adequacy capacity products; 2) Renewable Energy; 3) Ancillary Services and all other CAISO products and services (including, without limitation, imbalance energy); and 4) Deposits with the CAISO.  Pilot Power has procured and paid for certain Resource Adequacy capacity products and renewable energy products and expended its own capital and credit, and has had to post deposits on WCE's behalf.

Moreover, with respect to ancillary services and all other CAISO products and services, Pilot Power has been expending its own capital, credit and deposits by performing all CAISO Scheduling Coordination functions under a Scheduling Coordinator ID provided to WCE by Pilot Power.  All load being scheduled under a Pilot Power SC ID employs Pilot Power's credit with the CAISO, together with the letters of credit and other collateral postings required by the CAISO in order for Pilot Power to continue to serve as a Scheduling Coordinator.  Moreover, if WCE fails to pay a CAISO invoice when due, Pilot Power (as the SC of record and the owner of the SC ID) is required to make the payment on WCE's behalf.  If Pilot Power does not or can not make the payment demanded by the CAISO within 2 days, the CAISO will commence a process that will shortly result in Pilot Power losing its SC certification, thereby losing the ability to provide SC services for WCE, for Pilot Power's own electricity customers, and for any other load serving entities for which Pilot Power provides SC services.

2.    <u>Payment Protocols</u>.  Exhibit C to Schedule 1 to the Agreement requires that Pilot Power's Accounting Department process all transfers from the Lock Box account.  In other words, Pilot Power is to have control over the disbursement of all revenues from CCA operations.  This control over the revenues is the primary means of protection and risk mitigation for Pilot Power.  WCE has prevented Pilot Power from obtaining control over and management of the CCA revenues as envisioned in the Agreement, and has prevented Pilot Power from providing various of its services to WCE to the detriment of both WCE and Pilot Power.  This default is continuing post-petition.

**Requirements to Cure WCE Post-Petition Defaults**.

1.      WCE must either: a) comply fully with the provisions of Exhibit A of Schedule 1 to the Agreement, or b) employ its own capital, credit and collateral to support ***all*** Energy Procurement as required in Section 1 of Schedule 1, and in Sections 7(c) and 7(d) of Schedule 1, including without limitation, Resource Adequacy, Renewable Energy, and Ancillary Services and other CAISO products and services.   Providing Credit support for the CAISO includes, without limitation, providing all credit and collateral postings with the CAISO to support CAISO operations related to WCE load, including collateral to cover WCE's Estimated Aggregate Liability ("EAL") that as of May 24, 2021 (the "Petition Date"), aggregated to $1,637,051.94, and since the Petition Date has grown to $2,494,524.20 as of today's date (and CAISO recommends maintaining a collateral posting of 10% more than the then current EAL which brings the collateral requirement to $2,771,693.56).   At a minimum, WCE needs to provide all credit and collateral with respect to the CAISO that exceeds the amounts already being provided by Pilot Power on WCE's behalf as of the Petition Date, and to continue to add to that credit and collateral as the EAL grows; and

2.      In full compliance with Exhibit C to Schedule 1 to the Agreement, provide Pilot Power's accounting department with full access to, and control over any and all bank accounts in which customer payments and/or any other operating revenues from WCE are deposited.

         PLEASE TAKE NOTICE, that if above defaults are not cured through the corrective actions described above, Pilot Power will seek relief from the Bankruptcy Court to take any and all actions authorized by the Court, including, without limitation, compelling rejection of the Agreement, relief from the automatic stay to terminate the Agreement and/or an order for adequate protection.

Very truly yours,

Denis Vermette
President

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF DENIS VERMETTE IN SUPPORT OF EMERGENCY MOTION FOR ORDER COMPELLING IMMEDIATE REJECTION OF EXECUTORY CONTRACT, AND FOR RELIEF FROM THE AUTOMATIC STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 10, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:  On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY** (state method for each person or entity served):
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **June 10, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Personal Delivery – Judge Yun**

United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 345 / Courtroom 302
Riverside, CA 92501-3819

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 10, 2021 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

MAINDOCS-#251907-v3-WCE_Vermette_Dec_Mtn_Reject

**NEF SERVICE LIST**

- **Bashar Ahmad** bahmad@boutinjones.com, cdomingo@boutinjones.com
- **Abram Feuerstein** abram.s.feuerstein@usdoj.gov
- **Beth Gaschen** bgaschen@wgllp.com, kadele@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com;lbracken@wgllp.com;bgaschen@ecf.courtdrive.com
- **Seth Goldman** seth.goldman@mto.com
- **David M Goodrich** dgoodrich@wgllp.com, kadele@wgllp.com;lbracken@wgllp.com;wggllp@ecf.courtdrive.com
- **Everett L Green** everett.l.green@usdoj.gov
- **Anna Gumport** agumport@sidley.com, laefilingnotice@sidley.com;anna-gumport-6608@ecf.pacerpro.com
- **Chad V Haes** chaes@marshackhays.com, chaes@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com;kfrederick@ecf.courtdrive.com
- **Brian D Huben** hubenb@ballardspahr.com, carolod@ballardspahr.com
- **Lindsey E Kress** lkress@lockelord.com, hayli.holmes@lockelord.com
- **Peter W Lianides** plianides@wghlawyers.com, jmartinez@wghlawyers.com;mweinberg@wghlawyers.com
- **Richard A Marshack** rmarshack@marshackhays.com, lbuchananmh@ecf.courtdrive.com;rmarshack@ecf.courtdrive.com
- **Thomas G Mouzes** tmouzes@boutinjones.com, cdomingo@boutinjones.com
- **Valerie Bantner Peo** vbantnerpeo@buchalter.com
- **Cameron C Ridley** Cameron.Ridley@usdoj.gov
- **Clifford W Stevens** dsupnet@neumiller.com
- **Jason D Strabo** jstrabo@mwe.com, cfuraha@mwe.com
- **United States Trustee (RS)** ustpregion16.rs.ecf@usdoj.gov
- **Joseph M VanLeuven** joevanleuven@dwt.com, katherinehardee@dwt.com;pdxdocket@dwt.com
- **Marc J Winthrop** mwinthrop@wghlawyers.com, jmartinez@wghlawyers.com