## Exhibit A

**Credit Agreement**

Execution Copy



REVOLVING CREDIT AGREEMENT


Dated March 12, 2020


Between


WESTERN COMMUNITY ENERGY


and


BARCLAYS BANK PLC

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS AND ACCOUNTING TERMS ........................................... 1

    Section 1.01          Defined Terms ........................................................... 1
    Section 1.02          Other Interpretive Provisions ................................... 11
    Section 1.03          Accounting Terms ..................................................... 12
    Section 1.04          Rounding ................................................................... 12
    Section 1.05          Times of Day ............................................................. 12

ARTICLE II          THE TERM LOAN ........................................................................ 12

    Section 2.01          Commitment to Lend; Use of Loan Proceeds ................... 12
    Section 2.02          Termination or Reduction of Commitment ....................... 13
    Section 2.03          Method of Loans ....................................................... 14
    Section 2.04          Interest ...................................................................... 14
    Section 2.05          Principal .................................................................... 16
    Section 2.06          General Provisions as to Payments ............................ 17
    Section 2.07          Computation of Interest and Fees; Payments ................. 17
    Section 2.08          Maximum Interest Rate; Payment of Fee ......................... 17
    Section 2.09          Administrative Fees .................................................. 18
    Section 2.10          Evidence of Debt ....................................................... 18
    Section 2.11          Obligations Absolute ................................................ 18
    Section 2.12          Yield Protection ....................................................... 18
    Section 2.13          Withholding ............................................................. 20
    Section 2.14          Other Taxes .............................................................. 20
    Section 2.15          Commitment Fee ...................................................... 20
    Section 2.16          Pledge and Security .................................................. 21

ARTICLE III          CONDITIONS PRECEDENT TO CREDIT EXTENSION ......................... 21

    Section 3.01          Conditions of Credit Extension ................................ 21
    Section 3.02          Conditions Precedent to each Subsequent Loan ............... 23

ARTICLE IV          REPRESENTATIONS AND WARRANTIES ...................................... 23

    Section 4.01          Existence and Power .................................................. 23
    Section 4.02          Regulatory Authority ............................................... 23
    Section 4.03          Noncontravention ..................................................... 23
    Section 4.04          Due Authorization .................................................... 24
    Section 4.05          Valid and Binding Obligations ................................ 24
    Section 4.06          Pending Litigation and Other Proceedings ..................... 24
    Section 4.07          Insurance ................................................................... 24
    Section 4.08          Financial Projections ................................................ 24
    Section 4.09          Complete and Correct Information ............................ 24
    Section 4.10          Pending Legislation and Decisions .......................... 25
    Section 4.11          Default ...................................................................... 25
    Section 4.12          Employee Benefit Plan Compliance ........................ 25
    Section 4.13          [Reserved.] ............................................................... 25

DM_US 159094637-10.071370.0787

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 4.14 | Sovereign Immunity | 25 |
| Section 4.15 | Usury | 25 |
| Section 4.16 | Federal Reserve Board Regulations | 25 |
| Section 4.17 | Investment Company Act | 25 |
| Section 4.18 | No Proposed Legal Changes | 26 |
| Section 4.19 | No Outstanding Indebtedness | 26 |
| Section 4.20 | Loan Documents | 26 |
| Section 4.21 | Incorporation of Representations and Warranties | 26 |
| Section 4.22 | Collateral | 26 |
| Section 4.23 | Parties to the Joint Powers Agreement | 26 |
| Section 4.24 | Anti-Terrorism Laws | 26 |
| ARTICLE V | COVENANTS | 27 |
| Section 5.01 | Compliance With Laws and Regulations | 27 |
| Section 5.02 | Reporting Requirements | 27 |
| Section 5.03 | Notice of Default | 29 |
| Section 5.04 | Further Assurances | 29 |
| Section 5.05 | Right of Entry | 29 |
| Section 5.06 | Payment of Obligations; Removal of Liens | 29 |
| Section 5.07 | Related Obligations | 29 |
| Section 5.08 | Insurance | 30 |
| Section 5.09 | Employee Benefit Plan Compliance | 30 |
| Section 5.10 | Disclosure of Participants | 30 |
| Section 5.11 | Sovereign Immunity | 30 |
| Section 5.12 | Notice of Adverse Change | 30 |
| Section 5.13 | Taxes and Liabilities | 30 |
| Section 5.14 | Legal Fee | 30 |
| Section 5.15 | Preservation of Existence, Ownership, Etc | 30 |
| Section 5.16 | Certain Information | 31 |
| Section 5.17 | Disposition of Assets | 31 |
| Section 5.18 | Consolidation or Merger | 31 |
| Section 5.19 | Proceeds of Loans | 31 |
| Section 5.20 | Disclosure in Financial Statements | 31 |
| Section 5.21 | Liens | 31 |
| Section 5.22 | Burdensome Contracts With Members | 31 |
| Section 5.23 | Indebtedness | 32 |
| Section 5.24 | Deposit of Pledged Revenues | 32 |
| Section 5.25 | Use of Pledged Revenues | 32 |
| Section 5.26 | Amendments | 32 |
| Section 5.27 | Incorporation by Reference | 32 |
| Section 5.28 | Delivery of Cash Collateral | 32 |
| Section 5.29 | Debt Service Coverage Ratio and Operating Reserve Fund Balance | 33 |

# TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| Section 5.30 | Rate Covenant | 34 |
| Section 5.31 | Repayment of the County Loan | 35 |
| **ARTICLE VI** | **EVENTS OF DEFAULT, REMEDIES** | 35 |
| Section 6.01 | Events of Default and Remedies | 35 |
| Section 6.02 | Remedies | 36 |
| Section 6.03 | Remedies Cumulative; Solely for the Benefit of the Bank | 37 |
| **ARTICLE VII** | **MISCELLANEOUS** | 37 |
| Section 7.01 | Amendments, Etc | 37 |
| Section 7.02 | Notices; Effectiveness; Electronic Communication | 38 |
| Section 7.03 | No Waiver; Cumulative Remedies | 39 |
| Section 7.04 | Costs and Expenses; Damage Waiver | 39 |
| Section 7.05 | Payments Set Aside | 40 |
| Section 7.06 | Successors and Assigns | 40 |
| Section 7.07 | Counterparts; Integration; Effectiveness | 41 |
| Section 7.08 | Survival of Representations and Warranties | 41 |
| Section 7.09 | Severability | 42 |
| Section 7.10 | Governing Law; Jurisdiction; Etc | 42 |
| Section 7.11 | Waiver of Jury Trial | 42 |
| Section 7.12 | Extension of Maturity Date | 43 |
| Section 7.13 | No Advisory or Fiduciary Relationship | 43 |
| Section 7.14 | Electronic Execution of Certain Documents | 43 |
| Section 7.15 | USA Patriot Act | 44 |
| Section 7.16 | Time of the Essence | 44 |
| Section 7.17 | Entire Agreement | 44 |
| Section 7.18 | Further Assurances | 44 |
| Section 7.19 | Right of Setoff | 44 |
| Section 7.20 | Bail-In Action Acknowledgment | 44 |
| Section 7.21 | No Recourse Against Constituent Members of Borrower or Individuals | 45 |
| Section 7.22 | No Third Party Rights | 46 |

DM_US 159094637-10.071370.0787

# REVOLVING CREDIT AGREEMENT

**THIS REVOLVING CREDIT AGREEMENT** dated March 12, 2020 (as amended, modified or restated from time to time, this "*Agreement*"), between **WESTERN COMMUNITY ENERGY**, a California joint power authority (the "*Borrower*") and **BARCLAYS BANK PLC**, together with any successors and assigns (the "*Bank*").

## RECITALS

**WHEREAS,** the Borrower wishes to obtain credit from the Bank hereunder and the Bank is willing, upon the terms and subject to the conditions set forth below, to provide such credit to the Borrower for use in connection with purposes consistent with the Act and the purpose implementing and operating a community choice aggregation program established by Borrower pursuant to California Public Utilities Code Section 366.2; and

**WHEREAS,** all obligations of the Borrower to repay the Bank for Credit Extensions (as defined herein) made by the Bank under the Commitment (as defined herein), and interest thereon, are created under and will be evidenced by this Agreement and the Note, and will be secured by a pledge of and lien on Pledged Revenues (as defined herein), subject only to amounts required to be paid by the Borrower pursuant to the terms of Power Purchase Agreements (as defined herein) executed by the Borrower;

**NOW, THEREFORE**, to induce the Bank to make the loans, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Borrower and the Bank hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01  Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"*Account Control Agreement*" means the Deposit Account Control Agreements by and among the Bank, the Borrower and the Custodian to be executed, in form and substance acceptable to the Bank, granting the Bank control over each of the Operating Fund Account and the Operating Reserve Fund, prior to the initial Borrowing or issuance of a Letter of Credit hereunder.

"*Act*" means the Joint Exercise of Powers Act, California Government Code §§ 6500 et seq., as amended.

"*Adjusted LIBOR Rate*" means, for any day, a per annum interest rate determined pursuant to the following formula:

$$\text{Adjusted LIBOR Rate} = \frac{\text{LIBOR}}{1 - \text{Reserve Percentage}}$$

*"Affiliate"* means, with respect to the Bank, any other Person controlling or controlled by, or under common control with, the Bank. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting rights, membership, the power to appoint members, trustees or directors, by contract or otherwise.

*"Agreement"* has the meaning set forth in the introductory paragraph hereof.

*"Alternate Rate"* means, for any day, the sum of (i) the rate per annum which is established with reference to an index that the Bank determines, in its sole discretion, as being the index that most closely approximates LIBOR or which is being commonly substituted for LIBOR, as selected by the Bank upon notice thereof provided by the Bank to the Borrower, plus (ii) the Applicable Spread for such day, rounded upward to the second decimal place (assuming such rate is expressed as a percentage); provided, however, the Alternate Rate shall never be below the Applicable Spread plus twenty-five (25) basis points.

*"Anti-Terrorism Laws"* has the meaning set forth in Section 4.25 hereof.

*"Applicable Spread"* means, as of any date of determination, (i) with respect to Loans, three hundred twenty basis points (3.20%) and (ii) with respect to Unreimbursed Amounts, three hundred seventy basis points (3.70%).

*"Authorized Officer"* means the Chief Executive Officer, the Chief Operating Officer or the Treasurer of the Borrower or any person designated in writing by the Chief Executive Officer, the Chief Operating Officer or the Treasurer of the Borrower to act as an Authorized Officer hereunder.

*"Availability Period"* means, with respect to (i) the agreement of the Bank to issue Letters of Credit for the account of the Borrower pursuant to the terms and conditions hereof, the period from and including the Effective Date to and excluding the Commitment Termination Date, and (ii) the agreement of the Bank to extend Loans pursuant to the terms and conditions hereof, the period from the Effective Date to and excluding the Loan Facility Scheduled Termination Date.

*"Available Commitment"* means an initial amount equal to $16,000,000 and thereafter such initial amount adjusted from time to time as follows: (a) downward in an amount equal to any Loan made to, and an amount equal to the L/C Obligations related to any Letter of Credit issued for the account of, the Borrower under the Commitment; (b) prior to the Loan Facility Scheduled Termination Date only, upward in an amount equal to the principal amount of any Loan made to the Borrower under the Commitment that is repaid or prepaid in the manner provided herein; (c) upward in an amount equal to the principal amount equal to the L/C Obligations related to any Letter of Credit issued for the account of the Borrower under the Commitment that is repaid, prepaid, expires or terminates, as applicable, in the manner provided herein; (d) downward in an amount equal to any reduction thereof effected pursuant to Section 2.05 hereof; (e) downward to the Letter of Credit Sublimit on the Loan Facility Scheduled Termination Date; and (f) downward to zero upon the Commitment Termination Date in accordance with the terms hereof; provided, that, after giving effect to any of the foregoing

adjustments the Available Commitment shall never exceed (i) $16,000,000 from the Effective Date to but excluding Loan Facility Scheduled Termination Date, and (ii) $10,000,000 from and after the Loan Facility Scheduled Termination Date.

"*Bank*" has the meaning set forth in the introductory paragraph hereto.

"*Bank Agreement*" means any credit agreement, loan agreement, liquidity agreement, standby bond purchase agreement, reimbursement agreement, direct purchase agreement (such as a continuing covenant agreement or supplemental bondholder's agreement), bond purchase agreement or other agreement or instrument under which, directly or indirectly, any Person or Persons undertake to loan, make or provide funds to make payment of, or to purchase, hedge or provide credit enhancement to or on behalf of the Borrower for any Indebtedness of the Borrower.

"*Borrower*" has the meaning set forth in the introductory paragraph hereof.

"*Borrower's Account*" means the general operating account of the Borrower at River City Bank as specified in the Loan Notice or such other account as Borrower may inform the Bank in writing and which the Bank confirms in writing and telephonic notice.

"*Borrowing*" means a borrowing of Loans from the Bank pursuant to Section 2.01 hereof.

"*Borrowing Date*" has the meaning specified in Section 2.03 hereof.

"*Business Day*" means any day which is not (i) a Saturday or a Sunday, (ii) a day on which the Lending Office of the Bank is lawfully closed.

"*Cash Collateralize*" means, to pledge and deposit with or deliver to the Bank, as collateral for L/C Obligations or any other Obligations, (a) cash or deposit account balances, (b) backstop letters of credit entered into on terms, from issuers and in amounts satisfactory to the Bank, and/or (c) if the Bank shall agree, in its sole discretion, other credit support, in each case, in Dollars and in such amount as the Bank may reasonably require, and pursuant to documentation in form and substance reasonably satisfactory to the Bank. "*Cash Collateral*" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commitment*" means the Bank's obligation to (a) make Loans to the Borrower pursuant to Section 2.01 and (b) issue Letters of Credit for the account of the Borrower pursuant to Section 2.03. Subject at all times to Sections 2.05 and 6.02 hereof, the Commitment from and after the (x) Effective Date to but excluding the Loan Facility Scheduled Termination Date shall be $16,000,000, and (y) Loan Facility Scheduled Termination Date and at all times thereafter shall be $10,000,000.

"*Commitment Fee*" has the meaning set forth in Section 2.08.

-3-

"*Commitment Fee Rate*" means (i) with respect to the Bank's commitment to make Loans to the Borrower pursuant to Section 2.01, a rate per annum equal to 1.20% and (ii) with respect to the Bank's commitment to issue Letters of Credit for the account of the Borrower pursuant to Section 2.03, a rate per annum equal to 1.30%; provided, that, in each case, upon the occurrence, and at all times during the continuation, of an Event of Default, the Commitment Fee Rate shall increase four percent (4.0%) per annum above the Commitment Fee Rate otherwise in effect.

"*Commitment Termination Date*" shall mean the earlier of:

(a)      the Scheduled Termination Date; and

(b)      the date the Commitment is reduced to zero pursuant to Section 2.05 or Section 7.02 hereof.

"*Computation Date*" means the second London Business Day preceding each applicable Rate Reset Date.

"*Credit Extension*" means each of the following:  (a) a Borrowing and (b) an L/C Credit Extension.

"*Custodial Operating Account*" has the meaning set forth in Section 5.27(f).

"*Custodian*" means River City Bank and its successors or assigns, including any successor appointed in accordance with the terms hereof.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Debt Service Coverage Ratio*" means, for each Financial Covenant Determination Date, the ratio determined by dividing (a) the Income Available for Debt Service for the twelve (12) months ending simultaneously with such Financial Covenant Determination Date by (b) the aggregate of the payments required to be made during such twelve (12) months in respect of Assumed Debt Service and in respect of principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on all outstanding Indebtedness of the Borrower.  For purposes of computing the amount under clause (b) of this definition, "Assumed Debt Service" means the sum of the amount of principal which would be payable hereunder during such computation period assuming that the full amount of the Loan Sublimit (initially $10,000,000) had been borrowed by the Borrower and assuming that the Borrower is required to repay such amount in equal monthly installments on the first day of each calendar month (commencing on March 1, 2021) for the period from March 1, 2021 until the Loan Facility Scheduled Termination Date.

"*Debt Service Coverage Ratio Requirement*" means 2.0x.

-4-

*"Default"* means any event or condition that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

*"Default Rate"* means, for any day, the sum of the Prime Rate plus four percent (4.00%) per annum.

*"Dollar"* and *"$"* mean lawful money of the United States.

*"Effective Date"* means the date that the conditions precedent set forth in Article 3.01 hereof have been satisfied or waived by the Bank.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

*"Event of Default"* with respect to this Agreement has the meaning set forth in Section 6.01 hereof.

*"Event of Insolvency"* means, with respect to any Person, the occurrence of one or more of the following events:

(a)    the Person shall (i) commence a voluntary case or other proceeding seeking liquidation, reorganization, arrangement, adjustment, winding-up, dissolution, composition or other similar relief with respect to itself or its indebtedness under any bankruptcy, insolvency, reorganization or other similar law for the relief of debtors now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or a substantial part of its property, (ii) consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, (iii) make a general assignment for the benefit of creditors, (iv) fail generally to pay or admit in writing its inability to pay its indebtedness as it becomes due, or (v) take (through an authorized officer or representative) any official action to authorize any of the foregoing; or

(b)    any of the following shall occur with respect to such Person: (i) an involuntary case or other proceeding shall be commenced against such Person seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property and either (A) such Person shall consent in writing to such action or (B) such case shall not be dismissed within sixty (60) days, (ii) an order for relief shall be entered against such Person under the federal bankruptcy laws as now or hereafter in effect or pursuant to any other State or federal laws concerning insolvency or of similar purpose, (iii) a final and non-appealable debt moratorium, debt adjustment, debt restructuring or comparable extraordinary restriction with respect to the payment of principal or interest on the indebtedness of such Person shall be declared or imposed pursuant to a finding or ruling by such Person, the United States of America, the State, any instrumentality thereof or any other Governmental Authority of competent jurisdiction over such Person, or (iv) the issuance, under the laws of any state or under

the laws of the United States of America, of an order of rehabilitation, liquidation or dissolution of such Person.

*"Executive Order"* has the meaning set forth in Section 4.25 hereof.

*"Expenses"* means, for any period, the aggregate of all expenses calculated under GAAP, including without limitation any taxes, incurred by the Borrower during such period, but excluding (a) interest on Indebtedness, (b) depreciation and amortization, (c) any unrealized loss resulting from changes in the value of investment securities, (d) extraordinary expenses and other non-recurring, non-cash expenses (including without limitation losses on the sale of fixed or capital assets other than in the ordinary course of business and losses on the extinguishment of debt), (e) losses resulting from any reappraisal, revaluation or write-down of assets (excluding revaluation of accounts receivable), and (f) any noncash loss or change in the value of a Swap Contract (including any change in the value of the termination value thereof) which loss or change in value is not the result of the expiration or termination (including early termination) of such Swap Contract; provided, however, that the provisions of (a) through (f) notwithstanding, no amount shall be subtracted from expenses more than once.

*"Financial Covenant Determination Date"* means each March 31, June 30, September 30 and December 31 and any such additional dates specified in Section 5.27(a) hereof.

*"Financing Documents"* means the Security Agreement, the Intercreditor and Collateral Agency Agreement and the PPA Account Control Agreement.

*"Fiscal Year"* means the fiscal year of the Borrower ending on June 30 of each calendar year or such other fiscal year as may be adopted by the Borrower from time to time to the extent permitted hereunder.

*"Generally Accepted Accounting Principles"* or *"GAAP"* means generally accepted accounting principles in effect from time to time in the United States and applicable to entities such as the Borrower, including, without limitation, those principles set forth in the statements and pronouncement of the Government Accounting Standards Board.

*"Governmental Authority"* means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Guarantee"* means, for any Person, all guarantees, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations of such Person to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor of another Person against loss.

*"Honor Date"* has the meaning set forth in Section 2.03(c) hereof.

"*Income Available for Debt Service*" shall mean, as to any period of time, the excess of Revenues over Expenses of the Borrower for such period.

"*Indebtedness*" means for any Person (without duplication), all items that would be classified as a liability in accordance with generally accepted accounting principles, including, without limitation, (a) indebtedness or liability for borrowed money, or for the deferred purchase price of property or services (including trade obligations); (b) obligations as lessee under leases which are, should have been, or should be, recorded as capital leases in accordance with generally accepted accounting principles; (c) current liabilities in respect of unfunded benefits under employee benefit, retirement or pension plans; (d) obligations issued for the account of any other Person; (e) all Guarantees, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss; (f) obligations secured by any mortgage, lien, pledge, security interest or other charge or encumbrance on property, whether or not the obligations have been assumed; (g) obligations under Bank Agreements, and (h) obligations under Swap Contracts.

"*Indemnitee*" has the meaning set forth in Section 7.04(b) hereof.

"*Intercreditor and Collateral Agency Agreement*" means the Intercreditor and Collateral Agency Agreement, dated as of February 13, 2020, by and among River City Bank, as Collateral Agent, the PPA Providers from time to time party thereto and the Borrower.

"*Interest Payment Date*" means each of (i) the first Business Day of each calendar month, (ii) the date on which any principal amount of the related Loan or L/C Obligation, as applicable, is paid or prepaid, for any reason, and (iii) the Commitment Termination Date.

"*Interest Period*" means, with respect to each Loan and Unreimbursed Amount, (i) the period from (and including) the date such Loan is issued or Unreimbursed Amount is paid by the Bank to (but excluding) the next succeeding Rate Reset Date, and (ii) thereafter, each period from (and including) a Rate Reset Date to (but excluding) the next succeeding Rate Reset Date (or, if sooner, to and including the Scheduled Termination Date or the date the Loan and/or Unreimbursed Amount, as applicable, is paid in full, as applicable).

"*ISP*" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"*Joint Powers Agreement*" means the Joint Powers Agreement, dated as of August 23, 2018, by and among the Cities of Norco, Perris, Wildomar, Jurupa Valley, Hemet, Eastvale and Canyon Lake.

"*Launch Date*" means the date that the Borrower initiates providing energy to customers.

"*Laws*" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof,

and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

*"L/C Credit Extension"* means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

*"L/C Document"* means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the Bank and/or the Borrower relating to such Letter of Credit.

*"L/C Obligations"* means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts.  For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.05 hereof.  For all purposes of this Agreement, if on any date of determination, a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

*"Lending Office"* means the Bank's address and, as appropriate, account as set forth on Schedule I, or such other address or account as the Bank may from time to time notify the Borrower.

*"Letter of Credit"* means any standby letter of credit issued hereunder.

*"Letter of Credit Application"* means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Bank.

*"Letter of Credit Expiration Date"* means the earlier of (i) the date on which the Bank declares its obligation to make Credit Extensions terminated under Section 7.02 hereof and (ii) the day that is thirty (30) days prior to the Scheduled Termination Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

*"Letter of Credit Fee"* has the meaning specified in Section 2.03(g) hereof.

*"Letter of Credit Sublimit"* means an amount equal to the lesser of (a) $10,000,000 and (b) the Commitment. The Letter of Credit Sublimit is part of, and not in addition to, the Commitment.

*"LIBOR"* means, for any Rate Reset Date, the London interbank offered rate for deposits in United States dollars for a period of one month, which rate appears on the Reuters Screen LIBOR01 Page (or such other page as may replace LIBOR01 on that service or such other service as may be nominated by the ICE Benchmark Administration (or any entity that assumes responsibility for determining such rate) as an information vendor for the purpose of displaying such rate for U.S. Dollar deposits) as of 11:00 a.m., London, England time, on the Computation Date immediately preceding such Rate Reset Date, or if such rate is not available, the rate which is established with reference to an index that the Bank determines in its sole discretion as being

the index that most closely approximates LIBOR or which is being commonly substituted for LIBOR, as selected by the Bank upon notice thereof provided by the Bank to the Borrower. In the event that LIBOR is less than zero, it shall be deemed to be zero.

"*LIBOR Index Rate*" means a fluctuating rate per annum, determined on each Computation Date for the period from and including the first succeeding Rate Reset Date to but excluding the next succeeding Rate Reset Date thereafter, equal to the sum of (i) the Adjusted LIBOR Rate (as determined on such Computation Date) plus (ii) the Applicable Spread as of such first succeeding Rate Reset Date, rounded upward to the fourth decimal place.

"*Loan*" and "*Loans*" has the meaning specified in Section 2.01 hereof.

"*Loan Documents*" means, collectively this Agreement and the Account Control Agreement.

"*Loan Facility Scheduled Termination Date*" means March 11, 2024, unless extended pursuant to Section 7.12 hereof.

"*Loan Notice*" means a notice in writing of a Borrowing pursuant to Section 2.02(a) hereof, which shall be substantially in the form of Exhibit B attached hereto, or such other form as may be approved by the Bank (including any form on an electronic platform or electronic transmission system as shall be approved by the Bank), appropriately completed and signed by an Authorized Officer.

"*Loan Sublimit*" means an amount equal to the lesser of (a) $10,000,000 and (b) the Commitment. The Loan Sublimit is part of, and not in addition to, the Commitment.

"*Lockbox Account*" means the account identified as such in the Security Agreement pursuant to which revenues from the sale of electricity will be deposited for distribution solely to make payments due to (i) PPA Providers for energy sold to Borrower; (ii) the California Independent System Operator for charges related to the distribution of energy; and (iii) River City Bank, as Collateral Agent under the Security Agreement, for performance of its duties; and from which excess revenues after payment of amounts due to the foregoing shall be deposited in the Operating Fund Account for payment to the Bank of the Obligations payable hereunder.

"*London Business Day*" means any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency) in the City of London, United Kingdom.

"*Margin Stock*" shall have the meaning assigned to that term in Regulation U promulgated by the Board of Directors of the Federal Reserve System, as now and hereafter from time to time in effect.

"*Material Adverse Change*" means the occurrence of any event or change resulting in a material and adverse change in the business, condition (financial or otherwise), operations or prospects of the Borrower since June 30, 2019 or which materially and adversely affects the enforceability of this Agreement or any of the Loan Documents or the ability of the Borrower to perform its obligations hereunder or thereunder.

*"Material Adverse Effect"* means:  (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower; (b) a material impairment of the ability of the Borrower to perform its obligations under this Agreement or any of the Loan Documents; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of this Agreement or any of the Loan Documents.

*"Maximum Interest Rate"* means the lesser of (i) twenty-five percent (25%) per annum and (ii) the maximum rate of interest on the relevant obligation permitted by applicable law.

*"Member"* means each city and town within the State of California that is a signatory to the Joint Powers Agreement as specified in Exhibit D.

*"Minimum Collateral Amount"* means, at any time, with respect to Cash Collateral provided in accordance with the provisions of Section 2.13(a)(i) or 2.13(a)(ii) hereof, an amount or stated amount equal to 105% of the Outstanding Amount of all L/C Obligations.

*"Note"* means that certain Note dated the date hereof of the Borrower, in favor of the Bank, evidencing the outstanding Loans and any Unreimbursed Amounts made by the Bank and substantially in the form of Exhibit A hereto.

*"Notice of Loan Prepayment"* means a notice of prepayment with respect to a Loan which shall be substantially in the form of Exhibit C or such other form as may be approved by the Bank (including any form on an electronic platform or electronic transmission system as shall be approved by the Bank), appropriately completed and signed by an Authorized Officer.

*"Obligations"* means the obligations of the Borrower under this Agreement to repay (i) all Loans, all L/C Obligations, and the Note, together with interest thereon, pursuant to and in accordance with this Agreement and the Note, (ii) all fees, and (iii) all expenses and charges payable or reimbursable hereunder to the Bank (including, without limitation, any amounts to reimburse the Bank for any advances or expenditures by it under any of such documents) and all other payment obligations of the Borrower to the Bank arising under or in relation to this Agreement or the other Financing Documents, in each, case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired and including interest and fees that accrue after the commencement by or against the Borrower of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

*"OFAC"* has the meaning set forth in Section 4.25 hereof.

*"Operating Expenses"* of the Borrower for any period means the excess, if any, of all operating expenses of the Borrower in such period (including interest expense and energy purchase expenses) over all amounts deducted by the Borrower in calculating operating expenses in such period for or to make provisions for property retirement, depreciation, depletion, obsolescence, impairment, allowances for bad or uncollectible debt, and amortization of debt discount, issuance expense, and goodwill, all determined in accordance with GAAP.

-10-

"*Operating Fund Account*" means the account established with River City Bank, designated as the "Operating Fund Account", together with any other fund or account held by or for the benefit of the Borrower into which Pledged Revenues or any portion thereof are deposited, including, without limitation, any Custodial Operating Account into which the Operating Fund Account is transferred or converted pursuant to the terms hereof.

"*Operating Reserve Fund*" means the account established with River City Bank, designated as the "Operating Reserve Account" into which the amounts required pursuant to Section 5.27(e) hereof shall be deposited.

"*Operating Reserve Fund Requirement*" means three million dollars ($3,000,000).

"*Outstanding Amount*" means (a) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the aggregate amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of Unreimbursed Amounts.

"*Participant*" has the meaning set forth in Section 7.06(c) hereof.

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001).

"*Person*" means an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

"*Pledged Revenues*" means the Receivables and other Collateral (each as defined in the Security Agreement) and all proceeds thereof, but only to the extent that such Receivables and other Collateral (each as defined in the Security Agreement) (or proceeds thereof) have been released from the pledge and lien of the Security Agreement in accordance with the terms thereof.

"*Power Purchase Agreement*" has the meaning set forth in the Security Agreement.

"*PPA Account Control Agreement*" means the Account Control Agreement, dated as of February 13, 2020 by and among River City Bank, as Account Bank, the Borrower and River City Bank, not in its individual capacity, but solely as collateral agent, as Secured Party.

"*PPA Provider*" means each seller of Product (as defined in the Security Agreement) under a Power Purchase Agreement that is a party to the Intercreditor and Collateral Agency Agreement.

"*Prime Rate*" means the rate established by Barclays Bank PLC, from time to time as its prime rate, with each change in the Prime Rate being effective from and including the date such

-11-

change is publicly announced as being effective; provided, however, the Bank may lend to its customers at rates that are at, above or below the Prime Rate.

"*Property*" shall mean any and all rights, titles and interests in and to any and all property, whether real or personal, tangible or intangible and wherever situated.

"*Rate Reset Date*" means the first Business Day of each calendar month commencing April 1, 2020.

"*Reduction Amount*" has the meaning specified in Section 2.04(b)(ii) hereof.

"*Reduction and Termination Fee*" has the meaning specified in Section 2.05(a)(ii) hereof.

"*Reserve Percentage*" means for any day, that percentage (expressed as a decimal) which is in effect from time to time under regulations issued from time to time by the Board of Governors of the Federal Reserve System of the United States for determining the maximum reserve requirement (including, without limitation, any basic, supplemental, emergency, special, marginal or other reserves) applicable with respect to Eurocurrency funding (or against any other category of funding liabilities that includes deposits by reference to which the interest rate of the Loans is determined), whether or not the Bank has any Eurocurrency liabilities subject to such reserve requirement at that time. The Loans shall be deemed to constitute a Eurocurrency liability and as such shall be deemed subject to reserve requirements without benefit of credit for any prorations, exceptions or offsets that may be available from time to time to the Bank. The Adjusted LIBOR Rate shall be adjusted automatically on and as of the effective date of any change in the Reserve Percentage.

"*Revenues*" means, for any period, the revenues of the Borrower, as determined in accordance with GAAP; but excluding (i) any unrealized gain or loss resulting from changes in the value of investment securities, (ii) any gains on the sale or other disposition of fixed or capital assets not in the ordinary course, (iii) earnings resulting from any reappraisal, revaluation or write-up of fixed or capital assets, (iv) noncash gains or changes in the valuation of Swap Contracts which gain or change in value is not the result of the expiration or termination (including early termination) of such Swap Contracts and (v) any realized gain in excess of 10% on common and preferred stock during such period (measured by dividing the net realized gains on common and preferred stock for such period by the average of the market value of the common and preferred stock as of the first day and last day of such period).

"*SCE*" means Southern California Edison and its successors or assigns.

"*SCE Agreement*" means the Community Choice Aggregator (CCA) Service Agreement, dated February 26, 2019, between the Borrower and SCE.

"*Scheduled Termination Date*" means March 11, 2025, or such later date as may be established pursuant to Section 7.12 hereof.

"*Security Agreement*" means the Security Agreement, dated as of February 12, 2020, by and between the Borrower and River City Bank, as collateral agent.

"*Start-Up Expense*" means working capital expenses of the Borrower incurred prior to June 1, 2020, and specifically excludes any expenses for power purchases or the establishment or posting of reserves, collateral or other security related to current or future power purchases.

"*State*" means the State of California.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any International Foreign Exchange Master Agreement, including any such obligations or liabilities thereunder.

"*Total Outstandings*" means the aggregate Outstanding Amount of all Loans and L/C Obligations.

"*Trade Obligations*" means obligations for the purchase of goods and services in the ordinary course of business on trade credit with a duration of less than ninety (90) days.

all letters of credit, bank guarantees, bankers' acceptances or similar instruments issued in respect of trade payables or similar obligations but in any event excluding performance obligations.

"*UCC*" means the Uniform Commercial Code in effect in the State of California from time to time.

"*UCP*" means the Uniform Customs and Practice for Documentary Credits in effect from time to time.

"*United States*" and "U.S." mean the United States of America.

"*Unreimbursed Amount*" has the meaning specified in Section 2.03(c) hereof.

**Section 1.02   Other Interpretive Provisions**.  With reference to this Agreement, unless otherwise specified herein:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "*including*" shall be deemed to be followed by the phrase "without limitation."  The word "*will*"

-13-

shall be construed to have the same meaning and effect as the word *"shall."* Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any of the Loan Documents), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words *"hereto," "herein," "hereof"* and *"hereunder,"* and words of similar import when used herein, shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof, (iv) all references in this Agreement to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word *"from"* means *"from and including;"* the words *"to"* and *"until"* each mean *"to but excluding;"* and the word *"through"* means *"to and including."*

(c)    Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

**Section 1.03  Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the audited financial statements of the Borrower delivered to the Bank pursuant to Section 5.02(a) hereof, *except* as otherwise specifically prescribed herein.

**Section 1.04  Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Section 1.05  Letter of Credit Amounts**.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any L/C Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

-14-

**Section 1.06   Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable).

# ARTICLE II

## THE COMMITMENT

**Section 2.01   Loans**.  Subject to the terms and conditions set forth herein, the Bank agrees to make loans (individually, a *"Loan"* and collectively, the *"Loans"*) to the Borrower from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time the lesser of the Loan Sublimit and the Commitment, for the purpose of the acquisition of power or providing collateral in connection with the acquisition of power, securing payments due under Power Purchase Agreements and, subject to the provisions below and prior to June 1, 2020, for Start-Up Expenses; *provided, however,* prior to the Launch Date, the Borrower shall only be permitted to request Loans to fund Start-Up Expenses in an aggregate amount not to exceed $600,000; *provided further, however,* that after giving effect to any Borrowing, (x) the Total Outstandings shall not exceed the Commitment, subject to any reductions thereof pursuant to the terms hereof, and (y) the Outstanding Amount of the Loans shall not exceed the Loan Sublimit.  Subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.04 hereof, and reborrow under this Section 2.01.  Each Loan shall bear interest as set forth in Section 2.07 hereof.  Notwithstanding anything herein to the contrary, Loans may not be requested to repay Unreimbursed Amounts.

**Section 2.02   Borrowing of Loans**.  (a) Each Borrowing shall be made upon the Borrower's irrevocable notice to the Bank, which may be given by a Loan Notice; provided that any telephonic notice must be confirmed immediately by delivery to the Bank of a Loan Notice.  Each such Loan Notice must be received by the Bank not later than 4:00 p.m. (New York City time) on the third (3rd) Business Day immediately preceding the requested date of any Borrowing (the "*Borrowing Date*").  Each Borrowing shall be in the principal amount of $250,000 or a whole multiple of $50,000 in excess thereof.  Each Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of the Loan to be borrowed.

(b)   Following receipt of a Loan Notice, upon satisfaction of the applicable conditions set forth in Section 3.02 hereof (and, if such Borrowing is the initial Borrowing, Section 3.01 hereof), the Bank shall make the requested funds available to the Borrower by wire transfer of such funds to the Borrower's Account.

(c)   The obligation of the Borrower to repay the Loans and L/C Obligations, together with interest thereon, shall be evidenced by this Agreement. The Obligations shall be secured and payable in accordance with the provisions of Section 2.20 hereof.

**Section 2.03   Letters of Credit.**

(a)   *The Letter of Credit Commitment.*  (i) Subject to the terms and conditions set forth herein, the Bank agrees (A) from time to time on any Business Day during the period from the

-15-

Effective Date until the Letter of Credit Expiration Date, to issue Letters of Credit in Dollars for the account of the Borrower, and to amend Letters of Credit previously issued by it, in accordance with Section 2.03(b) hereof, and (B) to honor drawings under the Letters of Credit; *provided* that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Commitment and (y) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)     The Bank shall not be under any obligation to issue any Letter of Credit if:

(A)     the expiry date of the requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless the Bank has approved such expiration date;

(B)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Bank from issuing the Letter of Credit, or any Law applicable to the Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Bank shall prohibit, or request that the Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Bank in good faith deems material to it;

(C)     the issuance of the Letter of Credit would violate one or more policies of the Bank applicable to letters of credit generally;

(D)     except as otherwise agreed by the Bank, the Letter of Credit is in an initial stated amount less than $250,000;

(E)     the Letter of Credit is to be denominated in a currency other than Dollars; or

(F)     the Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder.

(iii)     The Bank shall be under no obligation to amend any Letter of Credit if (A) the Bank would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to the Letter of Credit.

-16-

(b)    *Procedures for Issuance and Amendment of Letters of Credit*. (i) Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the Bank in the form of a Letter of Credit Application, appropriately completed and signed by an Authorized Officer of the Borrower.  Such Letter of Credit Application may be sent by fax transmission, by United States mail, by overnight courier, by electronic transmission using the system provided by the Bank, by personal delivery or by any other means acceptable to the Bank.  Such Letter of Credit Application must be received by the Bank not later than 4:00 p.m. (New York City time) at least five (5) Business Days (or such later date and time as the Bank may agree in a particular instance in its sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Bank:  (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the Bank may require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Bank (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the Bank may require.  Additionally, the Borrower shall furnish to the Bank such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any L/C Documents, as the Bank may require.

(ii)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the Bank will also deliver to the Borrower a true and complete copy of such Letter of Credit or amendment.

(c)    *Drawings and Reimbursements.*  Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Bank shall notify the Borrower thereof.  Not later than 2:00 p.m. (New York City time) on the date of any payment by the Bank under a Letter of Credit (each such date, an *"Honor Date"*), the Borrower shall reimburse the Bank in an amount equal to the amount of such drawing.  If the Borrower fails to so reimburse the Bank by such time on the Honor Date for such drawing, the amount equal to the amount of the unreimbursed drawing (the *"Unreimbursed Amount"*) shall bear interest at the LIBOR Index Rate.  Any notice given by the Bank pursuant to this Section 2.03(c) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(d)    *Obligations Absolute.*  The obligation of the Borrower to reimburse the Bank for each drawing under each Letter of Credit shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

-17-

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Financing Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Bank or any other Person, whether in connection with this Agreement or by such Letter of Credit, the transactions contemplated hereby or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, endorsement, certificate or other document presented under or in connection with such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    waiver by the Bank of any requirement that exists for the Bank's protection and not the protection of the Borrower or any waiver by the Bank which does not in fact materially prejudice the Borrower;

(v)    honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)    any payment made by the Bank in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under, such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)    any payment by the Bank under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Bank under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law; or

(viii)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Bank. The Borrower shall be conclusively deemed to have waived any such claim against the Bank and its correspondents unless such notice is given as aforesaid.

(e)     *Role of the Bank.*  The Bank and the Borrower agree that, in paying any drawing under a Letter of Credit, the Bank shall not have any responsibility to obtain any document (other than any sight or time draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided, however*, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Bank, any of its related parties nor any correspondent, participant or assignee of the Bank shall be liable or responsible for any of the matters described in Section 2.03(d) hereof.  In furtherance and not in limitation of the foregoing, the Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the Bank shall not be responsible for the validity or sufficiency of any instrument transferring, endorsing or assigning or purporting to transfer, endorse or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.  The Bank may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication *("SWIFT")* message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(f)     *Applicability of ISP and UCP; Limitation of Liability.*  Unless otherwise expressly agreed by the Bank and the Borrower when a Letter of Credit is issued the rules of the ISP shall apply to each standby Letter of Credit.  Notwithstanding the foregoing, the Bank shall not be responsible to the Borrower for, and the Bank's rights and remedies against the Borrower shall not be impaired by, any action or inaction of the Bank required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the Bank or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(g)     *Letter of Credit Fees.*  The Borrower shall pay to the Bank a Letter of Credit fee (the *"Letter of Credit Fee"*) equal to 2.00% per annum times the daily amount available to be drawn under such Letter of Credit; *provided*, that upon the occurrence, and at all times during the continuation, of an Event of Default, the Letter of Credit Fee shall increase to 6.00% per annum times the daily amount available to be drawn under such Letter of Credit.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.05 hereof.  Letter of Credit Fees shall be (A) due and payable on (x) the first Business Day of each January, April, July and October, commencing with the first such date to occur after the issuance of such Letter of Credit, (y) the Letter of Credit Expiration Date and (z) thereafter on demand and (B) computed on a quarterly basis in arrears.  The Borrower shall also be responsible for the fees and miscellaneous

-19-

handling charges in connection with the issuance of each Letter of Credit as set forth in the related Letter of Credit Application.

(h)     *Letter of Credit Application Fee.*  Upon the Bank's issuance of any Letter of Credit, the Bank shall invoice and the Borrower shall pay to the Bank an application fee of $600, or such other application fee amount then required by the Bank, in immediately available funds, which such fee shall be fully earned by the Bank and non-refundable.

(i)     *Letter of Credit Amendment Fee.*  The Borrower shall promptly pay to the Bank a fee for each amendment to a Letter of Credit in a minimum amount of $135 or such amount then required by the Bank in connection with such amendment.

(j)     *Conflict with Borrower Documents.*  In the event of any conflict between the terms hereof and the terms of any L/C Document, the terms hereof shall control.

### Section 2.04   Prepayments.

(a)     *Optional*. The Borrower may, upon notice to the Bank pursuant to delivery to the Bank of a Notice of Loan Prepayment, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty subject to Section 2.18 hereof; *provided* that, unless otherwise agreed by the Bank (A) such notice must be received by Bank not later than 4:00 p.m. (New York City time) five (5) Business Days prior to any date of prepayment and (B) any prepayment of Loans shall be in a minimum principal amount of $250,000 or such lesser amount equal to the total outstanding principal amount of such Loan if the total outstanding principal amount thereof is less than $250,000.  Each such Notice of Loan Prepayment shall specify the date and amount of such prepayment.  If such Notice of Loan Prepayment is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of principal shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 2.18 hereof.

(b)     *Mandatory.*

(i)     *Outstandings.*  If for any reason at any time the (a) Total Outstandings at any time exceed the Commitment, (b) the L/C Obligations exceed the Letter of Credit Sublimit or (c) the Loans exceed the Loan Sublimit, in each case, as applicable, the Borrower shall, without notice, prepay Loans (together with all accrued but unpaid interest thereon) and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; *provided, however,* that the Borrower shall not be required to Cash Collateralize the L/C Obligations pursuant to this Section 2.04(b)(i) unless, after the prepayment of the Loans, the Total Outstandings exceed the Commitment at such time. For the avoidance of doubt, the Minimum Collateral Amount shall not apply to the Cash Collateral required under this Section 2.04(b)(i) unless an Event of Default has occurred and is continuing.

(ii)     *Application of Mandatory Prepayments.*  Prepayments made pursuant to this Section 2.04(b), *first,* shall be applied to the outstanding Loans, and, *second,* shall be

used to Cash Collateralize the remaining L/C Obligations; and, in the case of prepayments under the Commitment required pursuant to clause (i) of this Section 2.04(b), the amount remaining, if any, after the prepayment in full of all Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full (the sum of such prepayment amounts, cash collateralization amounts and remaining amount being, collectively, the *"Reduction Amount"*) may be retained by the Borrower for use in the ordinary course of its business. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrower that has provided Cash Collateral) to reimburse the Bank.

All prepayments under this Section 2.04(b) shall be subject to Section 2.18 hereof, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

**Section 2.05    Termination or Reduction of Commitment**.

(a)    *Optional*.    (i) The Borrower may, upon notice to the Bank, terminate the Commitment, the Loan Sublimit or the Letter of Credit Sublimit or, from time to time permanently reduce the Commitment, Loan Sublimit or the Letter of Credit Sublimit; provided that (i) any such notice shall be received by the Bank not later than 4:00 p.m. (New York City time) five (5) Business Days prior to the date of termination or permanent reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $250,000 in excess thereof and (iii) Borrower shall not terminate or reduce the (A) Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Commitment, (B) Letter of Credit Sublimit if, after giving effect thereto and to any concurrent prepayments or Cash Collateralizations hereunder, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit or (C) Loan Sublimit if, after giving effect thereto and to any concurrent prepayments hereunder, the Outstanding Amount of Loans not repaid hereunder would exceed the Loan Sublimit. Failure by the Borrower to designate in the notice required under this Section 2.05(a)(i) whether the Commitment, Loan Sublimit or Letter of Credit Sublimit is to be permanently reduced shall be deemed to be a permanent reduction in the Commitment.

(ii)    The Borrower hereby agrees to pay to the Bank a Reduction and Termination Fee (as defined below) in connection with any permanent reduction to, or termination or replacement of, the Commitment, the Loan Sublimit or the Letter of Credit Sublimit by the Borrower prior to the first (1st) anniversary of the Effective Date, in an amount equal to the product of (1) the applicable Commitment Fee Rate in effect on the date of such permanent reduction or termination or replacement, (2) the amount of such permanent reduction, termination or replacement of the Commitment, Loan Sublimit or Letter of Credit Sublimit, as applicable, and (3) a fraction, the numerator of which is equal to the number of days from and including the date of such termination or replacement to and including the first (1st) anniversary of the Effective Date, and the denominator of which is 360 (the *"Reduction and Termination Fee"*), payable on the date of such termination or replacement.

(b)     *Letter of Credit Sublimit*.  If after giving effect to any reduction or termination of the Commitment under this Section 2.05, the Letter of Credit Sublimit exceeds the Commitment at such time, the Letter of Credit Sublimit, as the case may be, shall be automatically reduced by the amount of such excess.

**Section 2.06   Repayment of Loans and Unreimbursed Amounts.**   The Borrower shall repay to the Bank, (a) on the earlier of (i) the Loan Facility Scheduled Termination Date and (ii) the Commitment Termination Date, the aggregate principal amount of Loans outstanding on such date, together with accrued interest thereon and (b) on the earlier of (i) the Scheduled Termination Date and (ii) the Commitment Termination Date, the aggregate principal amount of Unreimbursed Amounts outstanding on such date, together with accrued interest thereon. Subject at all times to Section 2.18 hereof, the Borrower shall repay to the Bank on the Commitment Termination Date all other Obligations payable hereunder.

**Section 2.07   Interest and Default Rate**.

(a)     *Interest*.  Subject to the provisions of subsection 2.07(b) below, each Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing Date at a rate per annum equal to the LIBOR Index Rate.  While the outstanding principal amount of any Loan or Unreimbursed Amount bears interest at a LIBOR Index Rate, the Bank shall determine the LIBOR Index Rate as of each applicable Computation Date and the LIBOR Index Rate applicable to Loans and Unreimbursed Amounts shall be effective (i) from the (A) Borrowing Date with respect to any Borrowing and (B) Honor Date with respect to any Unreimbursed Amount of L/C Obligations, in each case to but not including the immediately succeeding Rate Reset Date and (ii) thereafter, be effective for the period from and including the immediately succeeding Rate Reset Date to but not including the next succeeding Rate Reset Date; provided that, for purposes of calculating the initial LIBOR Index Rate with respect to any Loan or any Unreimbursed Amount, the Rate Reset Date applicable solely to such Loan or Unreimbursed Amount, as applicable (and not to any other outstanding Loans or Unreimbursed Amounts) until the next succeeding Rate Reset Date shall be the date such Loan or Unreimbursed Amount is advanced hereunder.

(b)     *Default Rate*.  (i)   While any Event of Default exists, the Borrower shall pay interest on all outstanding obligations of the Borrower hereunder (including, without limitation, all Loans and Unreimbursed Amounts) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws, payable on demand.

(ii)     Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     *Interest Payments*.  Interest on each Loan and Unreimbursed Amount shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any bankruptcy or insolvency proceeding.

(d)      *Discretion of Bank as to Manner of Funding*.  Notwithstanding any provision of this Agreement to the contrary, the Bank shall be entitled to fund and maintain its funding of all or any part of the Loans or Unreimbursed Amount hereunder in any commercially reasonable manner, it being understood, however, that for the purposes of this Agreement all determinations hereunder shall be made as if the Bank had actually funded and maintained the Loans or Unreimbursed Amounts during each Interest Period applicable thereto through the purchase of deposits in the relevant market in the amount of the Loans, having a maturity corresponding to such Interest Period.

(e)      Absence of LIBOR Funding.

(i)      *Circumstances Affecting LIBOR Index Rate Availability*.  If for any reason (A) the Bank shall determine (which determination shall be conclusive and binding absent fraud or manifest error) that Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount of any Loan and/or Unreimbursed Amount, or (B) the Bank shall determine (which determination shall be conclusive and binding absent fraud or manifest error) that reasonable and adequate means do not exist for ascertaining LIBOR for any Interest Period with respect to any Loan and/or Unreimbursed Amount, then the Bank shall promptly give notice thereof to the Borrower.   Thereafter, each such Loan and/or Unreimbursed Amount shall automatically convert to bear interest at the Alternate Rate until the circumstance or condition requiring such conversion to the Alternate Rate ceases to apply or exist.

(ii)      *Laws Affecting LIBOR Index Rate Availability*.  If, after the date hereof, the enactment or effectiveness of, or any change in, any applicable Law or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or any of its lending offices) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, shall make it unlawful or impossible for the Bank (or any of its lending offices) to honor its obligations hereunder to make or maintain the Loans and/or Unreimbursed Amounts with the LIBOR Index Rate applicable, the Bank shall promptly give notice thereof to the Borrower.   Thereafter, each Loan and/or Unreimbursed Amount shall automatically convert to bear interest at the Alternate Rate until the circumstance or condition requiring such conversion to the Alternate Rate ceases to apply or exist.

**Section 2.08   Fees.**

(a)      *Commitment Fee*. Commencing on the date of this Agreement, the Borrower shall pay to the Bank a commitment fee (the "*Commitment Fee*") equal to the sum of:

(i)      an amount equal to the product of (A) the Commitment Fee Rate applicable to the Bank's obligation to make Loans to the Borrower pursuant to Section 2.01 hereof and (B) the greater of (x) zero and (y) the Commitment less the Letter of Credit Sublimit and less all Loans outstanding; and

-23-

(ii)    an amount equal to the product of (A) the Commitment Fee Rate applicable to the Bank's obligation to issue Letters of Credit for the account of the Borrower pursuant to Section 2.03 hereof and (B) the greater of (x) zero and (y) the Letter of Credit Sublimit less all L/C Obligations outstanding,

in each case as from time to time in effect and computed on the basis of a year of 360 days and the actual number of days elapsed.  For the avoidance of doubt, the Commitment Fee shall not apply to the Outstanding Amount of Loans or the amount available to be drawn under outstanding Letters of Credit.  The Commitment Fee shall accrue from March 13, 2020 and at all times until the Commitment Termination Date, including at any time during which one or more of the conditions in Article III is not met (and solely for purposes of calculating the Commitment Fee, the Effective Date shall be deemed to be March 13, 2020), and shall be due and payable on the first Business Day of each January, April, July and October commencing with April 1, 2020 and on the Commitment Termination Date.  The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Commitment Fee Rate during any quarter, the daily actual amount shall be computed and multiplied by the Commitment Fee Rate separately for each period during such quarter that each such Commitment Fee Rate was in effect.  The Bank shall provide an invoice to the Borrower stating the Commitment Fees due for each quarterly period in arrears on the first Business Day of each January, April, July and October.

(b)    *Amendment Fees*. The Borrower hereby agrees to pay to the Bank, on the date of each amendment to this Agreement or any other Financing Document, a non refundable fee equal to $5,000, plus, in each case, the reasonable fees and expenses of counsel to the Bank in an amount to be agreed upon by the parties prior to the making of such amendment.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c)    *California Debt and Investment Advisory Commission Fees*.  The Borrower shall either (i) pay the fees to be paid in connection with the Agreement, if any, directly to the California Debt and Investment Advisory Commission, or (ii) on or before the thirtieth (30th) day immediately following the date that the Bank shall pay such amount, reimburse the Bank for the fees paid by the Bank to the California Debt and Investment Advisory Commission in connection with this Agreement, if any.

(d)    *Other Fees*.  The Borrower shall pay to the Bank such other fees as set forth in Sections 2.03(a), 2.03(h), 2.17, 2.18 and 7.04 hereof and all other fees provided for in this Agreement.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**Section 2.09   Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a year of three hundred sixty (360) days, and actual days elapsed. Interest shall accrue on each Loan and any Unreimbursed Amount for the day on which such Loan or payment is made, and shall not accrue for the day on which the Loan or Unreimbursed Amount, as applicable, or such portion is paid, provided that any Loan or Unreimbursed Amount that is repaid on the same day on which it is made shall, subject to Section 2.18(a) hereof, bear interest for one day.  Each determination by the Bank of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

-24-

**Section 2.10  Evidence of Debt**.  The Borrowings made from the Bank shall be evidenced by one or more accounts or records maintained by the Bank in the ordinary course of business.  The accounts or records maintained by the Bank shall be conclusive absent manifest error of the amount of the Borrowings made from the Bank by the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  The Loans shall be evidenced by the Note to be issued on the Effective Date, initially registered in the name of, and payable to, the Bank and otherwise duly completed.  The Bank may attach schedules to the Note and endorse thereon the date, amount and maturity of Loans and payments with respect thereto.

**Section 2.11  General Provisions as to Payments**.  All payments by the Borrower to the Bank hereunder shall be nonrefundable and made in lawful currency of the United States and in immediately available funds.  Amounts payable to the Bank hereunder shall be transferred to the Bank's account at Barclays Bank PLC, ABA# 026002574, Credit to Account No.: 050019104, Reference: Western Community Energy (or to such other account of the Bank as the Bank may specify by written notice to the Borrower) not later than 3:00 p.m., on the date payment is due.  Any payment received by the Bank after 3:00 p.m. shall be deemed to have been received by the Bank on the next Business Day.  If any payment hereunder is due on a day that is not a Business Day, then such payment shall be due on the immediately succeeding Business Day, and, in the case of the computation of the interest or fees hereunder, such extension of time shall, in such case, be included in the computation of the payment due hereunder.

**Section 2.12  Maximum Interest Rate; Payment of Fee**.  If the rate of interest due hereunder shall exceed the Maximum Interest Rate for any period for which interest is payable, then (i) interest at the Maximum Interest Rate shall be due and payable with respect to such interest period and (ii) if and to the extent permitted by applicable law, interest at the rate equal to the difference between (A) the rate of interest calculated in accordance with the terms hereof and (B) the Maximum Interest Rate (the "Excess Interest"), shall be deferred until such date as the rate of interest calculated in accordance with the terms hereof ceases to exceed the Maximum Interest Rate, at which time the Borrower shall pay to the Bank, with respect to amounts then payable to the Bank that are required to accrue interest hereunder if and to the extent permitted by applicable law, such portion of the deferred Excess Interest as will cause the rate of interest then paid to the Bank to equal the Maximum Interest Rate, which payments of deferred Excess Interest shall continue to apply to such unpaid amounts hereunder until all deferred Excess Interest is fully paid to the Bank.  Upon the repayment in full of any Loan or Unreimbursed Amount bearing Excess Interest, in consideration for the limitation of the rate of interest otherwise payable hereunder, the Borrower, if and to the extent permitted by applicable law, shall pay to the Bank a fee equal to the amount of all unpaid deferred Excess Interest on such Loan or Unreimbursed Amount, as applicable.

**Section 2.13  Cash Collateral.**

(a)    *Certain Credit Support Events.*  If (i) as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, or (ii) the Borrower shall be required to provide Cash Collateral pursuant to the terms hereof, the Borrower shall immediately following

-25-

any request by the Bank, provide Cash Collateral in an amount not less than the applicable Minimum Collateral Amount except as otherwise provided for herein.  Additionally, if the Bank notifies the Borrower at any time that the Outstanding Amount of all L/C Obligations at such time exceeds the Letter of Credit Sublimit then in effect, then within ten (10) Business Days after receipt of such notice, the Borrower shall provide Cash Collateral for the Outstanding Amount of the L/C Obligations in an amount not less than the amount by which the Outstanding Amount of all L/C Obligations exceeds the Letter of Credit Sublimit.

(b)    *Grant of Security Interest.*  The Borrower hereby grants to (and subjects to the control of) the Bank and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as Cash Collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to Section 2.13(c) hereof.  If at any time the Bank determines in good faith that Cash Collateral is subject to any right or claim of any Person other than the Bank, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Bank, pay or provide to the Bank additional Cash Collateral in an amount sufficient to eliminate such deficiency. All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in one or more blocked, non-interest-bearing deposit accounts at the Bank.  The Borrower shall pay on demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance and disbursement of Cash Collateral.

(c)    *Application.*  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.13 or Sections 2.03, 2.05 or 6.02 hereof in respect of Letters of Credit shall be held and applied to the satisfaction of the specific L/C Obligations and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(d)    *Release.*  Cash Collateral (or the appropriate portion thereof) provided to secure obligations shall be released promptly following the determination by the Bank that there exists excess Cash Collateral.

**Section 2.14  Obligations Absolute**.  The payment obligations of the Borrower of Loans under this Agreement shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including without limitation the following:

(a)    any lack of validity or enforceability of this Agreement or any of the Loan Documents;

(b)    any amendment or waiver of or any consent to departure from all or any of this Agreement or any of the Loan Documents;

(c)    the existence of any claim, set off, defense or other right which the Borrower may have at any time against the Bank or any other Person, whether in connection with this

-26-

Agreement or any of the Loan Documents, the transactions contemplated herein or therein or any unrelated transaction; or

(d)      any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

**Section 2.15   Yield Protection**. (a) <u>Reserves</u>. If the Bank or any Participant shall have determined that the adoption or implementation of any change in any law, rule, treaty or regulation or any policy, guideline, or directive of, or any change in the enforcement, interpretation, implementation, or administration thereof by, any court, central bank, or other administrative authority or Governmental Authority or compliance by the Bank or any Participant with any request or directive of any such court, central bank, or other administrative authority or Governmental Authority occurring following the execution of this Agreement (in each case, whether or not having the force of law) (a "Change in Law"), shall at any time (i) impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, pursuant to Regulation D of the Board of Governors of the Federal Reserve System) against letters of credit, credits or commitments to extend credit extended by, or assets (funded or contingent) of, deposits with or for the account of, or other acquisitions of funds or bonds by the Bank or any Participant, (ii) subject credits or commitments to issue letters of credit or extend credit extended by the Bank or any Participant to any assessment or other cost imposed by the Federal Deposit Insurance Corporation or any successor thereto or the Prudential Regulation Authority or the Financial Conduct Authority or any successor thereto, (iii) change the basis of taxation of payments to the Bank or any Participant of any amounts payable hereunder (except for taxes on the overall net income of the Bank or any Participant), or (iv) impose on the Bank or any Participant any other or similar condition regarding this Agreement, the commitment or obligations of the Bank or any Participant hereunder, and the result of any event referred to in clause (i), (ii), (iii) or (iv) above shall be to increase the cost to the Bank or any Participant of agreeing to issue, issuing or maintaining the Letters of Credit and/or Loans or to reduce the amount of any sum received or receivable by the Bank or any Participant hereunder, then, upon demand by the Bank, the Borrower shall pay to the Bank for its account, or that of any such Participant as may be applicable, such additional amount or amounts as will compensate the Bank or such Participant for such increased costs or reductions in amount.

(b)      <u>Capital Charges</u>.  If the Bank or any Participant shall have determined that the adoption or implementation of any Change in Law shall impose, modify or deem applicable any capital adequacy or similar requirement (including, without limitation, a request or requirement that affects the manner in which the Bank or any Participant allocates capital resources to its commitments) that either (i) affects or would affect the amount of capital to be maintained by the Bank or such Participant or (ii) reduces or would reduce the rate of return on the Bank's or such Participant's capital to a level below that which the Bank or such Participant could have achieved but for such circumstances (taking into consideration the policies of the Bank or such Participant with respect to capital adequacy) then, upon demand by the Bank for its own account or that of such Participant as may be applicable, the Borrower shall pay to the Bank for its own account, or such Participant, as applicable, such additional amounts as will compensate the Bank or such Participant for such event such that the Bank or such Participant shall enjoy the same economic benefit that the Bank or such Participant would have enjoyed if such event had not occurred.

-27-

(c)     All payments of amounts referred to in clauses (a) and (b) above shall be paid by the Borrower to the Bank within thirty (30) days of such demand.  A certificate as to such increased cost, increased capital, or reduction in return incurred by the Bank or any Participant as a result of any event mentioned in clause (a) or (b) of this subsection setting forth, in reasonable detail, the basis for calculation and the amount of such calculation shall be submitted by the Bank to the Borrower simultaneously with such demand for payment and shall be conclusive as to the amount thereof absent manifest error.  In making the determinations contemplated by the above referenced certificate, the Bank or any such Participant may make such reasonable estimates, assumptions, allocations and the like that the Bank or such Participant in good faith determines to be appropriate.  The obligations of the Borrower under this Section 2.15 shall survive the termination of this Agreement.

(d)     Third Party Beneficiaries.  The benefits of this Section 2.15 shall be available to each assignee of the Bank and each Participant; provided, however, that no assignee or Participant shall be entitled to receive (nor shall the Bank be entitled to receive on behalf of any assignee or Participant) any greater payment under this Section 2.15 than the Bank would have been entitled to receive without regard to any such assignment or participation unless any such assignment or participation is made with the express written consent of the Borrower.

**Section 2.16  Withholding**.  All payments by or on behalf of the Borrower under this Agreement shall be made without counterclaim, setoff, condition or qualification, and free and clear of, and without deduction or withholding for, or by reason of any present or future taxes, levies, imposts, deductions or charges of any nature whatsoever; excluding, however, taxes imposed on or measured by the net income or capital of the Bank by any jurisdiction or any political subdivision or taxing authority thereof or therein (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes"). If requested, the Bank, any assignee and any Participant, from time to time, shall provide the Borrower and the United States Internal Revenue Service (to the extent such information and forms may be lawfully provided by the Bank or such assignee or Participant) with such information and forms as may be required by the Treasury Regulations Section 1.1441 (C.F.R.) or any other such information and forms as may be necessary to establish that the Borrower is not subject to any withholding obligation under Section 1442 or other comparable provisions of the Code. If as a result of a change of Law, the Borrower shall be required by law to withhold or deduct any Taxes imposed by the United States or any political subdivision thereof from or in respect of any sum payable hereunder to the Bank, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.16) the Bank receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. If the Borrower shall make any payment under this Section 2.16 to or for the benefit of the Bank with respect to Taxes and if the Bank shall claim any credit or deduction for such Taxes against any other taxes payable by the Bank to any taxing jurisdiction in the United States, then the Bank shall pay to the Borrower an amount equal to the amount by which such other taxes are actually reduced; provided, however, that the aggregate amount payable by the Bank pursuant to this sentence shall not exceed the aggregate amount previously paid by the Bank with respect to such Taxes.  All of the Borrower's

-28-

obligations under this Section 2.16 shall survive the termination of this Agreement and the repayment in full of the Loans.

**Section 2.17    Other Taxes**.  To the extent permitted by law, the Borrower agrees to indemnify and hold the Bank harmless (on a net after-tax basis) from any present or future claim or liability for stamp, transfer, documentary, excise or other similar tax and any penalties or interest with respect thereto, which may be assessed, levied or collected by any government authority in connection with the execution, delivery, performance, filing and recording of, or any payment made under, this Agreement or the Loan Documents, or any amendment hereto or thereto and any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

**Section 2.18    Compensation for Losses.**  Upon demand of the Bank from time to time, the Borrower shall promptly compensate the Bank for and hold the Bank harmless from any loss, cost or expense incurred by it as a result of:

(a)    any payment or prepayment of any Loan or Unreimbursed Amount, the interest on which is determined by reference to LIBOR on a day other than the Rate Reset Date (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)    any failure by the Borrower (for a reason other than the failure of the Bank to make a Loan or Unreimbursed Amount) to prepay or borrow any Loan or Unreimbursed Amount on the date or in the amount notified by the Borrower;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or Unreimbursed Amount or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by the Bank in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Bank under this Section 2.18, the Bank shall be deemed to have funded each Loan and Unreimbursed Amount made by it at LIBOR for such Loan or Unreimbursed Amount by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Loan was in fact so funded.

**Section 2.19    Modification of Sublimits.**    Provided that no Event of Default has occurred and is continuing under this Agreement, the Borrower may from time to time request a modification in the balance of available funding between the Loan Sublimit and the Letter of Credit Sublimit to take into account any change in the needs of Borrower with respect to complying with the security requirements of PPA Providers.  Any modification of the Loan Sublimit and Letter of Credit Sublimit shall be subject to receipt by the Bank of any required internal approvals, including internal credit approval and subject to execution by the parties of an amendment to this Agreement evidencing such modification, it being understood that the Bank shall not be obligated to agree to any modification of the Loan Sublimit and the Letter of Credit Sublimit requested by the Borrower.

DM_US 159094637-10.071370.0787

**Section 2.20   Pledge and Security**. (a)  The Borrower hereby conveys, grants, pledges and assigns to the Bank and its successors and assigns a first priority security interest in (i) the Pledged Revenues, (ii) the Operating Reserve Fund and (iii) the Operating Fund Account to secure all of the Obligations (including, without limiting the foregoing, payments of principal of and interest on each Loan) of the Borrower hereunder.

(b)    Notwithstanding any other provision of this Agreement or any other Loan Document to the contrary, the Borrower hereby acknowledges and agrees that payment of all Obligations (including, without limiting the foregoing, payments of principal of and interest on each Loan) is a general obligation of the Borrower secured by a first priority lien on the Pledged Revenues, the Operating Reserve Fund and the Operating Fund Account.   The Bank acknowledges that the Obligations of the Borrower hereunder are solely obligations of the Borrower and are not debts, liabilities or obligations of any of the Members and no taxing power of any of the foregoing is pledged therefor.  The Borrower has no taxing powers.

## ARTICLE III

## CONDITIONS PRECEDENT TO BORROWINGS

**Section 3.01   Conditions of Initial Borrowing or issuance of initial Letter of Credit**. The obligation of the Bank to advance the initial Borrowing or issuance the initial Letter of Credit hereunder is subject to the following conditions precedent.

(a)    The Bank shall have received, on or before the Effective Date, the items listed below, each dated and in form and substance as is satisfactory to the Bank:

(i)    copies of the resolutions of the Borrower approving the execution and delivery of this Agreement and the Loan Documents and the other matters contemplated hereby and thereby, certified by the Authorized Officer of the Borrower as being a true and complete copy thereof and in full force and effect on the Effective Date;

(ii)    a certificate by an Authorized Officer of the Borrower, delivered to the Bank at least two (2) Business Days prior to the Effective Date, certifying the names and signatures of the persons authorized to sign, on behalf of the Borrower, this Agreement, the Loan Documents and each Loan Notice and certifying that the proceeds of such Loan shall only be used for the purpose of acquiring power or providing collateral in connection with the acquisition of power;

(iii)    unaudited internally-produced cash flow and balance sheet projections of the Borrower;

(iv)    originals (or copies certified to be true copies by the Borrower) of all governmental and regulatory approvals, if any, at the time required to be obtained by the Borrower with respect to this Agreement and the Loan Documents and the transactions contemplated hereby and thereby, together with a list of any approvals still to be received, if any;

(v)    an executed original of this Agreement and each of the Loan Documents;

(vi)     an opinion of Best, Best & Krieger LLP, special counsel to the Borrower, or other counsel acceptable to the Bank, addressed to the Bank or on which the Bank is otherwise expressly authorized to rely, as to the due authorization, execution, delivery and enforceability of this Agreement and each of the Loan Documents, validity of each security interest created hereunder and such other matters as the Bank may reasonably request;

(vii)     a certificate dated the Effective Date and executed by an Authorized Officer certifying (i) that there has been no event or circumstance since January 1, 2019, that has had or could be reasonably expected to have, either individually or in the aggregate, a material adverse effect upon the operations, business, properties, liabilities or financial condition of the Borrower, (ii) that the representations and warranties contained in Article IV hereof are true and correct in all material respects on the Effective Date and (iii) no event has occurred and is continuing, or would result from entry into this Agreement or any of the Loan Documents, which would constitute a Default or Event of Default;

(viii)     an executed United States Internal Revenue Service Form W-9 with respect to the Borrower;

(ix)     the executed Loan Notice delivered to the Bank at least two (2) Business Days prior to the Borrowing Date; and

(x)     a written description of all actions, suits or proceedings pending or threatened against the Borrower in any court or before any arbitrator of any kind or before or by any Governmental Authority and such other statements, certificates, agreements, documents and information with respect thereto as the Bank may reasonably request.

(b)     The Bank shall have received, on or before advancing the initial Borrowing or the issuance the initial Letter of Credit hereunder, executed copies of the Security Agreement, PPA Account Control Agreement and the Account Control Agreement and the establishment of the Lockbox Account, Operating Fund Account and Operating Reserve Fund and opinions of counsel covering such documents, in each case, in form and substance satisfactory to the Bank in its sole discretion, it being acknowledged and agreed that the Bank shall not be obligated to issue any Letters of Credit hereunder or advance any Loans hereunder until the satisfaction of this condition.

(c)     On or prior to the date of the advance of the initial Loan or initial issuance of a Letter of Credit, the Bank shall have received reimbursement (or direct payment) of the Bank's fees and expenses (including the reasonable legal fees and expenses of McDermott Will & Emery LLP, in the amount of $53,000), fees of legal counsel to the Bank in connection with the review and negotiation of the documents required under clause (b) of this Section and any other reasonable fees incurred in connection with the transaction contemplated by this Agreement and the Loan Documents; and

DM_US 159094637-10.071370.0787

(d)      All other legal matters pertaining to the execution and delivery of this Agreement and the Loan Documents shall be satisfactory to the Bank and its counsel, and the Bank shall have received such other statements, certificates, agreements, documents and information with respect to the Borrower and matters contemplated by this Agreement as the Bank may reasonably request.

**Section 3.02   Conditions Precedent to each Subsequent Loan**.  The obligation of the Bank to advance each subsequent Loan is subject to the further conditions precedent that:

(a)      The Bank shall have received the executed Loan Notice at least three (3) Business Days prior to the Borrowing Date;

(b)      The Bank shall have received, on or before the Borrowing Date, in form and substance as is satisfactory to the Bank, a certificate dated the Borrowing Date and executed by an Authorized Officer certifying (i) that the representations and warranties contained in Article IV hereof are true and correct in all material respects on the Borrowing Date and (ii) no event has occurred and is continuing, or would result from issuance of the requested Loan, which would constitute a Default or Event of Default;

(c)      The principal amount of such Loan shall not exceed the Available Commitment on the date such Loan is to be advanced and that after giving effect to any Borrowing, the (x) Total Outstandings shall not exceed the Commitment, subject to any reductions thereof pursuant to the terms hereof, and (y) the Outstanding Amount of the Loans shall not exceed the Loan Sublimit;

(d)      The Loan Facility Scheduled Termination Date shall not have occurred on or prior to the Borrowing Date; and

(e)      If the Loan is being requested prior to the Launch Date, the proceeds of such Loan shall only be used for the purpose of acquiring power or providing collateral in connection with the acquisition of power.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Borrower makes the following representations and warranties to the Bank as of the date hereof:

**Section 4.01   Existence and Power**.  The Borrower (i) is a joint powers agency created pursuant to the Act, (ii) has full power and authority to own its properties and carry on its business as now conducted, and (iii) has full power and authority to execute (or adopt, if applicable), deliver and perform its obligations under this Agreement and the Loan Documents and to borrow hereunder.  The Borrower is an "Electric Service Provider" under the Community Energy Aggregation Act and has full power and authority to offer electrical service to customers within its service territory.

**Section 4.02   Regulatory Authority**.  The Borrower is duly authorized to conduct its business and activities under all applicable laws, rulings, regulations and ordinances and the departments, agencies and political subdivisions governing it or regulating its business and activities, and the Borrower has obtained all material and requisite approvals of the State and of federal, regional and local governmental bodies required to be obtained in connection with the execution and delivery of this Agreement and the other Loan Documents prior to the date of the execution and delivery of this Agreement and the Loan Documents.

**Section 4.03   Noncontravention**.  The execution and delivery by the Borrower of this Agreement and the Loan Documents and the performance of its obligations hereunder and thereunder, does not and will not violate any existing law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Borrower or any of its assets, or result in a breach of any of the terms of, or constitute a default under or result in the creation or imposition of any lien on, any indenture, mortgage, deed of trust, lease or other agreement or instrument to which the Borrower is a party or by which it or any of its property is bound or the Act, its bylaws (if any), or any of the rules or regulations applicable to it or its property or any decree or order of any court or other governmental body.

**Section 4.04   Due Authorization**.  The execution, delivery and performance by the Borrower of this Agreement and the Loan Documents are within its corporate power and authority, and have been duly authorized by all necessary action and will not contravene any provision of the Act or its bylaws (if any).

**Section 4.05   Valid and Binding Obligations**.  This Agreement and each of the Loan Documents is a valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

**Section 4.06   Power Purchase Agreement.**  Each Power Purchase Agreement shall constitute a legal, valid and binding agreement of the Borrower, enforceable against the Borrower according to its terms except as enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to equitable principles in the event that equitable remedies are sought.

**Section 4.07   Pending Litigation and Other Proceedings**.  There is no action, suit or proceeding by or before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, pending (which has been served to the extent required to be served) or, to the Borrower's knowledge, threatened action or proceeding affecting or involving the Borrower or any of its business, properties, revenues or assets before any court, governmental agency or arbitrator which, if adversely determined, could result in a Material Adverse Effect (in the reasonable judgment of the Borrower), or otherwise adversely affect (A) the validity or enforceability of this Agreement or any of the Loan Documents, or (B) the status of the Borrower as a joint powers agency created pursuant to sections 6500 et seq. of the California Government Code, validly existing under the laws of the State.

**Section 4.08   Insurance.**  The Borrower currently maintains insurance with respect to its business, operations, assets and properties against such risks, in such amounts, with such companies and with such deductibles as is customarily carried by and insures against such risks

-33-

as are customarily insured against by entities with business, operations, assets and properties of like size, location and character to those of the Borrower.

**Section 4.09   Financial Projections.**  The projected balance sheet of the Borrower as provided to the Bank on September 12, 2019 and the related statement of revenues and expenses fairly present the Borrower's expectation of its future financial condition, changes in financial position and results of operations at such dates and for such periods as set forth therein.  Since September 12, 2019 there has been no material adverse change (in the reasonable judgment of the Borrower) in the business, assets, revenues, properties, condition (financial or otherwise) or operations, present or prospective, of the Borrower not otherwise disclosed to the Bank in writing prior to the Effective Date.

**Section 4.10   Complete and Correct Information**.  All information, reports and other papers and data with respect to the Borrower furnished to the Bank or its counsel by the Borrower were, taken in the aggregate and at the time the same were so furnished, complete and correct in all material respects.  No fact is known to the Borrower which materially and adversely affects or in the future may materially and adversely affect the business, revenues, properties, assets or liabilities, financial condition, results of operations of the Borrower, or any of its business prospects which has not been set forth in the financial statements referred to in Section 4.08 hereof or in such information, reports, papers and data or otherwise disclosed in writing to the Bank by the Borrower.  When taken in the aggregate, no document furnished or statement made by the Borrower in connection with the negotiation, preparation or execution of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading.

**Section 4.11   Pending Legislation and Decisions**.  There is no amendment, or to the current knowledge of the Borrower, proposed amendment to the Constitution of the State or any State law or any administrative interpretation of the Constitution of the State or any State law, or any legislation that has passed either house of the legislature of the State, or any judicial decision interpreting any of the foregoing, which would materially adversely affect the Borrower's obligations under this Agreement or the Loan Documents, or the Borrower's ability to pay when due its obligations under this Agreement.

**Section 4.12   Default**.  No Default or Event of Default has occurred and is continuing with respect to the Borrower.

**Section 4.13   Employee Benefit Plan Compliance**.  The Borrower has no funding deficiency with respect to any employee benefit plan and is otherwise in compliance with terms of any such plan in which the Borrower or any of its employees participate in.  Neither the Borrower nor any employee benefit plan maintained by the Borrower is subject to the Employee Retirement Income Security Act of 1974, as amended.

**Section 4.14   Operating Reserve Fund.**  The Borrower has created the Operating Reserve Fund and such account is and shall at all times be maintained and segregated from all other funds and accounts of the Borrower.

**Section 4.15  Sovereign Immunity**.  The Borrower is not entitled to immunity from legal proceedings to enforce this Agreement or any other Loan Document to which the Borrower is a party (including, without limitation, immunity from service of process or immunity from jurisdiction of any court otherwise having jurisdiction) and is subject to claims and suits for damages in connection with this Agreement or any other Loan Document to which the Borrower is a party.

**Section 4.16  Usury**.  The terms of this Agreement regarding the calculation and payment of interest and fees do not violate any applicable usury laws.  The obligations of the Borrower hereunder are not subject to any limitations as to maximum rate of interest payable to regulated financial institutions.

**Section 4.17  Federal Reserve Board Regulations**.  The Borrower will not use any part of the proceeds of the Loans or Letters of Credit and has not incurred any indebtedness to be reduced, retired or purchased by the Borrower out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the Borrower does not own and will not acquire any such Margin Stock.

**Section 4.18  Investment Company Act**.  The Borrower is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

**Section 4.19  No Proposed Legal Changes**.  To the best knowledge of the Borrower, there is no proposed amendment to the Constitution of the State or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the State legislature, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to result in a Material Adverse Change.

**Section 4.20  No Outstanding Indebtedness.**  The Borrower has no outstanding Indebtedness.

**Section 4.21  Loan Documents**.  Each of the Loan Documents is (or upon execution and delivery on even date herewith will be) in full force and effect.  No Event of Default and no event which, with the giving of notice, the passage of time or both, would constitute an Event of Default, presently exists under any of the Loan Documents.  Neither the Borrower nor any other party under the Loan Documents has waived or deferred performance of any material obligation under any such Loan Document.

**Section 4.22  Incorporation of Representations and Warranties**.  The Borrower hereby makes to the Bank the same representations and warranties made by the Bank in each Loan Document, which representations and warranties, together with the related definitions of terms contained therein, are hereby incorporated by reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety.  No amendment to or waiver of such representations and warranties or definitions made pursuant to

-35-

the relevant Loan Documents shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Bank.

**Section 4.23   Parties to the Joint Powers Agreement**.  Each of the entities identified on Exhibit D hereto is currently a Member Agency (as defined in the Joint Powers Agreement).

**Section 4.24   ERISA.**  The Borrower does not maintain or contribute to, and has not maintained or contributed to, any "employee benefit plans" that are subject to Title IV of ERISA.

**Section 4.25   Anti-Terrorism Laws**.  The Borrower is not in violation of any Laws relating to terrorism or money laundering ("*Anti-Terrorism Laws*"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "*Executive Order*"), and the Patriot Act;

(a)      The Borrower is not any of the following:

(i)      a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with which the Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)      a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)      a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("*OFAC*") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(b)      The Borrower does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (a)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

**ARTICLE V**

**COVENANTS**

-36-

As long as this Agreement is in effect, and until all amounts payable hereunder are paid in full, the Borrower will perform and observe the covenants set forth below, unless the Bank shall otherwise consent in writing:

**Section 5.01   Compliance With Laws and Regulations**.  The Borrower shall comply with all laws, ordinances, orders, rules and regulations of duly constituted public authorities which may be applicable to it, its revenues, assets or properties.

**Section 5.02   Reporting Requirements**.  The Borrower shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Borrower on a consolidated or combined basis in accordance with generally accepted accounting principles consistently applied.  The Borrower will deliver to the Bank either in hard copy or by electronic mail to xramunicipalcovenant@barclayscapital.com (or such other email address as shall be directed from time to time by the Bank):

(a)   *Annual Financial Statements*.  As soon as available, and in any event within two hundred seventy (270) days after the close of each Fiscal Year of the Borrower, commencing with the Fiscal Year ending June 30, 2019, the complete audited financial statements of the Borrower including the balance sheet as of the end of such Fiscal Year and the related statements of revenues, expenses and cash flows and changes in fund balance for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the preceding Fiscal Year all in reasonable detail, certified and prepared by an independent certified public accountant in accordance with generally accepted accounting principles, consistently applied.

(b)   *Quarterly Financial Statements*.  As soon as available, and in any event within forty-five (45) days after the last day of each of each quarter of each Fiscal Year of the Borrower, the unaudited financial statements of the Borrower including the balance sheet as of the end of such quarter and a statement of income and expenses, all in reasonable detail and certified, subject to year-end adjustment, by an Authorized Officer of the Borrower and a statement of customer count and usage as of such date.

(c)   *Certificate of Compliance*.  Simultaneously with the delivery of each set of financial statements referred to in Section 5.02(a) hereof, a certificate signed by an Authorized Officer of the Borrower stating that (i) under his/her supervision the Borrower has made a review of its activities during the preceding annual period for the purpose of determining whether or not the Borrower has complied with all of the terms, provisions and conditions of this Agreement and each Loan Document and (ii) to the best of his/her knowledge no Default or Event of Default has occurred with respect to the Borrower in the performance or observance of any of the terms, covenants, provisions or conditions of this Agreement or any Loan Document, or if a Default or Event of Default shall have occurred with respect to the Borrower, such certificate shall specify each such Default or Event of Default, the nature and status thereof and any remedial steps taken or proposed to correct each such Default or Event of Default.

(d)   *Financial Covenant Compliance*.  The Borrower shall deliver to the Bank within thirty (30) days after each Financial Covenant Determination Date, a certificate of an Authorized Officer of the Borrower certifying, in form and substance acceptable to the Bank, the Borrower's

-37-

Operating Reserve Fund balance and Debt Service Coverage Ratio as of such Financial Covenant Determination Date, and providing the basis for such calculation.

(e)    *Amendments*.  Promptly after the adoption thereof, copies of any amendments of or supplements to any Loan Document, the Joint Powers Agreement, any Financing Document or any bylaws of the Borrower.

(f)    *Parties to Joint Powers Agreement*.  Promptly after any entity ceases to be a Party (as defined in the Joint Powers Agreement), notice thereof and copies of any notices or documents provided by or to the Borrower in connection therewith.

(g)    *Power Purchase Agreement Defaults*.  Promptly upon any Authorized Officer obtaining knowledge of the occurrence of (i) an event of default or notice thereof or (ii) any condition or event which, with the giving of notice or lapse of time, or both, would, unless cured or waived, become an event of default, in each case, caused by the Borrower under any Power Purchase Agreements, and in any event within five (5) days thereafter, the Borrower will provide to the Bank the written statement of an Authorized Officer setting forth the reasonable detail of such event and the action which the Borrower proposes to take with respect thereto.

(h)    *Operating Reserve*.  Within fifteen (15) days after the end of each calendar month after March 31, 2021, the Borrower shall provide the Bank with a statement indicating the amount of funds on deposit in the Operating Reserve Fund.

(i)    *Other Reports*.  Promptly upon request by the Bank, copies of any financial statement or report furnished to any other holder of long term securities of the Borrower pursuant to the terms of any long-term indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Bank pursuant to any other clause of this Section 5.02.

(j)    *Financing Documents*.  Promptly after the execution thereof, copies of any of the Financing Documents.

(k)    *Other Information*.  Such other information with respect to the business, properties, revenues, assets or the condition or operations, financial or otherwise, of the Borrower as the Bank may from time to time reasonably request.

**Section 5.03   Notices.**  (a) As promptly as practical (but in no event more than five (5) days) after the date the Borrower shall have obtained knowledge of the occurrence of an Event of Default or breach of this Agreement, the Borrower shall provide notice of the same to the Bank and, in either case, provide to the Bank the written statement of the Borrower setting forth the details of each such event and the action which the Borrower proposes to take with respect thereto.

(b)    *Offering Circulars and Material Event Notices*.  The Borrower shall, within ten (10) days after the filing of a material event notice or the issuance by the Borrower of any indebtedness or other obligation with respect to which a final official statement or other offering circular has been prepared by the Borrower, provide the Bank with a copy of such notice, official statement or offering circular, as applicable.

-38-

**Section 5.04  Further Assurances**.  The Borrower shall, upon the request of the Bank, from time to time, execute and deliver and, if necessary, file, register and record such further financing statements, amendments, confirmation statements and other documents and instruments and take such further action as may be reasonably necessary to effectuate the provisions of this Agreement and each Loan Document.  Except to the extent it is exempt therefrom, the Borrower will pay or cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Agreement and each Loan Document and such instruments of further assurance.

**Section 5.05  Right of Entry**.   The Borrower shall permit the duly authorized representatives of the Bank during normal business hours and upon reasonable notice to enter the premises of the Borrower, or any parts thereof, to examine and copy the Borrower's financial and corporate books, records and accounts, and to discuss the affairs, finances, business and accounts of the Borrower with the Borrower's officers and employees.

**Section 5.06  Payment of Obligations; Removal of Liens**.  The Borrower shall pay (a) all indebtedness and obligations of the Borrower in accordance with the terms thereof and (b) all assessments or other governmental charges as the same respectively become due, all taxes, assessments (general or special) and governmental charges of any kind whatsoever that may be at any time lawfully assessed or levied against or with respect to any of its or its businesses, property, revenues and assets or any interest thereon and promptly discharge or cause to be discharged all liens, encumbrances and charges on such businesses, property, revenues and assets.  Nothing contained in this Section 5.06 will require Borrower to make any payment (other than amounts owed under this Agreement) that it disputes or has offset in good faith with respect to any payee or will prevent Borrower from challenging any tax, assessment or charge in good faith, provided, however, that such non-payment or challenge does not have a Material Adverse Effect on the Borrower.

**Section 5.07  Related Obligations**.  The Borrower shall promptly pay all amounts payable by it under this Agreement and under the other Loan Documents according to the terms hereof or thereof and shall duly observe, perform and fulfill each of its obligations under this Agreement and under the provisions of each of the other Loan Documents.  Such provisions of such other Loan Documents, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety without giving effect to any expiration, amendment, supplement or termination of the Loan Documents to which the Bank has not given its express written consent.

**Section 5.08  Insurance**.  The Borrower will at all times maintain insurance with respect to its business, operations, assets and properties against such risks, in such amounts, with such companies and with such deductibles as is customarily carried by and insures against such risks as are customarily insured against by entities with business, operations, assets and properties of like size, location and character to those of the Borrower.

-39-

**Section 5.09   Employee Benefit Plan Compliance**.  The Borrower shall, in a timely fashion, comply in all material respects with all requirements under any employee benefit plan in which the Borrower or any of its employees participate.

**Section 5.10   Disclosure of Participants**.  The Borrower permits the Bank to disclose any information received by the Bank in connection herewith to any Participant, including without limitation the financial information described in Section 5.02 hereof.

**Section 5.11   Sovereign Immunity**.  The Borrower irrevocably agrees that it will not assert the defense of any future right of sovereign immunity in a legal proceeding to enforce or collect upon the obligations of the Borrower under this Agreement, the Loan Documents or the transactions contemplated hereby and thereby.

**Section 5.12   Notice of Adverse Change**.  The Borrower shall provide to the Bank written notice as soon as possible of (i) the filing of actions, suits and proceedings before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, against the Borrower, where the amount claimed is in excess of two million Dollars ($2,000,000), (ii) any action, suit, proceeding, inquiry or investigation before or by any court, public board or body pending or threatened wherein an unfavorable decision, ruling or finding could result in a Material Adverse Change or (iii) any other event which, in the reasonable judgment of the Borrower, is likely to result in a Material Adverse Change.

**Section 5.13   Taxes and Liabilities**.  The Borrower shall pay all its indebtedness and other obligations promptly and in accordance with their terms and pay and discharge or cause to be paid and discharged promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, which default could result in a Material Adverse Change.

**Section 5.14   Compliance With Laws, Etc**.  The Borrower shall not violate any laws, rules, regulations, or governmental orders to which it is subject and of which it is aware after diligent inquiry, which violation involves a reasonable likelihood of resulting in a Material Adverse Change.

**Section 5.15   Preservation of Existence, Ownership, Etc**.  The Borrower shall (a) preserve and maintain its corporate existence, right (charter and statutory) and franchises, trade names and licenses, (b) qualify and remain qualified to do business in each jurisdiction in which such qualification is necessary in view of the Borrower's business or operations and (c) preserve all of the property of the Borrower used or useful in the conduct of the Borrower's business or operations and keep the same in good repair, working order and condition, and from time to time make, or cause to be made, all needful and proper repairs, renewals and replacements, betterments and improvements thereto, so that the business carried in connection therewith may be properly and advantageously conducted at all times.

**Section 5.16   Certain Information**.  The Borrower shall not include in an offering document for any Indebtedness any information concerning the Bank that is not supplied in

-40-

writing, or otherwise approved, by the Bank expressly for inclusion therein, which supply or approval shall not be unreasonably withheld.

Section 5.17   **Disposition of Assets**.   The Borrower shall not dissolve nor shall it sell, lease, assign, transfer or otherwise dispose of all or a substantial portion of its properties and assets.

Section 5.18   **Consolidation or Merger**.   The Borrower shall not consolidate with or merge into another Person or permit one or more other Persons to consolidate with or merge into it or acquire all or substantially all of the property and assets of any other Person without the consent of the Bank; provided, that nothing in this Section 5.18 is intended to preclude the addition of new Members to the Borrower in accordance with the Joint Powers Agreement.

Section 5.19   **Proceeds of Loans**.   The proceeds of the Loans will be used by the Borrower solely for purposes consistent with the Act and the purposes of the Borrower as set forth in the Joint Powers Agreement, including for purposes consistent with the community choice aggregation program established by Borrower pursuant to California Public Utilities Code Section 366.2.  The Borrower shall use Credit Extensions (i) in the case of Letters of Credit, to secure payments due under Power Purchase Agreements, and (ii) in the case of Loans, to purchase energy for the community choice aggregation program and to secure payments due under Power Purchase Agreements.  The Borrower shall use the proceeds of any Loan requested prior to the Launch Date solely for the purpose of acquiring power or providing collateral in connection with the acquisition of power.

Section 5.20   **Disclosure in Financial Statements**.   The Borrower shall reflect the indebtedness evidenced by this Agreement in any statement of assets and liabilities prepared by or for the Borrower.

Section 5.21   **Liens**.   The Borrower will not create, incur or permit to exist any lien of any kind on any Property of the Borrower senior to or on parity with the lien on Pledged Revenues in favor of the Bank.  The Borrower will not create, incur or permit to exist any lien of any kind on any Property of the Borrower on a basis subordinate to the lien on Pledged Revenues in favor of the Bank.

Section 5.22   **Burdensome Contracts With Members**.   The Borrower will not enter into any contract, agreement or business arrangement with any of its Members on terms and conditions which are less favorable to the Borrower than would be usual and customary in similar contracts, agreements or business arrangements between unrelated persons transacting with each other on an arm's length basis.

Section 5.23   **Indebtedness**.   The Borrower shall not create, incur, assume or suffer to exist any Indebtedness except (i) Loans hereunder, (ii) any Power Purchase Agreements, (iii) Trade Obligations in an aggregate amount not in excess of $500,000 and (iv) any other Indebtedness consented to by the Bank.

Section 5.24   **Use of Pledged Revenues**.   The Borrower shall not spend, disburse, apply, lend or otherwise dispose of monies constituting Pledged Revenues except for purposes consistent with the purpose of the Borrower as set forth in the Joint Powers Agreement,

-41-

including for purposes consistent with the community choice aggregation program established by Borrower pursuant to California Public Utilities Code Section 366.2; provided that, following the occurrence of an Event of Default hereunder, the Borrower shall apply all Pledged Revenues solely to the payment of Obligations hereunder.

Section 5.25   **Amendments**.  The Borrower shall not amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Loan Documents, the Joint Powers Agreement or the Financing Documents or its bylaws, if any, without the prior written consent of the Bank; provided, that nothing in this Section 5.25 is intended to preclude (a) the addition of new Members to the Borrower in accordance with the Joint Powers Agreement or (b) any amendment to the Joint Powers Agreement which does not materially adversely affect the rights of the Bank hereunder.

Section 5.26   **Incorporation by Reference.**  From and after the date hereof and so long as this Agreement is in effect, except to the extent compliance in any case or cases is waived in writing by the Bank, the Borrower shall perform, observe, fulfill and comply with, abide by, and be restricted by the provisions of the Financing Documents to which it is a party, so long as any Obligations remain outstanding hereunder, which agreements, covenants, obligations and undertakings together with the related definitions, exhibits and ancillary provisions are incorporated herein by reference, mutatis mutandis, and made a part hereof to the same extent and with the same force and effect as if the same had been herein set forth in their entirety.  No amendment to any such covenants or defined terms shall be effective to amend such covenants and defined terms as incorporated by reference herein without the prior written consent of the Bank.

Section 5.27   **Debt Service Coverage Ratio and Operating Reserve Fund Balance**. (a) As of each Financial Covenant Determination Date commencing on April 1, 2021, the Debt Service Coverage Ratio of the Borrower shall be not less than the Debt Service Coverage Ratio Requirement; provided that, for the Financial Covenant Determination Dates occurring on April 1, 2021 and July 1, 2021, such calculation shall be determined based on Income Available for Debt Service and interest (but not principal) for the prior twelve months.

(b)      If the Debt Service Coverage Ratio of the Borrower is less than the Debt Service Coverage Ratio Requirement as of any Financial Covenant Determination Date (a "*Noncompliance Date*"), the Borrower shall (A) notify the Bank within one (1) Business Day thereof and (B) at its own expense, retain a Consultant within thirty (30) days of such Financial Covenant Determination Date, to make recommendations with respect to the rates, fees and charges of the Borrower and the Borrower's methods of operation and other factors affecting its financial condition in order to increase the Debt Service Coverage Ratio of the Borrower above the Debt Service Coverage Ratio Requirement.   Such Consultant shall be selected by the Borrower and shall be acceptable to the Bank and shall deliver its report and recommendations within forty-five (45) days of its appointment.

(c)      A copy of the Consultant's report and recommendations shall be provided to the Bank.   The Borrower shall consider the recommendations of the Consultant to the extent commercially reasonable in the exercise of their business judgment, subject at all times to the legislative authority of the governing board of the Borrower and to the extent permitted by law.

-42-

If the Borrower shall, for any reason, not implement or comply with the recommendations of the consultant, such event shall be an Event of Default under this Agreement. In addition, if the Debt Service Coverage Ratio of the Borrower on the date which is six months after the Borrower retains the Consultant pursuant to clause (b) above (which date shall be considered a Financial Covenant Determination Date under this Agreement) or any subsequent Financial Covenant Determination Date thereafter is less than the Debt Service Coverage Ratio Requirement, such event shall be an Event of Default under this Agreement.

(d)      The balance in the Operating Reserve Fund of the Borrower shall be not less than: (i) from and including April 1, 2021 to but excluding July 1, 2021, twenty percent (20%) of the Operating Reserve Fund Requirement, (ii) from and including July 1, 2021 to but excluding October 1, 2021, fifty percent (50%) of the Operating Reserve Fund Requirement, and (iii) from and including October 1, 2021 and as of each Financial Covenant Determination Date thereafter, one hundred percent (100%) of the Operating Reserve Fund Requirement, unless waived in writing by the Bank. The Borrower shall provide written evidence of its compliance with the requirements set forth in clauses (i), and (ii) on the last day of each such period and shall provide written evidence of its compliance with the requirements of clause (iii) above on October 1, 2021 and on each Financial Covenant Determination Date thereafter.

(e)      If, on any date, the balance in the Operating Reserve Fund of the Borrower shall be less than the amount required pursuant to clause (d) above, the Borrower shall, within thirty (30) days of such date, deposit sufficient additional funds into the Operating Reserve Fund to satisfy such requirement.

(f)      In addition to the obligations set forth above, if the Debt Service Coverage Ratio of the Borrower is less than the Debt Service Coverage Ratio Requirement as of any Financial Covenant Determination Date or the balance in the Borrower's Operating Reserve Fund is less than the Operating Reserve Fund Requirement, the Borrower shall, within thirty (30) days thereof, take all necessary action to convert the Operating Fund Account to a custodial account (the "*Custodial Operating Account*"), in form and substance acceptable to the Bank, reflecting the Bank's first priority security interest therein and in the Pledged Revenues, authorizing the Bank to issue a notice of exclusive control in respect thereof upon the occurrence of an Event of Default hereunder, and accompanied by such opinions of counsel to the Borrower as the Bank may reasonably request in respect thereof. Following the occurrence of an Event of Default, the Borrower shall, upon written notice from the Bank, transfer such Custodial Operating Account to a third party financial institution custodian reasonably satisfactory to the Bank.

**Section 5.28   Operating Reserve Fund**. The Borrower shall (i) maintain the Operating Reserve Fund at all times; (ii) deposit all Pledged Revenues into the Operating Reserve Fund to the extent necessary to comply with Section 5.27 hereof; and (iii) segregate the Operating Reserve Fund and amounts on deposit therein from all other funds and accounts of the Borrower. The Borrower shall not release any moneys, securities or entitlements held in the Operating Reserve Fund without the prior written consent of the Bank.

**Section 5.29   Power Purchase Agreements.** On or prior to thirty (30) days prior to the Launch Date, the Borrower shall provide evidence satisfactory to the Bank that the Borrower has executed at least two (2) Power Purchase Agreements.

**Section 5.30   Payments to WRCOG**.  The Borrower shall not make any payments to Western Riverside Council of Governments prior to the later of (i) April 1, 2021 or (ii) the date on which the Borrower shall fund the Operating Reserve Fund to 100% of the Operating Reserve Fund Requirement and shall meet the Debt Service Coverage Ratio required by Section 5.27 above.

**Section 5.31   Rate Covenant.**  The Borrower shall establish and maintain fees, rates, rents, charges and surcharges sufficient so that Revenues reasonably expected to be produced during such period will be at least equal to the sum of (i) the aggregate of the payments required to be made during such period in respect of principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on all outstanding Indebtedness of the Borrower and (ii) the amount necessary to pay all other payment expenses of the Borrower for such period, including, but not limited to, all Expenses, as shown on the most recent financial pro-forma provided to the Bank or the operating budget adopted by the governing board of the Borrower.

## ARTICLE VI

## EVENTS OF DEFAULT, REMEDIES

**Section 6.01   Events of Default and Remedies**.  If any of the following events shall occur, each such event shall be an "*Event of Default*":

(a)   (i) the Borrower shall fail to pay the principal of or interest on any Loan or Unreimbursed Amount when due or (ii) the Borrower shall fail to pay any other Obligation within five (5) days of the date when due;

(b)   any representation or warranty made by or on behalf of the Borrower in this Agreement or any Loan Document or in any certificate or statement delivered hereunder or thereunder shall be incorrect or untrue in any material respect when made or deemed to have been made or delivered; or

(c)   the Borrower shall default in the due performance or observance of any of the covenants set forth in Section 5.11, 5.17, 5.18, 5.19, 5.23, 5.24, 5.25, 5.26, 5.27, 5.28, 5.29, 5.30 or 5.31 hereof; or

(d)   the Borrower shall default in the due performance or observance of any other term, covenant or agreement contained in this Agreement or any Loan Document and such default, if capable of being remedied shall remain unremedied for a period of thirty (30) days or more; or

(e)   the occurrence of any of the events set forth in Section 5.27(c) hereof which are designated as an Event of Default; or

(f)   one or more final, unappealable judgments against the Borrower for the payment of money, which, individually or in the aggregate, equal or exceed $1,000,000, shall remain unpaid, unstayed, undischarged, unbonded or undismissed for a period of sixty (60) days; or

(g)    an Event of Insolvency shall have occurred with respect to the Borrower; or

(h)    this Agreement or any Loan Document or any material provision hereof or thereof shall at any time for any reason cease to be valid and binding on the Borrower as a result of a ruling or finding by a court or a Governmental Authority with competent jurisdiction or shall be declared by any court with competent jurisdiction to be null and void, invalid, or unenforceable, or the validity or enforceability thereof shall be contested by the Borrower or any agent or trustee on their behalf or the Borrower or any agent or trustee on their behalf shall in writing repudiate or otherwise deny that it has any further liability or obligation with respect thereto; or

(i)    (i) (A) default by the Borrower in the payment of any amount due in respect of any Indebtedness owed to the Bank, as and when the same shall become due or (B) default by the Borrower in the payment of any amount due in respect of any Indebtedness of the Borrower (excluding any amount due to any PPA Provider) in an aggregate amount in excess of $100,000, as and when the same shall become due and subject to any applicable cure period, or (ii) the occurrence of any default, event of default or other similar condition or event (however described) under any Loan Document or any mortgage, agreement or other instrument under or pursuant to which any Indebtedness of the Borrower (excluding any amount due to any PPA Provider) having an aggregate principal amount in excess of $100,000 is incurred or issued, and continuance of such default beyond the period of grace, if any, allowed with respect thereto; or

(j)    default by the Borrower in the payment of any amount due to any PPA Provider, subject to any applicable cure period, unless such obligation is being contested in good faith by the Borrower through appropriate action; or

(k)    a senior officer of the Borrower shall (i) claim in writing that this Agreement or any Loan Document or any material provision herein or therein is not legal, valid or enforceable or (ii) repudiate in writing its obligations under this Agreement or any Loan Document or under any Indebtedness of the Borrower; or

(l)    the Borrower or any Governmental Authority with jurisdiction over the Borrower shall initiate any legal proceedings to seek an adjudication that this Agreement or any Loan Document or the obligation to pay or repay any Loan or any other Indebtedness of the Borrower is not valid or not binding on the Borrower; or

(m)    there shall be appointed or designated with respect to the Borrower, an entity such as an organization, board, commission, authority, agency or body to monitor or declare a financial emergency or similar state of financial distress with respect to it or there shall be declared by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

(m)    SCE shall default in the performance of the SCE Agreement and the Borrower shall have failed, within thirty (30) days after the occurrence of such default, to exercise the remedies available to it under the SCE Agreement; or

(n)    a Material Adverse Effect shall occur with respect to the community choice aggregation program operated by the Borrower or the Borrower's ability to repay Obligations under this Agreement; or

-45-

(o)    dissolution or termination of the existence of the Borrower or the community choice aggregation program operated by the Borrower.

**Section 6.02    Remedies**.  Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the interest rate on the Loans and all other outstanding Obligations hereunder shall immediately and without further action convert to the Default Rate and the Bank at its option may take any one or more of the following actions:

(a)    declare the Commitment and the obligation of the Bank to make Credit Extensions to be terminated, whereupon such Commitment and obligation shall be terminated;

(b)    by written notice to the Borrower, declare the outstanding amount of the Obligations and all other obligations of the Borrower under this Agreement to be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue;

(c)    require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the Minimum Collateral Amount with respect thereto);

(d)    at the expense of the Borrower, cure any Event of Default or event of nonperformance hereunder or under any other Financing Document; provided, however, that the Bank shall have no obligation to effect such a cure; and

(e)    exercise, or cause to be exercised, any and all remedies as it may have under the Financing Documents and as otherwise available at Law and at equity;

(f)    exercise its rights under any Custodial Operating Account or pursuant to any account control agreement or other agreement relating thereto; and/or

(g)    pursue any action available at law or in equity.

**Section 6.03    Remedies Cumulative; Solely for the Benefit of the Bank**.  To the extent permitted by, and subject to the mandatory requirements of, applicable Law, each and every right, power and remedy herein specifically given to the Bank shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Bank, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Bank specified herein are for the sole and exclusive benefit, use and protection of the Bank, and the Bank is entitled, but shall have no duty or obligation to the Borrower or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Bank hereunder or under any Loan Document.

-46-

# ARTICLE VII

# MISCELLANEOUS

**Section 7.01   Amendments, Etc**.   No amendment or waiver of any provision of this Agreement or any Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing signed by the Bank and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  In the case of any such waiver or consent relating to any provision hereof, any Default or Event of Default so waived or consented to shall be deemed to be cured and not continuing, but no such waiver or consent shall extend to any other or subsequent Default or Event of Default or impair any right consequent thereto.

**Section 7.02   Notices; Effectiveness; Electronic Communication**.   (a)  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax transmission or e-mail transmission to the address, fax number or e-mail address specified for such Person on Schedule I, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number specified for such Person on Schedule I.  Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (c).

(b)   *Electronic Communications*.  Notices and other communications to the Bank hereunder may be delivered or furnished by electronic communication (including e-mail) pursuant to procedures approved by the Bank.  The Bank or the Borrower, in its discretion, agrees to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it provided that the approval of such procedures may be limited to particular notices or communications.

(c)   Unless the Bank otherwise prescribes, notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient following the sender's receipt of an acknowledgment from the intended recipient.

-47-

(d)     *Change of Address, Etc*.  Each of the Borrower and the Bank may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(e)     *Reliance by the Bank*.  The Bank shall be entitled to rely and act upon any notices (including telephonic or electronic notices) purportedly given by or on behalf of the Borrower by an Authorized Officer even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Bank from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower; provided that the Borrower shall not be required to indemnify the Bank for any losses, costs, expenses or liabilities, to the extent, but only to the extent, caused by the willful misconduct or gross negligence of the Bank.  All telephonic notices to and other telephonic communications with the Bank may be recorded by the Bank, and each of the parties hereto hereby consents to such recording.

**Section 7.03   No Waiver; Cumulative Remedies**.  No failure by the Bank to exercise, and no delay by the Bank in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided and provided under the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**Section 7.04   Costs and Expenses; Damage Waiver**.  (a)  The Borrower shall pay (i) all reasonable out of pocket expenses incurred by the Bank and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Bank in the amount of $53,000) in connection with the preparation, negotiation, execution, and delivery of this Agreement and the Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out of pocket expenses incurred by the Bank (including the fees, charges and disbursements of any counsel for the Bank), and all fees and time charges for attorneys who may be employees of the Bank, in connection with the enforcement or protection of its rights in connection with this Agreement or the Loan Documents, including its rights under this Section, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such purchase.

(b)     *Indemnification by the Borrower*.  To the extent permitted by law, in addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, the Borrower hereby agrees to indemnify and hold harmless each of the Bank, each Participant and their respective officers, directors, employees and agents (each an "Indemnitee") from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an Indemnitee may incur (or which may be claimed against an Indemnitee by any Person whatsoever) that arises out of the transactions contemplated by this Agreement or the Loan Documents, including, without limitation, (i) the execution and delivery or transfer of, or payment or failure to pay under, this

-48-

Agreement or the Loan Documents; and (ii) the use of the proceeds of the Loan; provided that the Borrower shall not be required to indemnify any Indemnitee for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by the willful misconduct or gross negligence of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction. If any proceeding shall be brought or threatened against any Indemnitee by reason of or in connection with the events described in (i) or (ii), the Bank shall promptly notify the Borrower in writing and the Borrower shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation. The Borrower will not settle or compromise any such action or claim without the prior written consent of the relevant Indemnitee if the settlement or compromise involves any performance by or adverse admission of such Indemnitee. Notwithstanding the preceding sentence, if the interests of the Borrower and an Indemnitee are, in the reasonable judgment of the Indemnitee, in material conflict, an Indemnitee shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of the Borrower.

(c)      *Waiver of Consequential Damages, Etc.* To the fullest extent permitted by law, the Borrower shall not assert, and hereby waives, and acknowledges that no other Person has or shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, the Loans, the Letters of Credit or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)      *Payments*. All amounts due under this Section shall be payable not later than thirty (30) days after demand therefor.

(e)      *Survival*. The agreements in this Section shall survive the payment in full of the Loans and Unreimbursed Amounts, the repayment, satisfaction or discharge of all other Obligations and the termination of this Agreement.

**Section 7.05   Payments Set Aside**. To the extent that any payment by or on behalf of the Borrower is made to the Bank, and such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential or required (including pursuant to any settlement entered into by the Bank in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

**Section 7.06   Successors and Assigns**.

(a)     *Successors and Assigns Generally*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted by this Section.  The Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Bank.

(b)     The Bank may at any time, without the consent of, or notice to, the Borrower, assign or otherwise transfer any of its rights or obligations hereunder to (i) an entity which is affiliated with the Bank or (ii) a funding entity or other special purpose arrangement established by the Bank or an Affiliate of the Bank.  The Bank may at any time, with the written consent of the Borrower (such consent not to be unreasonably withheld or delayed), assign or otherwise transfer any of its rights or obligations hereunder to any other bank, institutional investor or other entity which, in each case, customarily purchases or holds loans.

(c)     *Participations*.  The Bank may at any time, without the consent of, or notice to, the Borrower, sell participations to any Person (other than a natural Person or the Borrower) (each, a "Participant") in all or a portion of the Bank's rights and/or obligations under this Agreement (including all or a portion of the Loans or Unreimbursed Amounts) and any such Participant, and any investors in any such Participant if such Participant is a funding vehicle, such as a tender option trust or similar vehicle, shall be entitled to receive from the Bank any information provided by the Borrower to the Bank; provided that (i) the Bank's obligations under this Agreement shall remain unchanged, (ii) the Bank shall remain solely responsible to the Borrower for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations under this Agreement; and provided however, that (A) no such Participant shall be entitled to receive payment hereunder of any amount greater than the amount which would have been payable had the Bank not granted a participation to such Participant; (B) no Participant shall be entitled to receive directly from the Borrower any notice required to be given by the Borrower to the Bank hereunder; and (C) no Participant shall be entitled to request or receive directly from the Borrower any other information required to be provided to the Bank hereunder.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Sections 2.12, 2.13, 2.14 and 7.04 as though it were the Bank.

(d)     *Certain Pledges*.  The Bank may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of the Bank, including any pledge or grant to secure obligations to a Federal Reserve Bank; provided that no such pledge or grant shall release the Bank from any of its obligations hereunder or substitute any such pledgee or grantee for the Bank as a party hereto.

**Section 7.07  Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 3.01, this Agreement shall become effective when it shall have been executed by the Bank and when the Bank shall have received counterparts hereof that, when taken together, bear the signatures of the other party hereto.  Delivery of an executed counterpart of a signature page of this Agreement by fax

-50-

transmission or e-mail transmission (e.g., *"pdf"* or *"tif"*) shall be effective as delivery of a manually executed counterpart of this Agreement. Without limiting the foregoing, to the extent a manually executed counterpart is not specifically required to be delivered under the terms of this Agreement, upon the request of any party, such fax transmission or e-mail transmission shall be promptly followed by such manually executed counterpart.

**Section 7.08  Survival of Representations and Warranties**. All representations and warranties made hereunder and in any other document delivered pursuant hereto or in connection herewith shall survive the execution and delivery hereof. Such representations and warranties have been or will be relied upon by the Bank, regardless of any investigation made by the Bank or on its behalf and notwithstanding that the Bank may have had notice or knowledge of any Default at the time of making the Loans or issuing Letters of Credit hereunder, and shall continue in full force and effect as long as any other Obligation hereunder shall remain unpaid or unsatisfied.

**Section 7.09  Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 7.10  Governing Law; Jurisdiction; Etc**. (a)  This Agreement will be governed by and construed in accordance with the laws of the State of New York.

(b)  *Submission to Jurisdiction*. Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of any State or Federal court in the State of New York in the County of New York, in any action or proceeding arising out of or relating to this Agreement, the Loan Documents or any other related document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court in the County of New York or in such Federal court in the State of New York in the County of New York. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)  Each of the parties hereto irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement, the Loan Documents or any other related document in any court referred to in paragraph (b) of this section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**Section 7.11  Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 7.12  Extension of Loan Facility Scheduled Termination Date or Scheduled Termination Date**.  The Loan Facility Scheduled Termination Date or Scheduled Termination Date may be extended from time to time by agreement in writing between the Bank and the Borrower.  If no Event of Default has occurred and is continuing, the Borrower may request in writing to the Bank, in the form of Exhibit E to this Agreement not earlier than one hundred eighty (180) days prior to the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, that the Bank extend the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable.  The Borrower has no obligation to request an extension of the Loan Facility Scheduled Termination Date or Scheduled Termination Date and the Bank has no obligation to agree to an extension of the Loan Facility Scheduled Termination Date or Scheduled Termination Date, and all terms of the extension (including the term, commitment and other fees, interest rates, amortization terms and other provisions) shall be mutually acceptable to the Bank and the Borrower.  The Bank agrees to respond to a written extension request by the Borrower within thirty (30) days of receipt of such request by the Bank.  If the Bank fails to respond to the Borrower within thirty (30) days of receipt of the Borrower's request or the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable shall have occurred, the Bank shall be deemed to have denied such request. If the Bank and the Borrower agree to an extension of the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, the Bank shall give written notice, in the form of a Notice of Extension substantially in the form of Exhibit F hereto (a "Notice of Extension") of its determination to extend the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, to the Borrower.  If the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, is extended, the Borrower shall, except as otherwise agreed to in writing by the Bank, be deemed to have made the representations and warranties contained herein on and as of the date on which the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, is so extended.

**Section 7.13  No Advisory or Fiduciary Relationship**.  In connection with all aspects of each transaction contemplated hereby or by the Loan Documents (including in connection with any amendment, waiver or other modification hereof or thereof), the Borrower acknowledges and agrees that:  (a) (i) the services regarding this Agreement provided by the Bank and any Affiliate thereof are arm's-length commercial transactions between the Borrower, on the one hand, and the Bank and its Affiliates, on the other hand, (ii) the Borrower has

-52-

consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby or by the Loan Documents; (b) (i) the Bank and its Affiliates each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, or any other Person and (ii) neither the Bank nor any of its Affiliates has any obligation to the Borrower with respect to the transactions contemplated hereby or by the Loan Documents except those obligations expressly set forth herein and therein; and (c) the Bank and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, and neither the Bank nor any of its Affiliates has any obligation to disclose any of such interests to the Borrower.  To the fullest extent permitted by law, the Borrower, hereby waives and releases any claims that it may have against the Bank or any of its Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

**Section 7.14   Electronic Execution of Certain Documents**.  The words "execute," "execution," "signed," "signature," and words of like import in this Agreement or any other document related hereto (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Bank, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 7.15   USA Patriot Act**.  The Bank is subject to the Patriot Act and hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Bank to identify the Borrower in accordance with the Patriot Act.  The Borrower shall, promptly following a request by the Bank, provide all documentation and other information that the Bank requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**Section 7.16   Reserved**.

**Section 7.17   Entire Agreement**.  This Agreement and the Loan Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements among the parties.

**Section 7.18   Further Assurances**.  From time to time upon the request of either party hereto, the other shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the requesting party may in its reasonable discretion deem necessary or desirable to confirm this Agreement or the Loan Documents to carry out the purpose and intent hereof and thereof or to enable the requesting party to enforce any of its rights

-53-

hereunder and thereunder.  At any time, and from time to time, upon request by the Bank, the Borrower will, at the Borrower's expense, correct any defect, error or omission which may be discovered in the form or content of this Agreement or the Loan Documents.  Upon any failure by the Borrower to do so, the Bank may make, execute and record any and all such instruments, certificates and other documents for and in the name of the Borrower, all at the sole expense of the Borrower, and the Borrower hereby appoints the Bank the agent and attorney in fact of the Borrower to do so, this appointment being coupled with an interest and being irrevocable.  In addition, at any time, and from time to time, upon request by the Bank, the Borrower will, at the Borrower's expense, provide any and all further instruments, certificates and other documents as may, in the opinion of the Bank, be necessary or desirable in order to verify the Borrower's identity and background in a manner satisfactory to the Bank.

**Section 7.19   Right of Setoff**.  Upon the occurrence of an Event of Default, the Bank and its Affiliates may, at any time and from time to time, without notice to the Borrower or any other Person (any such notice being expressly waived), set off and appropriate and apply, against and on account of, any obligations and liabilities of the Borrower to the Bank or its Affiliates arising under or connected with this Agreement or the Loan Documents, without regard to whether or not the Bank shall have made any demand therefor, and although such obligations and liabilities may be contingent or unmatured, any and all deposits (general or special, including but not limited to indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other indebtedness or other payment obligation at any time held or owing by the Bank or its Affiliates to or for the credit or the account of the Borrower.

**Section 7.20   Bail-In Action Acknowledgment**.   The Borrower acknowledges and agrees that notwithstanding any other term of this Agreement or any other agreement, arrangement or understanding with the Bank, any liability arising under or in connection with this Agreement may be subject to Bail-In Action, and accept to be bound by the effect of:

(a)      any Bail-In Action in relation to such liability, including (without limitation):

(i)      a reduction, in full or in part, of any amount due in respect of any such liability;

(ii)      a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, you; and

(iii)      a cancellation of any such liability; and

(b)      a variation of any term of this Agreement to the extent necessary to give effect to Bail-In Action in relation to any such liability.

"Bail-In Action" means the exercise by a resolution authority of any write-down or conversion power existing from time to time (including, without limitation, any power to amend or alter the maturity of eligible liabilities of an institution under resolution or amend the amount of interest payable under such eligible liabilities or the date on which interest becomes payable, including by suspending payment for a temporary period and together with any power to terminate and value transactions) under, and exercised in compliance with, any laws, regulations, rules or

-54-

requirements in effect in the United Kingdom relating to the transposition of the Bank Recovery and Resolution Directive, as amended from time to time, including but not limited to, the Banking Act 2009 as amended from time to time, and the instruments, rules and standards created thereunder, pursuant to which our obligations (or those of the Bank's affiliates) can be reduced (including to zero), cancelled or converted into shares, other securities, or other obligations of the Bank or any other person.

**Section 7.21  No Recourse Against Constituent Members of Borrower or Individuals**.  Borrower is organized as a Joint Powers Authority in accordance with the Joint Exercise of Powers Act of the State of California (Government Code Section 6500 et seq.) pursuant to the Joint Powers Agreement and is a public entity separate from its constituent Members.  Borrower shall be solely responsible for all debts, obligations and liabilities accruing and arising out of this Agreement and the Loans and the other Loan Documents.  None of this Agreement, the Loans or any other Obligations or any other Loan Document shall constitute a debt, liability or obligation of any of the constituent Members of the Borrower.  The Bank shall not make any claims, take any actions or assert any remedies against any of the Borrower's constituent Members in connection with any payment default by Borrower under this Agreement or any other Loan Document.

It is hereby recognized and agreed that no member of the Board of Directors, no officer, employee or agent of the Borrower, no member of the governing body or officer of the constituent Members of the Borrower shall be individually liable for the payment of the Loans or other Obligations hereunder or in respect of any undertakings by the Borrower under this Loan Agreement or the other Loan Documents.

**Section 7.22  No Third Party Rights**.  Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Borrower, the Bank, any successors and assigns thereof, or any Participant, any legal or equitable right, remedy or claim under or in respect of this Agreement, which is intended for the sole and exclusive benefit of the aforementioned parties.

[SIGNATURE PAGE FOLLOWS.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date.

**WESTERN COMMUNITY ENERGY**

By _____

Name: _____

Title: _____

Approved as to form:

By _____

Steven DeBaun, Partner

Best Best & Krieger LLP

**BARCLAYS BANK PLC**

By _____

Name:   R. Cassandra Bolz

Title:   Authorized Signatory for and on behalf of Barclays Bank PLC

**SCHEDULE I**


**ADDRESSES**


The Borrower:                 Western Community Energy
                              3390 University Ave., Suite 200
                              Riverside, CA  92501
                              Attention:   Chief Financial Officer
                              Telephone: (951) 405-6700
                              E-mail: aruiz@wrcog.us


The Bank:                     For a Loan Notice and for billing and payment purposes:

                              Barclays Bank PLC
                              1301 6th Avenue
                              New York, New York 10019
                              Attention: Loan Operations
                              Telephone: (212) 320-7564
                              Fax: (917) 522-0569
                              Email: XrausLoanOps5@barcap.com and
                              liquiditydraw@barclayscapital.com

                              For all other purposes:

                              Barclays Bank PLC
                              745 Seventh Avenue, 19th Floor
                              New York, New York  10019
                              Attention:      R. Cassandra Bolz
                              Facsimile:      (646) 758-1419
                              Telephone:      (212) 526-3974
                              Email:  cassandra.bolz@barclays.com

DM_US 159094637-10.071370.0787

## EXHIBIT A

### FORM OF NOTE

Principal Amount Not to exceed $16,000,000                    March 12, 2020

FOR VALUE RECEIVED, the undersigned WESTERN COMMUNITY ENERGY (the *"Borrower"*), hereby promises to pay to BARCLAYS BANK PLC, or its registered assigns (the *"Bank"*), in accordance with the provisions of the Agreement (as hereinafter defined), the principal outstanding amount of all Unreimbursed Amounts related to Letters of Credit and each Loan from time to time made by the Bank to the Borrower, in each case under that certain Revolving Credit Agreement, dated as of March 12, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the *"Agreement;"* the terms defined therein being used herein as therein defined), between the Borrower and the Bank, in accordance with the terms of the Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Loan and Unreimbursed Amount from the date of such Loan or Honor Date, as applicable, until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement.  All payments of principal and interest shall be made to the Bank in Dollars in immediately available funds at the Bank's Lending Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  The Loans made by the Bank and Unreimbursed Amounts shall be evidenced by one or more loan accounts or records maintained by the Bank in the ordinary course of business. The Bank may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loans and Unreimbursed Amounts and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

A-2

Delivery of an executed counterpart of a signature page of this Note by fax transmission or other electronic mail transmission (*e.g.*, "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Note.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

WESTERN COMMUNITY ENERGY

By: _____

Name: _____

Title: _____

A-3

## LOANS AND PAYMENTS WITH RESPECT THERETO

| DATE | AMOUNT OF LOAN MADE | AMOUNT OF PRINCIPAL OR INTEREST PAID THIS DATE | OUTSTANDING PRINCIPAL BALANCE THIS DATE | NOTATION MADE BY |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

A-4

EXHIBIT B

FORM OF LOAN NOTICE

Date:  _____, 201_

To:    Barclays Bank PLC

       745 Seventh Avenue, 19th Floor

       Attention:  Cassandra Bolz

       Telephone:  212-526-3974

       Email:  Cassandra.bolz@barclays.com

Ladies and Gentlemen:

Reference is made to that certain Revolving Credit Agreement, dated as of March 12, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the *"Agreement"*) (the terms defined therein being used herein as defined in the Agreement), between Western Community Energy (the *"Borrower"*), and Barclays Bank PLC (the *"Bank"*).

The undersigned hereby requests a Borrowing of Loan:

1.    On _____ (a Business Day).

2.    In the amount of $_____.

3.    The proceeds of the Borrowing shall be applied to:

   **[Start-Up Costs (only permitted prior to June 1, 2020)]**

   **[purchase energy for the Community Energy Program]**

   **[secure payments due under Power Purchase Agreements]**

4.    To the account set forth below in the Agreement.

The Borrowing requested herein complies with the proviso to the first sentence of Section 2.01 of the Agreement.

Borrower hereby represents and warrants that the conditions specified in Section 3.02 of the Agreement shall be satisfied on and as of the date of the Borrowing requested herein.

B-1

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic mail transmission (*e.g.*, "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

WESTERN COMMUNITY ENERGY

By: _____

    Name: _____

    Title: _____

DM_US 159094637-10.071370.0787

**EXHIBIT C**

**FORM OF NOTICE OF LOAN PREPAYMENT**

TO:          Barclays Bank PLC, as lender (the *"Bank"*)

RE:    Revolving Credit Agreement, dated as of March 12, 2020, by and between Western Community Energy (the *"Borrower"*) and the Bank (as amended, modified, extended, restated, replaced, or supplemented from time to time, the *"Credit Agreement"*; capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement)

DATE:          [Date]

_____

The Borrower hereby notifies the Bank that on _____[1] pursuant to the terms of Section 2.04 (Prepayments) of the Credit Agreement, the Borrower intends to optionally prepay the Loan in the following amount(s):  $_____[2]

---

[1]      Specify date of such prepayment.

[2]      Any prepayment shall be in a principal amount of at least $250,000 (or if less, the entire principal amount thereof outstanding).

C-1

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic mail transmission (e.g. "*pdf*" or "*tif*") shall be effective as delivery of a manually executed counterpart of this notice.

WESTERN COMMUNITY ENERGY

By: _____

Name: _____

Title: _____

C-2

# EXHIBIT D

## CURRENT PARTIES TO JOINT POWERS AGREEMENT

City of Norco

City of Perris

City of Wildomar

City of Jurupa Valley

City of Hemet

City of Eastvale

City of Canyon Lake

**EXHIBIT E**

**FORM OF REQUEST FOR EXTENSION**

**REQUEST FOR EXTENSION**

Barclays Bank PLC
[*ADDRESS*]
Attention:

Ladies and Gentlemen:

Reference is hereby made to that certain Revolving Credit Agreement dated as of March 12, 2020 (the "Agreement"), between Western Community Energy (the "Borrower") and Barclays Bank PLC (the "Bank").  All capitalized terms contained herein which are not specifically defined shall be deemed to have the definition set forth in the Agreement.  The Borrower hereby requests, pursuant to Section 7.12 of the Agreement, that the _____ for the Agreement be extended by [*IDENTIFY APPROPRIATE PERIOD*], subject to such other terms as shall be mutually acceptable to the Bank and the Borrower.  Pursuant to Section 7.12 of the Agreement, we have enclosed along with this request the following information:

1.     The nature of any and all Defaults and Events of Default;

2.     Confirmation that all representations and warranties of the Borrower as set forth in Article IV of the Agreement are true and correct as though made on the date hereof and that no Event of Default has occurred and is continuing on the date hereof except as referenced in paragraph 2 above; and

3.     Any other pertinent information previously requested by the Bank.

The Bank is requested to notify the Borrower of its decision with respect to this request for extension within thirty (30) days of the date of receipt hereof.  If the Bank fails to notify the Borrower of its decision within such thirty (30) day period, the Bank shall be deemed to have rejected such request.

Very truly yours,

WESTERN COMMUNITY ENERGY

By_____
Name_____
Title_____

C-4

## EXHIBIT F

## NOTICE OF EXTENSION

[*DATE*]

Western Community Energy
1111 Broadway Floor 3
Oakland, CA 94607

Ladies and Gentlemen:

Reference is hereby made to that certain Revolving Credit Agreement dated as of March 12, 2020 (the "Agreement"), between Western Community Energy (the "Borrower") and Barclays Bank PLC (the "Bank").

The undersigned, a duly authorized signatory of the Bank hereby advises you, with reference to the above-referenced Agreement (any capitalized term used herein and not defined shall have its respective meaning as set forth in the Agreement), that [Complete as Appropriate]:

1.      On [date], the Borrower delivered to the Bank, pursuant to Section 7.12 of the Agreement, a Request For Extension requesting that the date referenced in the definition of "_____" in the Agreement (as such date may have been extended previously from time to time) be extended to _____.

2.      At the request and for the account of the Borrower, we hereby extend the date referenced in the definition of "_____" in the Agreement (as such date may have been extended previously from time to time) to _____.

3.      Except as specifically provided in paragraph (1) above, all of the terms and conditions of the Agreement remain unchanged and in full force and effect.

4.      This Notice of Extension is an integral part of the Agreement.

5.      [Specify such other terms (including the term, commitment and other fees, interest rates, amortization terms and other provisions) as mutually agreed upon between the Bank and the Borrower.]

[The _____ will not be extended at this time.]

IN WITNESS WHEREOF, the undersigned, on behalf of the Bank, has executed and delivered this Notice of Extension as of the _____ day of _____.

BARCLAYS BANK PLC


By_____

Name_____

Title_____

DM_US 159094637-10.071370.0787