## Exhibit B

**Security Agreement**

# SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "**Agreement**") dated as of February 12, 2020, is entered into between WESTERN COMMUNITY ENERGY, a California joint powers authority, as pledgor ("**WCE**"), and RIVER CITY BANK, a California corporation, not in its individual capacity, but solely as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), for the benefit of the PPA Providers (as defined below), as Secured Creditors (as defined below).

### RECITALS:

A.     WCE intends to enter into a Power Purchase Agreement (as defined below) with multiple power providers (each, a "**PPA Provider**" and collectively, the "**PPA Providers**"), pursuant to which WCE will agree to purchase the Product (as defined below) from each such PPA Provider;

B.     WCE shall sell the Product purchased from PPA Providers to WCE's customers at rates established by WCE from time to time;

C.     WCE's customers are billed by Southern California Edison ("**SCE**") amounts they owe for the Product provided by WCE;

D.     As of the date hereof, WCE has directed SCE to remit all present and future collections on accounts receivable now or hereafter billed by SCE on behalf of WCE to Collateral Agent, for remittance to the Lockbox Account (as defined below) maintained by Collateral Agent, which direction is irrevocable unless both Collateral Agent, at the direction of the Required Secured Creditors (as defined below), and WCE direct SCE otherwise;

E.     WCE desires herein to pledge to Collateral Agent, for the benefit of the PPA Providers as Secured Creditors, a first priority continuing security interest in and to the Collateral (defined below);

F.     The PPA Providers and WCE will enter into the Intercreditor Agreement (as defined below) wherein the PPA Providers will appoint the Collateral Agent to act on their behalf regarding the administration, collection and allocation of the proceeds of the Collateral; and

G.     WCE and Collateral Agent desire to enter into this Agreement to evidence the pledge of the Collateral and to set forth their agreements regarding the Collateral and the application of the Collateral to the Obligations (as defined below).

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

## Section 1.    Definitions, Etc.

1.01    Defined Terms.  The following terms shall have the meanings assigned to them in this Section 1.01 or in the provisions of this Agreement referred to below:

"**Applicable Law**" means any applicable law, including without limitation any: (a) federal, state, territorial, county, municipal or other governmental or quasi-governmental law, statute, ordinance, rule, regulation, requirement or use or disposal classification or restriction, whether domestic or foreign; (b) judicial, administrative or other governmental or quasi-governmental order, injunction, writ, judgment, decree, ruling, interpretation, finding or other directive, whether domestic or foreign; (c) common law or other legal or quasi-legal precedent; (d) arbitrator's, mediator's or referee's decision, finding, award or recommendation; or (e) charter, rule, regulation or other organizational or governance document of any national securities exchange or market or other self-regulatory organization.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, and the rules promulgated thereunder, as the same may be in effect from time to time.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in the United States are required or authorized to close.

"**Collateral**" means the following, whether now existing or hereafter arising: (a) the Receivables; (b) the Lockbox Account; (c) all cash, cash equivalents, securities, Investment Property (as such term is defined in the UCC), Security Entitlements (as such term is defined in the UCC), checks, money orders and other items of value now or hereafter that are required to be, or that are, paid, deposited, credited or held (whether for collection, provisionally or otherwise) in or with respect to the Lockbox Account or otherwise in the possession or under the control of, or in transit to, the Collateral Agent or the Depositary Bank for credit or with respect to the Lockbox Account and all interest accumulated thereon; and (d) all Proceeds (as such term is defined in the UCC) of any or all of the foregoing.  The term "Collateral" shall not include any amounts distributed to WCE pursuant to Section 6.02(v).

"**Collateral Agent**" has the meaning given to such term in the Preamble hereof.

"**Control**" has the meaning given to such term in Section 9-104 of the UCC.

"**Control Agreements**" means the Lockbox Account Control Agreement, and any other agreements entered into among WCE, Collateral Agent and Depositary Bank which shall designate the Lockbox Account as a blocked account under the Control of Collateral Agent, for the benefit of Secured Creditors, as provided in the UCC, as each such agreement may be amended, supplemented, restated or replaced from time to time.

"**Credit Rating**" means for a Qualified Institution the respective ratings then assigned to such entity's unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement) by S&P, Moody's or other specified rating

- 2 -

agency or agencies or, if such entity does not have a rating for its unsecured, senior long-term debt or deposit obligations, then the rating assigned to such entity as its "corporate credit rating" by S&P.

"**Customer**" means any customer of WCE who purchases the Product from WCE but is invoiced by SCE, and any other obligor(s) responsible for payment of a Receivable.

"**Depositary Bank**" means River City Bank, a California corporation, in its capacity as depositary bank and its successors and assigns.

"**Direction Letter**" means that certain letter, a copy of which has been delivered to the Collateral Agent, from WCE to SCE pursuant to which WCE has directed SCE to remit all of the Proceeds on the Receivables collected by SCE from Customers to the Lockbox Account specified therein for application to the Obligations, unless and until both Collateral Agent, at the direction of the Required Secured Creditors, and WCE jointly instruct SCE to terminate or change such direction and any written amendments, modifications, restatements, extensions or supplements thereto or replacements thereof and any similar letter or written direction provided to SCE.

"**Discharge Date**" means that date on which: (a) any and all outstanding Obligations under the Transaction Agreements have been fully satisfied, and (b) there are no continuing obligations by WCE under any Transaction Agreements (other than for any provisions which are intended to survive the termination of the Transaction Agreements).

"**Distribution Date**" means the twenty-fifth (25) day of each month.

"**Distribution Date Certificate**" means a certificate prepared and submitted by WCE in accordance with Section 6.03.

"**Event of Default**" has the meaning set forth in the applicable Master Agreement or Power Purchase Agreement.

"**Intercreditor Agreement**" means the Intercreditor and Collateral Agency Agreement, dated as of even date herewith, among Collateral Agent, the Secured Creditors from time to time party thereto and WCE, as amended, supplemented, restated or replaced from time to time.

"**Lender**" means Barclays Bank PLC.

"**Letter of Credit**" means one or more irrevocable, transferable standby letters of credit, in a form acceptable to the Secured Creditors and issued by a Qualified Institution.

"**Lien**" means any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien (statutory or other), assignment, charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any sale governed by Article 9 of the UCC, any conditional sale or title retention agreement, or any capital lease having substantially the same economic effect as any of the foregoing).

"**Lockbox Account**" means the deposit account no. [*account number* ], which is maintained in the name of WCE and is under the Control of Collateral Agent, for the benefit of the Secured Creditors, at Depositary Bank, and any replacement account, in each case, pursuant to the Lockbox Account Control Agreement.

"**Lockbox Account Control Agreement**" means the Account Control Agreement, dated as of the date hereof, among Depositary Bank, WCE and Collateral Agent and any other agreements entered into among Depositary Bank, WCE and Collateral Agent which shall designate the Lockbox Account as a blocked account under the Control of Collateral Agent, for the benefit of Secured Creditors, as provided in the UCC, as each such agreement may be amended, supplemented, restated or replaced from time to time.

"**Master Agreements**" means the Master Power Purchase Agreements entered into between WCE and PPA Providers, a current list of which is set forth on **Exhibit "B"**, as the same may be modified from time to time.

"**Moody's**" means Moody's Investor Services, Inc.

"**Obligations**" means all of the obligations and liabilities of WCE to each PPA Provider, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereinafter arising under or in respect of one or more of the Transaction Agreements, including all payments, fees, purchases, mark-to-market exposure, commitments for reimbursement, indemnifications, interest, damages and Termination Payments, if any. The term "Obligations" also includes all of WCE's other present and future obligations to each PPA Provider under the Transaction Agreements, including the repayment of (a) any amounts that Collateral Agent (or a PPA Provider) may advance or spend for the maintenance or preservation of the Collateral and (b) any other expenditure that Collateral Agent (or PPA Provider) may make under the provisions of the Transaction Agreements for the benefit of WCE. For the avoidance of doubt, the term "Obligations" includes any of the foregoing that arises after the filing of a petition by or against WCE under any bankruptcy or insolvency statute, even if the Obligations do not accrue because of any statutory automatic stay or otherwise.

"**Operating Account Control Agreement**" means the Operating Account Control Agreement, dated as of the date hereof, among Depositary Bank, WCE and Lender, for the benefit of Lender, as provided in the UCC, as each such agreement may be amended, supplemented, restated or replaced from time to time.

"**Operating Funds Flow Account**" means the deposit account no. [*account number*], which is maintained in the name of WCE, for the benefit of Lender, at Depositary Bank, and any replacement account, in each case, pursuant to the Operating Account Control Agreement

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

"**Power Purchase Agreement**" means each agreement, including the Master Agreements, together with the exhibits, schedules, transactions, confirmations (including confirmations entered into after the date hereof), and any written amendments, modifications, restatements, extensions or supplements thereto or replacements thereof, pursuant to which a PPA Provider sells the Product to WCE on behalf of WCE, as amended, modified, supplemented, restated, extended or replaced from time to time.

"**PPA Provider**" means each seller of Product under a Power Purchase Agreement that is made a party to the Intercreditor Agreement, and its respective successors and assigns.

"**Product**" means one or more of the following: energy, renewable energy attributes, capacity attributes, resource adequacy benefits, or any other similar or related products contemplated in the Master Agreements.

"**Qualified Institution**" means a commercial bank organized under the laws of the United States or a political subdivision thereof having at the applicable time (a) a Credit Rating of (i) A- or better from Standard & Poor's, or (ii) A3 or better from Moody's, or (iii) if such bank has a Credit Rating at such time from both Standard & Poor's and Moody's, A- or better from Standard & Poor's and A3 or better from Moody's and (b) assets of at least Ten Billion Dollars ($10,000,000,000).

"**Receivable**" means an Account evidencing WCE's rights to payment for Product, billed in an invoice sent to a Customer by SCE, together with all late fees and other fees which SCE and WCE agree are to be charged in such invoice to the Customer by SCE on behalf of WCE.

"**Regular Charges**" means, as of any date of determination, amounts then due and owing to such PPA Provider for the Product delivered by such PPA Provider, without giving effect to any Supplemental Payment owing to such PPA Provider.

"**Regular Sharing Percentage**" means, as of any date of determination, with respect to each PPA Provider as calculated by WCE in a commercially reasonable manner, the percentage equivalent of a fraction, (i) the numerator of which is the amount of the Regular Charges due and owing to such PPA Provider, as of such date, and (ii) the denominator of which is the amount of the Regular Charges due and owing to all PPA Providers, as of such date.

"**Required Secured Creditors**" has the meaning given to such term in the Intercreditor Agreement.

"**Reserve Amount**" means an amount of [_____] Dollars ($_____).  If WCE is not subject to an Event of Default, the total Reserve Amount shall automatically be reduced by Twenty Percent (20%) annually, upon the annual anniversary of the date on which this Agreement was entered into (or next Business Day if the anniversary date is not a Business Day).

"**Secured Creditors**" means each PPA Provider party to the Intercreditor Agreement, WCE, and their respective successors and assigns.

"**Standard & Poor's**" means Standard & Poor's Rating Group (a division of McGraw-Hill, Inc.).

"**Supplemental Payment**" means, as of any date of determination, all Obligations owing by WCE to each PPA Provider, excluding, however, the Regular Charges owed to such PPA Provider. Supplemental Payments include, but are not limited to, all out-of-pocket losses such as indemnity claims arising under the Transaction Agreements to the extent such losses were incurred by such PPA Provider, all late payment charges due under a Power Purchase Agreement, and all Obligations arising upon a default or Termination Event, such as Termination Payments.

"**Supplemental Sharing Percentage**" means, as of any date of determination, with respect to each PPA Provider, the percentage equivalent of a fraction, (y) the numerator of which is the outstanding amount of the Supplemental Payments due and owing to such PPA Provider, as of such date, and (z) the denominator of which is the sum of the outstanding amount of the Supplemental Payments due and owing to all PPA Providers, as of such date.

"**Termination Event**" means, with respect to any Power Purchase Agreement, the termination and/or acceleration thereof in accordance with the terms of such Power Purchase Agreement.

"**Termination Payment**" has the meaning given to such term in the Intercreditor Agreement.

"**Transaction Agreements**" means the Master Agreements, any other Power Purchase Agreements, the Control Agreements, the Intercreditor Agreement, this Agreement and all other agreements, instruments or documents to which WCE is a party and which are executed and delivered from time to time in connection with or as security for WCE's obligations under the Master Agreements, any other Power Purchase Agreements, as the same may be amended, restated, modified, replaced, extended or supplemented from time to time.

"**UCC**" means the Uniform Commercial Code in effect in the State of California from time to time.

1.02    Certain Uniform Commercial Code Terms. As used herein, the terms "**Account**", "**Investment Property**", and "**Proceeds**" have the respective meanings set forth in Article 9 of the UCC. The terms "**Security**" and "**Security Entitlements**" have the respective meanings set forth in Article 8 of the UCC.

1.03    Other Interpretive Provisions. References to "Sections" shall be to Sections of this Agreement unless otherwise specifically provided. For purposes hereof, "including" is not limiting and "or" is not exclusive. All capitalized terms defined in the UCC and not otherwise defined herein or in the Security Agreement shall have the respective

- 6 -

meanings provided for by the UCC. Any of the terms defined in this Agreement may, unless the context otherwise requires, be used in the singular or the plural depending on the reference. References to any instrument, agreement or document shall include such instrument, agreement or document as supplemented, modified, amended or restated from time to time to the extent permitted by this Agreement. References to any Person include the successors and permitted assigns of such Person. References to any statute, act or regulation shall include its related current version and all amendments and any successor statutes, acts and regulations. References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States. References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.

### Section 2.    **Grant of Security Interest.**

As collateral security for the payment and performance in full of the Obligations when due, whether at stated maturity, by acceleration or otherwise, WCE hereby assigns, pledges and grants to Collateral Agent, for the benefit of the Secured Creditors, a first priority continuing security interest in and continuing lien on all of WCE's right, title and interest in and to the Collateral, including the following:

(a)    the prompt and complete payment, when due and payable, of all Obligations;

(b)    the timely performance and observance by WCE of all covenants, obligations and conditions contained in the Transaction Agreements; and

(c)    without limiting the generality of the foregoing and to the fullest extent permitted under Applicable Law, the payment of all amounts, including interest which constitute part of the Obligations and would be owed by WCE to the Secured Creditors under the Transaction Agreements but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving WCE.

The collateral assignment evidenced by this Agreement is a continuing one and is irrevocable by WCE so long as any of the Obligations are outstanding.

### Section 3.    **Representations and Warranties.**

WCE represents and warrants to Collateral Agent that:

3.01    Title. It is the sole beneficial owner of the Collateral and such Collateral is free and clear of all liens, except liens in favor of Collateral Agent created hereunder.

3.02    Formation. As of the date hereof, WCE is a joint powers authority duly formed and validly existing under the laws of the State of California to implement a Community Choice Aggregation Program for its member entities, which are all public agencies and municipalities in the State of California. WCE's primary office is located at 3390 University Avenue in the City of Riverside, State of California.

- 7 -

3.03    Changes in Circumstances. WCE has not: (a) within the period of four (4) months prior to the date hereof, changed its location (as defined in Article 9 of the UCC); (b) within the period of five (5) years prior to the date hereof, changed its name; or (c) within the period of four (4) months prior to the date hereof, become a "new debtor" (as defined in Article 9 of the UCC) with respect to a currently effective security agreement previously entered into with any other Person.

3.04    Security Interests. The Liens granted by this Agreement have attached and constitute a perfected first priority continuing security interest in the Collateral. WCE owns good and marketable title to the Collateral free and clear of all Liens other than such Liens established under this Agreement, and neither the Collateral nor any interest in the Collateral has been transferred to any other Person. WCE has full right, power and authority to grant a first-priority security interest in the Collateral to Collateral Agent in the manner provided in this Agreement, free and clear of any other Liens, adverse claims and options and without the consent of any other person or entity or if consent is required, such consent has been obtained. No other Lien, adverse claim or option has been created by WCE or is known by WCE to exist with respect to the Collateral. At the time the security interest in favor of Collateral Agent attaches, good and indefeasible title to all after-acquired property included within the Collateral, free and clear of any other Liens, adverse claims or options shall be vested in WCE. All consents for the assignment of Collateral to Collateral Agent, if any, required to be obtained by WCE have been obtained.

### Section 4.    **Covenants.**

WCE hereby stipulates and agrees with the Collateral Agent as follows:

4.01    Perfection by Control. WCE shall not be permitted to withdraw funds from the Lockbox Account until the Discharge Date and this Agreement has been terminated. Collateral Agent shall have the exclusive authority to withdraw, or (other than as set forth herein) direct the withdrawal of, funds from the Lockbox Account. The Control Agreement for the Lockbox Account shall give the Collateral Agent the sole power to direct Depositary Bank regarding the Lockbox Account, and thus Collateral Agent shall Control the Lockbox Account within the meaning of the UCC. Collateral Agent shall make distributions from the Lockbox Account only in accordance with Section 6 of this Agreement.

4.02    Further Assurances. Upon the request of Collateral Agent, WCE shall promptly from time to time give, execute, deliver, file, record, authorize or obtain all such financing statements, continuation statements, notices, documents, agreements or other papers as may be necessary in the judgment of Collateral Agent to create, preserve, perfect, maintain the perfection of or validate the security interest granted pursuant hereto or to enable Collateral Agent to exercise and enforce its rights hereunder with respect to such security interest, and without limiting the foregoing, shall:

(a)    take such other action as Collateral Agent may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in the Collateral;

- 8 -

(b)     promptly from time to time enter into such Control Agreements, each in form and substance reasonably acceptable to Collateral Agent, as may be required to perfect the security interest created hereby;

(c)     keep full and accurate books and records relating to the Collateral, and stamp or otherwise mark such books and records in such manner as Collateral Agent may reasonably require in order to reflect the security interests granted by this Agreement; and

(d)     permit representatives of Collateral Agent, upon reasonable notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral, and to be present at WCE's places of business to receive copies of communications and remittances relating to the Collateral, and forward copies of any notices or communications received by WCE with respect to the Collateral, all in such manner as Collateral Agent may reasonably require.

4.03     No Other Liens.     WCE is and shall be the owner of or have other transferable rights in the Collateral free from any right or claim of any other Person or any other Lien and WCE shall defend the same against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Collateral Agent.  WCE shall not (a) grant, or permit to be granted, any Lien with respect to any of the Collateral in which Collateral Agent is not named as the sole secured party, (b) file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to any of the Collateral in which Collateral Agent is not named as the sole secured party, or (c) cause or permit any Person other than Collateral Agent to have Control of the Lockbox Account.

4.04     Locations; Names, Etc.     Without at least thirty (30) days' prior written notice to the Collateral Agent, WCE shall not: (a) change its location (as defined in Article 9 of the UCC), (b) change its legal name, or (c) agree to or authorize any modification of the terms of any item of the Collateral if the effect thereof would be to result in a loss of perfection of, or diminution of priority for, the security interests created hereunder in such item of Collateral, or the loss of control (within the meaning of Article 9 of the UCC) by Collateral Agent over such item of Collateral.

4.05     Perfection and Recordation.     WCE authorizes Collateral Agent to file Uniform Commercial Code financing statements describing the Collateral (provided that no such description shall be deemed to modify the description of Collateral set forth in Section 2).  The Collateral Agent, in accordance with Section 4.02 hereof, hereby requests and instructs WCE to, and WCE hereby agrees, at its sole cost and expense to, prepare and file such Uniform Commercial Code financing and continuation statements describing the Collateral as may be necessary to perfect and continue the security interest granted herein.  WCE shall deliver to the Collateral Agent a file stamped copy of all such filings, which the Collateral Agent shall make available to any PPA Provider upon request.

### Section 5.     Remittance of Collections to Collateral Agent.

5.01     Irrevocable Direction.     WCE has, pursuant to the Direction Letter, irrevocably instructed SCE to remit to Collateral Agent all payments due or to become due in

- 9 -

respect of the Receivables unless and until both Collateral Agent, at the direction of the Required Secured Creditors, and WCE direct otherwise in writing. WCE shall periodically take such additional measures as may be commercially reasonable to cause SCE to make all payments due to WCE into the Lockbox Account. WCE shall provide Collateral Agent with such proof of compliance with this Section 5.01 as Collateral Agent may reasonably request from time to time. Without the prior written consent of Collateral Agent (acting at the written direction of the Required Secured Creditors), WCE shall not (a) terminate, amend, revoke or modify such payment instructions to SCE or Customers or (b) direct or cause, directly or indirectly, SCE or any Customer to make any payments except in accordance with such payment instructions. The parties agree that if any such payments, or any other Proceeds of Collateral, are received by WCE, (i) they shall be held in trust by WCE for the benefit of the Collateral Agent, (ii) WCE shall as promptly as possible remit or deliver same to Collateral Agent for application as provided herein, (iii) WCE shall take such commercially reasonable steps as necessary to require SCE to make any future remittances into the Lockbox Account and (iv) such activity shall be reported promptly to Collateral Agent following WCE's receipt of such funds. Collateral Agent thus has the right to all collections on the Collateral remitted to it by SCE until the Discharge Date.

5.02    Application of Proceeds. The Proceeds of any collection or realization of all or any part of the Collateral shall be applied by Collateral Agent as provided for in Section 6 below. Collateral Agent waives all rights under the UCC to enforce rights in the Collateral by means of a sale or other foreclosure action; the Collateral shall be collected by Collateral Agent from SCE pursuant to the Direction Letter.

5.03    Deficiency. If the Proceeds of the collection of the Collateral are insufficient to pay in full the Obligations, WCE remains liable to Collateral Agent and Secured Creditors for any deficiency.

5.04    Attorney-in-Fact. Collateral Agent is hereby appointed the attorney-in-fact of WCE to receive, endorse and collect all checks made payable to the order of WCE representing any payment or other distribution in respect of the Collateral.

### Section 6.    Establishment of and Distributions From Lockbox Account.

6.01    Establishment of Lockbox Account. WCE shall establish the Lockbox Account in WCE's name at Depositary Bank and shall fund the Reserve Amount into the Lockbox Account. The deposits into the Lockbox Account and all interest accumulated thereon shall be held and disbursed by the Depositary Bank in accordance with the terms and conditions of the Control Agreements. The Lockbox Account is subject to the sole dominion, control and discretion of Collateral Agent until the Discharge Date. Until the Discharge Date, neither WCE nor any person or entity claiming on behalf of or through WCE shall have any right or authority, whether express or implied, to make use of, withdraw or transfer any funds or to give instructions with respect to disbursement of the Accounts other than Collateral Agent. Until the Discharge Date, subject to Section 6.02, Collateral Agent shall be entitled to exercise any and all rights in respect of or in connection with the Lockbox Account including (i) the right to specify the amount of payments to be made from the Lockbox Account, (ii) when such payments are to be made out of the Lockbox Account and (iii) the right to withdraw funds for the payment of

- 10 -

Obligations which are due and payable from the Lockbox Account. Collateral Agent shall accept all funds remitted to the Lockbox Account under this Agreement, and credit such funds as provided for in <u>Section 6.02</u> below.

6.02    <u>Priority of Distributions of Collateral</u>.    Proceeds of Collateral shall be allocated in accordance with this <u>Section 6.02</u>. On each Distribution Date, Collateral Agent shall distribute all funds in the Lockbox Account or otherwise received on the Collateral in accordance with the following priority:

(i)    *first*, to each PPA Provider in payment of any Regular Charges, according to its Regular Sharing Percentage;

(ii)    *second*, to each PPA Provider in payment of any Supplemental Payment owing to it according to its Supplemental Sharing Percentage;

(iii)    *third*, to the California Independent System Operator for all amounts currently due and payable by WCE;

(iv)    *fourth*, to the Collateral Agent (as such and in its individual capacity) in respect of its reasonable out-of-pocket fees and expenses incurred under this Agreement, the Intercreditor Agreement or the Control Agreements that have been invoiced to WCE, including, without limitation, payment of expenses incurred by the Collateral Agent which indemnity shall include the reasonable out of pocket attorneys' fees of outside counsel to the Collateral Agent; and

(v)    *fifth*, unless an Event of Default shall exist as to WCE, the balance, if any, after retention in the Lockbox Account of the Reserve Amount, shall be deposited for the benefit of WCE, free and clear of the lien of this Agreement, to the Operating Funds Flow Account, provided, however, that if the Collateral Agent has been notified of a dispute in accordance with Section 6.06, the portion of the balance, if any, up to such disputed amount shall be retained in the Lockbox Account and WCE shall only receive the amount of the balance, if any, that is in excess of such disputed amount until such time as the Collateral Agent receives written notice from the relevant PPA Provider and WCE that the dispute pursuant to Section 6.06 has been resolved. No distribution will be made pursuant to this Section 6.02(v) to any deposit account other than the Operating Funds Flow Account, without the express written consent of Lender.

Collateral Agent shall rely, and shall be fully protected in relying, on a Distribution Date Certificate submitted to it by WCE in making the above calculations, without any requirement that Collateral Agent verify the accuracy of such Distribution Date Certificate, subject to revision in the event of disputes resolved under <u>Section 6.06</u>.

6.03    <u>Distribution Date Certificate</u>.    On or before three (3) Business Days before each Distribution Date, WCE shall remit to Collateral Agent and each PPA Provider a certificate in substantially the form of <u>Exhibit A</u> hereto (the "**Distribution Date Certificate**") prepared by WCE itemizing each of the payments to be remitted under <u>Section 6.02</u> above. The PPA Providers may share such Distribution Date Certificates with their respective accountants, legal counsel and other advisors.

- 11 -

6.04    <u>Replenishing the Reserve Amount; No Waiver</u>.  Subject to Section 6.05, if at any time the balance in the Lockbox Account is less than the Reserve Amount, then (a) the Collateral Agent shall within two (2) Business Days after the Collateral Agent has actual knowledge thereof provide WCE with written notice thereof, and (b) WCE shall deposit such shortfall amount into the Lockbox Account not later than ten (10) Business Days after its receipt of such notice from Collateral Agent.  The Collateral Agent shall have no duty or obligation to monitor or oversee WCE's replenishment of the Reserve Amount, and shall have no duty or obligation under this Section 6.04 other than to deliver the written notice required pursuant to 6.04(a).  Nothing contained herein shall impair or otherwise limit WCE's obligations to timely make the payments required pursuant to any of the Transaction Agreements.  It is expressly understood and agreed that the Collateral Agent shall have no liability for its failure to deliver any amounts required to be delivered by it pursuant to this Agreement or any other Transaction Agreement to the extent that such amounts are not then available in the Lockbox Account.

6.05    <u>Release of Reserve Amount</u>.  Except following and during the continuance of an Event of Default, if WCE and all Secured Creditors confirm in writing to the Collateral Agent that no such Event of Default exists or is continuing and provides the Collateral Agent with a Letter of Credit for the benefit of the PPA Providers in an amount equal to the Reserve Amount, WCE may request in writing and, upon receipt of such request, Collateral Agent shall instruct the Depositary Bank to release and distribute the Reserve Amount to WCE.  All of the fees, costs and expenses associated with the Letter of Credit shall be borne by WCE.  WCE shall thereafter cause the Letter of Credit to be maintained in full force and effect through the Discharge Date.  If at any time the issuer of the Letter of Credit is no longer a Qualified Institution, then WCE shall, within five (5) Business Days of such occurrence, either (a) provide Collateral Agent with a replacement Letter of Credit for the benefit of the PPA Providers issued by a Qualified Institution in an amount equal to the Reserve Amount or (b) fund the applicable Reserve Amount into the Lockbox Account.

6.06    <u>Disputes</u>.  If a PPA Provider advises WCE and Collateral Agent in writing that the calculations in any Distribution Date Certificate are in its opinion materially incorrect, then WCE and such PPA Provider shall attempt to resolve the discrepancy in good faith.  If the parties are able to reach an agreement with respect to such discrepancy in advance of the relevant Distribution Date, WCE shall remit to Collateral Agent and each PPA Provider a revised Distribution Date Certificate reflecting the agreed upon amounts, and the Collateral Agent shall disburse funds in accordance with such revised Distribution Date Certificate on the applicable Distribution Date, provided, however, that the Collateral Agent shall have no liability whatsoever for any failure to disburse funds in accordance with a revised Distribution Date Certificate to the extent that it has not received such revised Distribution Date Certificate sufficiently in advance of the scheduled distribution.  If the parties are unable to agree, they shall resolve such dispute in accordance with the dispute resolution provision of the Power Purchase Agreement between such PPA Provider and WCE.  In the interim, the Distribution Date Certificate originally submitted by WCE shall be relied upon by Collateral Agent for purposes of making distributions from the Lockbox Account of all undisputed amounts in accordance with <u>Section 6.02</u>, and the Collateral Agent shall make no distribution in respect of any disputed amount until such time as it has received a revised Distribution Date Certificate.  Notwithstanding the above, no dispute shall prevent any other PPA Provider from receiving its distributions from the Lockbox Account, even if such distributions would result in a shortfall of

the disputed amount. However, WCE shall not be entitled to receive any funds if such distribution to WCE would result in a shortfall of the disputed amount.

6.07    Earnings on Lockbox Account.    WCE shall establish the Lockbox Account as a non-interest bearing account.

6.08    Rights and Remedies.    If an Event of Default shall have occurred and is continuing, Collateral Agent, without any other notice to or demand upon WCE, shall, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located; it being understood and agreed that the Collateral Agent would be exercising any such rights and remedies in its capacity as collateral agent for the benefit of the PPA Providers, as Secured Creditors.  In addition, **WCE HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE TO A JUDICIAL HEARING IN ADVANCE OF THE ENFORCEMENT OF COLLATERAL AGENT'S RIGHTS AND REMEDIES HEREUNDER, INCLUDING ITS RIGHT FOLLOWING AN EVENT OF DEFAULT TO TAKE IMMEDIATE POSSESSION OF THE COLLATERAL AND TO EXERCISE ITS RIGHTS AND REMEDIES WITH RESPECT THERETO**.  Collateral Agent shall only act at the written instruction of the Required Secured Creditors in (a) taking any action under this Agreement, the Intercreditor Agreement or any Control Agreement with respect to the Collateral following an Event of Default and (b) asserting any claim under this Agreement, the Intercreditor Agreement or any Control Agreement.  Notwithstanding the foregoing, if Collateral Agent deems it prudent to take reasonable actions, without the instruction of a Secured Creditor, to protect the Collateral, it may (but shall be under no obligation to) do so and thereafter provide written notice to all the Secured Creditors of such actions, and no provision of this Agreement shall restrict Collateral Agent from exercising such rights and no liability shall be imposed on Collateral Agent for omitting to exercise such rights. Notwithstanding anything herein or elsewhere, unless and until the Collateral Agent has received written notice from WCE or a Secured Creditor that an Event of Default has occurred or is continuing, the Collateral Agent shall assume, and shall be fully protected in assuming, that no Event of Default exists or is continuing.

6.09    No Waiver by Collateral Agent.    Collateral Agent shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be made in writing and signed by Collateral Agent (acting at the written direction of the Required Secured Creditors).  No delay or omission on the part of Collateral Agent in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy.  A waiver on any occasion shall not be construed as a bar to or a waiver of any right or remedy on any future occasion.  All rights and remedies of Collateral Agent with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, may be exercised by Collateral Agent (acting at the written direction of the Required Secured Creditors), shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Collateral Agent (acting at the written direction of the Required Secured Creditors) deems expedient.

6.10    Waivers by WCE.    To the extent permitted by applicable law, WCE hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans

- 13 -

made, credit extended, collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description.

6.11    Marshalling.  **TO THE EXTENT THAT IT LAWFULLY MAY, WCE HEREBY AGREES THAT IT WILL NOT INVOKE ANY LAW RELATING TO THE MARSHALLING OF COLLATERAL WHICH MIGHT CAUSE DELAY IN OR IMPEDE THE ENFORCEMENT OF COLLATERAL AGENT'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR UNDER ANY OTHER INSTRUMENT CREATING OR EVIDENCING ANY OF THE OBLIGATIONS OR UNDER WHICH ANY OF THE OBLIGATIONS IS OUTSTANDING OR BY WHICH ANY OF THE OBLIGATIONS IS SECURED OR PAYMENT THEREOF IS OTHERWISE ASSURED, AND, TO THE EXTENT THAT IT LAWFULLY MAY, WCE HEREBY IRREVOCABLY WAIVES THE BENEFITS OF ALL SUCH LAWS.**

### Section 7. **Miscellaneous.**

7.01    Notices.    Except as otherwise expressly provided herein, all notices, consents and waivers and other communications made or required to be given pursuant to this Agreement shall be in writing and shall be delivered by hand, mailed by registered or certified mail or prepaid overnight air courier, or by electronic mail, addressed to the relevant party as provided below their signatures to this Agreement or at such other address for notice as WCE or Collateral Agent shall last have furnished in writing to the Person giving the notice.  A notice addressed as provided herein that (i) is delivered by hand or overnight courier is effective upon delivery, (ii) that is sent by electronic mail is effective if when confirmed by the recipient, and (iii) that is sent by registered or certified mail is effective on the earlier of acknowledgement of receipt as shown on the return receipt or three (3) Business Days after mailing.

7.02    No Waiver.  No failure on the part of the Collateral Agent to exercise, and no course of dealing with respect to, and no delay in exercising, any right or power hereunder shall operate as a waiver thereof.

7.03    Amendments.  The terms of this Agreement may be waived, altered or amended only by an instrument in writing duly executed by WCE and Collateral Agent.

7.04    Expenses.  If WCE fails to do so, Collateral Agent may, upon receipt from the Required Secured Creditors of written direction and such sums as may be necessary in connection therewith, discharge taxes and any other Liens or encumbrance at any time levied or placed on any of the Collateral.  WCE agrees to reimburse Collateral Agent on demand for any such expenditures made by Collateral Agent, and the Collateral Agent promptly upon receipt thereof shall remit such reimbursed sums to the Required Secured Creditors.  For the avoidance of doubt, it is expressly understood and agreed that the Collateral Agent shall not use or expend its own funds in connection with such taxes, Liens or encumbrances.  Collateral Agent shall have no obligation to make any such expenditure nor shall the making thereof be construed as a waiver or cure of any Event of Default.  WCE agrees to reimburse Collateral Agent (as such and in its individual capacity) for all reasonable costs and expenses incurred by it (including the reasonable fees and expenses of legal counsel) in connection with (i) the performance by Collateral Agent of its duties under this Agreement, the Intercreditor Agreement or the Control

- 14 -

Agreements, (x) protecting, defending or asserting rights and claims of the Collateral Agent in respect of the Collateral, (y) litigation relating to the Collateral, and (z) workout, restructuring or other negotiations or proceedings, and (ii) the enforcement of this Section 7.04, and all such reasonable costs and expenses shall be Obligations entitled to the benefits of the collateral security provided pursuant to Section 2.

7.05    Duty of Care; Earnings.  Collateral Agent shall have no duty or obligation with respect to the Collateral except for its contractual obligations under this Agreement, the Intercreditor Agreement or a Control Agreement.  The Collateral Agent shall have no duty or obligation as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against any Person, beyond the safe custody of any Collateral in the Collateral Agent's possession or control.  Without limiting the generality of the foregoing, Collateral Agent shall have no duty (a) other than to instruct WCE as set forth in Section 4.05 hereof, to see to any recording or filing of any financing statement evidencing a security interest in the Collateral, or to see to the maintenance of any such recording or filing, (b) to see to the payment or discharge of any tax, assessment or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against any part of the Collateral, (c) to confirm or verify the contents of any reports or certificates delivered to Collateral Agent believed by it to be genuine and to have been signed or presented by the proper party or parties, or (d) to ascertain or inquire as to the performance of observance by any other Person of any representations, warranties or covenants.  Collateral Agent may require an officer's certificate or an opinion of counsel before acting or refraining from acting, and Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or an opinion of counsel.

7.06    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of WCE, the Secured Creditors, and the Collateral Agent (provided that WCE shall not assign, transfer or delegate its rights or obligations hereunder without the prior written consent of Collateral Agent) and Collateral Agent shall only transfer or assign its rights hereunder in connection with a resignation or removal from its capacity as Collateral Agent in accordance with the terms of the Intercreditor Agreement).  This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect in accordance with Section 7.12, and be binding upon WCE, its successors and assigns, and inure, together with the rights of Collateral Agent hereunder, to the benefit of the Collateral Agent and its successors, transferees and assigns.

7.07    Counterparts.  This Agreement and any related amendment or waiver may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, but all of which together shall constitute one instrument.  In proving this Agreement it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.  A facsimile of a signature page hereto shall be as effective as an original signature.

7.08    GOVERNING LAW; JURISDICTION.  THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND ENFORCED UNDER, THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF SUCH STATE.  EACH PARTY TO THIS

- 15 -

AGREEMENT HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE BROUGHT IN THE COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF CALIFORNIA OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. EACH PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS NOTICE ADDRESS APPLICABLE TO THIS AGREEMENT, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING.

7.09    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER, OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.

7.10    **CONSENT TO INJUNCTIVE RELIEF**. **WITHOUT LIMITING ANY OTHER RIGHTS OR REMEDIES THAT COLLATERAL AGENT MAY HAVE, WCE ACKNOWLEDGES THAT ITS VIOLATION OF <u>SECTION 5.01</u> WOULD RESULT IN IRREPARABLE INJURY TO COLLATERAL AGENT FOR WHICH NO ADEQUATE REMEDY AT LAW WOULD BE AVAILABLE.  ACCORDINGLY, WCE HEREBY (I) CONSENTS TO THE ENTRY OF AN IMMEDIATE EX-PARTE INJUNCTION, TEMPORARY RESTRAINING ORDER, AND/OR PERMANENT INJUNCTION TO ENFORCE THE PROVISIONS OF <u>SECTION 5.01</u>, IN ADDITION TO ANY OTHER REMEDIES AVAILABLE AT LAW OR IN EQUITY AND (II) WAIVES ANY DEFENSE THAT ADEQUATE REMEDIES ARE AVAILABLE AT LAW AND ANY REQUIREMENT THAT A BOND OR ANY OTHER SECURITY BE POSTED IN CONNECTION WITH THE ENTRY OF ANY RESTRAINING ORDER OR INJUNCTION.**

7.11    <u>Captions</u>.    The captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

7.12    <u>Termination</u>.    Unless earlier terminated in writing by the parties hereto, this is a continuing security agreement and the grant of a security interest under this Agreement shall remain in full force and effect and all the rights, powers and remedies of Collateral Agent hereunder shall continue to exist until: (a) the Obligations are paid in full as the same becomes due and payable; (b) the PPA Providers have no further obligation to deliver products or render services (including credit support services) to, or on behalf of, WCE; (c) WCE has no further obligations to the PPA Providers under any of the Transaction Agreements; and (d) the PPA Providers, upon request of WCE, have executed and delivered to each of WCE and the Collateral Agent a written termination statement, and Collateral Agent has reassigned to WCE, without

- 16 -

recourse, the Collateral and all rights conveyed hereby and returned possession of the Collateral to WCE.  Furthermore, it is contemplated by the parties that there may be times when no Obligations are owing; but notwithstanding such occurrences, unless the PPA Providers have executed a written termination under clause (d) above, this Agreement shall remain valid and shall be in full force and effect as to subsequent Obligations, provided Collateral Agent has not executed a written agreement terminating this Agreement.  This Agreement shall continue irrespective of the fact that the liability of any other obligor may have ceased, or irrespective of the validity or enforceability of the Transaction Agreements, to which any other obligor may be a party, and notwithstanding the reorganization or bankruptcy of WCE, or any other event or proceeding affecting WCE or any other obligor.  At WCE's request, Collateral Agent shall, at WCE's reasonable expense, instruct Depositary Bank to release all assets credited to the Lockbox Account to WCE, and Collateral Agent shall also execute such other documentation as shall be reasonably requested by WCE to effect the termination and release of the liens on the Collateral, including notice to SCE that the Direction Letter is terminated.

      7.13    <u>Severability</u>.  The provisions of this Agreement are intended to be severable.  If for any reason any of the provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

      7.14    <u>Disclosure of Information</u>.  WCE hereby consents to the disclosure by any PPA Provider or Collateral Agent of any information provided by or relating to WCE as may be required or reasonably necessary for the administration of this Agreement, the Intercreditor Agreement or the Control Agreements, or the enforcement or protection of any of the rights of the Collateral Agent or the PPA Providers hereunder.

[Signatures on following page]

- 17 -

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as an instrument under seal by their authorized representatives as of the date first written above.

WESTERN COMMUNITY ENERGY, a California joint powers authority, as Pledgor

By: *Rick Bishop*
Name: RICK BISHOP
Title: EXECUTIVE DIRECTOR

Notice Address:

Western Community Energy
Attention: Andrew Ruiz, Chief Financial Officer
3390 University Ave., Suite 200
Riverside, CA 92501
Phone: (951) 405-6740
Email: aruiz@wrcog.us
Facsimile: (951) 223-9720

RIVER CITY BANK, a California corporation, not in its individual capacity, but solely as Collateral Agent

By: _____
Name: _____
Title: _____

Notice Address:

River City Bank
Attention: Cash Management
2485 Natomas Park Drive
Sacramento, CA 95833
Telephone: 916-567-2660
Email: CashMgmt@rivercitybank.com
Facsimile: 916-567-2779

LOCKBOX SECURITY AGREEMENT
WESTERN COMMUNITY ENERGY

APPROVED AS TO FORM:

Best Best & Krieger LLP

By: _____
Steven DeBaun, Partner

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as an instrument under seal by their authorized representatives as of the date first written above.

WESTERN COMMUNITY ENERGY, a California joint powers authority,
as Pledgor

By: _____
Name: _____
Title: _____

Notice Address:

Western Community Energy
Attention: Andrew Ruiz, Chief Financial Officer
3390 University Ave., Suite 200
Riverside, CA 92501
Phone: (951) 405-6740
Email: aruiz@wrcog.us
Facsimile: (951) 223-9720

RIVER CITY BANK, a California corporation,
not in its individual capacity, but solely as Collateral Agent

By: _Kinzie Nichols_____
Name: _Kinzie Nichols_____
Title: _Cash Management Manager VP____

Notice Address:

River City Bank
Attention: Cash Management
2485 Natomas Park Drive
Sacramento, CA 95833
Telephone: 916-567-2660
Email: CashMgmt@rivercitybank.com
Facsimile: 916-567-2779

<u>Exhibit A</u>

Form of Distribution Date Certificate

The undersigned, [INSERT NAME], the [INSERT NAME OF OFFICE HELD] of WESTERN COMMUNITY ENERGY, a California joint powers authority ("**WCE**"), hereby certifies, with reference to that certain Security Agreement dated as of [_____], 2020 (capitalized terms used herein shall have the same meaning as set forth in the Security Agreement) between WCE and RIVER CITY BANK, a California corporation, as collateral agent ("**Collateral Agent**"), to Collateral Agent as follows:

This certificate is being delivered to Collateral Agent on or before the date that is three (3) Business Days before the Distribution Date of [_____ , 20__].

No Event of Default exists as of the date of this certificate and WCE does not anticipate that an Event of Default will exist as of the Distribution Date set forth in paragraph 1 above.

The funds that are on deposit in the Lockbox Account shall be disbursed on the Distribution Date as follows:

1.  [To [INSERT NAME OF APPLICABLE PPA PROVIDER], for payment of its Regular Charges, an aggregate amount equal to [_____ Dollars ($_____)]; [*Include this paragraph for each PPA Provider*]

2.  [To [INSERT NAME OF APPLICABLE PPA PROVIDER], for payment of any Supplemental Payment owing in an aggregate amount equal to [_____ Dollars ($_____)]; [*Include this paragraph for each PPA Provider]*

3.  To the California Independent System Operator for payment of amounts due and owing from WCE in an aggregate amount equal to [_____ Dollars ($_____)];

4.  To Collateral Agent, in respect of Collateral Agent's reasonable out-of-pocket fees and expenses incurred under the Security Agreement or the Intercreditor Agreement that have been invoiced to WCE, an aggregate amount equal to [_____ Dollars ($_____)]; and

5.  The remaining funds, if any, that are on deposit, after retention of the Reserve Amount, are to be disbursed to WCE into the account designated by WCE.

[Signatures on following page]

I hereby certify, in my capacity as [_____], that this Distribution Date Certificate is true and complete in all material respects.

_____

By:    _____
Name:  _____
Title:   _____
Date:   _____

## EXHIBIT B

## MASTER AGREEMENTS

Power Purchase Agreements in effect as of February 13, 2020:

1.    Edison Electric Institute Master Power Purchase and Sale Agreement dated February 13, 2020, between WCE and BP Energy Company;

2.    Edison Electric Institute Master Power Purchase and Sale Agreement dated February 13, 2020, between WCE and Morgan Stanley Capital Group, Inc.;