## Exhibit G

**SCE Claim Objection**

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 2 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 1 of 24

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Joel Moss (SBN 241853) (admission pending)<br>Daniel H.R. Laguardia (SBN 314654)<br>SHEARMAN AND STERLING LLP<br>535 Mission Street, 25th Floor<br>San Francisco, CA 94105<br>Email: joel.moss@shearman.com<br> daniel.laguardia@shearman.com<br><br>Jason D. Strabo (SBN 246426)<br>Kristin K. Going (admitted pro hac vice)<br>MCDERMOTT WILL & EMERY LLP<br><br>☒ *Attorney for:* Barclays Bank PLC | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

| In re:<br><br>WESTERN COMMUNITY ENERGY,<br><br><br><br><br><br>Debtor(s). | CASE NO.: 6:21-bk-12821-SY |
|---|---|
| | CHAPTER: 9 |
| | ## NOTICE OF OBJECTION TO CLAIM |
| | DATE: 01/06/2022<br>TIME: 1:30 pm<br>COURTROOM: 302<br>PLACE: U.S. Bankruptcy Court, Central District of CA<br><br>3420 Twelfth Streeth,<br>Riverside, CA 92501-3819 |

1.  TO *(specify claimant and claimant's counsel, if any):*  Southern California Edison Company, Attn: Samantha Nicely;
    Seth Goldman, Bradley R. Schneider

2.  NOTICE IS HEREBY GIVEN that the undersigned has filed an objection to your Proof of Claim (Claim #18-21      ) filed
    in the above referenced case.  The Objection to Claim seeks to alter your rights by disallowing, reducing or modifying the
    claim based upon the grounds set forth in the objection, a copy of which is attached hereto and served herewith.

3.  **Deadline for Opposition Papers:** You must file and serve a response to the Objection to Claim not later than 14
    days prior to the hearing date set forth above.

    **IF YOU FAIL TO TIMELY RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE
    RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

Date:  11/30/2021

McDermott Will & Emery LLP
Printed name of law firm

/s/ Jason Strabo
Signature

Date Notice Mailed:  11/30/2021

Jason Strabo
Printed name of attorney for objector

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 3 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 2 of 24

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

 2049 Century Park East, Suite 3200, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **NOTICE OF OBJECTION TO CLAIM** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 11/30/2021    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/30/2021 | Jason D. Strabo | /s/ Jason D. Strabo |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 4 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 3 of 24

# Mailing Information for Case 6:21-bk-12821-SY

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Abram Feuerstein**    abram.s.feuerstein@usdoj.gov
- **Beth Gaschen**    bgaschen@wgllp.com, kadele@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com;lbracken@wgllp.com;bgaschen@ecf.courtdrive.com;gestrada@wgllp.com
- **Seth Goldman**    seth.goldman@mto.com
- **David M Goodrich**    dgoodrich@wgllp.com, kadele@wgllp.com;lbracken@wgllp.com;wggllp@ecf.courtdrive.com;gestrada@wgllp.com
- **Everett L Green**    everett.l.green@usdoj.gov
- **Anna Gumport**    agumport@sidley.com, laefilingnotice@sidley.com;anna-gumport-6608@ecf.pacerpro.com
- **Chad V Haes**    chaes@marshackhays.com, chaes@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com;kfrederick@ecf.courtdrive.com
- **Brian D Huben**    hubenb@ballardspahr.com, carolod@ballardspahr.com;rev_jarushewskyj@ballardspahr.com
- **Mark T Jessee**    jesseelaw@aol.com, marktjessee@gmail.com
- **Lindsey E Kress**    lkress@lockelord.com, hayli.holmes@lockelord.com
- **Peter W Lianides**    plianides@wghlawyers.com, jmartinez@wghlawyers.com;mweinberg@wghlawyers.com
- **Richard A Marshack**    rmarshack@marshackhays.com, lbuchananmh@ecf.courtdrive.com;rmarshack@ecf.courtdrive.com
- **Ali Matin**    ali.matin@usdoj.gov, carolyn.k.howland@usdoj.gov
- **David L. Neale**    dln@lnbyg.com
- **Valerie Bantner Peo**    vbantnerpeo@buchalter.com
- **Cameron C Ridley**    Cameron.Ridley@usdoj.gov
- **Brandy A Sargent**    brandy.sargent@klgates.com, litigation.docketing@klgates.com
- **Bradley R Schneider**    bradley.schneider@mto.com
- **Clifford W Stevens**    dsupnet@neumiller.com
- **Jason D Strabo**    jstrabo@mwe.com, cgreer@mwe.com
- **United States Trustee (RS)**    ustpregion16.rs.ecf@usdoj.gov
- **Joseph M VanLeuven**    joevanleuven@dwt.com, katherinehardee@dwt.com;pdxdocket@dwt.com

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 5 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 4 of 24

- **Marc J Winthrop**    mwinthrop@wghlawyers.com,
  jmartinez@wghlawyers.com
- **Robert J Wood**    robert.wood@rivercitybank.com
- **Nahal Zarnighian**    zarnighiann@ballardspahr.com

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 6 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 5 of 24

1  Joel Moss (SBN 241853) (admission pending)
   Daniel H.R. Laguardia (SBN 314654)
2  **SHEARMAN AND STERLING LLP**
   535 Mission Street, 25th Floor
3  San Francisco, CA 94105
   Email: joel.moss@shearman.com
4          daniel.laguardia@shearman.com

5  Jason D. Strabo (SBN 246426)
   Kristin K. Going (admitted *pro hac vice*)
6  **MCDERMOTT WILL & EMERY LLP**
   2049 Century Park East, Suite 3200
7  Los Angeles, California 90067-3218
   Telephone: (310) 788-4125
8  Facsimile: (310) 277-4730
   Email: jstrabo@mwe.com
9          kgoing@mwe.com

10

11 *Attorneys for Barclays Bank PLC*

12              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
13                    **RIVERSIDE DIVISION**

14

15 In re:                              Case No. 6:21-bk-12821-SY

16 WESTERN COMMUNITY ENERGY,           Chapter 9

17          Debtor.                    **OBJECTION TO CLAIMS OF SOUTHERN**
                                       **CALIFORNIA EDISON COMPANY**
18                                     **(PROOFS OF CLAIM 18-21)**

19                                     **Hearing:**
                                       January 6, 2022 at 1:30 p.m. (PT)
20                                     Place: U.S. Bankruptcy Court
                                             Central District of California
21                                             Telephonic/In-Person
                                             3420 Twelfth Street, Courtroom 302
22                                             Riverside, CA 92501-3819

23                                     Judge: Honorable Scott H. Yun

24

25

26

27

28

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 7 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 6 of 24

Pursuant to section 502(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 3007-1 of the Local Rules for the United States Bankruptcy Court for the Central District of California (the "Court"), Barclays Bank PLC ("Barclays"), as a secured creditor and party-in-interest, hereby objects to proofs of claim 18 through 21 filed by Southern California Edison Company ("SCE"). This objection (the "Objection") is based on the record of this case, and the evidence, arguments, and representations that may be presented at or prior to the hearing on the Objection. In support of this Objection, Barclays submits the following:

## **PRELIMINARY STATEMENT**

1. As Barclays will demonstrate in connection with the adversary proceeding commenced contemporaneously herewith, Barclays is a fully secured creditor in this chapter 9 bankruptcy case. SCE, an unsecured creditor, is seeking to elevate its unsecured claims through setoff rights that are barred under the Bankruptcy Code and claims for administrative expenses that are wholly without merit. None of SCE's claims are secured by a right of setoff under section 553 of the Bankruptcy Code because (i) SCE's claims lack mutuality—a key element that SCE must demonstrate to assert a right of setoff under section 553 of the Bankruptcy Code; (ii) SCE cannot offset postpetition funds; (iii) any alleged setoff rights are subordinate to prepetition secured claims, including Barclays' secured claims; and (iv) allowing SCE to setoff WCE's postpetition customer remittances to satisfy its unsecured claims would be inequitable and not serve the goals of the Bankruptcy Code.

2. SCE has failed to demonstrate how any of its claims should be afforded administrative expense priority. First, it is unclear whether administrative expenses under section 503(b)(1)(A) are allowed under chapter 9 of the Bankruptcy Code. But more importantly, SCE

1

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit G - SCE Claim Objection   Page 8 of 210

Case 6:21-bk-12821-SY   Doc 221   Filed 11/30/21   Entered 11/30/21 17:39:50   Desc
Main Document   Page 7 of 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

has failed to establish the fundamental elements required for the allowance of administrative expenses: (1) the claim must directly and substantially benefit the estate; and (2) that benefit must be quantifiable. SCE cannot satisfy either element.

3. Finally, claim numbers 19, 20, and 21, lack sufficient evidence to establish the validity and amount of such claims. In particular, claim 19 lacks any evidence whatsoever, and claims 20 and 21 contain documentation that fails to establish the validity and amount of such claims. Further, in order for SCE to successfully assert the large claim referenced in claim 21, it would need to take actions that violate the automatic stay. Accordingly, SCE's proofs of claim evidence nothing more than general unsecured claims. SCE has failed to establish that its claims should be allowed, let alone that such claims are subject to a secured right of setoff or should be accorded administrative expense status. At best SCE holds certain general unsecured claims in amounts not yet established by the proofs of claim it has filed.

## **BACKGROUND**

4. The California Public Utilities Code allows cities, states, and joint power authorities ("JPA") to participate in community choice aggregator ("CCA") programs to procure electricity for customers within their respective jurisdictions. *See* Cal. Pub. Util. Code § 366.2. On or about August 12, 2018, WCE was established as a JPA for the purposes of implementing a CCA program in seven cities located in Riverside County: Canyon Lake, Eastvale, Hemet, Jurupa Valley, Norco, Perris, and Wildomar.

5. SCE is the primary electricity supply company for the above cities and much of Southern California and is responsible for collecting payments on behalf of WCE from WCE's customers. As such, on February 26, 2019, WCE entered into a Community Choice Aggregator Agreement ("CCA Agreement") with SCE for billing and metering services for its CCA program.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 9 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 8 of 24

Under the CCA Agreement, SCE collects WCE's customers' remittances and sends those remittances to WCE after deducting fees and charges that compensate SCE for its services. Importantly, SCE essentially in doing so functions as a pass through, with such remittances never constituting funds of SCE.   The role of SCE in holding such remittances for WCE is described in the Security Agreement, dated February 12, 2020, between WCE and River City Bank ("RCB") as collateral agent (the "Security Agreement").[1]  *See* Security Agreement § 5.01 ("WCE has, pursuant to the Direction Letter, irrevocably instructed SCE to remit to Collateral Agent all payments due or to become due in respect of the Receivables unless and until both Collateral Agent, at the direction of the Required Secured Creditors, and WCE direct otherwise in writing."). Pursuant to section 6.01 of the Security Agreement, the "Lockbox Account is subject to the sole dominion, control and discretion of the Collateral Agent until the Discharge Date."[2]  The Security Agreement also makes clear that once the Collateral Agent is paid, "[n]o distribution will be made . . . to any deposit account other than the Operating Funds Flow Account, without the express written consent of Lender."  Security Agreement § 6.02.

6.    On August 15, 2019, WCE and SCE entered into an *Agreement Between Southern California Edison Company and Western Community Energy Regarding WCE Implementation and Resource Adequacy Compliance for 2020, 2021 and 2022* (the "RA Agreement").[3]  The RA Agreement provided for, among other things, a "set-off" against customer remittances received by SCE under the CCA Agreement in the event of default by WCE under the RA Agreement.

---

[1] The Security Agreement is attached to Barclays' amended proof of claim as Exhibit 7. *See* Proof of Claim No. 22-3.
[2] The "Discharge Date" is defined as the date on which "any and all outstanding Obligations under the Transaction Agreements have been fully satisfied."  Security Agreement at 4.   "Transaction Agreements" means "this Agreement and all other agreements, instruments or documents to which WCE is a party and which are executed and delivered from time to time in connection with or as a security for WCE's obligations under the Master Agreements" or any other "Power Purchase Agreements."
[3] The RA Agreement is attached as Exhibit 1 to SCE claim number 18.

3

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit G - SCE Claim Objection   Page 10 of 210

Case 6:21-bk-12821-SY   Doc 221   Filed 11/30/21   Entered 11/30/21 17:39:50   Desc
Main Document   Page 9 of 24

Specifically, section J(c) of the RA Agreement expressly provides that "SCE has the right to set off <u>WCE's customer remittances</u> against any payment due to SCE under this Agreement that remains unpaid sixty (60) calendar days from the date of SCE's invoice." (emphasis added).    The reference to the amounts SCE claims as being subject to setoff as "WCE's customer remittances" is also consistent with SCE holding such funds for WCE's benefit.

7.    On May 24, 2021, WCE filed a chapter 9 bankruptcy petition (the "<u>Petition Date</u>").

8.    On June 9, 2021, WCE's board of directors voted unanimously to de-register WCE as a community choice aggregator with the California Public Utilities Commission (the "<u>CPUC</u>") and terminate its CCA program.  On June 10, 2021, WCE provided notice to the CPUC of its deregistration and termination of its program and requested the CPUC to immediately deregister WCE and begin the involuntary return of WCE's customers to SCE for generation services.

9.    In accordance with Local Rule 3007-1(c)(2), attached as <u>Exhibit B</u> is the declaration of Jason D. Strabo ("<u>Strabo Declaration</u>") attesting that the attached proofs of claims are the true and complete proofs of claim on file with the Court.

10.    On September 30, 2021, SCE filed the following four proofs of claim (Claim Nos. 18, 19, 20, and 21) (collectively, the "<u>SCE Claims</u>"): (i) a claim for $7,603,680.16 ("<u>SCE Claim 18</u>"), attached as <u>Exhibit 1</u> to the Strabo Declaration, which SCE alleges is "secured by a right of offset against customer remittances collected by SCE pursuant to its service agreement with [WCE]"; (ii) a claim for $2,426,150 ("<u>SCE Claim 19</u>"), attached as <u>Exhibit 2</u> to the Strabo Declaration, which contains no supporting documentation and indicates that it is not secured; (iii) a claim for $107,306.68 ("<u>SCE Claim 20</u>"), attached as <u>Exhibit 3</u> to the Strabo Declaration, which SCE alleges is "secured by a right of offset and/or recoupment against customer payments that SCE collects and remits to [WCE] under the Services Agreement"; and (iv) a claim for

4

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 11 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 10 of 24

$14,568,891.88 ("SCE Claim 21"), attached as Exhibit 4 to the Strabo Declaration, which SCE alleges is secured by a right of setoff for "re-entry fees" (the "Re-Entry Fees") from WCE, "to the extent WCE consents," to "cover the incremental procurement and administration caused [by] its mass involuntary return of customers to SCE's procurement service." Strabo Declaration, Exhibit 4 at 5. In addition, SCE alleges, without providing any basis, that SCE Claims 20 and 21 constitute an "administrative expense." *See* Strabo Declaration, Exhibits 3 and 4.

11. Prior to the Petition Date, Barclays made loans to WCE and issued letters of credit for the benefit of WCE pursuant to a Revolving Credit Agreement, dated March 12, 2020, between WCE and Barclays (the "Credit Agreement").[4] The Credit Agreement functions in tandem with a Security Agreement.

12. WCE and Barclays are also parties to that certain Promissory Note (Principal Amount not to exceed $16,000,000) dated March 12, 2020 (the "Promissory Note," and together with the Credit Agreement and Security Agreement, the "Barclays Security Documents")[5] pursuant to which WCE promised to pay the unpaid principal amount of each Loan and Unreimbursed Amount from the date of such Loan.

13. Pursuant to Section 2.20 of the Credit Agreement, WCE conveyed to Barclays a first priority security interest in "(i) the Pledged Revenues, (ii) the Operating Reserve Fund, and (iii) the Operating Fund Account to secure all of [WCE's] Obligations."

14. The parties' entry in the Credit Agreement gave Barclays an immediately enforceable and automatically binding statutory lien in the Pledged Collateral under California law.

---

[4] The Credit Agreement is attached to Barclays' amended proof of claim as Exhibit 1. *See* Proof of Claim No. 22-3. Capitalized terms that are undefined have the meaning ascribed to such terms in the Credit Agreement.
[5] Each of the Barclays Security Documents are attached as Exhibits A, B, and C, respectively, to Barclays' complaint for declaratory judgment, dated November 30, 2021 (the "Barclays Complaint").

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 12 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 11 of 24

Section 5451 of the California Government Code provides:

(a) A pledge of collateral by any public body to secure, directly or indirectly, the payment of the principal or redemption price of, or interest on, any bonds, or any reimbursement or similar agreement with any provider of credit enhancement for bonds, which is issued by or entered into by a public body, shall be valid and binding in accordance with the terms of the pledge document from the time the pledge is made for the benefit of pledgees and successors thereto.
(b) The collateral shall immediately be subject to the pledge, and the pledge shall constitute a lien and security interest which shall immediately attach to the collateral and be effective, binding, and enforceable against the pledgor, its successors, purchasers of the collateral, creditors, and all others asserting the rights therein, to the extent set forth, and in accordance with, the pledge document irrespective of whether those parties have notice of the pledge and without the need for any physical delivery, recordation, filing, or further act.

15.    Additionally, while not required by virtue of the operation of California Government Code 5451, Barclays' liens on  WCE's Operating Funds Account and Operating Reserve Account were perfected prepetition pursuant to UCC §§ 9-104(b)(8), 9-104, and 9-314 as a result of entry into Deposit Control Agreements, and Barclays' lien on the Pledged Revenues was perfected by filing of a UCC financing statement.[6]

16.    Accordingly, Barclays has a first-priority lien in the assets that SCE claims postpetition secured setoff rights in pursuant to the SCE Claims.[7]

### **RELIEF REQUESTED**

17.    By this Objection, Barclays requests entry of the attached order (the "Proposed Order") (a) granting the Objection; (b) disallowing any setoff rights asserted in the SCE Claims; (c) disallowing any administrative expense claims asserted in the SCE Claims; (d) disallowing and expunging SCE Claims 19 through 21 in their entirety; and (e) granting Barclays such other and further relief as may be appropriate under the circumstances.

---

[6] For more information relating to the Deposit Control Agreements, see the Barclays Complaint.
[7] Contemporaneously with filing this Objection, Barclays filed the Barclays Complaint which seeks a declaratory judgment that Barclays' claims are secured by a first-priority lien that trumps any alleged setoff rights SCE may have.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 13 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 12 of 24

## OBJECTION

18.    Barclays objects to the SCE Claims for the following reasons: (1) SCE does not have a valid claim secured by a right of setoff, and even if it did, the Court should deny any setoff rights; (2) SCE lacks a valid administrative claim in this case; and (3) SCE Claims 19 through 21 are completely unfounded and lack sufficient supporting documentation (or in the case of SCE Claim 19, any documentation whatsoever).

### 1.    The SCE Claims Are Not Secured by A Right of Setoff

19.    While setoff rights are preserved in bankruptcy, they are limited by 11 U.S.C. § 553, which provides:

(a)    Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . ."

11 U.S.C. § 553(a).

20.    Setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.'" *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996) (quoting *Citizens Bank of Md. V. Strumpf*, 516 U.S. 16, 19 (1995)).   The party asserting a right of setoff bears the burden of proof. *Id.* at 1399.

21.    At the outset, SCE must establish that it is entitled to a right of setoff under section 553 of the Bankruptcy Code.   There are three conditions that must be met for a setoff in bankruptcy: "(1) the debtor owes the creditor a prepetition debt; (2) the creditor owes the debtor a prepetition debt; and (3) the debts are mutual."  *In re Wade Cook Fin. Corp.*, 375 B.R. 580, 594

7

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 14 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 13 of 24

(B.A.P. 9th Cir. 2007) (quoting *In re Luz Int'l, Ltd.*, 219 B.R. 837, 843–44 (9th Cir. BAP 1998)). "In essence, a creditor must establish two elements before a setoff may be asserts: timing and mutuality." *Id.*  As for timing, "each debt or claim sought to be offset must have arisen prior to filing of the bankruptcy petition." *Newbery*, 95 F.3d at 1398.  For mutuality, the debts "must be in the same right and between the same parties, standing in the same capacity." *Id.* at 1399 (internal quotation omitted).  *See also In re County of Orange*, 183 B.R. 609, 615 (Bankr. C.D. Cal. 1995) ("[T]he mutuality requirement in bankruptcy should be strictly construed because setoffs run contrary to fundamental bankruptcy policies such as the equal treatment of creditors and the preservation of a reorganized debtor's assets.").

### a.  The SCE Claims Lack Mutuality

22.     Under the CCA Agreement and RA Agreement, SCE does not owe a debt to WCE with respect to the Receivables[8] that are required to be deposited in the Lockbox Account and over which SCE claims rights of setoff.  Rather, SCE holds the money paid by WCE's customers (i.e. "WCE's customer remittances") to SCE under the CCA Agreement for the benefit of WCE.  In other words, SCE does not hold a beneficial interest in customer remittances.  Rather, SCE holds WCE's customer remittances in trust for WCE's benefit.  Although SCE may assert that an express trust does not exist, one does not need to exist in this context.  The law may imply or infer a trust relationship. *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1086 (E.D. Cal. 2003) ("Under California law, 'a resulting trust is a trust implied by operation of law to enforce the inferred intent of the parties to establish a trust.'" (citing *In re Golden Triangle Capital*, 171 B.R. 79, 82 (9th Cir.BAP 1994))).

---

[8] "Receivable" is defined in the Security Agreement as "an Account evidencing WCE's rights to payment for Product, billed in an invoice sent to a Customer by SCE, together with all late fees and other fees which SCE and WCE agree are to be charged in such invoice to the Customer by SCE on behalf of WCE."

8

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 15 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 14 of 24

23.    SCE's role as trustee with respect to the customer remittances is supported by the obligations in the Security Agreement.    Pursuant to the Security Agreement, SCE has been irrevocably instructed to "remit to Collateral Agent all payments due or to become due in respect of the Receivables unless and until both Collateral Agent, at the direction of the Required Secured Creditors, and WCE direct otherwise in writing." Security Agreement § 5.01.  Pursuant to section 6.01 of the Security Agreement, the "Lockbox Account is subject to the sole dominion, control and discretion of the Collateral Agent until the Discharge Date."[9]  The Security Agreement also makes clear that once the Collateral Agent is paid, "[n]o distribution will be made . . . to any deposit account other than the Operating Funds Flow Account, without the express written consent of [Barclays]."  Security Agreement § 6.02.

24.    A trustee cannot exercise setoff rights against funds held in trust.  *In re Carlyle*, 242 B.R. 881, 888 n. 4 (Bankr. E.D. Va. 1999) ("A trustee cannot set off against the trust fund held by him his individual demand against the creator of the trust. In this connection, equity treats the fiduciary as holding the res in a separate capacity.") (internal quotations omitted); *and see In re Ben Franklin Retail Store, Inc.*, 202 B.R. 955, 957 (Bankr. N.D. Ill. 1996) ("[W]hen a fund is deposited for a 'special purpose' it is held in trust for the depositor, rather than 'owed' to the depositor.  Because of this distinction, the requisite mutuality of obligation is not present with special purpose funds and set off is not permitted.").

25.    Under the CCA Agreement, SCE is a fiduciary for WCE, while any claim owed by WCE to SCE that SCE claims is subject to setoff is owed to WCE as principal.  As such, there is

---

[9] The "Discharge Date" is defined as the date on which "any and all outstanding Obligations under the Transaction Agreements have been fully satisfied."  Security Agreement at 4.   "Transaction Agreements" means "this Agreement and all other agreements, instruments or documents to which WCE is a party and which are executed and delivered from time to time in connection with or as a security for WCE's obligations under the Master Agreements" or any other "Power Purchase Agreements."

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 16 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 15 of 24

no mutuality for setoff purposes because there is no capacity mutuality. *In re Luz*, 219 B.R. at 847–48; *see Matter of Esgro, Inc.*, 645 F.2d 794, 797 (9ᵗʰ Cir. 1981); *In re Cty. of Orange*, 183 B.R. 609, 619 (Bankr. C.D. Cal. 1995) ("Thus, for example, where the debt of an entity arises from a fiduciary duty, or is in the nature of a trust, there is no mutuality."  (citing *In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262 (9ᵗʰ Cir. 1973), *cert. denied*, 93 S.Ct. 2735 (1973))). Moreover, the language in the RA Agreement that purportedly gives rise to SCE's setoff rights expressly refers to the funds that SCE is seeking to setoff as "WCE's customer remittances." *See* Strabo Declaration, Exhibit 1 at 6.  This characterization of the funds to be setoff is inconsistent with SCE holding a beneficial interest in the funds to be setoff, meaning that mutuality of capacity is lacking.

26.    Because there is no mutuality, there can be no valid right of setoff in favor of SCE under section 553 of the Bankruptcy Code.

### b.  SCE Cannot Offset Postpetition Funds

27.    The funds in the Lockbox Account represent WCE's customer remittances that were collected by SCE for WCE's benefit postpetition.    SCE's obligation to turn over customer remittances under the agreements with WCE by definition can only arise when such funds are collected, here postpetition. WCE's postpetition funds cannot be setoff, because under section 553(a) of the Bankruptcy Code, each debt and claim subject to offset must have arisen prepetition. *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d 926, 933 (9th Cir. 2020) ("'[U]nder § 553(a) of the Code, each debt or claim sought to be offset must have arisen prior to [the] filing of the bankruptcy petition.'"    (quoting    *Newbery*,    95    F.3d    at    1398)). *In re Orient River Investments, Inc.*, 105 B.R. 790, 794 (Bankr. E.D. Pa. 1989) ("In no event can a creditor seek to assert setoff as to a claim which the debtor has against it which has arisen post-

10

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit G - SCE Claim Objection   Page 17 of 210

Case 6:21-bk-12821-SY   Doc 221   Filed 11/30/21   Entered 11/30/21 17:39:50   Desc
Main Document   Page 16 of 24

petition."); *In re All-Bright Sign Service Co., Inc.*, 11 B.R. 409, 411 (Bankr. W.D. Ky. 1981) ("The filing of the petition marks the time at which mutuality ceases, and any money thereafter deposited is considered either property of the debtor or his estate. This is embodied in 11 U.S.C. § 553(a), which permits setoff in bankruptcy, only for mutual debts that arose before the commencement of the case.") (internal quotations omitted).

28.    Therefore, remittances collected by SCE on WCE's behalf postpetition may not be used to setoff debts allegedly owed to SCE.  Simply put, customer remittances received by SCE after the Petition Date are not subject to setoff under section 553 of the Bankruptcy Code.

29.    Moreover, to the extent that the Receivables were collected postpetition by SCE, SCE could not rely on such Receivables forming a part of its secured claim due to the operation of section 552 of the Bankruptcy Code.  Section 552 of the Bankruptcy Code would expressly cut off SCE's lien on funds acquired postpetition, unless such funds were proceeds of SCE's prepetition collateral. *See* 11 U.S.C. § 552(a) ("Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.").  SCE did not have any lien or security interest on any collateral prepetition, but rather, SCE acted as a pass-through entity for WCE's customer remittances.  New customer remittances are not the proceeds of any prepetition collateral held by SCE, and if SCE holds a security interest in customer remittances, which it does not, that interest is limited to the funds in its possession on the Petition Date.  SCE does not hold a lien on any postpetition remittances, which constitute property of WCE.

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit G - SCE Claim Objection   Page 18 of 210

Case 6:21-bk-12821-SY   Doc 221   Filed 11/30/21   Entered 11/30/21 17:39:50   Desc
Main Document   Page 17 of 24

### c. **Even If SCE Had Valid Setoff Rights, Its Setoff Rights Would Be Subordinate to Secured Claims**

30.     Under UCC § 9-404 and analogous common law principles, even if SCE's claims were secured by valid setoff rights, such setoff rights would be subordinate to secured claims that existed before SCE's right of setoff accrued. Section 9-404(a)(2) provides:

> Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (c), the rights of an assignee are subject to:

> (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

UCC § 9-404(a)(2).

31.     "A creditor's setoff right is subordinate to a lender's security interest if the creditor received authenticated notice of that security interest." *In re Commc'n Dynamics, Inc.*, 300 B.R. 220, 223 (Bankr. D. Del. 2003).   "A person has notice of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all of the facts and circumstances known to the person at the time in question, has reason to know that it exists."  UCC § 1-202(a).  Further, the UCC states "a person 'receives' a notice or notification when . . . it comes to that person's attention."  UCC § 1-202(e).

32.     As of the Petition Date, SCE had notice of the security interests of secured creditors (RCB and Power Purchase Aggregators) and, therefore, could not possess valid setoff rights.  *See* Security Agreement § 5.01 (directing SCE to remit customer remittances for the "Required Secured Creditors").

33.     SCE also had notice of Barclays' liens, which are secured by a valid lien on substantially all of WCE's assets that was granted by WCE, attached, and perfected prior to the Petition Date.  *See* Barclays Compl. ¶¶16-30.  Barclays perfected its liens pursuant to a UCC-1

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 19 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 18 of 24

prepition. *Id.* Section 5.01 of the Security Agreement directs SCE to deposit all payments made in respect of "Receivables" and any proceeds generated by the "Collateral" into the Lockbox Account." *See* Security Agreement § 5.01. Further, that same Security Agreement identifies Barclays as Lender and provides that "[n]o distribution will be made pursuant to . . . any deposit account other than the Operating Funds Flow Account, without the express written consent of Lender." *See* Security Agreement § 6.02. It would defy logic to argue that SCE did not have actual notice of Barclays' validly perfected first-priority liens, and thus, any alleged right of setoff would be subordinate to Barclays first-priority liens.

### d. Even if SCE Can Meet the Bankruptcy Code's Requirements Under Section 553, the Court Should Deny Any Right of Setoff

34.    Even if SCE could somehow establish that its contractual setoff rights meet the technical requirements of section 553 of the Bankruptcy Code, because setoff in this case would be inequitable, the Court should exercise its discretion to deny setoff.

35.    The right of setoff is permissive and its application rests in the discretion of the Court. *In re Cty. of Orange*, 183 B.R. 609, 622–23 (Bankr. C.D. Cal. 1995) ("An issuer's lien is also unlike a setoff because an issuer's lien is a legal remedy, while setoff has its foundation in equity. A valid issuer's lien must comport with the specific statutory requirements of § 8103. If all of these criteria are met, the court must recognize its validity. In contrast, a setoff is an equitable remedy which, when properly invoked, still rests in the discretion of the court."); *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d at 1399; *In re Cascade Roads, Inc.*, 34 F.3d 756, 763 (9th Cir. 1994). "Once the three-part test is satisfied, a court must scrutinize the right of setoff in light of the Bankruptcy Code's goals and objectives which include an orderly bankruptcy process and equitable treatment of all creditors." *Steadfast Insurance Company v. Woodside Group, LLC*, 2009 WL 6340015 at *4 (Bankr. C.D. Cal. 2009); *see In re Lakeside Community Hosp., Inc.*, 151 B.R.

13

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 20 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 19 of 24

887, 893-94 (N.D. Ill. 1993) ("The right of setoff is exercised in aid of justice . . . if the rights of no one but the debtor are affected by the act . . . Equity may override a creditor's satisfaction of technical statutory requirements.") (internal citations omitted).

36.    Permitting SCE to setoff WCE's postpetition customer remittances to satisfy its unsecured claims would be inequitable and not serve the goals of the Bankruptcy Code. A right of setoff for SCE would elevate SCE's unsecured claim to a secured claim, thereby preferring SCE over all other unsecured creditors. Setoff would allow SCE to receive 100% of customer remittances while other unsecured creditors will be limited to a pro rata share of the remaining funds of the WCE's chapter 9 bankruptcy. This would grant SCE a windfall to the detriment of all other creditors. Accordingly, SCE should not be permitted to retain customer remittances and offset those remittances against WCE's debt.

### 2. SCE's Does Not Have an Administrative Claim

37.    First, it is unclear whether administrative expense claims under 503(b)(1)(A) of the Bankruptcy Code can even exist under chapter 9 of the Bankruptcy Code. *See In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141-142 (Bankr. S.D.N.Y. 2010) ("Because a chapter 9 debtor's property remains its own and does not inure into a bankruptcy estate as provided by section 541 of the Bankruptcy Code, there can be no administrative expenses for 'the actual necessary costs of preserving the estate' as contemplated by section 503(b)(1)(A) of the Bankruptcy Code."). The concept of the "estate" is not incorporated into chapter 9, and thus it is unclear whether there can be administrative expenses for "preserving the estate." In *Off-Track Betting*, the court explained:

> Both leading bankruptcy treatises concur with this approach. Collier observes that because there is no estate in a chapter 9 case, administrative expense claims under section 503 must be limited to "expenses incurred in connection with the chapter 9 case itself" and

14

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 21 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 20 of 24

not operating expenses. 6 COLLIER ON BANKRUPTCY ¶ 901.04[13][a]. Norton agrees, observing in passing that no operating administrative expenses are permitted in a chapter 9 bankruptcy case. 5 WILLIAM J. NORTON, JR. WILLIAM L. NORTON III, NORTON BANKRUPTCY LAW AND PRACTICE § 90:3.

*Id.*

38.    Even if SCE can show that administrative expenses under 503(b)(1)(A) should be allowed in the context of chapter 9, SCE has failed to demonstrate how their claims constitute a quantifiable benefit to the bankruptcy estate.  In order for a claim to be deemed an administrative expense under 503(b)(1), the claim "must (1) arise from a transaction with the debtor in possession, and (2) directly and substantially benefit the estate."  *In re Rodakis*, No. 2:06-BK-04123-SSC, 2009 WL 1069164, at *3 (Bankr. D. Ariz. Mar. 30, 2009) (citing *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir.1998)).  The benefit provided to the estate must be quantifiable and cannot be speculative.  *See*, *e.g.*, *In re Durango Georgia Paper Co.*, No. 02-21669, 2021 WL 1259530, at *6 (Bankr. S.D. Ga. Mar. 31, 2021) ("'[T]hat which is thought to have some potential benefit . . . is too speculative to be allowed as an 'actual, necessary cost and expense of preserving the estate.'" (quoting *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530, 1532 (11th Cir. 1986))); *In re Ideal Mortg. Bankers, Ltd.*, 539 B.R. 409, 431 (Bankr. E.D.N.Y. 2015), *aff'd sub nom. Holzer v. Barnard*, No. 15-CV-6277 (JFB), 2016 WL 4046767 (E.D.N.Y. July 27, 2016) ("A creditor must not only show that what it provided to the bankruptcy estate was used, but also that such use benefited the estate. Where the speculative benefit is not quantifiable, the mere potential benefit does not qualify as a benefit for purposes of determining administrative expense priority status."); *In re Lazar*, 207 B.R. 668, 674–75 (Bankr. C.D. Cal. 1997) ("Absent any better evidence of postpetition leakage, the court finds this evidence too speculative to provide a basis for an award of administrative expenses."); *In re CIS Corp.*, 142 B.R. 640, 644 (S.D.N.Y. 1992) ("This speculative benefit is not quantifiable, and a mere potential

15

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 22 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 21 of 24

benefit    does    not    qualify    as    a    benefit    for    the    purposes    of

determining administrative expense status.").

39.    While it is questionable whether the administrative expenses sought can even be

allowed in chapter 9, the SCE Claims present no realizable and quantifiable benefit to the

bankruptcy estate given that WCE is liquidating and no longer services the very customers that

SCE took back from SCE, and SCE has failed to present any evidence of a quantifiable benefit

provided to the WCE or its creditors.  Accordingly, there simply is no basis for SCE to claim

administrative expenses.

### 3.  SCE Claims 19, 20, and 21 Lack Sufficient Evidence to Establish their Validity

40.    SCE Claims 19, 20, and 21 lack sufficient documentation to establish the validity

of such claims, and the documentary evidence provided for SCE Claim 21 in particular does not

support the claim asserted therein.  "A proof of claim that lacks the documentation required by

Rule 3001(c) does not qualify for the evidentiary benefit of Rule 3001(f). . . ." *In re Heath*, 331

B.R. 424, 426 (B.A.P. 9th Cir. 2005).  A claim that fails to provide documentation in support of

such claim cannot serve as prima facie evidence of the validity and amount of the claim.  *Id.*

41.    SCE Claim 19—a claim in excess of $2.4 million—does not contain any evidence

in support of such claim.  *See* Strabo Declaration, Exhibit 2.  As such, SCE has failed to establish

any basis for such claim.  Accordingly, SCE has failed to provide evidence as to the validity and

amount of the claim, and such claim should be disallowed.

42.    SCE Claim 20—a claim for $107,306.68 for "CCA Services"—only provides a

copy of a CCA service agreement and is devoid of any other support.  In fact, section 5 of the CCA

service agreement attached to SCE Claim 20 provides that "SCE will bill and the CCA agrees to

pay SCE for all services and products provided by SCE."  Strabo Declaration, Exhibit 3 at 11.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 23 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 22 of 24

However, SCE attached no bills, receipts, accounting or any similar evidence to provide a sufficient basis for its $107,306.68 claim. This is particularly relevant given the fact that WCE ceased being a CCA in the early part of June 2021, and SCE Claim 20 asserts fees for the month of June.

43. SCE Claim 21—a claim in excess of $14.5 million—also does not contain sufficient documentation to establish the validity of such claim. Pursuant to the language of the CCA Agreement, SCE was, among other things, required to provide written notice and a demand to WCE for Re-Entry Fees. *See* Strabo Declaration, Exhibit 4 at 79 ("SCE will issue a written demand to WCE for payment of the Re-Entry Fees in conformance with [Section X of Rule 23 Community Choice Aggregation]"). The CCA Agreement requires SCE to "file a Tier 1 Advice Letter to notify the Commission." Strabo Declaration, Exhibit 4 at 64. Further, SCE must serve notice and a "demand to the CCA for payment of the Re-Entry Fees . . . no later than sixty (60) days after the start of the Involuntary Return of CCA customers to utility procurement service." *Id.* at 66. However, SCE has failed to attach any evidence of such notice having been provided to WCE, presumably because serving such postpetition notice and demand on WCE would violate the automatic stay. *See*, *e.g.*, *In re Del Mission Ltd.*, 998 F.2d 756, 758 (9th Cir. 1993) ("[The Employment Development Department] and the Board violated the automatic stay by demanding unauthorized payments.").

44. Rather, by submitting its Tier 1 advice letter to the California Public Utilities Commission, SCE is attempting to have the CPUC adjudicate its claim in violation of the automatic stay. *See* Strabo Declaration, Exhibit 4 at 75-80. SCE cannot have CPUC adjudicate its claim outside of the jurisdiction of the Bankruptcy Court because any action to do so is a clear violation of the automatic stay. Moreover, SCE filing its proofs of claim with the Court amounts

17

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 24 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 23 of 24

to SCE's submission to the Court's jurisdiction for purposes of determining the validity and amounts of its claims. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, No. 11 CV 2392 AKH, 2011 WL 7975167 (S.D.N.Y. Dec. 15, 2011) ("It is well settled that by filing a proof of claim, a creditor submits to the bankruptcy court's equitable jurisdiction regarding adjudication of matters related to that claim, including avoidance actions." (citing *Langenkamp v. Culp,* 498 U.S. 42, 44 (1990))); *Buena Vista Television v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),* 307 B.R. 404, 418 (Bankr.S.D.N.Y.2004) ("[W]hen [plaintiffs] filed proofs of claim in the bankruptcy court, they submitted to the equitable jurisdiction of this court, especially with respect to the very subject matter of their claims.").

45.    Section 362 of the Bankruptcy Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." *See* 11 U.S.C. §§ 362(a)(3), (6). Section 362 is made applicable in chapter 9 cases by section 901. 11 U.S.C. 901(a) ("Section[] . . . 362 . . . of this title appl[ies] in a case under this chapter."). Thus, SCE has not and cannot comply with the CCA Agreement and its claim must therefore be disallowed in its entirety.

## CONCLUSION

46.    For the reasons set forth above, Barclays respectfully requests that the Court enter the Proposed Order (a) granting the Objection; (b) disallowing any setoff rights asserted in the SCE Claims; (c) disallowing any administrative expense claims asserted in the SCE Claims; (d) disallowing and expunging SCE Claims 19 through 21 in their entirety; and (e) granting Barclays such other and further relief as may be appropriate under the circumstances.

18

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 25 of 210

Case 6:21-bk-12821-SY    Doc 221    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Main Document    Page 24 of 24

## RESERVATION OF RIGHTS

47.    Barclays expressly reserves all rights and/or remedies, including without limitation, to supplement this Objection and/or to file further objections to claims of SCE on any additional grounds not referenced herein.

Dated:   November 30, 2021                    Respectfully submitted,

By: */s/ Joel Moss*
Joel Moss (SBN 241853)
Daniel H.R. Laguardia (SBN 314654)
**SHEARMAN & STERLING LLP**
535 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone:    (415) 616-1100
Facsimile:    (415) 616-1199
Email:        joel.moss@shearman.com
              daniel.laguardia@shearman.com

*- and -*

Jason D. Strabo (SBN 246426)
Kristin K. Going (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3218
Telephone:    (310) 788-4125
Facsimile:    (310) 277-4730
Email:        jstrabo@mwe.com
              kgoing@mwe.com

*Counsel for Barclays Bank PLC*

19

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit G - SCE Claim Objection   Page 26 of 210

Case 6:21-bk-12821-SY   Doc 221-1   Filed 11/30/21   Entered 11/30/21 17:39:50   Desc
Exhibit A - Proposed Order   Page 1 of 3

**Exhibit A**

**Proposed Order**

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 27 of 210

Case 6:21-bk-12821-SY    Doc 221-1    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Exhibit A - Proposed Order    Page 2 of 3

1
2

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**RIVERSIDE DIVISION**

3
4
5
6
7
8

In re:

WESTERN COMMUNITY ENERGY,

      Debtor.

Case No. 6:21-bk-12821-SY

Chapter 9

**OBJECTION TO CLAIMS OF SOUTHERN**
**CALIFORNIA EDISON COMPANY**
**(PROOFS OF CLAIM 18-21)**

9
10

**ORDER GRANTING BARCLAYS BANK PLC'S OBJECTION TO CLAIMS OF**
**SOUTHERN CALIFORNIA EDISON COMPANY (CLAIM NOS. 18, 19, 20, AND 21)**

11
12
13
14
15
16
17
18
19
20

    Upon consideration of the Objection[1] to the SCE Claims filed by Barclays Bank PLC

("Barclays"), requesting an order pursuant to section 502 of the Bankruptcy Code and Bankruptcy

Rule 3007 disallowing any setoff rights asserted in the SCE Claims, disallowing any administrative

expense claims asserted in the SCE Claims, and disallowing and expunging SCE Claims 19

through 21 in their entirety; and upon all other documentation filed in connection with the

Objection and the SCE Claims; and adequate notice of the Objection having been given as set forth

in the Objection; and it appearing that no other or further notice is required; and sufficient cause

appearing therefor;

21
22

    **IT IS HEREBY ORDERED:**

23

    1.      The Objection is SUSTAINED.

24

    2.      The SCE Claims do not assert a valid right of setoff, and no portion of the SCE

Claims are secured under section 506 of the Bankruptcy Code.

25
26

    3.      The SCE Claims do not constitute administrative expenses.

27
28

---

[1] Capitalized terms that are undefined shall have the respective meanings ascribed to such terms in the Objection.

4.    SCE Claims 19, 20, and 21 are disallowed in their entirety for all purposes in this chapter 9 bankruptcy case and shall be automatically expunged from the claims register maintained in this case.

5.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2021

_____
Scott H. Yun
United States Bankruptcy Judge

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit G - SCE Claim Objection   Page 29 of 210

Case 6:21-bk-12821-SY   Doc 221-2   Filed 11/30/21   Entered 11/30/21 17:39:50   Desc
Exhibit B - Strabo Declaration   Page 1 of 3

## **Exhibit B**

**Strabo Declaration**

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 30 of 210

Case 6:21-bk-12821-SY    Doc 221-2    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Exhibit B - Strabo Declaration    Page 2 of 3

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>WESTERN COMMUNITY ENERGY,<br><br>      Debtor. | Case No. 6:21-bk-12821-SY<br><br>Chapter 9<br><br>**OBJECTION TO CLAIMS OF SOUTHERN CALIFORNIA EDISON COMPANY (PROOFS OF CLAIM 18-21)**<br><br>**Hearing:**<br>January 6, 2022 at 1:30 p.m. (PT)<br>Place: U.S. Bankruptcy Court<br>      Central District of California<br>      Telephonic/In-Person<br>      3420 Twelfth Street, Courtroom 302<br>      Riverside, CA 92501-3819<br><br>Judge: Honorable Scott H. Yun |

## DECLARATION OF JASON D. STRABO

I, Jason D. Strabo, declare as follows:

1.  I am an attorney at law, duly licensed and entitled to practice in the State of California and admitted to practice before this Court.[1] I am a partner in the law firm of McDermott, Will & Emery LLP, counsel to Barclays Bank PLC.

2.  I make this declaration in support of the *Objection to Claims of Southern California Edison Company (Proofs of Claim 18-21)* (the "Objection"), filed concurrently herewith. Capitalized terms used but not defined herein have the meanings ascribed to them in the Objection.

---

[1] Capitalized terms that are undefined shall have the meanings ascribed to such terms in the Objection.

1

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit G - SCE Claim Objection    Page 31 of 210

Case 6:21-bk-12821-SY    Doc 221-2    Filed 11/30/21    Entered 11/30/21 17:39:50    Desc
Exhibit B - Strabo Declaration    Page 3 of 3

3.     This Declaration is based on knowledge I have gained from a review of publicly available information, including: all of the proofs of claim filed by SCE in this chapter 9 case and listed in the official Claims Register and the pleadings filed in the above captioned case.

4.     Attached hereto as Exhibits 1 through 4 are true and correct copies of the SCE Claims as they appear in the official Claims Register:

    a.  Exhibit 1, Proof of Claim 18, filed on September 30, 2021;

    b.  Exhibit 2, Proof of Claim 19, filed on September 30, 2021;

    c.  Exhibit 3, Proof of Claim 20, filed on September 30, 2021; and

    d.  Exhibit 4, Proof of Claim 21, filed on September 30, 2021.

5.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 30th day of November, 2021.
Los Angeles, California

By: */s/ Jason D. Strabo*
Jason D. Strabo

2

**Exhibit 1**

**SCE Claim 18**

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C abC SCE claim Objection Claim Page 33 Page 1 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 1

| Fill in this information to identify the case: |
|---|

Debtor 1    __Western Community Energy__

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Central District of California

Case number   6:21-bk-12821-SY

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Southern California Edison Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Munger, Tolles & Olson LLP
Name

350 South Grand Ave.
Number    Street

Los Angeles    CA    90071
City    State    ZIP Code

Contact phone  213-683-9554

Contact email  seth.goldman@mto.com

Where should payments to the creditor be sent? (if different)

See Addendum.
Name

Number    Street

City    State    ZIP Code

Contact phone  _____

Contact email  _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit 3 SCE Claim Objection Claim    Page 34 Page 10 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 2
of 58

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _____ 7,603,680.16 . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
   ☐ Motor vehicle
   ☐ Other. Describe: _____

   **Basis for perfection:** _____
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:** $_____
   **Amount of the claim that is secured:** $_____

   **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:** $_____

   **Annual Interest Rate** (when case was filed) _____%
   ☐ Fixed
   ☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No
☑ Yes. Identify the property: See Attachment. _____

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C abc C Declaration Objection Claim Page 35 Page 14 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 3
of 58

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    09/30/2021
                    MM  /  DD  /  YYYY


/s/ Bradley Schneider (original on following page)
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Counsel |
|---|---|

| Company | Munger, Tolles & Olson LLP |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 350 South Grand Avenue |
|---|---|
| | Number        Street |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |

| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |
|---|---|---|---|

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit C abs C to Declaration Objection Claim 836 Page 36 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 4
of 58

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

### Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09/30/2021
                    MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number          Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cabs SCE Claim Objection Claim Page 837 Page 16 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 5
of 58

# ADDENDUM TO PROOF OF CLAIM

## In re Western Community Energy,
## Case No. 6:21-bk-12821-SY

This addendum is attached to and a part of the proof of claim (the "Proof of Claim") filed by Southern California Edison Company ("SCE") (the "Claimant") against Western Community Energy Company (the "Debtor").

## 1.     Basis for Proof of Claim and Asserted Amount

On August 15, 2019, SCE and the Debtor entered into a contract entitled *Agreement Between Southern California Edison Company and Western Community Energy Regarding WCE Implementation and Resource Adequacy Compliance for 2020, 2021 and 2022* (the "CSRP RA Agreement"), which was effective upon its submission to the California Public Utilities Commission ("CPUC") on August 22, 2019 in Advice Letter 4058-E, and approved by the CPUC on February 27, 2020 in Resolution E-5051.  A true and correct copy of the CSRP RA Agreement is attached hereto as Exhibit 1.

Under this agreement, SCE agreed to satisfy the Debtor's resource adequacy ("RA") obligations for 2020 for the Debtor.  SCE further agreed that for 2021 and 2022, it would transfer local RA resources to the Debtor each month and show that RA each month so the Debtor could satisfy its local RA obligations.  To operationalize this part of the agreement, SCE and the Debtor subsequently executed an amendment to the CSRP RA Agreement, effective August 15, 2019 ("Amendment No. 1").  A true and correct copy of Amendment No. 1 is attached hereto as Exhibit 2.

In 2019, consistent with the CSRP RA Agreement, SCE satisfied the Debtor's RA obligations for 2020.  On January 15, 2021, SCE sent an invoice to the Debtor for the 2020 RA in the amount of $12,878,205.21, which was due on February 15, 2021.  The Debtor failed to pay the invoice when due.  On February 16, 2021, SCE gave notice to the Debtor of the payment default.  On March 12, 2021, SCE gave the Debtor notice that it had failed to cure its payment default.

On May 24, 2021, SCE notified that the Debtor by letter that, as a result of the Debtor's uncured payment default of the CSRPA RA Agreement, the CSRP RA Agreement was terminated that day, effective immediately.  Later that same day (the "Petition Date"), the Debtor filed its petition for relief under chapter 9 of the Bankruptcy Code.  The net amount owed to SCE as of the Petition date for 2020 RA was $12,878,695.00.

Prior to the Petition Date, and consistent with Amendment No. 1, SCE made monthly transfers of local RA to the Debtor.  These transfers allowed the Debtor to meet its local RA compliance obligations through June 2021.  As of the Petition Date, the Debtor owed SCE $2,944,405.10 plus accrued interest for these monthly RA transfers.

On June 1, 2021, the Court entered an order granting the Debtor's motion for a preliminary injunction that, among other things, enjoined SCE from withholding RA from the

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cab S Ce to claim Objection Claim Page 38 Page 7 of 59

Case 6:21-bk-12821-SY     Claim 18-1     Filed 09/30/21     Desc Main Document     Page 6
of 58

Debtor under the CSRP RA Agreement.  The Court's order was entered a written order on the docket on June 11, 2021.  *See* Temporary Restraining Order, W*estern Community Energy v. Southern California Edison Company*, Adv. No. 6:21-ap-01068-SY (Bankr. C.D. Cal. June 11, 2021) ("TRO Order").  Pursuant to the TRO Order, SCE transferred local RA to the Debtor in June 2021 that satisfied the Debtor's local RA compliance obligations for July 2021 (the "July 2021 RA").  SCE is entitled to $556,483 for the July 2021 RA.

On June 11, 2021, the Court entered an order providing that the automatic stay was modified to the extent necessary to allow SCE to cease performance under the CSRP RA Agreement and to implement and effectuate the termination of that agreement, including by way of setoff of any moneys deposited or letters of credit provided under the agreement.  *See* Order Approving Stipulation For Modification of Automatic Stays of 11 U.S.C. § § 362(a) and 922(a) and Temporary Restraining Order, Docket No. 54.

Consistent with the Court's June 11, 2021 Order, SCE effected the termination of the CSRP RA Agreement.  SCE has determined that its actual damages arising from the termination of the agreement are $1,736,717.00.

As of the Petition Date, SCE right to payment under the CSRP RA Agreement was secured by (1) two letters of credit provided by the Debtor that totaling $9 million; and (2) cash advances from the Debtor totaling $1,075,511.00.  Pursuant to the Court's June 11, 2021 Order, SCE applied this security to its claim under the CSRP RA Agreement, resulting in an net amount owed to SCE of $7,603,860.16 for 2020 RA provided under the CSRP RA Agreement.

SCE's claim for unpaid RA is also secured by a right of offset against customer remittances collected by SCE pursuant to its service agreement with the Debtor (the "Service Agreement").  Specifically, Section J(c) of the CSRP Agreement provides that "SCE has the right to set off WCE's customer remittances against any payment due to SCE under this Agreement that remains unpaid sixty (60) calendar days from the date of SCE's invoice."  Exhibit 1 at p. 6.  More than 60 calendar days have elapsed since SCE's invoice for 2020 RA.

On and after June 23, 2021, SCE has remitted approximately $10,169,683.22 of customer payments to WCE, of which at least $9,123,151.01 were payments for services with a bill period before May 24, 2021.  Thus, SCE's claim for unpaid RA is fully secured by its right of offset against customer remittances.

## 2.        Reservations of Rights

The filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver or release of Claimant's rights against any other entity or person liable for all or any part of the Proof of Claim asserted herein; (ii) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver or release of Claimant's right to mediate or arbitrate any dispute, as applicable, including the amount or nature of the Proof of Claim; (iv) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of

such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (v) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (vi) a waiver or release of Claimant's right to have any and all final orders entered only after de novo review by a United States District Court Judge; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto, or other proceeding which may be commenced in this case against or otherwise involving Claimant; (viii) a waiver or release or limitation of Claimant's right to setoff or recoupment; or (ix) a waiver of Claimant's right to assert any additional claims that may be entitled to administrative priority under sections 503 and 507 of the Bankruptcy Code.

**3.     Amendments**

Claimant reserves the right to amend and/or supplement this Proof of Claim at any time, in any manner, including, but not limited to, fixing the amount of the claims described above that are or may become due to Claimant, and/or to file additional proofs of claim for any additional claim which may be based on the same or additional documents or grounds of liability.

**4.     Notices**

All notices relating to this Proof of Claim should be sent as follows:

Southern California Edison Company
Energy Contract Management
Attn:  Jason Lim
2244 Walnut Grove Ave.
Rosemead, CA 91770
Jason.Lim@sce.com
626.302.2477

With a copy to:

Seth Goldman
Bradley R. Schneider
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071

All payments should be sent to:

Southern California Edison Company
Energy Contract Management
Attn:  Jason Lim
2244 Walnut Grove Ave.
Rosemead, CA 91770
Jason.Lim@sce.com
626.302.2477

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibits Cab SCE Claim Objection Claim 840 Page 40 Page 10 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 8
of 58

**EXHIBIT 1**

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit C abc SDE Claim Objection C for Claim Page 41 Page 210 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 9 of 58

<u>AGREEMENT BETWEEN SOUTHERN CALIFORNIA EDISON COMPANY AND WESTERN COMMUNITY ENERGY REGARDING WCE IMPLEMENTATION AND RESOURCE ADEQUACY COMPLIANCE FOR 2020, 2021 and 2022</u>

This Agreement is made by and between Western Community Energy ("WCE"), a California Community Choice Aggregator and joint powers authority, and Southern California Edison Company ("SCE"), a California corporation, regarding WCE's program implementation and Resource Adequacy compliance for its 2020 load. WCE and SCE may be referred to herein individually as "a Party" and collectively as "the Parties."

RECITALS:

1. WCE filed an implementation plan certified by the California Public Utilities Commission ("CPUC"), dated March 19, 2018 to initiate its community choice aggregation program starting in March 2020, and as forecasted in WCE's load forecast submitted to the CPUC on April 19, 2019.

2. SCE is currently replacing its 30-year old mainframe customer billing system through its Customer Service Re-Platform Project ("CSRP"), for which SCE will initiate a CSRP system freeze from January through May 2020 during which SCE is unable to transfer customer accounts to WCE service, and has sought agreement from WCE that WCE implement its program no sooner than July 2020.

3. The Parties disagree on WCE's implementation start date due to certain WCE operational, revenue and resource adequacy ("RA") costs and increased risk to CSRP implementation and SCE's customers, and have attempted to resolve WCE's 2020 implementation date by participating in the CPUC's Resolution E-4907 meet and confer process, as documented in SCE's Rule 23.

4. In order to resolve WCE Implementation, SCE and WCE desire to agree on a post-July 2020 implementation date and RA compliance plan.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

AGREEMENT:

A. WCE agrees to postpone WCE Implementation from its planned date in April 2020, and the Parties agree that WCE Implementation will occur beginning July 2020, with the ability to phase in certain load classes in early 2021 consistent with applicable SCE tariffs, subject to Paragraph R.

B. SCE agrees to allocate RA resources to satisfy WCE's 2020 RA compliance requirements, including the 3-year forward local RA compliance requirement for WCE's 2020 load, as set forth in CPUC Decision 19-02-002 (collectively, "WCE RA Obligation"), and to transfer RA resources that WCE can use to satisfy its 2021 and 2022 local RA compliance requirements, in exchange for WCE's issuance of a letter of credit and all of the payments due to SCE for WCE RA Obligation under this Agreement calculated as described in Paragraph J below (collectively, the "WCE Payments"). SCE will satisfy WCE's 2020 system, flexible and local RA obligations on

1

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
ExhibitExhibitCabcSDECClaimoObjeCtoorClaiPage 42Pag2101 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 10
of 58

WCE's behalf.  WCE will be responsible for satisfying its system, flexible and local RA obligations
on its own behalf post-2020 (*e.g.*, for 2021 and 2022 RA obligations).

C.  On or about June 1, 2019, WCE provided SCE its estimated WCE RA Obligation.

D.  On or about July 2019, WCE provided SCE with an update of its 2020 load forecast.

E.  In July 2019, WCE received its estimated WCE RA Obligation from the California Energy
Commission ("CEC") and WCE provided this updated estimate to SCE.

F.  By August 16, 2019, SCE will submit to CPUC and CEC any updated load forecasts for purposes of
satisfying WCE RA Obligation, along with any updates to SCE's 2020 bundled service load
forecasts.  SCE will show WCE's 2020 load forecast separately and break out the volume of
WCE's load forecast by each month during 2020.  Notwithstanding the foregoing, if CEC requires
WCE to submit to CPUC and CEC any updated load forecasts for purposes of satisfying WCE RA
Obligation, then WCE and SCE will coordinate on such submittal as reasonably practicable and
decide whether SCE or WCE shall submit any requisite forecast revisions.

G.  Upon CEC confirming WCE RA Obligation (expected in or about September 2019), WCE will
provide that requirement to SCE within five business days of receiving that information from
CEC if the CEC provides this confirmation directly to WCE.  The operational mechanics as
specified by the CEC and CPUC are set forth in Appendix A hereto, except that with regard to
Paragraph 3 of Appendix A, volumes for System, Local and Flexible RA allocations under this
Agreement will be calculated by SCE using ratio shares based on coincident peak loads outlined
by the CEC in or about September 2019.

H.  WCE will follow the Step 9 and subsequent steps in the 2020 Import Capability Assignment
Process at SCE's instructions, and secure Import Allocation Rights at locations per SCE's
instructions.  WCE will promptly transfer to SCE all its Import Allocation Rights for the term
1/1/2020 to 12/31/2020 of the 2020 Import Capability Assignment Process, at no cost to SCE.

I.  The Parties further clarify SCE's satisfaction of WCE RA Obligation:

   a)  Beginning in or around October 2019 until December 2020, SCE will allocate all required
   2020 system, flexible and local RA resources to satisfy WCE RA Obligation such that the
   WCE complies with all CPUC and CEC rules and regulations for the WCE RA Obligation, in
   exchange for the WCE Payments. SCE will satisfy WCE's 2020 system, flexible and local
   RA obligations on WCE's behalf.

   b)  In or around October 2020, SCE will transfer local RA resources in the same volume
   allocated for the October 2019 local RA showing on WCE's behalf, which WCE can use to
   satisfy its 2021 and 2022 local RA compliance requirements, in exchange for the WCE
   Payments and Letter of Credit.  WCE will be responsible for satisfying its system, flexible
   and local RA obligations on its own behalf post-2020 (*e.g.*, for 2021 and 2022 RA
   obligations).  Notwithstanding the foregoing, if the CPUC adopts rules that would
   require WCE to receive the transfer of the local RA resources prior to October 2020, the
   Parties will work together to determine the new transfer date and to accelerate the
   dates for the October 1, 2020 Payment and issuance of the Letter of Credit, discussed in

2

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cabot SCE Claim Objection Claim Page 43 of 210 Page 112 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 11
of 58

Paragraphs J.b.i and J.b.ii below, so that they are completed prior to the new transfer date. Similarly, if the CPUC adopts rules that would enable WCE to receive the transfer of the local RA resources in November 2020 or thereafter, the Parties will work together to determine the new transfer date and to postpone the dates for the October 1, 2020 Payment and issuance of the Letter of Credit, discussed in Paragraphs J.b.i and J.b.ii below, but still require them to be completed prior to the new transfer date.

    i. Conditions precedent to SCE's obligation to transfer any local RA resources to WCE as provided for in this paragraph are WCE's timely October 1, 2020 Payment to SCE, and its timely issuance of the Letter of Credit in favor of SCE, as required in Paragraphs J.b.i and J.b.ii below.

    ii. The Parties shall work together in good faith to operationalize SCE's transfer of the local RA resources to WCE under this Agreement in a manner reasonably consistent with the provisions of SCE's RA Capacity (Buy or Sell) Confirmation Letter, v. 7.25.2019 (a copy of which has been provided to WCE), through an amendment to this Agreement signed by both Parties no later than November 30, 2019.

c) SCE's satisfaction of WCE RA Obligation will account for WCE's customers' share of CAM, DRAM, LCR preferred resources, and DR-allocated RA, as applicable.

d) SCE will satisfy WCE RA Obligation by the applicable CPUC October 2019 deadline, and any other applicable deadline. SCE will satisfy WCE's 2020 month-ahead system and flex RA obligation 45 days prior to the compliance month.

e) Volumes for system, flexible and local RA allocations under this Agreement will be consistent with WCE RA Obligation established by the CEC in or about September 2019, plus any updates in volumes for month-ahead compliance at T-75 for each month of 2020.

f) SCE will satisfy WCE RA Obligation by the applicable CPUC October 2019 deadline, and any other applicable deadline. SCE will satisfy WCE's 2020 month-ahead system and flex RA obligation 45 days prior to the compliance month.

g) For month-ahead load adjustments for system and flexible RA for 2020, WCE will provide SCE load adjustments and associated RA obligation adjustments, if any, 90 days prior to the compliance month for submission by SCE (as appropriate) to CEC 75 days prior to the compliance month, in accordance with the month-ahead load adjustment filing requirement.

h) SCE is responsible for meeting and reporting on WCE RA Obligation at both the CPUC and CAISO for WCE's 2020 load subject to the terms and conditions of the Agreement; provided, however, that if the CPUC or CAISO requires WCE to file compliance documentation separately from SCE, then SCE will not be responsible for such filing, but will cooperate with WCE in doing so. WCE is responsible for meeting and reporting on its RA obligations at the CPUC and CAISO after 2020.

J. The Parties further clarify WCE Payments obligations and methodologies:

    a) WCE shall compensate SCE for its satisfaction of the WCE RA Obligation as follows:

3

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C abc SCE Claim Objection Claim Page 44 Page 12 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 12 of 58

   i. If WCE begins serving load in or before August 2020, pursuant to CPUC-adopted rules and requirements, WCE has the local RA obligation for the entirety of 2020 for its 2020 load.  For months prior to WCE serving load in which it has a local RA obligation, WCE will pay SCE for the 2020 local RA volumes at a price equal to the CPUC's 2020 local RA market price benchmark, as trued up by the CPUC in or about November 2020 and converted to a dollar per kilowatt-month price (the "2020 Local RA Price") plus the 2020 system RA market price benchmark, as trued up by the CPUC in or about November 2020 and converted to a dollar per kilowatt-month price (the "2020 System RA Price"), plus interest, which shall accrue monthly as of January 2020 by applying the Interest Rate as defined in SCE's Preliminary Statement ZZ to the average of the beginning and ending monthly WCE Payments balance that accrues under this Agreement.  If WCE begins serving load after August 2020, the WCE Payments will only include system RA and flexible RA resources for 2020.

   ii. Once WCE commences to serve load, for months in which WCE has system, flexible and /or local RA obligations, WCE will pay SCE for satisfying the WCE RA Obligation for each month as follows:

       1. First, at the 2020 Local RA Price, plus the 2020 System RA Price, for the WCE's monthly 2020 Local RA obligation , *i.e.*, (2020 Local RA Price + 2020 System RA Price) x 2020 Local RA volumes;

       2. Second, at a price equal to the CPUC's 2020 Flexible RA market price benchmark, as trued up by the CPUC in or about November 2020 and converted to a dollar per kilowatt-month price (the "2020 Flexible RA Price"), plus the 2020 System RA Price, for the WCE's monthly 2020 Flexible RA obligation; *i.e.*, (2020 Flex RA Price + 2020 System RA Price) x 2020 Flexible RA volumes; and

       3. Third, at a price equal to the 2020 System RA Price for any monthly 2020 System RA obligation, if any, after having accounted for the volumes of 2020 Local RA and 2020 Flexible RA above; plus

       4. Interest, which shall accrue monthly as of WCE's implementation start date by applying the Interest Rate as defined in SCE's Preliminary Statement ZZ to the average of the beginning and ending monthly WCE Payments balance that accrues under this Agreement.

       5. WCE Payments will be calculated on a monthly basis and shall be the sum of products of (i) the RA quantities required for WCE consistent with the Commission's rules for 2020 system, flexible and/or local RA; and (ii) the Local, Flexible, and System RA Prices delineated above; and (iii) the Interest Rate accrued as delineated above.

   iii. This Agreement assumes that the CPUC will adopt separate market price benchmarks for 2020 system, flexible and local RA, and that the flexible and

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
ExhibitExhibitCabaSDECaDaitioObjeCtoClairPage 45 Pag2104 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 13
of 58

local market price benchmarks will be adders to the market price benchmark for system RA.

1. If the CPUC adopts only one market price benchmark for RA for 2020, then the price for system, flexible, and local RA under this Agreement will be the one RA market price benchmark, as trued up by the CPUC in or about November 2020, and converted to a dollar per kilowatt-month price. If the CPUC adopts flexible and local market price benchmarks that are independent values, and not adders to the system RA market price benchmark, then the 2020 Local RA Price shall equal the 2020 local RA market price benchmark, only, as trued up by the CPUC in or about November 2020, and converted to a dollar per kilowatt-month price, and the 2020 Flexible RA Price shall equal the 2020 flexible RA market price benchmark, only, as trued up by the CPUC in or about November 2020, and converted to a dollar per kilowatt-month price.

2. WCE Payment for the WCE RA Obligation will accrue monthly as described above and be due and payable to SCE thirty (30) calendar days from the date of SCE's invoice, which shall be issued in January 2021, following the CPUC's true-up of the applicable 2020 RA market price benchmarks in or about November 2020; provided, however, that should the CPUC elect to not true up the 2020 RA market price benchmarks for any reason, or if the CPUC has not trued up the applicable 2020 RA market price benchmarks by December 2020, SCE shall have the right to invoice WCE for payment in January 2021 based on the 2020 RA market price benchmarks used to forecast SCE's 2020 Power Charge Indifference Adjustment (PCIA) rate, and to issue a true-up invoice if and when the CPUC trues up the applicable 2020 RA market price benchmarks. The estimated total value of the system, flexible and local RA resources to be allocated in 2020 under this Agreement to meet the WCE RA Obligation is FOURTEEN MILLION THREE HUNDRED THOUSAND DOLLARS ($14.3 MILLION).

b) WCE shall compensate SCE for its transfer of local RA resources that WCE can use to satisfy its 2021 and 2022 local RA compliance requirements, as follows:

i. By October 1, 2020, WCE shall issue an irrevocable, non-transferable letter of credit consistent with the requirements set forth in Appendix B hereto, in favor of SCE in an amount not less than FOUR MILLION FIVE HUNDRED THOUSAND DOLLARS ($4.5 MILLION) (the "Letter of Credit"), which shall remain effective until March 1, 2023.

ii. By October 1, 2020, WCE shall make a payment to SCE in the amount of $4.5 MILLION (the "October 1, 2020 WCE Payment"). The October 1, 2020 Payment amount represents half of the estimated total value of the local RA resources to be transferred to WCE under this Agreement of NINE MILLION DOLLARS ($9 MILLION).

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 46 of 210 15 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 14
of 58

iii. Should WCE fail to timely issue the Letter of Credit and make the October 1, 2020 Payment as required above, SCE shall have no obligation to transfer any local RA resources to WCE under this Agreement effective as of October 2, 2020.

iv. If and upon SCE's transfer of the local RA resources to WCE, expected to occur in or around October 2020, WCE shall, by July 1, 2021, make a payment to SCE in the amount of $4.5 MILLION (the "July 1, 2021 WCE Payment"). The July 1, 2021 Payment amount represents the second half of the estimated total value of the local RA resources to be transferred to WCE under this Agreement.

v. In or around December 2021, SCE shall true up the estimated total value of the local RA resources transferred to WCE under this Agreement using the CPUC's 2021 local RA market price benchmark, plus the 2021 system RA market price benchmark, as trued up by the CPUC in or about November 2021 and converted to a dollar per kilowatt-month price (the "2021 Local RA Price"), and the methodology described in Sections J.a.ii and J.a.iii above.

1. If the true up results in an additional payment owed to SCE, the additional WCE Payment shall be due and payable to SCE 30 calendar days from the date of SCE's invoice, which shall be issued in January 2022; provided, however, that should the CPUC elect to not true up the 2021 local RA market price benchmark or the 2021 system RA market price benchmark for any reason, or if the CPUC has not trued up the applicable 2021 local RA market price benchmark or the 2021 system RA market price benchmark by December 2021, SCE shall have the right to invoice WCE for payment in January 2022 based on the 2021 local RA market price benchmark and the 2021 system RA market price benchmark used to forecast SCE's 2021 PCIA rate, and to issue a true-up invoice if and when the CPUC trues up the applicable 2021 Local RA market price benchmark and 2020 system RA market price benchmark.

2. If the true up results in a refund due to WCE, SCE shall issue such refund to WCE in January 2022 provided it is based on the 2021 local RA market price benchmark and the 2021 system RA market price benchmark trued up by the CPUC in or around November 2021. Otherwise, SCE may wait to issue payment to WCE until the CPUC trues up the 2021 Local RA market price benchmark and the 2021 system RA market price benchmark, or elects to not true up the 2021 Local RA market price benchmark or the 2021 system RA market price benchmark, in which case SCE will issue any refund due to WCE, if any, in January 2022 based on the 2021 local RA market price benchmark and the 2021 system RA market price benchmark used to forecast SCE's 2021 PCIA rate.

3. If the CPUC adopts a local market price benchmark that is an independent value, and not an adder to the system RA market price benchmark, then the 2021 Local RA Price shall equal the 2021 local RA market price benchmark, only, as trued up by the CPUC in or about November 2021.

vi. In or around December 2022, SCE shall true up the estimated total value of the local RA resources transferred to WCE under this Agreement using the CPUC's

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim to Objection Claim to ClaimPage 47 Pag of 2110 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 15
of 58

2022 local RA market price benchmark, plus the 2022 system RA market price benchmark, as trued up by the CPUC in or about November 2022, and converted to a dollar per kilowatt-month price (the "2022 Local RA Price"), and the methodology described in Paragraphs J.a.ii and J.a.iii above.

1. If the true up results in an additional payment owed to SCE, the additional WCE Payment shall be due and payable to SCE 30 calendar days from the date of SCE's invoice, which shall be issued in January 2023; provided, however, that should the CPUC elect to not true up the 2022 local RA market price benchmark or the 2022 system RA market price benchmark for any reason, or if the CPUC has not trued up the applicable 2022 local RA market price benchmark or the 2022 system RA market price benchmark by December 2022, SCE shall have the right to invoice WCE for payment in January 2023 based on the 2022 local RA market price benchmark and the 2022 system RA market price benchmark used to forecast SCE's 2022 PCIA rate, and to issue a true-up invoice if and when the CPUC trues up the applicable 2022 local RA market price benchmark.

2. If the true up results in a refund due to WCE, SCE shall issue such refund to WCE in January 2023, provided it is based on the 2022 local RA market price benchmark and the 2022 system RA market price benchmark trued up by the CPUC in or around November 2022. Otherwise, SCE may wait to issue payment to WCE until the CPUC trues up the 2022 local RA market price benchmark and the 2022 system RA market price benchmark or elects to not true up the 2022 local RA market price benchmark and the 2022 system RA market price benchmark, in which case SCE will issue any refund due to WCE, if any, in January 2023 based on the 2022 local RA market price benchmark and the 2022 system RA market price benchmark used to forecast SCE's 2022 PCIA rate.

3. If the CPUC adopts a local market price benchmark that is an independent value, and not an adder to the system RA market price benchmark, then the 2022 Local RA Price shall equal the 2022 local RA market price benchmark, only, as trued up by the CPUC in or about November 2021.

c) SCE has the right to set off WCE's customer remittances against any payment due to SCE under this Agreement that remains unpaid sixty (60) calendar days from the date of SCE's invoice. SCE will provide WCE with 10 calendar days advance notice prior to any offset. SCE's right of offset shall survive any expiration or termination of this Agreement.

K. WCE may use the RA resources allocated by SCE under this Agreement solely for WCE's 2020 RA compliance. WCE shall not monetize the RA Obligation purchased under this Agreement or trade such allocation in the secondary market. This restriction does not apply to the 2021 and 2022 local RA resources transferred to WCE under this Agreement; provided, however, that WCE will promptly notify SCE of any sale or transfer by WCE of a local RA resource transferred to WCE under this Agreement and SCE will work with WCE on effectuating such transfer.

7

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cal-SCE Claim Objection Claim 48 Page 107 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 16
of 58

L.  WCE Payments will be recorded in SCE's PABA balancing account.

M.  Each Party agrees to manage its obligations under this Agreement in a commercially prudent manner, such that WCE is, and remains, in compliance with all applicable CPUC, CEC and CAISO rules, and to hold each other harmless regarding compliance with same.

N.  This Agreement is conditioned on approval of the CPUC, WCE commencing service in 2020, and full performance of each Party.

O.  The Parties will work together in good faith to manage operational and mechanical aspects of compliance and settlements of the terms of this Agreement.

P.  In accordance with Rule 9.2.3 of CPUC's General Order 96-B, SCE and WCE will submit a Tier 3 Advice Letter within 15 working days of execution of this Agreement by both Parties, which Advice Letter shall be effective pending final disposition by the CPUC.  The Parties agree to each use reasonable efforts to secure a favorable disposition of the Advice Letter, including working with CPUC and CEC staff prior to submission of the Advice Letter.

Q.  Should the CPUC not approve the Tier 3 Advice Letter, this Agreement will automatically terminate effective as of the issuance of the CPUC's final resolution declining such approval and SCE shall invoice WCE, and WCE shall pay SCE, for any and all RA resources allocated prior to the termination of this Agreement to satisfy the WCE RA Obligation, and for any and all RA resources transferred to WCE so that it may satisfy its RA obligations on its own behalf post 2020, and for any RA resources for which SCE continues to be obligated to show – and does show – on WCE's behalf after termination due to the fact that WCE's load will already be included in SCE's load for purposes of 2020 RA compliance, calculated pursuant to the terms of this Agreement.  This paragraph shall survive any expiration of termination of this Agreement.

R.  The target start date for WCE's implementation set forth in Paragraph A is subject to change to a later date if requested by WCE due to a change in its implementation plans, or if requested by SCE as a result of CSRP.  A Party requesting a change in the target start date set forth in Paragraph A must provide at least sixty (60) days advance written notice to the other Party, upon which the Parties agree to promptly meet to discuss the need for the change and work together to establish a new start date.  The Parties will continue to work together in good faith to address any operational or implementation needs associated with WCE Implementation, including, but not limited to, regular meetings with WCE's data management consultant.

S.  Each Party releases and holds harmless the other Party from losses, liabilities, damages and claims, and all related costs and expenses, including reasonable legal fees and costs, arising out of, or in connection with, the change in WCE's start date for automatic enrollment in 2020 pursuant to this Agreement, unless this Agreement is terminated in accordance with Paragraph Q.

T.  Should the Parties have a dispute under this Agreement, the following procedures will apply:

a)  The Party asserting the dispute must provide the other Party with advance written notice of the dispute, and allow 15 calendar days from the other Party's receipt of the notice to cure the alleged deficiency in a manner reasonably acceptable to both Parties.

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal. SCE Claim Objection to Claim Page 49 of 210 3 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 17
of 58

b) The Parties shall use good faith efforts to resolve any written dispute by scheduling a meeting with personnel who have authority to reach a resolution within 15 calendar days of one Party's written notification to the other.

U. This Agreement shall be subject to the jurisdiction of the CPUC.  The Parties retain all rights in law and equity.

V. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements or understandings (oral or written) between the Parties with respect to such subject matter.  SCE's tariffs and the CPUC's decisions governing CCA implementation and RA compliance continue to govern the Parties' rights and obligations unless and to the extent they are modified by this Agreement.

W. Unless previously terminated pursuant to the terms of this Agreement, the Agreement shall expire on March 1, 2023.  Despite the expiration or termination of the Agreement, or any portion of the Agreement, the Parties shall continue to be bound by those provisions of the Agreement which by their nature survive the expiration or termination, including but not limited to Paragraphs J, K, Q, S, and T.

AGREED AND ACCEPTED:

_____         8/15/2019
                                         _____

**Southern California Edison Company**      **Date**

Name:  Colin Cushnie

Title:    Vice President


_____         _____

**Western Community Energy**               **Date**

A Joint Powers Authority

Name:  Ben Benoit

Title:    Chair, Western Community Energy

9

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal SCE Claim Objection Claim Page 50 of 210 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 18 of 58

b) The Parties shall use good faith efforts to resolve any written dispute by scheduling a meeting with personnel who have authority to reach a resolution within 15 calendar days of one Party's written notification to the other.

U. This Agreement shall be subject to the jurisdiction of the CPUC. The Parties retain all rights in law and equity.

V. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements or understandings (oral or written) between the Parties with respect to such subject matter. SCE's tariffs and the CPUC's decisions governing CCA implementation and RA compliance continue to govern the Parties' rights and obligations unless and to the extent they are modified by this Agreement.

W. Unless previously terminated pursuant to the terms of this Agreement, the Agreement shall expire on March 1, 2023. Despite the expiration or termination of the Agreement, or any portion of the Agreement, the Parties shall continue to be bound by those provisions of the Agreement which by their nature survive the expiration or termination, including but not limited to Paragraphs J, K, Q, S, and T.

**AGREED AND ACCEPTED:**

_____          _____

**Southern California Edison Company**          **Date**

Name:  Colin Cushnie

Title:    Vice President

_____          _8/15/19_

**Western Community Energy**          **Date**

A Joint Powers Authority

Name:  Ben Benoit

Title:    Chair, Western Community Energy

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 51 Page 20 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 19
of 58

## APPENDIX A - OPERATIONAL MECHANICS

CEC staff, Energy Division staff, and SCE agree that the following is a general outline of steps in the 2020 load forecasting and RA compliance process that would apply to SCE, pending approval by the California Public Utilities Commission (CPUC) of relevant agreements between SCE and CCAs. SCE has indicated that it will submit all such agreements to the CPUC via a Tier 3 advice letter process, and the CPUC encourages SCE to also specify its data needs in these Tier 3 advice letters.

1. **SCE Aggregated Bundled Service Customer Load**

   For the August 2019 forecast update, the CCA 2020 load will be included in SCE's bundled service customer load, similar to the West Lake Village April 2019 load forecast filing. SCE will send the Aggregated* noncoincident load forecast to CEC and CPUC in August 2019 (including separately identified noncoincident forecasts for all individual CCAs included in the Aggregated forecast).

2. **CEC to Update SCE Aggregated Bundled Service Customer Load 2020 RA Requirements**

   CEC to review and revise SCE Aggregated bundled service customer load for 2020 System, Flex and Local RA in September 2019, in accordance with the typical Load Forecast Adjustment Process.

3. **CPUC to Separately Identify CCA 2020 RA Requirements**

   Following adjustment of noncoincident forecasts, CPUC will provide SCE with individual RA requirements for SCE bundled load and for each CCA included in the Aggregated forecast – including any relevant allocations and credits – so that SCE can identify both separate and aggregated RA requirements for planning purposes. As in the past, the CPUC will provide requirements in Excel format.

4. **SCE to Meet RA Requirements for Aggregated Bundled Service Customer Load 2020 Year-Ahead RA Requirements**

   SCE to meet Aggregated bundled service customers' RA requirements in October 2019 for 2020 Year-Ahead compliance for Local, Flex and System RA requirements.

5. **SCE to Update Month - Ahead Aggregated Bundled Service Customer Load**

   SCE to update CEC and CPUC of changes in load migration each month in 2020, with input from CCA, for the purpose of updating SCE's Aggregated bundled service customer load for its Month-Ahead System requirements for 2020 and for the annual true-up of Local and Flex requirements.

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 52 Page 21 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 20 of 58

6. **SCE to Meet RA Requirements for Aggregated Bundled Service Customer Load for 2020 Month-Ahead RA Requirements in Each Month of 2020**

   SCE to meet Aggregated bundled service customers' RA requirements for 2020 Month-Ahead compliance for Flex, System, and Local RA requirements.

7. **CIRA and CPUC Templates**

   No change is anticipated for the CIRA tool. CPUC will hold a workshop for RA stakeholders outlining changes to 2020 RA compliance filing templates on July 26, 2019.

\*Aggregated Bundled Customer RA requirement = RA requirement of (CCA plus SCE bundled service customer)

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
ExhibitExhibit Cal SCE Claim Objection SCE Claim Page 53 Page 21 22 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 21
of 58

## APPENDIX B – INSTRUCTIONS – Letter of Credit

A Letter of Credit ("LOC"), subject to the criteria listed below, is an acceptable form of Financial Security ("Security") for meeting the Financial Security Requirement of SCE's Rule 23. SCE's standard form of the LOC, which has been provided to WCE, will be used. All fields shown in <u>yellow</u> highlighting must be completed.

SCE's criteria for accepting an LOC includes the following:

(a) The issuing bank must have a credit rating of A or better by Standard and Poor's, and, A2 or better by Moody's if rated by both agencies; or, A or better by Standard and Poor's, or, A2 or better by Moody's if rated by only one of the rating agencies,

(b) The issuing bank must be a United States bank or a United States branch of a foreign bank with assets of at least one billion US Dollars ($1,000,000,000).

SCE's standard practice is to review all Security to ensure acceptability, which will include the issuer's acceptability, as discussed above, as well as the acceptability of the Security's terms and conditions. Using SCE's standard forms, without modification, will ensure that the terms and conditions of the Security are acceptable to SCE. If the issuer seeks modification to any of the conditions, SCE recommends that prior to submission, a draft of the Security should be sent to your SCE Project Manager and to the following email address: sce.credit.risk@sce.com. Please allow at least two (2) Business Days for SCE's review of the draft Security.

Questions about posting the Security should be directed to your SCE Project Manager.

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
ExhibitExhibitGabcSDFcClaimonObjectconClaiPage 54Pageof21of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 22
of 58

**EXHIBIT 2**

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C abc SCE Claim Objection Claim Page 55 Page 22 of 124 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 23
of 58

<u>AMENDMENT NO. 1 TO AGREEMENT BETWEEN SOUTHERN CALIFORNIA EDISON COMPANY AND
WESTERN COMMUNITY ENERGY REGARDING WCE IMPLEMENTATION AND RESOURCE ADEQUACY
COMPLIANCE FOR 2020, 2021 and 2022</u>

This Amendment No. 1 ("Amendment") amends the Agreement ("Agreement") dated August 15, 2019
by and between Western Community Energy ("WCE"), a California Community Choice Aggregator and
joint powers authority, and Southern California Edison Company ("SCE"), a California corporation,
regarding WCE's program implementation and Resource Adequacy compliance for its 2020 load.  WCE
and SCE may be referred to herein individually as "a Party" and collectively as "the Parties."

RECITALS:

1. On August 22, 2019, the Parties filed Advice Letter (AL) 4058-E seeking approval of the
   Agreement from the California Public Utility Commission ("CPUC").  Pursuant to Rule 9.2.3 of
   General Order 96-B, the Agreement is effective upon the filing of AL 4058-E, pending the CPUC's
   final disposition.

2. The Parties wish to amend the Agreement to incorporate additional terms and conditions
   related to the transfer of Local Resource Adequacy resources by SCE to WCE on or about
   October 2020, pursuant to and in accordance with Paragraph I.b.ii of the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Parties agree to amend the Agreement as follows.

1. Paragraph A is deleted in its entirety and replaced with the following:

   a. "WCE agrees to postpone WCE Implementation from its planned date in April 2020, and
      the Parties agree that WCE Implementation will occur beginning April 2020 for the Cities
      of Norco, Perris and Wildomar and May 2020 for the Cities of Eastvale, Hemet and
      Jurupa Valley, with the ability to phase in certain load classes in early 2021 consistent
      with applicable SCE tariffs, subject to Paragraph R."

2. The terms and conditions in Appendix C, attached hereto, are hereby added to the Agreement in
   their entirety as "APPENDIX C."

3. The terms and conditions in APPENDIX C shall only apply to the transfer of local RA resources
   contemplated in Paragraph I.b of the Agreement.

4. All other provisions of the Agreement remain unmodified and in full force and effect.

5. The signatories hereto represent that they have been duly authorized to enter into this
   Amendment on behalf of the Party for whom they sign.

6. This Amendment may be signed in counterparts, each of which shall be deemed an original, and
   facsimile signatures shall be considered to be original signatures.

7. IN WITNESS WHEREOF, the undersigned have executed this Amendment to be effective as of its
   signing by both Parties.

1

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal SCE Claim Objection Claim    Page 56 of 210 25 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 24
of 58

AGREED AND ACCEPTED:

_____          _12/3/2019_____

Southern California Edison Company          Date

Name:  Colin Cushnie

Title:    Vice President



_____          _____

Western Community Energy          Date

A California Joint Powers Authority

Name:  Barbara Spoonhour

Title:    Deputy Executive Director, Western Community Energy

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab - SCE Claim Objection Claim Page 57 Page 126 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 25
of 58

AGREED AND ACCEPTED:

_____          _____

Southern California Edison Company          Date

Name:  Colin Cushnie

Title:     Vice President

_____          _11/27/19_____

Western Community Energy          Date

A California Joint Powers Authority

Name:  Barbara Spoonhour

Title:     Deputy Executive Director, Western Community Energy

2

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal-SDG&C Claim Objection Claim Page 59 of 210 128 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 27
of 58

APPENDIX C – ADDITIONAL TERMS AND CONDITIONS OF THE TRANSFER OF
RESOURCE ADEQUACY RESOURCES

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C to SCE Claim Objection Claim   Page 60 of 210   of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 28
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Capitalized terms used but not otherwise defined in this Appendix C shall have the meanings ascribed to them in the CAISO Tariff (defined herein below).

Article 1.              TRANSFER TERMS

**1.1**    *Product; Elections*

*Transferee: WCE*

*Transferor: SCE*

Flexible Capacity is Not Applicable.

*Product:*        *The product, including the Capacity Attributes of the Unit(s), as defined in Attachment B, or Alternate Unit(s) provided in accordance with Section 2.3.*

**1.2**    *Delivery of Product*

Transferor shall transfer to Transferee, and Transferee shall receive and purchase from Transferor the Product in the amount of the applicable Contract Quantity for each day of each month of the Delivery Period, except as may be excused due to force majeure.

**1.3**    *Delivery Period*

(a)    <u>Delivery Period</u>. The Delivery Period is as specified in Paragraph I.b. of the Agreement: January 1, 2021 through December 31, 2022, inclusive, unless terminated earlier in accordance with the terms of this Agreement.

**1.4**    *Contract Quantity*

The Contract Quantity for each day of each applicable Showing Month is as follows:

4

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab oSCE Claim Objection Claim Page 61 Page 210 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 29
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Contract Quantity (MWs for each day of such Showing Month)

| LA Basin | | |
|---|---|---|
| Showing Month | 2021 | 2022 |
| January | 34.30 | - |
| February | 33.11 | - |
| March | 42.78 | - |
| April | 40.96 | - |
| May | 40.98 | - |
| June | 45.94 | - |
| July | 40.20 | - |
| August | 38.82 | - |
| September | 35.07 | - |
| October | 30.74 | - |
| November | 33.10 | - |
| December | 33.64 | - |

| Big Creek-Ventura | | |
|---|---|---|
| Showing Month | 2021 | 2022 |
| January | 33.16 | 6.32 |
| February | 32.76 | 5.92 |
| March | 38.76 | 11.92 |
| April | 37.56 | 10.72 |
| May | 37.96 | 11.12 |
| June | 43.96 | 17.12 |
| July | 47.16 | 20.32 |
| August | 42.36 | 15.52 |
| September | 37.16 | 10.32 |
| October | 32.36 | 5.52 |
| November | 32.36 | 5.52 |
| December | 31.56 | 4.72 |

**1.5** *Flexible Capacity is Not Applicable.*

**1.6** *Contract Price*

See Paragraph J.b of the Agreement.

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cabo SCE Claim Objection Claim Page 62 Page 31 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 30 of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ARTICLE 2.          Delivery Obligations

2.1    *Delivery of Product*

Transferor shall provide Transferee with the Expected Contract Quantity of Product for each day of each Showing Month consistent with the following:

(a)    Transferor shall, on a timely basis, submit, or cause the Unit's SC to submit, (i) Monthly Supply Plans and (ii) Annual Supply Plans if the Agreement Effective Date is prior to the year-ahead Compliance Showing deadline applicable for the Showing Months as specified in Sections 1.4 and 1.5 herein, in accordance with the CAISO Tariff to identify and confirm the Expected Contract Quantity provided to Transferee for each day of each Showing Month so that the total amount of Expected Contract Quantity identified and confirmed for each day of such Showing Month equals the Expected Contract Quantity for such day of such Showing Month.

(b)    Transferor shall or shall cause the Unit's SC to submit written notification to Transferee, no later than fifteen (15) Business Days before the initial Compliance Showing deadline for each Showing Month, confirming that Transferee will be specified as the recipient of the Expected Contract Quantity for each day of such Showing Month in the Unit's SC Supply Plan. For illustrative purposes only, as of the Agreement Effective Date, the applicable Compliance Showing deadlines are as follows: (A) forty-five (45) days prior to the Showing Month covered by the Supply Plan for the Monthly Supply Plan; and (B) the last Business Day of October that is prior to commencement of the year for the Annual Supply Plan. The Parties acknowledge and agree that such dates may be modified by the CAISO from time to time throughout the Delivery Period.

(c)    If Transferor is delivering Product to Transferee from more than one Unit, Transferor shall deliver such Product to Transferee from each Unit in accordance with the Contract Quantity Unit Allocation, as set forth in Attachment E; provided, Transferor may modify the Contract Quantity Unit Allocation from time to time by providing email notice to Transferee's Supply Plan contact, as set forth in Attachment F, no later than the initial Compliance Showing deadline for each Showing Month.

2.2    *Adjustments to Contract Quantity*

Transferor shall deliver to Transferee the Contract Quantity of Product for each day of each Showing Month consistent with the following:

6

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C abc SCE Claim Objection Claim    Page 63 Page 210 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 31
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(a)  Underline{Planned Outages:} Transferor's obligation to deliver the Contract Quantity for each day of each Showing Month may be reduced at Transferor's option by the amount of any Planned Outages which exist with respect to any portion of the Unit during the applicable Showing Month for the applicable days of such Planned Outages; provided, (i) Transferor notifies Transferee, no later than fifteen (15) Business Days before the initial deadline for the Compliance Showing applicable to that Showing Month, of the amount of Product from the Unit Transferee is permitted to include in Transferee's Compliance Showings applicable to that month as a result of such Planned Outage, and (ii) such reduction is able to be reflected on the Supply Plans in accordance with the CAISO Tariff.

(b)  Underline{Reductions in Unit NQC and Unit EFC:} Transferor's obligation to deliver the applicable Contract Quantity for each Showing Month may also be reduced in the event the Unit experiences a reduction in Unit NQC or Unit EFC after the Agreement Effective Date as determined by the CAISO. In the event the Unit experiences such a reduction in Unit NQC or Unit EFC, Transferor has the option, but not the obligation, to provide the applicable Contract Quantity for such Showing Month from (i) the same Unit, provided the Unit has sufficient remaining and available Product or (ii) from Alternate Units, provided, that in each case Transferor provides and identifies such Alternate Units in accordance with Section 2.3.

2.3  *Transferor's Option To Provide Alternate Capacity*

If Transferor is unable to provide the full Contract Quantity in accordance with Section 2.2 for any Showing Month for any reason, or Transferor desires to provide the Contract Quantity for any Showing Month from a different generating unit other than the Unit, then Transferor may, at no cost to Transferee, provide Transferee with Product from one or more Alternate Units in an amount such that the total amount of Product provided to Transferee from the Unit and Alternate Units for each day of the Showing Month is not more than the Contract Quantity in accordance with Section 2.2 for the applicable Showing Month, provided that in each case:

(a)  Transferor shall notify Transferee of its intent to provide Product from and identify alternate units that (i) have the same Capacity Attributes of the Unit originally identified in Appendix B, (ii) are accepted by the CAISO, and (iii) otherwise that satisfy the requirements of this Agreement ("Alternate Units"), meeting the above Contract Quantity requirements no later than fifteen (15) Business Days before the initial deadline for Transferee Compliance Showing related to such Showing Month;

(b)  Transferor shall, or shall cause the Unit's SC to submit a Monthly Supply Plan and an Annual Supply Plan, as applicable, that includes the Alternate Units, in accordance with the CAISO Tariff, no later than fifteen (15) Business Days before the initial Compliance Showing deadline for the applicable Showing Month;

7

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab-S Dec Claim Objection Claim Page 64 of 213 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 32
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(c)     if Transferor does not comply with the requirements of Sections 2.3(a) and (b) for the applicable Showing Month, then any such Alternate Units shall not be deemed a Unit for purposes of this Agreement for that Showing Month and Transferor shall not receive payment for such Product.

Subject to the satisfaction of the conditions contained in subsections (a) – (c) of this Section 2.3, once Transferor has identified in writing any Alternate Units that meet the requirements of this Section 2.3, then any such Alternate Units shall be automatically deemed a Unit for purposes of this Agreement for that Showing Month.

2.4     *Damages for Failure to Provide Capacity*

If Transferor fails to provide Transferee with the Expected Contract Quantity of Product for any day of any Showing Month, in accordance with Section 2.1 (the "Replacement Obligation"), in each case as applicable, then the following shall apply:

(a)     Transferee may, but shall not be required to, replace all or any portion of the Replacement Obligation for the applicable Showing Month with capacity having equivalent Capacity Attributes as the Expected Contract Quantity; provided, if, using commercially reasonable efforts, Transferee is unable to acquire capacity having equivalent Capacity Attributes for any portion of any Showing Month, Transferee may replace such portion of the Replacement Obligation with capacity having Capacity Attributes in excess of the Contract Quantity (the "Replacement Capacity"). Transferee may enter into purchase transactions with one or more parties to purchase Replacement Capacity. Additionally, Transferee may enter into one or more arrangements to repurchase its obligation to sell and deliver capacity to another party, and such arrangements shall be considered the procurement of Replacement Capacity. Transferee shall act in a commercially reasonable manner to minimize damages in procuring any Replacement Capacity.

(b)     Transferor shall pay to Transferee the following damages: an amount equal to the positive difference, if any, between (i) the sum of (A) the actual cost paid by Transferee for any Replacement Capacity, including any transaction costs and expenses incurred in connection with such procurement, plus (B) each applicable Replacement Capacity Price multiplied by the aggregate amount of Replacement Obligation neither provided by Transferor as Alternate Capacity nor purchased by Transferee as Replacement Capacity, for all applicable portions of the applicable Showing Month pursuant to Section 2.4(a), and (ii) the Replacement Obligation minus the Alternate Capacity, not provided for all applicable portions of the applicable Showing Month times the Contract Price for that month. Transferee's invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount and shall include supporting documentation.

8

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal. SCE Claim to Objection Claim Page 65 of 210 4 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 33
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

2.5    *Indemnities for Failure to Deliver Expected Contract Quantity*

Transferor agrees to indemnify, defend and hold harmless Transferee from any
penalties, fines or costs assessed against Transferee by the CPUC or the CAISO,
resulting from any of the following:

(a)    Transferor's failure to provide any portion of the Expected Contract
Quantity for any portion of the Delivery Period;

(b)    Transferor's failure to provide notice of the non-availability of any
portion of the Expected Contract Quantity for any portion of the
Delivery Period as required under Section 2.2;

(c)    Transferor's or the Unit's SC's failure to timely submit Supply Plans
that identify Transferee's right to the Expected Contract Quantity for
each Unit purchased hereunder for each day of the Delivery Period; or

(d)    Transferor's or the Unit's SC's failure to submit accurate Supply Plans
that identify Transferee's right to the Expected Contract Quantity for
each Unit purchased hereunder for each day of the Delivery Period; or

(e)    Any other failure by Transferor to perform its obligations under this
Agreement.

With respect to the foregoing, the Parties shall use commercially reasonable
efforts to minimize such penalties, fines and costs; provided, that in no event
shall Transferee be required to use or change its utilization of its owned or
controlled assets or market positions to minimize these penalties and fines.

2.6    *Transferee's Re-Sale of Product*

Transferee may re-sell all or a portion of the Product and any associated rights, in
each case, acquired under this Agreement, in accordance with Applicable Laws
and CPUC Decisions ("Resold Product"); provided, with respect to Resold
Product that includes the sale of Capacity Attributes that impact Transferor's
obligations under this Agreement, Transferee agrees to: (a) notify Transferor that
such a sale has occurred; (b) provide Transferor with the information described in
Attachment D; (c) notify Transferor of any subsequent changes to the information
in Attachment D with respect to any particular sale; in each case promptly
following such sale and in no event later than the initial Compliance Showing
deadline for each Showing Month. Subject to Article 6 below, Transferor agrees,
and agrees to cause the Unit's SC, to: (i) follow Transferee's instructions with
respect to providing such Resold Product to subsequent purchasers of such Resold
Product; and (ii) take all commercially reasonable actions and execute any and all
documents or instruments reasonably necessary to allow such subsequent
purchasers to use such Resold Product.

Transferor acknowledges and agrees that with respect to any Resold Product, if

9

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 66 Page 215 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 34
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Transferee incurs any liability to any purchaser of such Resold Product due to the failure of Transferor or the Unit's SC to comply with the terms of this Agreement, and Transferor would have had liability to Transferee under this Agreement for such failure had Transferee not sold the Resold Product to a subsequent purchaser, then Transferor shall be liable to Transferee under this Agreement, including without limitation, pursuant to Sections 2.4 and 2.5, for the amounts it would have been liable to Transferee for had such Resold Product not been sold to a subsequent purchaser. Transferee acknowledges and agrees that with respect to any Resold Product, if Transferor incurs any liability to any purchaser of such Resold Product due to the failure of Transferee to comply with the terms of this Agreement, and Transferee would have had liability to Transferor under this Agreement for such failure had Transferee not sold the Resold Product to a subsequent purchaser, then Transferee shall be liable to Transferor under this Agreement for the amounts it would have been liable to Transferor for had such Resold Product not been sold to a subsequent purchaser.

2.7    *CAISO Offer Requirements*

Transferor shall, or cause each Unit's SC to, schedule with, or make available to, the CAISO the Expected Contract Quantity for each Unit in compliance with the CAISO Tariff, and shall, or shall cause each Unit's SC, owner, or operator, as applicable, to perform all obligations under the CAISO Tariff that are associated with the sale and delivery of Product hereunder. Transferee shall have no liability for the failure of Transferor or the failure of any Unit's SC, owner, or operator to comply with such CAISO Tariff provisions, including any penalties, charges or fines imposed on Transferor or such Unit's SC, owner, or operator for such noncompliance.

2.8    *Unit SC's Substitution Obligation*

After the obligation to replace all or any portion of the Expected Contract Quantity transfers from the load serving entity to the Unit's SC for a Showing Month in accordance with the CAISO Tariff, and if the CAISO determines that any portion of the Expected Contract Quantity for any portion of a Showing Month that was shown by Transferee in its Compliance Showings requires outage substitution in accordance with Section 40.9.3.6 of the CAISO Tariff because the Unit, or Alternate Unit, as applicable, is scheduled to take an outage (planned or otherwise) (such amount requiring outage substitution, the "SC Substitute Capacity"), then: (a) Transferor shall have no liability under Sections 2.4 or 2.5 with respect to such SC Substitute Capacity; and (b) Transferor shall have no liability to Transferee for any costs that are allocated to Transferee by the CAISO for any CPM Capacity procured by the CAISO pursuant to the Capacity Procurement Mechanism and that are related to such SC Substitute Capacity.

Article 3.    BILLING & PAYMENT

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal SCE Claim Objection Claim Page 67 of 210 36 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 35
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

### 3.1    Billing & Payment

See Paragraph J.b of the Agreement.

### 3.2    Allocation of Other Payments and Costs

(a)    Transferor shall retain any revenues it may receive from and pay all costs charged by the CAISO or any other third party with respect to the Unit for (i) start-up, shutdown, and minimum load costs, (ii) energy sales, and (iii) any revenues for black start or reactive power services.

(b)    Transferee shall be entitled to receive and retain all revenues associated with the Aggregate Contract Quantity (including any capacity revenues from RMR Contracts for the Unit, Capacity Procurement Mechanism or its successor, RUC Availability Payments, or its successor, but excluding payments described in Section 3.2(a)(i)-(iii)). To the extent permitted by the CAISO Tariff, Transferor shall, or shall cause each Unit's SC to, submit RUC Availability Bids for the Expected Contract Quantity for each Unit for each hour of the Delivery Period at a bid price of Zero Dollars ($0) per MW per hour, regardless of whether each Unit is shown on a Supply Plan for the applicable Showing Month.

(c)    In accordance with Section 3.1 of this Agreement,

(i)    all such Transferee revenues described in this Section 3.2, but received by Transferor, or a Unit's SC, owner, or operator shall be remitted to Transferee, and Transferor shall pay such revenues to Transferee if the Unit's SC, owner, or operator fails to remit those revenues to Transferee, including against customer remittances as provided for in Paragraph J.c of the Agreement, or Transferor may recover such amounts from Transferee's Letter of Credit. If Transferor fails to pay such revenues to Transferee, Transferee may offset any amounts owing to it for such revenues against any future amounts Transferee may owe to Transferor. In order to verify the accuracy of such revenues, Transferee shall have the right, at its sole expense and during normal working hours after reasonable prior notice, to hire an independent third party reasonably acceptable to Transferor to audit any documents, records or data of Transferor associated with the Contract Quantity; and

11

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cal-SCE Claim Objection Claim Page 68 Page 210 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 36
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(ii) all such Transferor, or a Unit's SC, owner, or operator revenues described in this Section 3.2, but received by Transferee shall be remitted to Transferor. If Transferee fails to pay such revenues to Transferor, Transferor may offset any amounts owing to it for such against any future amounts it may owe to Transferee.

(d) If a centralized capacity market develops within the CAISO region, Transferee will have exclusive rights to offer, bid, or otherwise submit the applicable Contract Quantity of Product for each day of each Showing Month provided to Transferee pursuant to this Agreement for re-sale in such market, and retain and receive any and all related revenues.

(e) Transferor agrees that the Unit is subject to the terms of the Availability Standards, Non-Availability Charges, and Availability Incentive Payments as contemplated under Section 40.9 of the CAISO Tariff. Furthermore, the Parties agree that any Availability Incentive Payments are for the benefit of the Transferor and for Transferor's account and that any Non-Availability Charges are the responsibility of the Transferor and for Transferor's account.

3.3 *Offset Rights*

See Paragraph J.c of the Agreement.

ARTICLE 4.   Other Transferee and Transferor Covenants

4.1 *Transferor's and Transferee's Duty to Take Action to Allow the Utilization of the Product*

Transferee and Transferor shall, throughout the Delivery Period: (a) cause the required showing information listed in Attachment C to be included in all applicable Supply Plans; (b) execute any and all documents or instruments reasonably necessary to ensure Transferee's right to the use of the Aggregate Contract Quantity for the sole benefit of Transferee or any subsequent purchaser under Section 2.6; and (c) cause all Supply Plans to be filed in conformance with the requirements of the CPUC Filing Guide and the CAISO Tariff. If during the Delivery Period, there are changes to the information included in Attachment C, the Parties agree to communicate such changes to each other promptly. The Parties further agree to negotiate in good faith to make necessary amendments, if any, to this Agreement to conform this Transfer to subsequent clarifications, revisions, or decisions rendered by the CPUC, FERC, CAISO or other Governmental Authority having jurisdiction to administer Compliance Obligations, so as to maintain the benefits of the bargain struck by the Parties on the Agreement Effective Date.

4.2 *Transferor's Representations, Warranties and Covenants*

12

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab-SCE Claim Objection Claim Page 69 of 210 38 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 37 of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(a)    Transferor represents, warrants and covenants to Transferee that, throughout the Delivery Period:

    (i)    Transferor owns or has the exclusive right to the Product sold under this Agreement from the Unit, and shall furnish Transferee, CAISO, CPUC or other Governmental Authority with such evidence as may reasonably be requested to demonstrate such ownership or exclusive right;

    (ii)    No portion of the Aggregate Contract Quantity has been committed by Transferor to any third party in order to satisfy Compliance Obligations or analogous obligations in any CAISO or non-CAISO markets, other than pursuant to an RMR Contract between the CAISO and either Transferor or the Unit's owner or operator;

    (iii)    Transferor shall comply with Applicable Laws relating to the Product;

    (iv)    Transferor shall, and shall cause the Unit's SC to promptly (and in any event within one (1) Business Day of the time Transferor receives notification from the CAISO) notify Transferee in the event the CAISO designates any portion of the Aggregate Contract Quantity as CPM Capacity and (B) in the event the CAISO makes such a designation Transferor shall, and shall cause the Unit's SC to not accept any such designation by the CAISO unless and until Transferee has agreed to accept such designation;

    (v)    Transferee shall have the exclusive right to offer the Aggregate Contract Quantity, or any portion thereof, to the CAISO as CPM Capacity and Transferor shall not, and shall cause the Unit's SC not to, offer any portion of the Aggregate Contract Quantity to the CAISO as CPM Capacity or accept any designation of any portion thereof as CPM Capacity;

    (vi)    The Unit is connected to the CAISO Controlled Grid, is within the CAISO Control Area, and is under the control of CAISO;

    (vii)    Transferor shall cause the Unit's SC, owner and operator to comply with Applicable Laws relating to the Product;

    (viii)    Transferee shall have no liability for the failure of Transferor or the failure of the Unit's SC, owner, or operator to comply with such CAISO Tariff provisions, including any penalties, charges or fines imposed on Transferor or the Unit's SC, owner, or operator for such noncompliance.

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 70 Page 39 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 38
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(ix)   If Transferor is the owner of the Unit, the aggregation of all amounts of Capacity Attributes that Transferor has sold, assigned or transferred for the Unit does not exceed the Unit NQC or Unit EFC for that Unit;

(x)   Transferor has notified the SC of the Unit that Transferor has transferred the Contract Quantity, including the amount of Flexible Capacity and Inflexible Capacity, to the extent applicable, with respect to each day of each Showing Month to Transferee, and the SC is obligated to deliver the Supply Plans in accordance with the CAISO Tariff and this Agreement;

(xi)   Transferor has notified the SC of the Unit that Transferor is obligated to cause the Unit's SC to provide to the Transferee, at least fifteen (15) Business Days before the initial deadline for each Compliance Showing, the applicable Expected Contract Quantity of the Unit for each day of such Showing Month, including the amount of Flexible Capacity and Inflexible Capacity, to the extent applicable, that is to be submitted in the Supply Plan associated with this Agreement for the applicable period; and

(xii)   Transferor has notified the Unit's SC that Transferee is entitled to the revenues set forth in Section 3.2, and such SC is obligated to promptly deliver those revenues to Transferee, along with appropriate documentation supporting the amount of those revenues.

## ARTICLE 5.  CONFIDENTIALITY

The Parties agree that: (i) Transferee may disclose the Aggregate Contract Quantity or any applicable portion of the Aggregate Contract Quantity, including any amounts of Flexible Capacity and Inflexible Capacity, to the extent applicable, under this Transfer to any Governmental Authority, the CPUC, the CAISO in order to support its Compliance Showings, if applicable; (ii) Transferor may disclose the transfer of the Aggregate Contract Quantity and the applicable Contract Quantity and Expected Contract Quantity (as well as any amounts of Flexible Capacity and Inflexible Capacity, to the extent applicable) for each day of each Showing Month under this Transfer to the SC of the Unit in order for such SC to timely submit accurate Supply Plans; (iii) both Parties may disclose the terms and conditions of the Agreement and any and all written or recorded or oral information, data, analyses, documents, and materials furnished or made available by a Party to the other Party in connection with this Agreement to the Independent Evaluator; and (iv) Transferee and the Independent Evaluator may disclose the terms and conditions of the Agreement and any and all written or recorded or oral information, data, analyses, documents, and materials furnished or made available by a Party to the other Party in connection with this Agreement to the CAISO, the CPUC, and all divisions thereof, the California Energy Commission, and participants of the Procurement Review Group established pursuant to D.02-08-071 and D.03-06-071; provided, that each

14

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab-SCE Claim Objection Claim Page 71 Pag 2140 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 39
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

disclosing Party shall use reasonable efforts to limit, to the extent possible, the ability of any such applicable Governmental Authority, CAISO, or SC to further disclose such information. In addition, in the event Transferee resells all or any portion of the Aggregate Contract Quantity to another party, Transferee shall be permitted to disclose to the other party to such resale transaction all such information necessary to effect such resale transaction. This Agreement is subject to the California Public Records Act (Government Code Section 6250 et seq.). Transferee agrees that to the extent that it receives a request for disclosures of information in this Agreement under the California Public Records Act, Transferee shall provide prompt notice to Transferor of any such request and Transferee shall use commercially reasonable efforts to redact all confidential information contained within any disclosed documents prior to any such disclosure; provided that, if Transferee and Transferor, acting reasonably, are unable to agree on whether or not specific information is confidential, then Transferee shall use commercially reasonable efforts to redact all agreed confidential information, and Transferor shall be responsible for taking all legal steps necessary to protect any information designated by Transferor as confidential and by Transferee as non-confidential.

ARTICLE 6.  HOLDBACK

No later than five (5) Business Days before the deadline for the initial Compliance Showing deadline with respect to a particular Showing Month, Transferee may request that Transferor not list, or cause the Unit's SC not to list, a portion or all of a Unit's applicable Expected Contract Quantity for any portion(s) of such Showing Month on the Supply Plan. The amount of Expected Contract Quantity that is the subject of such a request shall be deemed Expected Contract Quantity provided consistent with Section 2.1 for purposes of calculating a Monthly Payment pursuant to Section 3.1 and calculating any amounts due pursuant to Section 2.4 or 2.5. Transferor shall, or shall cause the Unit's SC to, comply with Transferee's request under this Article 6.

ARTICLE 7.  MARKET BASED RATE AUTHORITY

Transferor agrees, in accordance with FERC Order No. 697, to, upon request of Transferee, submit a letter of concurrence in support of any affirmative statement by Transferee that this contractual arrangement does not transfer "ownership or control of generation capacity" from Transferor to Transferee as the term "ownership or control of generation capacity" is used in 18 CFR § 35.42. Transferor also agrees that it will not, in any filings, if any, made subject to FERC Order Nos. 652 and 697, claim that this contractual arrangement conveys ownership or control of generation capacity from Transferor to Transferee.

ARTICLE 8.  COLLATERAL REQUIREMENTS

See Paragraph J.b of the Agreement.

15

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C - SCE Claim Objection Claim Page 72 Page 41 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 40
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ARTICLE 9.   OTHER

9.1 Billing.  See Paragraph J.b of the Agreement.

9.2 Limitation of Remedies, Liability and Damages.  THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED.  THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF.  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. NOTHWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION SET FORTH IN THIS AGREEMENT OR OTHERWISE, PROVIDED, HOWEVER, NOTHING IN THIS SECTION SHALL AFFECT THE ENFORCEABLILITY OF THE PROVISIONS OF THIS AGREEMENT EXPRESSLY ALLOWING FOR DAMAGES, INCLUDING BUT NOT LIMITED TO, REMEDIES FOR DELIVERY OBLIGATIONS IN SECTION 2.4.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.  TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS AND ARE NOT PENALTIES.

16

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 73 Page 142 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 41
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

9.3 Assignment.  Neither Party shall assign this Agreement or its rights hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, Transferor may, without the consent of the Transferee (and without relieving itself from liability hereunder), (i) transfer, sell, pledge, encumber or assign this Agreement or the accounts, revenues or proceeds hereof in connection with any financing or other financial arrangements, (ii) transfer or assign this Agreement to an affiliate of such Party which affiliate's creditworthiness is equal to or higher than that of such Party, or (iii) transfer or assign this Agreement to any person or entity succeeding to all or substantially all of the assets whose creditworthiness is equal to or higher than that of such Party; provided, however, that in each such case, any such assignee shall agree in writing to be bound by the terms and conditions hereof and so long as the transferring Party delivers such tax and enforceability assurance as the non-transferring Party may reasonably request

9.4 Each Party represents and warrants to the other Party that as of the date hereof, it is an "eligible commercial entity" within the meaning of the Commodity Exchange Act, as otherwise amended, updated or modified from time to time; and it is an "eligible contract participant" within the meaning of the Commodity Exchange Act, as otherwise amended, updated or modified from time to time.

*[Remainder of Page Intentionally Left Blank]*

17

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C abc SCE Claim ObjectionClaim Page 74 Page 143 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 42
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT A
DEFINED TERMS

"Aggregate Contract Quantity" means the aggregate amount of Product associated with the MWs set forth in the table in Section 1.4 which Transferor has agreed to provide to Transferee from the Unit throughout the entire term of the Delivery Period.

"Agreement" has the meaning specified in the introductory paragraph of this Agreement.

"Agreement Effective Date" is August 22, 2019.

"Alternate Capacity" means Product which Transferor has elected to provide to Transferee in accordance with the terms of Section 2.3.

"Alternate Unit" means a generating unit meeting the requirements specified in Section 2.3.

"Annual Supply Plan" has the meaning set forth in the CAISO Tariff.

"Applicable Laws" means the CAISO Tariff and all constitutions, treaties, laws, ordinances, rules, regulations, interpretations, permits, judgments, decrees, injunctions, writs and orders of any Governmental Authority that apply to either or both of the Parties, the Project, the Unit or the terms of this Agreement.

"Availability Incentive Payments" has the meaning set forth in the CAISO Tariff.

"Availability Standards" has the meaning set forth in the CAISO Tariff.

"CAISO" means the California Independent System Operator Corporation, or any successor entity performing the same functions.

"CAISO Control Area" has the meaning set forth in the CAISO Tariff.

"CAISO Controlled Grid" has the meaning as set forth in the CAISO Tariff.

"CAISO Tariff" means the California Independent System Operator Corporation Tariff, Business Practice Manuals (BPMs), Operating Agreements, and Operating Procedures, including the rules, protocols, procedures and standards attached thereto, as the same may be amended or modified from time to time and approved by FERC, if applicable.

"Capacity Attributes" means, with respect to a Unit, any and all of the following, in each case which are attributed to or associated with the Unit at any time throughout the Delivery Period:

    (a)    resource adequacy attributes, as may be identified from time to time by the CPUC, CAISO, or other Governmental Authority having jurisdiction, that can be counted toward RAR;

18

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Obj SCE Claim Page 75 of 210 14 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 43
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

     (b)     resource adequacy attributes or other locational attributes for the Unit related to a Local Capacity Area, as may be identified from time to time by the CPUC, CAISO or other Governmental Authority having jurisdiction, associated with the physical location or point of electrical interconnection of the Unit within the CAISO Control Area, that can be counted toward a Local RAR; and

     (c)     other current or future defined characteristics, certificates, tags, credits, or accounting constructs, howsoever entitled, including any accounting construct counted toward any Compliance Obligation;

provided that, notwithstanding the foregoing, Capacity Attributes shall exclude all flexible capacity resource adequacy attributes, characteristics, certificates, tags, credits, or accounting constructs, howsoever entitled associated with the Unit.

"Capacity Procurement Mechanism" has the meaning set forth in the CAISO Tariff.

"Collateral Annex" has the meaning specified in the introductory paragraph of this Agreement.

"Compliance Obligations" means the RAR and Local RAR.

"Compliance Showings" means the (a) Local RAR compliance or advisory showings (or similar or successor showings) and (b) RAR compliance or advisory showings (or similar or successor showings), in each case, a load serving entity is required to make to the CPUC (and, to the extent authorized by the CPUC, to the CAISO) pursuant to the CPUC Decisions, to the CAISO pursuant to the CAISO Tariff, or to any Governmental Authority having jurisdiction.

"Contract Price" means, for any Showing Month, the prices described Paragraph J.b of the Agreement.

"Contract Quantity" means, with respect to any particular Showing Month of the Delivery Period, the amount of Product associated with the number of MWs set forth in the table in Section 1.4, which Transferor has agreed to provide to Transferee from the Unit for each day of such Showing Month.

"Contract Quantity Unit Allocation" means, if Transferor is delivering Product to Transferee from more than one Unit, the allocation of Contract Quantity Transferor will deliver from each Unit, as set forth in Attachment E and as modified by Transferor from time to time in accordance with Section 2.1(c).

"Cover Sheet" has the meaning specified in the introductory paragraph of this Agreement.

"CPM Capacity" has the meaning set forth in the CAISO Tariff.

"CPUC" means the California Public Utilities Commission.

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C abc SCE Claim Objection Claim Page 76 of 210 145 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 44
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

"CPUC Decisions" means CPUC Decisions 04-01-050, 04-10-035, 05-10-042, 06-04-040, 06-06-064, 06-07-031, 07-06-029, 08-06-031, 09-06-028, 10-06-036, 11-06-022, 12-06-025, 13-06-024, 14-06-050, and any other existing or subsequent decisions, resolutions, or rulings related to resource adequacy, including, without limitation, the CPUC Filing Guide, in each case as may be amended from time to time by the CPUC.

"CPUC Filing Guide" is the document issued annually by the CPUC which sets forth the guidelines, requirements and instructions for load serving entities to demonstrate compliance with the CPUC's resource adequacy program.

"Current Mark-to-Market Value" has the meaning specified in Section 8.2

"Delivery Period" has the meaning specified in Section 1.3(a).

"EEI" has the meaning specified in the introductory paragraph of this Agreement.

"EEI Agreement" has the meaning specified in the introductory paragraph of this Agreement.

"Expected Contract Quantity" means, with respect to any particular day of any Showing Month of the Delivery Period, the Contract Quantity of Product for such day of such Showing Month, including the amount of Contract Quantity of Product that Transferor has elected to provide Alternate Capacity for such day, and after giving effect to any reductions to Contract Quantity for such day as specified in Section 2.2 with respect to which Transferor has not elected to provide Alternate Capacity.

"FFIA Monthly Payment" shall be the Monthly Payment calculated using the Contract Quantity rather than the Expected Contract Quantity, such that variable C in the formula for Monthly Payment shall be as follows: C = the Contract Quantity of Product for each applicable day of the Showing Month.

"Good Utility Practice" has the meaning set forth in the CAISO Tariff.

"Governmental Authority" means any: (a) federal, state, local, municipal or other government; (b) governmental, regulatory or administrative agency, commission or other authority lawfully exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and (c) court or governmental tribunal.

"Independent Evaluator" has the meaning set forth in CPUC Decision 04-12-048.

"Local Capacity Area" has the meaning set forth in the CAISO Tariff.

"Local RAR" means the local resource adequacy requirements established for load serving entities by the CPUC pursuant to the CPUC Decisions, the CAISO pursuant to the CAISO Tariff, or by any other Governmental Authority having jurisdiction. Local RAR may also be known as local area reliability, local resource adequacy, local resource

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab - SCE Claim Objection Claim Page 77 Page 45 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 45
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

adequacy procurement requirements, or local capacity requirement in other regulatory proceedings or legislative actions.

"Monthly Payment" has the meaning specified in Section 3.1.

"Monthly Supply Plan" has the meaning set forth in the CAISO Tariff.

"MW" means megawatt (or 1,000 kilowatts) of alternating current electric energy generating capacity.

"Net Qualifying Capacity" has the meaning set forth in the CAISO Tariff.

"Next Showing Month" means the next calendar month for which a Compliance Showing will be made.

"Non-Availability Charges" has the meaning set forth in the CAISO Tariff.

"North" means north of Path 26.

"Path 26" has the meaning set forth in the CAISO Tariff.

"Planned Outage" means, an Approved Maintenance Outage (as defined in the CAISO Tariff), but does not include a RA Maintenance Outage With Replacement (as defined in the CAISO Tariff), a Short-Notice Opportunity RA Maintenance Outage (as defined in the CAISO Tariff) or an Off-Peak Opportunity RA Maintenance Outage (as defined in the CAISO Tariff).

"Product" means the Capacity Attributes of the Unit, including any capacity from RMR Contracts for the Unit, or its successor, Capacity Procurement Mechanism, or its successor, and RUC Availability Payments, or its successor; provided that:

(a) Product does not include any right to the energy or ancillary services from the Unit;

(b) any change by the CAISO, CPUC or other Governmental Authority that defines new or re-defines existing Local Capacity Areas that results in a decrease or increase in the amount of Capacity Attributes related to a Local Capacity Area provided hereunder will not result in a change in payments made pursuant to this Transfer; and

(c) the Parties agree that, under this Agreement, if the CAISO, CPUC or other Governmental Authority defines new or re-defines existing Local Capacity Areas whereby the Unit subsequently qualifies for a Local Capacity Area, the Product shall include all Capacity Attributes related to such Local Capacity Area.

21

Case 6:21-bk-12821-SY   Doc 222-3   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cabs SCE Claim Objection Claim Page 78 Page 217 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 46
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

"RAR" means the resource adequacy requirements established for load serving entities by the CPUC pursuant to the CPUC Decisions, the CAISO pursuant to the CAISO Tariff, or by any other Governmental Authority having jurisdiction.

"Replacement Capacity" has the meaning specified in Section 2.4.

"Replacement Capacity Price" means the market price for Product with Capacity Attributes reasonably equivalent to the quantity of Product not provided by Transferor under this Agreement.

"Replacement Obligation" has the meaning specified in Section 2.4.

"Resold Product" has the meaning specified in Section 2.6.

"Resource Category" shall be as described in the annual CPUC Filing Guide, as such may be modified, amended, supplemented or updated from time to time.

"RMR Contracts" has the meaning set forth in the CAISO Tariff.

"RUC Availability Bid" has the meaning set forth in the CAISO Tariff.

"RUC Availability Payment" has the meaning set forth in the CAISO Tariff.

"SC" has the meaning set forth in the CAISO Tariff.

"SC Substitute" has the meaning set forth in Section 2.8.

"Showing Month" shall be the calendar month of the Delivery Period that is the subject of the Compliance Showing, as set forth in the CPUC Decisions and outlined in the CAISO Tariff. For illustrative purposes only, pursuant to the CAISO Tariff and CPUC Decisions in effect as of the Agreement Effective Date, the monthly Compliance Showing made in June is for the Showing Month of August.

"South" means south of Path 26.

"Supply Plan" has the meaning set forth in the CAISO Tariff.

"Transferee" has the meaning specified in the introductory paragraph of this Agreement.

"Transferor" has the meaning specified in the introductory paragraph of this Agreement.

"Unit" shall mean the generation assets described in Attachment B (including any Alternate Units), from which Product is provided by Transferor to Transferee.

"Unit NQC" means the Net Qualifying Capacity set by the CAISO for the applicable Unit. The Parties agree that if the CAISO adjusts the Net Qualifying Capacity of a Unit after the Agreement Effective Date, then for the period in which the adjustment is effective, the Unit NQC shall be deemed the lesser of (i) the Unit NQC as of the Agreement Effective Date, or (ii) the CAISO-adjusted Net Qualifying Capacity.

22

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

## ADDITIONAL DEFINED TERMS

To the extent that the Parties have selected Flexible Capacity as being "Applicable", the following definitions shall be utilized in lieu of the corresponding definition, where appropriate, or in addition to the definitions set forth in the above Defined Terms:

"<u>Aggregate Contract Quantity</u>" means the aggregate amount of Product associated with the MWs set forth in the table in Section 1.4 which Transferor has agreed to provide to Transferee from the Unit throughout the entire term of the Delivery Period and which includes Product which is Flexible Capacity in an amount equal to the aggregate amount identified in Section 1.5. All Product identified in Section 1.4 is Inflexible Capacity except to the extent identified as Flexible Capacity in Section 1.5.

"<u>Capacity Attributes</u>" means, with respect to a Unit, any and all of the following, in each case which are attributed to or associated with the Unit at any time throughout the Delivery Period:

    (a)    resource adequacy attributes, as may be identified from time to time by the CPUC, CAISO, or other Governmental Authority having jurisdiction, that can be counted toward RAR;

    (b)    resource adequacy attributes or other locational attributes for the Unit related to a Local Capacity Area, as may be identified from time to time by the CPUC, CAISO or other Governmental Authority having jurisdiction, associated with the physical location or point of electrical interconnection of the Unit within the CAISO Control Area, that can be counted toward a Local RAR;

    (c)    other current or future defined characteristics, certificates, tags, credits, or accounting constructs, howsoever entitled, including any accounting construct counted toward any Compliance Obligations; and

    (d)    flexible capacity resource adequacy attributes for the Unit, including, without limitation, the amount of Unit EFC and MWs associated with Unit EFC as may be identified from time to time by the CPUC, CAISO, or other Governmental Authority having jurisdiction, that can be counted toward Flexible RAR.

"<u>Compliance Obligations</u>" means the RAR, Local RAR and Flexible RAR.

"<u>Compliance Showings</u>" means the (a) Local RAR compliance or advisory showings (or similar or successor showings), (b) RAR compliance or advisory showings (or similar or successor showings), and (c) Flexible RAR compliance or advisory showings (or similar successor showings), in each case, a load serving entity is required to make to the CPUC (and, to the extent authorized by the CPUC, to the CAISO) pursuant to the CPUC

23

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab c SCE Claim obje CtEon Claim Page 80 of 210 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 48
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Decisions, to the CAISO pursuant to the CAISO Tariff, or to any Governmental Authority having jurisdiction.

"Contract Quantity" means, with respect to any particular Showing Month of the Delivery Period, the amount of Product associated with the number of MWs set forth in the table in Section 1.4, which Transferor has agreed to provide to Transferee from the Unit for each day of such Showing Month, and which includes Product which is Flexible Capacity in an amount equal to the amount identified in Section 1.5. All Product identified in Section 1.4 is Inflexible Capacity except to the extent identified as Flexible Capacity in Section 1.5.

"Effective Flexible Capacity" has the meaning set forth in the CAISO Tariff.

"Flexible Capacity" means, with respect to any particular Showing Month of the Delivery Period, the number of MWs of Product set forth in the table in Section 1.5 which Transferor has agreed to provide to Transferee from the Unit as part of the Contract Quantity for each day of such Showing Month, and which such MWs of Product are eligible to satisfy a load serving entity's Flexible RAR and which such MWs of Product are associated with MWs of the Unit that are part of the Unit EFC.

"Flexible RAR" means the flexible capacity requirements established for load serving entities by the CPUC pursuant to the CPUC Decisions, the CAISO pursuant to the CAISO Tariff, or by any other Governmental Authority having jurisdiction and includes any non-binding advisory showings which a load serving entity is to make with respect to flexible capacity.

"Inflexible Capacity" means, with respect to any particular Showing Month of the Delivery Period, the number of MWs of Product set forth in the table in Section 1.4 minus the number of MWs of Product set forth in the table in Section 1.5, which Transferor has agreed to provide to Transferee from the Unit as part of the Contract Quantity for each day of such Showing Month, and which such MWs of Product are not eligible to satisfy a load serving entity's Flexible RAR and which are Product associated MWs of the Unit that are not part of or outside the Unit EFC. Inflexible Capacity is also known as 'generic capacity'.

"Product" means the Capacity Attributes of the Unit, provided that:

(a) Product does not include any right to the energy or ancillary services from the Unit;

(b) any change by the CAISO, CPUC or other Governmental Authority that defines new or re-defines existing Local Capacity Areas that results in a decrease or increase in the amount of Capacity Attributes related to a Local Capacity Area provided hereunder will not result in a change in payments made pursuant to this Transfer;

(c) any change by the CAISO, CPUC or other Governmental Authority that defines new or re-defines existing Flexible RAR, Capacity Attributes related to Flexible RAR, or attributes of the Unit related to Flexible RAR, that results in a decrease or

24

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
ExhibitExhibit Cab SCE Claim Objection Claim Page 81 Page 150 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 49 of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

increase in the amount of Capacity Attributes related to Flexible RAR provided hereunder will not result in a change in payments made pursuant to this Transfer;

(d) the Parties agree that, under this Agreement, if the CAISO, CPUC or other Governmental Authority defines new or re-defines existing Local Capacity Areas whereby the Unit subsequently qualifies for a Local Capacity Area, the Product shall include all Capacity Attributes related to such Local Capacity Area; and

(e) the Parties agree that, under this Agreement, if the CAISO, CPUC or other Governmental Authority defines new or re-defines existing Flexible RAR, Capacity Attributes related to Flexible RAR, or attributes of the Unit related to Flexible RAR whereby the Unit, or a portion of the Unit which did not previously qualify to satisfy Flexible RAR, subsequently qualifies to satisfy Flexible RAR, the Product shall include all Capacity Attributes of the Unit related to Flexible RAR, including any Capacity Attributes related to Flexible RAR with respect to any portion of the Unit which previously was not able to satisfy Flexible RAR.

"Unit EFC" means the Effective Flexible Capacity (in MWs) of the Unit. The Parties agree that if the CAISO adjusts the Effective Flexible Capacity of a Unit after the Agreement Effective Date, then for the period in which the adjustment is effective, the Unit EFC shall be deemed the lesser of (i) the Unit EFC as of the Agreement Effective Date, or (ii) the CAISO-adjusted Effective Flexible Capacity.

25

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal. SCE Claim Objection Claim Page 82 of 210 51 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 50 of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

## ATTACHMENT B

## UNIT INFORMATION

| | Unit 1 | Unit 2 | Unit 3 | Unit 4 |
|---|---|---|---|---|
| Unit Name | RE Rosamond 2 | NRG Solar Oasis | Sycamore Cogeneration | Mountain View Power Partners |
| CAISO Resource ID | RSMSLR_6_SOLAR2 | OASIS_6_SOLAR2 | SYCAMR_2_UNIT 2 | BLAST_1_WIND |
| Unit NQC (MW as of the Agreement Effective Date by month) | 0.8<br>0.6<br>3.6<br>3<br>3.2<br>6.2<br>7.8<br>5.4<br>2.8<br>0.4<br>0.4<br>0 | 0.8<br>0.6<br>3.6<br>3<br>3.2<br>6.2<br>7.8<br>5.4<br>2.8<br>0.4<br>0.4<br>0 | 80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80 | 6.86<br>5.88<br>13.72<br>12.25<br>12.25<br>16.17<br>11.27<br>10.29<br>7.35<br>3.92<br>5.88<br>6.37 |
| If Flexible Capacity is designated as applicable in Section 1.1, Unit EFC (MW, as of the Agreement Effective Date by month) | *N/A* | *N/A* | *N/A* | *N/A* |
| Resource Type | *Solar* | *Solar* | *Cogeneration* | *Wind* |
| Resource Category (1, 2, 3 or 4) | 4 | 4 | 4 | 4 |
| Path 26 (North, South or None) | South | South | South | South |
| Local Capacity Area (if any, as of | Big Creek-Ventura | Big Creek-Ventura | Big Creek-Ventura | LA Basin |

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal-SDCE Claim Objection Claim Page 83 Page 52 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 51
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| Agreement Effective Date) | | | |
|---|---|---|---|
| PABA Vintage | | | |

| | Unit 5 | Unit 6 | Unit 7 |
|---|---|---|---|
| Unit Name | OLS Energy Chino | San Gorgonio Westwinds II | Golden Springs Develop. Co, |
| CAISO Resource ID | CHINO_6_CIM GEN | GARNET_2_WIND 4 | DELAMO_2_SO LAR2 |
| Unit NQC (MW as of the Agreement Effective Date by month) | 26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26 | 1.37<br>1.18<br>2.74<br>2.45<br>2.45<br>3.23<br>2.25<br>2.06<br>1.47<br>0.78<br>1.18<br>1.27 | 0.07<br>0.05<br>0.32<br>0.26<br>0.28<br>0.54<br>0.68<br>0.47<br>0.25<br>0.04<br>0.04<br>0 |
| If Flexible Capacity is designated as applicable in Section 1.1, Unit EFC (MW, as of the Agreement Effective Date by month) | *N/A* | *N/A* | *N/A* |
| Resource Type | | *Wind* | *Solar* |
| Resource Category (1, 2, 3 or 4) | 4 | 4 | 4 |
| Path 26 (North, South or None) | South | South | South |

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Declaration Objection Claim Page 84 Page 53 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 52
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| Local Capacity Area (if any, as of Agreement Effective Date) | LA Basin | LA Basin | LA Basin | |
|---|---|---|---|---|
| PABA Vintage | | | | |

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 85 Page 154 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 53
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT C

SUPPLY PLAN INFORMATION


Benefitting load serving entity SCID:  LWSTN

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Declaration Objection Claim Page 86 of 215 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 54
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT D

SUBSEQUENT SALE INFORMATION


Contract Key ID: _____

Subsequent sale contract quantity (in MW): _____

Subsequent sale delivery period: _____

Amount of Inflexible Capacity included in Volume: _____

New Benefitting load serving entity SC identification number: _____

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit A b-S DE Claim Objection Obj Claim Page 87 Page 2156 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 55
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT E

CONTRACT QUANTITY UNIT ALLOCATION

| Showing Month, Year | Unit 1 | | Unit 2 | | Unit 3 | | Unit 4 | |
|---|---|---|---|---|---|---|---|---|
| | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) |
| Jan 2021 | 0.8 | N/A | 0.8 | N/A | 31.6 | N/A | 6.86 | N/A |
| Feb 2021 | 0.6 | N/A | 0.6 | N/A | 31.6 | N/A | 5.88 | N/A |
| Mar 2021 | 3.6 | N/A | 3.6 | N/A | 31.6 | N/A | 13.7 | N/A |
| APR 2021 | 3 | N/A | 3 | N/A | 31.6 | N/A | 12.3 | N/A |
| May 2021 | 3.2 | N/A | 3.2 | N/A | 31.6 | N/A | 12.3 | N/A |
| June 2021 | 6.2 | N/A | 6.2 | N/A | 31.6 | N/A | 16.2 | N/A |
| July 2021 | 7.8 | N/A | 7.8 | N/A | 31.6 | N/A | 11.3 | N/A |
| Aug 2021 | 5.4 | N/A | 5.4 | N/A | 31.6 | N/A | 10.3 | N/A |
| Sep 2021 | 2.8 | N/A | 2.8 | N/A | 31.6 | N/A | 7.35 | N/A |
| Oct 2021 | 0.4 | N/A | 0.4 | N/A | 31.6 | N/A | 3.92 | N/A |
| Nov 2021 | 0.4 | N/A | 0.4 | N/A | 31.6 | N/A | 5.88 | N/A |
| Dec 2021 | 0 | N/A | 0 | N/A | 31.6 | N/A | 6.37 | N/A |
| Jan 2022 | 0.8 | N/A | 0.8 | N/A | 4.72 | N/A | N/A | N/A |
| Feb 2022 | 0.6 | N/A | 0.6 | N/A | 4.72 | N/A | N/A | N/A |
| Mar 2022 | 3.6 | N/A | 3.6 | N/A | 4.72 | N/A | N/A | N/A |
| Apr 2022 | 3 | N/A | 3 | N/A | 4.72 | N/A | N/A | N/A |

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim    Page 88 Page 157 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 56
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)
v.09.09.2019*

| May 2022 | 3.2 | N/A | 3.2 | N/A | 4.72 | N/A | N/A | N/A |
| June 2022 | 6.2 | N/A | 6.2 | N/A | 4.72 | N/A | N/A | N/A |
| July 2022 | 7.8 | N/A | 7.8 | N/A | 4.72 | N/A | N/A | N/A |
| Aug 2022 | 5.4 | N/A | 5.4 | N/A | 4.72 | N/A | N/A | N/A |
| Sep 2022 | 2.8 | N/A | 2.8 | N/A | 4.72 | N/A | N/A | N/A |
| Oct 2022 | 0.4 | N/A | 0.4 | N/A | 4.72 | N/A | N/A | N/A |
| Nov 2022 | 0.4 | N/A | 0.4 | N/A | 4.72 | N/A | N/A | N/A |
| Dec 2022 | 0 | N/A | 0 | N/A | 4.72 | N/A | N/A | N/A |

| | Unit 5 | | Unit 6 | | Unit 7 | | | |
| Showing Month, Year | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | | |
|---|---|---|---|---|---|---|---|---|
| Jan 2021 | 26 | N/A | 1.37 | N/A | 0.07 | N/A | | |
| Feb 2021 | 26 | N/A | 1.18 | N/A | 0.05 | N/A | | |
| Mar 2021 | 26 | N/A | 2.74 | N/A | 0.32 | N/A | | |
| APR 2021 | 26 | N/A | 2.45 | N/A | 0.26 | N/A | | |
| May 2021 | 26 | N/A | 2.45 | N/A | 0.28 | N/A | | |
| June 2021 | 26 | N/A | 3.23 | N/A | 0.54 | N/A | | |
| July 2021 | 26 | N/A | 2.25 | N/A | 0.68 | N/A | | |
| Aug 2021 | 26 | N/A | 2.06 | N/A | 0.47 | N/A | | |
| Sep 2021 | 26 | N/A | 1.47 | N/A | 0.25 | N/A | | |
| Oct 2021 | 26 | N/A | 0.78 | N/A | 0.04 | N/A | | |

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 89 of 215 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 57
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| Nov 2021 | 26 | N/A | 1.18 | N/A | 0.04 | N/A | |
| Dec 2021 | 26 | N/A | 1.27 | N/A | 0 | N/A | |
| Jan 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Feb 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Mar 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Apr 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| May 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| June 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| July 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Aug 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Sep 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Oct 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Nov 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Dec 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |

Case 6:21-bk-12821-SY    Doc 222-3    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cal. SCE Claim Objection Claim Page 90 Page 159 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 58
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*


ATTACHMENT F

SUPPLY PLAN CONTACT INFORMATION

Transferor's Supply Plan contact information:

> Transferor's Supply Plan name: Angelica Sindelar

> Transferor's Supply Plan email: angelica.sindelar@sce.com

> Transferor's Supply Plan phone number: 626-302-9576


Transferee's Supply Plan contact information:

> Transferee's Supply Plan name: Western Community Energy

> Transferee's Supply Plan email: sparr@edms-llc.com; aanderson@edms-llc.com;
> regulatoryp@ilotpowergroup.com

> Transferee's Supply Plan phone number: 858-678-0118

34

**Exhibit 2**

**SCE Claim 19**

Case 6:21-bk-12821-SY    Doc 222-4    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit 3 Cal SCE Claim Objection Claim 92 Page 2 of 5

Case 6:21-bk-12821-SY    Claim 19-1    Filed 09/30/21    Desc Main Document    Page 1

**Fill in this information to identify the case:**

Debtor 1    Western Community Energy

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    6:21-bk-12821-SY

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

Southern California Edison Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Munger, Tollles & Olson LLP
Name

350 South Grand Avenue
Number    Street

Los Angeles        CA        90071
City            State        ZIP Code

Contact phone    213-683-9554

Contact email    seth.goldman@mto.com

**Where should payments to the creditor be sent?** (if different)

See Addendum.
Name

Number        Street

City            State        ZIP Code

Contact phone    _____

Contact email    _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit 3 Declaration Objection Claims 93 Page 3 of 5

Case 6:21-bk-12821-SY    Claim 19-1    Filed 09/30/21    Desc Main Document    Page 2
of 4

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|--------------------------------------------------------------------|

6. **Do you have any number you use to identify the debtor?**
☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

7. **How much is the claim?** $_____ 2,426,150.00 . **Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum. _____

9. **Is all or part of the claim secured?**
☑ No
☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____
**Amount of the claim that is secured:** $_____
**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**
☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: _____

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit 3 B a B CE Claim Objection Claim 94 Page 4 of 5

Case 6:21-bk-12821-SY    Claim 19-1    Filed 09/30/21    Desc Main Document    Page 3
of 4

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    09/30/2021
                    MM / DD / YYYY

/s/  Bradley Schneider (original on following page)
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Ave. | | |
| | Number        Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Sorab SCE Claim Objection Claim Page 95 Page 5 of 5

Case 6:21-bk-12821-SY   Claim 19-1   Filed 09/30/21   Desc Main Document   Page 4
of 4

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09/30/2021
                   MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number       Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email bradley.schneider@mto.com | |

**Exhibit 3**

**SCE Claim 20**

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C abo 5 CE claim Objection Claim Page 097 Page 12 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 1

**Fill in this information to identify the case:**

Debtor 1    Western Community Energy

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    6:21-bk-12821-SY

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Southern California Edison Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Munger, Tolles & Olson LLP
Name

350 South Grand Avenue
Number    Street

Los Angeles    CA    90071
City    State    ZIP Code

Contact phone  213-683-9554

Contact email  seth.goldman@mto.com

**Where should payments to the creditor be sent?** (if different)

See Addendum
Name

Number    Street

City    State    ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — —

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cabs SCE Claim Objection Claim Page 098 Page 13 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 2
of 22

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**  $_____107,306.68_. **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____
**Amount of the claim that is secured:** $_____
**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No
☑ Yes. Identify the property: See Addendum _____

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit SC Claim Objection Claim 20-99 Page 14 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 3 of 22

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check all that apply:* |

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\*  Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09/30/2021
                   MM / DD / YYYY

/s/ Bradley Schneider (original on following page)
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Bradley<br>First name | Robert<br>Middle name | Schneider<br>Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP<br>Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue<br>Number        Street | | |
| | Los Angeles<br>City | CA<br>State | 90071<br>ZIP Code |
| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit 3 BSC Fee Claim Objection Claim 20 100 Page 215 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 4
of 22

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date   09/30/2021
                        MM / DD / YYYY

*Signature*

Print the name of the person who is completing and signing this claim:

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number    Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email bradley.schneider@mto.com | |

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibits B-E SCE Claim Objection Claim 20-1    Page 101 Page 10 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 5
of 22

## ADDENDUM TO PROOF OF CLAIM

### In re Western Community Energy,
### Case No. 6:21-bk-12821-SY

This addendum is attached to and a part of the proof of claim (the "Proof of Claim") filed by Southern California Edison Company ("SCE") (the "Claimant") against Western Community Energy Company (the "Debtor" and, with SCE, the "Parties").

**1.    Basis for Proof of Claim and Asserted Amount**

The Debtor contracted with SCE to provide certain services that were necessary to the Debtor's operations, including billing and metering to the Debtor's customers ("CCA Services"). SCE provided CCA Services pursuant to an agreement that it entered with the Debtor on February 26, 2019 (the "Service Agreement"), as well as SCE's Rule 23 Community Choice Aggregation Tariff ("Rule 23 Tariff"). A true and correct copy of the Services Agreement is attached hereto as Exhibit 1.

Section 5 of the Service Agreement provides that "SCE will bill and the CCA agrees to pay SCE for all services and products provided by SCE in accordance with the terms and conditions set forth in SCE's Rule 23 Tariff. Section B.14 of the Rule 23 Tariff, in turn, provides that "SCE costs for services to a CCA . . . shall be charged the CCA . . . as set forth in the appropriate SCE rate schedule."

SCE provided CCA Services to the Debtor through and after the Debtor's filing of its chapter 9 bankruptcy petition on May 24, 2021 (the "Petition Date"). As of the Petition Date, SCE was owed $91,600 for CCA Services. SCE's claim for this amount is secured by a right of offset and/or recoupment against customer payments that SCE collects and remits to the Debtor under the Services Agreement.

SCE is owed $15,707 for CCA Services provided from the Petition Date through June 30, 2021. SCE continues to provide CCA services to the Debtor and, thus, servicing fees owed to SCE by the Debtor are continuing to accrue. SCE's claim for post-petition servicing fees is secured by a right of offset and/or recoupment against customer payments collected and remitted to the Debtor. In addition, SCE asserts an administrative claim to recover these amounts as an administrative expense.

**2.    Reservations of Rights**

The filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver or release of Claimant's rights against any other entity or person liable for all or any part of the Proof of Claim asserted herein; (ii) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver or release of Claimant's right to mediate or arbitrate any dispute, as applicable, including the amount or nature of the Proof of Claim; (iv) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether the same be designated legal or private rights or in

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit S - Cal SCE Claim Objection Claim 20-102 Page 210 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 6
of 22

any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (v) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (vi) a waiver or release of Claimant's right to have any and all final orders entered only after de novo review by a United States District Court Judge; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto, or other proceeding which may be commenced in this case against or otherwise involving Claimant; (viii) a waiver or release or limitation of Claimant's right to setoff or recoupment; or (ix) a waiver of Claimant's right to assert any additional claims that may be entitled to administrative priority under sections 503 and 507 of the Bankruptcy Code.

**3.    Amendments**

Claimant reserves the right to amend and/or supplement this Proof of Claim at any time, in any manner, including, but not limited to, fixing the amount of the claims described above that are or may become due to Claimant, and/or to file additional proofs of claim for any additional claim which may be based on the same or additional documents or grounds of liability.

**4.    Notices**

All notices relating to this Proof of Claim should be sent as follows:

> Southern California Edison Company
> Attn:  Samantha Nicely
> 6060 N. Irwindale Ave.
> Suite J
> Irwindale, CA 91702

> With a copy to:

> Seth Goldman
> Bradley R. Schneider
> Munger, Tolles & Olson LLP
> 350 South Grand Avenue, 50th Floor
> Los Angeles, CA 90071

All payments should be sent to:

> Southern California Edison Company
> Attn:  Samantha Nicely
> 6060 N. Irwindale Ave.
> Suite J
> Irwindale, CA 91702

Case 6:21-bk-12821-SY   Doc 222-5   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit 5 also Cure Claim 20 in Claim 20-1 Page 103 Page 18 of 23

Case 6:21-bk-12821-SY   Claim 20-1   Filed 09/30/21   Desc Main Document   Page 7
of 22

**EXHIBIT 1**

Case 6:21-bk-12821-SY Doc 222-5 Filed 11/30/21 Entered 11/30/21 19:38:50 Desc
Exhibit Exhibit S Declaration Objection Claim 2104 Page 19 of 23

DocuSign Envelope ID: 6F9G4580-E2A84600 67ED B4F90E12595B1
Case 6:21-bk-12821-SY Claim 20-1 Filed 09/30/21 Desc Main Document Page 8 of 22

# Community Choice Aggregation Service Agreement
# Instruction Sheet

**Purpose**

The Community Choice Aggregation (CCA) Service Agreement incorporates SCE's applicable tariffs and is required prior to commencement of CCA Service within SCE service territory.

**General Instructions**

1. Please type or print in ink.
2. Do not make any changes to the text of this agreement.
3. If a mistake is made, please request a new agreement.
4. If subsequent changes need to be made, please submit them in writing to SCE.
5. Send completed agreement:

   CCA Services
   6020 N. Irwindale Ave., Suite I
   Irwindale, CA 91702
   Attn: Michelle Stark

6. Please make a copy of your completed agreement for your records.
7. If you have any questions, please contact:

   CCA Services at (626) 812-7649

**Instructions for Preparation**

Please complete all blank data fields of the agreement.

DocuSign Envelope ID: 8F9G4580-F2A8-4690-876D-B4F90F12F36B1



**Southern California Edison Company**

# COMMUNITY CHOICE AGGREGATOR (CCA) SERVICE AGREEMENT

This Community Choice Aggregator (CCA) Service Agreement (this "Agreement") is made and entered into as of this 26 day of February , 2019 , by and between " Western Community Energy _____ " ("CCA"), a Joint Powers Authority _____ organized and existing under the laws of the state of California , and Southern California Edison Company  (SCE), a corporation organized and existing under the laws of the state of California.  From time to time, CCA and SCE shall be individually referred to herein as a "Party" and collectively as the "Parties."

---

**Section 1:**    **General Description of Agreement**

1.1    This Agreement is a legally binding contract.  The Parties named in this Agreement are bound by the terms set forth herein and otherwise incorporated herein by reference.  This Agreement shall govern the business relationship between the Parties hereto by which CCA shall offer electrical energy services. Each Party, by agreeing to undertake specific activities and responsibilities for or on behalf of customers, acknowledges that each Party shall relieve and discharge the other Party of the responsibility for said activities and responsibilities with respect to those customers.  Except where explicitly defined herein (including Attachment A hereto) the definitions controlling this Agreement are contained in SCE's applicable rules or in the relevant community choice aggregation tariff.

1.2    The form of this Agreement has been developed as part of the CPUC regulatory process to implement Assembly Bill 117, was intended to conform to CPUC directions, was filed and approved by the CPUC for use between SCE and CCAs and may not be waived, altered, amended or modified, except as provided herein or in the applicable community choice aggregation tariff, or as may otherwise be authorized by the CPUC.

1.3    This Agreement incorporates by reference the applicable community choice aggregation tariff as authorized and modified from time to time by the CPUC.

---

**Section 2:**    **Representations**

2.1    Each Party represents that it is and shall remain in compliance with all applicable laws and tariffs, including applicable CPUC requirements.

DocuSign Envelope ID: 9F9C45B0-E2A3-4699-976D-B1F9D5127DB5

2.2    Each person executing this Agreement for the respective Parties expressly represents and warrants that he or she has authority to bind the entity on whose behalf this Agreement is executed.

2.3    Each Party represents that (a) it has the full power and authority to execute and deliver this Agreement and to perform its terms and conditions; (b) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate or other action by such Party; and (c) this agreement constitutes such Party's legal, valid and binding obligation, enforceable against such Party in accordance with its terms.

2.4    Each Party shall (a) exercise all reasonable care, diligence and good faith in the performance of its duties pursuant to this Agreement; and (b) carry out its duties in accordance with applicable recognized professional standards in accordance with the requirements of this Agreement.

**Section 3:    Term of Service**

The term of this Agreement shall commence on the date of execution by both Parties hereto (the "Effective Date") and shall terminate on the earlier of (a) the date CCA informs SCE that it is no longer operating as a CCA in SCE's service territory; (b) the earlier termination pursuant to Section 4 hereof; or (c) the effective date of a new CCA Service Agreement between the Parties hereto. Notwithstanding the Effective Date of this Agreement, the CCA acknowledges that it may only offer Community Choice Aggregation Services to customers effective on or after the CPUC-approved date for commencement of such services by CCAs, and only after it has complied with all provisions of this Agreement and SCE's applicable tariffs.

**Section 4:    Events of Default and Remedy for Default**

4.1    An Event of Default under this Agreement shall include either Party's material breach of any provision of this Agreement, including those incorporated by reference herein, and failure to cure such breach within thirty (30) calendar days after receipt of written notice thereof from the non-defaulting Party; or such other period as may be provided by this Agreement or SCE's applicable community choice aggregation tariff.

4.2    In the event of such an Event of Default, the non-defaulting Party shall be entitled to exercise any and all remedies (a) available under SCE's applicable community choice aggregation tariff; and/or (b) provided for by law or in equity to the extent not inconsistent with SCE's community choice aggregation tariff. In addition, in the event of an Event of Default this Agreement may be effectively terminated upon Commission authorization.

4.3      Breach by any Party hereto of any provision of SCE's community choice
         aggregation tariff, including a breach occurring during Exigent Circumstances as
         defined in Section T.3 of such tariff, which circumstances also shall include
         bankruptcy of CCA, shall be governed by applicable provisions contained therein
         and each Party will retain all rights granted thereunder.  A breach of said tariff for
         which no remedy is specified therein shall be governed by this Agreement as an
         Event of Default.

**Section 5:**      **Billing and Payment**

         SCE will bill and the CCA agrees to pay SCE for all services and products
         provided by SCE in accordance with the terms and conditions set forth in SCE's
         community choice aggregation tariff, as stated in SCE's Electric Rule 23 and
         SCE's rate schedules.  Any services provided by the CCA to SCE shall be by
         separate agreement between the Parties and are not a subject of this
         Agreement.

**Section 6:**      **Limitation of Liability**

         Each Party's liability to the other Party for any loss, cost, claim, injury, liability, or
         expense, including reasonable attorneys' fees, relating to or arising from any act
         or omission in its performance of this Agreement, shall be limited to the amount
         of direct damage actually incurred, except as provided for in this Section.  In no
         event shall either Party be liable to the other Party for any indirect, special,
         consequential, or punitive damages of any kind whatsoever, whether in contract,
         tort or strict liability, except in the event of an action covered by the
         Indemnification provisions of Section 7 of this Agreement or by the
         indemnification provisions in any Nondisclosure Agreement relating to the
         disclosure of confidential information to the CCA, in which event this Section 6
         shall not be applicable.

**Section 7:**      **Indemnification**

7.1      To the fullest extent permitted by law, and subject to the limitations set forth in
         Section 6 of this Agreement, each Party (the "Indemnifying Party") shall
         indemnify and hold harmless the other Party, and its current and future direct
         and indirect parent companies, affiliates and their shareholders, officers,
         directors, employees, agents, servants and assigns (collectively, the
         "Indemnified Party"), and at the Indemnified Party's option, the Indemnifying
         Party shall defend the Indemnified Party, from and against any and all claims
         and/or liabilities for losses, expenses, damage to property, injury to or death of
         any person, including, but not limited to, the Indemnified Party's employees and
         its affiliates' employees, subcontractors and subcontractors' employees, or any
         other liability incurred by the Indemnified Party, including reasonable expenses,
         legal and otherwise, which shall include reasonable attorneys' fees, caused

         wholly or in part by any negligent, grossly negligent or willful act or omission by
         the Indemnifying Party, its officers, directors, employees, agents or assigns
         arising out of this Agreement, except to the extent caused wholly or in part by

DocuSign Envelope ID: 9F9C45B8-E2A3-4599-976D-B1F9D5127B5B

any negligent, grossly negligent or willful act or omission of the Indemnified Party.

7.2      If any claim covered by Section 7.1 is brought against the Indemnified Party, then the Indemnifying Party shall be entitled to participate in, and unless in the opinion of counsel for the Indemnified Party a conflict of interest between the Parties may exist with respect to such claim, assume the defense of such claim, with counsel reasonably acceptable to the Indemnified Party.  If the Indemnifying Party does not assume the defense of the Indemnified Party, or if a conflict precludes the Indemnifying Party from assuming the defense, then the Indemnifying Party shall reimburse the Indemnified Party on a monthly basis for the Indemnified Party's defense through separate counsel of the Indemnified Party's choice.  Even if the Indemnifying Party assumes the defense of the Indemnified Party with acceptable counsel, the Indemnified Party, at its sole option, may participate in the defense, at its own expense, with counsel of its own choice without relieving the Indemnifying Party of any of its obligations hereunder. In no event shall either Party be liable to the other Party for any indirect, special, consequential, or punitive damages of any kind whatsoever, whether in contract, tort or strict liability.

7.3      The Indemnifying Party's obligation to indemnify under this Section 7 shall survive termination of this Agreement, and shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Indemnifying Party under any statutory scheme, including, without limitation, under any Worker's Compensation Acts, Disability Benefit Acts or other Employee Benefit Acts.

**Section 8:**      **Assignment and Delegation**

8.1      Neither Party to this Agreement shall assign any of its rights or obligations under this Agreement, except with the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  No assignment of this Agreement shall relieve the assigning Party of any of its obligations under this Agreement until such obligations have been assumed by the assignee.  When duly assigned in accordance with the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the assignee and the assignor shall be relieved of its rights and obligations.  Any assignment in violation of this Section 8 shall be void.

8.2      Notwithstanding the provisions of this Section 8, either Party may subcontract its duties under this Agreement to a subcontractor, provided that the subcontracting Party shall remain fully responsible as a principal and not as a guarantor for performance of any subcontracted duties, shall serve as the point of contact between its subcontractor and the other Party, and shall

provide the other Party with thirty (30) calendar days' prior written notice of any such subcontracting, which notice shall include such information about the subcontractor as the other Party shall reasonably require.  If either Party subcontracts any of its duties hereunder, it shall cause its subcontractors to perform in a manner which is in conformity with that Party's obligations under this Agreement.

**Section 9:**     **Independent Contractors**

Each Party shall perform its obligations under this Agreement (including any obligations performed by a Party's designees as permitted under Section 8 of this Agreement) as an independent contractor.

**Section 10:**     **Entire Agreement**

This Agreement consists of, in its entirety, this Community Choice Aggregator Service Agreement and all attachments hereto, all Community Choice Aggregation Service Requests submitted pursuant to this Agreement and SCE's community choice aggregation tariffs.  This Agreement supersedes all other agreements or understandings, written or oral, between the Parties related to the subject matter hereof, with the express exception of any Nondisclosure Agreement relating to the disclosure of confidential information to the CCA.  This Agreement may be modified from time to time only by an instrument in writing, signed by both Parties.

**Section 11:**     **Nondisclosure**

11.1     Notwithstanding anything provided below, prior to receiving any SCE confidential customer information, CCA agrees to enter into the CCA Non-Disclosure Agreement and be bound by its terms with respect to Confidential Information as defined therein.

Neither Party may disclose any Confidential Information obtained pursuant to this Agreement to any third party, including affiliates of such Party, without the express prior written consent of the other Party.  As used herein, the term "Confidential Information" shall include, but not be limited to, all business, financial, and commercial information pertaining to the Parties, customers of either or both Parties, suppliers for either Party, personnel of either Party, any trade secrets, and other information of a similar nature, whether written or in intangible form that is marked proprietary or confidential with the appropriate owner's name.  Confidential Information shall not include information known to either Party prior to obtaining the same from the other Party, information in the public domain, or information obtained by a Party from a third party who did not, directly or indirectly, receive the same from the other Party to this Agreement or from a party who was under an obligation of confidentiality to the other Party to this Agreement or information developed by either Party independent of any

DocuSign Envelope ID: 9F9C45B8-E343-4599-976D-B1F0D51270B5

Confidential Information.  The receiving Party shall use the higher of the standard of care that the receiving Party uses to preserve its own confidential information or a reasonable standard of care to prevent unauthorized use or disclosure of such Confidential Information.  Each receiving Party shall, upon termination of this Agreement or at any time upon the request of the disclosing Party, promptly return or destroy all Confidential Information of the disclosing Party then in its possession.

11.2    Notwithstanding the preceding, Confidential Information may be disclosed to any governmental, judicial or regulatory authority requiring such Confidential Information pursuant to any applicable law, regulation, ruling, or order, provided that: (a) such Confidential Information is submitted under any applicable provision, if any, for confidential treatment by such governmental, judicial or regulatory authority; and (b) prior to such disclosure, the other Party is given prompt notice of the disclosure requirement so that it may take whatever action it deems appropriate, including intervention in any proceeding and the seeking of any injunction to prohibit such disclosure.

**Section 12:**    **Enforceability**

If any provision of this Agreement or the application thereof, is to any extent held invalid or unenforceable, the remainder of this Agreement and the application thereof, other than those provisions which have been held invalid or unenforceable, shall not be affected and shall continue in full force and effect and shall be enforceable to the fullest extent permitted by law or in equity.

**Section 13:**    **Notices**

13.1    Except as otherwise provided in this Agreement, any notices under this Agreement shall be in writing and shall be effective upon delivery if delivered by (a) hand; (b) U.S. Mail, first class postage pre-paid, or (c) facsimile, with confirmation of receipt to the Parties as follows:

**If the notice is to CCA:**

Name of Entity:  Western Community Energy

Contact Name:  Rick Bishop

Business Address: 3390 University Avenue, Suite 450, Riverside CA 92501

Facsimile:

DocuSign Envelope ID: C9F9C45B8-E2A8-4599-976D-B1F90F5125B5

**If the notice is to SCE:**

*Contact Name*: Mike Marelli _____

*Business Address*: 6020 N Irwindale Ave., Ste. I, Irwindale, CA 91702

*Facsimile*: (626) 633-9948 _____

13.2    Each Party shall be entitled to specify as its proper address any other address in the United States upon written notice to the other Party.

13.3    Each Party shall designate on Attachment A the person(s) to be contacted with respect to specific operational matters relating to Community Choice Aggregation Service.  Each Party shall be entitled to specify any change to such person(s) upon written notice to the other Party.

**Section 14:    Time of Essence**

The Parties expressly agree that time is of the essence for all portions of this Agreement.

**Section 15:    Dispute Resolution**

15.1    The form of this Agreement has been filed with and approved by the CPUC as part of SCE's applicable tariffs. Except as provided in Section 15.2 and 15.3, any dispute arising between the Parties relating to interpretation of the provisions of this Agreement or to the performance of SCE's obligations hereunder shall be reduced to writing and referred to the Parties' representatives identified on Attachment A for resolution, with the responding Party filing its written response within thirty (30) business days after receiving the written position of the complaining party.   Thereafter, the Parties shall be required to meet and confer within ten (10) business days in a good faith effort to resolve their dispute. Pending such resolution, the Parties shall continue to proceed diligently with the performance of their respective obligations under this Agreement, unless this Agreement has been terminated under Section 4.2. If the Parties fail to reach an agreement within ten (10) additional business days of the last session to meet and confer, the matter shall, upon demand of either Party, be submitted to resolution before the CPUC in accordance with the CPUC's rules, regulations and procedures applicable to resolution of such disputes.

15.2    Except as provided in Rule 23 Section T.3, any dispute arising between the Parties relating to interpretation of the provisions of this Agreement or to the performance of the CCA's obligations hereunder shall be reduced to writing and referred to the Parties' representatives identified on Attachment A for resolution,

with the responding Party filing its written response within thirty (30) business days after receiving the written position of the complaining party. Thereafter, the Parties shall be required to meet and confer  within ten (10) business days in a good faith effort to resolve their dispute. Pending resolution, the Parties shall

DocuSign Envelope ID: 9F9C45B8-F2A3-4590-976D-B1F90512708B

continue to proceed diligently with the performance of their respective obligations under this Agreement, unless this Agreement has been terminated under Section 4.2. If the Parties fail to reach an agreement within ten (10) additional business days of the last session to meet and confer, the matter shall, upon demand of either Party, be submitted to resolution before the CPUC in accordance with the CPUC's rules, regulations and procedures applicable to resolution of such disputes, as allowed by law or in equity, or the parties may mutually agree to pursue mediation or binding arbitration to resolve such issues.

15.3    Notwithstanding the provisions of Paragraph 15.1 and 15.2 above: (a) all disputes between the Parties relating to the payment by the CCA of any SCE fees or charges shall be subject to the provisions of SCE's applicable tariffs governing disputes over customer bills; (b) all disputes between the Parties regarding  non-bypassable charges (including Competition Transition Charges, Cost Responsibility Surcharges, and any other nonbypassable charges adopted by the Commission) payable by community choice aggregation customers or the CCA on behalf of such customers shall be subject to the provisions of SCE's applicable tariffs; and (c) SCE may pursue available remedies in law or equity for unauthorized electrical use by the CCA in a court of competent jurisdiction.

15.4    If the dispute involves a request for damages, parties understand that the Commission has no authority to award damages. To resolve such issues, the parties may mutually agree to pursue mediation or binding arbitration to resolve such issues, or if no such agreement is reached, to pursue other legal or equitable remedies that are available to the parties.

**Section 16:    Applicable Law and Venue**

This Agreement shall be interpreted, governed by and construed in accordance with the laws of the State of California, and shall exclude any choice of law rules that direct the application of the laws of another jurisdiction, irrespective of the place of execution or of the order in which the signatures of the parties are affixed or of the place or places of performance. Except for matters and disputes with respect to which the CPUC is the initial proper venue for dispute resolution pursuant to applicable law or this Agreement, the federal and state courts located in Los Angeles, California shall constitute the sole proper venue for resolution of any matter or dispute hereunder, and the Parties submit to the exclusive jurisdiction of such courts with respect to such matters and disputes.

**Section 17:**    **Force Majeure**

Neither Party shall be liable for any delay or failure in the performance of any part of this Agreement (other than obligations to pay money) due to any event of force majeure or other cause beyond its reasonable control, including but not limited to, unusually severe weather, flood, fire, lightning, epidemic, quarantine restriction, war, sabotage, act of a public enemy, earthquake, insurrection, riot, civil disturbance, strike, work stoppage caused by jurisdictional and similar disputes, restraint by court order or public authority, or action or non-action by or inability to obtain authorization or approval from any governmental authority, or any combination of these causes, which by the exercise of due diligence and foresight such Party could not reasonably have been expected to avoid and which by the exercise of due diligence is unable to overcome.  It is agreed that upon the Party so affected giving written notice and reasonably full particulars of such force majeure to the other Party within a reasonable time after the cause relied on, then the obligations of the Party, so far as they are affected by the event of force majeure, shall be suspended during the continuation of such inability and circumstance and shall, so far as possible, be remedied with all reasonable dispatch.  In the event of force majeure, as described herein, both Parties shall take all reasonable steps to comply with this Agreement and SCE's applicable tariffs despite occurrence of a force majeure event.

**Section 18:**    **Unauthorized Use of Energy (Energy Theft)**

18.1    The CCA represents and warrants that for each of its Customers, and at all times during which it provides community choice aggregation services as an Community Choice Aggregator, the CCA shall completely, accurately, and in a timely manner account for each of its Customer's loads.  Load data not accounted for in this manner may provide grounds for termination of this Agreement.  For verification purposes only, SCE shall have complete access to the load data provided to the ISO by the CCA. Such information is to remain confidential, and shall not be disclosed to any unauthorized person other than the CPUC, the California Independent System Operator or other law enforcement or regulatory authority.

18.2    SCE shall notify the CCA immediately and the CCA shall notify SCE immediately of any suspected unauthorized energy use.  The Parties agree to preserve any evidence of unauthorized energy use.  Once unauthorized energy use is suspected, SCE, in its sole discretion, may take any or all of the actions permitted under SCE's applicable tariffs.

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C tab 6 CCA claim Objection Claim Page 201 114 of 21 9 of 23

DocuSign Envelope ID: 9F9C45R0-E2A3-4599-976D-B1F9D512708B    Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 18 of 22

**Section 19:**    **Not a Joint Venture**

Unless specifically stated in this Agreement to be otherwise, the duties, obligations, and liabilities of the Parties are intended to be several and not joint or collective.  Nothing contained in this Agreement shall ever be construed to create an association, trust, partnership or joint venture or to impose a trust or partnership duty, obligation, or liability on or with regard to either Party. Each Party shall be liable individually and severally for its own obligations under this Agreement.

**Section 20:**    **Conflicts Between this Agreement and SCE's Community Choice Aggregation Tariff**

Should a conflict exist or develop between the provisions of this Agreement and SCE's community choice aggregation tariff, as approved by the CPUC, the provisions of SCE's community choice aggregation tariff shall prevail.

**Section 21:**    **Amendments or Modifications**

21.1    Except as provided in Section 21.2, no amendment or modification shall be made to this Agreement, in whole or in part, except by an instrument in writing executed by authorized representatives of the Parties, and no amendment or modification shall be made by course of performance, course of dealing or usage of trade.

21.2    This Agreement may be subject to such changes or modifications as the CPUC may from time to time direct or necessitate in the exercise of its jurisdiction, and the Parties may amend the Agreement to conform to changes directed or necessitated by the CPUC.  In the event the Parties are unable to agree on the required changes or modifications to this Agreement, their dispute shall be resolved in accordance with the provisions of Section 15 hereof or, in the alternative, CCA may elect to terminate this Agreement upon written notice to SCE, which shall be effective upon the receipt thereof.  SCE retains the right to unilaterally file with the CPUC, pursuant to the CPUC's rules and regulations, an application for a change in SCE's rates, charges, classification, service or rules, or any agreement relating thereto.

DocuSign Envelope ID: C9F9C45R8-E2A82459Ce976D-B1F9F5127ABB

**Section 22:**    **Audits**

22.1    SCE shall retain such specific records as may be required to support the accuracy of meter data provided in SCE's consolidated billings.  When the CCA reasonably believes that errors related to metering or billing activity may have occurred, the CCA may request the production of such documents as may be required to verify the accuracy of such metering and consolidated billing.  Such documents shall be provided within ten (10) business days of such request.  In the event the CCA, upon review of such documents, continues to believe that the SCE's duty to accurately meter and provide consolidated billing for usage has been breached, the CCA may direct that an audit be conducted. The CCA shall designate their own employee representative or their contracted representative to audit SCE's records.

22.2    Any such audit shall be undertaken by the CCA, or their contracted representative at reasonable times without interference with SCE's business operations, and in compliance with the SCE's security procedures.  SCE and the CCA agree to cooperate fully with any such audit.

22.3    Specific records to support the accuracy of meter data provided in the consolidated billings may require examination of billing and metering support documentation maintained by subcontractors.   SCE shall include a similar clause in its agreements with subcontractors reserving the right to designate their own employee representative, or their contracted representative to audit records related to consolidated billing to Community Choice Aggregation Customers.

22.4    The CCA will notify SCE in writing of any exception taken as a result of an audit.  SCE shall refund the amount of any undisputed exception to the CCA within ten (10) days.  If SCE fails to make such payment, SCE agrees to pay interest, accruing monthly, at a rate equal to the prime rate plus two percent (2%) of Bank of America NT&SA, San Francisco, or any successor institution, in effect from time to time, but not to exceed the maximum contract rate permitted by the applicable usury laws of the State of California.  Interest will be computed from the date of written notification of exceptions to the date SCE reimburses the CCA for any exception.  The cost of such audit shall be paid by the auditing Party; provided, however, that in the event an audit verifies overcharges of five percent (5%) or more, then SCE shall reimburse the CCA for the cost of the audit.

DocuSign Envelope ID: C9F9C45R0-E2A8-4599-976D-R1F0D5127AR5

22.5    This right to audit shall extend for a period of three (3) years following the date of final payment under this Agreement.  Each party and each subcontractor shall retain all necessary records and documentation for the entire length of this audit period.

**Section 23:    Miscellaneous**

23.1    Unless otherwise stated in this Agreement: (a) any reference in this Agreement to a section, subsection, attachment or similar term refers to the provisions of this Agreement; (b) a reference to a section includes that section and all its subsections; and (c) the words "include," "includes," and "including" when used in this Agreement shall be deemed in each case to be followed by the words "without limitation." The Parties agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement

23.2    The provisions of this Agreement are for the benefit of the Parties and not for any other person or third party beneficiary.  The provisions of this Agreement shall not impart rights enforceable by any person, firm or organization other than a Party or a successor or assignee of a Party to this Agreement.

23.3    The descriptive headings of the various sections of this Agreement have been inserted for convenience of reference only and shall in no way define, modify or restrict any of the terms and provisions thereof.

23.4    Any waiver at any time by either Party of its rights with respect to a default under this Agreement, or with respect to any other matter arising in connection with this Agreement, shall not be deemed a waiver with respect to any other or subsequent default or matter and no waiver shall be considered effective unless in writing.

23.5    Each Party shall be responsible for paying its own attorneys' fees and other costs associated with this Agreement, except as provided in Sections 6 and 7 hereof.  If a dispute exists hereunder, the prevailing Party, as determined by the CPUC, or as may otherwise be determined by the dispute resolution procedure contained in  Section 15 hereof, if used, or by a court of law, shall be entitled to reasonable attorneys' fees and costs.

23.6    To the extent that the CPUC has a right under then-current law to audit either Party's compliance with this Agreement or other legal or regulatory requirements pertaining to Community Choice Aggregation transactions, that Party shall cooperate with such audits.  Nothing in this Section shall be construed as an admission by either Party with respect to the right of the CPUC to conduct such audits or the scope thereof.

Case 6:21-bk-12821-SY    Doc 222-5    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit 5 to SCE Claim Objection Page 20 of 23

DocuSign Envelope ID: C950C45B0-F9A3-4599-976D-B1F90E512F8B5
Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 21
of 22

23.7    Except as otherwise provided in this Agreement, all rights of termination,
cancellation or other remedies in this Agreement are cumulative.  Use of any
remedy shall not preclude any other remedy in this Agreement.

The Parties have executed this Agreement on the dates indicated below, to be effective upon
the later date.

**On Behalf of CCA**

By: _____ *Rick Bishop* _____

Name: __Rick Bishop_____

Title: __Executive Director_____

Date: ____2/26/2019_____

**On Behalf of SCE**

By: _____ *Mike Marelli* _____

Name: __Mike Marelli_____

Title: __VP Business Customer Division____

Date: ____2/19/2019_____

**ATTACHMENT A**

**A.    Definitions:**

**Billing Services** - The consolidated billing services described in SCE's community choice aggregation tariff which are provided by SCE.

**Community Choice Aggregation Customer** - An end-use customer located within SCE's service territory who purchases Community Choice Aggregation Services through the CCA.

**Community Choice Aggregator (CCA)** – An entity that provides electric supply services to Community Choice Aggregation customers within SCE's service territory.  A CCA may also provide certain energy efficiency and conservation programs to its Community Choice Aggregation customers as provided for under SCE's tariffs.

**CCA Charges** - Charges for Community Choice Aggregation Services provided by the CCA.

**SCE Charges** - Charges (a) for services provided by SCE; or (b) which are energy-related and which are approved by the CPUC or the Federal Energy Regulatory Commission (including any nonbypassable charges such as Competition Transition Charges, Cost Responsibility Surcharges, and any other nonbypassable charges adopted by a regulatory body) or Fixed Transition Amount Charges owing to SCE or its affiliates, as those terms are defined under the California Public Utilities Code). Fixed Transition Amount Charges are also referred to as Trust Transfer Amount (TTA) Charges.

**B.    Contact Persons (Section 13.3):**

            **Billing Services**

               SCE Contact:  Kathryn Anderson

               CCA Contact:  Barbara Spoonhour

**C.    Parties' Representatives (Section 15.1):**

            *SCE Representative*:

               *Contact Name* Kathryn Anderson

               *Business Address*  6020 N Irwindale Ave. Ste. I

               Irwindale, CA 91702

            *CCA Representative*:

               *Contact Name* Barbara Spoonhour

               *Business Address*  3390 University Avenue, Suite 450 Riverside C

**Exhibit 4**

**SCE Claim 21**

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G also SCE Claim Objection Claim 21120 Page 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 1

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | Western Community Energy |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 6:21-bk-12821-SY |

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Southern California Edison Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Munger, Tolles & Olson LLP<br>Name | See Addendum.<br>Name |
| 350 South Grand Avenue<br>Number      Street | Number      Street |
| Los Angeles      CA      90071<br>City      State      ZIP Code | City      State      ZIP Code |
| Contact phone 213-683-9554 | Contact phone _____ |
| Contact email seth.goldman@mto.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit G also SC Declaration Objection Claim Page 121 Page 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 2
of 91

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?** $_____14,568,891.88_. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: See Addendum _____

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit G - SCE Claim Objection Claim 21-122    Page 214 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 3
of 91

<table>
<tr>
<td>

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

</td>
<td colspan="2">

☑ No

☐ Yes. *Check all that apply:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

</td>
<td>

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

</td>
</tr>
</table>

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    09/30/2021
                    MM / DD / YYYY

/s/ Bradley Schneider (original on following page)
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Bradley | Robert | Schneider |
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number       Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |

Case 6:21-bk-12821-SY Doc 222-7 Filed 11/30/21 Entered 11/30/21 19:38:50 Desc
Exhibit Exhibit 5B & C Declaration Objection Claim Page 123 Page 215 of 92

Case 6:21-bk-12821-SY Claim 21-1 Filed 09/30/21 Desc Main Document Page 4
of 91

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09/30/2021
                  MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number    Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email bradley.schneider@mto.com | |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibits G-J SCE Claim Objection Claim 21 124 Page 216 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 5
of 91

## ADDENDUM TO PROOF OF CLAIM

### In re Western Community Energy,
### Case No. 6:21-bk-12821-SY

This addendum is attached to and a part of the proof of claim (the "Proof of Claim") filed by Southern California Edison Company ("SCE") (the "Claimant") against Western Community Energy Company (the "Debtor" and, with SCE, the "Parties").

**1.    Basis for Proof of Claim and Asserted Amount**

On June 10, 2021, WCE submitted a written notice of deregistration as a Community Choice Aggregator ("CCA") with the California Public Utility Commission ("CPUC"). The Debtor's notice of deregistration served as advanced written notice of the Debtor's mass involuntary return of its CCA customers to SCE's procurement service.

On June 11, 2021, SCE entered into a Load Transfer Agreement with the Debtor and the California Independent System Operator ("CAISO") whereby SCE assumed Scheduling Coordination of the Debtor's load on June 15, 2021. The Debtor's customer service accounts that were mass involuntarily returned to SCE totaled 113,337 and were switched to SCE's Bundled Portfolio Service effective on June 15, 2021.

Under California law, SCE is entitled to recover re-entry fees ("Re-Entry Fees") from the Debtor to cover the incremental procurement and administration caused its mass involuntary return of customers to SCE's procurement service. See Cal. Pub. Util. Code § 394.25(e); California Public Utility Commission, *Decision Establishing Reentry Fees and Financial Security Requirements for Community Choice Aggregators*, D.18-05-022 (June 7, 2018) and Resolution E-5059 (Oct 8, 2020), authorizing changes to SCE's Rule 23 to implement § 394.25(e) and D.18-05-022.

Pursuant to Section X of its Rule 23 Community Choice Aggregation Tariff ("Rule 23 Tariff"), SCE has calculated the total Re-Entry Fees owed by the Debtor as $14,715,892. A true and correct copy of SCE's current Rule 23 Tariff is attached hereto as Exhibit 1. The Debtor posted the financial security requirement ("FSR") of $147,000 in the form of a letter of credit. After drawing on the FSR posting, SCE is owed $14,568,892 in Re-Entry Fees.

On July 12, 2021, SCE submitted a Tier 1 Advice Letter to the CPUC providing notice of the mass involuntary return of the Debtor's customers to SCE's procurement service and setting forth SCE's calculation of Re-Entry Fees. A true and correct copy of SCE's Tier 1 Advice Letter is attached hereto as Exhibit 2.

The Debtor may direct SCE to set off its claim for Re-Entry Fees against customer payments that SCE collects and remits to the Debtor. *See* Rule 23 Tariff § W.4.f. To the extent the Debtor so consents, SCE's claim for Re-Entry Fee is secured by a right of setoff.

Finally, SCE asserts an administrative claim for Re-Entry Fees as an administrative expense.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibits G also SCE Claim Objection Claim 21-1 Page 125 Page 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 6
of 91

## 2.    Reservations of Rights

The filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver or release of Claimant's rights against any other entity or person liable for all or any part of the Proof of Claim asserted herein; (ii) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver or release of Claimant's right to mediate or arbitrate any dispute, as applicable, including the amount or nature of the Proof of Claim; (iv) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (v) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (vi) a waiver or release of Claimant's right to have any and all final orders entered only after de novo review by a United States District Court Judge; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto, or other proceeding which may be commenced in this case against or otherwise involving Claimant; (viii) a waiver or release or limitation of Claimant's right to setoff or recoupment; or (ix) a waiver of Claimant's right to assert any additional claims that may be entitled to administrative priority under sections 503 and 507 of the Bankruptcy Code.

## 3.    Amendments

Claimant reserves the right to amend and/or supplement this Proof of Claim at any time, in any manner, including, but not limited to, fixing the amount of the claims described above that are or may become due to Claimant, and/or to file additional proofs of claim for any additional claim which may be based on the same or additional documents or grounds of liability.

## 4.    Notices

All notices relating to this Proof of Claim should be sent as follows:

> Southern California Edison Company
> Attn:  Samantha Nicely
> 6060 N. Irwindale Ave.
> Suite J
> Irwindale, CA 91702
>
> With a copy to:
>
> Seth Goldman
> Bradley R. Schneider
> Munger, Tolles & Olson LLP
> 350 South Grand Avenue, 50th Floor
> Los Angeles, CA 90071

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibits A - SCE Claim Objection Claim    Page 126 of 210    Page 8 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 7
of 91

All payments should be sent to:

Southern California Edison Company
Attn:  Samantha Nicely
6060 N. Irwindale Ave.
Suite J
Irwindale, CA 91702

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibits G also SOE Claim Objection Claim 21-1   Page 127   Page 219 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 8
of 91

## EXHIBIT 1

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C Cal. SCE Claim Objection Claim Page 128 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 9
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 70466-E |
| Rosemead, California    (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 67459-E |

---

<u>Rule 23</u>                                    Sheet 1
<u>COMMUNITY CHOICE AGGREGATION</u>

TABLE OF CONTENTS

A. CUSTOMER SERVICE ELECTIONS

B. GENERAL TERMS

C. CUSTOMER INQUIRIES AND DATA ACCESSIBILITY

D. BASIC CCA SERVICE

E. CCA SPECIALIZED SERVICE REQUESTS, INCLUDING PHASE-IN

F. CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT

G. CCA SERVICE CUSTOMER ELIGIBILITY

H. CCA CUSTOMER NOTIFICATION PROCESSES

I. CCA CUSTOMER OPT-OUT PROCESSES

J. CCA SERVICE MASS ENROLLMENT PROCESSES

K. CUSTOMER RELOCATION PROCESSES FOLLOWING MASS ENROLLMENT

L. CCA CUSTOMERS SWITCHING RULES

M. CCA SERVICE REQUESTS (CCASR) AFTER MASS ENROLLMENT

N. METERING SERVICES

O. BOUNDARY METERING SPECIAL REQUESTS

P. BILLING SERVICE OBLIGATIONS

Q. PAYMENT AND COLLECTION TERMS

R. LATE OR PARTIAL PAYMENTS AND UNPAID BILLS

S. VOLUNTARY CCA SERVICE TERMINATION

T. INVOLUNTARY SERVICE CHANGES

U. SERVICE DISCONNECTIONS AND RECONNECTIONS

V. CREDIT REQUIREMENTS

W. CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS                    (N)
                                                                          |
                                                                          |
X. CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE                 |
    REQUIREMENTS                                                          (N)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| *1C12* | | Resolution    E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Gab 6 CCE Claim Objection Clas Page 129 Page 10 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 10
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 55566-E |
|---|---|---|---|---|
| Rosemead, California  (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 47476-E |

---

<u>Rule 23</u>                                      Sheet 2        (T)
<u>COMMUNITY CHOICE AGGREGATION</u>

(Continued)

Community Choice Aggregation Service (CCA Service) permits cities, counties, a city and county, or      (N)
any group of cities and counties, as defined by PU Code Section 331.1  whose governing board(s)         |
have elected to do so, or have elected to form a joint powers agency to do so, or the Kings River        |
Conservation District, the Sonoma County Water Agency, or any California public agency possessing        |
statutory authority to generate and deliver electricity at retail within its designated jurisdiction provided   |
the cities and counties within, or contiguous to, its jurisdiction have by resolution requested the agency    |
to do so, to aggregate the electric loads of SCE end-use customers within their service areas for the    |
purposes of acquiring and providing their electric power needs.  These entities are hereinafter referred   (N)
to as Community Choice Aggregators (CCA), to provide electric services to SCE end-use customers
located within their service area(s) as set forth in California Public Utilities (PU) Code Section 366.2
and other Commission directives.  Customers that have not elected to opt-out of CCA Service or at the    (N)
customer's election shall have their electric power procured by the CCA.                                  (N)

The following terms and conditions apply to both SCE customers and CCAs who participate in CCA
Service and are not meant to include all requirements that may otherwise be mandated to comply with
state laws, the PU Code, Federal Energy Regulatory Commission (FERC) Rules, and California
Independent System Operator (CAISO) Rules applicable to CCAs and CCA Service.  CCA Service
shall refer to the electric service provided by a CCA to any group of end-use electric customers located
within the service area of the CCA who have not elected to opt-out from such service and receive
electricity procurement and other related services from the CCA.

A.    CUSTOMER SERVICE ELECTIONS

      1.    SCE Bundled Services

            This service preserves traditional utility electric services, under which SCE performs all
            electric energy services for the end-use customer including metering, billing, collection,
            and customer services. Customers not receiving service under CCA Service or Direct
            Access Service shall receive service under SCE Bundled Services.

      2.    Non-SCE Energy Services

            a.    Community Choice Aggregation Service (CCA Service)

                  This service permits cities, counties, a city and county, or any group of cities,
                  counties, or cities and counties, as defined by PU Code Section 331.1, whose
                  governing boards have elected to do so, to aggregate the electric load of SCE
                  end-use customers within their service areas for the purposes of acquiring and
                  providing their electric power needs.  These entities are CCAs.  Customers that
                  have not elected to opt-out of CCA Service or at the customer's election shall
                  have their electric power procured by the CCA.

            b.    Direct Access

                  This service election allows customers to purchase electric power and, at the
                  customer's election, additional energy services from non-SCE entities known as
                  Electric Service Providers (ESPs).  Direct Access service is governed by Rule    (T)
                  22.  Direct Access customers are eligible for CCA Service participation pursuant
                  to the provisions set forth in Section G of this Rule.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice     3113-E | Megan Scott-Kakures | Date Filed | Oct 7, 2014 |
| Decision | Vice President | Effective | Oct 1, 2015 |
| 2C20 | | Resolution | E-4730 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit G at SCE Claim Objection Claim Page 113 Page 210 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 11
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 55567-E |
| Rosemead, California | (U 338-E) | Cancelling Original | Cal. PUC Sheet No. | 40025-E |

---

Rule 23                                                              Sheet 3        (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

B.   GENERAL TERMS

1.   Definitions

The definitions of principal terms used in this Rule are found either herein or in Rule 1, Definitions.  Unless otherwise stated, all references to "customer" in this Rule will refer to SCE customers that have service accounts within a CCA's service area. Unless otherwise stated, all references to "service account" shall refer to individual customer meters.  Unless otherwise stated, all references to "utility" shall refer to SCE.  Unless other stated all references to "CCA Service Customer" shall refer to "CCA Customer" as defined in Rule 1.  The descriptive section headings of this Rule have been inserted for convenience of reference only and shall in no way define, modify or restrict any of the terms and provisions thereof.

2.   General Obligations of SCE

a.   Non-Discrimination

SCE shall discharge its responsibilities under this Rule in a fully cooperative, fair and non-discriminatory manner as to providers of all commodities and services, which are subject to CCA and Direct Access Service.  Pursuant to D.05-12-041, fully cooperative is defined to mean SCE shall facilitate the CCA program and a CCA's efforts to implement it to the extent reasonable and in ways that do not compromise other SCE services.

b.   Requests for SCE Services

SCE shall process requests for similar SCE services, such as Community Choice Aggregation Service Requests (CCASRs), in the same manner and within the same period of time for all CCAs and their respective customers.

c.   Timeliness and Due Diligence

Consistent with State law and Commission decisions, SCE shall exercise due diligence in meeting its obligations and deadlines under this Rule so as to implement CCA Service as quickly as possible.

d.   Transmission and Distribution Service

Subject to the terms and conditions of the CCA Service Agreement (Form 14-768), applicable SCE tariffs, applicable FERC rules and CCA's and customer's compliance with their terms and conditions, SCE shall provide transmission and distribution services under applicable tariffs and contracts for delivery of electric power to CCA customers.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    3113-E | Megan Scott-Kakures | Date Filed    Oct 7, 2014 |
| Decision | Vice President | Effective    Oct 1, 2015 |
| 3C16 | | Resolution    E-4730 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE Claim Objection Cn Claims 113 Page 213 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 12
of 91

EDISON
An EDISON INTERNATIONAL Company

| | | | | |
|---|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. | 55568-E |
| Rosemead, California | (U 338-E) | Cancelling Original | Cal. PUC Sheet No. | 40026-E |

---

Rule 23        Sheet 4    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

B.     GENERAL TERMS (Continued)

     3.      General Obligations of CCAs

        a.      Timeliness and Due Diligence

           CCAs shall exercise due diligence in meeting their obligations and deadlines under this Rule, applicable laws and Commission decisions. CCAs shall make all payments owed to SCE under this Rule in a timely manner subject to applicable payment dispute provisions.

        b.      Arrangements with CCA Customers

           CCAs shall be solely responsible for having contractual or other arrangements with their customers necessary to implement CCA consistent with all applicable laws, Commission requirements and this Rule. SCE shall not be responsible for monitoring, reviewing or enforcing such contracts or arrangements.

        c.      Scheduling Coordinator

           As a requirement of this Rule, CCAs providing electric power shall have one or more Scheduling Coordinators. SCE shall not be responsible for enforcing requirements applicable to the performance of Scheduling Coordinators.

     4.      Transfer of Cost Obligations Between CCAs and Customers

        Nothing in this Rule is intended to prevent CCAs and customers from agreeing to reallocate between them any costs for CCA Services which are designated in this Rule to be paid by either of them.

     5.      Responsibility for Electric Purchases

        CCAs have exclusive responsibility for obtaining and providing the electric power needs (including ancillary services) of their CCA customers and to deliver such power to the necessary grid location required to serve electric power needs to those customers.

     6.      SCE Not Liable for CCA Services

        If a customer receives service from a CCA, SCE has no obligations to the customer with respect to the services provided by the CCA. The customer must look to the CCA to carry out the responsibilities associated with that service.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    3113-E | Megan Scott-Kakures | Date Filed | Oct 7, 2014 |
| Decision | Vice President | Effective | Oct 1, 2015 |
| 4C16 | | Resolution | E-4730 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit SCE Cab SCE Claim Objection Claim Page 132 of 210

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 13
of 91

EDISON
An EDISON INTERNATIONAL Company

Southern California Edison                        Revised      Cal. PUC Sheet No.   55569-E
Rosemead, California       (U 338-E)      Cancelling   Original      Cal. PUC Sheet No.   40027-E

---

Rule 23                                        Sheet 5       (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

B.    GENERAL TERMS (Continued)

7.    CCA Not Liable for SCE Services

To the extent the customer receives service from SCE, a CCA has no obligations to
the customer with respect to the services provided by SCE.  The customer must look
to SCE to carry out the responsibilities associated with that service.

8.    Load Aggregation for Procuring Electric Power

CCAs may aggregate individually metered electric loads located within the service
area of the CCA only for the purpose of procuring electric power and ancillary
services.  Load aggregation shall not be used to determine SCE charges or tariff
applicability.  The right of customers to physically aggregate by combining multiple
accounts into a single metered account as permitted under Commission-approved
tariffs is not restricted by this section.

9.    Split Loads Not Allowed

Customers participating in CCA may not partition the electric loads of an individual
service account among electric service options or providers.  The entire load of an
individual service account must receive service under only one electric service option
or provider.

10.    Residential Customers

All residential customers, as defined in Rule 1, located within a CCA's service area
shall be offered CCA Service.

11.    Interval Metering

Interval metering shall refer to a meter device capable of recording the minimum data
required for (a) hourly data required for the CCA Service settlement process; and (b)
data required to bill SCE distribution tariffs.

12.    Statistical Load Profiles

SCE shall provide statistical load profiles, in place of Interval Metering, to permit SCE
or CCA to compute the bills for all CCA customers who have service accounts where
interval metering data is not provided to the CCA.  Statistical load profiles shall be
applied as authorized by the Commission.

13    Master Metered Customers

Individual master metered customers who provide sub-metered tenant billings, may
participate in CCA Service as a single account.  A master metered customer may not
partition the electric loads of a single master meter among several electric service
options or providers.  The entire load of a single master meter must receive service
under one electric service option and provider.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3113-E | Megan Scott-Kakures | Date Filed    Oct 7, 2014 |
| Decision | Vice President | Effective    Oct 1, 2015 |
| 5C16 | | Resolution    E-4730 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit C Cab 6 C E Claim Objection Claim 21 1 Page 133 Page 215 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 14
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No.   55570-E |
| Rosemead, California   (U 338-E) | Cancelling | Original | Cal. PUC Sheet No.   40028-E |

---

Rule 23   Sheet 6   (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

B.   GENERAL TERMS (Continued)

14.   Service Fees and Other Charges

a.   SCE costs for services provided to a CCA or CCA Customer shall be charged to the CCA or customer as set forth in the appropriate SCE rate schedule.  SCE may charge service fees for CCA related services described in this Rule only for the incremental costs associated with providing these services and provided that service fees do not assess charges on CCAs for billing processes or customer services that are unrelated to services and customer billings associated with the CCA's CCA Service or are collected in other SCE rates, charges or fees.

b.   SCE Service charges approved by the Commission, which may include, but are not limited to, service establishment charges and special meter reading fees, which are contained within or authorized by other tariffs are not affected by this Rule.

c.   Service fees for CCA Services are described in Schedule CCA-SF and Schedule   (T)
CCA-INFO.   (T)

15.   Non-bypassable Obligations

As a condition of participating in CCA Service, CCA customers shall be responsible to pay for all non-bypassable charges authorized by the Commission and for which SCE may recover from customers in accordance with state law.     SCE shall continue to bill the customer for such charges.   Disputed charges shall be resolved pursuant to the provisions set forth in Rule 10.

16.   Franchise Fees And Other Charges

CCA Customers shall continue to be responsible to pay all applicable fees, surcharges and taxes as authorized by law.  SCE shall bill customers for franchise fees as set forth in PU Code Sections 6350 to 6354, and for fees as set forth in PU Code Sections 401 to 410.  The CCA and SCE shall each be responsible for calculating other fees, taxes, and surcharges for their respective services.

17.   Liability In Connection With CCA Services

a.   In this Section, "damages" shall include all losses, harm, costs, and detriment, both direct and consequential, suffered by the customer.

b.   SCE shall not be liable to the customer or CCA for any damages caused by SCE's conduct in compliance with, or as permitted by, SCE's electric rules and tariffs, the CCA Service Agreement and associated legal and regulatory requirements related to CCA Service.

c.   SCE shall not be liable to the customer for any damages caused to the customer by any failure by CCA to comply with SCE's tariffs, the CCA Service Agreement and associated legal and regulatory requirements related to CCA Service.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice   3113-E | Megan Scott-Kakures | Date Filed   Oct 7, 2014 |
| Decision | Vice President | Effective   Oct 1, 2015 |
| 6C17 | | Resolution   E-4730 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G Cal. SCE Claim Objection Cal Page 113 Page 216 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 15
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No.  65643-E |
| Rosemead, California     (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No.  55571-E |

---

<u>Rule 23</u>                                            Sheet 7
<u>COMMUNITY CHOICE AGGREGATION</u>

(Continued)

B.    GENERAL TERMS (Continued)

17.    Liability In Connection With CCA Services (Continued)

d.    The Commission shall have initial jurisdiction to interpret, add, delete or modify any provision of this Rule or the CCA Service Agreement, and to resolve disputes regarding SCE's performance of its obligations under SCE's tariffs, the CCA Service Agreement and requirements related to CCA Service, including any disputes regarding delays in the implementation of CCA.

e.    SCE shall not be liable to the customer for any damages caused by CCA's failure to perform its obligations to the customer, including, but not limited to the obligation to provide electric supply services to the customer.  The CCA shall not be liable to the customer for any damages caused by SCE's failure to perform its obligations to the customer.

f.    A CCA is not SCE's agent for any purpose.  SCE shall not be liable to the customer for any damages resulting from any acts, omissions, or representations made by CCA in connection with soliciting customers for CCA Service or performing any of its functions in rendering CCA Service.

g.    SCE is not the CCA's agent for any purpose.  The CCA shall not be liable to the customer for any damages resulting from any acts, omissions, or representations made by SCE in connection with soliciting customers for CCA Service or performing any of its functions in rendering CCA Service.

18.    CCA Implementation Plan

A CCA shall develop an Implementation Plan, as defined in PU Code Section 366.2(c)(3).

19.    Sixty (60) Day Period

A Sixty (60) Day Period is a period of time equal to sixty (60) calendar days.  For purposes of this Rule, two billing cycles or two calendar months are also equal to 60 calendar days.

20.    Automatic Enrollment

Automatic Enrollment is the process whereby a CCA can automatically enroll an eligible SCE customer in CCA Service.  Customer participation in CCA Service may not require a positive written declaration, but all customers shall be informed of their right to opt-out of CCA Service.  If no negative declaration is made by the customer during the 60-day        (T)
initial notification period or the 60-day follow-up notification period, the customer shall be served through the CCA's CCA Service.  Automatic Enrollment is the transfer of a customer's service account to CCA Service with no action taken by the customer to initiate the transfer.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice      3923-E-A | R.O. Nichols | Date Submitted    May 21, 2019 |
| Decision | President | Effective    Jan 19, 2019 |
| 7C5 | | Resolution |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab-6 CE Claim Objection Claim Page 135 Page 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 16
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. 63349-E |
| Rosemead, California (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. 62185-E |

---

<u>Rule 23</u>                                   Sheet 8
COMMUNITY CHOICE AGGREGATION

(Continued)

B.    GENERAL TERMS (Continued)

21.    CCA Customer Notification

CCA Customer Notification is the required CCA customer notification that informs customers of the CCA's CCA Service. The CCA Customer Notification must inform customers that (a) they are to be automatically enrolled in CCA Service, (b) the terms and conditions of CCA Service, and (c) the customer has the right to opt-out of CCA Service. The notification must also include a mechanism by which a potential customer may opt-out of CCA Service. To qualify for Automatic Enrollment the CCA shall fully inform participating customers (1) once within the sixty (60) day period in advance of    (C)
the date of Automatic Enrollment, (2) once within the thirty (30)-day period in advance     |
of the date of Automatic Enrollment, and (3) at least twice during a 60-day period     (C)
following enrollment in a CCA's Service.

22.    Opt-Out of Automatic Enrollment

The term "opt-out" or "opt out" is the customer's election not to be served under CCA Service and to continue to receive its existing service. In order to exercise its right not to participate in CCA Service, a customer must request to "opt out" of CCA Service through the required action as prescribed in the CCA Notification. A customer may exercise its opt-out right at any time during a 60-day notification period prior to Automatic Enrollment through the end of the second 60-day notification period subsequent to the Automatic Enrollment of a customer's account to CCA Service. The terms and conditions of CCA service will be made available by the CCA. This CCA-specific information will be provided to customers pursuant to P.U. Code Section 366.2(c)(15)(A-C) – either directly by the CCA or by SCE pursuant to the provisions set forth in Section H – and will enable customers to make an informed decision whether or not to opt-out of CCA service. Customers receiving section 366.2(c)(15)(A-C) notices regarding a CCA with more than one planned CCA phase-in date will be provided the required 60-day notices based around the date their particular phase-in commences.

23.    Initial Notification Period

The Initial Notification Period is a period of time, lasting not less than sixty (60) days, leading up to the Automatic Enrollment date.

24.    Follow-up Notification Period

The Follow-up Notification Period is a sixty (60) day period of time commencing immediately following the date of Automatic Enrollment.

25.    CCA Cost Responsibility Surcharge (CCA-CRS)

As a condition of receiving CCA Service, CCA customer shall be responsible for paying a CCA Cost Responsibility Surcharge (CRS) as set forth in Schedule CCA-CRS. The CCA CRS shall be identified separately, as part of SCE charges on the customer's monthly billing statement.

26.    CCA Service Request (CCASR)

CCA Service Request (CCASR) is the electronic communication required to enroll or add customers to CCA Service, remove customers from CCA Service, change service options, and maintain customer information.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed    Feb 22, 2018 |
| Decision | Senior Vice President | Effective    Mar 24, 2018 |
| 8C13 | | Resolution    E-4907 |

**EDISON**
An EDISON INTERNATIONAL Company

| | | |
|---|---|---|
| Southern California Edison | Revised | Cal. PUC Sheet No. 70467-E |
| Rosemead, California    (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. 55573-E |

---

Rule 23                                                                Sheet 9
COMMUNITY CHOICE AGGREGATION

(Continued)

B.    GENERAL TERMS (Continued)

27.    CCA Phase-In

Pursuant to D.04-12-046, a CCA has the ability to offer service to some eligible customers before others.  This incremental enrollment process is defined as a Phase-In and shall be subject to the provisions set forth in Section E of this Rule.

28.    CCA Service

This service permits cities, counties, a city and county, or any group of cities, counties, or cities and counties, as defined by PU Code Section 331.1, whose governing boards have elected to do so, or have elected to form a joint powers agency to do so, or the Kings River Conservation District, the Sonoma County Water Agency, or any California public agency possessing statutory authority to generate and deliver electricity at retail within its designated jurisdiction provided the cities and counties within, or contiguous to, its jurisdiction have by resolution requested the agency to do so, to aggregate the electric load of SCE end-use customers within their service areas for the purposes of acquiring and providing their electric power needs.  These entities are CCAs.  Customers that have not elected to opt-out of CCA Service or at the customer's election shall have their electric power procured by the CCA.

29.    Involuntary Return                                                                         (N)

For purposes of assessing Re-Entry fees, an involuntary return of a CCA customer to Bundled Service may occur due to any of the following:

a.    The CCA has filed to deregister or the Commission has revoked the CCA's registration,
b.    The CCA service under the Service Agreement becomes terminated,
c.    The CCA or its authorized CAISO Scheduling Coordinator (SC) has defaulted on its CAISO SC obligations, such that the CCA no longer has an appropriately authorized CAISO SC,
d.    A voluntary service termination pursuant to Section S of this Rule, or
e.    An involuntary service termination pursuant to Section T of this Rule, including the Commission issuing an order to terminate service either at SCE's request or by Commission initiation.

An Involuntary Return of a CCA customer does not include the following events:
a.    A customer's contract with an CCA has expired, or
b.    CCA discontinues service to a customer due to that customer's default under their                 (N)
service agreement with the CCA.

                                                                                                (L)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 9C13 | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE claim Objection Claim 113 Page 137 Page 219 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 18
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| | | | | |
|---|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. | 70468-E |
| Rosemead, California (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 55573-E |
| | | Original | | 55574-E |

<u>Rule 23</u>                                             Sheet 10
COMMUNITY CHOICE AGGREGATION

(Continued)

B.    GENERAL TERMS (Continued)                                    (N)

30.    Financial Security Requirement (FSR)

All new and existing CCAs are required to post and maintain financial security with SCE in the form and amount as set forth in Section W of this Rule.                    (N)

                                                                (L)

C.    CUSTOMER INQUIRIES AND DATA ACCESSIBILITY

1.    Customer Inquiries

Customers contacting SCE requesting information on CCA Service shall be referred to the CCA for assistance. SCE shall provide the customer with the CCA's telephone number.

2.    Customer Request To Initiate CCA Service

Eligible customers contacting SCE requesting to initiate CCA Service from the CCA shall be processed by SCE.  SCE shall notify the CCA pursuant to the provisions set forth in this Rule.                                                    (L)

3.    Access to Customer Data

a.    SCE shall provide customer-specific usage data pursuant to Schedule CCA-INFO.  SCE and CCA shall abide by the instructions of a customer as to the entities to whom access to the confidential customer information is provided.

b.    When a customer is enrolled into CCA Service, the customer's account information will be sent to the CCA.  Such information will include information such as metering information required for billing, settlement and other functions and twelve (12) months of historical usage data (if available).

c.    A CCA has the option to request additional customer information pursuant to Schedule CCA-INFO.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 10C13 | | Resolution | E-5059 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cab 6 CCE claim Objection Claim Page 113 Page 210 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 19
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 55575-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 55694-E |

Rule 23    Sheet 11    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

C.  CUSTOMER INQUIRIES AND DATA ACCESSIBILITY (Continued)

    4.    Customer Inquiries Concerning Billing-Related Issues

        Customer inquiries concerning SCE's charges and services shall be directed to SCE. Customer inquiries concerning the CCA's charges or services shall be directed to the CCA.

    5.    Customer Inquiries Related To Emergency Situations And Outages

        a.    SCE shall be responsible for responding to all inquiries related to distribution or transmission service, emergency system conditions, outages and safety situations.  Customers contacting the CCA with such inquiries shall be referred directly to SCE.

        b.    It may be necessary for SCE to shed or curtail customer load at the request of the CAISO, or as otherwise provided by Commission-approved tariffs. Nothing in this Rule or CCA Service shall change the criteria for load shedding established by the CAISO or Commission.

        c.    SCE shall continue to be responsible for implementing Commission-approved load curtailment and demand response programs, including providing notification to participating customers.

        d.    The CCA shall be responsible for notifying its Scheduling Coordinator of any notice issued to the CCA by SCE under this Section.

D.  BASIC COMMUNITY CHOICE AGGREGATION SERVICES

    1.    In accordance with Decision (D). 04-12-046 and D.05-12-041 , the processes set forth below describe basic services provided by SCE to develop, implement and support CCA Service:

        a.    A standard opt-out service as defined in Section I.

        b.    A mass enrollment process, defined in Section J, whereby all eligible customers who have not opted-out of CCA Service, shall be automatically enrolled in CCA Service on the customer's scheduled meter read date during a one month period, subject to phasing or the mutual agreement of SCE and CCA pursuant to the provisions set forth in Section E of this Rule.

        c.    On an ongoing basis, subsequent to the initial mass enrollment, SCE shall initiate the customer's enrollment or transfer to CCA service, as defined in Section K, when the customer contacts SCE to establish or relocate SCE service.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice   3113-E | Megan Scott-Kakures | Date Filed | Oct 7, 2014 |
| Decision | Vice President | Effective | Oct 1, 2015 |
| 11C23 | | Resolution | E-4730 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C Tab 6 CCE claim Objection Claim Page 139 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 20
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 55576-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Original | Cal. PUC Sheet No. | 40033-E |

---

Rule 23                                                            Sheet 12      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

E.    CCA SPECIALIZED SERVICE REQUESTS, INCLUDING PHASE-IN

　　　1.    A CCA electing not to utilize the basic processes described above may request specialized services from SCE at a cost to the CCA as set forth below.  Specialized Services include any request for services that do not conform to SCE's basic CCA services and processes in Section D.  Specialized Services may include, but are not limited to CCA Phase-In, special reporting or other unique services.

　　　　　　a.    A CCA interested in submitting a request for Specialized Services shall be responsible for funding an analysis of the impacts to SCE normal operations and a study to determine the estimate of costs for which the CCA shall be responsible to pay.

　　　　　　b.    A CCA requesting Specialized Services shall be responsible for executing a Specialized Services Agreement between the CCA and SCE.

　　　　　　c.    SCE shall consider requests for Specialized Services on a case by case basis, provided that implementation can be accomplished without compromising SCE's customer service obligations, reliability or operational flexibility of SCE's systems.

　　　　　　d.    The estimate of the costs for which the CCA shall be responsible, shall be provided to the CCA and shall be based upon time and materials costs and fees set forth in the appropriate SCE rate schedule.  The estimate of costs shall include any cost savings that may occur as a result of the specialized service.

　　　　　　e.    The CCA shall be responsible for all actual costs associated with Specialized Services, including but not limited to the development of the estimate of costs, the implementation of the Specialized Service and all applicable ongoing maintenance costs.

　　　　　　f.    The costs associated with the initial implementation of any Specialized Services shall be paid in advance by the CCA before work is commenced.

　　　　　　g.    The CCA and SCE shall agree to a mutually acceptable implementation schedule.  The implementation schedule shall take into consideration and provide priority to required SCE system work, which may include work related to mandated regulatory changes, customer service obligations, computer system integrity testing and maintenance.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    3113-E | Megan Scott-Kakures | Date Filed | Oct 7, 2014 |
| Decision | Vice President | Effective | Oct 1, 2015 |
| 12C17 | | Resolution | E-4730 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G a 6 CC claim Objection Claim Page 140 Page 21 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 21
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No.    63350-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No.    55577-E |

---

Rule 23                                                                    Sheet 13
COMMUNITY CHOICE AGGREGATION

(Continued)

E.    CCA SPECIALIZED SERVICE REQUESTS, INCLUDING PHASE-IN (Continued)

  h.    Pursuant to D.04-12-046, a CCA may choose to phase-in CCA Service to customers.  To assist CCA's with their phase-in plans, SCE has developed an optional standard phase-in service, more fully described in Schedule CCA-SF, which requires minimal system changes to minimize the CCA's phase-in costs.  A CCA, however, has the option to propose its own phase-in plan as a Specialized Services request.   Regardless whether a CCA chooses the standard phase-in service or proposes its own phase-in criteria, SCE will work cooperatively with CCAs to phase-in groups of customers in a manner that minimizes SCE and CCA costs.  CCA phase-in service shall be subject to the provisions set forth in Schedule CCA-SF and this section.

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT

  1.    CCA Implementation Plan and CCA Registration With The Commission

    a.    Pursuant to D.05-12-041, and Resolution E-4907, at the request of either the CCA or SCE, the parties must "meet and confer" as soon as reasonably practical to address areas of concern or dispute with the CCA's implementation plans or the CCA's ability to comply with SCE's tariffs. Such a request shall be presented in writing with a recitation of disputed items or areas of concern.    (N)(D)

      If the first attempts at resolution are not successful, the CCA and SCE (the parties) shall meet in person. Should the parties be unable to reach consensus after the in-person meeting(s), either party may request that Energy Division assist by sponsoring a moderated in-person discussion between the parties. Such a request should come in the form of a request to the Director of Energy Division explaining the general nature of any unresolved issues regarding CCA compliance with utility tariffs. During the "meet and confer" parties shall discuss the contents of the CCA's Implementation Plan and any relevant issues with compliance with SCE tariffs. The "meet and confer" process shall implicate no approvals, either formal or informal, from the Commission.

                                                                                    (N)
                                                                                    (D)
                                                                                    (L)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed    Feb 22, 2018 |
| Decision    | Senior Vice President | Effective    Mar 24, 2018 |
| 13C14 | | Resolution    E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C Cal SCE Claim Objection Cal Page 141 Page 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 22
of 91

EDISON
An EDISON INTERNATIONAL Company

| | | |
|---|---|---|
| Southern California Edison | Original | Cal. PUC Sheet No. 63351-E |
| Rosemead, California    (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. 55577-E |

---

<u>Rule 23</u>                                    Sheet 14
COMMUNITY CHOICE AGGREGATION

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)    (L)

  1.    CCA Implementation Plan and CCA Registration With The Commission (Continued)

    b.    Pursuant to D.05-12-041 and Resolution E-4907, for CCAs who have not    (C)
        submitted implementation plans to the Energy Division by December 8, 2017,
        the CCAs and SCE shall adhere to the following timeline and procedures for    (C)
        submitting and certifying receipt of the Implementation Plan, notice to
        customers, notice to CCAs of the appropriate CRS, and registration of CCAs.    (L)

      (1) On or before January 1 of Year 1[i] (DAY 1), the prospective or expanding    (N)(D)
          CCA submits its Implementation Plan to Energy Division and serves it on
          the R.03-10-003 Service List, on the R.16-02-007 Service List, and on the
          R.17-09-020 Service List, or successor proceedings.

      (2) Within 10 days of DAY 1, the Commission shall notify the Utility servicing
          the customers that are proposed for aggregation that an implementation
          plan initiating their CCA program has been filed.

      (3) Within 60 days of DAY 1, the CCA provides a draft customer notice to the
          Commission's Public Advisor.

          Within 15 days of receipt of the draft notice, the Public Advisor shall
          finalize that notice and send it to the CCA.

      (4) Within 90 days of DAY 1[ii],

        (a) The Commission shall send a letter confirming that it has received the
            Implementation Plan and certify that the CCA has satisfied the
            requirements of an Implementation Plan pursuant to Section 366.2(c)
            (3). This letter shall inform the CCA about the cost recovery
            mechanism as required by P.U. Code Section 366.2(c)(7).

            If and when the Commission requests additional information from a
            CCA, the CCA shall respond to CPUC staff within 10 days, or notify
            the staff of a date when the information will be available.    (N)

---

[i] Except for 2018, where implementation plans may be submitted by March 1, 2018.
[ii] For 2018, Energy Division will certify plans by April 13, 2018 if received by March 1, 2018 as long as the
plans are reasonably complete and meet all requirements.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed    Feb 22, 2018 |
| Decision | Senior Vice President | Effective    Mar 24, 2018 |
| 14C16 | | Resolution    E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C to SCE Claim Objection Claim Page 142 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 23
of 91

EDISON
An EDISON INTERNATIONAL Company

Southern California Edison                                    Revised    Cal. PUC Sheet No.    70469-E
Rosemead, California        (U 338-E)        Cancelling  Original    Cal. PUC Sheet No.    63352-E

---

Rule 23                                Sheet 15
COMMUNITY CHOICE AGGREGATION

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)

1.    CCA Implementation Plan and CCA Registration With The Commission (Continued)
b.   (4)  Within 90 days of DAY 1 (Continued)

(b)  The Commission shall provide the CCA with its findings regarding any cost recovery that must be paid by customers of the CCA in order to prevent cost shifting. (P.U. Code Section 366.2 (c) (7).)

(c)  At the request of either SCE or the CCA, the CCA and SCE shall Meet-and-Confer regarding the CCA's ability to conform its operations to the SCE's tariff requirements. The request shall be presented in writing with a recitation of disputed items or areas of concern. This process shall implicate no approvals, either informal or formal, from the Commission.

(5)  Within 90 days of DAY 1[i], the CCA shall submit its registration packet to the Commission including:

(a) Signed service agreement with SCE, and

(b)  Pursuant to Resolution E-4907, D.18-05-022, and Resolution E-5059, confirmation that the CCA has posted financial security with SCE in the form and amount set forth in Section W of this Rule.    (C)
|
|
(C)

(6)  Within 90 days to 120 days of DAY 1[ii], if the registration packet is complete, the Commission shall confirm registration as a CCA to the CCA and SCE:

(7)  The CCA shall comply with the Resource Adequacy deadlines set forth in Section F.4.g, below.

(8)  Prospective CCA Customers subject to Automatic Enrollment into CCA Service, as described in Section B.20, shall be notified by the CCA as set forth in Section H, below.

(9)  January 1, Year 2, the CCA may begin service.

---

[i] For 2018, the bond and signed service agreement must be submitted to the Energy Division by April 20, 2018.
[ii] For 2018, the Commission will confirm registration by April 27,2018.
(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 15C12 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit G abs SCE claim objection Claim 21-1 Page 114 Page 225 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 24
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. 64431-E |
| Rosemead, California    (U 338-E) | Cancelling | Original | Cal. PUC Sheet No. 63353-E |

---

<u>Rule 23</u>                                              Sheet 16
<u>COMMUNITY CHOICE AGGREGATION</u>

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)

(D)
2.    The CCA shall provide to SCE the Commission's certification of (1) CCA registration,    (L)
      and (2) the amount of cost recovery that must be paid by its customers.                  |
                                                                                               |
3.    The earliest possible date a CCA may implement CCA Service shall be the date the         |
      CCA has fulfilled all requirements in the applicable tariffs, including service          |
      establishment requirements set forth in this Rule, or the date the CCA and SCE agree     |
      is reasonable, whichever is later, unless stated otherwise in a Commission order or in   |
      a letter from the Commission's Executive Director.  In advance of providing service to   |
      the first CCA in SCE's service territory, SCE shall require six (6) months from the date |
      the first CCA files its Implementation Plan with the Commission or a mutually agreed     |
      upon date between SCE and the CCA.                                                        (L)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3846-E | Caroline Choi | Date Submitted    Aug 16, 2018 |
| Decision | Senior Vice President | Effective    Sep 15, 2018 |
| *16C10* | | Resolution |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit G Cab 6 CE Claim Objection Cla Page 144 Page 226 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 25
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 64432-E |
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 63354-E |

---

Rule 23                                                                    Sheet 17
COMMUNITY CHOICE AGGREGATION

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)

(L)

4.    CCA Service Establishment

Prior to providing CCA Services within SCE's service territory, the CCA must comply with the following requirements:

a.    CCAs must submit an executed CCA Service Agreement in the form attached hereto.

b.    The CCA remains fully responsible for its subcontractors, agents, and Scheduling Coordinators performing CCA related services on behalf of the CCA.

c.    The CCA must satisfy SCE credit-worthiness requirements set forth in Section V, Credit Requirements.

d.    The CCA must satisfy applicable Electronic Data Exchange requirements, including:

(1)    Completion of all necessary electronic interfaces for the CCA and SCE to communicate for CCASRs, billing, collections, general communications and communication of meter reading and usage data from SCE.

(2)    Have the capability to exchange data with SCE via the Internet.

(3)    Successful completion of all standard SCE technical testing and must have the capability to communicate using Electronic Data Interchange (EDI), Internet, or an electronic format acceptable to SCE and enter into appropriate agreements related thereto. EDI testing may commence between CCA and SCE at any time prior to CCA service commencing and both SCE and CCA will make best efforts to complete EDI testing expeditiously.

e.    No outstanding charges related to Specialized Services defined in Section E.

f.    Confirmation that the CCA is registered with the Commission and that the CCA has filed an Implementation Plan with the Commission.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
| Advice    3846-E | Caroline Choi | Date Submitted | Aug 16, 2018 |
| Decision | Senior Vice President | Effective | Sep 15, 2018 |
| 17C10 | | Resolution | |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G Cable SCE claim Objection Clam 145 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 26
of 91

EDISON
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Original | Cal. PUC Sheet No.   63355-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No.   55578-E |

---

Rule 23                                                                 Sheet 18
COMMUNITY CHOICE AGGREGATION

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)

    4.    CCA Service Establishment (Continued)

        g.    Pursuant to Resolution E-4907, unless the CCA has received a waiver from the     (N)
Commission as described in Section F.4.g.(4), below, a CCA must comply with
the Resource Adequacy requirement deadlines set forth in Appendix A and
Appendix B of Resolution E-4907 and outlined below:

            (1)    April, Year 1, in accordance with P.U. Code Section 380, the CCA shall
submit its year-ahead Resource Adequacy forecast.

            (2)    August, Year 1, the CCA shall submit its updated year-ahead Resource
Adequacy forecast.

            (3)    October, Year 1 (75 days before service commences), the CCA shall submit
its monthly load migration forecast for the Resource Adequacy program, filed
about 75 days prior to the compliance month.                                    (N)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed    Feb 22, 2018 |
| Decision   _____ | Senior Vice President | Effective    Mar 24, 2018 |
| *18C17* | | Resolution    E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G-5 SCE Claim Objection Claim Page 146 of 228

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 27
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 70470-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Original | Cal. PUC Sheet No. | 63356-E |

---

Rule 23                                                    Sheet 19
COMMUNITY CHOICE AGGREGATION

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)

    4.    CCA Service Establishment (Continued)

        g.    (4). Any new or expanding CCA may request a waiver from the above timelines in order to begin service prior to the deadlines in January 1, 2019.  To request a waiver either:

            i..    The CCA and SCE shall jointly submit a Tier 1 Advice Letter no later than 75 days prior to the Resource Adequacy compliance month in which the CCA wishes to begin service. This Advice Letter shall provide notification that the utility and CCA mutually agree (via payment, allocation of Resource Adequacy or a combination thereof) that they have addressed Resource Adequacy requirements and cost responsibility concerns raised by the intra-year load migration for 2018. Notification of agreements must include what categories of RA for what periods are being satisfied; or,

            ii.    If no agreement is reached, the CCA shall file a Tier 1 Advice Letter no later than 75 days prior to the Resource Adequacy compliance month in which the CCA wishes to begin service.  This Advice Letter shall provide notification that the SCE and the CCA are unable to reach agreement to address the RA requirements and cost responsibility concerns raised by the intra-year load migration for 2018, and shall state that the CCA agrees to be bound by a future Commission determination in the Resource Adequacy Proceeding (R.17-09-020) regarding cost responsibility for intra-year load migration, subject to appellate rights under the Commission's Rules. The CCA then shall file a motion in the Resource Adequacy Proceeding seeking such a determination within 60 days of the submittal of the Advice Letter. Submittal of this Advice Letter allows the CCA to begin service 75 days later and shifts the Resource Adequacy responsibility from the utility to the CCA.

        h.    The CCA must post and maintain financial security with SCE in the form and amount in accordance with Section W of this Rule. Failure of the CCA to provide SCE with financial security within sixty (60) days of the effective date of the FSR advice letter described in Section W of this Rule and/or issuance of Resolution E-5059, as applicable, may be grounds for the CCA's involuntary service suspension by the Commission.    (N)
|
|
|
|
(N)

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 19C12 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C Tab 6 CCA claim Objection Claim Page 147 Page 219 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 28
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63357-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling    Revised | Cal. PUC Sheet No. | 55579-E |

---

<u>Rule 23</u>                                                           Sheet 20      (T)
<u>COMMUNITY CHOICE AGGREGATION</u>

(Continued)

F.    CCA IMPLEMENTATION PLAN AND CCA SERVICE ESTABLISHMENT (Continued)

5.    Adding/Deleting A Municipality To An Existing CCA

This section is applicable to CCAs participating in a joint powers agency (JPA) pursuant to Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code pursuant to PU Code Section 331.1.b.  The CCA shall comply with each of the following:

a.    Before SCE will process requests associated with a city or county joining or leaving an existing CCA, the CCA must execute a Specialized Services Agreement between the CCA and SCE pursuant to the applicable provisions set forth in Section E of this Rule.

b.    Before SCE will process requests associated with an existing CCA adding a city and/or county to its membership, the CCA must update or renew all requirements as specified in Sections F.1, F.2, F.3 and F.4 above.

G.    CCA SERVICE CUSTOMER ELIGIBILITY

A CCA must offer to provide electric power to all residential customers located within its service area and pursuant to D.04-12-046, the CCA has the option to provide CCA Service to non-residential customers located within its service area.  Pursuant to D.05-12-041, all customers, including active Direct Access customers, located within a CCA's service area that have been offered service by the CCA that do not affirmatively decline such service (opt-out), shall be served by the CCA.  SCE shall not be responsible or liable in any way for any costs, fees, or penalties associated with a customer's Automatic Enrollment in CCA Service.

1.    Customers with a SCE commodity contract term obligating them to remain on SCE's Bundled Service, including Bundled Portfolio Service (BPS), shall be included in the CCA's Automatic Enrollment process and are subject to a CCA Cost Responsibility Surcharge as set forth in Schedule CCA-CRS.  Customer inquiries concerning SCE contract term requirements will be referred to SCE.

2.    Customers taking service under Net Energy Metering (NEM) Rate Schedules, shall be included in the CCA's Automatic Enrollment process and are subject to the provisions set forth in SCE's NEM Rate Schedules which may preclude NEM eligibility or may require special metering prior to the switch to CCA service, as defined in Section J.

3.    Customers currently under Direct Access service shall be included in the CCA's Automatic Enrollment process and are subject to a CCA Cost Responsibility Surcharge as set forth in Schedule CCA-CRS.  SCE may require Direct Access customers with meters that do not conform to SCE's metering standards and are incompatible with current SCE metering reading systems to be replaced with a compatible meter prior to the switch to CCA service, as defined in Section M.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | | Senior Vice President | Effective | Mar 24, 2018 |
| 20C18 | | | Resolution | E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim 21-1 Page 148 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 29
of 91

EDISON
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63358-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 55580-E |

---

Rule 23                                         Sheet 21        (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

H.    CCA CUSTOMER NOTIFICATION PROCESSES

1.    CCA Customer Notifications

A CCA must provide required CCA Customer Notifications to participating customers eligible to receive Automatic Enrollment into CCA Service during the Initial Notification Period and Follow-up Notification Period. The CCA shall be solely responsible for all obligations associated with CCA Customer Notifications and performing those obligations consistent with the requirements set forth in Public Utilities (PU) Code Section 366.2, the CCA's Implementation Plan, Commission requirements and all applicable Commission orders. SCE shall not be responsible for monitoring, reviewing or enforcing such obligations.

All notifications must include the necessary customer data and instructions that will allow customers to gain access to and complete the opt-out service described in Section I.

2.    SCE CCA Customer Notification Services

a.    A CCA may request SCE to provide the required CCA Customer Notifications on behalf of the CCA with adequate advance notice as set forth in Schedule CCA-SF. Customized CCA Customer Notification mailing services may be provided to CCAs only upon agreement with SCE.

b.    A CCA requesting to include its required customer notifications in SCE's billing envelope is subject to the provisions set forth in Schedule CCA-SF. The information in CCA customer notifications included in SCE's billing envelope shall be limited to that required by PU Code Section 366.2(c)(13)(A).

c.    CCA is responsible to ensure mailing instructions provided to SCE comply with the communication plan set forth in the CCA's Implementation Plan, rules and applicable laws.

d.    The standard CCA Customer Notification mailing(s), when provided by SCE, shall be staggered based on the customers' billing cycles.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
| Advice    3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | Senior Vice President | Effective | Mar 24, 2018 |
| 21C16 | | Resolution | E-4907 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cab 6 CE claim Objection Claim Page 149 of 210 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 30
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63359-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 57091-E |

Rule 23                                                        Sheet 22      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

H.   CCA CUSTOMER NOTIFICATION PROCESSES (Continued)

3.   The following additional provisions apply to CCA Customer Notifications:

a.   The CCA and SCE must mutually agree on the date before the CCA's Customer Notification process can begin.

b.   CCA Customer Notifications may be sent concurrently with SCE's billing cycles.

c.   Neither CCAs nor SCE shall use the other party's logo on CCA Customer Notifications or other materials absent express written consent to do so. Neither party shall express nor imply that the other party is affiliated with, is a sponsor of, or endorses their services or other programs.

d.   If a CCA's Automatic Enrollment process is suspended by the CCA, the Commission or any other State agency, the CCA shall be responsible for all SCE costs, including, but not limited to, customer communications associated with the suspension.

I.   CCA CUSTOMER OPT-OUT PROCESSES

Pursuant to PU.Code § 366.2(c)(13)(A)(i), CCA-issued Customer Notifications required for automatic enrollments into the CCA program shall include the opportunity for customers to opt-out of CCA Service and continue to receive their existing service. Pursuant to PU Code § 366.2(c)(13)(C), the opt out may take the form of a self-addressed return postcard indicating the customer's election to remain with, or return to, electrical energy service provided by the electrical corporation, or another straightforward means by which the customer may elect to derive electrical energy service through the electrical corporation providing service in the area. The CCA may elect to administer the opt-out process, which shall include the distribution of the requisite customer notifications and the receipt of customer opt-out requests through options of its choosing.  Alternatively, pursuant to PU Code § 366.2 (c)(13)(B), a CCA may request that the Commission approve and order SCE to provide the Customer Notifications required in Subparagraph (A). If the CCA makes this request and the Commission approves it, the CCA shall use SCE's opt-out process as set forth below.

1.   SCE shall provide an opt-out process to be used by all CCAs.  If such request is made, SCE shall offer at least two (2) of the following options as a part of its opt-out process:

a.   Reply letter or postcard (postage paid) enclosed in CCA Customer Notifications
b.   Automated phone service
c.   Internet service
d.   Customer Call Center contact

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | Senior Vice President | Effective | Mar 24, 2018 |
| 22C16 | | Resolution | E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE Claim Objection Cla Page 159 Page 232 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 31
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63360-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 57092-E |

---

Rule 23                                                             Sheet 23      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

I.   CCA CUSTOMER OPT-OUT PROCESSES (Continued)

2.   Customers eligible for Automatic Enrollment in CCA Service must be notified twice during the Initial Notification period. If SCE is aware that a customer or group of customers has not received the required notifications, SCE shall immediately inform the CCA. If the CCA is aware that a customer or group of customers has not received the required notifications the CCA shall immediately inform SCE to remove the customer from Automatic Enrollment.

3.   A customer opting out of CCA Service during the Initial Notification Period shall be removed from the Automatic Enrollment process.

4.   Pursuant to D.05-12-041, every customer in the CCA's Automatic Enrollment that does not opt-out of CCA service shall be served by the CCA, including customers with commodity contracts, Direct Access customers and customers whose CCA Customer Notifications are returned unopened.

5.   A customer opting out of CCA Service during the Follow-up Notification Period and after enrollment in CCA Service shall be returned to its previous service, without penalty, on the customer's next scheduled meter read date, consistent with CCASR processing timing as defined in Section M.   These customers shall be returned to Bundled Portfolio Service subject to the terms in Section L of this Rule, and are not subject to Transitional Bundled Service as defined in Schedule PC-TBS.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    3749-E | Caroline Choi | Date Filed    Feb 22, 2018 |
| Decision | Senior Vice President | Effective    Mar 24, 2018 |
| 23C16 | | Resolution    E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim 21 Page 151 Page 33 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 32
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| | | |
|---|---|---|
| Southern California Edison | Revised | Cal. PUC Sheet No.   63361-E |
| Rosemead, California      (U 338-E) | Cancelling   Revised | Cal. PUC Sheet No.   57093-E |

---

Rule 23                                                                    Sheet 24      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

I.    CCA CUSTOMER OPT-OUT PROCESSES (Continued)

6.     If a CCA that has elected to use SCE's opt-out process pursuant to subsection 1 receives a customer request to opt out, the CCA should inform SCE of such opt-out requests in a fashion that is mutually agreeable to SCE and the CCA so that SCE can update its records.

7.     SCE shall provide notice to the customer when the customer's opt-out request has been processed only if the CCA and SCE agree that the SCE shall provide such notice.

8.     After the conclusion of the Initial Notification Period, in advance of the date of commencing Automatic Enrollment and prior to the customer's enrollment in CCA Service, either SCE or the CCA, depending on whether the CCA has elected to use SCE's opt-out processing services or administer its own opt-out process, may continue to accept customer opt-out requests and SCE and the CCA may make best efforts to process such requests before the customer's account switches to CCA Service.  Opt-out requests that cannot be processed before the account switches shall be processed following the CCASR processing timing to return the customer's account to its previous service, as defined in this Rule.

9.     After the customer's account has switched to CCA Service, either SCE or the CCA, as appropriate, shall notify the other party of customer Opt-out requests using the CCASR process as defined in Section M.

10.    Customers making a positive election to CCA Service are not eligible for opt-out privileges and will return to Bundled Service under the provisions of Section L of this Rule.

11.    If a CCA elects to use a postcard or reply letter for the opt-out mechanism, the reply letter or postcard opt-out service must include a customer specific utility identifier preprinted on the reply letter/card if SCE makes such identifier available to the CCA.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice   3749-E | Caroline Choi | Date Filed   Feb 22, 2018 |
| Decision | Senior Vice President | Effective   Mar 24, 2018 |
| 24C16 | | Resolution   E-4907 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit Cab 6 CE Claim Objection Claim 21-1 Page 152 of 214 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 33
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63362-E |
| Rosemead, California   (U 338-E) | Cancelling | Original | Cal. PUC Sheet No. | 57132-E |

Rule 23                                    Sheet 25      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

J.    CCA SERVICE MASS ENROLLMENT PROCESSES

SCE shall provide a Mass Enrollment process whereby all eligible CCA customers that have not opted out of CCA Service shall be automatically enrolled in CCA Service on the customers' regular scheduled meter read dates over a one (1) billing month period, subject to phasing.

1.    In advance of implementing the Mass Enrollment process, SCE must be in receipt of the CCA's confirmation, indicating the CCA has fulfilled its Initial Notification requirements. SCE has no responsibility for verifying that the CCA has complied with its notification requirements.

2.    Within fifteen (15) days after conclusion of the Initial Notification Period, SCE shall provide to the CCA one (1) update of its customer enrollments, providing individual customer information and energy usage data for those customers scheduled for mass enrollment. The update shall exclude all customer information for which SCE has processed opt-out requests. A CCA has the option to request additional customer information pursuant to Schedule CCA-INFO.

3.    The mass enrollment shall commence at a time not less than thirty (30) days and not more than forty-five (45) days after the conclusion of the Initial Notification Period, unless another date is mutually agreed to by the CCA and SCE, and shall be processed over a one billing month period by billing cycle unless the CCA and SCE have agreed to specialized services for CCA enrollment or Phase-in services as defined in this Rule.

4.    For each account in the mass enrollment, SCE shall switch the customer's account on its scheduled meter reading date, providing confirmation to the CCA.

5.    Following the Mass Enrollment, SCE shall provide the CCA with an update to its customer enrollments, providing individual customer information and energy usage data, and the switch dates for those customers that were actually enrolled in the CCA's CCA Service.

6.    Effective beginning on the date of the transfer, the CCA is solely responsible for providing the electric power needs of its customers.

7.    Customer opt-out requests processed after the account has switched to CCA Service shall be returned to the previous service by the initiation of a CCASR process and under the CCASR process timing, as defined in Section M.

8.    The CCA shall update its records within three (3) working days from the date of receiving a customer's opt-out notification from SCE to remove the opt-out customer from CCA Service and eliminate future communications from the CCA, concerning a customer's option to opt-out of the CCA Program, as defined in Section H of this Rule from the CCA.

9.    Except as otherwise provided for in Rule 23, no special metering shall be necessary or permitted during the mass enrollment process.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    3749-E | Caroline Choi | Date Filed   Feb 22, 2018 |
| Decision | Senior Vice President | Effective   Mar 24, 2018 |
| 25C16 | | Resolution   E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Gab 6 CE Claim Object Cir Claim Page 115 Page 15 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 34
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63363-E |
|---|---|---|---|---|
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 57094-E* |

---

Rule 23                                              Sheet 26      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

K.    CUSTOMER RELOCATION PROCESSES FOLLOWING MASS ENROLLMENT

The following sections apply to customers establishing electric service, relocating existing service, and discontinuing electric service within a CCA's service area. Except as otherwise exempted by this Rule, Commission decision or by law, customers establishing or relocating electric service within a CCA's service area shall be served under CCA Service unless the customer submits a request to the CCA to opt-out and the CCA provides notification to SCE of any such opt-out request.  If an existing customer moves the location of their electric service within the jurisdiction of the CCA, the customer shall retain the same electric commodity service provider as prior to the move, unless the customer affirmatively changes the customer's electric commodity service provider. If an existing DA customer moves the location of their electric service within the jurisdiction of the CCA, the DA customer must submit a DA relocation request and obtain SCE's approval of that request in order to remain on DA service and not be defaulted to CCA service upon relocation.

1.    The following section shall apply when CCA customers are contacting SCE to relocate or discontinue their electric service account within a CCA's service area:

a.    In addition to its normal business requirements related to the customer's request, SCE shall also process the changes for CCA Service and advise the customer it will place a CCA Service request to the CCA for the customer's account changes related to CCA Service.  SCE shall not use this customer contact opportunity to encourage the customer to return to Bundled Service.

b.    SCE shall notify the CCA of the customer's relocation or discontinuance of CCA Service by submitting the appropriate CCASRs as defined in this Rule.

c.    SCE shall be responsible for processing customer request(s) and the CCA is solely responsible for the customer's electric power supply needs consistent with the service date as indicated on the CCASR(s).

2.    The following section shall apply to customers establishing electric service within a CCA's service area.  Customers establishing electric service within a CCA service area shall be automatically enrolled in CCA Service at the time their electric service becomes active unless the customer submits a request to the CCA to opt-out and the CCA provides notification to SCE of any such opt-out request.

a.    In addition to its normal SCE business requirements related to the customer's request, SCE shall process the customer enrollment for CCA Service.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | | Senior Vice President | Effective | Mar 24, 2018 |
| *26C16* | | | Resolution | E-4907 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab SCE claim Objection Clarar 154 age 136 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 35
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| | | | | |
|---|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63364-E |
| Rosemead, California   (U 338-E) | Cancelling | Original | Cal. PUC Sheet No. | 57095-E* |

---

<u>Rule 23</u>                                                    Sheet 27      (T)
<u>COMMUNITY CHOICE AGGREGATION</u>

(Continued)

K.    CUSTOMER RELOCATION PROCESSES FOLLOWING MASS ENROLLMENT (Continued)

2.    (Continued)

b.    When processing a new electric service request within a CCA service territory, and the CCA has elected to administer its own opt-out process, SCE shall advise the customer that its account is to be automatically enrolled in CCA Service being offered by the CCA, that SCE will place a CCA Service request to the CCA and as applicable, the terms and conditions for the customer to return to Bundled Service. When the CCA has elected to use SCE's opt-out processing services, SCE will, only when prompted by the customer, process an opt-out at the time of turn-on. In either situation SCE shall not use this customer contact opportunity to encourage the customer to return to Bundled Service.

c.    SCE shall notify the CCA of the customer's enrollment by submitting the appropriate CCASRs as defined in this Rule.

d.    SCE shall be responsible for processing the customer request(s) and the CCA is solely responsible for providing the customer's electric power supply needs consistent with the service date as indicated on the CCASR(s).

e.    All CCA customer enrollments defined in this section shall be considered Automatic Enrollments and customers shall be permitted to opt-out in accordance with Section I.   The CCA shall be solely responsible for all obligations consistent with the requirements set forth in PU Code 366.2. Customers shall be referred to the CCA for the information related to the CCA's customer notifications and other CCA terms and conditions of CCA Service.

3.    When processing a new electric service request or an electric service relocation within a CCA service territory, and the CCA has elected to administer its own opt-out process, SCE shall advise the customer that its account is to be automatically enrolled in CCA Service being offered by the CCA, that SCE will place a CCA Service request to the CCA. When the CCA has elected to use SCE's opt-out processing services, SCE will, only when prompted by the customer, process an opt-out at the time of turn-on. In either situation SCE shall not use this customer contact opportunity to encourage the customer to return to Bundled Service

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | Senior Vice President | Effective | Mar 24, 2018 |
| 27C16 | | Resolution | E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C Cab 6 CE Claim Objection Claim 21 155 Page 2 37 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 36
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No.   70471-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No.   67460-E |

---

Rule 23                                                                    Sheet 28
COMMUNITY CHOICE AGGREGATION

(Continued)

L.    CCA CUSTOMERS SWITCHING RULES

1.    Positive Elections

Customers that have made a positive election to participate in CCA Service
requesting to return to Bundled Service must provide a six (6) month advance notice
and are subject to the terms and conditions of a Bundled Portfolio Service (BPS) as
set forth below.

2.    Customers Automatically Enrolled in CCA Service Returning to Bundled Service after
the Follow-up Notification Period.

Former Bundled Service Customers that have been Automatically Enrolled in CCA
Service returning to Bundled Service after the Follow-up Notification Period must
provide SCE with a six (6)-month advance notice and are subject to the terms and
conditions of Bundled Portfolio Service (BPS) as set forth below.

In an Involuntary Return, CCA customers will be returned to BPS and are subject to    (N)
the terms and conditions of BPS as set forth below in this Special Condition.    (N)

3.    DA Customers Switching to CCA Service

DA Customers that are not Automatically Enrolled in CCA Service or opted out from
CCA Service may request to Switch to CCA Service directly without having to return
to Bundled Service. For any DA customer requesting to Switch to CCA Service, the
DA Customers must submit a CCASR to enroll into CCA Service to request for a
switch directly from DA Service to CCA Service on the same date.

4.    CCA Customers Switching to DA Service

CCA Customers may request to switch to DA Service directly without having to return
to Bundled Service. These customers are subject to the requirements of SCE Rules
22 and 22.1.

If these CCA Customers fail to meet the DASR requirement timely, SCE shall cancel
the approved six-month advance notice to switch to DA, and these Customers will
continue on CCA Service.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 28C13 | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G a 6 CE Claim Objection Claim Page 1156 of 218 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 37
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 67461-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 63366-E |

<u>Rule 23</u>                    Sheet 29
COMMUNITY CHOICE AGGREGATION

(Continued)

L.    CCA CUSTOMERS SWITCHING RULES (Continued)                    (C)

5.    Bundled Portfolio Service

(T)

Bundled Portfolio Service is applicable to CCA customers who return to Bundled Service for a minimum of 12 months.  This 12-month minimum Bundled Service commitment shall be referred to herein as Bundled Portfolio Service (BPS).  The following conditions shall apply:

a.    Customers receiving this service make a 12-month minimum commitment to SCE and shall not be allowed to return to CCA Service or Direct Access (DA) Service until their 12-month minimum period has been completed.  The 12-month minimum period shall begin on the date the customer is switched to BPS after the conclusion of the six-month advance notice period as set forth in this Section L.3.b.  In the event a customer receives service under TBS during the six-month advance notice period, the time served under TBS shall apply toward the 12-month minimum commitment with SCE. No premature departures from the 12-month commitment shall be allowed.

b.    Customers must provide a six-month advance notice to SCE prior to becoming eligible for BPS so SCE can adjust its procurement activity to accommodate the additional load.  Such notification will be made by the customer submitting a Six-Month Advance Notice to Return to Bundled Portfolio Service (from Community Choice Aggregation Service) [Form 14-955]. The six-month advance notice for customers returning from CCA Service may be transmitted by an alternate method of notification as may be mutually agreed upon by SCE and the CCA.  SCE shall provide those customers who have provided advance notice with written confirmation and necessary switching process information within 10 business days of receipt of the customer's notification.  Once received by SCE, customers will have a three business-day rescission period after which advance notifications cannot be cancelled.  SCE shall process requests to BPS in the following manner:

(Continued)

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4013-E | Kevin Payne | Date Submitted | Jun 14, 2019 |
| Decision | 19-05-043 | Chief Executive Officer | Effective | Jul 14, 2019 |
| 29C13 | | | Resolution | |

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | | Revised | Cal. PUC Sheet No. | 67462-E |
|---|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 63367-E |

---

<u>Rule 23</u>                                        Sheet 30
COMMUNITY CHOICE AGGREGATION

(Continued)

L.    CCA CUSTOMERS SWITCHING RULES (Continued)                                       (C)

    5.    Bundled Portfolio Service (Continued)

        b.    (Continued)                                                                (T)

            (1)    Account transfers to BPS shall be switched on the customer's next scheduled meter read date after the completion of the six-month advance notice period.

            (2)    SCE shall initiate a CCASR, to transfer the account to BPS and shall provide notification to the customer and CCA in accordance with Section M.

        c.    During the six-month advance notice period before customers become eligible for BPS, customers may either continue on CCA Service or return to SCE and receive Transitional Bundled Service (TBS) commodity pricing terms as set forth in Schedule PC-TBS and be subject to the provisions and applicable charges of the CCA Cost Responsibility Surcharge as set forth in Schedule CCA-CRS.  After receiving a Six-Month Advance Notice to Return to Bundled Portfolio Service (Form 14-955) or an alternate means of transmitting the six-month advance notification, as may be mutually agreed upon by SCE and the CCA, SCE shall process any CCASR returning the customer to Bundled Service during the six-month advance notice period in accordance with Section M and shall provide service to the customer at the TBS rate for the remainder, if any, of the six-month advance notice period. SCE shall initiate the necessary transfer of the account to BPS at the conclusion of the six month advance notice period with notification to the customer. Customers returning to bundled service during the six-month advance notice period (i.e., before the commencement of BPS) cannot return to CCA Service or DA Service until their 12-month minimum commitment with SCE has expired.

        d.    Customers returning from CCA Service after the Follow-up Notification period has expired are subject to a re-entry fee as set forth in Schedule CCA-SF.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4013-E | Kevin Payne | Date Submitted | Jun 14, 2019 |
| Decision | 19-05-043 | Chief Executive Officer | Effective | Jul 14, 2019 |
| 30C13 | | | Resolution | |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE claim obj SCE clm Page 158 Page 240 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 39
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 67463-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 63368-E |

Rule 23 — Sheet 31
COMMUNITY CHOICE AGGREGATION

(Continued)

L.    CCA CUSTOMERS SWITCHING RULES (Continued)                                    (C)

    6.    End of Bundled Portfolio Service                                        (T)

        At the end of the customer's initial 12-month commitment, customers will have the option of switching to CCA Service, DA Service, or remaining on BPS based on the then current applicable rules in effect.  SCE will provide the customer with a courtesy reminder eight months before the expiration of the customer's 12-month minimum commitment term.  This timeframe will allow for the six-month notification period and will provide a 60-day period for the customer to notify SCE of its intent to return to CCA Service or transfer to DA Service.  If for any reason the customer is not sent, or does not receive, a courtesy reminder from SCE, the customer is not relieved of its responsibility for providing SCE the notice required in this Section L.4.a., below.

        a.    Customers electing to return to CCA Service at the conclusion of the 12-month commitment period shall provide advance, written notice using Form 14-954, Six-Month Advance Notice to Transfer to Community Choice Aggregation Service to SCE. Such notice, or its alternative, shall be transmitted at least six months prior to the conclusion of the 12-month minimum commitment term. SCE shall provide to the customer a written confirmation and necessary switching process information within 10 business days of the customer's notification, including the final date to be in receipt of a CCASR to return to CCA Service. The customer is responsible for providing its CCA with this information.

            (1)    The customer's CCA shall submit a CCASR to ensure the necessary switch to CCA Service under the CCASR rules, as set forth in Section M., occurs on the service account's next scheduled meter read date after the completion of the six-month advance notice period.

            (2)    If SCE is not in receipt of a CCASR by the end of the customer's 12-month commitment, the customer's request to return to CCA Service shall be cancelled.

        b.    Customers seeking to transfer to DA Service are subject to the requirements of SCE Rules 22 and 22.1

        c.    Customers electing to remain on BPS are not required to take any action.

(Continued)

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4013-E | Kevin Payne | Date Submitted | Jun 14, 2019 |
| Decision | 19-05-043 | Chief Executive Officer | Effective | Jul 14, 2019 |
| 31C12 | | | Resolution | |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G Cable SCE claim Objection for Claim 21 159 of 240 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 40
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63369-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 57100-E |

---

Rule 23                                                                Sheet 32    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

M.    CCA SERVICE REQUESTS (CCASR) AFTER MASS ENROLLMENT

1.    CCASRs, in the form specified by SCE, must be submitted electronically by the CCA unless an alternate means of submittal has been mutually agreed to by SCE and the CCA.  The CCASR process described herein is used for various changes to a customer's choice of services and service providers, such as customer CCA elections, customer-initiated returns to SCE Bundled Service, CCA-initiated customer returns to SCE Bundled Service, and maintaining customer information.  CCAs must execute the CCA Service Agreement and successfully complete all CCA Service establishment requirements set forth in this Rule before submitting CCASRs.

2.    SCE shall begin accepting CCASRs from the CCA for service accounts on a mutually agreed upon date with SCE, but no earlier than the start of the CCA's Mass Enrollment process.

3.    A separate CCASR must be submitted for each service account.  Upon request by a CCA, SCE shall provide timely updates on the status of the CCASR processing to the submitting CCA and customer.

4.    CCASRs must identify SCE account information, as determined by SCE, of the customer participating in Community Choice Aggregation.    A CCASR that does not contain this information shall be considered materially incomplete.

5.    CCASR forms shall be available through electronic means (e.g., SCE's website).

6.    SCE shall provide an acknowledgment of its receipt of the CCASR to the CCA within two (2) working days of its receipt.  SCE shall provide to the CCA, within three (3) working days, a CCASR status notification informing them as to whether the CCASR has been accepted, rejected or deemed pending for further information.  If accepted, the switch date determined in accordance with paragraphs 11 or 12 of this section shall be sent to the CCA.  If a CCASR is rejected, SCE shall provide the reason for the rejection.  If a CCASR is held pending further information, it shall be rejected if the CCASR is not completed within eleven (11) working days following the status notification.

7.    In accordance with the provisions of Rule 3, SCE has the right to deny the CCA's request for service for a particular customer if the information provided by the customer is false, incomplete, or inaccurate in any material respect.

8.    If a submitted CCASR complies with the CCASR requirements, the CCASR shall be accepted and scheduled for CCA implementation.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | Senior Vice President | Effective | Mar 24, 2018 |
| 32C16 | | Resolution | E-4907 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit G Tab 6 CCE Claim Objection Claim 21-1   Page 160 of 210   Page 242 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 41
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63370-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling   Revised | Cal. PUC Sheet No. | 57101-E |

<u>Rule 23</u>                                        Sheet 33      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

M.   CCA SERVICE REQUESTS (CCASR) AFTER MASS ENROLLMENT (Continued)

9.    CCASRs shall be handled on a first-come, first-served basis.  Each request shall be time-stamped by SCE.

10.   If more than one enrollment CCASR is received for a service account within a single CCASR processing period, only the first valid CCASR received shall be processed in that period.  All subsequent CCASRs shall be rejected.

11.   Accepted CCASRs that do not require a meter change and that are received by SCE a minimum of five (5) days before the customer's next scheduled meter reading date shall be switched over on the next scheduled meter reading date for that service account.

12.   If an accepted CCASR requires a meter change (i.e., the existing meter is incompatible with SCE's meter reading system), SCE shall install a new meter and switch the account over to CCA on the date of installation.  SCE shall endeavor to complete the meter change request within fifteen (15) days after acceptance of the CCASR in the absence of a meter installation backlog or other circumstances beyond SCE's control such as, but not limited to, delays in the installation of a communication line to the meter.  SCE may require Direct Access customers with meters that are incompatible with SCE's systems to be replaced with a compatible meter prior to the acceptance of a CCASR.  SCE shall provide notice of any current meter service backlog or the next available installation date.  Such metering services are subject to fees in accordance with Schedule CC-DSF.

13.   In the event the Commission or the CAISO governing board declares an emergency and institutes a moratorium of SCE processing of CCA requests, SCE shall comply with such moratoriums and inform CCAs or customers of the details of emergency plans.

14.   SCE, CCA and customer, on mutual agreement, may agree to a different service change date for the service changes requested in a CCASR.

15.   A CCASR is submitted pursuant to the terms and conditions of the CCA Service Agreement and this Rule and shall also be used to define the CCA Services that the CCA is providing the customer.

16.   CCASR's submitted for customers returning to SCE Bundled Service will follow the same process and timing as CCASRs to establish CCA Service. CCAs shall be responsible for the continued provision of the customer's electric power needs until the service change date.  Customers returning to SCE Bundled Service shall be subject to the terms and conditions as set forth in Section L.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    3749-E | Caroline Choi | Date Filed   Feb 22, 2018 |
| Decision | Senior Vice President | Effective   Mar 24, 2018 |
| 33C16 | | Resolution   E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab 6 CE claim Objection ClaimPage 161 Page 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 42
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63371-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 57102-E |

<u>Rule 23</u>                                                    Sheet 34     (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

M.    CCA SERVICE REQUESTS (CCASR) AFTER MASS ENROLLMENT (Continued)

17.    SCE shall assess a service fee for CCASRs for adding or removing customers from CCA Service.  This service fee shall be billed to the CCA unless the customer is requesting to return to SCE service after the Follow-up Notification Period whereupon the customer's re-entry service fee shall be billed to the customer.

18.    SCE shall not hold the CCA responsible for any unpaid customer billing charges that the customer incurred prior to the customer's switch to CCA.  Unpaid billing charges shall not delay the processing of CCASRs and shall remain the customer's responsibility to pay SCE.  SCE shall follow current Commission credit rules in the event of customer non-payment, which includes the disconnection of service.

19.    CCA must submit CCASRs only for customer accounts within its service area and for customers that meet the eligibility requirements set forth in Section G.

20.    Any CCASR not meeting the above requirements shall be rejected, the affected customer shall be notified, and the applicable CCASR fee shall be charged to the CCA.

21.    If a customer cancels an agreement, a CCASR shall not be submitted for that customer.  If a CCASR has already been submitted, the submitting party shall, within two (2) business days, direct SCE to cancel the CCASR.

22.    CCA's shall offer service to all residential customers and shall not return residential customers involuntarily to Bundled Service, except in the event of non-payment of CCA charges by the customer, as set forth in Section U.2.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    3749-E | Caroline Choi | Date Filed    Feb 22, 2018 |
| Decision | Senior Vice President | Effective    Mar 24, 2018 |
| 34C16 | | Resolution    E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit S Cab 6 CCE Claim Objection Claim 21 162 Page 214 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 43
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | | Revised | Cal. PUC Sheet No. | 63372-E |
| Rosemead, California | (U 338-E) | Cancelling Revised | | Cal. PUC Sheet No. | 57103-E |

---

Rule 23    Sheet 35    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

N.    METERING SERVICES

    1.    Meter Services

Meter services are comprised of three primary functions, Meter Ownership, Meter Services (Installation, maintenance, and testing) and Meter Data Management Agent (MDMA) Services.  SCE shall perform all Metering Services for a CCA's customers.

SCE, as the Meter Service provider, shall ensure all of its meters and associated metering services are in conformance with its metering standards and Commission approved rules governing such services.

    a.    Meter Conformity

Customers who had previously purchased or leased an interval meter acceptable to SCE as a condition of receiving DA service, may own or lease interval meters used for billing purposes for CCA Service, but shall continue to be responsible for the obligations of a meter owner under Rule 22 Section G.

If the customer has a non-conforming meter, or elects to have the meter replaced, SCE reserves the right to extend its normal installation period due to meter and installation personnel availability.  Under these circumstances, SCE shall apprise the customer and CCA of the specific reasons for the delay and the anticipated schedule for installation.

    b.    MDMA Services

SCE shall perform all Meter Data and Management Agent (MDMA) services required for CCA Service in accordance with its Commission approved tariffs. MDMA obligations include but are not limited to the following:

    (1)    Meter data for CCA customers shall be read, validated, edited, and transferred to the MDMA server pursuant to SCE's standards.

    (2)    Both SCE and CCA shall have access to the MDMA server.

    (3)    SCE shall provide the CCA's (or their designated agents) reasonable and timely access to meter data as required to allow the proper performance of billing, settlement, scheduling, forecasting and other functions.

    c.    Charges for Metering Services

SCE may charge the customer or the CCA for the provision of metering services only to the extent such charges are authorized by the Commission. If the installation of metering services is at the customer's expense, the customer's authorization is required.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
| Advice | 3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | | Senior Vice President | Effective | Mar 24, 2018 |
| 35C16 | | | Resolution | E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit SCE's Cab 6 CE Claim Objection Claim Page 116 Page 245 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 44
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63373-E |
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 57104-E |

<u>Rule 23</u>                                    Sheet 36    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

O.    BOUNDARY METERING SPECIAL REQUESTS

In accordance with PU Code Section 366.2, at the request and expense of any CCA SCE shall install, maintain and calibrate metering devices at mutually agreeable locations within or adjacent to the CCA's service area.  SCE shall read the metering devices and provide the data collected to the CCA at the CCA's expense.  All costs incurred by SCE as a result of providing this specialized service, hereinafter referred to as Boundary Metering shall be the sole responsibility of the requesting CCA.

1.    SCE shall consider and evaluate requests for Boundary Metering on a case-by-case basis, provided that implementation can be accomplished without compromising the safety, reliability or operational flexibility of SCE's electrical facilities.  Any CCA interested in submitting a request for Boundary Metering shall be responsible for funding an analysis of the electric system impacts and a study to determine the estimated costs associated with Boundary Metering.  The CCA shall be provided with an estimate of costs for which it shall be responsible to pay.

2.    A CCA requesting Boundary Metering installation shall be responsible for executing  a Specialized Service agreement or contract established pursuant to Rule 2 establishing the terms and conditions for installation and maintenance of the special facilities.

3.    The CCA shall be responsible for all actual costs associated with Boundary Metering services, including but not limited to the development of the estimate of costs, the implementation of Boundary Metering and all ongoing operating and maintenance costs.

4.    All costs associated with the deployment of Boundary Metering for a CCA shall be paid in advance by the CCA before work commences.

5.    A CCA terminating Boundary Metering services with SCE shall be responsible for all costs related to the restoration of SCE's facilities, which may include, but are not limited to, removal of meters.

6.    As applicable, Boundary Metering costs shall be included as a part of SCE's credit requirements set forth in Section V.

7.    The CCA and SCE shall agree to a mutually acceptable Boundary Metering installation schedule.  The installation schedule shall take into consideration and provide priority to required SCE metering work which may include work related to mandated regulatory changes, customer installations and testing, emergency service orders and routine testing and maintenance.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
| Advice    3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | Senior Vice President | Effective | Mar 24, 2018 |
| 36C16 | | Resolution | E-4907 |

**EDISON**
An EDISON INTERNATIONAL Company

| | | | | |
|---|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63374-E |
| Rosemead, California   (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 57105-E |

---

<u>Rule 23</u>                                    Sheet 37     (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

P.    BILLING SERVICE OBLIGATIONS

SCE shall perform the billing services for the CCA.   SCE shall use SCE's Consolidated Billing process described below.

1.    Introduction

This section establishes SCE and CCA obligations for billing information and legal and safety notices.

a.    Description

A CCA shall send its customer billing information to SCE.  SCE shall in turn send a consolidated bill, containing both SCE and CCA charges, to the customer.

b.    SCE Obligations

(1)    SCE shall calculate SCE charges and send the bill either by mail or electronic means to the customer.  SCE shall include CCA charges on the bill.  SCE is not responsible for computing or determining the accuracy of the CCA charges on the bill.

(2)    SCE bill shall include a summary of the CCA charges and may provide any billing-related details of CCA charges, including the CCA's telephone number.  The CCA bill may be printed with the SCE bill, or electronically transmitted exactly as provided by the CCA.

(3)    SCE shall process customer payments and transfer amounts paid toward CCA charges to the CCA when the payments are received pursuant to the provisions set forth in Section R., Late or Partial Payments and Unpaid Bills.

c.    CCA Obligations

(1)    The CCA shall offer SCE consolidated billing services to the CCA customers it serves.

(2)    In accordance with subsection d., below, the CCA shall submit the necessary billing information to facilitate billing services according to SCE's billing schedule and by service account.

(3)    The CCA shall provide SCE with a summary of CCA charges by electronic transmittal.  The CCA may provide billing-related details of CCA charges on a separate page which shall be included in the consolidated bill if transmitted with the summary charge.   CCA charges which are not transmitted as required shall not be included in the consolidated bill.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice     3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | Senior Vice President | Effective | Mar 24, 2018 |
| 37C16 | | Resolution | E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G tab 6 CE claim Objection Claim 6 Page 165 Page 46 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 46
of 91

EDISON
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63375-E |
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 57106-E |

---

Rule 23      Sheet 38    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

P.    BILLING SERVICE OBLIGATIONS (Continued)

    d.    Timing Requirements

        (1)    SCE shall render customer bills once a month. Nothing contained in this Section shall limit SCE's ability to render bills more frequently, consistent with SCE's existing practices. However, CCA charges shall be included on SCE bills in accordance with the regular monthly billing cycles.

        (2)    Except as provided in paragraph d(1) above, both CCA and SCE charges shall be based on the same billing period data to avoid any confusion concerning these charges.

        (3)    CCA charges must be received by SCE the day following SCE's actual meter reading date. If billing charges have not been received from the CCA by this date, SCE will render the bill for SCE charges only, without CCA charges. The CCA must wait until the billing cycle following the receipt of the CCA charges. At the discretion of SCE, other arrangements may be made available at a fee as set forth in the applicable fee schedule.

    2.    Billing Information and Inserts

    a.    Identify SCE and CCA Charges

        The consolidated SCE bill, at a minimum, shall identify SCE charges as specified by the Commission or its codes and when CCA charges are received shall identify, at a minimum, two sets of charges: one for SCE services and another for CCA energy services.

    b.    Required Legal and Safety Notices

        All customers, including CCA and SCE Bundled Service customers, shall receive mandated legal and safety notices, and SCE shall be responsible for the creation of these notices. SCE may also enclose SCE-related bill inserts in consolidated SCE billing as permitted by Commission regulations.

    c.    CCA Obligations under Consolidated SCE Billing

        The CCA may include any information directly related to the calculation or understanding of CCA charges directly in the bill but may not include any text on the separate detail page which is not specifically related to the charges or their explanation.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    3749-E | Caroline Choi | Date Filed   Feb 22, 2018 |
| Decision | Senior Vice President | Effective   Mar 24, 2018 |
| 38C16 | | Resolution   E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab G CE Claim Objection Claim Page 166 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 47
of 91

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison                    Revised        Cal. PUC Sheet No.    63376-E
Rosemead, California        (U 338-E)    Cancelling  Revised    Cal. PUC Sheet No.    57107-E

---

Rule 23                                              Sheet 39    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

P.    BILLING SERVICE OBLIGATIONS (Continued)

3.    Billing Adjustments for Meter Error and Billing Error

a.    Adjustment of Bills for Meter Error

SCE shall perform the adjustment of bills for meter error in accordance with Rule 17.

b.    Adjustment of Bills for Billing Error

SCE shall perform the adjustment of bills for billing error in accordance with Rule 17.

4.    Unauthorized Usage of Energy

a.    SCE will conduct the investigation of the unauthorized use of energy in accordance with Rule 17.

b.    If SCE determines there has been unauthorized use, SCE shall have the legal right to recover, from any customer, CCA, or other person that caused or benefited from such unauthorized use, the total estimated amount of the undercharge, including the CCA electric power component, for the full period of such unauthorized use, and any other actions authorized pursuant to its Commission-approved tariffs or by law.

Q.    PAYMENT AND COLLECTION TERMS

1.    SCE shall pay the CCA the amounts paid to SCE for CCA charges only after the payment is received from the customer.  Payments shall be transferred to the CCA electronically specifying the amount paid by each specific customer account or group of customer accounts if the customer is Summary Billed.

2.    Upon receipt of SCE's payment, the CCA is responsible for accurately posting the payment to the customer's account.  The CCA shall also be responsible for any follow-up inquiries either with SCE or customer if there are questions concerning the posting of that payment amount.

3.    SCE shall remit payments to the CCA only for the amounts paid by the CCA customer for payment of CCA charges.  Payments are due on or before the later of:

a.    Seventeen (17) calendar days after the bill was rendered to the customer, or

b.    The next business day after the payment is received from the customer.

(Continued)

---

(To be inserted by utility)              Issued by              (To be inserted by Cal. PUC)
Advice    3749-E                        Caroline Choi          Date Filed    Feb 22, 2018
Decision _____              Senior Vice President      Effective    Mar 24, 2018
39C16                                                          Resolution    E-4907

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G abc-SCE claim-Obj SCE Claim-Page 167 of 249 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 48
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 63377-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 57108-E |

Rule 23
COMMUNITY CHOICE AGGREGATION

Sheet 40    (T)

(Continued)

Q.    PAYMENT AND COLLECTION TERMS (Continued)

4.    SCE shall process payments, post SCE charges paid to customer accounts, and transfer funds owed the CCA to the CCA. SCE shall debit to the CCA any amounts resulting from returned payments and assess returned payment charges (i.e., a charge for each returned payment) to the appropriate customers.

5.    The CCA has no payment obligations for customer payments under consolidated SCE billing services. The CCA is required to settle any disputes of CCA charges with the customer.

6.    The customer is obligated to pay SCE for all SCE and CCA charges consistent with existing tariffs.

7.    The customer must notify SCE of any disputed SCE charges; otherwise, any outstanding balance shall be handled as an amount past due. Customer disputes of CCA charges must be directed to the CCA, and customer disputes of SCE charges must be directed to SCE.

8.    If the customer disputes any SCE charges, it shall nevertheless pay the amount billed; provided, however, that the customer may, at its election, pay that portion of the charges that the customer disputes to the Commission in accordance with Rule 10. If the customer disputes any CCA charges, the provisions of its agreement with the CCA shall apply. SCE shall forward to the CCA amounts paid to cover CCA charges. However, no CCA may discontinue CCA Service to a residential customer for a disputed amount if that customer has filed a complaint with the Commission, and that customer has paid the disputed amount into an escrow account.

9.    For CCA sundry charges, SCE shall accept cash, check or electronic payments. The CCA must remit payment for any charges, approved by the Commission, for services provided it by SCE. Sundry charges shall be considered past due 30 days after the date the bill to the CCA is rendered.

(Continued)

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 3749-E | Caroline Choi | Date Filed | Feb 22, 2018 |
| Decision | | Senior Vice President | Effective | Mar 24, 2018 |
| 40C16 | | | Resolution | E-4907 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit G Tab 5 CCE Claim Objection Claim 21-16 Page 116 Page 250 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 49
of 91

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison                     Revised      Cal. PUC Sheet No.    70472-E
Rosemead, California      (U 338-E)     Cancelling Revised      Cal. PUC Sheet No.    63378-E

---

Rule 23                                        Sheet 41
COMMUNITY CHOICE AGGREGATION

(Continued)

R.    LATE OR PARTIAL PAYMENTS AND UNPAID BILLS

1.    SCE is responsible for collecting the unpaid balance of all charges, including the CCA charges, from customers during the time the CCA is providing CCA Service, sending notices informing customers of unpaid balances, and taking the appropriate actions to recover the unpaid amounts owed the CCA during its credit related interactions with customers.

2.    Partial payments by customers shall be allocated on a pro rata basis to SCE charges for which delinquency may result in disconnection, and then any balance shall be prorated between the CCA and other SCE charges.

3.    Undisputed overdue balances owed SCE shall be considered late and subject to SCE late payment procedures.

4.    Commission rules shall apply to unpaid SCE charges by the customer.

S.    VOLUNTARY CCA SERVICE TERMINATION

Termination of a CCA's CCA Service occurs when an individual CCA or a CCA operating under a Joint Powers Agency (JPA) discontinues providing CCA Service to all customers in its service area.   Upon termination of CCA Service, all active CCA customers in the CCA's    (T)
service area shall be involuntarily returned to Bundled Portfolio Service (BPS) pursuant to    (T)
Section L of this Rule.   CCAs shall use best efforts to provide as much advance notice as possible to customers, the Commission and SCE and coordinate with the Commission and SCE to ensure an efficient process and to protect all SCE customers from service problems and additional costs.   In addition to the above, the CCA must comply with the requirements set forth below or may be subject to Section T, Involuntary Service Changes, of this Rule.    (T)

1.    The CCA shall provide at least a one (1) year advanced written notice to the Commission and SCE of the CCA's intention to discontinue its CCA Service.

2.    The CCA shall provide customers with a six-month notice and at a minimum provide a second notice during the final 60 days before the CCA's scheduled termination of service.

3.    SCE shall provide notification to and return all CCA's customers to SCE's BPS during the month in which the CCA terminates its CCA Service on the customer's scheduled meter read date.   The CCA shall be responsible for the continued provision of the customer's electric power needs until the date the customer returns to Bundled Service, and shall be responsible for payment of all Re-Entry Fees for the Involuntary    (N)
Return pursuant to Section W of this Rule.    (N)

(Continued)

---

(To be inserted by utility)              Issued by              (To be inserted by Cal. PUC)
Advice       4394-E                        Carla Peterman            Date Submitted    Jan 15, 2021
Decision     18-05-022                  Senior Vice President       Effective          Jan 15, 2021
41C12                                                                Resolution         E-5059

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE Claim Objection Claim Page 169 of 250    Page 50 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 50
of 91

**EDISON**

An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 70473-E |
|---|---|---|---|---|
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 63379-E |

---

<u>Rule 23</u>                                    Sheet 42
<u>COMMUNITY CHOICE AGGREGATION</u>


(Continued)

S.    VOLUNTARY CCA SERVICE TERMINATION  (Continued)

4.    Customers eligible to switch to Direct Access shall do so subject to Direct Access    (C)
Rule 22.1.  All other customers shall be returned to BPS subject to the terms in    |
Section L, but are not subject to Transitional Bundled Service as defined in SCE's    |
rate Schedule PC-TBS.                                                        (C)

5.    Customers requesting to return to Bundled Service before the termination of CCA
Service shall be subject to all terms and conditions in Section L of this Rule.  The
CCA shall not terminate any of its customers' CCA Service before the termination of
the CCA's CCA Service.

6.    The CCA remains responsible for compliance with all applicable Commission rules,
CAISO requirements and LSE obligations.

7.    A CCA shall be responsible for all costs resulting from the CCA's CCA Service    
termination including Re-Entry Fees owed by the CCA upon an Involuntary Return    (C/
pursuant to Section W. of this Rule.  SCE reserves the right to withhold CCA
customer payment remittances from the CCA for undisputed overdue charges
including Re-Entry Fees owed by the CCA upon an Involuntary Return pursuant to    (N)
Section W of this Rule that are in excess of the posted CCA FSR amount.  SCE will    |
refund any CCA funds that SCE has retained that are greater than the costs SCE    |
incurred, or at the time that the CCA fully replaces a FSR instrument because such    |
FSR instrument terminated or expired or for other reasons specified in Section W.1 of    |
this Rule.                                                                  (N)

(L)


(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    <u>4394-E</u> | <u>Carla Peterman</u> | Date Submitted | <u>Jan 15, 2021</u> |
| Decision    <u>18-05-022</u> | <u>Senior Vice President</u> | Effective | <u>Jan 15, 2021</u> |
| 42C13 | | Resolution | <u>E-5059</u> |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab 6 CEe claim Objection Cla Page 170 age 252 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 51
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | | Original | Cal. PUC Sheet No. | 70474-E |
| Rosemead, California | (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 63379-E |

---

<u>Rule 23</u>                                    Sheet 43       (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

S.    VOLUNTARY CCA SERVICE TERMINATION  (Continued)                    (L)

8.    The CCA's Service Agreement with SCE will be cancelled with its termination of its CCA Service.  At any time not less than three (3) years after the CCA's termination of CCA Service, the CCA's eligibility to engage in CCA Service may be reinstated.  The CCA's reestablishment of CCA Service will require the CCA to complete all CCA Service establishment requirements, including filing a new Implementation Plan with the Commission, being registered by the Commission, establishment of service with SCE pursuant to Section F, completion of credit requirements pursuant to Section V, all past due charges and arrearages having been paid, with interest, and the CCA has re-established compliance with all then-current Commission requirements.

9.    A CCA providing CCA Service pursuant to a JPA that terminates its CCA Service must fully comply with the CCA Voluntary Service termination requirements. Should    (T) one or more constituent members of a JPA seek to continue operations as a CCA, that new entity shall comply with all requirements for CCA Service establishment set    (L)(N) forth in Section F of this Rule. If the JPA continues operations, but a constituent CCA member discontinues its participation in the JPA and seeks to offer CCA Service as an individual CCA entity or through another entity, that new entity shall comply with all requirements for CCA Service establishment set forth in Section F of this Rule. Otherwise, the constituent JPA member's discontinuance of its participation in the JPA shall result in i) a voluntary CCA service termination under this Section S for the CCA customers in that constituent JPA member's jurisdiction; and, ii) the Involuntary Return of those customers to Bundled Service.    (N)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
| Advice      4394-E | Carla Peterman | Date Submitted   Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective          Jan 15, 2021 |
| 43C14 | | Resolution        E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab SCE claim Objection Claim Page 117 Page 53 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 52
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | |
|---|---|---|
| Southern California Edison | Original | Cal. PUC Sheet No. 70475-E |
| Rosemead, California    (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. 63380-E |

---

Rule 23                                                        Sheet 44    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

T.    INVOLUNTARY SERVICE CHANGES                                        (L)

1.    Service Changes

Pursuant to D.05-12-041, absent the express approval of the CCA, an order of a court, the Commission or the FERC, SCE shall adhere to the requirements set forth below in the event it seeks to terminate service to a CCA.

2.    SCE shall send notices of involuntary service changes or termination to the CCA, to each affected CCA customer, and to the Commission.  The CCA shall be responsible for all SCE costs associated with an Involuntary Service Change occurrence.  Such costs may include, but are not limited to, system, administrative, customer communications, legal costs and any Re-Entry Fees owed by the CCA upon an Involuntary Return pursuant to Section W. of this Rule.  SCE has the right to withhold and offset CCA customer payment remittance to the CCA until the CCA has paid all such undisputed charges, including Re-Entry Fees pursuant to Section W of this Rule that are in excess of the posted CCA FSR amount.  SCE will refund any CCA funds that SCE has retained that are greater than the costs SCE incurred, or at the time that the CCA fully replaces an FSR instrument because it terminated or expired or for other reasons specified in Section W.1 of this Rule.  Pursuant to D.05-12-041, absent the express approval of the CCA, an order of a court, the Commission or the FERC, SCE shall adhere to the requirements set forth below in the event it seeks to terminate service to a CCA.                                        (C)

(C)
(N)

(L)(N)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| *44C17* | | Resolution    E-5059 |

Case 6:21-bk-12821-SY  Doc 222-7  Filed 11/30/21  Entered 11/30/21 19:38:10  Desc
Exhibit Exhibit G 6 SCE Claim Objection Cla Page 172 of 254 of 92

Case 6:21-bk-12821-SY  Claim 21-1  Filed 09/30/21  Desc Main Document  Page 53
of 91

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison                              Revised    Cal. PUC Sheet No.  70476-E
Rosemead, California      (U 338-E)    Cancelling  Revised    Cal. PUC Sheet No.  63380-E

---

|  | Rule 23 | Sheet 45 | (T) |
|--|---------|----------|-----|

<u>Rule 23</u>
<u>COMMUNITY CHOICE AGGREGATION</u>                         Sheet 45    (T)

(Continued)

T.    INVOLUNTARY SERVICE CHANGES (CONTINUED)                          (T)
                                                                       (L)


    3.    Change of Service Election In Exigent Circumstances

          Where continued CCA service would constitute an emergency or may substantially
          compromise SCE operations or service to bundled customers, SCE should seek an
          emergency order from the Commission.  In the event a CCA or a customer has failed
          to meet its obligations under this Rule or CCA Service Agreement such that SCE
          seeks to invoke its remedies under this Section, and the failure constitutes an
          emergency (i.e. the failure poses a substantial threat to the reliability of the electric
          system or to public health and safety or the failure poses a substantial threat of
          irreparable economic or other harm to SCE or the customer), or the failure relates to
          CCA's unauthorized energy use, then SCE may initiate a change, or, in some cases,
          terminate a customer's CCA Service, or a CCA's ability to provide services under
          CCA.  In such case, SCE shall seek an emergency order from the Commission.
          Pursuant to D.05-12-041, the assigned Administrative Law Judge (ALJ), in
          consultation with the assigned Commissioner, is authorized to issue a ruling providing
          interim authority for SCE to terminate a CCA's service.  Upon receipt of such a ruling,
          SCE shall initiate the change or termination by preparing a CCASR, but the change or
          termination may be made immediately notwithstanding the applicable CCASR
          processing times set forth in this Rule.  SCE shall provide such notice to the CCA
          and/or the affected customer as is reasonable under the circumstances of this
          section, if any is reasonable.  The CCA or the affected customer shall have the right
          to seek an order from the Commission restoring the customer's service election
          and/or the CCA's ability to provide services.  If a customer's CCA Service is
          terminated because the customer failed to meet its obligations under this Rule, the   (N)
          customer will be subject to the provisions of Section L and the terms and conditions of
          Bundled Portfolio Service.   Unless expressly ordered by the Commission, these
          provisions do not disconnect electric service provided to the customer. If the CCA's   (N)
          ability to provide CCA Service is terminated under this Section T, such termination will   |
          result in an Involuntary Return of the CCA's customers to Bundled Service,   |
          irrespective of whether the CCA is a JPA, a constituent member of a JPA, or an   |
          individual CCA.                                                              (N)

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 45C14 |  | Resolution    E-5059 |

Case 6:21-bk-12821-SY Doc 222-7 Filed 11/30/21 Entered 11/30/21 19:38:50 Desc
Exhibit Exhibit G Tab 6 CCE Claim Objection Claim 21 17 Page 256 of 92

Case 6:21-bk-12821-SY Claim 21-1 Filed 09/30/21 Desc Main Document Page 54 of 91

EDISON
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. 70477-E |
| Rosemead, California (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. 63381-E |

---

<u>Rule 23</u>                                                                    Sheet 46    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

T.    INVOLUNTARY SERVICE CHANGES (Continued)

    4.    Change of Service Election Absent Exigent Circumstances

       In the event SCE finds that a CCA has failed to meet its obligations under this Rule or CCA Service Agreement such that SCE seeks to invoke its remedies under this Section, but the failure does not constitute an emergency (as defined in Section T.3), SCE shall notify the CCA and the affected customer of such finding in writing stating specifically:

       a.    The nature of the alleged non-performance;

       b.    The actions necessary to cure it;

       c.    The consequences of failure to cure it and the remedy SCE proposes to invoke in the event of a failure to cure; and

       d.    The name, address and telephone number of a contact person at SCE authorized to discuss resolution of the problem.

       The CCA shall have thirty (30) days from receipt of such notice to cure the alleged non-performance or reach an agreement regarding it with SCE. If the problem is not cured or an agreement is not reached following this 30 day period, SCE may seek authority from the Commission to terminate CCA Service. SCE's request to the Commission shall specify the reasons for the requested termination, the impacts of the termination, and the expected impacts if the CCA's service is not terminated. Upon Commission approval, SCE may initiate the CCASR process set forth in this Rule to accomplish the remedy set forth in the notice. If a customer's CCA Service is terminated, the customer will be subject to the provisions of Section L and the terms and conditions of Bundled Portfolio Service, unless the customer is eligible for Direct Access and has previously selected another ESP in accordance with Rule 22. SCE shall suspend the exercise of such remedy if, before the end of the cure period, the CCA has filed an application with the Commission requesting an order from the Commission that the CCA is entitled to continue the CCA Service Agreement and SCE is not entitled to exercise the remedy it has identified in its notice. The status of the CCA shall not change pending the Commission's review of SCE's request provided that an emergency, as described in Section T.3 of this Rule does not arise. Unless expressly ordered by the Commission, these provisions do not disconnect electric service provided to the customer. SCE's action to defer the exercise of its remedies in accordance with this section does not constitute a waiver of any rights.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 46C15 | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab SCE claim Objection Cla Page 174 of 256 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 55
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| Southern California Edison | | Revised | Cal. PUC Sheet No. | 70478-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling Revised | Cal. PUC Sheet No. | 63382-E |

---

<u>Rule 23</u>                                                                    Sheet 47    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

T.    INVOLUNTARY SERVICE CHANGES (Continued)

5.    Following consultation with the CCA, SCE is authorized to serve CCA customers temporarily where the CAISO or the CCA has notified SCE that customers would otherwise not be served. In such cases, the CCA's Service Agreement is not terminated; however SCE shall immediately initiate the process to return affected CCA customers to Bundled Service without prior Commission approval.  SCE shall initiate the service change by preparing a CCASR, but the service change may be made immediately notwithstanding the applicable CCASR processing times set forth in this Rule. Affected customers will be provided service temporarily under Schedule PC-TBS.  CCA customers receiving temporary service in this situation may not seek service from other ESPs or CCAs.  SCE may seek authority from the Commission to terminate CCA Service pursuant to Section T.4 of this Rule at anytime after being notified that the CCA's customers are not being served.

6.    Burden of Proof Before Commission

In any case before the Commission the party bearing the burden of going forward and the party bearing the burden of proof shall be established in the manner normally established at the Commission.

7.    Involuntary Returns                                                        (N)
                                                                                  |
a.    An Involuntary Return is defined in Section B.29 herein.                     |
                                                                                  |
b.    Action in the Event of an Involuntary Return                                 |
Except for the customers eligible for Direct Access that previously selected       |
another ESP under the procedures set forth in the Direct Access Rules 22 and       |
22.1., upon the Involuntary Return of a CCA Service customer, the customer shall    |
be returned to BPS subject to the terms in Section L, but is not subject to        |
Transitional Bundled Service as defined in SCE's rate Schedule PC-TBS.            (N)

8.    Action in the Event of Termination                                          (D)

At any time not less than three (3) years and six (6) months after termination of a CCA's CCA Service rights pursuant to this Section T, the CCA's eligibility to engage in CCA Service shall be reinstated upon a reasonable showing by the CCA that the cause(s) of the CCA's termination have been cured, all past due charges and arrearages have been paid, with interest, including any unpaid Re-Entry Fees owed    (N)
by the CCA as a result of an Involuntary Return pursuant to Section W of this Rule,  (N)
and the CCA has re-established compliance with all then-current Commission requirements, including credit requirements under Section V.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 | |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 | |
| 47C18 | | Resolution    E-5059 | |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit SCE Cab 6 CE Claim Objection Claim Page 175 of 250

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 56
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Revised | Cal. PUC Sheet No. 70479-E |
| Rosemead, California    (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. 63383-E |

<u>Rule 23</u>                                                    Sheet 48    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

U.    SERVICE DISCONNECTIONS AND RECONNECTIONS

1.    SCE shall notify the customer of SCE's right to disconnect electric service for the non-payment of SCE charges pursuant to electric Rule 8.  The customer, and not SCE, is responsible for contacting CCA in the event it receives notice of late payment or service termination from SCE. If a customer has been disconnected, and is not reconnected within two days, SCE shall promptly notify the CCA. A service charge shall be imposed on the customer if a field call is performed to disconnect electric service.

2.    SCE shall not disconnect electric service to the customer for the late payment or non-payment of CCA charges. In the event of non-payment of CCA charges by the customer, the CCA may submit a CCASR requesting transfer of the service account to SCE Bundled Service according to Section M.

3.    SCE shall reconnect electric service for a Commission-authorized service fee when the criteria for reconnection pursuant to the provisions set forth Rule 11, Discontinuance of Service, and Schedule SC have been met.

V.    CREDIT REQUIREMENTS

1.    SCE may require the CCA to establish its creditworthiness through evaluations, deposits, or other security in the manner described in Section V.2 of this Rule, to cover Commission-approved charges incurred as a result of CCA participation. That is, the creditworthiness only applies to SCE charges that are billed directly to the CCA.

2.    Creditworthiness

a.    Credit Evaluation

A CCA with a demonstrable current credit rating of Baa2 or higher from Moody's or BBB or higher from Standard and Poor's, Fitch or Duff & Phelps, is deemed to be creditworthy unless SCE determines that a material change in the CCA's creditworthiness has occurred. SCE requires CCAs to complete a credit application including financial information reasonably necessary to establish credit. The creditworthiness evaluation may be conducted by an outside credit analysis agency, determined by SCE, with final credit approval granted by SCE. This evaluation shall be completed within ten (10) business days.  Credit reports shall remain strictly confidential between the credit analysis agency and SCE. A credit application processing fee, as approved by the Commission, may be charged to offset the cost of determining the CCA's creditworthiness.

(Continued)

| | | |
|---|---|---|
| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 48C15 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CCA claim Objection Claim 21 176 of 258    of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 57
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | |
|---|---|---|
| Southern California Edison | Revised | Cal. PUC Sheet No.   70480-E |
| Rosemead, California        (U 338-E) | Cancelling   Revised | Cal. PUC Sheet No.   63384-E |

---

Rule 23    Sheet 49    (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

V.    CREDIT REQUIREMENTS (Continued)

    2.    Creditworthiness (Continued)

        b.    Security Deposits

The CCA or its authorized agent may submit and maintain a cost-based security deposit in lieu of submitting to or being qualified under a creditworthiness evaluation. The amount of the security deposit required to establish credit will be based on SCE providing services to the CCA for customers in the CCA's service area and costs associated with specialized services and boundary metering requested by the CCA. The value of the security deposit shall be determined by SCE. Security deposits may be in the form of (1) cash deposits, with interest earned at the 3-month commercial paper rate, (2) letters of credit, defined as irrevocable and renewable issued by a major financial institution acceptable to SCE, or (3) surety bonds, defined as renewable and issued by a major insurance company acceptable to SCE Security deposits must be posted with SCE prior to the CCA's participation in CCA and prior to the implementation of any Customer Notifications as identified in Section H. Security deposits posted with SCE which are in excess of outstanding unpaid bills owed to SCE will be returned to the CCA within approximately 60 days after the CCA has terminated its services in SCE's service territory.

While the CCA is participating in CCA, deposits cannot be used as payment for past due bills in order to avoid or delay imposition of any of the Commission tariffs and rules pertaining to CCA's non-payment of bills owed to SCE.

        c.    Interest on Cash Deposit

SCE shall pay interest on cash deposits, except as provided below, calculated on a daily basis, and compounded at the end of each calendar month, from the date fully paid to the date of refund by check or credit to the CCA's account.  The interest rate applicable in each calendar month shall be set forth in Rule 7; except that when a refund is made within the first fifteen days of a calendar month the interest rate applicable in the previous month shall be applied for the elapsed portion of the month in which the refund is made.  No interest shall be paid if the CCA's right to continue to provide CCA Service is temporarily or permanently discontinued for nonpayment of bills. No interest shall be paid for periods covered by bills paid after becoming past due.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 49C15 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G Cab 5 CE Claim Objection Claim 7 Page 177 of 259 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 58
of 91

EDISON
An EDISON INTERNATIONAL Company

| | | |
|---|---|---|
| Southern California Edison | Revised | Cal. PUC Sheet No. 70481-E |
| Rosemead, California    (U 338-E) | Cancelling  Revised | Cal. PUC Sheet No. 63385-E |

---

<u>Rule 23</u>                                                   Sheet 50      (T)
COMMUNITY CHOICE AGGREGATION

(Continued)

V.    CREDIT REQUIREMENTS (Continued)

    d.    Ongoing Maintenance of Credit

    To assure continued validity of established unsecured credit, the CCA shall promptly notify SCE of any material change in its credit rating or financial condition.  CCA shall also furnish evidence of an acceptable credit rating or financial condition, as set forth above, to SCE upon request.

    3.    Additional Documents

    The CCA shall execute and deliver all documents and instruments (including, without limitation, security agreements and SCE financing statements) reasonably required from time to time to implement the provisions set forth above and to perfect any security interest granted to SCE.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 50C16 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C Cab 6 Cec Claatio SCE Cir ClaRage 178 ag 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 59
of 91

EDISON
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | | Original | Cal. PUC Sheet No. | 70482-E |
| Rosemead, California | (U 338-E) | Cancelling | | Cal. PUC Sheet No. | |

---

<u>Rule 23</u>                                    Sheet 51        (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS

As described in Section F.4.h, all new and existing CCAs are required to post and maintain an FSR with SCE using a financial security instrument in the form of an irrevocable standby letter of credit, a surety bond, or cash held by a U.S. branch of a commercial bank acting as the escrow holder in an escrow, and in the amount sufficient to cover the Re-Entry Fees associated with the Involuntary Return of its CCA Service customers to SCE's Bundled Service, as required by this Section W.

The terms of the FSR instrument are subject to mutual agreement by SCE, CCA, and the third-party issuer of the FSR instrument. The FSR instrument will govern the rights and obligations of the parties and shall be based on commercially reasonable and accepted terms and conditions and consistent with D.18-05-022 and SCE's tariffs. No party may unreasonably withhold its agreement to commercially reasonable terms and conditions of the FSR instrument.

<u>1.</u>    The FSR instrument must meet the following requirements:

<u>a.</u>    An irrevocable standby letter of credit in form, substance and amount satisfactory to SCE and issued by a bank mutually acceptable to SCE and CCA. SCE shall be the beneficiary or recipient of the letter of credit. The issuing bank must be a U.S. national bank, or by a U.S. branch of a foreign bank mutually acceptable to SCE and CCA. SCE's standard form of letter of credit may be used for this purpose. Or,

<u>b.</u>    A surety bond in form, substance and amount satisfactory to SCE, by an insurer mutually acceptable to SCE and CCA, authorized to issue and hold surety bonds in the State of California. SCE shall be the beneficiary or recipient of the surety bond. It is further agreed and understood that if co-sureties are used, the bonds shall be issued on a "joint and several" basis. SCE's standard form of surety bond may be completed for this purpose. Or,

<u>c.</u>    Cash held by a U.S. branch of a commercial bank acting as the escrow holder in an escrow account. The escrow agreement shall be in form, substance and amount satisfactory to SCE, CCA and the bank. SCE shall be the beneficiary or recipient of the escrow account. The issuing bank must be a U.S. national bank or by a U.S. branch of a foreign bank mutually acceptable to SCE and CCA. SCE's standard form of escrow agreement may be used for this purpose.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 51C15 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab 6 CEd Claim Objection Clam21 179 age 260 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 60
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Original | Cal. PUC Sheet No.    70483-E |
|---|---|---|---|
| Rosemead, California    (U 338-E) | Cancelling | | Cal. PUC Sheet No. |

---

<u>Rule 23</u>                                                  Sheet 52    (N)
<u>COMMUNITY CHOICE AGGREGATION</u>

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

<u>1.</u>    The FSR instrument must meet the following requirements
(Continued):

The issuer of a FSR instrument must have an investment grade rating equivalent to at least an A- by Standard & Poor's or A3 by Moody's. The calculated FSR amount will include the incremental administrative costs related to switching the involuntarily returned customer service accounts back to Bundled Service and, pursuant to the methodology adopted in D.18-05-022 and set forth in Section X of this Rule, the incremental procurement costs for involuntarily returned customer service accounts for a six-month period. The incremental administrative costs shall be calculated for each involuntarily returned customer service account using the Schedule CCA-SF Customer Re-Entry Fee effective at the time the FSR amount is calculated. All costs associated with the issuance and maintenance of the FSR instrument are the responsibility of the CCA. If (i) the issuer of the FSR instrument fails to comply with or perform its obligations under the FSR instrument; or (ii) the issuer of the FSR instrument disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of the FSR instrument; or (iii) such FSR instrument expires or terminates, or fails or ceases to be in full force and effect at any time during which the CCA is required to provide a FSR instrument; or (iv) the issuer of such FSR instrument becomes insolvent or subject to a bankruptcy proceeding; or (v) the issuer of the FSR instrument fails to maintain an investment grade rating equivalent to at least an A- by Standard & Poor's or A3 by Moody's; then the CCA must replace the FSR instrument with an FSR instrument from an issuer that has an investment grade credit rating equivalent to at least an A- by Standard & Poor's or A3 by Moody's within five (5) business days of notice from SCE.

The FSR amount shall be the higher of the amount determined in accordance with Sections W.2 and W3 below, as applicable, or the minimum FSR amount of one hundred and forty-seven thousand dollars ($147,000) and SCE shall be the beneficiary or recipient of the FSR instrument. The terms and conditions for these FSR instruments must be mutually acceptable to SCE, the CCA and the issuer, and must meet the minimum requirements listed above.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    <u>4394-E</u> | <u>Carla Peterman</u> | Date Submitted    <u>Jan 15, 2021</u> |
| Decision    <u>18-05-022</u> | <u>Senior Vice President</u> | Effective    <u>Jan 15, 2021</u> |
| *52C18* | | Resolution    <u>E-5059</u> |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE claim Objection Claim Page 180 of 92 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 61
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Original | Cal. PUC Sheet No.    70484-E |
| Rosemead, California    (U 338-E) | Cancelling | | Cal. PUC Sheet No. |

---

Rule 23    Sheet 53    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

2.    The initial FSR for existing and new CCAs will be established as follows:

a.    For existing CCAs, SCE will perform the initial financial security calculation based upon the incremental administrative and procurement costs of switching a CCA's customers back to Bundled Service in accordance with Section X of this Rule and submit the proposed financial security amounts in a Tier 2 advice letter for CPUC approval. For purposes of calculating the number of customer service accounts for each CCA, any customers that submitted, prior to the Involuntary Return, Direct Access Service Requests (DASRs) or CCASRs to voluntarily return to DA service or BPS, respectively, and that do make the switch in accordance with those requests, shall be excluded in the calculation of the respective CCA's financial security amount. Any confidential data relating to a CCA or proprietary information of a third party utilized in the calculation shall be redacted in the public version of the advice letter. The confidential version of the advice letter will be filed under confidential seal with the Energy Division. Concurrent with submitting the advice letter to the CPUC's Energy Division, SCE will serve by electronic means on each applicable CCA a copy of the advice letter, with the relevant supporting data, redacted of any proprietary information that is not the subject of a non-disclosure agreement or third-party proprietary information that can be acquired through a subscription with the Intercontinental Exchange (ICE), and calculations of each respective CCA's financial security amount provided confidentially only to that specific CCA. The CCA must post the FSR with SCE in the form and amount described above within sixty (60) days of the effective date of the advice letter or within 60 days of the Commission's issuance of Resolution E-5059, as applicable.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 53C15 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab 6 CE Claim Objection Cla Page 181 of 213 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 62
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | | |
|---|---|---|---|
| Southern California Edison | | Original | Cal. PUC Sheet No.  70485-E |
| Rosemead, California    (U 338-E) | Cancelling | Cal. PUC Sheet No. |

---

<u>Rule 23</u>                                                    Sheet 54    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

2.    The initial FSR for existing and new CCAs will be established as follows (Continued):

b.    For a new CCA, or for a new phase of an expanding CCA in SCE's service territory, the FSR amount will be calculated in Month M (where M denotes the month when SCE will calculate the financial security amount) using Month M-1 data, and the financial security will be for months of the six (6) month forecast period of M+1 to M+6 during which the CCA will serve load. SCE may submit the financial security calculation and amount in a Tier 2 advice letter for CPUC Energy Division's approval no later than thirty (30) days prior to the start date of the new CCA's, or new phase of, Mass Enrollment. Any confidential data relating to the CCA or proprietary information of a third party utilized in the calculation shall be redacted in the public version of the advice letter. Concurrent with submitting the advice letter to the CPUC's Energy Division, SCE will serve by electronic means on each applicable CCA a copy of the advice letter, with the relevant supporting data, redacted of any proprietary information  that is not the subject of a non-disclosure agreement or third-party proprietary information that can be acquired through a subscription with the Intercontinental Exchange (ICE),  and calculations of each respective CCA's financial security amount provided confidentially only to that specific CCA. The CCA must post the FSR with SCE in the form and amount described above within sixty (60) days of the effective date of the advice letter.

For a new CCA in SCE's service territory, for the purpose of registration as described in Section F.1.b.(5)(b), the CCA is required to post and maintain the minimum financial security amount established by the Commission in D.18-05-022 of one hundred and forty-seven thousand dollars ($147,000) within 90 days of Day 1, as defined in Section F, which may be adjusted upon approval of the financial security calculation and amount pursuant to the paragraph above.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| *54C16* | | Resolution    E-5059 |

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Original | Cal. PUC Sheet No. | 70486-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling | Cal. PUC Sheet No. | |

---

**Rule 23**                                               Sheet 55    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

   3.    Semi-annual Financial Security Requirement Calculation:

        SCE will update the CCA's FSR amount semi-annually and submit the updated amount
        to the CPUC by May 10 and November 10 of each year. Updated FSR amounts for each
        CCA will be submitted in a Tier 2 advice letter to the CPUC's Energy Division. Any
        adjustments to the CCA FSR amount must be posted by the following January 1 and
        July 1, respectively. The posted amounts are subject to the Energy Division's final
        disposition. Any confidential data relating to a CCA or proprietary information of a third
        party utilized in the calculation shall be redacted in the public version of the advice letter.
        Concurrent with submitting the advice letter to the CPUC, SCE will serve by electronic
        means on each applicable CCA a copy of the advice letter, with the relevant supporting
        data, redacted of any proprietary information that is not the subject of a non-disclosure
        agreement or third-party proprietary information that can be acquired through a
        subscription with the Intercontinental Exchange (ICE), and calculations of each
        respective CCA's FSR amount provided confidentially only to that specific CCA. The
        CCA shall adjust the posted FSR amount if and when the calculated amount is (1) more
        than ten percent (10%) above or below the CCA's current posted FSR amount (i.e., if the
        recalculated financial security amount is less than 90% or more than 110% of the posted
        amount), and (2) more than twenty thousand dollars ($20,000) above or below the
        posted amount.

        If a CCA believes SCE has miscalculated its FSR amount, the CCA shall confer with
        SCE to resolve the inaccuracies, and may file comments with the Energy Division, and
        serve them upon SCE, indicating any appropriate corrections with relevant supporting
        explanation and detail within twenty (20) days of the submission of the  advice letter.  A
        CCA that fails to timely post the FSR in the required amount is subject to involuntary
        service changes pursuant to Section T of this Rule.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 55C15 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab 6 CE Claim Objection Claim 21 188 Page 216 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 64
of 91

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison                                    Original      Cal. PUC Sheet No.    70487-E
Rosemead, California      (U 338-E)          Cancelling              Cal. PUC Sheet No.

---

                                    Rule 23                              Sheet 56       (N)
                         COMMUNITY CHOICE AGGREGATION

                                   (Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

      4.    Re-Entry Fees For The Involuntary Return Of Customers:

            The CCA is responsible for all Re-Entry Fees for the Involuntary Return of its customers
            as defined in Section B.29.

            a.    When an Involuntary Return is initiated, SCE will file a Tier 1 Advice Letter within
                  30 days of its occurrence to notify the Commission of the involuntary return and, if
                  feasible, provide the Re-Entry Fee calculation, which serves notice to the CCA
                  that they must pay the calculated Re-Entry fees upon SCE's demand pursuant to
                  Section X of this Rule. Otherwise, SCE will supplement the Tier 1 Advice Letter
                  within 30 days of its submittal to provide the calculated Re-Entry Fees, which will
                  be a binding estimate as provided in Section X.3.b of this Rule. Any party may file
                  a protest to this AL disputing aspects of the Re-Entry Fees and whether they are
                  compliant with D.18-05-022 or SCE's tariff. However, SCE can continue to move
                  forward with drawing upon the CCA's posted FSR instrument, even if the CCA
                  files a protest, except as provided in Section W.4.i below. Re-entry fees that are
                  calculated correctly and in compliance with D.18-05-022 should not be subject to
                  dispute. If the CCA submits a protest of the calculated Re-entry Fees based on a
                  dispute that is not directly addressed by D.18-05-022 or Resolution E-5059, SCE
                  will file another Tier 1 AL creating a memorandum account to track disputed
                  costs. Any legitimately disputed costs will be deferred to the Provider of Last
                  Resort (POLR) proceeding or other proceeding at the CPUC's direction for review
                  and will be collected from the involuntarily returning CCA customers upon CPUC
                  approval.

                                   (Continued)

---

(To be inserted by utility)              Issued by              (To be inserted by Cal. PUC)
Advice      4394-E                      Carla Peterman           Date Submitted    Jan 15, 2021
Decision    18-05-022                 Senior Vice President       Effective        Jan 15, 2021
56C16                                                            Resolution        E-5059

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE claim Objection Claim 21 18 Page 184 age 256 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 65
of 91

**EDISON**
An EDISON INTERNATIONAL Company

| | | |
|---|---|---|
| Southern California Edison | Original | Cal. PUC Sheet No.    70488-E |
| Rosemead, California    (U 338-E) | Cancelling | Cal. PUC Sheet No. |

<u>Rule 23</u>                                                                 Sheet 57    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

4.    Re-Entry Fees For The Involuntary Return Of Customers (Continued):

b.    SCE will calculate Re-Entry Fees pursuant to the methodology set forth in Section X of this Rule within sixty (60) days of the earlier of (i) the start of the Involuntary Return of customers, or (ii) SCE's receipt of the CCA's advance written notice of the Involuntary Return.  The Re-Entry Fees will be a binding estimate of:

i.    The incremental administrative costs to switch the involuntarily returned CCA customer service accounts to BPS, which will be established for each customer service account using the proxy amount equal to the Customer Re-Entry Fee for voluntarily returning CCA customers as established in SCE's Schedule CCA-SF, unless SCE has tracked the actual incremental administrative costs of the Involuntary Return pursuant to Section W.4.h below, in which case SCE reserves the right to use the actual incremental administrative costs; plus

ii.    The incremental procurement costs for involuntarily returned CCA customer for an additional six-month period for those customers remaining on BPS as set forth in Section X of this Rule.

At no time shall the sum of the administrative cost and the incremental procurement costs for customers subject to Involuntary Return be less than zero dollars ($0). The amount of the Re-Entry Fees will not be subject to true-up. If SCE tracks and plans to recover the actual administrative costs of processing the Involuntary Return, SCE shall file another Tier 1 AL creating a memorandum account to track the costs.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 57C15 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab SCE Claim Objection Clara Page 185 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 66
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| Southern California Edison | | Original | Cal. PUC Sheet No. | 70489-E |
| Rosemead, California | (U 338-E) | Cancelling | Cal. PUC Sheet No. | |

---

Rule 23
COMMUNITY CHOICE AGGREGATION

Sheet 58    (N)

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

    4.    Re-Entry Fees For The Involuntary Return Of Customers (Continued)

        c.    SCE's demand to the CCA for payment of the Re-Entry Fees shall be made no later than sixty (60) days after the start of the Involuntary Return of CCA customers to utility procurement service.

        d.    Re-Entry Fees are due and payable to SCE within fifteen (15) days after SCE's issuance of the demand for payment. An Involuntary Return by a CCA, and the failure of the CCA to make full payment of the Re-Entry Fees within fifteen (15) days of SCE's demand shall entitle SCE to immediately draw upon the defaulting CCA's FSR instrument in an amount not to exceed the Re-Entry Fees, except as provided in Section W.4.i below. The CCA FSR instrument may only be drawn upon in the event of an Involuntary Return, or as mutually agreed upon in or pursuant to the terms of the FSR instrument

        e.    In the event that SCE's draw on the defaulting CCA's FSR instrument results in a reduction in the posted FSR amount of another CCA (e.g., a JPA), SCE will recalculate the FSR amount of that non-defaulting CCA, which shall adjust its posted FSR amount within five (5) business days if the recalculated amount is (1) more than ten percent (10%) above or below the CCA's current posted FSR amount (i.e., if the recalculated FSR amount is less than 90% or more than 110% of the posted amount), and (2) more than twenty thousand dollars ($20,000) above or below the posted amount.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 58C16 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit SCE Cab 6 SCE Claim Objection Claim Page 186 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 67
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Original | Cal. PUC Sheet No. | 70490-E |
|---|---|---|---|---|
| Rosemead, California | (U 338-E) | Cancelling | Cal. PUC Sheet No. | |

---

Rule 23                                              Sheet 59    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

4.    Re-Entry Fees For The Involuntary Return Of Customers (Continued)

f.    At the CCA's discretion, the CCA may pay the Re-entry Fees or direct SCE to draw upon the FSR instrument or withhold customer payment remittances. In the event a CCA fails to timely pay the Re-Entry Fees owed to SCE pursuant to Sections W.4.c and W.4.d above, SCE shall have the immediate right to demand and receive payment from the issuer of the defaulting CCA's FSR instrument in an amount not to exceed the Re-Entry Fees. To the extent the CCA fails to discharge its obligation to pay the Re-Entry Fees, any Re-Entry Fees not recovered from the CCA, either directly and/or from SCE's draw on its FSR instrument, will be recovered from the involuntarily returned CCA customers. If the CCA payments and the FSR instrument amount are together inadequate to cover the Re-Entry Fees, the residual costs will be allocated to the involuntarily returned CCA customers.

Any Re-Entry Fees not recovered from the CCA shall be paid by the involuntarily returned CCA customers. For any Re-Entry Fees not recovered from the CCA, SCE will file a Tier 2 Advice Letter to specify SCE's proposal for recovering the residual Re-Entry Fees from the involuntarily returned CCA customers and schedule. If the residual Re-Entry Fees are not the subject of a legitimate dispute, they may be collected upon approval of the Tier 2 Advice Letter. If SCE subsequently recovers additional Re-Entry Fees from the CCA, a refund up to the recovered amount will be provided to the involuntarily returned CCA customers in proportion to the amount collected by SCE.

g.    Service changes for the CCA's involuntarily returned customers will be as follows:

CCA service accounts will be switched to Bundled Portfolio Service, but are otherwise subject to the same rights and obligations of other CCA customers with respect to advance notices required for switching, and the minimum stay provisions in SCE's authorized tariffs.

h.    SCE may seek recovery of the actual administrative cost of the involuntary return in lieu of the adopted proxy CCA service fee amount. In such an event, SCE shall file a Tier 1 advice letter to create a memorandum account to track the actual administrative costs of processing the Involuntary Return. SCE's procurement costs shall continue to be recovered in rates through the operation of its' applicable balancing accounts.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 59C17 | | | Resolution | E-5059 |

**EDISON**
An EDISON INTERNATIONAL Company

Southern California Edison                                    Original      Cal. PUC Sheet No.    70491-E
Rosemead, California        (U 338-E)          Cancelling              Cal. PUC Sheet No.

---

<u>Rule 23</u>                                                        Sheet 60        (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

W.    CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (Continued)

    4.    Re-Entry Fees For The Involuntary Return Of Customers (Continued)

        i.    If the CCA FSR instrument contains each of the following conditions i) – iii), SCE will wait until the end of the 20-day protest period of the Tier 1 advice letter submission and of its supplement, if any, made pursuant to Section W.4.a, before drawing on the CCA FSR instrument and only draw undisputed Re-Entry Fee amounts:

            i.    In the event the issuer of the CCA's FSR instrument terminates the FSR instrument, the CCA must replace the CCA FSR instrument before the effective date of termination using a qualified new issuer;

            ii.    If the CCA fails for any reason to replace the CCA FSR instrument within 20 business days prior to the effective date of the issuer's termination, SCE has the immediate right to draw on the FSR instrument up to the full amount of the calculated Re-Entry Fees, even if the CCA has submitted a protest; and

            iii.    The CCA continues to be responsible for all issuer fees associated with the CCA FSR instrument.

    Undisputed Re-Entry Fee amounts are those amounts set forth in the SCE's Tier 1 advice letter submission, or if a supplemental Tier 1 advice letter is submitted, SCE's Tier 1 supplemental advice letter, made pursuant to Section W.4.a, that i) are not timely protested by the CCA; and/or ii) are approved.

(Continued)

---

(To be inserted by utility)                    Issued by                    (To be inserted by Cal. PUC)
Advice      <u>4394-E</u>                        <u>Carla Peterman</u>              Date Submitted    <u>Jan 15, 2021</u>
Decision    <u>18-05-022</u>                  <u>Senior Vice President</u>        Effective            <u>Jan 15, 2021</u>
60C18                                                                        Resolution            <u>E-5059</u>

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G Tab 6 CCE Claim Objection Cal Claim Page 188 Page 270 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 69
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Original | Cal. PUC Sheet No. | 70492-E |
| Rosemead, California    (U 338-E) | Cancelling | | Cal. PUC Sheet No. | |

---

Rule 23                                                                    Sheet 61    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

X.    CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENT

The following steps shall apply for purposes of determining CCA Financial Security Requirements and Re-Entry Fees for incremental procurement costs associated with the Involuntary Return to Bundled Service of CCA customers in accordance with the methodology proposed in Joint Utilities' testimony (Ex. JU-01, Appendix E), adopted in D.18-05-022.

1.    Load Forecast

Each CCA's usage, peak demand, and number of customer service accounts (collectively, the CCA's "load forecast") will be based on the most recent calendar year of historical data, unless a collaborative load forecast has been developed at least one month prior to the submission date of the advice letter setting forth the financial security amounts, as described in Section W. 2. The CCA's load forecast will be established using the corresponding six (6)-month period from the most recent calendar year of historical usage (MWh) data. The CCA's monthly peak demand forecast (MW) will be established using the most recent 12 months of historical monthly peaks, defined as the CCA's demand during each month's system peak hour. The CCA's customer service accounts forecast will be established using the actual number of customer service accounts to whom the CCA provided service as of the date of the forecast, unless the CCA is new and beginning service, or plans to implement a new phase of service during the 6-month forecast period, as discussed below.

For a new CCA that is beginning service, unless the CCA and SCE otherwise agree on a collaborative load forecast, the CCA Load Forecast shall be based on the default assumptions regarding the percentage of customers in the various classes that may opt out of CCA service established by the Commission and set forth in Section A.2. of SCE's Rule 23.2, as follows:

- Bundled Service Customers - 5% for residential and 20% for non-residential customers.
- Direct Access Customers – 100% for both residential and non-residential customers.

If the CCA plans to implement a new phase of service (e.g., expanding its services to new cities or to additional customer groups within its existing service territory pursuant to its Implementation Plan) within the 6-month forecast period, the load associated with the new phase will be included in that CCA's load forecast to determine the CCA's financial security amount The load forecast of the new phase of service will be based on the most recent calendar year of historical data for customers service accounts in the new phase, using the default assumptions above for the new phase of service, unless a collaborative load forecast has been developed at least one month prior to the submission date of the advice letter setting forth the financial security amounts that estimates the number of customer service accounts likely to be served by the CCA (e.g., contains agreed-upon customer opt-out rate assumptions).

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 61C17 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab 6 CCE claim Objection Claim Page 189 Page 270 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 70
of 91

EDISON
An EDISON INTERNATIONAL Company

| Southern California Edison | | Original | Cal. PUC Sheet No. | 70493-E |
| Rosemead, California    (U 338-E) | Cancelling | | Cal. PUC Sheet No. | |

---

Rule 23                                                              Sheet 62    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

X.    CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS
(Continued)

1.    Energy Cost Forecast

To forecast incremental energy costs for the CCA FSR, SCE will use a load-weighted
forward SP-15 price and update the forward price forecast monthly.  The forward prices
will be obtained from Intercontinental Exchange (ICE) and will be the load-weighted[i]
average of daily peak and off-peak energy prices for all trading days in Month M-1 for
Months M+1 to Month M+6, inclusive, where Month M denotes the month when the
financial security amount is calculated.  Additionally, the IOU-specific line-loss factor
specified in Resolution E-4475 is then applied to the incremental energy cost forecast.

Calculation

- On-Peak Forecast--PF ($/MWh) = Average of daily peak prices in month M-1 for
  Months M+1 to M+6, inclusive

- Off-Peak Forecast--OF ($/MWh) = Average of daily off-peak prices in month M-1
  for Months M+1 to M+6, inclusive

- On-Peak Load--PL (MWh) = Estimated CCA customers' Peak Period usage for 6
  forward months

- Off-Peak Load--OL (MWh) = Estimated CCA customers' Off-Peak Period usage
  for 6 forward months

- Energy Cost Forecast = [(PF x PL) + (OF x OL)] x IOU-Specific Line Loss Factor

---

[i]    Load weights will be determined based on CCA-specific on- and off-peak usage ratios.  For example, if
65% of a CCA's total usage is measured during the on-peak hours, as defined in the North American
Electric Reliability Corporation (NERC) Policy 1, and 35% of the CCA's total usage is measured during
the off-peak hours, ICE's on- and off-peak forward prices will be multiplied by 0.65 and 0.35,
respectively.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 62C16 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab 6 CE claim Objection Cla Page 119 Page 72 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 71
of 91

EDISON
An EDISON INTERNATIONAL Company

| | | | |
|---|---|---|---|
| Southern California Edison | | Original | Cal. PUC Sheet No.   70494-E |
| Rosemead, California   (U 338-E) | Cancelling | | Cal. PUC Sheet No. |

---

Rule 23                                                                                   Sheet 63      (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

X.    CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS
       (CONTINUED)

   1.   RPS Cost Forecast

        In the absence of a robust index, a forward quote, or durable methodology for regularly
        estimating the value of a REC, SCE will use the $10/MWh REC value adopted by the
        Commission in D.16-05-006 as an estimate of the incremental cost of satisfying the RPS
        requirement for the involuntarily returned CCA load. A Commission decision in the RPS
        Rulemaking to update or modify the $10/MWh REC value will apply to all programs and
        tariffs that use the $10/MWh REC value, including the CCA FSR and Re-Entry fee
        calculations. The REC value will be multiplied by SCE's annual RPS target and by the
        forecast of CCA usage to determine the RPS cost forecast.  Additionally, the SCE-specific
        line-loss factor specified in Resolution E-4475 is then applied to the RPS cost forecast.

        Calculation

        •   RPS Cost Forecast = REC Value ($/MWh) x Annual RPS Target (%) x CCA
            Annual Usage Forecast (MWh) x IOU-Specific Line Loss Factor

   2.   RA Cost Forecast

        In the absence of a forward quote of RA prices, SCE will use data published in the
        CPUC's annual Resource Adequacy report (CPUC RA report) as an estimate of the
        incremental cost of procuring RA for the involuntarily returned CCA load.  SCE will
        multiply the CCA's local RA requirement (MW)[i] by the local RA VWAP ($/kW-mo)
        specified in the CPUC's RA report, and to multiply the CCA's net system RA requirement
        (MW),[ii] which will include the Planning Reserve Margin (PRM) of 115%, by the system RA
        average monthly price specified in the CPUC's RA report.  This result will be multiplied by
        6 to determine the RA cost forecast.

---

[i]   Because the Commission-set local RA requirement for the CCA is considered confidential, SCE will
      estimate this requirement by multiplying the CCA's load share (defined as the CCA's annual peak
      demand divided by the annual peak demand in the Transmission Access Charge (TAC) area) by the
      total local capacity requirement for all local areas within the utility's service territory.
[ii]  Because the Commission-set system RA requirement for the CCA is considered confidential, SCE will
      estimate this requirement by multiplying their historical average monthly peak demand by the 115%
      PRM.

(Continued)

---

| (To be inserted by utility) | | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|---|
| Advice | 4394-E | Carla Peterman | Date Submitted | Jan 15, 2021 |
| Decision | 18-05-022 | Senior Vice President | Effective | Jan 15, 2021 |
| 63C16 | | | Resolution | E-5059 |

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit C a b S C E Claim io Obj SCE ti Cer Claims 119 Pa of 270 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 72
of 91

EDISON
An EDISON INTERNATIONAL Company

| | | |
|---|---|---|
| Southern California Edison | Original | Cal. PUC Sheet No. 70495-E |
| Rosemead, California    (U 338-E) | Cancelling | Cal. PUC Sheet No. |

---

Rule 23                                                          Sheet 64    (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

X.    CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS
(CONTINUED)

    4.    RA Cost Forecast (Continued)

       Calculation
- Local RA requirement (MW) = Annual local capacity requirement (LCR) in Transmission Access Charge (TAC) area (MW)[i] as adopted by the Commission
- CCA load share = CCA's annual peak demand (MW) / annual peak demand in the TAC area (MW)[ii]
- CCA's local RA requirement (MW) = Local RA requirement (MW) x CCA load share
- CCA's system RA requirement (MW) = Average of the CCA's monthly peak demand forecast (MW) x PRM of 115%
- CCA's net system RA requirement (MW) = (Average of the CCA's monthly peak demand forecast (MW) x PRM of 115%) – CCA's local RA requirement (MW)
- RA Cost Forecast = [(CCA's local RA requirement (MW) x Local RA VWAP ($kW-mo)) + (CCA's net system RA requirement x System RA VWAP ($/kw-mo))] x 6 x 1000

    5.    Forecast Cost of New Procurement to Serve Involuntarily Returned CCA Customers
The Forecast Cost of New Procurement to serve involuntarily returned CCA customers for a 6-month period after an Involuntary Return is the sum of the Energy, RPS, and RA costs calculated in Sections X.2 to X.4.

       Calculation
- Forecast Cost of New Procurement = (Energy Cost Forecast + RPS Cost Forecast + RA Cost Forecast)

---

[i]   Local capacity requirements include the MW requirements for all local areas within SCE's service territory.
[ii]  The CCA's annual peak demand will be established using the monthly peak demand forecast established in Step 1.  The annual peak demand in the TAC area will be established using the most recent TAC Area load forecasts developed by the CEC in its Mid Demand Baseline - Mid AAEE scenario.  This load share calculation is modeled off the methodology used by the Commission to allocate local capacity requirements.

(Continued)

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice    4394-E | Carla Peterman | Date Submitted    Jan 15, 2021 |
| Decision    18-05-022 | Senior Vice President | Effective    Jan 15, 2021 |
| 64C16 | | Resolution    E-5059 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab 6 CCA claim Objection Claim Page 192 Page 274 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 73
of 91

**EDISON**
*An EDISON INTERNATIONAL Company*

| | | |
|---|---|---|
| Southern California Edison | Original | Cal. PUC Sheet No.   70496-E |
| Rosemead, California   (U 338-E)   Cancelling | | Cal. PUC Sheet No. |

---

Rule 23   Sheet 65   (N)
COMMUNITY CHOICE AGGREGATION

(Continued)

X.   CALCULATION OF CCA FINANCIAL SECURITY AND RE-ENTRY FEE REQUIREMENTS (CONTINUED)

4.   Forecast of Revenues That Will Be Collected Directly from Returned CCA Customers through Their Bundled Service Generation Rate (Forecast Revenues)

Involuntarily returned CCA customers will be placed on BPS.  A forecast of the revenues that will be collected from these customers through their bundled service generation rates will be developed by multiplying SCE's system average bundled generation rate, as set in the most recent rate change filing, by the CCA's load forecast.

5.   Incremental Procurement Cost Exposure

To determine the forecasted exposure to incremental procurement costs, which should be covered by the CCA's financial security instrument, subtract the Forecast Revenues from the Forecast Cost of New Procurement

Calculation
   •   Incremental Procurement Cost Exposure = (Forecast Cost of New Procurement – Forecast Revenues).

6.   Administrative Costs

To forecast the administrative costs for purposes of setting the FSR, SCE will use its Commission-approved Re-Entry fee in a voluntary return of a CCA customer (i.e., at the customer's election) as the proxy for the utility's incremental time and material costs in the event of an involuntary return of CCA customers.  This fee is detailed in SCE's Schedule CCA-SF.

Calculation
   •   Administrative costs = CCA-SF Re-Entry fee*[number of involuntarily returned customer service accounts].

7.   CCA Financial Security Requirement

To determine the CCA FSR, add the forecast Incremental Procurement Cost Exposure to the forecast Administrative Costs.

Calculation
   •   CCA FSR = Incremental Procurement Cost Exposure + Administrative Cost.

The financial security amount for a CCA shall be the higher of the amount determined in accordance with the steps above or the minimum financial security amount of one hundred and forty seven thousand dollars ($147,000).

At no time shall the sum of the administrative costs and the incremental procurement costs for involuntarily returned customers be less than zero dollars ($0).

---

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) | |
|---|---|---|---|
| Advice   4394-E | Carla Peterman | Date Submitted   Jan 15, 2021 |
| Decision   18-05-022 | Senior Vice President | Effective   Jan 15, 2021 |
| 65C15 | | Resolution   E-5059 |

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit 5 Cabs Cd Claaino Objecti0n Cla Page 199 age 216 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 74
of 91

**EXHIBIT 2**

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit G abs CE Claim Objection Claim Page 119 Page 276 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 75 of 91



**Shinjini C. Menon**
Managing Director, State Regulatory Operations

July 12, 2021

**ADVICE 4541-E**
**(U 338-E)**

PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA
ENERGY DIVISION

    **SUBJECT:**    Notice of Western Community Energy's Mass Involuntary
                   Return its Community Choice Aggregator Customers and Re-
                   Entry Fee Calculation

In compliance with Southern California Edison Company's (SCE's) Rule 23, SCE
hereby notifies the Commission that on June 10, 2021 Western Community Energy
(WCE), a Community Choice Aggregation (CCA) program, submitted a written notice of
deregistration with the California Public Utilities Commission (Commission).  WCE's
notice closely followed its Chapter 9 bankruptcy petition, filed May 24, 2021.  WCE's
written notice of deregistration served as advance written notice of the mass involuntary
return of WCE's CCA customers to SCE's procurement service.

**PURPOSE**

Pursuant to SCE's Rule 23, Section W.4.a, SCE submits this Tier 1 advice letter
providing notice to the Commission of the mass involuntary return of WCE's CCA
customers to SCE's procurement service.  SCE also sets forth the Re-Entry Fee
calculation in conformance with Rule 23, Section X.  Attached hereto is a confidential
version of the Re-Entry Fee calculation for the Commission (Attachment A), the
associated confidentiality declaration (Attachment B), and a public, redacted version
(Attachment C).

**BACKGROUND**

In Assembly Bill (AB) 117 (2002), authorizing the formation of CCA programs, the
Legislature enacted Section 394.25(e), a consumer protection provision, which
provides:

> *If a customer of an electric service provider or a community choice
> aggregator is involuntarily returned to service provided by an electrical
> corporation, any reentry fee imposed on that customer that the commission
> deems is necessary to avoid imposing costs on other customers of*

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit Exhibit G abs SCE Claim Objection for Claim 1195 age 217 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 76
of 91

ADVICE 4541-E
(U 338-E)                                         - 2 -                                  July 12, 2021

> *the electrical corporation shall be the obligation of the electric service provider or a community choice aggregator, except in the case of a customer returned due to default in payment or other contractual obligations or because the customer's contract has expired.  As a condition of its registration, an electric service provider or a community choice aggregator shall post a bond or demonstrate insurance sufficient to cover those reentry fees.  In the event that an electric service provider becomes insolvent and is unable to discharge its obligation to pay reentry fees, the fees shall be allocated to the returning customers.*

The Commission ordered the implementation of Section 394.25(e) for CCA programs and adopted the methods for calculating Financial Security Requirement (FSR) amounts and Re-Entry Fees[1] in Decision (D.)18-05-022, issued June 7, 2018.  D.18-05-022 concluded that, to keep other utility customers indifferent to a mass involuntary return of CCA customers to the utility's procurement service, CCA Re-Entry Fees need to recover the incremental procurement and administration costs caused by the mass involuntary return.[2]  The Decision adopted the Joint Utilities' methodology set forth in Exhibit JU-01, Appendix E of R.03-10-003, for calculating the incremental procurement costs with the changes necessary to be consistent with the Decision.[3]  The Decision requires the CCA FSR to be calculated twice a year and reflect incremental administrative costs and incremental procurement costs for a six-month forward period, finding that "[a] six-month notice period allows sufficient time for a utility to adjust its procurement portfolio to accommodate additional bundled load due to returning CCA customers."[4]  A minimum CCA financial security amount of $147,000 was also established.[5]

Pursuant to the Decision, SCE submitted two advice letters:

1. On August 15, 2018, SCE submitted Advice 3839-E, providing each active CCA within SCE's service area with the calculation for its respective FSR amount pursuant to D.18-05-022.  SCE also affirmed in Advice 3839-E that "[t]he CCA financial security amounts will be recalculated on the regular bi-annual schedule adopted in D.18-05-022 and submitted with the Commission starting in November 2018."  The Commission approved Advice 3839-E on September 14, 2018.  However, the newly calculated FSRs were not required

---

[1]  Re-entry fees include a utility's administrative and procurement costs resulting from a mass involuntary return of a CCA's customers to the utility, and financial security amounts are intended to cover those potential costs.

[2]  *See* D.18-05-022, pp. 2-3, 4, 5-7, Finding of Fact (FOF) 1, 4, Conclusion of Law (COL) 2, Ordering Paragraphs 1, 5.

[3]  *See id.*, p. 7, OP 5, 8, 9.

[4]  *Id.*, FOF 5.

[5]  *See* D.18-05-022, Ordering Paragraph (OP) 9.

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Cab 6 Cc Claim Obj SCE Cc Claim Page 196 of 278 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 77
of 91

ADVICE 4541-E
(U 338-E)                                    - 3 -                          July 12, 2021

to be posted by the CCAs until the Commission approved the modifications to
SCE's Rule 23, implementing D.18-05-022.

2. On August 15, 2018, SCE submitted Advice 3840-E to revise SCE's CCA
   Service Fees tariff schedule (Schedule CCA-SF) and SCE's CCA tariff rule
   (Rule 23) to implement the CCA FSR and Re-Entry Fees requirements in
   SCE's tariffs in compliance with D.18-05-022. Advice 3840-E was approved
   in Resolution E-5059,[6] which "adopts the proposed tariff revisions that were
   specifically directed in Decision (D.) 18-05-022 and rejects proposed revisions
   that do not comply with the decision."[7] Resolution E-5059 resolved numerous
   disputed issues on the tariff implementation of the CCA FSR and Re-Entry
   Fees, including cost responsibility for residual Re-Entry Fees (*i.e.,* those Re-
   Entry Fees not recovered from the defaulting CCA):

   > *P.U. Code Section 366.2(a)(4) supports this interpretation: 'The
   > implementation of a community choice aggregation program shall not
   > result in a shifting of costs between the customers of the community
   > choice aggregator and the bundled service customers of an electrical
   > corporation.' If returning CCA customers avoid residual reentry costs
   > above the financial security requirement, this could shift costs to
   > bundled customers in violation of Section 366.2(a)(4). Therefore, we
   > conclude that P.U. Code Sections 366.2(a)(4), 394.25(e) and D.18-05-
   > 022 do not absolve involuntarily returned CCA customers from reentry
   > fees. CCA customers bear cost responsibility for reentry fees that the
   > CPUC deems necessary to avoid cost shifting.[8]*

On December 8, 2020, WCE submitted Advice 4-E pursuant to Resolution E-5059,
which directed CCAs to post new FSR instruments with the utilities within 60 days.[9]

On January 15, 2021, SCE submitted Advice 4394-E to implement the tariff revisions in
compliance with Resolution E-5059.[10]

The CCA FSR amounts were updated for the first time after being posted in SCE Advice
4494-E, submitted on May 10, 2021.[11]

---

[6]  Resolution E-5059 was adopted on October 8, 2020.

[7]  Resolution, p. 2.

[8]  Resolution E-5059, p. 10; *see also* p. 17 and Finding 9.

[9]  *See* Resolution E-5059, OP 11.

[10] Energy Division approved SCE Advice 4394-E on February 26, 2021, with an effective date
     of January 15, 2021.

[11] See SCE's Advice 4494-E, p. 2, explaining "[f]or the Resource Adequacy (RA) Cost Forecast, SCE is
     using the data that is published in the CPUC's 2019 Resource Adequacy Report (CPUC 2019 RA
     Report or "Report") as an estimate of the incremental cost of procuring RA for the involuntarily

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:50   Desc
Exhibit SCE Cabos SCE Claim Objection Claim 21-1 Part 7   Page 197 of 210

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 78
of 91

ADVICE 4541-E
(U 338-E)                                         - 4 -                                  July 12, 2021

**MASS INVOLUNTARY RETURN**

On May 24, 2021, WCE declared a fiscal emergency and filed for Chapter 9 Bankruptcy protections.[12]  Shortly thereafter, on June 10, 2021 WCE submitted a written notice of deregistration as a CCA with the Commission.[13]  WCE's notice of deregistration served as advanced written notice of WCE's mass involuntary return of its CCA customers to SCE's procurement service.

Working closely with WCE, the Commission and the California Independent System Operator (CAISO) to coordinate an efficient return of WCE customers to SCE's procurement service, on June 11, 2021 SCE entered into a Load Transfer Agreement with WCE and CAISO pursuant to which SCE assumed Scheduling Coordination of WCE's load on June 15, 2021.  The WCE customer service accounts mass involuntarily returned to SCE totaled 113,337 and were switched to SCE's Bundled Portfolio Service effective on June 15, 2021.

The mass involuntary return impacted all accounts served by WCE on June 10, 2021, including those customer service accounts that had six-month advance notices to return to SCE's procurement service still pending (*i.e.*, that had not completed the full six months advance notice period).  Moreover, customers that switched to SCE's Transitional Bundled Service (TBS) on or after May 24, 2021 (the WCE bankruptcy filing date) were presumed to be fleeing an insolvent CCA and were therefore moved to SCE's Bundled Portfolio Service and included in the mass involuntarily return.[14]  WCE customers that switched to SCE's TBS prior to May 24, 2021 were not included in the mass involuntary return.[15]  Moreover, inactive service accounts, and WCE customer service accounts that exercised their opt-out right during their 60-day pre- or post-notification periods occurring prior to the mass involuntary return, were also not included.

---

returned CCA load. However, SCE notes that the Report's data is out of date and not consistent with current RA market pricing as reflected in the Commission's RA Market Price Benchmarks (MPBs) established pursuant to D.18-10-019 and D.19-10-001. Consistent with the CCA FSR methodology established in Decision (D.) 18-05-022 and Resolution E-5059, the CCA FSR should be calculated using the Commission's MPBs for RA and Renewable Portfolio Standards (RPS) because the MPBs reflect actual market transactions and prices. In the Provider of Last Resort (POLR) Rulemaking (R.21-03-011), SCE is seeking the Commission's concurrence to begin using the MPBs for the FSR calculations" (footnotes omitted).  *See also* SCE's Reply Comments filed on May 10, 2021 in R.21-03-011 (POLR OIR), at pp. 11-12.

[12]   WCE press release announcing its Chapter 9 Bankruptcy petition (https://westerncommunityenergy.com/press-release-wce-files-for-chapter-9-bankruptcy/)

[13]   *See* Western Community Energy Notice of Deregistration as a Community Choice Aggregator, submitted to Executive Director Rachel Peterson on June 10, 2021.

[14]   SCE saw a material uptick in the number of WCE customer requests to switch to SCE's procurement service on / after May 24, 2021.

[15]   SCE did not see a material uptick in uptick in the number of WCE customer requests to switch to SCE's procurement service prior to May 24, 2021.

Case 6:21-bk-12821-SY   Doc 222-7   Filed 11/30/21   Entered 11/30/21 19:38:10   Desc
Exhibit Exhibit Gabs CCe Claim Objection Claim 198 Page 280 of 92

Case 6:21-bk-12821-SY   Claim 21-1   Filed 09/30/21   Desc Main Document   Page 79
of 91

### RE-ENTRY FEE CALCULATION

The Re-Entry Fee calculation is set forth in detail in Section X of SCE's Rule 23.  It is designed to enable a CCA to mitigate its incremental procurement cost exposure by giving the investor-owned electric utility (IOU) at least six months advance notice of a mass involuntary return.  This is because the Commission in D.18-05-022 found that six months is sufficient for the IOU to adjust its procurement portfolio to accommodate the additional bundled service load of the mass involuntarily returned CCA customers.[16]  In WCE's case, SCE received only five calendar days advance notice of the mass involuntary return, which is not sufficient to mitigate incremental procurement cost exposure.

SCE has calculated the Re-Entry Fees for WCE's mass involuntary return of 113,337 customer service accounts pursuant to and in compliance with SCE's Rule 23, Section X, and they total $14,715,892.  SCE will issue a written demand to WCE for payment of the Re-Entry Fees in conformance with Rule 23.  However, because WCE is insolvent, SCE expects to draw on WCE's posted FSR and seek, in a subsequent Tier 2 advice filing, Commission authorization of a ratemaking mechanism to recover the residual Re-Entry Fees from WCE's mass involuntarily returned customer service accounts.  If, at the conclusion of WCE's bankruptcy proceeding, SCE recovers any Re-Entry Fee monies beyond WCE's posted FSR amount, those monies will be refunded to the mass involuntarily returned customer service accounts using a methodology approved by the Commission.

The Re-Entry Fee calculation uses the 2021 forecasted Market Price Benchmarks (MPBs) for Resource Adequacy (RA) and Renewable Portfolio Service (RPS) attributes established by the Commission pursuant to D.18-10-019 and D.19-10-001, issued in the Power Charge Indifference Adjustment (PCIA) Rulemaking.[17]  Use of these up-to-date MPBs is appropriate and necessary to avoid shifting the costs caused by WCE's mass involuntary return to other SCE customers in violation of California law.[18]  It is appropriate to use the PCIA MPBs because the Re-Entry Fee calculation methodology approved by the Commission expressly contemplates the use of up-to-date values when they are available.  Specifically, SCE's Rule 23, Section X, expressly authorizes the use of a "forward quote" of RA prices, or "robust index, forward quote, or durable methodology for regularly estimating the value of a REC [Renewable Energy Credit]" when they are available.[19]  The PCIA MPBs satisfy these criteria.  The Commission forecasts and trues-up the PCIA MPBs annually based on the actual RA and RPS transactions of all jurisdictional load-serving entities (LSEs) in California.  As such, they are robust indices or forward quotes of RA and RPS compliance attributes, established using a durable methodology for estimating the value of these attributes.

---

[16] *See* fn. 4, *supra*.
[17] Rulemaking (R.) 17-06-026.
[18] *See e.g.*, Public Utilities Code Sections 394.25(e), 366.2 (a)(4), 366(d)(1), 366.3 and 365.2.
[19] *See* SCE's Rule 23, Section X, Sheets 63 and 64.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim Page 199 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 80
of 91

ADVICE 4541-E
(U 338-E)                                    - 6 -                                    July 12, 2021

Use of the PCIA MPBs is also appropriate because they are the values the bundled service customers "pay" to CCA customers upon their departure from SCE's procurement service.  The PCIA MPBs establish the market value of SCE's PCIA portfolio of resources, which bundled service customers are obligated to pay under the PCIA methodology. CCA customers pay their pro-rata vintaged share of the "above-market" costs of SCE's PCIA portfolio of resources through the PCIA rate.  The RA and RPS resources need to be consistently valued to avoid cost shifting.  If they are valued at market for CCA customers upon their departure from SCE's procurement service and valued below market for CCA customers upon their return to SCE's procurement service, that will cause unlawful cost shifting.[20]

SCE attaches hereto a confidential version of the Re-Entry Fee calculation for the Commission (Attachment A), the associated confidentiality declaration (Attachment B), and a public, redacted version (Attachment C), which redacts the proprietary Intercontinental Exchange (ICE) forward energy prices and the WCE total peak load and total energy forecasts.

**CONFIDENTIALITY PROTECTION**

Attachment A to this advice letter contains confidential material that is subject to the protections adopted in D.16-08-024 and D.06-06-066.  Attachment A is submitted to the Commission confidentially pursuant to D.16-08-024 and D.06-06-066.  This declaration is submitted as Attachment B to this advice letter.

Attachment A is removed from the public version of this advice letter. SCE is providing by electronic means to WCE and the Commission a copy of the confidential Re-Entry Fee calculation.

**TIER DESIGNATION**

Pursuant to Rule 23, Section W.4.a, this advice letter is submitted with a Tier 1 designation.

This advice letter will not increase any rate or change, cause the withdrawal of service, or conflict with any other schedule or rule.

---

[20]    SCE also notes that even the up-to-date 2021 forecasted PCIA MPBs for RA do not reflect the higher prices of RA SCE is paying in the current market.

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Scb 6 Claim Obj SCE Cr Claim 120 Page 182 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 81 of 91

ADVICE 4541-E
(U 338-E)                                - 7 -                                July 12, 2021

## EFFECTIVE DATE

This Tier 1 advice letter is effective upon submittal pending disposition.

## NOTICE

Anyone wishing to protest this advice letter may do so by letter via U.S. Mail, facsimile, or electronically, any of which must be received no later than 20 days after the date of this advice letter.  Protests should be submitted to:

> CPUC, Energy Division
> Attention:  Tariff Unit
> 505 Van Ness Avenue
> San Francisco, California  94102
> E-mail:  EDTariffUnit@cpuc.ca.gov

Copies should also be mailed to the attention of the Director, Energy Division, Room 4004 (same address above).

In addition, protests and all other correspondence regarding this advice letter should also be sent by letter and transmitted via facsimile or electronically to the attention of:

> Shinjini C. Menon
> Managing Director, State Regulatory Operations
> Southern California Edison Company
> 8631 Rush Street
> Rosemead, California 91770
> Telephone (626) 302-3377
> Facsimile:  (626) 302-6396
> E-mail:  AdviceTariffManager@sce.com

> Tara S. Kaushik
> Managing Director, Regulatory Relations
> c/o Karyn Gansecki
> Southern California Edison Company
> 601 Van Ness Avenue, Suite 2030
> San Francisco, California 94102
> Facsimile:  (415) 929-5544
> E-mail:  Karyn.Gansecki@sce.com

There are no restrictions on who may submit a protest, but the protest shall set forth specifically the grounds upon which it is based and must be received by the deadline shown above.

In accordance with General Rule 4 of GO 96-B, SCE is serving copies of this Advice Letter to the interested parties on SCE's GO 96-B, R.03-10-003, R.12-06-013, R.17-06-026, R.16-02-007, and R.17-09-020 service lists. Address change requests to

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cabos CE claim Objection Cla Page 120 Page 283 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 82
of 91

ADVICE 4541-E
(U 338-E)                                          - 8 -                                          July 12, 2021

the GO 96-B service list should be directed by electronic mail to
AdviceTariffManager@sce.com or (626) 302-4039. For changes to all other service
lists, please contact the Commission's Process Office at (415) 703-2021 or by electronic
mail at Process_Office@cpuc.ca.gov.

Further, in accordance with Public Utilities Code Section 491, notice to the public is
hereby given by submitting and keeping the Advice Letter at SCE's corporate
headquarters. To view other SCE advice letters submitted with the Commission, log on
to SCE's web site at https://www.sce.com/wps/portal/home/regulatory/advice-letters.

For questions, please contact Diana Valle at (626) 302-5666 or by electronic mail at
Diana.Valle@sce.com.

**Southern California Edison Company**

/s/ Shinjini C. Menon
Shinjini C. Menon

SCM:dv:jm
Enclosures



# ADVICE LETTER
# S U M M A R Y
## ENERGY UTILITY



| MUST BE COMPLETED BY UTILITY (Attach additional pages as needed) |
|---|

| Company name/CPUC Utility No.: Southern California Edison Company (U 338-E) |
|---|

| Utility type: | Contact Person: Darrah Morgan |
|---|---|
| ☑ ELC    ☐ GAS    ☐ WATER | Phone #: (626) 302-2086 |
| ☐ PLC    ☐ HEAT | E-mail: AdviceTariffManager@sce.com |
| | E-mail Disposition Notice to: AdviceTariffManager@sce.com |

| EXPLANATION OF UTILITY TYPE | (Date Submitted / Received Stamp by CPUC) |
|---|---|
| ELC = Electric         GAS = Gas<br>PLC = Pipeline      HEAT = Heat         WATER = Water | |

Advice Letter (AL) #: 4541-E                              Tier Designation: 1

Subject of AL:
Notice of Western Community Energy's Mass Involuntary Return its Community Choice Aggregator Customers and Re-Entry Fee Calculation

Keywords (choose from CPUC listing): Compliance

AL Type: ☐ Monthly  ☐ Quarterly  ☐ Annual  ☑ One-Time  ☐ Other:

If AL submitted in compliance with a Commission order, indicate relevant Decision/Resolution #:

Does AL replace a withdrawn or rejected AL? If so, identify the prior AL:

Summarize differences between the AL and the prior withdrawn or rejected AL:

Confidential treatment requested?    ☑ Yes    ☐ No

If yes, specification of confidential information: See Attachment B, Confidentiality Declaration
Confidential information will be made available to appropriate parties who execute a nondisclosure agreement. Name and contact information to request nondisclosure agreement/access to confidential information:

Resolution required?    ☐ Yes    ☑ No

Requested effective date: 7/12/21                    No. of tariff sheets: -0-

Estimated system annual revenue effect (%):

Estimated system average rate effect (%):

When rates are affected by AL, include attachment in AL showing average rate effects on customer classes (residential, small commercial, large C/I, agricultural, lighting).

Tariff schedules affected: None

Service affected and changes proposed[1]:

Pending advice letters that revise the same tariff sheets: None

[1]Discuss in AL if more space is needed.

Clear Form

Case 6:21-bk-12821-SY Doc 222-7 Filed 11/30/21 Entered 11/30/21 19:38:50 Desc
Exhibit Exhibit Cab SCE Claim Objection Claim 1 20 Page 203 Page 85 of 92

Case 6:21-bk-12821-SY Claim 21-1 Filed 09/30/21 Desc Main Document Page 84 of 91

**Protests and all other correspondence regarding this AL are due no later than 20 days after the date of this submittal, unless otherwise authorized by the Commission, and shall be sent to:**

CPUC, Energy Division
Attention: Tariff Unit
505 Van Ness Avenue
San Francisco, CA 94102
Email: EDTariffUnit@cpuc.ca.gov

Name: Shinjini C. Menon
Title: Managing Director, State Regulatory Operations
Utility Name: Southern California Edison Company
Address: 8631 Rush Street
City: Rosemead
State: California                    Zip: 91770
Telephone (xxx) xxx-xxxx: (626) 302-3377
Facsimile (xxx) xxx-xxxx: (626) 302-6396
Email: advicetariffmanager@sce.com

Name: Tara S. Kaushik  c/o Karyn Gansecki
Title: Managing Director,  Regulatory Relations
Utility Name: Southern California Edison Company
Address: 601 Van Ness Avenue, Suite 2030
City: San Francisco
State: California                    Zip: 94102
Telephone (xxx) xxx-xxxx:
Facsimile (xxx) xxx-xxxx: (415) 929-5544
Email: karyn.gansecki@sce.com

Clear Form

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit G abc C E claim Object SCE in Claim Page 204 of 210 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 85
of 91

## ENERGY Advice Letter Keywords

| | | |
|---|---|---|
| Affiliate | Direct Access | Preliminary Statement |
| Agreements | Disconnect Service | Procurement |
| Agriculture | ECAC / Energy Cost Adjustment | Qualifying Facility |
| Avoided Cost | EOR / Enhanced Oil Recovery | Rebates |
| Balancing Account | Energy Charge | Refunds |
| Baseline | Energy Efficiency | Reliability |
| Bilingual | Establish Service | Re-MAT/Bio-MAT |
| Billings | Expand Service Area | Revenue Allocation |
| Bioenergy | Forms | Rule 21 |
| Brokerage Fees | Franchise Fee / User Tax | Rules |
| CARE | G.O. 131-D | Section 851 |
| CPUC Reimbursement Fee | GRC / General Rate Case | Self Generation |
| Capacity | Hazardous Waste | Service Area Map |
| Cogeneration | Increase Rates | Service Outage |
| Compliance | Interruptible Service | Solar |
| Conditions of Service | Interutility Transportation | Standby Service |
| Connection | LIEE / Low-Income Energy Efficiency | Storage |
| Conservation | LIRA / Low-Income Ratepayer Assistance | Street Lights |
| Consolidate Tariffs | Late Payment Charge | Surcharges |
| Contracts | Line Extensions | Tariffs |
| Core | Memorandum Account | Taxes |
| Credit | Metered Energy Efficiency | Text Changes |
| Curtailable Service | Metering | Transformer |
| Customer Charge | Mobile Home Parks | Transition Cost |
| Customer Owned Generation | Name Change | Transmission Lines |
| Decrease Rates | Non-Core | Transportation Electrification |
| Demand Charge | Non-firm Service Contracts | Transportation Rates |
| Demand Side Fund | Nuclear | Undergrounding |
| Demand Side Management | Oil Pipelines | Voltage Discount |
| Demand Side Response | PBR / Performance Based Ratemaking | Wind Power |
| Deposits | Portfolio | Withdrawal of Service |
| Depreciation | Power Lines | |

Clear Form

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab SCE Claim Objection Claim 205 Page 187 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 86
of 91

# ATTACHMENT A

# Confidential Re-Entry Fee Calculation [OMITTED IN THE PUBLIC VERSION OF THIS ADVICE LETTER SUBMITTAL]

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit Cabot SCE Claim Objection Claim 21-1 Page 206 of 218    of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 87
of 91

# ATTACHMENT B

# Confidentiality Declaration

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:50    Desc
Exhibit Exhibit G abs SCE Claim Objection Claim Page 207 Page 89 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 88
of 91

## DECLARATION OF

## NATALIA WOODWARD

## REGARDING THE CONFIDENTIALITY OF CERTAIN DATA

I, Natalia Woodward declare and state:

1.   I am a Vice President and Treasurer at Southern California Edison Company (SCE) with authority to sign this declaration. I have responsibility for overseeing and reviewing the Western Community Energy (WCE), Community Choice Aggregation (CCA) Re-entry Fee calculation.

2.  I am making this declaration in accordance with the instructions set forth in Decision D.06-06-066 (as modified by D.07-05-032), which governs the submission of confidential, market-sensitive procurement information to the Commission, and Decisions 16-08-024 and 17-09-023, which govern the submission of all other confidential documents to the Commission.

3.   I have personal knowledge of the facts and representations herein and, if called upon to testify, could and would do so, except for those facts expressly stated to be based upon information and belief, and as to those matters, I believe them to be true.

4.   Listed below are the data for which SCE is seeking confidential protection and the basis for SCE's confidentiality request.

Case 6:21-bk-12821-SY  Doc 222-7  Filed 11/30/21  Entered 11/30/21 19:38:10  Desc
Exhibit Exhibit Gabs SCE Claim Objection Claim Page 120 Page 1290 of 92

Case 6:21-bk-12821-SY  Claim 21-1  Filed 09/30/21  Desc Main Document  Page 89
of 91

| Location of Confidential Data | Description of Information that is Confidential | Basis for SCE's Confidentiality Claim | Limitations on Confidentiality Specified in Matrix |
|---|---|---|---|
| Confidential WCE Reentry Fee _Calculation Sheet July 12, 2021 –ED Version.<br><br>Data shaded in grey. | Average On- and Off- Peak Forward Prices from Intercontinental Exchange (ICE). | The Average On- and Off-Peak Prices are proprietary to ICE and available only through a paid subscription with ICE.<br><br>SCE has obtained the written consent of ICE to provide its proprietary price data to the CPUC solely for purposes of verifying the accuracy of the WCE Reentry Fee calculation and its compliance with D.18-05-022. | N/A. |
| Confidential WCE Reentry Fee _Calculation Sheet July 12, 2021 –ED Version.<br><br>Data shaded in grey. | WCE Forecast Monthly On- and Off-Peak Energy and Peak Demand. | D.06-06-066 as modified by D.07-05-032), Matrix Appendix 2 Categories III.B and III.C (which protects similar ESP data). | Front three years of forecast data is confidential. |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 12, 2021 at Rosemead, California.

*/s/ Natalia Woodward*

Natalia Woodward

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit Cab 6 CE Claim Objection Claims 120 Page 290 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 90
of 91

# ATTACHMENT C

# Public Redacted Re-Entry Fee Calculation

Case 6:21-bk-12821-SY    Doc 222-7    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit Exhibit C abs C Declaration Objection Claim Page 211 Page 92 of 92

Case 6:21-bk-12821-SY    Claim 21-1    Filed 09/30/21    Desc Main Document    Page 91
of 91

**CCA Re-Entry Fee Requirement**
**WESTERN COMMUNITY ENERGY**

| | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|
| 1 | Average On-Peak and Off-Peak Forward Price Source | ICE | | | | |
| 2 | Calculation Month (M) | June-21 | | | | |
| | Trading Day Average for 6 Months Forward Strip From Month of (M-1) | Average On-Peak Forward Price | Average Off-Peak Forward Price | CCA Load Forecast On-Peak (MWh) | CCA Load Forecast Off-Peak (MWh) | CCA Monthly Peak Demand (MW) |
| 3 | Jul-21 | | | | | |
| 4 | Aug-21 | | | | | |
| 5 | Sep-21 | | | | | |
| 6 | Oct-21 | | | | | |
| 7 | Nov-21 | | | | | |
| 8 | Dec-21 | | | | | |
| 9 | Jan-22 | | | | | |
| 10 | Feb-22 | | N/A[1] | | | |
| 11 | Mar-22 | | | | | |
| 12 | Apr-22 | | | | | |
| 13 | May-22 | | | | | |
| 14 | Jun-22 | | | | | |
| 15 | Forecast CCA Number of Service Accounts (SA) | 113,337 | SA | | | |
| 16 | Customer Re-Entry Fee | $ 0.50 | Per SA | | | |
| 17 | IOU-Specific Line Loss Factor | 105% | | | | |
| 18 | IOU System Average Bundled Service Generation Rate | $ 86.00 | Per MWh | | | |
| 19 | Prior Period's CCA FSR | 147,000 | | | | |
| 20 | Minimum FSR | $ 147,000 | | | | |

**RPS Cost Forecast Inputs**

| 21 | REC Value | $ 14.49 | Per MWh |
| 22 | RPS Annual Target Percentage | 36% | |

**RA Cost Forecast Inputs**

| 23 | RA Planning Reserve Margin (PRM) Requirement | 115% | |
| 24 | Local RA Volume-Weighted Average Price (VWAP) | $6.37 | Per kW-mo |
| 25 | System RA Volume-Weighted Average Price (VWAP) | $6.10 | Per kW-mo |
| 26 | Annual Peak Demand in TAC Area | 23,145 | MW |
| 27 | Annual Local Capacity Requirement (LCR) in TAC Area | 8,423 | MW |

**Load Forecast Calculation** — Load Forecast Calculation Formulas

| 28 | CCA Usage Forecast | 877,712 | MWh | Sum of Columns 6, 7 |
| 29 | CCA Annual Peak Demand | 481.79 | MW | Max of Column 8 (Lines 3-14) |
| 30 | CCA Average Peak Demand | 372.97 | MW | Average of Column 8 (Lines 3-8) |

**RA Forecast Calculation** — RA Forecast Calculation Formulas

| 31 | CCA Peak Load Share (based on CCA Annual Peak Demand) | 2.08% | | Line 29 ÷ 26 |
| 32 | CCA Local RA Requirement | 175.33 | MW | Line 31 x 27 |
| 33 | CCA Net System RA Requirement | 253.58 | MW | Line (30 x 23) - Line 32 |

**Incremental Cost Calculation** — Total — Incremental Cost Calculation Formulas

| 34 | Energy Cost Forecast (incl. IOU-Specific Line Loss Factor) | $ 69,372,520 | [Sum Product of Columns 4, 5, 6, 7] x Line 17 |
| 35 | RPS Cost Forecast (incl. IOU-Specifc Line Loss Factor) | $ 4,787,676 | Line 21 x 22 x 28 x 17 |
| 36 | RA Cost Forecast | $ 15,982,248 | [(Line 24 x 32) + Line (25 x 33)] x [# of forward months with data] x 1000 |
| 37 | Forecast Cost of New Procurement | $ 90,142,444 | Line 34 + 35 + 36 |
| 38 | Forecast Revenues (Total Revenues Collected from Returned CCA Customers through the IOU System Average Bundled Service Generation Rate) | $ 75,483,221 | Line 18 x 28 |
| 39 | Incremental Procurement Cost Exposure (Forecast Cost of New Procurement Less Forecast Revenues) | $ 14,659,223 | Line 37 - 38 |
| 40 | Administrative Costs | $ 56,669 | Line 15 x 16 |

**Re-entry Fee Requirement Calculation** — FSR Calculation Formulas

| 41 | CCA Re-entry Fee Requirement (REF) under Section 394.25(e) | $ 14,715,892 | Max [Line 39 + 40 , 0] |
| 42 | Final REF | $ 14,715,892 | Max [Line 41 , Line 20] |
| 43 | Prior Period's CCA FSR | $ 147,000.00 | Line 19 |
| 44 | Change Required to CCA FSR | $ 14,568,892 | Line 42 - 43 if 10% and $20,000 deadband threshold is exceeded |

| | |
|---|---|
| Confidential Input Cell | Non-IOU Specific Input Cell |
| CCA Specific Input Cell | IOU Specific Input Cell |

**1.** While CCA Monthly Peak demand for 12 months is used to estimate monthly Local RA requirement, only monthls 1-6 are used to calculate System RA requirement and Forecast Cost of New Procurement.