**Exhibit 1**

**SCE Claim 18**

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 2 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 1

**Fill in this information to identify the case:**

Debtor 1    Western Community Energy

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    6:21-bk-12821-SY

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Southern California Edison Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Munger, Tolles & Olson LLP | See Addendum. |
| Name | Name |
| 350 South Grand Ave. | |
| Number        Street | Number        Street |
| Los Angeles        CA        90071 | |
| City        State        ZIP Code | City        State        ZIP Code |
| Contact phone  213-683-9554 | Contact phone _____ |
| Contact email  seth.goldman@mto.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — —

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 3 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 2 of 58

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 7,603,680.16 . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____
**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No
☑ Yes. Identify the property: See Attachment. _____

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 4 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 3
of 58

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

### Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    09/30/2021
                    MM / DD / YYYY

/s/ Bradley Schneider (original on following page)
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number        Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 5 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 4
of 58

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09/30/2021
                  MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number          Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email bradley.schneider@mto.com | |

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 6 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 5
of 58

## ADDENDUM TO PROOF OF CLAIM

### In re Western Community Energy,
### Case No. 6:21-bk-12821-SY

This addendum is attached to and a part of the proof of claim (the "Proof of Claim") filed by Southern California Edison Company ("SCE") (the "Claimant") against Western Community Energy Company (the "Debtor").

## 1.    Basis for Proof of Claim and Asserted Amount

On August 15, 2019, SCE and the Debtor entered into a contract entitled *Agreement Between Southern California Edison Company and Western Community Energy Regarding WCE Implementation and Resource Adequacy Compliance for 2020, 2021 and 2022* (the "CSRP RA Agreement"), which was effective upon its submission to the California Public Utilities Commission ("CPUC") on August 22, 2019 in Advice Letter 4058-E, and approved by the CPUC on February 27, 2020 in Resolution E-5051.  A true and correct copy of the CSRP RA Agreement is attached hereto as Exhibit 1.

Under this agreement, SCE agreed to satisfy the Debtor's resource adequacy ("RA") obligations for 2020 for the Debtor.  SCE further agreed that for 2021 and 2022, it would transfer local RA resources to the Debtor each month and show that RA each month so the Debtor could satisfy its local RA obligations.  To operationalize this part of the agreement, SCE and the Debtor subsequently executed an amendment to the CSRP RA Agreement, effective August 15, 2019 ("Amendment No. 1").  A true and correct copy of Amendment No. 1 is attached hereto as Exhibit 2.

In 2019, consistent with the CSRP RA Agreement, SCE satisfied the Debtor's RA obligations for 2020.  On January 15, 2021, SCE sent an invoice to the Debtor for the 2020 RA in the amount of $12,878,205.21, which was due on February 15, 2021.  The Debtor failed to pay the invoice when due.  On February 16, 2021, SCE gave notice to the Debtor of the payment default.  On March 12, 2021, SCE gave the Debtor notice that it had failed to cure its payment default.

On May 24, 2021, SCE notified that the Debtor by letter that, as a result of the Debtor's uncured payment default of the CSRPA RA Agreement, the CSRP RA Agreement was terminated that day, effective immediately.  Later that same day (the "Petition Date"), the Debtor filed its petition for relief under chapter 9 of the Bankruptcy Code.  The net amount owed to SCE as of the Petition date for 2020 RA was $12,878,695.00.

Prior to the Petition Date, and consistent with Amendment No. 1, SCE made monthly transfers of local RA to the Debtor.  These transfers allowed the Debtor to meet its local RA compliance obligations through June 2021.  As of the Petition Date, the Debtor owed SCE $2,944,405.10 plus accrued interest for these monthly RA transfers.

On June 1, 2021, the Court entered an order granting the Debtor's motion for a preliminary injunction that, among other things, enjoined SCE from withholding RA from the

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 7 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 6
of 58

Debtor under the CSRP RA Agreement.  The Court's order was entered a written order on the docket on June 11, 2021.  *See* Temporary Restraining Order, W*estern Community Energy v. Southern California Edison Company*, Adv. No. 6:21-ap-01068-SY (Bankr. C.D. Cal. June 11, 2021) ("TRO Order").  Pursuant to the TRO Order, SCE transferred local RA to the Debtor in June 2021 that satisfied the Debtor's local RA compliance obligations for July 2021 (the "July 2021 RA").  SCE is entitled to $556,483 for the July 2021 RA.

On June 11, 2021, the Court entered an order providing that the automatic stay was modified to the extent necessary to allow SCE to cease performance under the CSRP RA Agreement and to implement and effectuate the termination of that agreement, including by way of setoff of any moneys deposited or letters of credit provided under the agreement.  *See* Order Approving Stipulation For Modification of Automatic Stays of 11 U.S.C. § § 362(a) and 922(a) and Temporary Restraining Order, Docket No. 54.

Consistent with the Court's June 11, 2021 Order, SCE effected the termination of the CSRP RA Agreement.  SCE has determined that its actual damages arising from the termination of the agreement are $1,736,717.00.

As of the Petition Date, SCE right to payment under the CSRP RA Agreement was secured by (1) two letters of credit provided by the Debtor that totaling $9 million; and (2) cash advances from the Debtor totaling $1,075,511.00.  Pursuant to the Court's June 11, 2021 Order, SCE applied this security to its claim under the CSRP RA Agreement, resulting in an net amount owed to SCE of $7,603,860.16 for 2020 RA provided under the CSRP RA Agreement.

SCE's claim for unpaid RA is also secured by a right of offset against customer remittances collected by SCE pursuant to its service agreement with the Debtor (the "Service Agreement").  Specifically, Section J(c) of the CSRP Agreement provides that "SCE has the right to set off WCE's customer remittances against any payment due to SCE under this Agreement that remains unpaid sixty (60) calendar days from the date of SCE's invoice."  Exhibit 1 at p. 6.  More than 60 calendar days have elapsed since SCE's invoice for 2020 RA.

On and after June 23, 2021, SCE has remitted approximately $10,169,683.22 of customer payments to WCE, of which at least $9,123,151.01 were payments for services with a bill period before May 24, 2021.  Thus, SCE's claim for unpaid RA is fully secured by its right of offset against customer remittances.

## 2.    Reservations of Rights

The filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver or release of Claimant's rights against any other entity or person liable for all or any part of the Proof of Claim asserted herein; (ii) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver or release of Claimant's right to mediate or arbitrate any dispute, as applicable, including the amount or nature of the Proof of Claim; (iv) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 8 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 7
of 58

such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (v) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (vi) a waiver or release of Claimant's right to have any and all final orders entered only after de novo review by a United States District Court Judge; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto, or other proceeding which may be commenced in this case against or otherwise involving Claimant; (viii) a waiver or release or limitation of Claimant's right to setoff or recoupment; or (ix) a waiver of Claimant's right to assert any additional claims that may be entitled to administrative priority under sections 503 and 507 of the Bankruptcy Code.

**3.    Amendments**

Claimant reserves the right to amend and/or supplement this Proof of Claim at any time, in any manner, including, but not limited to, fixing the amount of the claims described above that are or may become due to Claimant, and/or to file additional proofs of claim for any additional claim which may be based on the same or additional documents or grounds of liability.

**4.    Notices**

All notices relating to this Proof of Claim should be sent as follows:

> Southern California Edison Company
> Energy Contract Management
> Attn:  Jason Lim
> 2244 Walnut Grove Ave.
> Rosemead, CA 91770
> Jason.Lim@sce.com
> 626.302.2477

> With a copy to:

> Seth Goldman
> Bradley R. Schneider
> Munger, Tolles & Olson LLP
> 350 South Grand Avenue, 50th Floor
> Los Angeles, CA 90071

All payments should be sent to:

> Southern California Edison Company
> Energy Contract Management
> Attn:  Jason Lim
> 2244 Walnut Grove Ave.
> Rosemead, CA 91770
> Jason.Lim@sce.com
> 626.302.2477

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 9 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 8
of 58

**EXHIBIT 1**

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 10 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 9
of 58

AGREEMENT BETWEEN SOUTHERN CALIFORNIA EDISON COMPANY AND WESTERN COMMUNITY
ENERGY REGARDING WCE IMPLEMENTATION AND RESOURCE ADEQUACY COMPLIANCE FOR 2020, 2021
and 2022

This Agreement is made by and between Western Community Energy ("WCE"), a California Community Choice Aggregator and joint powers authority, and Southern California Edison Company ("SCE"), a California corporation, regarding WCE's program implementation and Resource Adequacy compliance for its 2020 load.  WCE and SCE may be referred to herein individually as "a Party" and collectively as "the Parties."

RECITALS:

1.  WCE filed an implementation plan certified by the California Public Utilities Commission ("CPUC"), dated March 19, 2018 to initiate its community choice aggregation program starting in March 2020, and as forecasted in WCE's load forecast submitted to the CPUC on April 19, 2019.

2.  SCE is currently replacing its 30-year old mainframe customer billing system through its Customer Service Re-Platform Project ("CSRP"), for which SCE will initiate a CSRP system freeze from January through May 2020 during which SCE is unable to transfer customer accounts to WCE service, and has sought agreement from WCE that WCE implement its program no sooner than July 2020.

3.  The Parties disagree on WCE's implementation start date due to certain WCE operational, revenue and resource adequacy ("RA") costs and increased risk to CSRP implementation and SCE's customers, and have attempted to resolve WCE's 2020 implementation date by participating in the CPUC's Resolution E-4907 meet and confer process, as documented in SCE's Rule 23.

4.  In order to resolve WCE Implementation, SCE and WCE desire to agree on a post-July 2020 implementation date and RA compliance plan.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

AGREEMENT:

A.  WCE agrees to postpone WCE Implementation from its planned date in April 2020, and the Parties agree that WCE Implementation will occur beginning July 2020, with the ability to phase in certain load classes in early 2021 consistent with applicable SCE tariffs, subject to Paragraph R.

B.  SCE agrees to allocate RA resources to satisfy WCE's 2020 RA compliance requirements, including the 3-year forward local RA compliance requirement for WCE's 2020 load, as set forth in CPUC Decision 19-02-002 (collectively, "WCE RA Obligation"), and to transfer RA resources that WCE can use to satisfy its 2021 and 2022 local RA compliance requirements, in exchange for WCE's issuance of a letter of credit and all of the payments due to SCE for WCE RA Obligation under this Agreement calculated as described in Paragraph J below (collectively, the "WCE Payments").  SCE will satisfy WCE's 2020 system, flexible and local RA obligations on

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 11 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 10
of 58

WCE's behalf.  WCE will be responsible for satisfying its system, flexible and local RA obligations on its own behalf post-2020 (*e.g.*, for 2021 and 2022 RA obligations).

C.  On or about June 1, 2019, WCE provided SCE its estimated WCE RA Obligation.

D.  On or about July 2019, WCE provided SCE with an update of its 2020 load forecast.

E.  In July 2019, WCE received its estimated WCE RA Obligation from the California Energy Commission ("CEC") and WCE provided this updated estimate to SCE.

F.  By August 16, 2019, SCE will submit to CPUC and CEC any updated load forecasts for purposes of satisfying WCE RA Obligation, along with any updates to SCE's 2020 bundled service load forecasts.  SCE will show WCE's 2020 load forecast separately and break out the volume of WCE's load forecast by each month during 2020.  Notwithstanding the foregoing, if CEC requires WCE to submit to CPUC and CEC any updated load forecasts for purposes of satisfying WCE RA Obligation, then WCE and SCE will coordinate on such submittal as reasonably practicable and decide whether SCE or WCE shall submit any requisite forecast revisions.

G.  Upon CEC confirming WCE RA Obligation (expected in or about September 2019), WCE will provide that requirement to SCE within five business days of receiving that information from CEC if the CEC provides this confirmation directly to WCE.  The operational mechanics as specified by the CEC and CPUC are set forth in Appendix A hereto, except that with regard to Paragraph 3 of Appendix A, volumes for System, Local and Flexible RA allocations under this Agreement will be calculated by SCE using ratio shares based on coincident peak loads outlined by the CEC in or about September 2019.

H.  WCE will follow the Step 9 and subsequent steps in the 2020 Import Capability Assignment Process at SCE's instructions, and secure Import Allocation Rights at locations per SCE's instructions.  WCE will promptly transfer to SCE all its Import Allocation Rights for the term 1/1/2020 to 12/31/2020 of the 2020 Import Capability Assignment Process, at no cost to SCE.

I.  The Parties further clarify SCE's satisfaction of WCE RA Obligation:

a)  Beginning in or around October 2019 until December 2020, SCE will allocate all required 2020 system, flexible and local RA resources to satisfy WCE RA Obligation such that the WCE complies with all CPUC and CEC rules and regulations for the WCE RA Obligation, in exchange for the WCE Payments. SCE will satisfy WCE's 2020 system, flexible and local RA obligations on WCE's behalf.

b)  In or around October 2020, SCE will transfer local RA resources in the same volume allocated for the October 2019 local RA showing on WCE's behalf, which WCE can use to satisfy its 2021 and 2022 local RA compliance requirements, in exchange for the WCE Payments and Letter of Credit.  WCE will be responsible for satisfying its system, flexible and local RA obligations on its own behalf post-2020 (*e.g.*, for 2021 and 2022 RA obligations).  Notwithstanding the foregoing, if the CPUC adopts rules that would require WCE to receive the transfer of the local RA resources prior to October 2020, the Parties will work together to determine the new transfer date and to accelerate the dates for the October 1, 2020 Payment and issuance of the Letter of Credit, discussed in

2

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 12 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 11
of 58

Paragraphs J.b.i and J.b.ii below, so that they are completed prior to the new transfer date. Similarly, if the CPUC adopts rules that would enable WCE to receive the transfer of the local RA resources in November 2020 or thereafter, the Parties will work together to determine the new transfer date and to postpone the dates for the October 1, 2020 Payment and issuance of the Letter of Credit, discussed in Paragraphs J.b.i and J.b.ii below, but still require them to be completed prior to the new transfer date.

    i. Conditions precedent to SCE's obligation to transfer any local RA resources to WCE as provided for in this paragraph are WCE's timely October 1, 2020 Payment to SCE, and its timely issuance of the Letter of Credit in favor of SCE, as required in Paragraphs J.b.i and J.b.ii below.

    ii. The Parties shall work together in good faith to operationalize SCE's transfer of the local RA resources to WCE under this Agreement in a manner reasonably consistent with the provisions of SCE's RA Capacity (Buy or Sell) Confirmation Letter, v. 7.25.2019 (a copy of which has been provided to WCE), through an amendment to this Agreement signed by both Parties no later than November 30, 2019.

c) SCE's satisfaction of WCE RA Obligation will account for WCE's customers' share of CAM, DRAM, LCR preferred resources, and DR-allocated RA, as applicable.

d) SCE will satisfy WCE RA Obligation by the applicable CPUC October 2019 deadline, and any other applicable deadline. SCE will satisfy WCE's 2020 month-ahead system and flex RA obligation 45 days prior to the compliance month.

e) Volumes for system, flexible and local RA allocations under this Agreement will be consistent with WCE RA Obligation established by the CEC in or about September 2019, plus any updates in volumes for month-ahead compliance at T-75 for each month of 2020.

f) SCE will satisfy WCE RA Obligation by the applicable CPUC October 2019 deadline, and any other applicable deadline. SCE will satisfy WCE's 2020 month-ahead system and flex RA obligation 45 days prior to the compliance month.

g) For month-ahead load adjustments for system and flexible RA for 2020, WCE will provide SCE load adjustments and associated RA obligation adjustments, if any, 90 days prior to the compliance month for submission by SCE (as appropriate) to CEC 75 days prior to the compliance month, in accordance with the month-ahead load adjustment filing requirement.

h) SCE is responsible for meeting and reporting on WCE RA Obligation at both the CPUC and CAISO for WCE's 2020 load subject to the terms and conditions of the Agreement; provided, however, that if the CPUC or CAISO requires WCE to file compliance documentation separately from SCE, then SCE will not be responsible for such filing, but will cooperate with WCE in doing so. WCE is responsible for meeting and reporting on its RA obligations at the CPUC and CAISO after 2020.

J. The Parties further clarify WCE Payments obligations and methodologies:

    a) WCE shall compensate SCE for its satisfaction of the WCE RA Obligation as follows:

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 13 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 12
of 58

i.  If WCE begins serving load in or before August 2020, pursuant to CPUC-adopted rules and requirements, WCE has the local RA obligation for the entirety of 2020 for its 2020 load.  For months prior to WCE serving load in which it has a local RA obligation, WCE will pay SCE for the 2020 local RA volumes at a price equal to the CPUC's 2020 local RA market price benchmark, as trued up by the CPUC in or about November 2020 and converted to a dollar per kilowatt-month price (the "2020 Local RA Price") plus the 2020 system RA market price benchmark, as trued up by the CPUC in or about November 2020 and converted to a dollar per kilowatt-month price (the "2020 System RA Price"), plus interest, which shall accrue monthly as of January 2020 by applying the Interest Rate as defined in SCE's Preliminary Statement ZZ to the average of the beginning and ending monthly WCE Payments balance that accrues under this Agreement.  If WCE begins serving load after August 2020, the WCE Payments will only include system RA and flexible RA resources for 2020.

ii.  Once WCE commences to serve load, for months in which WCE has system, flexible and /or local RA obligations, WCE will pay SCE for satisfying the WCE RA Obligation for each month as follows:

1.  First, at the 2020 Local RA Price, plus the 2020 System RA Price, for the WCE's monthly 2020 Local RA obligation , *i.e.*, (2020 Local RA Price + 2020 System RA Price) x 2020 Local RA volumes;

2.  Second, at a price equal to the CPUC's 2020 Flexible RA market price benchmark, as trued up by the CPUC in or about November 2020 and converted to a dollar per kilowatt-month price (the "2020 Flexible RA Price"), plus the 2020 System RA Price, for the WCE's monthly 2020 Flexible RA obligation; *i.e.*, (2020 Flex RA Price + 2020 System RA Price) x 2020 Flexible RA volumes; and

3.  Third, at a price equal to the 2020 System RA Price for any monthly 2020 System RA obligation, if any, after having accounted for the volumes of 2020 Local RA and 2020 Flexible RA above; plus

4.  Interest, which shall accrue monthly as of WCE's implementation start date by applying the Interest Rate as defined in SCE's Preliminary Statement ZZ to the average of the beginning and ending monthly WCE Payments balance that accrues under this Agreement.

5.  WCE Payments will be calculated on a monthly basis and shall be the sum of products of (i) the RA quantities required for WCE consistent with the Commission's rules for 2020 system, flexible and/or local RA; and (ii) the Local, Flexible, and System RA Prices delineated above; and (iii) the Interest Rate accrued as delineated above.

iii.  This Agreement assumes that the CPUC will adopt separate market price benchmarks for 2020 system, flexible and local RA, and that the flexible and

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 14 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 13
of 58

local market price benchmarks will be adders to the market price benchmark for system RA.

1. If the CPUC adopts only one market price benchmark for RA for 2020, then the price for system, flexible, and local RA under this Agreement will be the one RA market price benchmark, as trued up by the CPUC in or about November 2020, and converted to a dollar per kilowatt-month price. If the CPUC adopts flexible and local market price benchmarks that are independent values, and not adders to the system RA market price benchmark, then the 2020 Local RA Price shall equal the 2020 local RA market price benchmark, only, as trued up by the CPUC in or about November 2020, and converted to a dollar per kilowatt-month price, and the 2020 Flexible RA Price shall equal the 2020 flexible RA market price benchmark, only, as trued up by the CPUC in or about November 2020, and converted to a dollar per kilowatt-month price.

2. WCE Payment for the WCE RA Obligation will accrue monthly as described above and be due and payable to SCE thirty (30) calendar days from the date of SCE's invoice, which shall be issued in January 2021, following the CPUC's true-up of the applicable 2020 RA market price benchmarks in or about November 2020; provided, however, that should the CPUC elect to not true up the 2020 RA market price benchmarks for any reason, or if the CPUC has not trued up the applicable 2020 RA market price benchmarks by December 2020, SCE shall have the right to invoice WCE for payment in January 2021 based on the 2020 RA market price benchmarks used to forecast SCE's 2020 Power Charge Indifference Adjustment (PCIA) rate, and to issue a true-up invoice if and when the CPUC trues up the applicable 2020 RA market price benchmarks. The estimated total value of the system, flexible and local RA resources to be allocated in 2020 under this Agreement to meet the WCE RA Obligation is FOURTEEN MILLION THREE HUNDRED THOUSAND DOLLARS ($14.3 MILLION).

b) WCE shall compensate SCE for its transfer of local RA resources that WCE can use to satisfy its 2021 and 2022 local RA compliance requirements, as follows:

i. By October 1, 2020, WCE shall issue an irrevocable, non-transferable letter of credit consistent with the requirements set forth in Appendix B hereto, in favor of SCE in an amount not less than FOUR MILLION FIVE HUNDRED THOUSAND DOLLARS ($4.5 MILLION) (the "Letter of Credit"), which shall remain effective until March 1, 2023.

ii. By October 1, 2020, WCE shall make a payment to SCE in the amount of $4.5 MILLION (the "October 1, 2020 WCE Payment"). The October 1, 2020 Payment amount represents half of the estimated total value of the local RA resources to be transferred to WCE under this Agreement of NINE MILLION DOLLARS ($9 MILLION).

5

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 15 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 14
of 58

iii.  Should WCE fail to timely issue the Letter of Credit and make the October 1, 2020 Payment as required above, SCE shall have no obligation to transfer any local RA resources to WCE under this Agreement effective as of October 2, 2020.

iv.  If and upon SCE's transfer of the local RA resources to WCE, expected to occur in or around October 2020, WCE shall, by July 1, 2021, make a payment to SCE in the amount of $4.5 MILLION (the "July 1, 2021 WCE Payment"). The July 1, 2021 Payment amount represents the second half of the estimated total value of the local RA resources to be transferred to WCE under this Agreement.

v.  In or around December 2021, SCE shall true up the estimated total value of the local RA resources transferred to WCE under this Agreement using the CPUC's 2021 local RA market price benchmark, plus the 2021 system RA market price benchmark, as trued up by the CPUC in or about November 2021 and converted to a dollar per kilowatt-month price (the "2021 Local RA Price"), and the methodology described in Sections J.a.ii and J.a.iii above.

1.  If the true up results in an additional payment owed to SCE, the additional WCE Payment shall be due and payable to SCE 30 calendar days from the date of SCE's invoice, which shall be issued in January 2022; provided, however, that should the CPUC elect to not true up the 2021 local RA market price benchmark or the 2021 system RA market price benchmark for any reason, or if the CPUC has not trued up the applicable 2021 local RA market price benchmark or the 2021 system RA market price benchmark by December 2021, SCE shall have the right to invoice WCE for payment in January 2022 based on the 2021 local RA market price benchmark and the 2021 system RA market price benchmark used to forecast SCE's 2021 PCIA rate, and to issue a true-up invoice if and when the CPUC trues up the applicable 2021 Local RA market price benchmark and 2020 system RA market price benchmark.

2.  If the true up results in a refund due to WCE, SCE shall issue such refund to WCE in January 2022 provided it is based on the 2021 local RA market price benchmark and the 2021 system RA market price benchmark trued up by the CPUC in or around November 2021. Otherwise, SCE may wait to issue payment to WCE until the CPUC trues up the 2021 Local RA market price benchmark and the 2021 system RA market price benchmark, or elects to not true up the 2021 Local RA market price benchmark or the 2021 system RA market price benchmark, in which case SCE will issue any refund due to WCE, if any, in January 2022 based on the 2021 local RA market price benchmark and the 2021 system RA market price benchmark used to forecast SCE's 2021 PCIA rate.

3.  If the CPUC adopts a local market price benchmark that is an independent value, and not an adder to the system RA market price benchmark, then the 2021 Local RA Price shall equal the 2021 local RA market price benchmark, only, as trued up by the CPUC in or about November 2021.

vi.  In or around December 2022, SCE shall true up the estimated total value of the local RA resources transferred to WCE under this Agreement using the CPUC's

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 16 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 15
of 58

2022 local RA market price benchmark, plus the 2022 system RA market price benchmark, as trued up by the CPUC in or about November 2022, and converted to a dollar per kilowatt-month price (the "2022 Local RA Price"), and the methodology described in Paragraphs J.a.ii and J.a.iii above.

1. If the true up results in an additional payment owed to SCE, the additional WCE Payment shall be due and payable to SCE 30 calendar days from the date of SCE's invoice, which shall be issued in January 2023; provided, however, that should the CPUC elect to not true up the 2022 local RA market price benchmark or the 2022 system RA market price benchmark for any reason, or if the CPUC has not trued up the applicable 2022 local RA market price benchmark or the 2022 system RA market price benchmark by December 2022, SCE shall have the right to invoice WCE for payment in January 2023 based on the 2022 local RA market price benchmark and the 2022 system RA market price benchmark used to forecast SCE's 2022 PCIA rate, and to issue a true-up invoice if and when the CPUC trues up the applicable 2022 local RA market price benchmark.

2. If the true up results in a refund due to WCE, SCE shall issue such refund to WCE in January 2023, provided it is based on the 2022 local RA market price benchmark and the 2022 system RA market price benchmark trued up by the CPUC in or around November 2022. Otherwise, SCE may wait to issue payment to WCE until the CPUC trues up the 2022 local RA market price benchmark and the 2022 system RA market price benchmark or elects to not true up the 2022 local RA market price benchmark and the 2022 system RA market price benchmark, in which case SCE will issue any refund due to WCE, if any, in January 2023 based on the 2022 local RA market price benchmark and the 2022 system RA market price benchmark used to forecast SCE's 2022 PCIA rate.

3. If the CPUC adopts a local market price benchmark that is an independent value, and not an adder to the system RA market price benchmark, then the 2022 Local RA Price shall equal the 2022 local RA market price benchmark, only, as trued up by the CPUC in or about November 2021.

c) SCE has the right to set off WCE's customer remittances against any payment due to SCE under this Agreement that remains unpaid sixty (60) calendar days from the date of SCE's invoice. SCE will provide WCE with 10 calendar days advance notice prior to any offset. SCE's right of offset shall survive any expiration or termination of this Agreement.

K. WCE may use the RA resources allocated by SCE under this Agreement solely for WCE's 2020 RA compliance. WCE shall not monetize the RA Obligation purchased under this Agreement or trade such allocation in the secondary market. This restriction does not apply to the 2021 and 2022 local RA resources transferred to WCE under this Agreement; provided, however, that WCE will promptly notify SCE of any sale or transfer by WCE of a local RA resource transferred to WCE under this Agreement and SCE will work with WCE on effectuating such transfer.

7

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 17 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 16
of 58

L.   WCE Payments will be recorded in SCE's PABA balancing account.

M.   Each Party agrees to manage its obligations under this Agreement in a commercially prudent manner, such that WCE is, and remains, in compliance with all applicable CPUC, CEC and CAISO rules, and to hold each other harmless regarding compliance with same.

N.   This Agreement is conditioned on approval of the CPUC, WCE commencing service in 2020, and full performance of each Party.

O.   The Parties will work together in good faith to manage operational and mechanical aspects of compliance and settlements of the terms of this Agreement.

P.   In accordance with Rule 9.2.3 of CPUC's General Order 96-B, SCE and WCE will submit a Tier 3 Advice Letter within 15 working days of execution of this Agreement by both Parties, which Advice Letter shall be effective pending final disposition by the CPUC.  The Parties agree to each use reasonable efforts to secure a favorable disposition of the Advice Letter, including working with CPUC and CEC staff prior to submission of the Advice Letter.

Q.   Should the CPUC not approve the Tier 3 Advice Letter, this Agreement will automatically terminate effective as of the issuance of the CPUC's final resolution declining such approval and SCE shall invoice WCE, and WCE shall pay SCE, for any and all RA resources allocated prior to the termination of this Agreement to satisfy the WCE RA Obligation, and for any and all RA resources transferred to WCE so that it may satisfy its RA obligations on its own behalf post 2020, and for any RA resources for which SCE continues to be obligated to show – and does show – on WCE's behalf after termination due to the fact that WCE's load will already be included in SCE's load for purposes of 2020 RA compliance, calculated pursuant to the terms of this Agreement.  This paragraph shall survive any expiration of termination of this Agreement.

R.   The target start date for WCE's implementation set forth in Paragraph A is subject to change to a later date if requested by WCE due to a change in its implementation plans, or if requested by SCE as a result of CSRP.  A Party requesting a change in the target start date set forth in Paragraph A must provide at least sixty (60) days advance written notice to the other Party, upon which the Parties agree to promptly meet to discuss the need for the change and work together to establish a new start date.  The Parties will continue to work together in good faith to address any operational or implementation needs associated with WCE Implementation, including, but not limited to, regular meetings with WCE's data management consultant.

S.   Each Party releases and holds harmless the other Party from losses, liabilities, damages and claims, and all related costs and expenses, including reasonable legal fees and costs, arising out of, or in connection with, the change in WCE's start date for automatic enrollment in 2020 pursuant to this Agreement, unless this Agreement is terminated in accordance with Paragraph Q.

T.   Should the Parties have a dispute under this Agreement, the following procedures will apply:

   a)   The Party asserting the dispute must provide the other Party with advance written notice of the dispute, and allow 15 calendar days from the other Party's receipt of the notice to cure the alleged deficiency in a manner reasonably acceptable to both Parties.

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 18 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 17
of 58

    b)  The Parties shall use good faith efforts to resolve any written dispute by scheduling a meeting with personnel who have authority to reach a resolution within 15 calendar days of one Party's written notification to the other.

U.  This Agreement shall be subject to the jurisdiction of the CPUC. The Parties retain all rights in law and equity.

V.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements or understandings (oral or written) between the Parties with respect to such subject matter. SCE's tariffs and the CPUC's decisions governing CCA implementation and RA compliance continue to govern the Parties' rights and obligations unless and to the extent they are modified by this Agreement.

W.  Unless previously terminated pursuant to the terms of this Agreement, the Agreement shall expire on March 1, 2023. Despite the expiration or termination of the Agreement, or any portion of the Agreement, the Parties shall continue to be bound by those provisions of the Agreement which by their nature survive the expiration or termination, including but not limited to Paragraphs J, K, Q, S, and T.

**AGREED AND ACCEPTED:**

_____      8/15/2019

**Southern California Edison Company**      **Date**

Name:  Colin Cushnie

Title:    Vice President


_____      _____

**Western Community Energy**      **Date**

A Joint Powers Authority

Name:  Ben Benoit

Title:    Chair, Western Community Energy

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 19 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 18
of 58

    b) The Parties shall use good faith efforts to resolve any written dispute by scheduling a meeting with personnel who have authority to reach a resolution within 15 calendar days of one Party's written notification to the other.

U. This Agreement shall be subject to the jurisdiction of the CPUC. The Parties retain all rights in law and equity.

V. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements or understandings (oral or written) between the Parties with respect to such subject matter. SCE's tariffs and the CPUC's decisions governing CCA implementation and RA compliance continue to govern the Parties' rights and obligations unless and to the extent they are modified by this Agreement.

W. Unless previously terminated pursuant to the terms of this Agreement, the Agreement shall expire on March 1, 2023. Despite the expiration or termination of the Agreement, or any portion of the Agreement, the Parties shall continue to be bound by those provisions of the Agreement which by their nature survive the expiration or termination, including but not limited to Paragraphs J, K, Q, S, and T.

**AGREED AND ACCEPTED:**

_____          _____

**Southern California Edison Company**          **Date**

Name:  Colin Cushnie

Title:    Vice President

_____          _____
                                                                    8/15/14

**Western Community Energy**          **Date**

A Joint Powers Authority

Name:  Ben Benoit

Title:    Chair, Western Community Energy

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 20 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 19
of 58

## APPENDIX A - OPERATIONAL MECHANICS

CEC staff, Energy Division staff, and SCE agree that the following is a general outline of steps in the 2020 load forecasting and RA compliance process that would apply to SCE, pending approval by the California Public Utilities Commission (CPUC) of relevant agreements between SCE and CCAs. SCE has indicated that it will submit all such agreements to the CPUC via a Tier 3 advice letter process, and the CPUC encourages SCE to also specify its data needs in these Tier 3 advice letters.

1. **SCE Aggregated Bundled Service Customer Load**

   For the August 2019 forecast update, the CCA 2020 load will be included in SCE's bundled service customer load, similar to the West Lake Village April 2019 load forecast filing.  SCE will send the Aggregated* noncoincident load forecast to CEC and CPUC in August 2019 (including separately identified noncoincident forecasts for all individual CCAs included in the Aggregated forecast).

2. **CEC to Update SCE Aggregated Bundled Service Customer Load 2020 RA Requirements**

   CEC to review and revise SCE Aggregated bundled service customer load for 2020 System, Flex and Local RA in September 2019, in accordance with the typical Load Forecast Adjustment Process.

3. **CPUC to Separately Identify CCA 2020 RA Requirements**

   Following adjustment of noncoincident forecasts, CPUC will provide SCE with individual RA requirements for SCE bundled load and for each CCA included in the Aggregated forecast – including any relevant allocations and credits – so that SCE can identify both separate and aggregated RA requirements for planning purposes. As in the past, the CPUC will provide requirements in Excel format.

4. **SCE to Meet RA Requirements for Aggregated Bundled Service Customer Load 2020 Year-Ahead RA Requirements**

   SCE to meet Aggregated bundled service customers' RA requirements in October 2019 for 2020 Year-Ahead compliance for Local, Flex and System RA requirements.

5. **SCE to Update Month - Ahead Aggregated Bundled Service Customer Load**

   SCE to update CEC and CPUC of changes in load migration each month in 2020, with input from CCA, for the purpose of updating SCE's Aggregated bundled service customer load for its Month-Ahead System requirements for 2020 and for the annual true-up of Local and Flex requirements.

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 21 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 20
of 58

6. **SCE to Meet RA Requirements for Aggregated Bundled Service Customer Load for 2020 Month-Ahead RA Requirements in Each Month of 2020**

SCE to meet Aggregated bundled service customers' RA requirements for 2020 Month-Ahead compliance for Flex, System, and Local RA requirements.

7. **CIRA and CPUC Templates**

No change is anticipated for the CIRA tool. CPUC will hold a workshop for RA stakeholders outlining changes to 2020 RA compliance filing templates on July 26, 2019.

*Aggregated Bundled Customer RA requirement = RA requirement of (CCA plus SCE bundled service customer)

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 22 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 21
of 58

## APPENDIX B – INSTRUCTIONS – Letter of Credit

A Letter of Credit ("LOC"), subject to the criteria listed below, is an acceptable form of Financial Security ("Security") for meeting the Financial Security Requirement of SCE's Rule 23.  SCE's standard form of the LOC, which has been provided to WCE, will be used.  All fields shown in <u>yellow</u> highlighting must be completed.

SCE's criteria for accepting an LOC includes the following:

    (a) The issuing bank must have a credit rating of A or better by Standard and Poor's, and, A2 or better by Moody's if rated by both agencies; or, A or better by Standard and Poor's, or, A2 or better by Moody's if rated by only one of the rating agencies,

    (b) The issuing bank must be a United States bank or a United States branch of a foreign bank with assets of at least one billion US Dollars ($1,000,000,000).

SCE's standard practice is to review all Security to ensure acceptability, which will include the issuer's acceptability, as discussed above, as well as the acceptability of the Security's terms and conditions.  Using SCE's standard forms, without modification, will ensure that the terms and conditions of the Security are acceptable to SCE.  If the issuer seeks modification to any of the conditions, SCE recommends that prior to submission, a draft of the Security should be sent to your SCE Project Manager and to the following email address:  sce.credit.risk@sce.com. Please allow at least two (2) Business Days for SCE's review of the draft Security.

Questions about posting the Security should be directed to your SCE Project Manager.

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 23 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 22
of 58

**EXHIBIT 2**

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 24 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 23
of 58

<u>AMENDMENT NO. 1 TO AGREEMENT BETWEEN SOUTHERN CALIFORNIA EDISON COMPANY AND
WESTERN COMMUNITY ENERGY REGARDING WCE IMPLEMENTATION AND RESOURCE ADEQUACY
COMPLIANCE FOR 2020, 2021 and 2022</u>

This Amendment No. 1 ("Amendment") amends the Agreement ("Agreement") dated August 15, 2019 by and between Western Community Energy ("WCE"), a California Community Choice Aggregator and joint powers authority, and Southern California Edison Company ("SCE"), a California corporation, regarding WCE's program implementation and Resource Adequacy compliance for its 2020 load.  WCE and SCE may be referred to herein individually as "a Party" and collectively as "the Parties."

RECITALS:

1.  On August 22, 2019, the Parties filed Advice Letter (AL) 4058-E seeking approval of the Agreement from the California Public Utility Commission ("CPUC").  Pursuant to Rule 9.2.3 of General Order 96-B, the Agreement is effective upon the filing of AL 4058-E, pending the CPUC's final disposition.

2.  The Parties wish to amend the Agreement to incorporate additional terms and conditions related to the transfer of Local Resource Adequacy resources by SCE to WCE on or about October 2020, pursuant to and in accordance with Paragraph I.b.ii of the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to amend the Agreement as follows.

1.  Paragraph A is deleted in its entirety and replaced with the following:

    a.  "WCE agrees to postpone WCE Implementation from its planned date in April 2020, and the Parties agree that WCE Implementation will occur beginning April 2020 for the Cities of Norco, Perris and Wildomar and May 2020 for the Cities of Eastvale, Hemet and Jurupa Valley, with the ability to phase in certain load classes in early 2021 consistent with applicable SCE tariffs, subject to Paragraph R."

2.  The terms and conditions in Appendix C, attached hereto, are hereby added to the Agreement in their entirety as "APPENDIX C."

3.  The terms and conditions in APPENDIX C shall only apply to the transfer of local RA resources contemplated in Paragraph I.b of the Agreement.

4.  All other provisions of the Agreement remain unmodified and in full force and effect.

5.  The signatories hereto represent that they have been duly authorized to enter into this Amendment on behalf of the Party for whom they sign.

6.  This Amendment may be signed in counterparts, each of which shall be deemed an original, and facsimile signatures shall be considered to be original signatures.

7.  IN WITNESS WHEREOF, the undersigned have executed this Amendment to be effective as of its signing by both Parties.

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 25 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 24
of 58

AGREED AND ACCEPTED:

_____          _12/3/2019_____

Southern California Edison Company          Date

Name:  Colin Cushnie

Title:    Vice President


_____          _____

Western Community Energy          Date

A California Joint Powers Authority

Name:  Barbara Spoonhour

Title:    Deputy Executive Director, Western Community Energy

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 26 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 25
of 58

AGREED AND ACCEPTED:

_____          _____

Southern California Edison Company                    Date

Name:  Colin Cushnie

Title:    Vice President

_____          _____

Western Community Energy                                    Date

A California Joint Powers Authority

Name:  Barbara Spoonhour

Title:    Deputy Executive Director, Western Community Energy

2

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 27 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 26
of 58

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 28 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 27
of 58

## APPENDIX C – ADDITIONAL TERMS AND CONDITIONS OF THE TRANSFER OF RESOURCE ADEQUACY RESOURCES

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 29 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 28
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Capitalized terms used but not otherwise defined in this Appendix C shall have the meanings ascribed to them in the CAISO Tariff (defined herein below).

Article 1.                    TRANSFER TERMS

**1.1**    *Product; Elections*

*Transferee: WCE*

*Transferor: SCE*

> Flexible Capacity is Not Applicable.

> *Product:*        *The product, including the Capacity Attributes of the Unit(s), as defined in Attachment B, or Alternate Unit(s) provided in accordance with Section 2.3.*

**1.2**    *Delivery of Product*

Transferor shall transfer to Transferee, and Transferee shall receive and purchase from Transferor the Product in the amount of the applicable Contract Quantity for each day of each month of the Delivery Period, except as may be excused due to force majeure.

**1.3**    *Delivery Period*

(a)    Delivery Period. The Delivery Period is as specified in Paragraph I.b. of the Agreement: January 1, 2021 through December 31, 2022, inclusive, unless terminated earlier in accordance with the terms of this Agreement.

**1.4**    *Contract Quantity*

The Contract Quantity for each day of each applicable Showing Month is as follows:

4

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 30 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 29
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Contract Quantity (MWs for each day of such Showing Month)

| LA Basin | | |
|---|---|---|
| Showing Month | 2021 | 2022 |
| January | 34.30 | - |
| February | 33.11 | - |
| March | 42.78 | - |
| April | 40.96 | - |
| May | 40.98 | - |
| June | 45.94 | - |
| July | 40.20 | - |
| August | 38.82 | - |
| September | 35.07 | - |
| October | 30.74 | - |
| November | 33.10 | - |
| December | 33.64 | - |

| Big Creek-Ventura | | |
|---|---|---|
| Showing Month | 2021 | 2022 |
| January | 33.16 | 6.32 |
| February | 32.76 | 5.92 |
| March | 38.76 | 11.92 |
| April | 37.56 | 10.72 |
| May | 37.96 | 11.12 |
| June | 43.96 | 17.12 |
| July | 47.16 | 20.32 |
| August | 42.36 | 15.52 |
| September | 37.16 | 10.32 |
| October | 32.36 | 5.52 |
| November | 32.36 | 5.52 |
| December | 31.56 | 4.72 |

**1.5** *Flexible Capacity is Not Applicable.*

**1.6** *Contract Price*

See Paragraph J.b of the Agreement.

5

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 31 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 30
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ARTICLE 2.          Delivery Obligations

2.1    *Delivery of Product*

Transferor shall provide Transferee with the Expected Contract Quantity of Product
for each day of each Showing Month consistent with the following:

(a)    Transferor shall, on a timely basis, submit, or cause the Unit's SC to
submit, (i) Monthly Supply Plans and (ii) Annual Supply Plans if the
Agreement Effective Date is prior to the year-ahead Compliance Showing
deadline applicable for the Showing Months as specified in Sections 1.4
and 1.5 herein, in accordance with the CAISO Tariff to identify and
confirm the Expected Contract Quantity provided to Transferee for each
day of each Showing Month so that the total amount of Expected Contract
Quantity identified and confirmed for each day of such Showing Month
equals the Expected Contract Quantity for such day of such Showing
Month.

(b)    Transferor shall or shall cause the Unit's SC to submit written notification
to Transferee, no later than fifteen (15) Business Days before the initial
Compliance Showing deadline for each Showing Month, confirming that
Transferee will be specified as the recipient of the Expected Contract
Quantity for each day of such Showing Month in the Unit's SC Supply
Plan. For illustrative purposes only, as of the Agreement Effective Date,
the applicable Compliance Showing deadlines are as follows: (A) forty-
five (45) days prior to the Showing Month covered by the Supply Plan for
the Monthly Supply Plan; and (B) the last Business Day of October that is
prior to commencement of the year for the Annual Supply Plan. The Parties
acknowledge and agree that such dates may be modified by the
CAISO from time to time throughout the Delivery Period.

(c)    If Transferor is delivering Product to Transferee from more than one Unit,
Transferor shall deliver such Product to Transferee from each Unit in
accordance with the Contract Quantity Unit Allocation, as set forth in
Attachment E; provided, Transferor may modify the Contract Quantity
Unit Allocation from time to time by providing email notice to
Transferee's Supply Plan contact, as set forth in Attachment F, no later
than the initial Compliance Showing deadline for each Showing Month.

2.2    *Adjustments to Contract Quantity*

Transferor shall deliver to Transferee the Contract Quantity of Product for each
day of each Showing Month consistent with the following:

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 32 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 31
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(a)    <u>Planned Outages:</u> Transferor's obligation to deliver the Contract Quantity for each day of each Showing Month may be reduced at Transferor's option by the amount of any Planned Outages which exist with respect to any portion of the Unit during the applicable Showing Month for the applicable days of such Planned Outages; provided, (i) Transferor notifies Transferee, no later than fifteen (15) Business Days before the initial deadline for the Compliance Showing applicable to that Showing Month, of the amount of Product from the Unit Transferee is permitted to include in Transferee's Compliance Showings applicable to that month as a result of such Planned Outage, and (ii) such reduction is able to be reflected on the Supply Plans in accordance with the CAISO Tariff.

(b)    <u>Reductions in Unit NQC and Unit EFC</u>: Transferor's obligation to deliver the applicable Contract Quantity for each Showing Month may also be reduced in the event the Unit experiences a reduction in Unit NQC or Unit EFC after the Agreement Effective Date as determined by the CAISO. In the event the Unit experiences such a reduction in Unit NQC or Unit EFC, Transferor has the option, but not the obligation, to provide the applicable Contract Quantity for such Showing Month from (i) the same Unit, provided the Unit has sufficient remaining and available Product or (ii) from Alternate Units, provided, that in each case Transferor provides and identifies such Alternate Units in accordance with Section 2.3.

2.3    *Transferor's Option To Provide Alternate Capacity*

If Transferor is unable to provide the full Contract Quantity in accordance with Section 2.2 for any Showing Month for any reason, or Transferor desires to provide the Contract Quantity for any Showing Month from a different generating unit other than the Unit, then Transferor may, at no cost to Transferee, provide Transferee with Product from one or more Alternate Units in an amount such that the total amount of Product provided to Transferee from the Unit and Alternate Units for each day of the Showing Month is not more than the Contract Quantity in accordance with Section 2.2 for the applicable Showing Month, provided that in each case:

(a)    Transferor shall notify Transferee of its intent to provide Product from and identify alternate units that (i) have the same Capacity Attributes of the Unit originally identified in Appendix B, (ii) are accepted by the CAISO, and (iii) otherwise that satisfy the requirements of this Agreement ("Alternate Units"), meeting the above Contract Quantity requirements no later than fifteen (15) Business Days before the initial deadline for Transferee Compliance Showing related to such Showing Month;

(b)    Transferor shall, or shall cause the Unit's SC to submit a Monthly Supply Plan and an Annual Supply Plan, as applicable, that includes the Alternate Units, in accordance with the CAISO Tariff, no later than fifteen (15) Business Days before the initial Compliance Showing deadline for the applicable Showing Month;

7

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 33 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 32
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(c)  if Transferor does not comply with the requirements of Sections 2.3(a) and (b) for the applicable Showing Month, then any such Alternate Units shall not be deemed a Unit for purposes of this Agreement for that Showing Month and Transferor shall not receive payment for such Product.

Subject to the satisfaction of the conditions contained in subsections (a) – (c) of this Section 2.3, once Transferor has identified in writing any Alternate Units that meet the requirements of this Section 2.3, then any such Alternate Units shall be automatically deemed a Unit for purposes of this Agreement for that Showing Month.

2.4  *Damages for Failure to Provide Capacity*

If Transferor fails to provide Transferee with the Expected Contract Quantity of Product for any day of any Showing Month, in accordance with Section 2.1 (the "Replacement Obligation"), in each case as applicable, then the following shall apply:

(a)  Transferee may, but shall not be required to, replace all or any portion of the Replacement Obligation for the applicable Showing Month with capacity having equivalent Capacity Attributes as the Expected Contract Quantity; provided, if, using commercially reasonable efforts, Transferee is unable to acquire capacity having equivalent Capacity Attributes for any portion of any Showing Month, Transferee may replace such portion of the Replacement Obligation with capacity having Capacity Attributes in excess of the Contract Quantity (the "Replacement Capacity"). Transferee may enter into purchase transactions with one or more parties to purchase Replacement Capacity. Additionally, Transferee may enter into one or more arrangements to repurchase its obligation to sell and deliver capacity to another party, and such arrangements shall be considered the procurement of Replacement Capacity. Transferee shall act in a commercially reasonable manner to minimize damages in procuring any Replacement Capacity.

(b)  Transferor shall pay to Transferee the following damages: an amount equal to the positive difference, if any, between (i) the sum of (A) the actual cost paid by Transferee for any Replacement Capacity, including any transaction costs and expenses incurred in connection with such procurement, plus (B) each applicable Replacement Capacity Price multiplied by the aggregate amount of Replacement Obligation neither provided by Transferor as Alternate Capacity nor purchased by Transferee as Replacement Capacity, for all applicable portions of the applicable Showing Month pursuant to Section 2.4(a), and (ii) the Replacement Obligation minus the Alternate Capacity, not provided for all applicable portions of the applicable Showing Month times the Contract Price for that month. Transferee's invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount and shall include supporting documentation.

8

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 34 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 33
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

2.5   *Indemnities for Failure to Deliver Expected Contract Quantity*

Transferor agrees to indemnify, defend and hold harmless Transferee from any penalties, fines or costs assessed against Transferee by the CPUC or the CAISO, resulting from any of the following:

(a)   Transferor's failure to provide any portion of the Expected Contract Quantity for any portion of the Delivery Period;

(b)   Transferor's failure to provide notice of the non-availability of any portion of the Expected Contract Quantity for any portion of the Delivery Period as required under Section 2.2;

(c)   Transferor's or the Unit's SC's failure to timely submit Supply Plans that identify Transferee's right to the Expected Contract Quantity for each Unit purchased hereunder for each day of the Delivery Period; or

(d)   Transferor's or the Unit's SC's failure to submit accurate Supply Plans that identify Transferee's right to the Expected Contract Quantity for each Unit purchased hereunder for each day of the Delivery Period; or

(e)   Any other failure by Transferor to perform its obligations under this Agreement.

With respect to the foregoing, the Parties shall use commercially reasonable efforts to minimize such penalties, fines and costs; provided, that in no event shall Transferee be required to use or change its utilization of its owned or controlled assets or market positions to minimize these penalties and fines.

2.6   *Transferee's Re-Sale of Product*

Transferee may re-sell all or a portion of the Product and any associated rights, in each case, acquired under this Agreement, in accordance with Applicable Laws and CPUC Decisions ("Resold Product"); provided, with respect to Resold Product that includes the sale of Capacity Attributes that impact Transferor's obligations under this Agreement, Transferee agrees to: (a) notify Transferor that such a sale has occurred; (b) provide Transferor with the information described in Attachment D; (c) notify Transferor of any subsequent changes to the information in Attachment D with respect to any particular sale; in each case promptly following such sale and in no event later than the initial Compliance Showing deadline for each Showing Month. Subject to Article 6 below, Transferor agrees, and agrees to cause the Unit's SC, to: (i) follow Transferee's instructions with respect to providing such Resold Product to subsequent purchasers of such Resold Product; and (ii) take all commercially reasonable actions and execute any and all documents or instruments reasonably necessary to allow such subsequent purchasers to use such Resold Product.

Transferor acknowledges and agrees that with respect to any Resold Product, if

9

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 35 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 34
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Transferee incurs any liability to any purchaser of such Resold Product due to the failure of Transferor or the Unit's SC to comply with the terms of this Agreement, and Transferor would have had liability to Transferee under this Agreement for such failure had Transferee not sold the Resold Product to a subsequent purchaser, then Transferor shall be liable to Transferee under this Agreement, including without limitation, pursuant to Sections 2.4 and 2.5, for the amounts it would have been liable to Transferee for had such Resold Product not been sold to a subsequent purchaser. Transferee acknowledges and agrees that with respect to any Resold Product, if Transferor incurs any liability to any purchaser of such Resold Product due to the failure of Transferee to comply with the terms of this Agreement, and Transferee would have had liability to Transferor under this Agreement for such failure had Transferee not sold the Resold Product to a subsequent purchaser, then Transferee shall be liable to Transferor under this Agreement for the amounts it would have been liable to Transferor for had such Resold Product not been sold to a subsequent purchaser.

2.7    *CAISO Offer Requirements*

Transferor shall, or cause each Unit's SC to, schedule with, or make available to, the CAISO the Expected Contract Quantity for each Unit in compliance with the CAISO Tariff, and shall, or shall cause each Unit's SC, owner, or operator, as applicable, to perform all obligations under the CAISO Tariff that are associated with the sale and delivery of Product hereunder. Transferee shall have no liability for the failure of Transferor or the failure of any Unit's SC, owner, or operator to comply with such CAISO Tariff provisions, including any penalties, charges or fines imposed on Transferor or such Unit's SC, owner, or operator for such noncompliance.

2.8    *Unit SC's Substitution Obligation*

After the obligation to replace all or any portion of the Expected Contract Quantity transfers from the load serving entity to the Unit's SC for a Showing Month in accordance with the CAISO Tariff, and if the CAISO determines that any portion of the Expected Contract Quantity for any portion of a Showing Month that was shown by Transferee in its Compliance Showings requires outage substitution in accordance with Section 40.9.3.6 of the CAISO Tariff because the Unit, or Alternate Unit, as applicable, is scheduled to take an outage (planned or otherwise) (such amount requiring outage substitution, the "SC Substitute Capacity"), then: (a) Transferor shall have no liability under Sections 2.4 or 2.5 with respect to such SC Substitute Capacity; and (b) Transferor shall have no liability to Transferee for any costs that are allocated to Transferee by the CAISO for any CPM Capacity procured by the CAISO pursuant to the Capacity Procurement Mechanism and that are related to such SC Substitute Capacity.

Article 3.        BILLING & PAYMENT

10

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 36 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 35
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

3.1    *Billing & Payment*

See Paragraph J.b of the Agreement.

3.2    *Allocation of Other Payments and Costs*

(a)    Transferor shall retain any revenues it may receive from and pay all costs charged by the CAISO or any other third party with respect to the Unit for (i) start-up, shutdown, and minimum load costs, (ii) energy sales, and (iii) any revenues for black start or reactive power services.

(b)    Transferee shall be entitled to receive and retain all revenues associated with the Aggregate Contract Quantity (including any capacity revenues from RMR Contracts for the Unit, Capacity Procurement Mechanism or its successor, RUC Availability Payments, or its successor, but excluding payments described in Section 3.2(a)(i)-(iii)). To the extent permitted by the CAISO Tariff, Transferor shall, or shall cause each Unit's SC to, submit RUC Availability Bids for the Expected Contract Quantity for each Unit for each hour of the Delivery Period at a bid price of Zero Dollars ($0) per MW per hour, regardless of whether each Unit is shown on a Supply Plan for the applicable Showing Month.

(c)    In accordance with Section 3.1 of this Agreement,

(i)    all such Transferee revenues described in this Section 3.2, but received by Transferor, or a Unit's SC, owner, or operator shall be remitted to Transferee, and Transferor shall pay such revenues to Transferee if the Unit's SC, owner, or operator fails to remit those revenues to Transferee, including against customer remittances as provided for in Paragraph J.c of the Agreement, or Transferor may recover such amounts from Transferee's Letter of Credit. If Transferor fails to pay such revenues to Transferee, Transferee may offset any amounts owing to it for such revenues against any future amounts Transferee may owe to Transferor. In order to verify the accuracy of such revenues, Transferee shall have the right, at its sole expense and during normal working hours after reasonable prior notice, to hire an independent third party reasonably acceptable to Transferor to audit any documents, records or data of Transferor associated with the Contract Quantity; and

11

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 37 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 36
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

      (ii)    all such Transferor, or a Unit's SC, owner, or operator revenues described in this Section 3.2, but received by Transferee shall be remitted to Transferor. If Transferee fails to pay such revenues to Transferor, Transferor may offset any amounts owing to it for such against any future amounts it may owe to Transferee.

(d)    If a centralized capacity market develops within the CAISO region, Transferee will have exclusive rights to offer, bid, or otherwise submit the applicable Contract Quantity of Product for each day of each Showing Month provided to Transferee pursuant to this Agreement for re-sale in such market, and retain and receive any and all related revenues.

(e)    Transferor agrees that the Unit is subject to the terms of the Availability Standards, Non-Availability Charges, and Availability Incentive Payments as contemplated under Section 40.9 of the CAISO Tariff. Furthermore, the Parties agree that any Availability Incentive Payments are for the benefit of the Transferor and for Transferor's account and that any Non-Availability Charges are the responsibility of the Transferor and for Transferor's account.

3.3    *Offset Rights*

See Paragraph J.c of the Agreement.

ARTICLE 4.   Other Transferee and Transferor Covenants

4.1    *Transferor's and Transferee's Duty to Take Action to Allow the Utilization of the Product*

Transferee and Transferor shall, throughout the Delivery Period: (a) cause the required showing information listed in Attachment C to be included in all applicable Supply Plans; (b) execute any and all documents or instruments reasonably necessary to ensure Transferee's right to the use of the Aggregate Contract Quantity for the sole benefit of Transferee or any subsequent purchaser under Section 2.6; and (c) cause all Supply Plans to be filed in conformance with the requirements of the CPUC Filing Guide and the CAISO Tariff. If during the Delivery Period, there are changes to the information included in Attachment C, the Parties agree to communicate such changes to each other promptly. The Parties further agree to negotiate in good faith to make necessary amendments, if any, to this Agreement to conform this Transfer to subsequent clarifications, revisions, or decisions rendered by the CPUC, FERC, CAISO or other Governmental Authority having jurisdiction to administer Compliance Obligations, so as to maintain the benefits of the bargain struck by the Parties on the Agreement Effective Date.

4.2    *Transferor's Representations, Warranties and Covenants*

12

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 38 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 37
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(a)   Transferor represents, warrants and covenants to Transferee that, throughout the Delivery Period:

    (i)   Transferor owns or has the exclusive right to the Product sold under this Agreement from the Unit, and shall furnish Transferee, CAISO, CPUC or other Governmental Authority with such evidence as may reasonably be requested to demonstrate such ownership or exclusive right;

    (ii)   No portion of the Aggregate Contract Quantity has been committed by Transferor to any third party in order to satisfy Compliance Obligations or analogous obligations in any CAISO or non-CAISO markets, other than pursuant to an RMR Contract between the CAISO and either Transferor or the Unit's owner or operator;

    (iii)   Transferor shall comply with Applicable Laws relating to the Product;

    (iv)   Transferor shall, and shall cause the Unit's SC to promptly (and in any event within one (1) Business Day of the time Transferor receives notification from the CAISO) notify Transferee in the event the CAISO designates any portion of the Aggregate Contract Quantity as CPM Capacity and (B) in the event the CAISO makes such a designation Transferor shall, and shall cause the Unit's SC to not accept any such designation by the CAISO unless and until Transferee has agreed to accept such designation;

    (v)   Transferee shall have the exclusive right to offer the Aggregate Contract Quantity, or any portion thereof, to the CAISO as CPM Capacity and Transferor shall not, and shall cause the Unit's SC not to, offer any portion of the Aggregate Contract Quantity to the CAISO as CPM Capacity or accept any designation of any portion thereof as CPM Capacity;

    (vi)   The Unit is connected to the CAISO Controlled Grid, is within the CAISO Control Area, and is under the control of CAISO;

    (vii)   Transferor shall cause the Unit's SC, owner and operator to comply with Applicable Laws relating to the Product;

    (viii)   Transferee shall have no liability for the failure of Transferor or the failure of the Unit's SC, owner, or operator to comply with such CAISO Tariff provisions, including any penalties, charges or fines imposed on Transferor or the Unit's SC, owner, or operator for such noncompliance.

13

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 39 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 38
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(ix)     If Transferor is the owner of the Unit, the aggregation of all amounts of Capacity Attributes that Transferor has sold, assigned or transferred for the Unit does not exceed the Unit NQC or Unit EFC for that Unit;

(x)      Transferor has notified the SC of the Unit that Transferor has transferred the Contract Quantity, including the amount of Flexible Capacity and Inflexible Capacity, to the extent applicable, with respect to each day of each Showing Month to Transferee, and the SC is obligated to deliver the Supply Plans in accordance with the CAISO Tariff and this Agreement;

(xi)     Transferor has notified the SC of the Unit that Transferor is obligated to cause the Unit's SC to provide to the Transferee, at least fifteen (15) Business Days before the initial deadline for each Compliance Showing, the applicable Expected Contract Quantity of the Unit for each day of such Showing Month, including the amount of Flexible Capacity and Inflexible Capacity, to the extent applicable, that is to be submitted in the Supply Plan associated with this Agreement for the applicable period; and

(xii)    Transferor has notified the Unit's SC that Transferee is entitled to the revenues set forth in Section 3.2, and such SC is obligated to promptly deliver those revenues to Transferee, along with appropriate documentation supporting the amount of those revenues.

ARTICLE 5.  CONFIDENTIALITY

The Parties agree that: (i) Transferee may disclose the Aggregate Contract Quantity or any applicable portion of the Aggregate Contract Quantity, including any amounts of Flexible Capacity and Inflexible Capacity, to the extent applicable, under this Transfer to any Governmental Authority, the CPUC, the CAISO in order to support its Compliance Showings, if applicable; (ii) Transferor may disclose the transfer of the Aggregate Contract Quantity and the applicable Contract Quantity and Expected Contract Quantity (as well as any amounts of Flexible Capacity and Inflexible Capacity, to the extent applicable) for each day of each Showing Month under this Transfer to the SC of the Unit in order for such SC to timely submit accurate Supply Plans; (iii) both Parties may disclose the terms and conditions of the Agreement and any and all written or recorded or oral information, data, analyses, documents, and materials furnished or made available by a Party to the other Party in connection with this Agreement to the Independent Evaluator; and (iv) Transferee and the Independent Evaluator may disclose the terms and conditions of the Agreement and any and all written or recorded or oral information, data, analyses, documents, and materials furnished or made available by a Party to the other Party in connection with this Agreement to the CAISO, the CPUC, and all divisions thereof, the California Energy Commission, and participants of the Procurement Review Group established pursuant to D.02-08-071 and D.03-06-071; provided, that each

14

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 40 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 39
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

disclosing Party shall use reasonable efforts to limit, to the extent possible, the ability of any such applicable Governmental Authority, CAISO, or SC to further disclose such information. In addition, in the event Transferee resells all or any portion of the Aggregate Contract Quantity to another party, Transferee shall be permitted to disclose to the other party to such resale transaction all such information necessary to effect such resale transaction. This Agreement is subject to the California Public Records Act (Government Code Section 6250 et seq.). Transferee agrees that to the extent that it receives a request for disclosures of information in this Agreement under the California Public Records Act, Transferee shall provide prompt notice to Transferor of any such request and Transferee shall use commercially reasonable efforts to redact all confidential information contained within any disclosed documents prior to any such disclosure; provided that, if Transferee and Transferor, acting reasonably, are unable to agree on whether or not specific information is confidential, then Transferee shall use commercially reasonable efforts to redact all agreed confidential information, and Transferor shall be responsible for taking all legal steps necessary to protect any information designated by Transferor as confidential and by Transferee as non-confidential.


ARTICLE 6.   HOLDBACK

No later than five (5) Business Days before the deadline for the initial Compliance Showing deadline with respect to a particular Showing Month, Transferee may request that Transferor not list, or cause the Unit's SC not to list, a portion or all of a Unit's applicable Expected Contract Quantity for any portion(s) of such Showing Month on the Supply Plan. The amount of Expected Contract Quantity that is the subject of such a request shall be deemed Expected Contract Quantity provided consistent with Section 2.1 for purposes of calculating a Monthly Payment pursuant to Section 3.1 and calculating any amounts due pursuant to Section 2.4 or 2.5. Transferor shall, or shall cause the Unit's SC to, comply with Transferee's request under this Article 6.

ARTICLE 7.   MARKET BASED RATE AUTHORITY

Transferor agrees, in accordance with FERC Order No. 697, to, upon request of Transferee, submit a letter of concurrence in support of any affirmative statement by Transferee that this contractual arrangement does not transfer "ownership or control of generation capacity" from Transferor to Transferee as the term "ownership or control of generation capacity" is used in 18 CFR § 35.42. Transferor also agrees that it will not, in any filings, if any, made subject to FERC Order Nos. 652 and 697, claim that this contractual arrangement conveys ownership or control of generation capacity from Transferor to Transferee.

ARTICLE 8.   COLLATERAL REQUIREMENTS


See Paragraph J.b of the Agreement.

15

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 41 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 40
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ARTICLE 9.    OTHER

9.1    Billing.  See Paragraph J.b of the Agreement.

9.2    Limitation of Remedies, Liability and Damages.  THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED.  THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF.  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. NOTHWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION SET FORTH IN THIS AGREEMENT OR OTHERWISE, PROVIDED, HOWEVER, NOTHING IN THIS SECTION SHALL AFFECT THE ENFORCEABLILITY OF THE PROVISIONS OF THIS AGREEMENT EXPRESSLY ALLOWING FOR DAMAGES, INCLUDING BUT NOT LIMITED TO, REMEDIES FOR DELIVERY OBLIGATIONS IN SECTION 2.4.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.  TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS AND ARE NOT PENALTIES.

16

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 42 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 41
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

9.3 Assignment.  Neither Party shall assign this Agreement or its rights hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, Transferor may, without the consent of the Transferee (and without relieving itself from liability hereunder), (i) transfer, sell, pledge, encumber or assign this Agreement or the accounts, revenues or proceeds hereof in connection with any financing or other financial arrangements, (ii) transfer or assign this Agreement to an affiliate of such Party which affiliate's creditworthiness is equal to or higher than that of such Party, or (iii) transfer or assign this Agreement to any person or entity succeeding to all or substantially all of the assets whose creditworthiness is equal to or higher than that of such Party; provided, however, that in each such case, any such assignee shall agree in writing to be bound by the terms and conditions hereof and so long as the transferring Party delivers such tax and enforceability assurance as the non-transferring Party may reasonably request

9.4 Each Party represents and warrants to the other Party that as of the date hereof, it is an "eligible commercial entity" within the meaning of the Commodity Exchange Act, as otherwise amended, updated or modified from time to time; and it is an "eligible contract participant" within the meaning of the Commodity Exchange Act, as otherwise amended, updated or modified from time to time.

*[Remainder of Page Intentionally Left Blank]*

Case 6:21-bk-12821-SY   Doc 224-3   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18   Page 43 of 59

Case 6:21-bk-12821-SY   Claim 18-1   Filed 09/30/21   Desc Main Document   Page 42
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)
v.09.09.2019*

ATTACHMENT A
DEFINED TERMS

"Aggregate Contract Quantity" means the aggregate amount of Product associated with
the MWs set forth in the table in Section 1.4 which Transferor has agreed to provide to
Transferee from the Unit throughout the entire term of the Delivery Period.

"Agreement" has the meaning specified in the introductory paragraph of this Agreement.

"Agreement Effective Date" is August 22, 2019.

 "Alternate Capacity" means Product which Transferor has elected to provide to
Transferee in accordance with the terms of Section 2.3.

"Alternate Unit" means a generating unit meeting the requirements specified in Section
2.3.

"Annual Supply Plan" has the meaning set forth in the CAISO Tariff.

"Applicable Laws" means the CAISO Tariff and all constitutions, treaties, laws,
ordinances, rules, regulations, interpretations, permits, judgments, decrees, injunctions,
writs and orders of any Governmental Authority that apply to either or both of the Parties,
the Project, the Unit or the terms of this Agreement.

"Availability Incentive Payments" has the meaning set forth in the CAISO Tariff.

"Availability Standards" has the meaning set forth in the CAISO Tariff.

 "CAISO" means the California Independent System Operator Corporation, or any
successor entity performing the same functions.

"CAISO Control Area" has the meaning set forth in the CAISO Tariff.

"CAISO Controlled Grid" has the meaning as set forth in the CAISO Tariff.

"CAISO Tariff" means the California Independent System Operator Corporation Tariff,
Business Practice Manuals (BPMs), Operating Agreements, and Operating Procedures,
including the rules, protocols, procedures and standards attached thereto, as the same may
be amended or modified from time to time and approved by FERC, if applicable.

"Capacity Attributes" means, with respect to a Unit, any and all of the following, in each
case which are attributed to or associated with the Unit at any time throughout the
Delivery Period:

> (a)     resource adequacy attributes, as may be identified from time to time by the
> CPUC, CAISO, or other Governmental Authority having jurisdiction, that
> can be counted toward RAR;

18

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 44 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 43
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

(b)    resource adequacy attributes or other locational attributes for the Unit related to a Local Capacity Area, as may be identified from time to time by the CPUC, CAISO or other Governmental Authority having jurisdiction, associated with the physical location or point of electrical interconnection of the Unit within the CAISO Control Area, that can be counted toward a Local RAR; and

(c)    other current or future defined characteristics, certificates, tags, credits, or accounting constructs, howsoever entitled, including any accounting construct counted toward any Compliance Obligation;

provided that, notwithstanding the foregoing, Capacity Attributes shall exclude all flexible capacity resource adequacy attributes, characteristics, certificates, tags, credits, or accounting constructs, howsoever entitled associated with the Unit.

"Capacity Procurement Mechanism" has the meaning set forth in the CAISO Tariff.

"Collateral Annex" has the meaning specified in the introductory paragraph of this Agreement.

"Compliance Obligations" means the RAR and Local RAR.

"Compliance Showings" means the (a) Local RAR compliance or advisory showings (or similar or successor showings) and (b) RAR compliance or advisory showings (or similar or successor showings), in each case, a load serving entity is required to make to the CPUC (and, to the extent authorized by the CPUC, to the CAISO) pursuant to the CPUC Decisions, to the CAISO pursuant to the CAISO Tariff, or to any Governmental Authority having jurisdiction.

"Contract Price" means, for any Showing Month, the prices described Paragraph J.b of the Agreement.

"Contract Quantity" means, with respect to any particular Showing Month of the Delivery Period, the amount of Product associated with the number of MWs set forth in the table in Section 1.4, which Transferor has agreed to provide to Transferee from the Unit for each day of such Showing Month.

"Contract Quantity Unit Allocation" means, if Transferor is delivering Product to Transferee from more than one Unit, the allocation of Contract Quantity Transferor will deliver from each Unit, as set forth in Attachment E and as modified by Transferor from time to time in accordance with Section 2.1(c).

"Cover Sheet" has the meaning specified in the introductory paragraph of this Agreement.

"CPM Capacity" has the meaning set forth in the CAISO Tariff.

"CPUC" means the California Public Utilities Commission.

19

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 45 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 44
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

"CPUC Decisions" means CPUC Decisions 04-01-050, 04-10-035, 05-10-042, 06-04-040, 06-06-064, 06-07-031, 07-06-029, 08-06-031, 09-06-028, 10-06-036, 11-06-022, 12-06-025, 13-06-024, 14-06-050, and any other existing or subsequent decisions, resolutions, or rulings related to resource adequacy, including, without limitation, the CPUC Filing Guide, in each case as may be amended from time to time by the CPUC.

"CPUC Filing Guide" is the document issued annually by the CPUC which sets forth the guidelines, requirements and instructions for load serving entities to demonstrate compliance with the CPUC's resource adequacy program.

"Current Mark-to-Market Value" has the meaning specified in Section 8.2

"Delivery Period" has the meaning specified in Section 1.3(a).

"EEI" has the meaning specified in the introductory paragraph of this Agreement.

"EEI Agreement" has the meaning specified in the introductory paragraph of this Agreement.

"Expected Contract Quantity" means, with respect to any particular day of any Showing Month of the Delivery Period, the Contract Quantity of Product for such day of such Showing Month, including the amount of Contract Quantity of Product that Transferor has elected to provide Alternate Capacity for such day, and after giving effect to any reductions to Contract Quantity for such day as specified in Section 2.2 with respect to which Transferor has not elected to provide Alternate Capacity.

"FFIA Monthly Payment" shall be the Monthly Payment calculated using the Contract Quantity rather than the Expected Contract Quantity, such that variable C in the formula for Monthly Payment shall be as follows: C = the Contract Quantity of Product for each applicable day of the Showing Month.

"Good Utility Practice" has the meaning set forth in the CAISO Tariff.

"Governmental Authority" means any: (a) federal, state, local, municipal or other government; (b) governmental, regulatory or administrative agency, commission or other authority lawfully exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and (c) court or governmental tribunal.

"Independent Evaluator" has the meaning set forth in CPUC Decision 04-12-048.

"Local Capacity Area" has the meaning set forth in the CAISO Tariff.

"Local RAR" means the local resource adequacy requirements established for load serving entities by the CPUC pursuant to the CPUC Decisions, the CAISO pursuant to the CAISO Tariff, or by any other Governmental Authority having jurisdiction. Local RAR may also be known as local area reliability, local resource adequacy, local resource

20

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

adequacy procurement requirements, or local capacity requirement in other regulatory proceedings or legislative actions.

"Monthly Payment" has the meaning specified in Section 3.1.

"Monthly Supply Plan" has the meaning set forth in the CAISO Tariff.

"MW" means megawatt (or 1,000 kilowatts) of alternating current electric energy generating capacity.

"Net Qualifying Capacity" has the meaning set forth in the CAISO Tariff.

"Next Showing Month" means the next calendar month for which a Compliance Showing will be made.

"Non-Availability Charges" has the meaning set forth in the CAISO Tariff.

"North" means north of Path 26.

"Path 26" has the meaning set forth in the CAISO Tariff.

"Planned Outage" means, an Approved Maintenance Outage (as defined in the CAISO Tariff), but does not include a RA Maintenance Outage With Replacement (as defined in the CAISO Tariff), a Short-Notice Opportunity RA Maintenance Outage (as defined in the CAISO Tariff) or an Off-Peak Opportunity RA Maintenance Outage (as defined in the CAISO Tariff).

"Product" means the Capacity Attributes of the Unit, including any capacity from RMR Contracts for the Unit, or its successor, Capacity Procurement Mechanism, or its successor, and RUC Availability Payments, or its successor; provided that:

> (a) Product does not include any right to the energy or ancillary services from the Unit;

> (b) any change by the CAISO, CPUC or other Governmental Authority that defines new or re-defines existing Local Capacity Areas that results in a decrease or increase in the amount of Capacity Attributes related to a Local Capacity Area provided hereunder will not result in a change in payments made pursuant to this Transfer; and

> (c) the Parties agree that, under this Agreement, if the CAISO, CPUC or other Governmental Authority defines new or re-defines existing Local Capacity Areas whereby the Unit subsequently qualifies for a Local Capacity Area, the Product shall include all Capacity Attributes related to such Local Capacity Area.

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 47 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 46
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

"RAR" means the resource adequacy requirements established for load serving entities by the CPUC pursuant to the CPUC Decisions, the CAISO pursuant to the CAISO Tariff, or by any other Governmental Authority having jurisdiction.

"Replacement Capacity" has the meaning specified in Section 2.4.

"Replacement Capacity Price" means the market price for Product with Capacity Attributes reasonably equivalent to the quantity of Product not provided by Transferor under this Agreement.

"Replacement Obligation" has the meaning specified in Section 2.4.

"Resold Product" has the meaning specified in Section 2.6.

"Resource Category" shall be as described in the annual CPUC Filing Guide, as such may be modified, amended, supplemented or updated from time to time.

"RMR Contracts" has the meaning set forth in the CAISO Tariff.

"RUC Availability Bid" has the meaning set forth in the CAISO Tariff.

"RUC Availability Payment" has the meaning set forth in the CAISO Tariff.

"SC" has the meaning set forth in the CAISO Tariff.

"SC Substitute" has the meaning set forth in Section 2.8.

"Showing Month" shall be the calendar month of the Delivery Period that is the subject of the Compliance Showing, as set forth in the CPUC Decisions and outlined in the CAISO Tariff. For illustrative purposes only, pursuant to the CAISO Tariff and CPUC Decisions in effect as of the Agreement Effective Date, the monthly Compliance Showing made in June is for the Showing Month of August.

"South" means south of Path 26.

"Supply Plan" has the meaning set forth in the CAISO Tariff.

"Transferee" has the meaning specified in the introductory paragraph of this Agreement.

"Transferor" has the meaning specified in the introductory paragraph of this Agreement.

"Unit" shall mean the generation assets described in Attachment B (including any Alternate Units), from which Product is provided by Transferor to Transferee.

"Unit NQC" means the Net Qualifying Capacity set by the CAISO for the applicable Unit. The Parties agree that if the CAISO adjusts the Net Qualifying Capacity of a Unit after the Agreement Effective Date, then for the period in which the adjustment is effective, the Unit NQC shall be deemed the lesser of (i) the Unit NQC as of the Agreement Effective Date, or (ii) the CAISO-adjusted Net Qualifying Capacity.

22

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 48 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 47
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

## ADDITIONAL DEFINED TERMS

To the extent that the Parties have selected Flexible Capacity as being "Applicable", the following definitions shall be utilized in lieu of the corresponding definition, where appropriate, or in addition to the definitions set forth in the above Defined Terms:

"Aggregate Contract Quantity" means the aggregate amount of Product associated with the MWs set forth in the table in Section 1.4 which Transferor has agreed to provide to Transferee from the Unit throughout the entire term of the Delivery Period and which includes Product which is Flexible Capacity in an amount equal to the aggregate amount identified in Section 1.5. All Product identified in Section 1.4 is Inflexible Capacity except to the extent identified as Flexible Capacity in Section 1.5.

"Capacity Attributes" means, with respect to a Unit, any and all of the following, in each case which are attributed to or associated with the Unit at any time throughout the Delivery Period:

(a)     resource adequacy attributes, as may be identified from time to time by the CPUC, CAISO, or other Governmental Authority having jurisdiction, that can be counted toward RAR;

(b)     resource adequacy attributes or other locational attributes for the Unit related to a Local Capacity Area, as may be identified from time to time by the CPUC, CAISO or other Governmental Authority having jurisdiction, associated with the physical location or point of electrical interconnection of the Unit within the CAISO Control Area, that can be counted toward a Local RAR;

(c)     other current or future defined characteristics, certificates, tags, credits, or accounting constructs, howsoever entitled, including any accounting construct counted toward any Compliance Obligations; and

(d)     flexible capacity resource adequacy attributes for the Unit, including, without limitation, the amount of Unit EFC and MWs associated with Unit EFC as may be identified from time to time by the CPUC, CAISO, or other Governmental Authority having jurisdiction, that can be counted toward Flexible RAR.

"Compliance Obligations" means the RAR, Local RAR and Flexible RAR.

"Compliance Showings" means the (a) Local RAR compliance or advisory showings (or similar or successor showings), (b) RAR compliance or advisory showings (or similar or successor showings), and (c) Flexible RAR compliance or advisory showings (or similar successor showings), in each case, a load serving entity is required to make to the CPUC (and, to the extent authorized by the CPUC, to the CAISO) pursuant to the CPUC

23

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 49 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 48
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

Decisions, to the CAISO pursuant to the CAISO Tariff, or to any Governmental Authority having jurisdiction.

"Contract Quantity" means, with respect to any particular Showing Month of the Delivery Period, the amount of Product associated with the number of MWs set forth in the table in Section 1.4, which Transferor has agreed to provide to Transferee from the Unit for each day of such Showing Month, and which includes Product which is Flexible Capacity in an amount equal to the amount identified in Section 1.5. All Product identified in Section 1.4 is Inflexible Capacity except to the extent identified as Flexible Capacity in Section 1.5.

"Effective Flexible Capacity" has the meaning set forth in the CAISO Tariff.

"Flexible Capacity" means, with respect to any particular Showing Month of the Delivery Period, the number of MWs of Product set forth in the table in Section 1.5 which Transferor has agreed to provide to Transferee from the Unit as part of the Contract Quantity for each day of such Showing Month, and which such MWs of Product are eligible to satisfy a load serving entity's Flexible RAR and which such MWs of Product are associated with MWs of the Unit that are part of the Unit EFC.

"Flexible RAR" means the flexible capacity requirements established for load serving entities by the CPUC pursuant to the CPUC Decisions, the CAISO pursuant to the CAISO Tariff, or by any other Governmental Authority having jurisdiction and includes any non-binding advisory showings which a load serving entity is to make with respect to flexible capacity.

"Inflexible Capacity" means, with respect to any particular Showing Month of the Delivery Period, the number of MWs of Product set forth in the table in Section 1.4 minus the number of MWs of Product set forth in the table in Section 1.5, which Transferor has agreed to provide to Transferee from the Unit as part of the Contract Quantity for each day of such Showing Month, and which such MWs of Product are not eligible to satisfy a load serving entity's Flexible RAR and which are Product associated MWs of the Unit that are not part of or outside the Unit EFC. Inflexible Capacity is also known as 'generic capacity'.

"Product" means the Capacity Attributes of the Unit, provided that:

(a) Product does not include any right to the energy or ancillary services from the Unit;

(b) any change by the CAISO, CPUC or other Governmental Authority that defines new or re-defines existing Local Capacity Areas that results in a decrease or increase in the amount of Capacity Attributes related to a Local Capacity Area provided hereunder will not result in a change in payments made pursuant to this Transfer;

(c) any change by the CAISO, CPUC or other Governmental Authority that defines new or re-defines existing Flexible RAR, Capacity Attributes related to Flexible RAR, or attributes of the Unit related to Flexible RAR, that results in a decrease or

24

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 50 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 49
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

increase in the amount of Capacity Attributes related to Flexible RAR provided hereunder will not result in a change in payments made pursuant to this Transfer;

(d) the Parties agree that, under this Agreement, if the CAISO, CPUC or other Governmental Authority defines new or re-defines existing Local Capacity Areas whereby the Unit subsequently qualifies for a Local Capacity Area, the Product shall include all Capacity Attributes related to such Local Capacity Area; and

(e) the Parties agree that, under this Agreement, if the CAISO, CPUC or other Governmental Authority defines new or re-defines existing Flexible RAR, Capacity Attributes related to Flexible RAR, or attributes of the Unit related to Flexible RAR whereby the Unit, or a portion of the Unit which did not previously qualify to satisfy Flexible RAR, subsequently qualifies to satisfy Flexible RAR, the Product shall include all Capacity Attributes of the Unit related to Flexible RAR, including any Capacity Attributes related to Flexible RAR with respect to any portion of the Unit which previously was not able to satisfy Flexible RAR.

"Unit EFC" means the Effective Flexible Capacity (in MWs) of the Unit. The Parties agree that if the CAISO adjusts the Effective Flexible Capacity of a Unit after the Agreement Effective Date, then for the period in which the adjustment is effective, the Unit EFC shall be deemed the lesser of (i) the Unit EFC as of the Agreement Effective Date, or (ii) the CAISO-adjusted Effective Flexible Capacity.

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 51 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 50
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT B

UNIT INFORMATION

| | Unit 1 | Unit 2 | Unit 3 | Unit 4 |
|---|---|---|---|---|
| Unit Name | RE Rosamond 2 | NRG Solar Oasis | Sycamore Cogeneration | Mountain View Power Partners |
| CAISO Resource ID | RSMSLR_6_SOLAR2 | OASIS_6_SOLAR2 | SYCAMR_2_UNIT 2 | BLAST_1_WIND |
| Unit NQC (MW as of the Agreement Effective Date by month) | 0.8<br>0.6<br>3.6<br>3<br>3.2<br>6.2<br>7.8<br>5.4<br>2.8<br>0.4<br>0.4<br>0 | 0.8<br>0.6<br>3.6<br>3<br>3.2<br>6.2<br>7.8<br>5.4<br>2.8<br>0.4<br>0.4<br>0 | 80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80<br>80 | 6.86<br>5.88<br>13.72<br>12.25<br>12.25<br>16.17<br>11.27<br>10.29<br>7.35<br>3.92<br>5.88<br>6.37 |
| If Flexible Capacity is designated as applicable in Section 1.1, Unit EFC (MW, as of the Agreement Effective Date by month) | *N/A* | *N/A* | *N/A* | *N/A* |
| Resource Type | *Solar* | *Solar* | *Cogeneration* | *Wind* |
| Resource Category (1, 2, 3 or 4) | 4 | 4 | 4 | 4 |
| Path 26 (North, South or None) | South | South | South | South |
| Local Capacity Area (if any, as of | Big Creek-Ventura | Big Creek-Ventura | Big Creek-Ventura | LA Basin |

26

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 52 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 51
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| | | | | |
|---|---|---|---|---|
| Agreement Effective Date) | | | | |
| PABA Vintage | | | | |

| | Unit 5 | Unit 6 | Unit 7 | |
|---|---|---|---|---|
| Unit Name | OLS Energy Chino | San Gorgonio Westwinds II | Golden Springs Develop. Co, | |
| CAISO Resource ID | CHINO_6_CIM GEN | GARNET_2_WIND 4 | DELAMO_2_SO LAR2 | |
| Unit NQC (MW as of the Agreement Effective Date by month) | 26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26<br>26 | 1.37<br>1.18<br>2.74<br>2.45<br>2.45<br>3.23<br>2.25<br>2.06<br>1.47<br>0.78<br>1.18<br>1.27 | 0.07<br>0.05<br>0.32<br>0.26<br>0.28<br>0.54<br>0.68<br>0.47<br>0.25<br>0.04<br>0.04<br>0 | |
| If Flexible Capacity is designated as applicable in Section 1.1, Unit EFC (MW, as of the Agreement Effective Date by month) | *N/A* | *N/A* | *N/A* | |
| Resource Type | | *Wind* | *Solar* | |
| Resource Category (1, 2, 3 or 4) | 4 | 4 | 4 | |
| Path 26 (North, South or None) | South | South | South | |

27

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 53 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 52
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| Local Capacity Area (if any, as of Agreement Effective Date) | LA Basin | LA Basin | LA Basin | |
|---|---|---|---|---|
| PABA Vintage | | | | |

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT C

SUPPLY PLAN INFORMATION

Benefitting load serving entity SCID:  LWSTN

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT D

SUBSEQUENT SALE INFORMATION


Contract Key ID: _____

Subsequent sale contract quantity (in MW): _____

Subsequent sale delivery period: _____

Amount of Inflexible Capacity included in Volume: _____

New Benefitting load serving entity SC identification number: _____

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 56 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 55
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

ATTACHMENT E

CONTRACT QUANTITY UNIT ALLOCATION

| Showing Month, Year | Unit 1 | | Unit 2 | | Unit 3 | | Unit 4 | |
|---|---|---|---|---|---|---|---|---|
| | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) |
| Jan 2021 | 0.8 | N/A | 0.8 | N/A | 31.6 | N/A | 6.86 | N/A |
| Feb 2021 | 0.6 | N/A | 0.6 | N/A | 31.6 | N/A | 5.88 | N/A |
| Mar 2021 | 3.6 | N/A | 3.6 | N/A | 31.6 | N/A | 13.7 | N/A |
| APR 2021 | 3 | N/A | 3 | N/A | 31.6 | N/A | 12.3 | N/A |
| May 2021 | 3.2 | N/A | 3.2 | N/A | 31.6 | N/A | 12.3 | N/A |
| June 2021 | 6.2 | N/A | 6.2 | N/A | 31.6 | N/A | 16.2 | N/A |
| July 2021 | 7.8 | N/A | 7.8 | N/A | 31.6 | N/A | 11.3 | N/A |
| Aug 2021 | 5.4 | N/A | 5.4 | N/A | 31.6 | N/A | 10.3 | N/A |
| Sep 2021 | 2.8 | N/A | 2.8 | N/A | 31.6 | N/A | 7.35 | N/A |
| Oct 2021 | 0.4 | N/A | 0.4 | N/A | 31.6 | N/A | 3.92 | N/A |
| Nov 2021 | 0.4 | N/A | 0.4 | N/A | 31.6 | N/A | 5.88 | N/A |
| Dec 2021 | 0 | N/A | 0 | N/A | 31.6 | N/A | 6.37 | N/A |
| Jan 2022 | 0.8 | N/A | 0.8 | N/A | 4.72 | N/A | N/A | N/A |
| Feb 2022 | 0.6 | N/A | 0.6 | N/A | 4.72 | N/A | N/A | N/A |
| Mar 2022 | 3.6 | N/A | 3.6 | N/A | 4.72 | N/A | N/A | N/A |
| Apr 2022 | 3 | N/A | 3 | N/A | 4.72 | N/A | N/A | N/A |

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 57 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 56
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| May 2022 | 3.2 | N/A | 3.2 | N/A | 4.72 | N/A | N/A | N/A |
|---|---|---|---|---|---|---|---|---|
| June 2022 | 6.2 | N/A | 6.2 | N/A | 4.72 | N/A | N/A | N/A |
| July 2022 | 7.8 | N/A | 7.8 | N/A | 4.72 | N/A | N/A | N/A |
| Aug 2022 | 5.4 | N/A | 5.4 | N/A | 4.72 | N/A | N/A | N/A |
| Sep 2022 | 2.8 | N/A | 2.8 | N/A | 4.72 | N/A | N/A | N/A |
| Oct 2022 | 0.4 | N/A | 0.4 | N/A | 4.72 | N/A | N/A | N/A |
| Nov 2022 | 0.4 | N/A | 0.4 | N/A | 4.72 | N/A | N/A | N/A |
| Dec 2022 | 0 | N/A | 0 | N/A | 4.72 | N/A | N/A | N/A |

| Showing Month, Year | Unit 5 | | Unit 6 | | Unit 7 | |
|---|---|---|---|---|---|---|
| | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) | Contract Capacity (MW) | Flexible Capacity (MW) |
| Jan 2021 | 26 | N/A | 1.37 | N/A | 0.07 | N/A |
| Feb 2021 | 26 | N/A | 1.18 | N/A | 0.05 | N/A |
| Mar 2021 | 26 | N/A | 2.74 | N/A | 0.32 | N/A |
| APR 2021 | 26 | N/A | 2.45 | N/A | 0.26 | N/A |
| May 2021 | 26 | N/A | 2.45 | N/A | 0.28 | N/A |
| June 2021 | 26 | N/A | 3.23 | N/A | 0.54 | N/A |
| July 2021 | 26 | N/A | 2.25 | N/A | 0.68 | N/A |
| Aug 2021 | 26 | N/A | 2.06 | N/A | 0.47 | N/A |
| Sep 2021 | 26 | N/A | 1.47 | N/A | 0.25 | N/A |
| Oct 2021 | 26 | N/A | 0.78 | N/A | 0.04 | N/A |

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 58 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 57
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*

| Nov 2021 | 26 | N/A | 1.18 | N/A | 0.04 | N/A | |
| Dec 2021 | 26 | N/A | 1.27 | N/A | 0 | N/A | |
| Jan 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Feb 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Mar 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Apr 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| May 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| June 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| July 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Aug 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Sep 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Oct 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Nov 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |
| Dec 2022 | N/A | N/A | N/A | N/A | N/A | N/A | |

Case 6:21-bk-12821-SY    Doc 224-3    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 1 to Strabo Declaration - SCE Claim 18    Page 59 of 59

Case 6:21-bk-12821-SY    Claim 18-1    Filed 09/30/21    Desc Main Document    Page 58
of 58

*Based on SCE's RA Capacity (Buy or Sell Confirmation)*
*v.09.09.2019*


ATTACHMENT F

SUPPLY PLAN CONTACT INFORMATION

Transferor's Supply Plan contact information:

Transferor's Supply Plan name: Angelica Sindelar

Transferor's Supply Plan email: angelica.sindelar@sce.com

Transferor's Supply Plan phone number: 626-302-9576


Transferee's Supply Plan contact information:

Transferee's Supply Plan name: Western Community Energy

Transferee's Supply Plan email: sparr@edms-llc.com; aanderson@edms-llc.com;
regulatoryp@ilotpowergroup.com

Transferee's Supply Plan phone number: 858-678-0118

34