**Exhibit 3**

**SCE Claim 20**

Case 6:21-bk-12821-SY    Doc 224-5    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20    Page 2 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 1

**Fill in this information to identify the case:**

Debtor 1    Western Community Energy

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    6:21-bk-12821-SY

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Southern California Edison Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Munger, Tolles & Olson LLP
Name

350 South Grand Avenue
Number    Street

Los Angeles          CA          90071
City                State              ZIP Code

Contact phone  213-683-9554

Contact email  seth.goldman@mto.com

**Where should payments to the creditor be sent?** (if different)

See Addendum
Name

Number    Street

City          State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Case 6:21-bk-12821-SY    Doc 224-5    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20    Page 3 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 2 of 22

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____107,306.68. **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum.

**9. Is all or part of the claim secured?**

☒ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☒ Yes. Identify the property: See Addendum _____

Case 6:21-bk-12821-SY    Doc 224-5    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20    Page 4 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 3
of 22

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | Amount entitled to priority |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    09/30/2021
                     MM / DD / YYYY

/s/ Bradley Schneider (original on following page)
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Bradley | Robert | Schneider |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number        Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email | bradley.schneider@mto.com |

Case 6:21-bk-12821-SY   Doc 224-5   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20   Page 5 of 23

Case 6:21-bk-12821-SY   Claim 20-1   Filed 09/30/21   Desc Main Document   Page 4
of 22

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | Check the appropriate box: |
|---|---|
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |
| | Executed on date  09/30/2021 |
| | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ |
| | MM / DD / YYYY |
| | |
| | _Signature_ |
| | Print the name of the person who is completing and signing this claim: |

| Name | **Bradley** | **Robert** | **Schneider** |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Counsel | | |
| Company | Munger, Tolles & Olson LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 350 South Grand Avenue | | |
| | Number        Street | | |
| | Los Angeles | CA | 90071 |
| | City | State | ZIP Code |
| Contact phone | 213-683-9237 | Email bradley.schneider@mto.com | |

Case 6:21-bk-12821-SY   Doc 224-5   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20   Page 6 of 23

Case 6:21-bk-12821-SY   Claim 20-1   Filed 09/30/21   Desc Main Document   Page 5
of 22

## ADDENDUM TO PROOF OF CLAIM

### In re Western Community Energy,
### Case No. 6:21-bk-12821-SY

This addendum is attached to and a part of the proof of claim (the "Proof of Claim") filed by Southern California Edison Company ("SCE") (the "Claimant") against Western Community Energy Company (the "Debtor" and, with SCE, the "Parties").

## 1.      Basis for Proof of Claim and Asserted Amount

The Debtor contracted with SCE to provide certain services that were necessary to the Debtor's operations, including billing and metering to the Debtor's customers ("CCA Services"). SCE provided CCA Services pursuant to an agreement that it entered with the Debtor on February 26, 2019 (the "Service Agreement"), as well as SCE's Rule 23 Community Choice Aggregation Tariff ("Rule 23 Tariff").  A true and correct copy of the Services Agreement is attached hereto as Exhibit 1.

Section 5 of the Service Agreement provides that "SCE will bill and the CCA agrees to pay SCE for all services and products provided by SCE in accordance with the terms and conditions set forth in SCE's Rule 23 Tariff.  Section B.14 of the Rule 23 Tariff, in turn, provides that "SCE costs for services to a CCA . . . shall be charged the CCA . . . as set forth in the appropriate SCE rate schedule."

SCE provided CCA Services to the Debtor through and after the Debtor's filing of its chapter 9 bankruptcy petition on May 24, 2021 (the "Petition Date").  As of the Petition Date, SCE was owed $91,600 for CCA Services.  SCE's claim for this amount is secured by a right of offset and/or recoupment against customer payments that SCE collects and remits to the Debtor under the Services Agreement.

SCE is owed $15,707 for CCA Services provided from the Petition Date through June 30, 2021.  SCE continues to provide CCA services to the Debtor and, thus, servicing fees owed to SCE by the Debtor are continuing to accrue.  SCE's claim for post-petition servicing fees is secured by a right of offset and/or recoupment against customer payments collected and remitted to the Debtor.  In addition, SCE asserts an administrative claim to recover these amounts as an administrative expense.

## 2.      Reservations of Rights

The filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver or release of Claimant's rights against any other entity or person liable for all or any part of the Proof of Claim asserted herein; (ii) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver or release of Claimant's right to mediate or arbitrate any dispute, as applicable, including the amount or nature of the Proof of Claim; (iv) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether the same be designated legal or private rights or in

Case 6:21-bk-12821-SY   Doc 224-5   Filed 12/01/21   Entered 12/01/21 11:37:49   Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20   Page 7 of 23

Case 6:21-bk-12821-SY   Claim 20-1   Filed 09/30/21   Desc Main Document   Page 6
of 22

any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (v) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (vi) a waiver or release of Claimant's right to have any and all final orders entered only after de novo review by a United States District Court Judge; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto, or other proceeding which may be commenced in this case against or otherwise involving Claimant; (viii) a waiver or release or limitation of Claimant's right to setoff or recoupment; or (ix) a waiver of Claimant's right to assert any additional claims that may be entitled to administrative priority under sections 503 and 507 of the Bankruptcy Code.

**3.      Amendments**

Claimant reserves the right to amend and/or supplement this Proof of Claim at any time, in any manner, including, but not limited to, fixing the amount of the claims described above that are or may become due to Claimant, and/or to file additional proofs of claim for any additional claim which may be based on the same or additional documents or grounds of liability.

**4.      Notices**

All notices relating to this Proof of Claim should be sent as follows:

> Southern California Edison Company
> Attn:  Samantha Nicely
> 6060 N. Irwindale Ave.
> Suite J
> Irwindale, CA 91702

> With a copy to:

> Seth Goldman
> Bradley R. Schneider
> Munger, Tolles & Olson LLP
> 350 South Grand Avenue, 50th Floor
> Los Angeles, CA 90071

All payments should be sent to:

> Southern California Edison Company
> Attn:  Samantha Nicely
> 6060 N. Irwindale Ave.
> Suite J
> Irwindale, CA 91702

Case 6:21-bk-12821-SY    Doc 224-5    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20    Page 8 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 7
of 22

**EXHIBIT 1**

# Community Choice Aggregation Service Agreement
# Instruction Sheet

**Purpose**

The Community Choice Aggregation (CCA) Service Agreement incorporates SCE's applicable tariffs and is required prior to commencement of CCA Service within SCE service territory.

**General Instructions**

1. Please type or print in ink.
2. Do not make any changes to the text of this agreement.
3. If a mistake is made, please request a new agreement.
4. If subsequent changes need to be made, please submit them in writing to SCE.
5. Send completed agreement:

    CCA Services
    6020 N. Irwindale Ave., Suite I
    Irwindale, CA  91702
    Attn: Michelle Stark

6. Please make a copy of your completed agreement for your records.
7. If you have any questions, please contact:

    CCA Services at   (626) 812-7649

**Instructions for Preparation**

Please complete all blank data fields of the agreement.

DocuSign Envelope ID: 6F9G4580-E2A8-4600-97AD-BCF90E12535B



**Southern California Edison Company**

# COMMUNITY CHOICE AGGREGATOR (CCA) SERVICE AGREEMENT

This Community Choice Aggregator (CCA) Service Agreement (this "Agreement") is made and entered into as of this ⎯26⎯ day of ⎯February⎯, ⎯2019⎯, by and between "⎯Western Community Energy⎯ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯" ("CCA"), a ⎯Joint Powers Authority⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ organized and existing under the laws of the state of ⎯California⎯⎯⎯⎯⎯, and Southern California Edison Company  (SCE), a corporation organized and existing under the laws of the state of California.  From time to time, CCA and SCE shall be individually referred to herein as a "Party" and collectively as the "Parties."

**Section 1:**　　**General Description of Agreement**

1.1　　This Agreement is a legally binding contract.  The Parties named in this Agreement are bound by the terms set forth herein and otherwise incorporated herein by reference.  This Agreement shall govern the business relationship between the Parties hereto by which CCA shall offer electrical energy services. Each Party, by agreeing to undertake specific activities and responsibilities for or on behalf of customers, acknowledges that each Party shall relieve and discharge the other Party of the responsibility for said activities and responsibilities with respect to those customers.  Except where explicitly defined herein (including Attachment A hereto) the definitions controlling this Agreement are contained in SCE's applicable rules or in the relevant community choice aggregation tariff.

1.2　　The form of this Agreement has been developed as part of the CPUC regulatory process to implement Assembly Bill 117, was intended to conform to CPUC directions, was filed and approved by the CPUC for use between SCE and CCAs and may not be waived, altered, amended or modified, except as provided herein or in the applicable community choice aggregation tariff, or as may otherwise be authorized by the CPUC.

1.3　　This Agreement incorporates by reference the applicable community choice aggregation tariff as authorized and modified from time to time by the CPUC.

**Section 2:**　　**Representations**

2.1　　Each Party represents that it is and shall remain in compliance with all applicable laws and tariffs, including applicable CPUC requirements.

DocuSign Envelope ID: 9F0C45B0-E2A3-4590-976D-B1F90E127ABB

2.2     Each person executing this Agreement for the respective Parties expressly represents and warrants that he or she has authority to bind the entity on whose behalf this Agreement is executed.

2.3     Each Party represents that (a) it has the full power and authority to execute and deliver this Agreement and to perform its terms and conditions; (b) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate or other action by such Party; and (c) this agreement constitutes such Party's legal, valid and binding obligation, enforceable against such Party in accordance with its terms.

2.4     Each Party shall (a) exercise all reasonable care, diligence and good faith in the performance of its duties pursuant to this Agreement; and (b) carry out its duties in accordance with applicable recognized professional standards in accordance with the requirements of this Agreement.

**Section 3:**      **Term of Service**

The term of this Agreement shall commence on the date of execution by both Parties hereto (the "Effective Date") and shall terminate on the earlier of (a) the date CCA informs SCE that it is no longer operating as a CCA in SCE's service territory; (b) the earlier termination pursuant to Section 4 hereof; or (c) the effective date of a new CCA Service Agreement between the Parties hereto. Notwithstanding the Effective Date of this Agreement, the CCA acknowledges that it may only offer Community Choice Aggregation Services to customers effective on or after the CPUC-approved date for commencement of such services by CCAs, and only after it has complied with all provisions of this Agreement and SCE's applicable tariffs.

**Section 4:**      **Events of Default and Remedy for Default**

4.1     An Event of Default under this Agreement shall include either Party's material breach of any provision of this Agreement, including those incorporated by reference herein, and failure to cure such breach within thirty (30) calendar days after receipt of written notice thereof from the non-defaulting Party; or such other period as may be provided by this Agreement or SCE's applicable community choice aggregation tariff.

4.2     In the event of such an Event of Default, the non-defaulting Party shall be entitled to exercise any and all remedies (a) available under SCE's applicable community choice aggregation tariff; and/or (b) provided for by law or in equity to the extent not inconsistent with SCE's community choice aggregation tariff. In addition, in the event of an Event of Default this Agreement may be effectively terminated upon Commission authorization.

Case 6:21-bk-12821-SY    Doc 224-5    Filed 12/01/21    Entered 12/01/21 11:37:49    Desc
Exhibit 3 to Strabo Declaration - SCE Claim 20    Page 12 of 23

Case 6:21-bk-12821-SY    Claim 20-1    Filed 09/30/21    Desc Main Document    Page 11
of 22

4.3    Breach by any Party hereto of any provision of SCE's community choice
aggregation tariff, including a breach occurring during Exigent Circumstances as
defined in Section T.3 of such tariff, which circumstances also shall include
bankruptcy of CCA, shall be governed by applicable provisions contained therein
and each Party will retain all rights granted thereunder.  A breach of said tariff for
which no remedy is specified therein shall be governed by this Agreement as an
Event of Default.

**Section 5:**    **Billing and Payment**

SCE will bill and the CCA agrees to pay SCE for all services and products
provided by SCE in accordance with the terms and conditions set forth in SCE's
community choice aggregation tariff, as stated in SCE's Electric Rule 23 and
SCE's rate schedules.  Any services provided by the CCA to SCE shall be by
separate agreement between the Parties and are not a subject of this
Agreement.

**Section 6:**    **Limitation of Liability**

Each Party's liability to the other Party for any loss, cost, claim, injury, liability, or
expense, including reasonable attorneys' fees, relating to or arising from any act
or omission in its performance of this Agreement, shall be limited to the amount
of direct damage actually incurred, except as provided for in this Section.  In no
event shall either Party be liable to the other Party for any indirect, special,
consequential, or punitive damages of any kind whatsoever, whether in contract,
tort or strict liability, except in the event of an action covered by the
Indemnification provisions of Section 7 of this Agreement or by the
indemnification provisions in any Nondisclosure Agreement relating to the
disclosure of confidential information to the CCA, in which event this Section 6
shall not be applicable.

**Section 7:**    **Indemnification**

7.1    To the fullest extent permitted by law, and subject to the limitations set forth in
Section 6 of this Agreement, each Party (the "Indemnifying Party") shall
indemnify and hold harmless the other Party, and its current and future direct
and indirect parent companies, affiliates and their shareholders, officers,
directors, employees, agents, servants and assigns (collectively, the
"Indemnified Party"), and at the Indemnified Party's option, the Indemnifying
Party shall defend the Indemnified Party, from and against any and all claims
and/or liabilities for losses, expenses, damage to property, injury to or death of
any person, including, but not limited to, the Indemnified Party's employees and
its affiliates' employees, subcontractors and subcontractors' employees, or any
other liability incurred by the Indemnified Party, including reasonable expenses,
legal and otherwise, which shall include reasonable attorneys' fees, caused

wholly or in part by any negligent, grossly negligent or willful act or omission by
the Indemnifying Party, its officers, directors, employees, agents or assigns
arising out of this Agreement, except to the extent caused wholly or in part by

DocuSign Envelope ID: 950C4580-E243-459C-976D-B1F90512792B

any negligent, grossly negligent or willful act or omission of the Indemnified Party.

7.2         If any claim covered by Section 7.1 is brought against the Indemnified Party, then the Indemnifying Party shall be entitled to participate in, and unless in the opinion of counsel for the Indemnified Party a conflict of interest between the Parties may exist with respect to such claim, assume the defense of such claim, with counsel reasonably acceptable to the Indemnified Party.  If the Indemnifying Party does not assume the defense of the Indemnified Party, or if a conflict precludes the Indemnifying Party from assuming the defense, then the Indemnifying Party shall reimburse the Indemnified Party on a monthly basis for the Indemnified Party's defense through separate counsel of the Indemnified Party's choice.  Even if the Indemnifying Party assumes the defense of the Indemnified Party with acceptable counsel, the Indemnified Party, at its sole option, may participate in the defense, at its own expense, with counsel of its own choice without relieving the Indemnifying Party of any of its obligations hereunder. In no event shall either Party be liable to the other Party for any indirect, special, consequential, or punitive damages of any kind whatsoever, whether in contract, tort or strict liability.

7.3         The Indemnifying Party's obligation to indemnify under this Section 7 shall survive termination of this Agreement, and shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Indemnifying Party under any statutory scheme, including, without limitation, under any Worker's Compensation Acts, Disability Benefit Acts or other Employee Benefit Acts.


**Section 8:**        **Assignment and Delegation**

8.1         Neither Party to this Agreement shall assign any of its rights or obligations under this Agreement, except with the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  No assignment of this Agreement shall relieve the assigning Party of any of its obligations under this Agreement until such obligations have been assumed by the assignee.  When duly assigned in accordance with the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the assignee and the assignor shall be relieved of its rights and obligations.  Any assignment in violation of this Section 8 shall be void.

8.2         Notwithstanding the provisions of this Section 8, either Party may subcontract its duties under this Agreement to a subcontractor, provided that the subcontracting Party shall remain fully responsible as a principal and not as a guarantor for performance of any subcontracted duties, shall serve as the point of contact between its subcontractor and the other Party, and shall

DocuSign Envelope ID: 9F9C45B9-E243-4599-976D-B1F90E127085

provide the other Party with thirty (30) calendar days' prior written notice of any such subcontracting, which notice shall include such information about the subcontractor as the other Party shall reasonably require.  If either Party subcontracts any of its duties hereunder, it shall cause its subcontractors to perform in a manner which is in conformity with that Party's obligations under this Agreement.

**Section 9:**     **Independent Contractors**

Each Party shall perform its obligations under this Agreement (including any obligations performed by a Party's designees as permitted under Section 8 of this Agreement) as an independent contractor.

**Section 10:**     **Entire Agreement**

This Agreement consists of, in its entirety, this Community Choice Aggregator Service Agreement and all attachments hereto, all Community Choice Aggregation Service Requests submitted pursuant to this Agreement and SCE's community choice aggregation tariffs.  This Agreement supersedes all other agreements or understandings, written or oral, between the Parties related to the subject matter hereof, with the express exception of any Nondisclosure Agreement relating to the disclosure of confidential information to the CCA.  This Agreement may be modified from time to time only by an instrument in writing, signed by both Parties.

**Section 11:**     **Nondisclosure**

11.1     Notwithstanding anything provided below, prior to receiving any SCE confidential customer information, CCA agrees to enter into the CCA Non-Disclosure Agreement and be bound by its terms with respect to Confidential Information as defined therein.

Neither Party may disclose any Confidential Information obtained pursuant to this Agreement to any third party, including affiliates of such Party, without the express prior written consent of the other Party.  As used herein, the term "Confidential Information" shall include, but not be limited to, all business, financial, and commercial information pertaining to the Parties, customers of either or both Parties, suppliers for either Party, personnel of either Party, any trade secrets, and other information of a similar nature, whether written or in intangible form that is marked proprietary or confidential with the appropriate owner's name.  Confidential Information shall not include information known to either Party prior to obtaining the same from the other Party, information in the public domain, or information obtained by a Party from a third party who did not, directly or indirectly, receive the same from the other Party to this Agreement or from a party who was under an obligation of confidentiality to the other Party to this Agreement or information developed by either Party independent of any

Form No. 14-768
Revised 6/2008

Confidential Information.  The receiving Party shall use the higher of the standard of care that the receiving Party uses to preserve its own confidential information or a reasonable standard of care to prevent unauthorized use or disclosure of such Confidential Information.  Each receiving Party shall, upon termination of this Agreement or at any time upon the request of the disclosing Party, promptly return or destroy all Confidential Information of the disclosing Party then in its possession.

11.2    Notwithstanding the preceding, Confidential Information may be disclosed to any governmental, judicial or regulatory authority requiring such Confidential Information pursuant to any applicable law, regulation, ruling, or order, provided that: (a) such Confidential Information is submitted under any applicable provision, if any, for confidential treatment by such governmental, judicial or regulatory authority; and (b) prior to such disclosure, the other Party is given prompt notice of the disclosure requirement so that it may take whatever action it deems appropriate, including intervention in any proceeding and the seeking of any injunction to prohibit such disclosure.

**Section 12:    Enforceability**

If any provision of this Agreement or the application thereof, is to any extent held invalid or unenforceable, the remainder of this Agreement and the application thereof, other than those provisions which have been held invalid or unenforceable, shall not be affected and shall continue in full force and effect and shall be enforceable to the fullest extent permitted by law or in equity.

**Section 13:    Notices**

13.1    Except as otherwise provided in this Agreement, any notices under this Agreement shall be in writing and shall be effective upon delivery if delivered by (a) hand; (b) U.S. Mail, first class postage pre-paid, or (c) facsimile, with confirmation of receipt to the Parties as follows:

**If the notice is to CCA:**

Name of Entity:  Western Community Energy

Contact Name:  Rick Bishop

Business Address: 3390 University Avenue, Suite 450, Riverside CA 92501

Facsimile:

DocuSign Envelope ID: C959C45B9-E243-4590-976D-B1F905127A85

**If the notice is to SCE:**

*Contact Name*:  Mike Marelli

*Business Address*:  6020 N Irwindale Ave., Ste. I, Irwindale, CA 91702

*Facsimile:*  (626) 633-9948

13.2    Each Party shall be entitled to specify as its proper address any other address in the United States upon written notice to the other Party.

13.3    Each Party shall designate on Attachment A the person(s) to be contacted with respect to specific operational matters relating to Community Choice Aggregation Service.  Each Party shall be entitled to specify any change to such person(s) upon written notice to the other Party.

**Section 14:**    **Time of Essence**

The Parties expressly agree that time is of the essence for all portions of this Agreement.

**Section 15:**    **Dispute Resolution**

15.1    The form of this Agreement has been filed with and approved by the CPUC as part of SCE's applicable tariffs. Except as provided in Section 15.2 and 15.3, any dispute arising between the Parties relating to interpretation of the provisions of this Agreement or to the performance of SCE's obligations hereunder shall be reduced to writing and referred to the Parties' representatives identified on Attachment A for resolution, with the responding Party filing its written response within thirty (30) business days after receiving the written position of the complaining party.   Thereafter, the Parties shall be required to meet and confer within ten (10) business days in a good faith effort to resolve their dispute. Pending such resolution, the Parties shall continue to proceed diligently with the performance of their respective obligations under this Agreement, unless this Agreement has been terminated under Section 4.2. If the Parties fail to reach an agreement within ten (10) additional business days of the last session to meet and confer, the matter shall, upon demand of either Party, be submitted to resolution before the CPUC in accordance with the CPUC's rules, regulations and procedures applicable to resolution of such disputes.

15.2    Except as provided in Rule 23 Section T.3, any dispute arising between the Parties relating to interpretation of the provisions of this Agreement or to the performance of the CCA's obligations hereunder shall be reduced to writing and referred to the Parties' representatives identified on Attachment A for resolution,

with the responding Party filing its written response within thirty (30) business days after receiving the written position of the complaining party. Thereafter, the Parties shall be required to meet and confer  within ten (10) business days in a good faith effort to resolve their dispute. Pending resolution, the Parties shall

Form No. 14-768
Revised 6/2008

continue to proceed diligently with the performance of their respective obligations under this Agreement, unless this Agreement has been terminated under Section 4.2. If the Parties fail to reach an agreement within ten (10) additional business days of the last session to meet and confer, the matter shall, upon demand of either Party, be submitted to resolution before the CPUC in accordance with the CPUC's rules, regulations and procedures applicable to resolution of such disputes, as allowed by law or in equity, or the parties may mutually agree to pursue mediation or binding arbitration to resolve such issues.

15.3    Notwithstanding the provisions of Paragraph 15.1 and 15.2 above: (a) all disputes between the Parties relating to the payment by the CCA of any SCE fees or charges shall be subject to the provisions of SCE's applicable tariffs governing disputes over customer bills; (b) all disputes between the Parties regarding  non-bypassable charges (including Competition Transition Charges, Cost Responsibility Surcharges, and any other nonbypassable charges adopted by the Commission) payable by community choice aggregation customers or the CCA on behalf of such customers shall be subject to the provisions of SCE's applicable tariffs; and (c) SCE may pursue available remedies in law or equity for unauthorized electrical use by the CCA in a court of competent jurisdiction.

15.4    If the dispute involves a request for damages, parties understand that the Commission has no authority to award damages. To resolve such issues, the parties may mutually agree to pursue mediation or binding arbitration to resolve such issues, or if no such agreement is reached, to pursue other legal or equitable remedies that are available to the parties.

**Section 16:**    **Applicable Law and Venue**

This Agreement shall be interpreted, governed by and construed in accordance with the laws of the State of California, and shall exclude any choice of law rules that direct the application of the laws of another jurisdiction, irrespective of the place of execution or of the order in which the signatures of the parties are affixed or of the place or places of performance. Except for matters and disputes with respect to which the CPUC is the initial proper venue for dispute resolution pursuant to applicable law or this Agreement, the federal and state courts located in Los Angeles, California shall constitute the sole proper venue for resolution of any matter or dispute hereunder, and the Parties submit to the exclusive jurisdiction of such courts with respect to such matters and disputes.

**Section 17:**    **Force Majeure**

Neither Party shall be liable for any delay or failure in the performance of any part of this Agreement (other than obligations to pay money) due to any event of force majeure or other cause beyond its reasonable control, including but not limited to, unusually severe weather, flood, fire, lightning, epidemic, quarantine restriction, war, sabotage, act of a public enemy, earthquake, insurrection, riot, civil disturbance, strike, work stoppage caused by jurisdictional and similar disputes, restraint by court order or public authority, or action or non-action by or inability to obtain authorization or approval from any governmental authority, or any combination of these causes, which by the exercise of due diligence and foresight such Party could not reasonably have been expected to avoid and which by the exercise of due diligence is unable to overcome.  It is agreed that upon the Party so affected giving written notice and reasonably full particulars of such force majeure to the other Party within a reasonable time after the cause relied on, then the obligations of the Party, so far as they are affected by the event of force majeure, shall be suspended during the continuation of such inability and circumstance and shall, so far as possible, be remedied with all reasonable dispatch.  In the event of force majeure, as described herein, both Parties shall take all reasonable steps to comply with this Agreement and SCE's applicable tariffs despite occurrence of a force majeure event.

**Section 18:**    **Unauthorized Use of Energy (Energy Theft)**

18.1    The CCA represents and warrants that for each of its Customers, and at all times during which it provides community choice aggregation services as an Community Choice Aggregator, the CCA shall completely, accurately, and in a timely manner account for each of its Customer's loads.  Load data not accounted for in this manner may provide grounds for termination of this Agreement.  For verification purposes only, SCE shall have complete access to the load data provided to the ISO by the CCA. Such information is to remain confidential, and shall not be disclosed to any unauthorized person other than the CPUC, the California Independent System Operator or other law enforcement or regulatory authority.

18.2    SCE shall notify the CCA immediately and the CCA shall notify SCE immediately of any suspected unauthorized energy use.  The Parties agree to preserve any evidence of unauthorized energy use.  Once unauthorized energy use is suspected, SCE, in its sole discretion, may take any or all of the actions permitted under SCE's applicable tariffs.

DocuSign Envelope ID: 959C45B8-E2A3-4590-976D-B1F90F127085

**Section 19:**   **Not a Joint Venture**

Unless specifically stated in this Agreement to be otherwise, the duties, obligations, and liabilities of the Parties are intended to be several and not joint or collective.  Nothing contained in this Agreement shall ever be construed to create an association, trust, partnership or joint venture or to impose a trust or partnership duty, obligation, or liability on or with regard to either Party. Each Party shall be liable individually and severally for its own obligations under this Agreement.

**Section 20:**   **Conflicts Between this Agreement and SCE's Community Choice Aggregation Tariff**

Should a conflict exist or develop between the provisions of this Agreement and SCE's community choice aggregation tariff, as approved by the CPUC, the provisions of SCE's community choice aggregation tariff shall prevail.

**Section 21:**   **Amendments or Modifications**

21.1   Except as provided in Section 21.2, no amendment or modification shall be made to this Agreement, in whole or in part, except by an instrument in writing executed by authorized representatives of the Parties, and no amendment or modification shall be made by course of performance, course of dealing or usage of trade.

21.2   This Agreement may be subject to such changes or modifications as the CPUC may from time to time direct or necessitate in the exercise of its jurisdiction, and the Parties may amend the Agreement to conform to changes directed or necessitated by the CPUC.  In the event the Parties are unable to agree on the required changes or modifications to this Agreement, their dispute shall be resolved in accordance with the provisions of Section 15 hereof or, in the alternative, CCA may elect to terminate this Agreement upon written notice to SCE, which shall be effective upon the receipt thereof.  SCE retains the right to unilaterally file with the CPUC, pursuant to the CPUC's rules and regulations, an application for a change in SCE's rates, charges, classification, service or rules, or any agreement relating thereto.

DocuSign Envelope ID: 950C45B8-E243-4590-976D-B1F90512785B

**Section 22:**    **Audits**

22.1    SCE shall retain such specific records as may be required to support the accuracy of meter data provided in SCE's consolidated billings.  When the CCA reasonably believes that errors related to metering or billing activity may have occurred, the CCA may request the production of such documents as may be required to verify the accuracy of such metering and consolidated billing.  Such documents shall be provided within ten (10) business days of such request.  In the event the CCA, upon review of such documents, continues to believe that the SCE's duty to accurately meter and provide consolidated billing for usage has been breached, the CCA may direct that an audit be conducted. The CCA shall designate their own employee representative or their contracted representative to audit SCE's records.

22.2    Any such audit shall be undertaken by the CCA, or their contracted representative at reasonable times without interference with SCE's business operations, and in compliance with the SCE's security procedures.  SCE and the CCA agree to cooperate fully with any such audit.

22.3    Specific records to support the accuracy of meter data provided in the consolidated billings may require examination of billing and metering support documentation maintained by subcontractors.   SCE shall include a similar clause in its agreements with subcontractors reserving the right to designate their own employee representative, or their contracted representative to audit records related to consolidated billing to Community Choice Aggregation Customers.

22.4    The CCA will notify SCE in writing of any exception taken as a result of an audit.  SCE shall refund the amount of any undisputed exception to the CCA within ten (10) days.  If SCE fails to make such payment, SCE agrees to pay interest, accruing monthly, at a rate equal to the prime rate plus two percent (2%) of Bank of America NT&SA, San Francisco, or any successor institution, in effect from time to time, but not to exceed the maximum contract rate permitted by the applicable usury laws of the State of California.  Interest will be computed from the date of written notification of exceptions to the date SCE reimburses the CCA for any exception.  The cost of such audit shall be paid by the auditing Party; provided, however, that in the event an audit verifies overcharges of five percent (5%) or more, then SCE shall reimburse the CCA for the cost of the audit.

22.5    This right to audit shall extend for a period of three (3) years following the date of final payment under this Agreement.  Each party and each subcontractor shall retain all necessary records and documentation for the entire length of this audit period.

**Section 23:    Miscellaneous**

23.1    Unless otherwise stated in this Agreement: (a) any reference in this Agreement to a section, subsection, attachment or similar term refers to the provisions of this Agreement; (b) a reference to a section includes that section and all its subsections; and (c) the words "include," "includes," and "including" when used in this Agreement shall be deemed in each case to be followed by the words "without limitation." The Parties agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement

23.2    The provisions of this Agreement are for the benefit of the Parties and not for any other person or third party beneficiary.  The provisions of this Agreement shall not impart rights enforceable by any person, firm or organization other than a Party or a successor or assignee of a Party to this Agreement.

23.3    The descriptive headings of the various sections of this Agreement have been inserted for convenience of reference only and shall in no way define, modify or restrict any of the terms and provisions thereof.

23.4    Any waiver at any time by either Party of its rights with respect to a default under this Agreement, or with respect to any other matter arising in connection with this Agreement, shall not be deemed a waiver with respect to any other or subsequent default or matter and no waiver shall be considered effective unless in writing.

23.5    Each Party shall be responsible for paying its own attorneys' fees and other costs associated with this Agreement, except as provided in Sections 6 and 7 hereof.  If a dispute exists hereunder, the prevailing Party, as determined by the CPUC, or as may otherwise be determined by the dispute resolution procedure contained in  Section 15 hereof, if used, or by a court of law, shall be entitled to reasonable attorneys' fees and costs.

23.6    To the extent that the CPUC has a right under then-current law to audit either Party's compliance with this Agreement or other legal or regulatory requirements pertaining to Community Choice Aggregation transactions, that Party shall cooperate with such audits.  Nothing in this Section shall be construed as an admission by either Party with respect to the right of the CPUC to conduct such audits or the scope thereof.

23.7        Except as otherwise provided in this Agreement, all rights of termination, cancellation or other remedies in this Agreement are cumulative.  Use of any remedy shall not preclude any other remedy in this Agreement.


The Parties have executed this Agreement on the dates indicated below, to be effective upon the later date.

**On Behalf of CCA**

By:   _Rick Bishop_____

Name:  Rick Bishop_____

Title:  Executive Director_____

Date:  _2/26/2019_____

**On Behalf of SCE**

By:   _Mike Marelli_____

Name:  Mike Marelli_____

Title:  VP Business Customer Division____

Date:  _2/19/2019_____

Form No. 14-768
Revised 6/2008

**ATTACHMENT A**

**A.**     **Definitions:**

**Billing Services** - The consolidated billing services described in SCE's community choice aggregation tariff which are provided by SCE.

**Community Choice Aggregation Customer** - An end-use customer located within SCE's service territory who purchases Community Choice Aggregation Services through the CCA.

**Community Choice Aggregator (CCA)** – An entity that provides electric supply services to Community Choice Aggregation customers within SCE's service territory.  A CCA may also provide certain energy efficiency and conservation programs to its Community Choice Aggregation customers as provided for under SCE's tariffs.

**CCA Charges** - Charges for Community Choice Aggregation Services provided by the CCA.

**SCE Charges** - Charges (a) for services provided by SCE; or (b) which are energy-related and which are approved by the CPUC or the Federal Energy Regulatory Commission (including any nonbypassable charges such as Competition Transition Charges, Cost Responsibility Surcharges, and any other nonbypassable charges adopted by a regulatory body) or Fixed Transition Amount Charges owing to SCE or its affiliates, as those terms are defined under the California Public Utilities Code). Fixed Transition Amount Charges are also referred to as Trust Transfer Amount (TTA) Charges.

**B.**     **Contact Persons (Section 13.3):**

            **Billing Services**

                  SCE Contact:  _Kathryn Anderson_____

                  CCA Contact:  _Barbara Spoonhour_____

**C.**     **Parties' Representatives (Section 15.1):**

                  *SCE Representative*:

                  *Contact Name* _Kathryn Anderson_____

                  *Business Address* _6020 N Irwindale Ave. Ste. I_____

                  _Irwindale, CA 91702_____

                  *CCA Representative*:

                  *Contact Name* _Barbara Spoonhour_____

                  *Business Address* _3390 University Avenue, Suite 450 Riverside C