1   **WEILAND GOLDEN GOODRICH LLP**
   David M. Goodrich, State Bar No. 208675
2   dgoodrich@wgllp.com
   Ryan W. Beall, State Bar No. 313774
3   rbeall@wgllp.com
   650 Town Center Drive, Suite 600
4   Costa Mesa, California 92626
   Telephone   714-966-1000
5   Facsimile   714-966-1002

6   Counsel for Debtor
   Western Community Energy
7

8        **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA**

10        **RIVERSIDE DIVISION**

11   In re               Case No. 6:21-bk-12821-SY

12   WESTERN COMMUNITY ENERGY,    Chapter 9

13           Debtor.    **MOTION FOR ORDER APPROVING**
14                **SETTLEMENT BETWEEN DEBTOR AND**
                 **BARCLAYS BANK PLC PURSUANT TO**
15                **FEDERAL RULE OF BANKRUPTCY**
                 **PROCEDURE 9019; AND**
16                **DECLARATIONS OF ANDREW RUIZ AND**
                 **DAVID M. GOODRICH IN SUPPORT**
17                **THEREOF**

18                <u>Hearing Date, Time and Location:</u>
                 Date:    January 6, 2021
19                Time:    1:30 p.m.
                 Place:   3420 Twelfth Street
20                         Courtroom 302
21                         Riverside, CA 92501

22
23
24
25
26
27
28

*Weiland Golden Goodrich LLP*
*650 Town Center Drive, Suite 600*
*Costa Mesa, California 92626*
*Tel 714-966-1000 · Fax 714-966-1002*

1353462.1                         MOTION TO APPROVE COMPROMISE

**TO THE HONORABLE SCOTT H. YUN, UNITED STATES BANKRUPTCY JUDGE, AND ALL OTHER INTERESTED PARTIES:**

Western Community Energy ("Debtor"), the chapter 9 debtor in the above-captioned bankruptcy case hereby files this *Motion for Order Approving Settlement Between Debtor and Barclays Bank PLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* ("Motion") seeking court approval of a settlement entered into by and between the Debtor and Barclays Bank PLC ("Barclays").[1] The Motion is based upon the notice of motion filed herewith, the declarations of Andrew Ruiz ("Ruiz Dec.") and David M. Goodrich ("Goodrich Dec."), the record in this case, all judicially noticeable facts and all evidence, arguments and representations made at or prior to the hearing on the Motion.

## I.    INTRODUCTION

The Debtor seeks the Court's approval of a settlement and release agreement ("Agreement") entered into between the Debtor and Barclays (collectively the "Parties") to settle Barclays' claims against the Debtor and resolve litigation between the Debtor, Barclays, and Southern California Edison Company ("SCE"). The controversy arises from claims Barclays' has asserted as secured claims against the Debtor,[2] which claims are in conflict with certain claims asserted by SCE.[3] The Agreement will settle all disputes between the Debtor and Barclays. As more fully set forth herein, the Agreement will result in a payment of $7,500,000 to Barclays in full satisfaction of its filed proof of claim totaling approximately $11,600,000, exclusive of interest and attorneys' fees. The Debtor believes the Agreement is reasonable and in the best interests of all parties because it will result in the satisfaction of Barclays' claims against the Debtor, preserve assets for other creditors, and prevent costly and protracted litigation. Further, for the reasons discussed below, the

---

[1] The Debtor only consents to the Court exercising jurisdiction under FRBP 9019 and does not consent to any other exercise of authority over the Debtor's assets and financial affairs.

[2] *See* Proofs of Claim Nos. 22, 22-3.

[3] *See* Complaint for Declaratory Relief, Adv. Pr. No. 21-01128 [Dkt. No. 1]; *see* Objection to Claims of Southern California Edison Company (Proofs of Claim 18-21) [Dkt. No. 221].

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  failure to approve the Agreement could jeopardize the Debtor's settlement with SCE thereby

2  exposing the Debtor to the possibility of further costly and protracted litigation.[4]  As such,

3  for all of the reasons set forth herein, the Court should approve the Agreement.

## II.  JURISDICTION AND VENUE

5  This Court has jurisdiction over this motion and the relief requested pursuant to 28

6  U. S. C. § 1334.  Venue for the motion is proper in this Court pursuant to 28 U.S.C §§

7  1408 and 1409.

## III.  STATEMENT OF FACTS

9  The Debtor filed a voluntary chapter 9 petition on May 24, 2021 ("Petition Date").

10  *See* Dkt. No. 1.  Prior to the Petition Date, Barclays lent money to the Debtor and issued

11  letters of credit for the benefit of Debtor ("Letters of Credit") pursuant to a *Revolving Credit*

12  *Agreement*, dated March 12, 2020 ("Credit Agreement").  *See* Ruiz Dec. at ¶ 2 and **Exhibits**

13  **1** and **2** thereto.  The Credit Agreement works in conjunction with the *Security Agreement*,

14  dated February 12, 2020, entered into between Debtor and River City Bank ("Security

15  Agreement").  *Id.*, and *see* **Exhibit 3** to the Ruiz Dec.  The Parties are also parties to a

16  *Promissory Note* dated March 12, 2020 ("Promissory Note") issued in connection with the

17  Credit Agreement. *See* **Exhibit 4** to the Ruiz Dec.

18  On June 7, 2021 the Court entered an *Interim Order Granting in Part, Motion*

19  *to Determine Adequacy of Adequate Protection to River City Bank for the Benefit of the PPA*

20  *Providers* ("Interim Order").  *See* **Exhibit 5** to the Goodrich Dec.  The *Final Order Granting,*

21  *in Part, Motion to Determine Adequacy of Adequate Protection to River City Bank for the*

22  *Benefit of PPA Providers* was entered on July 6, 2021 ("Adequate Protection Order").  *See*

23  **Exhibit 6** to the Goodrich Dec.  The Adequate Protection Order requires, among other

24  things, (1) the deposit of the Debtor's accounts receivable into the Debtor's lockbox deposit

25  account held at River City Bank ("RCB"), and (2) the hold of funds in the lockbox account

26

27

28  [4] *See* Order Approving Stipulation to Take Southern California Edison Company's Motion for Relief from the Automatic Stay Off Calendar in Light of Settlement in Principle [Dkt. No. 220].

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  except for payments authorized by the Court under the Adequate Protection Order.  *Id.*,

2  ¶¶ 2(A) and 6.

3      On June 11, 2021, the Court entered a *Temporary Retaining Order* ("TRO") that

4  granted, *inter alia*, a replacement lien to SCE in all post-petition revenue from the Debtor's

5  customers for any diminution in value of SCE's purported secured rights in the Debtor's

6  customer receivables that occurred after the petition date.  *See* **Exhibit 7** to the Goodrich

7  Dec.  Under the TRO, SCE's replacement lien does not extend to any other assets of the

8  Debtor. *Id.*  Since the entry of the TRO, all customer receivables have been deposited into

9  the RCB lockbox account.  *See* Ruiz Dec.

10      On June 18, 2021, the Debtor agreed to provide adequate protection of SCE's

11  alleged secured interest in customer payments deposited into the RCB lockbox account,

12  including a replacement lien. *See* **Exhibit 8** to the Goodrich Dec.  On June 22, 2021, the

13  Court approved the June 18, 2021 stipulation ("SCE Order").  *See* **Exhibit 9** to the Goodrich

14  Dec.   The adequate protection provided to SCE did not extend beyond the customer

15  receivables.  *Id.*

16      On October 13, 2021, the Court entered an order ("MFR Order") approving a

17  *Stipulation Resolving Debtor's Motion for Relief from Automatic Stay* ("Stipulation").  *See*

18  **Exhibits 10** and **11** to the Goodrich Dec.  The Stipulation provides for, among other things,

19  a $3,000,000 limitation on the use of funds held in the Debtor's operating account at River

20  City Bank ("RCB").  *See* Exhibit 5, at ¶ 26.

21      On November 26, 2021, Barclays filed amended proof of claim number 22-3,

22  asserting a secured claim against the Debtor in excess of $11,031,644.00 based upon

23  unpaid loaned amounts and interest, not including attorneys' fees ("Barclays Claim").  *See*

24  **Exhibit 12** to the Goodrich Dec.  Barclays asserts that its claim is fully secured against all

25  assets of the Debtor, including all customer receivables and all funds held in the Debtor's

26  four RCB deposit accounts, based upon, among other things, California law, the Credit

27  Agreement, Security Agreement, and Promissory Note.  *Id.*

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    On November 30, 2021, Barclays filed a complaint ("Barclays Complaint") against

2    the Debtor and SCE for declaratory relief asserting that Barclays holds a first priority lien in

3    substantially all of the Debtor's assets and that SCE holds no security interest in funds held

4    in the Debtor's lockbox account at River City Bank. *See* AP Dkt. No. 6:21-ap-01128 SY.

5    Additionally, on November 30, 2021, Barclays filed an objection to claim numbers 18, 19,

6    20, and 21 filed by SCE ("Claim Objections"). *See* Dkt. No. 221. *See* Dkt. No. 224. SCE

7    separately asserts a security interest against the same cash accounts of the Debtor. *See*

8    Goodrich Dec., at ¶ 9.

9    On December 15, 2021, the Court entered its order continuing the hearing on the

10   Claim Objections to March 3, 2022 at 1:30 p.m. *See* Dkt. No. 229.

11   After significant negotiations, the Debtor and Barclays have agreed, subject to Court

12   approval, to settle their dispute regarding Barclays' proof of claim by Debtor's payment of

13   $7,500,000 to Barclays ("Settlement Payment") in full satisfaction of the Barclays Claim and

14   all secured interest and liens associated therewith. *See* Ruiz Dec. A true and correct copy

15   of the Settlement Agreement and Release, which memorializes the Parties' agreement, is

16   attached to the Ruiz Dec. at **Exhibit 13**.

17   The Debtor is currently holding $12,913,712.49 in the RCB lockbox account and

18   $12,395,467.34 in the RCB operating account. *See* Ruiz Dec. The Debtor proposes to

19   fund the Settlement Payment from funds in the RCB lockbox account and the RCB operating

20   account.

21   A copy of the proposed order granting this Motion is attached to the Goodrich Dec.

22   at **Exhibit 14**.

23   **IV.    SUMMARY OF SALIENT TERMS OF THE AGREEMENT**

24   The salient terms of the Agreement provide:[5]

---

[5] The below summary is qualified in its entirety by reference to the actual Agreement. To the extent of any inconsistency, the Agreement shall control in all respects.

1.     As a full and complete settlement of the Barclays Claim against the Debtor, Debtor agrees to pay Barclays $7,500,000.00 ("Settlement Amount") within two (2) business days following the entry of an order of this Court approving the Agreement;

2.     Upon entry of an order of this Court approving the Agreement, Barclays shall, within five (5) business days (i) dismiss the Barclays Complaint, with prejudice, and (ii) withdraw its objection to SCE's proofs of claim, with prejudice; *provided* that if the Debtor breaches its obligations under section 2.5 of the Agreement following the dismissal and/or withdrawal, then Barclays shall, notwithstanding the dismissal of its lawsuit and withdrawal of its claim objection, be entitled to refile such lawsuit and claim objection;

3.     Barclays consents to the assignment of the Debtor's accounts receivable to SCE free and clear of any lien, security interest, interest, claim, or encumbrance of any kind, provided the Debtor will grant Barclays a replacement lien in funds on deposit in the Debtor's RCB operating account equal to the amount of accounts receivable transferred to SCE with such replacement lien providing the same extent and priority of Barclays' lien that existed pre-petition.  A separate agreement or stipulation between the Debtor and Barclays will be prepared with the form and substance of such agreement or stipulation reasonably acceptable to Barclays.  The agreement or stipulation providing adequate protection to Barclays must be approved by the Bankruptcy Court pursuant to an order reasonably acceptable in form and substance to Barclays.  Any replacement lien granted hereunder shall be released immediately upon payment of the Settlement Payment[6]; and

4.     Releases of claims between the Parties.

## V.    MEMORANDUM OF POINTS AND AUTHORITIES

## A.    Debtor's Limited Consent for Court's Authority to Approve Settlement

Section 904 states provides:

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
> (1) any of the political or governmental powers of the debtor;

---

[6] Barclays and the Debtor will file a separate stipulation for adequate protection.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1
2

(2) any of the property or revenues of the debtor; or
(3) the debtor's use or enjoyment of any income producing property.

3  11 U.S.C. § 904.

4       A debtor need not seek court approval of settlements in a chapter 9 bankruptcy case.

5  *In re City of Stockton, Cal.*, 486 B.R. 194, 197 (Bankr. E.D. Cal. 2013) ("It follows, then, that

6  if judicial scrutiny of compromises was not required in chapter IX cases, then none is

7  required in chapter 9 cases under the Bankruptcy Code."). Pursuant to § 904, a court would

8  not have authority to approve or disapprove of a compromise by a chapter 9 debtor absent

9  consent. *Id.* ("Hence, Rule 9019 applies in chapter 9 cases only if the debtor elects to

10 'consent' per § 904 to have the court consider approval of a compromise."). The Debtor

11 here consents to the Court's jurisdiction for the limited purpose of approving the Agreement.

12     **B.**    <u>**Standard to be Applied to Approval of a Settlement**</u>

13     FRBP 9019(a) provides:

14
15
16

On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

17     Under Rule 9019(a), "compromises are favored because they minimize costly

18 litigation and further parties' interests in expediting the administration of the bankruptcy

19 estate" and the Court only needs to find that the settlement was negotiated in good faith

20 and is reasonable, fair, and equitable by utilizing the following factors:

21
22
23

• The complexity of the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it and the probability of success in the litigation;

24     • the difficulties, if any, to be encountered in the matter of collection; and

25
26

• the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

27 *In re A & C Prop.*, 784 F.2d 1377, 1381 (9th Cir. 1986); *In re Sabine Oil & Gas Corp.*, 555

28 B.R. 180, 256 (Bankr. S.D.N.Y. 2016).  Although the court is to consider the range of results

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

in litigation, "the court's assessment does not require resolution of the issues, but only their identification, so that the reasonableness of the settlement may be evaluated." *In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986). In Chapter 9, however, the Court should primarily consider whether the proposed compromise is "fair and equitable" under bankruptcy standards. *In re City of Stockton, Cal.*, 486 B.R. at 200.

"The purpose of a compromise agreement [under Rule 9019] is to allow the [debtor] and the creditors to avoid the expenses and burdens associated with litigating sharply contested … claims." *In re A & C Prop.*, 784 F.2d at 1380-81. Accordingly, in approving a settlement agreement, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. *See United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). A court should not substitute its own judgment for the judgment of the debtor in possession. *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). A court, in reviewing a proposed settlement, is not to decide the numerous questions of law and fact but rather to canvass the issues to determine whether the settlement falls below the lowest point in the range of reasonableness. *In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) ("[T]he settlement need only be above the lowest point in the range of reasonableness.").

### 1. Probability of Success in Litigation

The Agreement primarily disposes of three pieces of litigation: (1) the Barclays Complaint, (2) the Claim Objection, and (3) Barclays' Claim.

The crux of the Barclays Complaint is the extent, scope and validity of Barclays' purported security interest and first-priority lien asserted against the Debtor's customer receivables and cash on deposit at RCB. The Debtor contends that Barclays does not hold a lien against the Debtor's assets unless customer receivables are deposited into the RCB Flow Account or RCB Reserve Account.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Barclays, however, contends the Debtor's interpretation of the collateral subject to its lien is incorrect.[7]  Barclays asserts that the Credit Agreement and Security Agreement granted a first priority lien on all accounts receivable and "Pledged Revenues" to Barclays, because, among other things, the defined phrase "Pledge Revenues" and term "Collateral" encompasses all receivables, regardless of the deposit of receivables into the RCB lockbox account or any other account.  Barclays argues that the Credit Agreement provides for an immediately enforceable present security interest in the Pledged Revenues, which attached and was perfected prepetition under California law as a statutory lien or, alternatively, under the UCC. Further, Barclays contends that the Pledged Revenues are subject to Barclays' prepetition liens pursuant to Section 922(d) and 928 of the Bankruptcy Code, because they constitute "special revenues."

With respect to the Claim Objection, Barclays takes issue with SCE's asserted security interest in some of Barclays' Pledged Collateral based solely on a purported right of setoff against receivables collected from the Debtor's customers following the Petition Date and deposited in to the Lockbox Account and SCE's attempt to seize those funds to satisfy the Debtor's prepetition indebtedness to SCE (which Barclays contends is unsecured).[8]  In the Claim Objection, Barclays argues that SCE does not have any valid setoff rights and even if SCE did, such setoff rights are barred by operation of section 553 of the Bankruptcy Code. *See* Claim Obj. ¶¶ 27–39. Further, Barclays argues that pursuant to UCC § 9-404 and common law principles, any setoff rights SCE would have would be subordinate to Barclays' prepetition secured liens and security interests in receivables.  *Id.*

Although the Debtor believes that it has strong arguments to oppose the Barclays Complaint, there is significant risk that Barclays could prevail.  Further, there are numerous

---

[7] The summary of Barclays' arguments herein is made with reference to the Barclays Complaint and Claim Objection.  This summary does not capture all of Barclays' arguments, and, as such, shall not in any way limit or modify the arguments made in the Barclays Complaint and Claim Objection.

[8] In the Barclays Complaint Barclays also seeks declaratory judgment that SCE has no valid and legally enforceable security interest, including based on any purported right of setoff, in the Pledged Collateral, including, without limitation, any receivables collected by SCE and deposited into the lockbox account.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   risks associated with litigation and should Barclays prevail in the Barclays Complaint and/or

2   Claim Objection, the distribution amount to unsecured creditors will be greatly diminished.

3   *See infra*, section 5 "Paramount Interest of the Creditors."  In addition, Barclays' complaint

4   and objection to SCE's claims puts a hard-fought and negotiated settlement between the

5   Debtor and SCE in jeopardy.  Further, the Debtor will incur significant legal expenses in

6   defending the Barclays Complaint and responding to the Claim Objections.   For these

7   reasons, among others, both the Debtor and SCE support the Agreement.

8            Based upon the foregoing, the Debtor believes this factor heavily favors approval.

9                    **2.      Difficulties of Collection on a Judgment**

10           This factor is not applicable since the dispute revolves around the amount of the

11  Barclays Claim and as a result, collection is not relevant.

12                   **3.      Complexity of the Matter**

13           Both the legal theories and the factual issues relating to this dispute are extremely

14  complicated and convoluted, as a significant aspect of the dispute arises from the various

15  defined terms arising in all of the above-referenced agreements and whether the Debtor's

16  customer receivables and cash accounts are subject to the Barclays' Claim based upon

17  the defined terms in the Credit Agreement.  Litigation may require expert testimony and

18  may require extensive discovery.  Further, the dispute is primarily rooted in legal issues

19  and one or more dispositive motions and/or motions in limine may be prosecuted by the

20  Debtor, Barclays and/or SCE.  This factor weighs in favor of approval.

21                   **4.      Inconvenience of the Delay**

22           If the Agreement is not approved, the Debtor will need to engage in fact intensive,

23  protracted litigation with Barclays, and a plan of adjustment may be delayed, diminished, or

24  eliminated as the Debtor would be unsure as to the extent of a more than $11 million

25  secured claim that would need to be treated under the plan of adjustment. The Debtor will

26  incur significant legal expenses defending the Barclays Complaint, responding to the Claim

27  Objections, and prosecuting or defending any appeal of either or both, if the Agreement is

28

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    not approved.  Further, the Debtor's settlement with SCE will be jeopardized exposing the

2    Debtor to the potential for even more contentious, costly, and protracted litigation.

3        Given the complexity of the issues surrounding potential litigation, interposed with

4    the fact the Agreement will result in greater distributions for creditors, this factor strongly

5    favors approval of the Agreement.  *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 39

6    (Bankr. N.D. Ohio 1990) (approving Rule 9019 settlement where "[i]f all the issues which

7    have been raised in this case were to be litigated by the Trustee, the litigation would be time

8    consuming, burdensome, somewhat risky, and would quite possibly cost the estate more

9    than it would generate for the payment of unsecured creditors."); *In re Partsearch Techs.*,

10    Inc., 453 B.R. 84, 105 (Bankr. S.D.N.Y. 2011) (approving Rule 9019 agreement where "the

11    risks of litigation here appear to be significant because of the substantial time and expense

12    required to conduct a trial.").

13        **5.    Paramount Interest of the Creditors**

14        The Agreement represents a fair outcome for all creditors.  If the Agreement is

15    approved, the Debtor estimates a distribution of approximately 34% will be made to

16    unsecured creditors.[9]  *See* Goodrich Dec.  If, however, the Agreement is not approved and

17    Barclays prevails on the Barclays Complaint, the Debtor estimates a distribution of

18    approximately 10% or less will be made to general unsecured creditors.[10]  *Id.*  If the

19    Agreement is not approved, but the Debtor successfully defends the Barclays Complaint

20    and any appeal (both of which will result in the Debtor incurring significant costs), the Debtor

21    estimates a distribution of approximately 38% will be made to general unsecured creditors.[11]

22    *Id.*  As these estimates demonstrate, the benefits of entering into the Agreement far

23    outweigh engaging in litigation with Barclays.  A settlement with Barclays is in the paramount

24

25

26    [9] Assumes a tentative agreement with SCE is approved and consummated.

27    [10] Assumes a tentative agreement with SCE is approved and consummated.  Also assumes attorneys' fees and costs to defend the Barclays complaint and respond to the Claim Objections.

28    [11] Assumes a tentative agreement with SCE is approved and consummated.  Also assumes attorneys' fees and costs to defend the Barclays complaint and respond to the Claim Objections.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  interest of all creditors and will significantly reduce the Barclays Claim while enabling the

2  Debtor to retain funds to make significant distributions to unsecured creditors under a plan

3  of adjustment.  This factor strongly favors approval.

### 6.    The Parties Are Entitled to Deference in their Decisions

5        The parties are entitled to deference in their decisions.  *In re A & C Prop.*, 784 at

6  1381 (explaining that one of the factors in considering a Rule 9019 settlement is "proper

7  deference to [the parties'] reasonable vies in the premises.").  The Agreement represents

8  the type of rational, negotiated solution that Rule 9019 encourages and that the Court

9  should approve.  *See generally Protective Comm. for Indep. Stockholders of TMT Trailer*

10  *Ferry, Inc. v. Anderson*, 390 U.S. 414, 434 (1968) ("Litigation and delay are always the

11  alternative to settlement, and whether that alternative is worth pursuing necessarily

12  depends upon a reasoned judgment as to the probable outcome of litigation.").  Here, the

13  Agreement has the support of the Debtor and SCE, resolves significant litigation, and

14  preserves value for other creditors.  The Debtor and Barclays negotiated the Agreement in

15  good-faith, and the Agreement represents the culmination of those negotiations.  There is

16  no doubt that the Agreement is in the best interest of the parties and does not fall below the

17  lowest point in the range of reasonableness.  For these reasons, the Debtor respectfully

18  requests that the Court approve the Agreement.

### C.    The Court Should Modify Its Previous Orders to Allow Payment

22        The Court has issued orders effectively freezing the use of funds held in the RCB

23  lockbox and operating accounts (the "Lockbox Account Orders").  *See* **Exhibits 5** through

24  **11** to the Goodrich Dec

25        The RCB lockbox account has $12,913,712.49 on deposit and the RCB operating

26  account has $12,395,467.34 on deposit.  SCE asserts a secured claim of approximately

27  $7,200,000 against the funds in the RCB lockbox account.  *See* Goodrich Dec.  In order to

28  maintain collateral for SCE's alleged secured claim asserted against funds in the RCB

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   lockbox account, the Debtor intends to pay the Settlement Payment from the RCB lockbox

2   and operating accounts.  The Debtor requests authority to access the RCB lockbox and

3   operating accounts to make the Settlement Payment to Barclays pursuant to the

4   Agreement.

5           The Court retained jurisdiction to modify or terminate the relief provided in its various

6   orders governing the deposit of customer receivables and the funds held in the RCB lockbox

7   and operating accounts.[12]  *See* **Exhibits 5, 6**, and **7**.  The Debtor respectfully requests that

8   the Court modify the Lockbox Account Orders to allow the Debtor to make the necessary

9   settlement payments requested herein and in the Agreement.

10                              **VI.    CONCLUSION**

11          The Debtor respectfully requests that the Court enter an order providing the following

12  relief:

13          1.     Granting the Motion;

14          2.     Approving the terms of the Agreement, a copy of which is attached as **Exhibit**

15  **13**, and authorizing the Debtor to enter into the Agreement;

16          3.     Authorizing the Debtor to execute any documents or take any actions

17  reasonably necessary to effectuate the terms of the Agreement;

18          4.     Authorizing the Debtor's use of funds in the RCB lockbox and operating

19  accounts to make the Settlement Payment;

20  //

21  //

22  //

23

24

25

26

---

27          [12] The Court also has authority to relieve the Debtor and RCB from the relief afforded under the Adequate
28  Protection Order and the Termination Order under FRCP 60(b)(5) and (6).  FRCP 60 is applicable to
    bankruptcy cases under FRBP 9024.

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1     5.    For such other and further relief as this Court may deem just and proper.

2                                    Respectfully submitted,

3    Dated:  December 16, 2021          WEILAND GOLDEN GOODRICH LLP

4

5                           By:   */s/ David M. Goodrich*_____
                                  DAVID M. GOODRICH
6                                 RYAN W. BEALL
                                  Counsel for Chapter 9 Debtor
7                                 Western Community Energy

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

# DECLARATION OF ANDREW RUIZ

I, Andrew Ruiz, declare as follows:

1.    I am Chief Financial Officer of Western Riverside Council of Governments, Managing Agent of Western Community Energy ("Debtor"), the chapter 9 debtor in the bankruptcy case number 6:21-bk-12821-SY. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated, and, if called as a witness, I could and would competently testify with respect thereto.  I make this declaration in support of the *Motion for Order Approving Settlement Between Debtor and Barclays Bank PLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* (the "Motion").  Any term not specifically defined herein shall have the meaning set forth in the Motion.

2.    Prior to the Petition Date, Barclays lent money to the Debtor and issued letters of credit for the benefit of Debtor pursuant to a *Revolving Credit Agreement*, dated March 12, 2020 ("Credit Agreement").  A true and correct copy of the Letters of Credit is attached hereto as **Exhibit 1**.  A true and correct copy of the Credit Agreement is attached hereto as **Exhibit 2**.

3.    The Credit Agreement works in conjunction with the *Security Agreement*, dated February 12, 2020, entered into between Debtor and River City Bank ("Security Agreement").  A true and correct copy of the Security Agreement is attached hereto as **Exhibit 3**.

4.    The Parties are also parties to a *Promissory Note* dated March 12, 2020 ("Promissory Note") issued in connection with the Credit Agreement.  A true and correct copy of the Promissory Note is attached hereto as **Exhibit 4**.

5.    Since the entry of the TRO, all customer receivables have been deposited into the RCB lockbox account.

6.    After significant negotiations, the Debtor and Barclays have agreed, subject to Court approval, to settle their dispute regarding Barclays' proof of claim by Debtor's payment of $7,500,000 to Barclays ("Settlement Payment") in full satisfaction of the Barclays Claim and all secured interest and liens associated therewith.  A true and correct

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

copy of the Settlement Agreement and Release, which memorializes the Parties' agreement, is attached hereto as **Exhibit 13**.

7.     The Debtor is currently holding $12,913,712.49 in the RCB lockbox account and $12,395,467.34 in the RCB operating account.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of December, 2021 at _Riverside_, California.

_____
Andrew Ruiz

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

**<u>DECLARATION OF DAVID M. GOODRICH</u>**

I, David M. Goodrich, declare as follows:

1.      I am a partner of the law firm of Weiland Golden Goodrich LLP, counsel for Western Community Energy ("Debtor"), the chapter 9 debtor in the bankruptcy case number 6:21-bk-12821-SY. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated, and, if called as a witness, I could and would competently testify with respect thereto.  I make this declaration in support of the *Motion for Order Approving Settlement Between Debtor and Barclays Bank PLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* ("Motion").  Any term not specifically defined herein shall have the meaning set forth in the Motion.

2.      A true and correct copy of the *Interim Order Granting in Part, Motion to Determine Adequacy of Adequate Protection to River City Bank for the Benefit of the PPA Providers* ("Interim Order") is attached hereto as **Exhibit 5**.

3.      A true and correct copy of the *Final Order Granting, in Part, Motion to Determine Adequacy of Adequate Protection to River City Bank for the Benefit of PPA Providers* was entered on July 6, 2021 ("Adequate Protection Order") is attached hereto as **Exhibit 6**.

4.      A true and correct copy of the *Temporary Retaining Order* is attached hereto as **Exhibit 7**.

5.      A true and correct copy of the *Stipulation Regarding Southern California Edison Company's Motion for Relief From the Automatic Stay* is attached hereto as **Exhibit 8**.  A true and correct copy of the SCE Order is attached hereto as **Exhibit 9**.

6.      A true and correct copy of the *Stipulation Resolving Debtor's Motion for Relief from Automatic Stay* ("Stipulation") is attached hereto as **Exhibit 10**.  A true and correct copy of the MFR Order is attached hereto as **Exhibit 11**.

7.       A true and correct copy of the Barclays Claim is attached hereto as **Exhibit 12**.

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    8.    On November 30, 2021, Barclays filed a complaint ("Barclays Complaint")

2  against the Debtor and SCE for declaratory relief asserting that Barclays holds a first priority

3  lien in substantially all of the Debtor's assets and that SCE holds no security interest in

4  funds held in the Debtor's lockbox account at River City Bank.    Additionally, on

5  November 30, 2021, Barclays filed an objection to claim numbers 18, 19, 20, and 21 filed

6  by SCE ("Claim Objections").   SCE separately asserts a security interest against the same

7  cash accounts of the Debtor.

8    9.    If the Agreement is approved, the Debtor estimates a distribution of

9  approximately 34% will be made to unsecured creditors.[13]   If, however, the Agreement is

10  not approved and Barclays prevails on the Barclays Complaint, the Debtor estimates a

11  distribution of approximately 10% or less will be made to general unsecured creditors.[14]  If

12  the Agreement is not approved, but the Debtor successfully defends the Barclays Complaint

13  and any appeal (both of which will result in the Debtor incurring significant costs), the Debtor

14  estimates a distribution of approximately 38% will be made to general unsecured creditors.[15]

15    10.    The Court has issued orders effectively freezing the use of funds held in the

16  RCB lockbox and operating accounts ("Lockbox Account Orders").

17    11.    A true and correct copy of the proposed order granting this Motion is attached

18  to the Goodrich Dec. at **Exhibit 14**.

19    I declare under penalty of perjury that the foregoing is true and correct.

20    Executed on this 16th day of December, 2021 at Costa Mesa, California.

21

22    _/s/ David M. Goodrich_
    David M. Goodrich

23

24

25

26    [13] Assumes a tentative agreement with SCE is approved and consummated.

27    [14] Assumes a tentative agreement with SCE is approved and consummated.  Also assumes attorneys'
fees and costs to defend the Barclays complaint and respond to the Claim Objections.

28    [15] Assumes a tentative agreement with SCE is approved and consummated.  Also assumes attorneys'
fees and costs to defend the Barclays complaint and respond to the Claim Objections.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

MOTION TO APPROVE COMPROMISE

# EXHIBIT 1

 **BARCLAYS**

745 Seventh Avenue
New York, NY 10019 USA

Tel    +1 212 526 7000

barclays.com

## IRREVOCABLE NONTRANSFERABLE STANDBY LETTER OF CREDIT

**Bank Reference Number**: SB-03895
**Issuance Date**: September 29, 2020

**Beneficiary**:
Southern California Edison Company
2244 Walnut Grove Avenue
GO#1, Quad 2B
Rosemead, CA 91770
Attn: Manager of Risk Operations and Collateral Management

**Applicant**:
Western Community Energy
3390 University Avenue, Suite 200
Riverside, CA 92501
Attn: Chief Financial Officer

**Available Amount**: $4,500,000.00 (United States Dollars Four Million Five Hundred Thousand and 00/100).

**Expiration Date**: September 30, 2021

Ladies and Gentlemen:

Barclays Bank PLC, New York Branch (the "Bank") hereby establishes this Irrevocable Nontransferable Standby Letter of Credit no. **SB-03895** ("Letter of Credit") in favor of **Southern California Edison Company**, a California corporation (the "Beneficiary"), for the account of **Western Community Energy**, a California Community Choice Aggregator and joint powers authority (the "Applicant"), for the amount stated above (the "Available Amount"), effective immediately. This Letter of Credit is being issued as financial security related to the "Agreement Between Southern California Edison Company and Western Community Energy Regarding WCE Implementation And Resource Adequacy Compliance For 2020, 2021 and 2022" dated as of August 15, 2019, as may be amended from time-to-time ("the Agreement"), also referred to by SCE as contract id 10127.

This Letter of Credit shall be of no further force or effect at 5:00 p.m., New York time on the expiration date stated above or, if such day is not a Business Day (as hereinafter defined), on the next Business Day (as may be extended pursuant to the terms of this Letter of Credit) (the

"Expiration Date").

For the purpose hereof, "Business Day" shall mean any day other than:

1. A Saturday or a Sunday,
2. A day on which banking institutions in the city of New York, NY, are required or authorized by Law to remain closed, or
3. A day on which the payment system of the Federal Reserve System is not operational.

It is a condition of this Letter of Credit that the Expiration Date shall be automatically extended without amendment for one (1) year from the Expiration Date hereof or any future Expiration Date unless at least sixty **(60)** days prior to such Expiration Date, we send notice to you by certified mail, overnight courier or hand delivered courier at the address stated below, that we elect not to extend this Letter of Credit for any such additional period.

Subject to the terms and conditions herein, funds under this Letter of Credit are available to Beneficiary by complying presentation on or before 5:00 p.m. New York time, on or before the Expiration Date of the following:

1. The original of this Letter of Credit and all amendments, or in the case of a partial drawing, a photocopy;

2. A Drawing Certificate in the form of **Attachment "A"** attached hereto and which forms an integral part hereof, duly completed and bearing the signature of an authorized representative of the Beneficiary signing as such; and

3. A Sight Draft in the form of **Attachment "B"** attached hereto and which forms an integral part hereof, duly completed and bearing the signature of an authorized representative of the Beneficiary.

Drawings may also be presented by facsimile transmission ("Fax") to fax number (212) 412-5011 under telephone pre-advice to (212) 320-7534 or alternatively to (212) 320-7533 and (212) 320-6122; provided that such Fax presentation is received on or before the Expiration Date on this instrument in accordance with the terms and conditions of this Letter of Credit. It is understood that any such Fax presentation shall be considered the sole operative instrument of drawing. In the event of presentation by Fax, the original documents should not also be presented.

Partial drawing of funds shall be permitted under this Letter of Credit, and this Letter of Credit shall remain in full force and effect with respect to any continuing balance; provided, the Available Amount shall be reduced by the amount of each such drawing.

This Letter of Credit is not transferable or assignable. Any purported transfer or assignment shall be void and of no force or effect.

Restricted - External

EXHIBIT 1      PAGE 20

All correspondence and any drawings (other than those made by facsimile) hereunder are to be directed to Barclays Bank PLC, New York Branch located at 745 Seventh Avenue, New York, NY 10019, Attn.: Letters of Credit Department.

All notices to Beneficiary shall be in writing and are required to be sent by certified letter, overnight courier, or delivered in person to: **Southern California Edison Company, Manager of Risk Operations and Collateral Management, 2244 Walnut Grove Avenue, GO1 Quad 2B, Rosemead, CA 91770**. Only notices to Beneficiary meeting the requirements of this paragraph shall be considered valid. Any notice to Beneficiary which is not in accordance with this paragraph shall be void and of no force or effect.

Banking charges shall be the sole responsibility of the Applicant.

This Letter of Credit sets forth in full our obligations and such obligations shall not in any way be modified, amended, amplified or limited by reference to any documents, instruments or agreements referred to herein, except only the attachment referred to herein; and any such reference shall not be deemed to incorporate by reference any document, instrument or agreement except for such attachment. Except in the case of an increase in the Available Amount or extension of the Expiration Date, this Letter of Credit may not be amended or modified without the Beneficiary's prior written consent.

The Bank engages with the Beneficiary that Beneficiary's drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the Bank on or before the Expiration Date.

Except so far as otherwise stated, this Letter of Credit is subject to the International Standby Practices ISP98 (also known as ICC Publication No. 590), or revision currently in effect (the "ISP"). As to matters not covered by the ISP, the laws of the State of New York, without regard to the principles of conflicts of laws thereunder, shall govern all matters with respect to this Letter of Credit.

Barclays Bank PLC, New York Branch

Name: Donna Jenkins
Title: Authorized Signatory / Letter Of Credit Analyst
Tel: (212) 320-7534 / Fax: (212) 412-5011
Email: Xraletterofcredit@Barclays.Com

Restricted - External

EXHIBIT 1    PAGE 21

## ATTACHMENT A

### DRAWING CERTIFICATE

TO: Barcalys Bank PLC, New York Branch
745 Seventh Avenue
New York, NY 10019
Attn: Letters of Credit Department

IRREVOCABLE NONTRANSFERABLE STANDBY LETTER OF CREDIT
REFERENCE NUMBER: **SB-03895**

DATE: _____

Southern California Edison Company (the "Beneficiary"), demands Barclays Bank PLC, New York Branch (the "Bank") payment to the order of the Beneficiary in the amount of U.S. $_____ (_____ U.S. Dollars), drawn under the Letter of Credit referenced above (the "Letter of Credit"), for the following reason(s) [check applicable provision]:

[  ]**A.**  Western Community Energy has failed to meet its obligations under the "Agreement Between Southern California Edison Company and Western Community Energy Regarding WCE Implementation And Resource Adequacy Compliance For 2020, 2021 and 2022", dated as of August 15, 2019, as may be amended from time-to-time ("the Agreement"), and payment is due to the Beneficiary.

[  ]**B.**  The Letter of Credit will expire in fewer than twenty (20) Business Days from the date hereof, and Western Community Energy has not provided Beneficiary alternative financial security acceptable to Beneficiary.

Unless otherwise provided herein, capitalized terms which are used and not defined herein shall have the meaning given each such term in the Letter of Credit.

Authorized Signature for Beneficiary:

SOUTHERN CALIFORNIA EDISON COMPANY

By:

Name: [print name]

Title: [print title]

Restricted - External

EXHIBIT 1    PAGE 22

## ATTACHMENT B

*SIGHT DRAFT*

[INSERT DATE]

TO: Barcalys Bank PLC, New York Branch
745 Seventh Avenue
New York, NY 10019
Attn: Letters of Credit Department

PAY AT SIGHT TO THE ORDER OF SOUTHERN CALIFORNIA EDISON COMPANY (THE "BENEFICIARY") THE AMOUNT OF USD **[INSERT AMOUNT IN WORDS/FIGURES]** DRAWN UNDER BARCLAYS BANK PLC, NEW YORK BRANCH, IRREVOCABLE NON-TRANSFERABLE STANDBY LETTER OF CREDIT NUMBER **SB-03895** ISSUED ON **SEPTEMBER 29, 2020.**

FUNDS PAID PURSUANT TO THE PROVISIONS OF THE LETTER OF CREDIT SHALL BE WIRE TRANSFERRED TO THE BENEFICIARY IN ACCORDANCE WITH THE FOLLOWING INSTRUCTIONS:

**[INSERT WIRING INSTRUCTION]**

_____
AUTHORIZED SIGNATURE
SOUTHERN CALIFORNIA EDISON COMPANY

NAME: [PRINT NAME]
TITLE: [PRINT TITLE]

Restricted - External

EXHIBIT 1    PAGE 23



745 Seventh Avenue
New York, NY 10019 USA

Tel    +1 212 526 7000

...ys.com

## IRREVOCABLE NONTRANSFERABLE STANDBY LETTER OF CREDIT

**Bank Reference Number**: SB-03917
**Issuance Date**: October 27, 2020

**Beneficiary**:
Southern California Edison Company
2244 Walnut Grove Avenue
GO#1, Quad 2B
Rosemead, CA 91770
Attn: Manager of Risk Operations and Collateral Management

**Applicant**:
Western Community Energy
3390 University Avenue, Suite 200
Riverside, CA 92501
Attn: Chief Financial Officer

**Available Amount**: US$1,823,600.00 (United States Dollars One Million Eight Hundred Twenty Three Thousand Six Hundred and 00/100)

**Expiration Date**: October 31, 2021

Ladies and Gentlemen:

Barclays Bank PLC, New York Branch (the "Bank") hereby establishes this Irrevocable Nontransferable Standby Letter of Credit. **SB-03917** ("Letter of Credit") in favor of **Southern California Edison Company**, a California corporation (the "Beneficiary"), for the account of **Western Community Energy**, a California Community Choice Aggregator and joint powers authority (the "Applicant"), for the amount stated above (the "Available Amount"), effective immediately.

This Letter of Credit shall be of no further force or effect at 5:00 p.m., New York time on the expiration date stated above or, if such day is not a Business Day (as hereinafter defined), on the next Business Day (as may be extended pursuant to the terms of this Letter of Credit) (the "Expiration Date").

Barclays Bank PLC, New York Branch

EXHIBIT 1    PAGE 24

For the purpose hereof, "Business Day" shall mean any day other than:

1. A Saturday or a Sunday,
2. A day on which banking institutions in the city of Los Angeles, California, are required or authorized by Law to remain closed, or
3. A day on which the payment system of the Federal Reserve System is not operational.

It is a condition of this Letter of Credit that the Expiration Date shall be automatically extended without amendment for one (1) year from the Expiration Date hereof or any future Expiration Date unless at least sixty **(60)** days prior to such Expiration Date, we send notice to you by certified mail or hand delivered courier, at the address stated below, that we elect not to extend this Letter of Credit for any such additional period.

Subject to the terms and conditions herein, funds under this Letter of Credit are available to Beneficiary by complying presentation on or before 5:00 p.m. New York time, on or before the Expiration Date of the following:

1. The original of this Letter of Credit and all amendments, or in the case of a partial drawing, a photocopy;

2. A Drawing Certificate in the form of **Attachment "A"** attached hereto and which forms an integral part hereof, duly completed and bearing the signature of an authorized representative of the Beneficiary signing as such; and

3. A Sight Draft in the form of **Attachment "B"** attached hereto and which forms an integral part hereof, duly completed and bearing the signature of an authorized representative of the Beneficiary.

Drawings may also be presented by facsimile transmission ("Fax") to fax number (212) 412-5011 under telephone pre-advice to (212) 320-7534 or alternatively to (212) 320-7533 and (212) 320-6122; provided that such Fax presentation is received on or before the Expiration Date on this instrument in accordance with the terms and conditions of this Letter of Credit. It is understood that any such Fax presentation shall be considered the sole operative instrument of drawing. In the event of presentation by Fax, the original documents should not be presented.

Partial drawing of funds shall be permitted under this Letter of Credit, and this Letter of Credit shall remain in full force and effect with respect to any continuing balance; provided, the Available Amount shall be reduced by the amount of each such drawing.

This Letter of Credit is not transferable or assignable. Any purported transfer or assignment shall be void and of no force or effect.

EXHIBIT 1    PAGE 25

All correspondence and any drawings (other than those made by facsimile) hereunder are to be directed to Barclays Bank PLC, New York Branch located at 745 Seventh Avenue, New York, NY 10019, Attn.: Letters of Credit Department.

All notices to Beneficiary shall be in writing and are required to be sent by certified letter, overnight courier, or delivered in person to: **Southern California Edison Company, Manager of Risk Operations and Collateral Management, 2244 Walnut Grove Avenue, GO1 Quad 2B, Rosemead, CA, 91770.** Only notices to Beneficiary meeting the requirements of this paragraph shall be considered valid. Any notice to Beneficiary which is not in accordance with this paragraph shall be void and of no force or effect.

Banking charges shall be the sole responsibility of the Applicant.

This Letter of Credit sets forth in full our obligations and such obligations shall not in any way be modified, amended, amplified or limited by reference to any documents, instruments or agreements referred to herein, except only the attachment referred to herein; and any such reference shall not be deemed to incorporate by reference any document, instrument or agreement except for such attachment. Except in the case of an increase in the Available Amount or extension of the Expiration Date, this Letter of Credit may not be amended or modified without the Beneficiary's prior written consent.

The Bank engages with the Beneficiary that Beneficiary's drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the Bank on or before the Expiration Date.

Except so far as otherwise stated, this Letter of Credit is subject to the International Standby Practices ISP98 (also known as ICC Publication No. 590), or revision currently in effect (the "ISP"). As to matters not covered by the ISP, the laws of the State of New York, without regard to the principles of conflicts of laws thereunder, shall govern all matters with respect to this Letter of Credit.

Barclays Bank PLC, New York Branch

By _____

Name: Dawn Townsend

Title:   Authorized Signatory / AVP

EXHIBIT 1    PAGE 26

## ATTACHMENT A

DRAWING CERTIFICATE

TO:    Barclays Bank PLC, New York Branch
745 Seventh Avenue
New York, NY 10019
Attn: Letters of Credit Department

IRREVOCABLE NONTRANSFERABLE STANDBY LETTER OF CREDIT
REFERENCE NUMBER: **SB-03917**

DATE: _____

Southern California Edison Company (the "Beneficiary"), demands Barclays Bank PLC, New York Branch (the "Bank") payment to the order of the Beneficiary in the amount of U.S. $_____ (_____ U.S. Dollars), drawn under the Letter of Credit referenced above (the "Letter of Credit"), for the following reason(s) [check applicable provision]:

[  ] A. An Event of Default, as defined in that certain Edison Electric Institute ("EEI") Master Power Purchase and Sale Agreement, effective as of _____ (as may be amended from time-to-time), along with the Cover Sheet, any amendments and annexes thereto and including, the EEI Collateral Annex along with the Paragraph 10 to the Collateral Annex between Western Community Energy or its successor and Beneficiary ("the Agreement"), with respect to the Counterparty has occurred and is continuing.

[  ] B. The Letter of Credit will expire in fewer than twenty (20) Business Days from the date hereof, and Western Community Energy or its successor has not provided Beneficiary alternative financial security acceptable to Beneficiary.

Unless otherwise provided herein, capitalized terms which are used and not defined herein shall have the meaning given each such term in the Letter of Credit.

Authorized Signature for Beneficiary:

SOUTHERN CALIFORNIA EDISON COMPANY

By:

Name: [print name]

Title: [print title]

## ATTACHMENT B

*SIGHT DRAFT*

[INSERT DATE]

TO:    Barclays Bank PLC, New York Branch
745 Seventh Avenue
New York, NY 10019
Attn: Letters of Credit Department

PAY AT SIGHT TO THE ORDER OF SOUTHERN CALIFORNIA EDISON COMPANY
(THE "BENEFICIARY") THE AMOUNT OF USD [INSERT AMOUNT] DRAWN UNDER
BARCLAYS BANK PLC, NEW YORK BRANCH, IRREVOCABLE NON-TRANSFERABLE
STANDBY LETTER OF CREDIT NUMBER **SB-03917** ISSUED ON **OCTOBER 27, 2020**.

FUNDS PAID PURSUANT TO THE PROVISIONS OF THE LETTER OF CREDIT SHALL
BE WIRE TRANSFERRED TO THE BENEFICIARY IN ACCORDANCE WITH THE
FOLLOWING INSTRUCTIONS:

[INSERT WIRING INSTRUCTION]

_____
AUTHORIZED SIGNATURE
SOUTHERN CALIFORNIA EDISON COMPANY

NAME: [PRINT NAME]
TITLE: [PRINT TITLE]

EXHIBIT 1    PAGE 28

10/27/2020                          FedEx Ship Manager - Print Your Label(s)



After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

EXHIBIT 1    PAGE 29

 **BARCLAYS**

745 Seventh Avenue
New York, NY 10019 USA

Tel +1 212 526 7000

barclays.com

**IRREVOCABLE NONTRANSFERABLE STANDBY LETTER OF CREDIT**

**Bank Reference Number**: SB-03941

**Issuance Date**: December 7, 2020

**Beneficiary**:
Southern California Edison Company
2244 Walnut Grove Avenue
GO#1, Quad 2B
Rosemead, CA 91770
Attn: Manager of Risk Operations and Collateral Management

**Applicant**:
Western Community Energy
3390 University Ave., Suite 200
Riverside, CA 92501
Attn: Chief Financial Officer

**Available Amount**: US$147,000.00 (United States Dollars One Hundred Forty-Seven
Thousand and 00/100)

**Expiration Date**: December 7, 2021

Ladies and Gentlemen:

Barclays Bank PLC, New York Branch (the "Bank") hereby establishes this Irrevocable Non-transferable Standby Letter of Credit ("Letter of Credit") in favor of **Southern California Edison Company**, a California corporation (the "Beneficiary"), for the account of **Western Community Energy**, a California Community Choice Aggregator and joint powers authority (the "Applicant"), for the amount stated above (the "Available Amount"), effective immediately.

This Letter of Credit is being issued as financial security related to the Beneficiary's Tariff Rule 23, which implements re-entry fees, calculated in accordance with the Tariff ("Re-Entry Fees") and Financial Security Requirements for Community Choice Aggregators. Re-Entry fees include investor owned utility (IOU) administrative costs and procurement costs resulting from a mass involuntary return of CCA customers to IOU service, and the financial security requirements must cover those potential costs.

Barclays Bank PLC, New York Branch                Restricted - External

EXHIBIT 1    PAGE 30

This Letter of Credit shall be of no further force or effect at 5:00 p.m., New York time on the expiration date stated above or, if such day is not a Business Day (as hereinafter defined), on the next Business Day (as may be extended pursuant to the terms of this Letter of Credit) (the "Expiration Date").

For the purpose hereof, "Business Day" shall mean any day other than:

1. A Saturday or a Sunday,
2. A day on which banking institutions in the city of New York, NY, are required or authorized by Law to remain closed, or
3. A day on which the payment system of the Federal Reserve System is not operational.

It is a condition of this Letter of Credit that the Expiration Date shall be automatically extended without amendment for one (1) year from the Expiration Date hereof or any future Expiration Date unless at least sixty **(60)** days prior to such Expiration Date, we send notice to you by certified mail or overnight courier, at the address stated below, that we elect not to extend this Letter of Credit for any such additional period.

Subject to the terms and conditions herein, funds under this Letter of Credit are available to Beneficiary by complying presentation on or before 5:00 p.m.  New York time, on or before the Expiration Date of the following:

1. The original of this Letter of Credit and all amendments, or copy of such documents in the case of partial drawings;

2. A Drawing Certificate in the form of **Attachment "A"** attached hereto and which forms an integral part hereof, duly completed and bearing the signature of an authorized representative of the Beneficiary signing as such; and

3. A Sight Draft in the form of **Attachment "B"** attached hereto and which forms an integral part hereof, duly completed and bearing the signature of an authorized representative of the Beneficiary.

Drawings may also be presented by facsimile transmission ("Fax") to fax number (212) 412-5011 under telephone pre-advice to (212) 320-7534 or alternatively to (212) 320-6122; provided that such Fax presentation is received on or before the Expiration Date on this instrument in accordance with the terms and conditions of this Letter of Credit. It is understood that any such Fax presentation shall be considered the sole operative instrument of drawing. In the event of presentation by Fax, the original documents should not be presented.

Partial drawing of funds shall be permitted under this Letter of Credit, and this Letter of Credit shall remain in full force and effect with respect to any continuing balance; provided, the Available Amount shall be reduced by the amount of each such drawing.

Restricted - External

EXHIBIT 1    PAGE 31

This Letter of Credit is not transferable or assignable. Any purported transfer or assignment shall be void and of no force or effect.

All correspondence and any drawings (other than those made by facsimile) hereunder are to be directed to Barclays Bank PLC, New York Branch at 745 Seventh Avenue, New York, NY 10019, Attn: Letters of Credit Department.

All notices to Beneficiary shall be in writing and are required to be sent by certified letter or overnight courier to: Southern California Edison Company, Manager of Risk Operations and Collateral Management, 2244 Walnut Grove Avenue, GO#1 Quad 2B, Rosemead, California 91770. Only notices to Beneficiary meeting the requirements of this paragraph shall be considered valid. Any notice to Beneficiary which is not in accordance with this paragraph shall be void and of no force or effect.

Banking charges shall be the sole responsibility of the Applicant.

This Letter of Credit sets forth in full our obligations and such obligations shall not in any way be modified, amended, amplified or limited by reference to any documents, instruments or agreements referred to herein, except only the attachment referred to herein; and any such reference shall not be deemed to incorporate by reference any document, instrument or agreement except for such attachment. Except in the case of an increase in the Available Amount or extension of the Expiration Date, this Letter of Credit may not be amended or modified without the Beneficiary's prior written consent.

 The Bank engages with the Beneficiary that Beneficiary's drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the Bank on or before the Expiration Date.

Except so far as otherwise stated, this Letter of Credit is subject to the International Standby Practices ISP98 (also known as ICC Publication No. 590), or revision currently in effect (the "ISP"). As to matters not covered by the ISP, the laws of the State of New York, without regard to the principles of conflicts of laws thereunder, shall govern all matters with respect to this Letter of Credit.

AUTHORIZED SIGNATURE for Bank

By _____
Name: Donna Jenkins
Title:   Authorized Signatory / LOC Analyst

Restricted - External

EXHIBIT 1    PAGE 32

**ATTACHMENT A**

DRAWING CERTIFICATE

TO: Barclays Bank PLC, New York Branch
   745 Seventh Avenue
   New York, NY 10019
   Attn: Letters of Credit Department

IRREVOCABLE NONTRANSFERABLE STANDBY LETTER OF CREDIT
REFERENCE NUMBER: **SB-03941**


DATE: _____

Southern California Edison Company (the "Beneficiary"), demands Barclays Bank PLC, New York Branch (the "Bank") payment to the order of the Beneficiary in the amount of U.S. $_____ (_____ U.S. Dollars), drawn under the Letter of Credit referenced above (the "Letter of Credit"), for the following reason(s) [check applicable provision]:

[  ] A. Under terms of the Tariff Rule 23, Beneficiary is entitled to draw under Letter of Credit No. **SB-03941** amounts owed by *Western Community Energy*


 [  ] B. The Letter of Credit will expire in fewer than twenty (20) Business Days from the date hereof, and Western Community Energy has not provided Beneficiary alternative financial security acceptable to Beneficiary.

Unless otherwise provided herein, capitalized terms which are used and not defined herein shall have the meaning given each such term in the Letter of Credit.

Authorized Signature for Beneficiary:

SOUTHERN CALIFORNIA EDISON COMPANY

By:

Name: [print name]

Title: [print title]

Restricted - External

EXHIBIT 1   PAGE 33

## ATTACHMENT B

*SIGHT DRAFT*

[INSERT DATE]

TO: Barclays Bank PLC, New York Branch
745 Seventh Avenue
New York, NY 10019
Attn: Letters of Credit Department

PAY AT SIGHT TO THE ORDER OF SOUTHERN CALIFORNIA EDISON COMPANY (THE "BENEFICIARY") THE AMOUNT OF USD [INSERT AMOUNT] DRAWN UNDER BARCLAYS BANK PLC, NEW YORK BRANCH, IRREVOCABLE NON-TRANSFERABLE STANDBY LETTER OF CREDIT NUMBER **SB-03941** ISSUED **ON DECEMBER 7, 2020**.

FUNDS PAID PURSUANT TO THE PROVISIONS OF THE LETTER OF CREDIT SHALL BE WIRE TRANSFERRED TO THE BENEFICIARY IN ACCORDANCE WITH THE FOLLOWING INSTRUCTIONS:

[INSERT WIRING INSTRUCTION]

_____
AUTHORIZED SIGNATURE
SOUTHERN CALIFORNIA EDISON COMPANY

NAME: [PRINT NAME]
TITLE: [PRINT TITLE]

Restricted - External

EXHIBIT 1    PAGE 34

 **BARCLAYS**

745 Seventh Avenue
New York, NY 10019 USA

**IRREVOCABLE STANDBY LETTER OF CREDIT**

Tel    +1 212 526 7000

barclays.com

**Date**: January 12, 2021

**Letter of Credit No**.:     **SB-03951**

**Stated Amount**:     **US$400,000.00** (United States Dollars Four Hundred Thousand and 00/100)

**Expiration Date**:     **November 30, 2021**

**Beneficiary's Name and Address**:     NRG Power Marketing LLC
804 Carnegie Center
Princeton, NJ 08540
Attn: Manager, Collateral
("Beneficiary")

**Applicant's Name and Address**:     Western Community Energy
3390 University Avenue, Suite 200
Riverside, CA 92501
Attn: Chief Financial Officer
("Applicant")

To Beneficiary:

We hereby issue this Irrevocable Standby Letter of Credit no. **SB-03951** ("Letter of Credit") in your favor for the account of Western Community Energy for payment at sight of up to the aggregate amount stated above ("Stated Amount"). Drawing(s) made in accordance with the terms and conditions of this Letter of Credit will be duly honored. This Letter of Credit is effective as of **January 12, 2021**.

Funds under this Letter of Credit, in an amount not to exceed the Stated Amount, will be made available to you upon presentation of a statement ("Beneficiary Statement") purportedly signed by an authorized officer of Beneficiary stating:

"Payment, in the amount of [$_____.___)] is due from Western Community Energy to us under that certain Resource Adequacy Confirmation Letter dated October 20, 2020, all applicable grace and cure periods have expired, and such payment has not been made. Wherefore, we hereby demand payment of the above referenced amount under Letter of Credit No. **SB-03951**."

OR

"This Letter of Credit No. **SB-03951** will expire in thirty (30) or fewer calendar days and we have not received an extension of said Letter of Credit or other acceptable replacement collateral. Wherefore, Beneficiary hereby demands payment of $[amount]."

Barclays Bank PLC, New York Branch          Restricted - External



EXHIBIT 1    PAGE 35

**Special Conditions:**

1.  Payment under this Letter of Credit will be effected per your instructions against a Beneficiary Statement presented at Barclays Bank PLC, New York Branch, 745 Seventh Avenue, New York, NY 10019, attn.: Letters of Credit Department ("Place for Presentation"). Such presentation may be made, (i) by first class certified or registered U.S. mail, or (ii) by overnight courier service or (iii) by facsimile.

2.  Partial and/or multiple drawings are permitted. Such partial drawings shall reduce the amount thereafter available for drawing under this Letter of Credit.

3.  This Letter of Credit will terminate at 5:00 p.m., New York time, on the earlier of (i) the Expiration Date, (ii) the date of surrender by you of this Letter of Credit for cancellation, and (iii) the date of our honoring of drawing(s) under this Letter of Credit that, in the aggregate, equal the Stated Amount.

4.  All Issuing Bank charges are for the account of Applicant.

5.  Any communications to us with respect to this Letter of Credit shall be addressed to the Place for Presentation and refer to "Letter of Credit No. **SB-03951**.

6.  Unless otherwise expressly stated herein, this Letter of Credit is governed by the Uniform Customs and Practice for Documentary Credits (2007 Version), International Chamber of Commerce Publication No. 600 ("UCP"). As to matters not governed by the UCP, this Letter of Credit is governed by the laws of the State of New York.

7.  Article 36 of the UCP is amended such that if the Letter of Credit expires while the Place for Presentation is closed due to events described in said Article, then the Expiration Date of this Letter of Credit shall be automatically extended without amendment to a date thirty (30) calendar days after the Place for Presentation reopens for business.

Very truly yours,

Barclays Bank PLC, New York Branch

_____
Name: Dawn Townsend
Title: Authorized Signatory / AVP
Tel: (212) 320-7534
Fax: (212) 412-5011
Email: xraletterofcredit@barclays.com

Restricted - External

EXHIBIT 1    PAGE 36

# EXHIBIT 2

Execution Copy

REVOLVING CREDIT AGREEMENT

Dated March 12, 2020

Between

WESTERN COMMUNITY ENERGY

and

BARCLAYS BANK PLC

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS AND ACCOUNTING TERMS ............................................ 1

Section 1.01    Defined Terms .................................................................. 1
Section 1.02    Other Interpretive Provisions................................................ 11
Section 1.03    Accounting Terms.............................................................. 12
Section 1.04    Rounding...................................................................... 12
Section 1.05    Times of Day.................................................................. 12

ARTICLE II      THE TERM LOAN................................................................ 12

Section 2.01    Commitment to Lend; Use of Loan Proceeds...................................... 12
Section 2.02    Termination or Reduction of Commitment....................................... 13
Section 2.03    Method of Loans .............................................................. 14
Section 2.04    Interest...................................................................... 14
Section 2.05    Principal..................................................................... 16
Section 2.06    General Provisions as to Payments ............................................ 17
Section 2.07    Computation of Interest and Fees; Payments.................................... 17
Section 2.08    Maximum Interest Rate; Payment of Fee ........................................ 17
Section 2.09    Administrative Fees .......................................................... 18
Section 2.10    Evidence of Debt.............................................................. 18
Section 2.11    Obligations Absolute ......................................................... 18
Section 2.12    Yield Protection ............................................................. 18
Section 2.13    Withholding .................................................................. 20
Section 2.14    Other Taxes .................................................................. 20
Section 2.15    Commitment Fee................................................................ 20
Section 2.16    Pledge and Security.......................................................... 21

ARTICLE III     CONDITIONS PRECEDENT TO CREDIT EXTENSION ...................................... 21

Section 3.01    Conditions of Credit Extension............................................... 21
Section 3.02    Conditions Precedent to each Subsequent Loan ................................. 23

ARTICLE IV      REPRESENTATIONS AND WARRANTIES............................................... 23

Section 4.01    Existence and Power .......................................................... 23
Section 4.02    Regulatory Authority ......................................................... 23
Section 4.03    Noncontravention............................................................. 23
Section 4.04    Due Authorization............................................................ 24
Section 4.05    Valid and Binding Obligations ................................................ 24
Section 4.06    Pending Litigation and Other Proceedings ..................................... 24
Section 4.07    Insurance .................................................................... 24
Section 4.08    Financial Projections........................................................ 24
Section 4.09    Complete and Correct Information ............................................. 24
Section 4.10    Pending Legislation and Decisions............................................ 25
Section 4.11    Default....................................................................... 25
Section 4.12    Employee Benefit Plan Compliance ............................................. 25
Section 4.13    [Reserved.].................................................................. 25

-i-

**TABLE OF CONTENTS**

(continued)

**Page**

| | | |
|---|---|---|
| Section 4.14 | Sovereign Immunity | 25 |
| Section 4.15 | Usury | 25 |
| Section 4.16 | Federal Reserve Board Regulations | 25 |
| Section 4.17 | Investment Company Act | 25 |
| Section 4.18 | No Proposed Legal Changes | 26 |
| Section 4.19 | No Outstanding Indebtedness | 26 |
| Section 4.20 | Loan Documents | 26 |
| Section 4.21 | Incorporation of Representations and Warranties | 26 |
| Section 4.22 | Collateral | 26 |
| Section 4.23 | Parties to the Joint Powers Agreement | 26 |
| Section 4.24 | Anti-Terrorism Laws | 26 |
| ARTICLE V | COVENANTS | 27 |
| Section 5.01 | Compliance With Laws and Regulations | 27 |
| Section 5.02 | Reporting Requirements | 27 |
| Section 5.03 | Notice of Default | 29 |
| Section 5.04 | Further Assurances | 29 |
| Section 5.05 | Right of Entry | 29 |
| Section 5.06 | Payment of Obligations; Removal of Liens | 29 |
| Section 5.07 | Related Obligations | 29 |
| Section 5.08 | Insurance | 30 |
| Section 5.09 | Employee Benefit Plan Compliance | 30 |
| Section 5.10 | Disclosure of Participants | 30 |
| Section 5.11 | Sovereign Immunity | 30 |
| Section 5.12 | Notice of Adverse Change | 30 |
| Section 5.13 | Taxes and Liabilities | 30 |
| Section 5.14 | Legal Fee | 30 |
| Section 5.15 | Preservation of Existence, Ownership, Etc | 30 |
| Section 5.16 | Certain Information | 31 |
| Section 5.17 | Disposition of Assets | 31 |
| Section 5.18 | Consolidation or Merger | 31 |
| Section 5.19 | Proceeds of Loans | 31 |
| Section 5.20 | Disclosure in Financial Statements | 31 |
| Section 5.21 | Liens | 31 |
| Section 5.22 | Burdensome Contracts With Members | 31 |
| Section 5.23 | Indebtedness | 32 |
| Section 5.24 | Deposit of Pledged Revenues | 32 |
| Section 5.25 | Use of Pledged Revenues | 32 |
| Section 5.26 | Amendments | 32 |
| Section 5.27 | Incorporation by Reference | 32 |
| Section 5.28 | Delivery of Cash Collateral | 32 |
| Section 5.29 | Debt Service Coverage Ratio and Operating Reserve Fund Balance | 33 |

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 5.30 | Rate Covenant | 34 |
| Section 5.31 | Repayment of the County Loan | 35 |
| ARTICLE VI | EVENTS OF DEFAULT, REMEDIES | 35 |
| Section 6.01 | Events of Default and Remedies | 35 |
| Section 6.02 | Remedies | 36 |
| Section 6.03 | Remedies Cumulative; Solely for the Benefit of the Bank | 37 |
| ARTICLE VII | MISCELLANEOUS | 37 |
| Section 7.01 | Amendments, Etc | 37 |
| Section 7.02 | Notices; Effectiveness; Electronic Communication | 38 |
| Section 7.03 | No Waiver; Cumulative Remedies | 39 |
| Section 7.04 | Costs and Expenses; Damage Waiver | 39 |
| Section 7.05 | Payments Set Aside | 40 |
| Section 7.06 | Successors and Assigns | 40 |
| Section 7.07 | Counterparts; Integration; Effectiveness | 41 |
| Section 7.08 | Survival of Representations and Warranties | 41 |
| Section 7.09 | Severability | 42 |
| Section 7.10 | Governing Law; Jurisdiction; Etc | 42 |
| Section 7.11 | Waiver of Jury Trial | 42 |
| Section 7.12 | Extension of Maturity Date | 43 |
| Section 7.13 | No Advisory or Fiduciary Relationship | 43 |
| Section 7.14 | Electronic Execution of Certain Documents | 43 |
| Section 7.15 | USA Patriot Act | 44 |
| Section 7.16 | Time of the Essence | 44 |
| Section 7.17 | Entire Agreement | 44 |
| Section 7.18 | Further Assurances | 44 |
| Section 7.19 | Right of Setoff | 44 |
| Section 7.20 | Bail-In Action Acknowledgment | 44 |
| Section 7.21 | No Recourse Against Constituent Members of Borrower or Individuals | 45 |
| Section 7.22 | No Third Party Rights | 46 |

-iii-

EXHIBIT 2    PAGE 40

## REVOLVING CREDIT AGREEMENT

**THIS REVOLVING CREDIT AGREEMENT** dated March 12, 2020 (as amended, modified or restated from time to time, this "*Agreement*"), between **WESTERN COMMUNITY ENERGY**, a California joint power authority (the "*Borrower*") and **BARCLAYS BANK PLC**, together with any successors and assigns (the "*Bank*").

## RECITALS

**WHEREAS,** the Borrower wishes to obtain credit from the Bank hereunder and the Bank is willing, upon the terms and subject to the conditions set forth below, to provide such credit to the Borrower for use in connection with purposes consistent with the Act and the purpose implementing and operating a community choice aggregation program established by Borrower pursuant to California Public Utilities Code Section 366.2; and

**WHEREAS,** all obligations of the Borrower to repay the Bank for Credit Extensions (as defined herein) made by the Bank under the Commitment (as defined herein), and interest thereon, are created under and will be evidenced by this Agreement and the Note, and will be secured by a pledge of and lien on Pledged Revenues (as defined herein), subject only to amounts required to be paid by the Borrower pursuant to the terms of Power Purchase Agreements (as defined herein) executed by the Borrower;

**NOW, THEREFORE**, to induce the Bank to make the loans, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Borrower and the Bank hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01  Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"*Account Control Agreement*" means the Deposit Account Control Agreements by and among the Bank, the Borrower and the Custodian to be executed, in form and substance acceptable to the Bank, granting the Bank control over each of the Operating Fund Account and the Operating Reserve Fund, prior to the initial Borrowing or issuance of a Letter of Credit hereunder.

"*Act*" means the Joint Exercise of Powers Act, California Government Code §§ 6500 et seq., as amended.

"*Adjusted LIBOR Rate*" means, for any day, a per annum interest rate determined pursuant to the following formula:

$$\text{Adjusted LIBOR Rate} = \frac{\text{LIBOR}}{1 - \text{Reserve Percentage}}$$

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 41

*"Affiliate"* means, with respect to the Bank, any other Person controlling or controlled by, or under common control with, the Bank. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting rights, membership, the power to appoint members, trustees or directors, by contract or otherwise.

*"Agreement"* has the meaning set forth in the introductory paragraph hereof.

*"Alternate Rate"* means, for any day, the sum of (i) the rate per annum which is established with reference to an index that the Bank determines, in its sole discretion, as being the index that most closely approximates LIBOR or which is being commonly substituted for LIBOR, as selected by the Bank upon notice thereof provided by the Bank to the Borrower, plus (ii) the Applicable Spread for such day, rounded upward to the second decimal place (assuming such rate is expressed as a percentage); provided, however, the Alternate Rate shall never be below the Applicable Spread plus twenty-five (25) basis points.

*"Anti-Terrorism Laws"* has the meaning set forth in Section 4.25 hereof.

*"Applicable Spread"* means, as of any date of determination, (i) with respect to Loans, three hundred twenty basis points (3.20%) and (ii) with respect to Unreimbursed Amounts, three hundred seventy basis points (3.70%).

*"Authorized Officer"* means the Chief Executive Officer, the Chief Operating Officer or the Treasurer of the Borrower or any person designated in writing by the Chief Executive Officer, the Chief Operating Officer or the Treasurer of the Borrower to act as an Authorized Officer hereunder.

*"Availability Period"* means, with respect to (i) the agreement of the Bank to issue Letters of Credit for the account of the Borrower pursuant to the terms and conditions hereof, the period from and including the Effective Date to and excluding the Commitment Termination Date, and (ii) the agreement of the Bank to extend Loans pursuant to the terms and conditions hereof, the period from the Effective Date to and excluding the Loan Facility Scheduled Termination Date.

*"Available Commitment"* means an initial amount equal to $16,000,000 and thereafter such initial amount adjusted from time to time as follows: (a) downward in an amount equal to any Loan made to, and an amount equal to the L/C Obligations related to any Letter of Credit issued for the account of, the Borrower under the Commitment; (b) prior to the Loan Facility Scheduled Termination Date only, upward in an amount equal to the principal amount of any Loan made to the Borrower under the Commitment that is repaid or prepaid in the manner provided herein; (c) upward in an amount equal to the principal amount equal to the L/C Obligations related to any Letter of Credit issued for the account of the Borrower under the Commitment that is repaid, prepaid, expires or terminates, as applicable, in the manner provided herein; (d) downward in an amount equal to any reduction thereof effected pursuant to Section 2.05 hereof; (e) downward to the Letter of Credit Sublimit on the Loan Facility Scheduled Termination Date; and (f) downward to zero upon the Commitment Termination Date in accordance with the terms hereof; provided, that, after giving effect to any of the foregoing

-2-

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 42

adjustments the Available Commitment shall never exceed (i) $16,000,000 from the Effective Date to but excluding Loan Facility Scheduled Termination Date, and (ii) $10,000,000 from and after the Loan Facility Scheduled Termination Date.

"*Bank*" has the meaning set forth in the introductory paragraph hereto.

"*Bank Agreement*" means any credit agreement, loan agreement, liquidity agreement, standby bond purchase agreement, reimbursement agreement, direct purchase agreement (such as a continuing covenant agreement or supplemental bondholder's agreement), bond purchase agreement or other agreement or instrument under which, directly or indirectly, any Person or Persons undertake to loan, make or provide funds to make payment of, or to purchase, hedge or provide credit enhancement to or on behalf of the Borrower for any Indebtedness of the Borrower.

"*Borrower*" has the meaning set forth in the introductory paragraph hereof.

"*Borrower's Account*" means the general operating account of the Borrower at River City Bank as specified in the Loan Notice or such other account as Borrower may inform the Bank in writing and which the Bank confirms in writing and telephonic notice.

"*Borrowing*" means a borrowing of Loans from the Bank pursuant to Section 2.01 hereof.

"*Borrowing Date*" has the meaning specified in Section 2.03 hereof.

"*Business Day*" means any day which is not (i) a Saturday or a Sunday, (ii) a day on which the Lending Office of the Bank is lawfully closed.

"*Cash Collateralize*" means, to pledge and deposit with or deliver to the Bank, as collateral for L/C Obligations or any other Obligations, (a) cash or deposit account balances, (b) backstop letters of credit entered into on terms, from issuers and in amounts satisfactory to the Bank, and/or (c) if the Bank shall agree, in its sole discretion, other credit support, in each case, in Dollars and in such amount as the Bank may reasonably require, and pursuant to documentation in form and substance reasonably satisfactory to the Bank. "*Cash Collateral*" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commitment*" means the Bank's obligation to (a) make Loans to the Borrower pursuant to Section 2.01 and (b) issue Letters of Credit for the account of the Borrower pursuant to Section 2.03. Subject at all times to Sections 2.05 and 6.02 hereof, the Commitment from and after the (x) Effective Date to but excluding the Loan Facility Scheduled Termination Date shall be $16,000,000, and (y) Loan Facility Scheduled Termination Date and at all times thereafter shall be $10,000,000.

"*Commitment Fee*" has the meaning set forth in Section 2.08.

-3-

EXHIBIT 2    PAGE 43

"*Commitment Fee Rate*" means (i) with respect to the Bank's commitment to make Loans to the Borrower pursuant to Section 2.01, a rate per annum equal to 1.20% and (ii) with respect to the Bank's commitment to issue Letters of Credit for the account of the Borrower pursuant to Section 2.03, a rate per annum equal to 1.30%; provided, that, in each case, upon the occurrence, and at all times during the continuation, of an Event of Default, the Commitment Fee Rate shall increase four percent (4.0%) per annum above the Commitment Fee Rate otherwise in effect.

"*Commitment Termination Date*" shall mean the earlier of:

     (a)    the Scheduled Termination Date; and

     (b)    the date the Commitment is reduced to zero pursuant to Section 2.05 or Section 7.02 hereof.

"*Computation Date*" means the second London Business Day preceding each applicable Rate Reset Date.

"*Credit Extension*" means each of the following:  (a) a Borrowing and (b) an L/C Credit Extension.

"*Custodial Operating Account*" has the meaning set forth in Section 5.27(f).

"*Custodian*" means River City Bank and its successors or assigns, including any successor appointed in accordance with the terms hereof.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Debt Service Coverage Ratio*" means, for each Financial Covenant Determination Date, the ratio determined by dividing (a) the Income Available for Debt Service for the twelve (12) months ending simultaneously with such Financial Covenant Determination Date by (b) the aggregate of the payments required to be made during such twelve (12) months in respect of Assumed Debt Service and in respect of principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on all outstanding Indebtedness of the Borrower.  For purposes of computing the amount under clause (b) of this definition, "Assumed Debt Service" means the sum of the amount of principal which would be payable hereunder during such computation period assuming that the full amount of the Loan Sublimit (initially $10,000,000) had been borrowed by the Borrower and assuming that the Borrower is required to repay such amount in equal monthly installments on the first day of each calendar month (commencing on March 1, 2021) for the period from March 1, 2021 until the Loan Facility Scheduled Termination Date.

"*Debt Service Coverage Ratio Requirement*" means 2.0x.

EXHIBIT 2    PAGE 44

*"Default"* means any event or condition that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

*"Default Rate"* means, for any day, the sum of the Prime Rate plus four percent (4.00%) per annum.

*"Dollar"* and *"$"* mean lawful money of the United States.

*"Effective Date"* means the date that the conditions precedent set forth in Article 3.01 hereof have been satisfied or waived by the Bank.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

*"Event of Default"* with respect to this Agreement has the meaning set forth in Section 6.01 hereof.

*"Event of Insolvency"* means, with respect to any Person, the occurrence of one or more of the following events:

(a)    the Person shall (i) commence a voluntary case or other proceeding seeking liquidation, reorganization, arrangement, adjustment, winding-up, dissolution, composition or other similar relief with respect to itself or its indebtedness under any bankruptcy, insolvency, reorganization or other similar law for the relief of debtors now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or a substantial part of its property, (ii) consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, (iii) make a general assignment for the benefit of creditors, (iv) fail generally to pay or admit in writing its inability to pay its indebtedness as it becomes due, or (v) take (through an authorized officer or representative) any official action to authorize any of the foregoing; or

(b)    any of the following shall occur with respect to such Person: (i) an involuntary case or other proceeding shall be commenced against such Person seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property and either (A) such Person shall consent in writing to such action or (B) such case shall not be dismissed within sixty (60) days, (ii) an order for relief shall be entered against such Person under the federal bankruptcy laws as now or hereafter in effect or pursuant to any other State or federal laws concerning insolvency or of similar purpose, (iii) a final and non-appealable debt moratorium, debt adjustment, debt restructuring or comparable extraordinary restriction with respect to the payment of principal or interest on the indebtedness of such Person shall be declared or imposed pursuant to a finding or ruling by such Person, the United States of America, the State, any instrumentality thereof or any other Governmental Authority of competent jurisdiction over such Person, or (iv) the issuance, under the laws of any state or under

-5-

EXHIBIT 2    PAGE 45

the laws of the United States of America, of an order of rehabilitation, liquidation or dissolution of such Person.

*"Executive Order"* has the meaning set forth in Section 4.25 hereof.

*"Expenses"* means, for any period, the aggregate of all expenses calculated under GAAP, including without limitation any taxes, incurred by the Borrower during such period, but excluding (a) interest on Indebtedness, (b) depreciation and amortization, (c) any unrealized loss resulting from changes in the value of investment securities, (d) extraordinary expenses and other non-recurring, non-cash expenses (including without limitation losses on the sale of fixed or capital assets other than in the ordinary course of business and losses on the extinguishment of debt), (e) losses resulting from any reappraisal, revaluation or write-down of assets (excluding revaluation of accounts receivable), and (f) any noncash loss or change in the value of a Swap Contract (including any change in the value of the termination value thereof) which loss or change in value is not the result of the expiration or termination (including early termination) of such Swap Contract; provided, however, that the provisions of (a) through (f) notwithstanding, no amount shall be subtracted from expenses more than once.

*"Financial Covenant Determination Date"* means each March 31, June 30, September 30 and December 31 and any such additional dates specified in Section 5.27(a) hereof.

*"Financing Documents"* means the Security Agreement, the Intercreditor and Collateral Agency Agreement and the PPA Account Control Agreement.

*"Fiscal Year"* means the fiscal year of the Borrower ending on June 30 of each calendar year or such other fiscal year as may be adopted by the Borrower from time to time to the extent permitted hereunder.

*"Generally Accepted Accounting Principles"* or *"GAAP"* means generally accepted accounting principles in effect from time to time in the United States and applicable to entities such as the Borrower, including, without limitation, those principles set forth in the statements and pronouncement of the Government Accounting Standards Board.

*"Governmental Authority"* means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Guarantee"* means, for any Person, all guarantees, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations of such Person to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor of another Person against loss.

*"Honor Date"* has the meaning set forth in Section 2.03(c) hereof.

-6-

EXHIBIT 2    PAGE 46

"*Income Available for Debt Service*" shall mean, as to any period of time, the excess of Revenues over Expenses of the Borrower for such period.

"*Indebtedness*" means for any Person (without duplication), all items that would be classified as a liability in accordance with generally accepted accounting principles, including, without limitation, (a) indebtedness or liability for borrowed money, or for the deferred purchase price of property or services (including trade obligations); (b) obligations as lessee under leases which are, should have been, or should be, recorded as capital leases in accordance with generally accepted accounting principles; (c) current liabilities in respect of unfunded benefits under employee benefit, retirement or pension plans; (d) obligations issued for the account of any other Person; (e) all Guarantees, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss; (f) obligations secured by any mortgage, lien, pledge, security interest or other charge or encumbrance on property, whether or not the obligations have been assumed; (g) obligations under Bank Agreements, and (h) obligations under Swap Contracts.

"*Indemnitee*" has the meaning set forth in Section 7.04(b) hereof.

"*Intercreditor and Collateral Agency Agreement*" means the Intercreditor and Collateral Agency Agreement, dated as of February 13, 2020, by and among River City Bank, as Collateral Agent, the PPA Providers from time to time party thereto and the Borrower.

"*Interest Payment Date*" means each of (i) the first Business Day of each calendar month, (ii) the date on which any principal amount of the related Loan or L/C Obligation, as applicable, is paid or prepaid, for any reason, and (iii) the Commitment Termination Date.

"*Interest Period*" means, with respect to each Loan and Unreimbursed Amount, (i) the period from (and including) the date such Loan is issued or Unreimbursed Amount is paid by the Bank to (but excluding) the next succeeding Rate Reset Date, and (ii) thereafter, each period from (and including) a Rate Reset Date to (but excluding) the next succeeding Rate Reset Date (or, if sooner, to and including the Scheduled Termination Date or the date the Loan and/or Unreimbursed Amount, as applicable, is paid in full, as applicable).

"*ISP*" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"*Joint Powers Agreement*" means the Joint Powers Agreement, dated as of August 23, 2018, by and among the Cities of Norco, Perris, Wildomar, Jurupa Valley, Hemet, Eastvale and Canyon Lake.

"*Launch Date*" means the date that the Borrower initiates providing energy to customers.

"*Laws*" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof,

-7-

EXHIBIT 2    PAGE 47

and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"*L/C Credit Extension*" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"*L/C Document*" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the Bank and/or the Borrower relating to such Letter of Credit.

"*L/C Obligations*" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.05 hereof. For all purposes of this Agreement, if on any date of determination, a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"*Lending Office*" means the Bank's address and, as appropriate, account as set forth on Schedule I, or such other address or account as the Bank may from time to time notify the Borrower.

"*Letter of Credit*" means any standby letter of credit issued hereunder.

"*Letter of Credit Application*" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Bank.

"*Letter of Credit Expiration Date*" means the earlier of (i) the date on which the Bank declares its obligation to make Credit Extensions terminated under Section 7.02 hereof and (ii) the day that is thirty (30) days prior to the Scheduled Termination Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"*Letter of Credit Fee*" has the meaning specified in Section 2.03(g) hereof.

"*Letter of Credit Sublimit*" means an amount equal to the lesser of (a) $10,000,000 and (b) the Commitment. The Letter of Credit Sublimit is part of, and not in addition to, the Commitment.

"*LIBOR*" means, for any Rate Reset Date, the London interbank offered rate for deposits in United States dollars for a period of one month, which rate appears on the Reuters Screen LIBOR01 Page (or such other page as may replace LIBOR01 on that service or such other service as may be nominated by the ICE Benchmark Administration (or any entity that assumes responsibility for determining such rate) as an information vendor for the purpose of displaying such rate for U.S. Dollar deposits) as of 11:00 a.m., London, England time, on the Computation Date immediately preceding such Rate Reset Date, or if such rate is not available, the rate which is established with reference to an index that the Bank determines in its sole discretion as being

-8-

EXHIBIT 2    PAGE 48

the index that most closely approximates LIBOR or which is being commonly substituted for LIBOR, as selected by the Bank upon notice thereof provided by the Bank to the Borrower.  In the event that LIBOR is less than zero, it shall be deemed to be zero.

"*LIBOR Index Rate*" means a fluctuating rate per annum, determined on each Computation Date for the period from and including the first succeeding Rate Reset Date to but excluding the next succeeding Rate Reset Date thereafter, equal to the sum of (i) the Adjusted LIBOR Rate (as determined on such Computation Date) plus (ii) the Applicable Spread as of such first succeeding Rate Reset Date, rounded upward to the fourth decimal place.

"*Loan*" and "*Loans*" has the meaning specified in Section 2.01 hereof.

"*Loan Documents*" means, collectively this Agreement and the Account Control Agreement.

"*Loan Facility Scheduled Termination Date*" means March 11, 2024, unless extended pursuant to Section 7.12 hereof.

"*Loan Notice*" means a notice in writing of a Borrowing pursuant to Section 2.02(a) hereof, which shall be substantially in the form of Exhibit B attached hereto, or such other form as may be approved by the Bank (including any form on an electronic platform or electronic transmission system as shall be approved by the Bank), appropriately completed and signed by an Authorized Officer.

"*Loan Sublimit*" means an amount equal to the lesser of (a) $10,000,000 and (b) the Commitment.  The Loan Sublimit is part of, and not in addition to, the Commitment.

"*Lockbox Account*" means the account identified as such in the Security Agreement pursuant to which revenues from the sale of electricity will be deposited for distribution solely to make payments due to (i) PPA Providers for energy sold to Borrower; (ii) the California Independent System Operator for charges related to the distribution of energy; and (iii) River City Bank, as Collateral Agent under the Security Agreement, for performance of its duties; and from which excess revenues after payment of amounts due to the foregoing shall be deposited in the Operating Fund Account for payment to the Bank of the Obligations payable hereunder.

"*London Business Day*" means any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency) in the City of London, United Kingdom.

"*Margin Stock*" shall have the meaning assigned to that term in Regulation U promulgated by the Board of Directors of the Federal Reserve System, as now and hereafter from time to time in effect.

"*Material Adverse Change*" means the occurrence of any event or change resulting in a material and adverse change in the business, condition (financial or otherwise), operations or prospects of the Borrower since June 30, 2019 or which materially and adversely affects the enforceability of this Agreement or any of the Loan Documents or the ability of the Borrower to perform its obligations hereunder or thereunder.

-9-

EXHIBIT 2    PAGE 49

*"Material Adverse Effect"* means:  (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower; (b) a material impairment of the ability of the Borrower to perform its obligations under this Agreement or any of the Loan Documents; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of this Agreement or any of the Loan Documents.

*"Maximum Interest Rate"* means the lesser of (i) twenty-five percent (25%) per annum and (ii) the maximum rate of interest on the relevant obligation permitted by applicable law.

*"Member"* means each city and town within the State of California that is a signatory to the Joint Powers Agreement as specified in Exhibit D.

*"Minimum Collateral Amount"* means, at any time, with respect to Cash Collateral provided in accordance with the provisions of Section 2.13(a)(i) or 2.13(a)(ii) hereof, an amount or stated amount equal to 105% of the Outstanding Amount of all L/C Obligations.

*"Note"* means that certain Note dated the date hereof of the Borrower, in favor of the Bank, evidencing the outstanding Loans and any Unreimbursed Amounts made by the Bank and substantially in the form of Exhibit A hereto.

*"Notice of Loan Prepayment"* means a notice of prepayment with respect to a Loan which shall be substantially in the form of Exhibit C or such other form as may be approved by the Bank (including any form on an electronic platform or electronic transmission system as shall be approved by the Bank), appropriately completed and signed by an Authorized Officer.

*"Obligations"* means the obligations of the Borrower under this Agreement to repay (i) all Loans, all L/C Obligations, and the Note, together with interest thereon, pursuant to and in accordance with this Agreement and the Note, (ii) all fees, and (iii) all expenses and charges payable or reimbursable hereunder to the Bank (including, without limitation, any amounts to reimburse the Bank for any advances or expenditures by it under any of such documents) and all other payment obligations of the Borrower to the Bank arising under or in relation to this Agreement or the other Financing Documents, in each, case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired and including interest and fees that accrue after the commencement by or against the Borrower of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

*"OFAC"* has the meaning set forth in Section 4.25 hereof.

*"Operating Expenses"* of the Borrower for any period means the excess, if any, of all operating expenses of the Borrower in such period (including interest expense and energy purchase expenses) over all amounts deducted by the Borrower in calculating operating expenses in such period for or to make provisions for property retirement, depreciation, depletion, obsolescence, impairment, allowances for bad or uncollectible debt, and amortization of debt discount, issuance expense, and goodwill, all determined in accordance with GAAP.

-10-

"*Operating Fund Account*" means the account established with River City Bank, designated as the "Operating Fund Account", together with any other fund or account held by or for the benefit of the Borrower into which Pledged Revenues or any portion thereof are deposited, including, without limitation, any Custodial Operating Account into which the Operating Fund Account is transferred or converted pursuant to the terms hereof.

"*Operating Reserve Fund*" means the account established with River City Bank, designated as the "Operating Reserve Account" into which the amounts required pursuant to Section 5.27(e) hereof shall be deposited.

"*Operating Reserve Fund Requirement*" means three million dollars ($3,000,000).

"*Outstanding Amount*" means (a) with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the aggregate amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of Unreimbursed Amounts.

"*Participant*" has the meaning set forth in Section 7.06(c) hereof.

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001).

"*Person*" means an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

"*Pledged Revenues*" means the Receivables and other Collateral (each as defined in the Security Agreement) and all proceeds thereof, but only to the extent that such Receivables and other Collateral (each as defined in the Security Agreement) (or proceeds thereof) have been released from the pledge and lien of the Security Agreement in accordance with the terms thereof.

"*Power Purchase Agreement*" has the meaning set forth in the Security Agreement.

"*PPA Account Control Agreement*" means the Account Control Agreement, dated as of February 13, 2020 by and among River City Bank, as Account Bank, the Borrower and River City Bank, not in its individual capacity, but solely as collateral agent, as Secured Party.

"*PPA Provider*" means each seller of Product (as defined in the Security Agreement) under a Power Purchase Agreement that is a party to the Intercreditor and Collateral Agency Agreement.

"*Prime Rate*" means the rate established by Barclays Bank PLC, from time to time as its prime rate, with each change in the Prime Rate being effective from and including the date such

-11-

EXHIBIT 2    PAGE 51

change is publicly announced as being effective; provided, however, the Bank may lend to its customers at rates that are at, above or below the Prime Rate.

"*Property*" shall mean any and all rights, titles and interests in and to any and all property, whether real or personal, tangible or intangible and wherever situated.

"*Rate Reset Date*" means the first Business Day of each calendar month commencing April 1, 2020.

"*Reduction Amount*" has the meaning specified in Section 2.04(b)(ii) hereof.

"*Reduction and Termination Fee*" has the meaning specified in Section 2.05(a)(ii) hereof.

"*Reserve Percentage*" means for any day, that percentage (expressed as a decimal) which is in effect from time to time under regulations issued from time to time by the Board of Governors of the Federal Reserve System of the United States for determining the maximum reserve requirement (including, without limitation, any basic, supplemental, emergency, special, marginal or other reserves) applicable with respect to Eurocurrency funding (or against any other category of funding liabilities that includes deposits by reference to which the interest rate of the Loans is determined), whether or not the Bank has any Eurocurrency liabilities subject to such reserve requirement at that time. The Loans shall be deemed to constitute a Eurocurrency liability and as such shall be deemed subject to reserve requirements without benefit of credit for any prorations, exceptions or offsets that may be available from time to time to the Bank. The Adjusted LIBOR Rate shall be adjusted automatically on and as of the effective date of any change in the Reserve Percentage.

"*Revenues*" means, for any period, the revenues of the Borrower, as determined in accordance with GAAP; but excluding (i) any unrealized gain or loss resulting from changes in the value of investment securities, (ii) any gains on the sale or other disposition of fixed or capital assets not in the ordinary course, (iii) earnings resulting from any reappraisal, revaluation or write-up of fixed or capital assets, (iv) noncash gains or changes in the valuation of Swap Contracts which gain or change in value is not the result of the expiration or termination (including early termination) of such Swap Contracts and (v) any realized gain in excess of 10% on common and preferred stock during such period (measured by dividing the net realized gains on common and preferred stock for such period by the average of the market value of the common and preferred stock as of the first day and last day of such period).

"*SCE*" means Southern California Edison and its successors or assigns.

"*SCE Agreement*" means the Community Choice Aggregator (CCA) Service Agreement, dated February 26, 2019, between the Borrower and SCE.

"*Scheduled Termination Date*" means March 11, 2025, or such later date as may be established pursuant to Section 7.12 hereof.

"*Security Agreement*" means the Security Agreement, dated as of February 12, 2020, by and between the Borrower and River City Bank, as collateral agent.

-12-

"*Start-Up Expense*" means working capital expenses of the Borrower incurred prior to June 1, 2020, and specifically excludes any expenses for power purchases or the establishment or posting of reserves, collateral or other security related to current or future power purchases.

"*State*" means the State of California.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any International Foreign Exchange Master Agreement, including any such obligations or liabilities thereunder.

"*Total Outstandings*" means the aggregate Outstanding Amount of all Loans and L/C Obligations.

"*Trade Obligations*" means obligations for the purchase of goods and services in the ordinary course of business on trade credit with a duration of less than ninety (90) days.

all letters of credit, bank guarantees, bankers' acceptances or similar instruments issued in respect of trade payables or similar obligations but in any event excluding performance obligations.

"*UCC*" means the Uniform Commercial Code in effect in the State of California from time to time.

"*UCP*" means the Uniform Customs and Practice for Documentary Credits in effect from time to time.

"*United States*" and "U.S." mean the United States of America.

"*Unreimbursed Amount*" has the meaning specified in Section 2.03(c) hereof.

**Section 1.02   Other Interpretive Provisions**.  With reference to this Agreement, unless otherwise specified herein:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "*including*" shall be deemed to be followed by the phrase "without limitation."  The word *"will"*

-13-

EXHIBIT 2    PAGE 53

shall be construed to have the same meaning and effect as the word *"shall."* Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any of the Loan Documents), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words *"hereto," "herein," "hereof"* and *"hereunder,"* and words of similar import when used herein, shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof, (iv) all references in this Agreement to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word *"from"* means *"from and including;"* the words *"to"* and *"until"* each mean *"to but excluding;"* and the word *"through"* means *"to and including."*

(c)      Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

**Section 1.03    Accounting Terms**.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the audited financial statements of the Borrower delivered to the Bank pursuant to Section 5.02(a) hereof, *except* as otherwise specifically prescribed herein.

**Section 1.04    Rounding**.    Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**Section 1.05    Letter of Credit Amounts**.    Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any L/C Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

-14-

EXHIBIT 2    PAGE 54

Section 1.06    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York time (daylight or standard, as applicable).

## ARTICLE II

## THE COMMITMENT

Section 2.01    **Loans**.  Subject to the terms and conditions set forth herein, the Bank agrees to make loans (individually, a *"Loan"* and collectively, the *"Loans"*) to the Borrower from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time the lesser of the Loan Sublimit and the Commitment, for the purpose of the acquisition of power or providing collateral in connection with the acquisition of power, securing payments due under Power Purchase Agreements and, subject to the provisions below and prior to June 1, 2020, for Start-Up Expenses; *provided, however,* prior to the Launch Date, the Borrower shall only be permitted to request Loans to fund Start-Up Expenses in an aggregate amount not to exceed $600,000; *provided further, however,* that after giving effect to any Borrowing, (x) the Total Outstandings shall not exceed the Commitment, subject to any reductions thereof pursuant to the terms hereof, and (y) the Outstanding Amount of the Loans shall not exceed the Loan Sublimit.  Subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.04 hereof, and reborrow under this Section 2.01.  Each Loan shall bear interest as set forth in Section 2.07 hereof.  Notwithstanding anything herein to the contrary, Loans may not be requested to repay Unreimbursed Amounts.

Section 2.02    **Borrowing of Loans**.  (a) Each Borrowing shall be made upon the Borrower's irrevocable notice to the Bank, which may be given by a Loan Notice; provided that any telephonic notice must be confirmed immediately by delivery to the Bank of a Loan Notice. Each such Loan Notice must be received by the Bank not later than 4:00 p.m. (New York City time) on the third (3rd) Business Day immediately preceding the requested date of any Borrowing (the *"Borrowing Date"*).  Each Borrowing shall be in the principal amount of $250,000 or a whole multiple of $50,000 in excess thereof.  Each Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of the Loan to be borrowed.

(b)    Following receipt of a Loan Notice, upon satisfaction of the applicable conditions set forth in Section 3.02 hereof (and, if such Borrowing is the initial Borrowing, Section 3.01 hereof), the Bank shall make the requested funds available to the Borrower by wire transfer of such funds to the Borrower's Account.

(c)    The obligation of the Borrower to repay the Loans and L/C Obligations, together with interest thereon, shall be evidenced by this Agreement. The Obligations shall be secured and payable in accordance with the provisions of Section 2.20 hereof.

Section 2.03    **Letters of Credit.**

(a)    *The Letter of Credit Commitment.*  (i) Subject to the terms and conditions set forth herein, the Bank agrees (A) from time to time on any Business Day during the period from the

-15-

EXHIBIT 2    PAGE 55

Effective Date until the Letter of Credit Expiration Date, to issue Letters of Credit in Dollars for the account of the Borrower, and to amend Letters of Credit previously issued by it, in accordance with Section 2.03(b) hereof, and (B) to honor drawings under the Letters of Credit; *provided* that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Commitment and (y) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit.  Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)    The Bank shall not be under any obligation to issue any Letter of Credit if:

(A)    the expiry date of the requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless the Bank has approved such expiration date;

(B)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Bank from issuing the Letter of Credit, or any Law applicable to the Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Bank shall prohibit, or request that the Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Bank in good faith deems material to it;

(C)    the issuance of the Letter of Credit would violate one or more policies of the Bank applicable to letters of credit generally;

(D)    except as otherwise agreed by the Bank, the Letter of Credit is in an initial stated amount less than $250,000;

(E)    the Letter of Credit is to be denominated in a currency other than Dollars; or

(F)    the Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder.

(iii)    The Bank shall be under no obligation to amend any Letter of Credit if (A) the Bank would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to the Letter of Credit.

-16-

EXHIBIT 2    PAGE 56

(b)    *Procedures for Issuance and Amendment of Letters of Credit.* (i) Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the Bank in the form of a Letter of Credit Application, appropriately completed and signed by an Authorized Officer of the Borrower.  Such Letter of Credit Application may be sent by fax transmission, by United States mail, by overnight courier, by electronic transmission using the system provided by the Bank, by personal delivery or by any other means acceptable to the Bank. Such Letter of Credit Application must be received by the Bank not later than 4:00 p.m. (New York City time) at least five (5) Business Days (or such later date and time as the Bank may agree in a particular instance in its sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Bank:  (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the Bank may require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Bank (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the Bank may require. Additionally, the Borrower shall furnish to the Bank such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any L/C Documents, as the Bank may require.

(ii)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the Bank will also deliver to the Borrower a true and complete copy of such Letter of Credit or amendment.

(c)    *Drawings and Reimbursements.*  Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Bank shall notify the Borrower thereof.  Not later than 2:00 p.m. (New York City time) on the date of any payment by the Bank under a Letter of Credit (each such date, an *"Honor Date"*), the Borrower shall reimburse the Bank in an amount equal to the amount of such drawing.  If the Borrower fails to so reimburse the Bank by such time on the Honor Date for such drawing, the amount equal to the amount of the unreimbursed drawing (the *"Unreimbursed Amount"*) shall bear interest at the LIBOR Index Rate.  Any notice given by the Bank pursuant to this Section 2.03(c) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(d)    *Obligations Absolute.*  The obligation of the Borrower to reimburse the Bank for each drawing under each Letter of Credit shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

-17-

EXHIBIT 2    PAGE 57

(i)  any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Financing Document;

(ii)  the existence of any claim, counterclaim, setoff, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Bank or any other Person, whether in connection with this Agreement or by such Letter of Credit, the transactions contemplated hereby or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)  any draft, demand, endorsement, certificate or other document presented under or in connection with such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)  waiver by the Bank of any requirement that exists for the Bank's protection and not the protection of the Borrower or any waiver by the Bank which does not in fact materially prejudice the Borrower;

(v)  honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)  any payment made by the Bank in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under, such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)  any payment by the Bank under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Bank under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law; or

(viii)  any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Bank. The Borrower shall be conclusively deemed to have waived any such claim against the Bank and its correspondents unless such notice is given as aforesaid.

-18-

EXHIBIT 2    PAGE 58

(e) *Role of the Bank.* The Bank and the Borrower agree that, in paying any drawing under a Letter of Credit, the Bank shall not have any responsibility to obtain any document (other than any sight or time draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided, however*, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Bank, any of its related parties nor any correspondent, participant or assignee of the Bank shall be liable or responsible for any of the matters described in Section 2.03(d) hereof. In furtherance and not in limitation of the foregoing, the Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the Bank shall not be responsible for the validity or sufficiency of any instrument transferring, endorsing or assigning or purporting to transfer, endorse or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The Bank may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication *("SWIFT")* message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(f) *Applicability of ISP and UCP; Limitation of Liability.* Unless otherwise expressly agreed by the Bank and the Borrower when a Letter of Credit is issued the rules of the ISP shall apply to each standby Letter of Credit. Notwithstanding the foregoing, the Bank shall not be responsible to the Borrower for, and the Bank's rights and remedies against the Borrower shall not be impaired by, any action or inaction of the Bank required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the Bank or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(g) *Letter of Credit Fees.* The Borrower shall pay to the Bank a Letter of Credit fee (the *"Letter of Credit Fee"*) equal to 2.00% per annum times the daily amount available to be drawn under such Letter of Credit; *provided*, that upon the occurrence, and at all times during the continuation, of an Event of Default, the Letter of Credit Fee shall increase to 6.00% per annum times the daily amount available to be drawn under such Letter of Credit. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.05 hereof. Letter of Credit Fees shall be (A) due and payable on (x) the first Business Day of each January, April, July and October, commencing with the first such date to occur after the issuance of such Letter of Credit, (y) the Letter of Credit Expiration Date and (z) thereafter on demand and (B) computed on a quarterly basis in arrears. The Borrower shall also be responsible for the fees and miscellaneous

-19-

EXHIBIT 2    PAGE 59

handling charges in connection with the issuance of each Letter of Credit as set forth in the related Letter of Credit Application.

(h)    *Letter of Credit Application Fee.*  Upon the Bank's issuance of any Letter of Credit, the Bank shall invoice and the Borrower shall pay to the Bank an application fee of $600, or such other application fee amount then required by the Bank, in immediately available funds, which such fee shall be fully earned by the Bank and non-refundable.

(i)    *Letter of Credit Amendment Fee.*  The Borrower shall promptly pay to the Bank a fee for each amendment to a Letter of Credit in a minimum amount of $135 or such amount then required by the Bank in connection with such amendment.

(j)    *Conflict with Borrower Documents.*  In the event of any conflict between the terms hereof and the terms of any L/C Document, the terms hereof shall control.

### Section 2.04    Prepayments.

(a)    *Optional.* The Borrower may, upon notice to the Bank pursuant to delivery to the Bank of a Notice of Loan Prepayment, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty subject to Section 2.18 hereof; *provided* that, unless otherwise agreed by the Bank (A) such notice must be received by Bank not later than 4:00 p.m. (New York City time) five (5) Business Days prior to any date of prepayment and (B) any prepayment of Loans shall be in a minimum principal amount of $250,000 or such lesser amount equal to the total outstanding principal amount of such Loan if the total outstanding principal amount thereof is less than $250,000.  Each such Notice of Loan Prepayment shall specify the date and amount of such prepayment.  If such Notice of Loan Prepayment is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of principal shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 2.18 hereof.

(b)    *Mandatory.*

(i)    *Outstandings.*  If for any reason at any time the (a) Total Outstandings at any time exceed the Commitment, (b) the L/C Obligations exceed the Letter of Credit Sublimit or (c) the Loans exceed the Loan Sublimit, in each case, as applicable, the Borrower shall, without notice, prepay Loans (together with all accrued but unpaid interest thereon) and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; *provided, however,* that the Borrower shall not be required to Cash Collateralize the L/C Obligations pursuant to this Section 2.04(b)(i) unless, after the prepayment of the Loans, the Total Outstandings exceed the Commitment at such time. For the avoidance of doubt, the Minimum Collateral Amount shall not apply to the Cash Collateral required under this Section 2.04(b)(i) unless an Event of Default has occurred and is continuing.

(ii)    *Application of Mandatory Prepayments.*  Prepayments made pursuant to this Section 2.04(b), *first,* shall be applied to the outstanding Loans, and, *second,* shall be

-20-

EXHIBIT 2    PAGE 60

used to Cash Collateralize the remaining L/C Obligations; and, in the case of prepayments under the Commitment required pursuant to clause (i) of this Section 2.04(b), the amount remaining, if any, after the prepayment in full of all Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full (the sum of such prepayment amounts, cash collateralization amounts and remaining amount being, collectively, the *"Reduction Amount"*) may be retained by the Borrower for use in the ordinary course of its business.  Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrower that has provided Cash Collateral) to reimburse the Bank.

All prepayments under this Section 2.04(b) shall be subject to Section 2.18 hereof, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

**Section 2.05    Termination or Reduction of Commitment**.

(a)    *Optional*.  (i) The Borrower may, upon notice to the Bank, terminate the Commitment, the Loan Sublimit or the Letter of Credit Sublimit or, from time to time permanently reduce the Commitment, Loan Sublimit or the Letter of Credit Sublimit; provided that (i) any such notice shall be received by the Bank not later than 4:00 p.m. (New York City time) five (5) Business Days prior to the date of termination or permanent reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $250,000 in excess thereof and (iii) Borrower shall not terminate or reduce the (A) Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Commitment, (B) Letter of Credit Sublimit if, after giving effect thereto and to any concurrent prepayments or Cash Collateralizations hereunder, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit or (C) Loan Sublimit if, after giving effect thereto and to any concurrent prepayments hereunder, the Outstanding Amount of Loans not repaid hereunder would exceed the Loan Sublimit.  Failure by the Borrower to designate in the notice required under this Section 2.05(a)(i) whether the Commitment, Loan Sublimit or Letter of Credit Sublimit is to be permanently reduced shall be deemed to be a permanent reduction in the Commitment.

(ii)    The Borrower hereby agrees to pay to the Bank a Reduction and Termination Fee (as defined below) in connection with any permanent reduction to, or termination or replacement of, the Commitment, the Loan Sublimit or the Letter of Credit Sublimit by the Borrower prior to the first (1st) anniversary of the Effective Date, in an amount equal to the product of (1) the applicable Commitment Fee Rate in effect on the date of such permanent reduction or termination or replacement, (2) the amount of such permanent reduction, termination or replacement of the Commitment, Loan Sublimit or Letter of Credit Sublimit, as applicable, and (3) a fraction, the numerator of which is equal to the number of days from and including the date of such termination or replacement to and including the first (1st) anniversary of the Effective Date, and the denominator of which is 360 (the *"Reduction and Termination Fee"*), payable on the date of such termination or replacement.

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 61

(b)     *Letter of Credit Sublimit*.  If after giving effect to any reduction or termination of the Commitment under this Section 2.05, the Letter of Credit Sublimit exceeds the Commitment at such time, the Letter of Credit Sublimit, as the case may be, shall be automatically reduced by the amount of such excess.

**Section 2.06   Repayment of Loans and Unreimbursed Amounts.**   The Borrower shall repay to the Bank, (a) on the earlier of (i) the Loan Facility Scheduled Termination Date and (ii) the Commitment Termination Date, the aggregate principal amount of Loans outstanding on such date, together with accrued interest thereon and (b) on the earlier of (i) the Scheduled Termination Date and (ii) the Commitment Termination Date, the aggregate principal amount of Unreimbursed Amounts outstanding on such date, together with accrued interest thereon. Subject at all times to Section 2.18 hereof, the Borrower shall repay to the Bank on the Commitment Termination Date all other Obligations payable hereunder.

**Section 2.07   Interest and Default Rate**.

(a)     *Interest*.  Subject to the provisions of subsection 2.07(b) below, each Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing Date at a rate per annum equal to the LIBOR Index Rate.  While the outstanding principal amount of any Loan or Unreimbursed Amount bears interest at a LIBOR Index Rate, the Bank shall determine the LIBOR Index Rate as of each applicable Computation Date and the LIBOR Index Rate applicable to Loans and Unreimbursed Amounts shall be effective (i) from the (A) Borrowing Date with respect to any Borrowing and (B) Honor Date with respect to any Unreimbursed Amount of L/C Obligations, in each case to but not including the immediately succeeding Rate Reset Date and (ii) thereafter, be effective for the period from and including the immediately succeeding Rate Reset Date to but not including the next succeeding Rate Reset Date; provided that, for purposes of calculating the initial LIBOR Index Rate with respect to any Loan or any Unreimbursed Amount, the Rate Reset Date applicable solely to such Loan or Unreimbursed Amount, as applicable (and not to any other outstanding Loans or Unreimbursed Amounts) until the next succeeding Rate Reset Date shall be the date such Loan or Unreimbursed Amount is advanced hereunder.

(b)     *Default Rate*.  (i)   While any Event of Default exists, the Borrower shall pay interest on all outstanding obligations of the Borrower hereunder (including, without limitation, all Loans and Unreimbursed Amounts) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws, payable on demand.

(ii)     Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     *Interest Payments*.  Interest on each Loan and Unreimbursed Amount shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any bankruptcy or insolvency proceeding.

-22-

EXHIBIT 2    PAGE 62

(d)    *Discretion of Bank as to Manner of Funding*.  Notwithstanding any provision of this Agreement to the contrary, the Bank shall be entitled to fund and maintain its funding of all or any part of the Loans or Unreimbursed Amount hereunder in any commercially reasonable manner, it being understood, however, that for the purposes of this Agreement all determinations hereunder shall be made as if the Bank had actually funded and maintained the Loans or Unreimbursed Amounts during each Interest Period applicable thereto through the purchase of deposits in the relevant market in the amount of the Loans, having a maturity corresponding to such Interest Period.

(e)    <u>Absence of LIBOR Funding</u>.

(i)    *Circumstances Affecting LIBOR Index Rate Availability*.  If for any reason (A) the Bank shall determine (which determination shall be conclusive and binding absent fraud or manifest error) that Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount of any Loan and/or Unreimbursed Amount, or (B) the Bank shall determine (which determination shall be conclusive and binding absent fraud or manifest error) that reasonable and adequate means do not exist for ascertaining LIBOR for any Interest Period with respect to any Loan and/or Unreimbursed Amount, then the Bank shall promptly give notice thereof to the Borrower.  Thereafter, each such Loan and/or Unreimbursed Amount shall automatically convert to bear interest at the Alternate Rate until the circumstance or condition requiring such conversion to the Alternate Rate ceases to apply or exist.

(ii)    *Laws Affecting LIBOR Index Rate Availability*.  If, after the date hereof, the enactment or effectiveness of, or any change in, any applicable Law or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or any of its lending offices) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, shall make it unlawful or impossible for the Bank (or any of its lending offices) to honor its obligations hereunder to make or maintain the Loans and/or Unreimbursed Amounts with the LIBOR Index Rate applicable, the Bank shall promptly give notice thereof to the Borrower.  Thereafter, each Loan and/or Unreimbursed Amount shall automatically convert to bear interest at the Alternate Rate until the circumstance or condition requiring such conversion to the Alternate Rate ceases to apply or exist.

**Section 2.08    Fees.**

(a)    *Commitment Fee*. Commencing on the date of this Agreement, the Borrower shall pay to the Bank a commitment fee (the "*Commitment Fee*") equal to the sum of:

(i)    an amount equal to the product of (A) the Commitment Fee Rate applicable to the Bank's obligation to make Loans to the Borrower pursuant to Section 2.01 hereof and (B) the greater of (x) zero and (y) the Commitment less the Letter of Credit Sublimit and less all Loans outstanding; and

-23-

EXHIBIT 2    PAGE 63

(ii)    an amount equal to the product of (A) the Commitment Fee Rate applicable to the Bank's obligation to issue Letters of Credit for the account of the Borrower pursuant to Section 2.03 hereof and (B) the greater of (x) zero and (y) the Letter of Credit Sublimit less all L/C Obligations outstanding,

in each case as from time to time in effect and computed on the basis of a year of 360 days and the actual number of days elapsed.  For the avoidance of doubt, the Commitment Fee shall not apply to the Outstanding Amount of Loans or the amount available to be drawn under outstanding Letters of Credit.  The Commitment Fee shall accrue from March 13, 2020 and at all times until the Commitment Termination Date, including at any time during which one or more of the conditions in Article III is not met (and solely for purposes of calculating the Commitment Fee, the Effective Date shall be deemed to be March 13, 2020), and shall be due and payable on the first Business Day of each January, April, July and October commencing with April 1, 2020 and on the Commitment Termination Date.  The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Commitment Fee Rate during any quarter, the daily actual amount shall be computed and multiplied by the Commitment Fee Rate separately for each period during such quarter that each such Commitment Fee Rate was in effect.  The Bank shall provide an invoice to the Borrower stating the Commitment Fees due for each quarterly period in arrears on the first Business Day of each January, April, July and October.

(b)    *Amendment Fees*.  The Borrower hereby agrees to pay to the Bank, on the date of each amendment to this Agreement or any other Financing Document, a non refundable fee equal to $5,000, plus, in each case, the reasonable fees and expenses of counsel to the Bank in an amount to be agreed upon by the parties prior to the making of such amendment.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c)    *California Debt and Investment Advisory Commission Fees*.  The Borrower shall either (i) pay the fees to be paid in connection with the Agreement, if any, directly to the California Debt and Investment Advisory Commission, or (ii) on or before the thirtieth (30th) day immediately following the date that the Bank shall pay such amount, reimburse the Bank for the fees paid by the Bank to the California Debt and Investment Advisory Commission in connection with this Agreement, if any.

(d)    *Other Fees*.  The Borrower shall pay to the Bank such other fees as set forth in Sections 2.03(a), 2.03(h), 2.17, 2.18 and 7.04 hereof and all other fees provided for in this Agreement.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**Section 2.09    Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a year of three hundred sixty (360) days, and actual days elapsed. Interest shall accrue on each Loan and any Unreimbursed Amount for the day on which such Loan or payment is made, and shall not accrue for the day on which the Loan or Unreimbursed Amount, as applicable, or such portion is paid, provided that any Loan or Unreimbursed Amount that is repaid on the same day on which it is made shall, subject to Section 2.18(a) hereof, bear interest for one day.  Each determination by the Bank of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

-24-

EXHIBIT 2    PAGE 64

Section 2.10  **Evidence of Debt**.  The Borrowings made from the Bank shall be evidenced by one or more accounts or records maintained by the Bank in the ordinary course of business.  The accounts or records maintained by the Bank shall be conclusive absent manifest error of the amount of the Borrowings made from the Bank by the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  The Loans shall be evidenced by the Note to be issued on the Effective Date, initially registered in the name of, and payable to, the Bank and otherwise duly completed.  The Bank may attach schedules to the Note and endorse thereon the date, amount and maturity of Loans and payments with respect thereto.

Section 2.11  **General Provisions as to Payments**.  All payments by the Borrower to the Bank hereunder shall be nonrefundable and made in lawful currency of the United States and in immediately available funds.  Amounts payable to the Bank hereunder shall be transferred to the Bank's account at Barclays Bank PLC, ABA# 026002574, Credit to Account No.: 050019104, Reference: Western Community Energy (or to such other account of the Bank as the Bank may specify by written notice to the Borrower) not later than 3:00 p.m., on the date payment is due.  Any payment received by the Bank after 3:00 p.m. shall be deemed to have been received by the Bank on the next Business Day.  If any payment hereunder is due on a day that is not a Business Day, then such payment shall be due on the immediately succeeding Business Day, and, in the case of the computation of the interest or fees hereunder, such extension of time shall, in such case, be included in the computation of the payment due hereunder.

Section 2.12  **Maximum Interest Rate; Payment of Fee**.  If the rate of interest due hereunder shall exceed the Maximum Interest Rate for any period for which interest is payable, then (i) interest at the Maximum Interest Rate shall be due and payable with respect to such interest period and (ii) if and to the extent permitted by applicable law, interest at the rate equal to the difference between (A) the rate of interest calculated in accordance with the terms hereof and (B) the Maximum Interest Rate (the "Excess Interest"), shall be deferred until such date as the rate of interest calculated in accordance with the terms hereof ceases to exceed the Maximum Interest Rate, at which time the Borrower shall pay to the Bank, with respect to amounts then payable to the Bank that are required to accrue interest hereunder if and to the extent permitted by applicable law, such portion of the deferred Excess Interest as will cause the rate of interest then paid to the Bank to equal the Maximum Interest Rate, which payments of deferred Excess Interest shall continue to apply to such unpaid amounts hereunder until all deferred Excess Interest is fully paid to the Bank.  Upon the repayment in full of any Loan or Unreimbursed Amount bearing Excess Interest, in consideration for the limitation of the rate of interest otherwise payable hereunder, the Borrower, if and to the extent permitted by applicable law, shall pay to the Bank a fee equal to the amount of all unpaid deferred Excess Interest on such Loan or Unreimbursed Amount, as applicable.

Section 2.13  **Cash Collateral.**

(a)  *Certain Credit Support Events.*  If (i) as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, or (ii) the Borrower shall be required to provide Cash Collateral pursuant to the terms hereof, the Borrower shall immediately following

-25-

EXHIBIT 2    PAGE 65

any request by the Bank, provide Cash Collateral in an amount not less than the applicable Minimum Collateral Amount except as otherwise provided for herein.  Additionally, if the Bank notifies the Borrower at any time that the Outstanding Amount of all L/C Obligations at such time exceeds the Letter of Credit Sublimit then in effect, then within ten (10) Business Days after receipt of such notice, the Borrower shall provide Cash Collateral for the Outstanding Amount of the L/C Obligations in an amount not less than the amount by which the Outstanding Amount of all L/C Obligations exceeds the Letter of Credit Sublimit.

(b)    *Grant of Security Interest.*  The Borrower hereby grants to (and subjects to the control of) the Bank and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as Cash Collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to Section 2.13(c) hereof.  If at any time the Bank determines in good faith that Cash Collateral is subject to any right or claim of any Person other than the Bank, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Bank, pay or provide to the Bank additional Cash Collateral in an amount sufficient to eliminate such deficiency. All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in one or more blocked, non-interest-bearing deposit accounts at the Bank.  The Borrower shall pay on demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance and disbursement of Cash Collateral.

(c)    *Application.*  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.13 or Sections 2.03, 2.05 or 6.02 hereof in respect of Letters of Credit shall be held and applied to the satisfaction of the specific L/C Obligations and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(d)    *Release.*  Cash Collateral (or the appropriate portion thereof) provided to secure obligations shall be released promptly following the determination by the Bank that there exists excess Cash Collateral.

**Section 2.14  Obligations Absolute**.  The payment obligations of the Borrower of Loans under this Agreement shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including without limitation the following:

(a)    any lack of validity or enforceability of this Agreement or any of the Loan Documents;

(b)    any amendment or waiver of or any consent to departure from all or any of this Agreement or any of the Loan Documents;

(c)    the existence of any claim, set off, defense or other right which the Borrower may have at any time against the Bank or any other Person, whether in connection with this

-26-

EXHIBIT 2    PAGE 66

Agreement or any of the Loan Documents, the transactions contemplated herein or therein or any unrelated transaction; or

(d)      any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

**Section 2.15   Yield Protection**.  (a)  <u>Reserves</u>.  If the Bank or any Participant shall have determined that the adoption or implementation of any change in any law, rule, treaty or regulation or any policy, guideline, or directive of, or any change in the enforcement, interpretation, implementation, or administration thereof by, any court, central bank, or other administrative authority or Governmental Authority or compliance by the Bank or any Participant with any request or directive of any such court, central bank, or other administrative authority or Governmental Authority occurring following the execution of this Agreement (in each case, whether or not having the force of law) (a "Change in Law"), shall at any time (i) impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, pursuant to Regulation D of the Board of Governors of the Federal Reserve System) against letters of credit, credits or commitments to extend credit extended by, or assets (funded or contingent) of, deposits with or for the account of, or other acquisitions of funds or bonds by the Bank or any Participant, (ii) subject credits or commitments to issue letters of credit or extend credit extended by the Bank or any Participant to any assessment or other cost imposed by the Federal Deposit Insurance Corporation or any successor thereto or the Prudential Regulation Authority or the Financial Conduct Authority or any successor thereto, (iii) change the basis of taxation of payments to the Bank or any Participant of any amounts payable hereunder (except for taxes on the overall net income of the Bank or any Participant), or (iv) impose on the Bank or any Participant any other or similar condition regarding this Agreement, the commitment or obligations of the Bank or any Participant hereunder, and the result of any event referred to in clause (i), (ii), (iii) or (iv) above shall be to increase the cost to the Bank or any Participant of agreeing to issue, issuing or maintaining the Letters of Credit and/or Loans or to reduce the amount of any sum received or receivable by the Bank or any Participant hereunder, then, upon demand by the Bank, the Borrower shall pay to the Bank for its account, or that of any such Participant as may be applicable, such additional amount or amounts as will compensate the Bank or such Participant for such increased costs or reductions in amount.

(b)      <u>Capital Charges</u>.  If the Bank or any Participant shall have determined that the adoption or implementation of any Change in Law shall impose, modify or deem applicable any capital adequacy or similar requirement (including, without limitation, a request or requirement that affects the manner in which the Bank or any Participant allocates capital resources to its commitments) that either (i) affects or would affect the amount of capital to be maintained by the Bank or such Participant or (ii) reduces or would reduce the rate of return on the Bank's or such Participant's capital to a level below that which the Bank or such Participant could have achieved but for such circumstances (taking into consideration the policies of the Bank or such Participant with respect to capital adequacy) then, upon demand by the Bank for its own account or that of such Participant as may be applicable, the Borrower shall pay to the Bank for its own account, or such Participant, as applicable, such additional amounts as will compensate the Bank or such Participant for such event such that the Bank or such Participant shall enjoy the same economic benefit that the Bank or such Participant would have enjoyed if such event had not occurred.

-27-

(c)     All payments of amounts referred to in clauses (a) and (b) above shall be paid by the Borrower to the Bank within thirty (30) days of such demand.  A certificate as to such increased cost, increased capital, or reduction in return incurred by the Bank or any Participant as a result of any event mentioned in clause (a) or (b) of this subsection setting forth, in reasonable detail, the basis for calculation and the amount of such calculation shall be submitted by the Bank to the Borrower simultaneously with such demand for payment and shall be conclusive as to the amount thereof absent manifest error.  In making the determinations contemplated by the above referenced certificate, the Bank or any such Participant may make such reasonable estimates, assumptions, allocations and the like that the Bank or such Participant in good faith determines to be appropriate.  The obligations of the Borrower under this Section 2.15 shall survive the termination of this Agreement.

(d)     Third Party Beneficiaries.  The benefits of this Section 2.15 shall be available to each assignee of the Bank and each Participant; provided, however, that no assignee or Participant shall be entitled to receive (nor shall the Bank be entitled to receive on behalf of any assignee or Participant) any greater payment under this Section 2.15 than the Bank would have been entitled to receive without regard to any such assignment or participation unless any such assignment or participation is made with the express written consent of the Borrower.

**Section 2.16   Withholding**.  All payments by or on behalf of the Borrower under this Agreement shall be made without counterclaim, setoff, condition or qualification, and free and clear of, and without deduction or withholding for, or by reason of any present or future taxes, levies, imposts, deductions or charges of any nature whatsoever; excluding, however, taxes imposed on or measured by the net income or capital of the Bank by any jurisdiction or any political subdivision or taxing authority thereof or therein (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes").  If requested, the Bank, any assignee and any Participant, from time to time, shall provide the Borrower and the United States Internal Revenue Service (to the extent such information and forms may be lawfully provided by the Bank or such assignee or Participant) with such information and forms as may be required by the Treasury Regulations Section 1.1441 (C.F.R.) or any other such information and forms as may be necessary to establish that the Borrower is not subject to any withholding obligation under Section 1442 or other comparable provisions of the Code. If as a result of a change of Law, the Borrower shall be required by law to withhold or deduct any Taxes imposed by the United States or any political subdivision thereof from or in respect of any sum payable hereunder to the Bank, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.16) the Bank receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. If the Borrower shall make any payment under this Section 2.16 to or for the benefit of the Bank with respect to Taxes and if the Bank shall claim any credit or deduction for such Taxes against any other taxes payable by the Bank to any taxing jurisdiction in the United States, then the Bank shall pay to the Borrower an amount equal to the amount by which such other taxes are actually reduced; provided, however, that the aggregate amount payable by the Bank pursuant to this sentence shall not exceed the aggregate amount previously paid by the Bank with respect to such Taxes.  All of the Borrower's

-28-

EXHIBIT 2    PAGE 68

obligations under this Section 2.16 shall survive the termination of this Agreement and the repayment in full of the Loans.

**Section 2.17   Other Taxes**.  To the extent permitted by law, the Borrower agrees to indemnify and hold the Bank harmless (on a net after-tax basis) from any present or future claim or liability for stamp, transfer, documentary, excise or other similar tax and any penalties or interest with respect thereto, which may be assessed, levied or collected by any government authority in connection with the execution, delivery, performance, filing and recording of, or any payment made under, this Agreement or the Loan Documents, or any amendment hereto or thereto and any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees.

**Section 2.18   Compensation for Losses.**   Upon demand of the Bank from time to time, the Borrower shall promptly compensate the Bank for and hold the Bank harmless from any loss, cost or expense incurred by it as a result of:

(a)   any payment or prepayment of any Loan or Unreimbursed Amount, the interest on which is determined by reference to LIBOR on a day other than the Rate Reset Date (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)   any failure by the Borrower (for a reason other than the failure of the Bank to make a Loan or Unreimbursed Amount) to prepay or borrow any Loan or Unreimbursed Amount on the date or in the amount notified by the Borrower;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or Unreimbursed Amount or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by the Bank in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Bank under this Section 2.18, the Bank shall be deemed to have funded each Loan and Unreimbursed Amount made by it at LIBOR for such Loan or Unreimbursed Amount by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Loan was in fact so funded.

**Section 2.19   Modification of Sublimits.**   Provided that no Event of Default has occurred and is continuing under this Agreement, the Borrower may from time to time request a modification in the balance of available funding between the Loan Sublimit and the Letter of Credit Sublimit to take into account any change in the needs of Borrower with respect to complying with the security requirements of PPA Providers.  Any modification of the Loan Sublimit and Letter of Credit Sublimit shall be subject to receipt by the Bank of any required internal approvals, including internal credit approval and subject to execution by the parties of an amendment to this Agreement evidencing such modification, it being understood that the Bank shall not be obligated to agree to any modification of the Loan Sublimit and the Letter of Credit Sublimit requested by the Borrower.

-29-

EXHIBIT 2    PAGE 69

Section 2.20   **Pledge and Security**. (a)  The Borrower hereby conveys, grants, pledges and assigns to the Bank and its successors and assigns a first priority security interest in (i) the Pledged Revenues, (ii) the Operating Reserve Fund and (iii) the Operating Fund Account to secure all of the Obligations (including, without limiting the foregoing, payments of principal of and interest on each Loan) of the Borrower hereunder.

(b)     Notwithstanding any other provision of this Agreement or any other Loan Document to the contrary, the Borrower hereby acknowledges and agrees that payment of all Obligations (including, without limiting the foregoing, payments of principal of and interest on each Loan) is a general obligation of the Borrower secured by a first priority lien on the Pledged Revenues, the Operating Reserve Fund and the Operating Fund Account.  The Bank acknowledges that the Obligations of the Borrower hereunder are solely obligations of the Borrower and are not debts, liabilities or obligations of any of the Members and no taxing power of any of the foregoing is pledged therefor.  The Borrower has no taxing powers.

## ARTICLE III

## CONDITIONS PRECEDENT TO BORROWINGS

Section 3.01   **Conditions of Initial Borrowing or issuance of initial Letter of Credit**. The obligation of the Bank to advance the initial Borrowing or issuance the initial Letter of Credit hereunder is subject to the following conditions precedent.

(a)     The Bank shall have received, on or before the Effective Date, the items listed below, each dated and in form and substance as is satisfactory to the Bank:

(i)     copies of the resolutions of the Borrower approving the execution and delivery of this Agreement and the Loan Documents and the other matters contemplated hereby and thereby, certified by the Authorized Officer of the Borrower as being a true and complete copy thereof and in full force and effect on the Effective Date;

(ii)     a certificate by an Authorized Officer of the Borrower, delivered to the Bank at least two (2) Business Days prior to the Effective Date, certifying the names and signatures of the persons authorized to sign, on behalf of the Borrower, this Agreement, the Loan Documents and each Loan Notice and certifying that the proceeds of such Loan shall only be used for the purpose of acquiring power or providing collateral in connection with the acquisition of power;

(iii)     unaudited internally-produced cash flow and balance sheet projections of the Borrower;

(iv)     originals (or copies certified to be true copies by the Borrower) of all governmental and regulatory approvals, if any, at the time required to be obtained by the Borrower with respect to this Agreement and the Loan Documents and the transactions contemplated hereby and thereby, together with a list of any approvals still to be received, if any;

(v)     an executed original of this Agreement and each of the Loan Documents;

-30-

EXHIBIT 2    PAGE 70

(vi)      an opinion of Best, Best & Krieger LLP, special counsel to the Borrower, or other counsel acceptable to the Bank, addressed to the Bank or on which the Bank is otherwise expressly authorized to rely, as to the due authorization, execution, delivery and enforceability of this Agreement and each of the Loan Documents, validity of each security interest created hereunder and such other matters as the Bank may reasonably request;

(vii)     a certificate dated the Effective Date and executed by an Authorized Officer certifying (i) that there has been no event or circumstance since January 1, 2019, that has had or could be reasonably expected to have, either individually or in the aggregate, a material adverse effect upon the operations, business, properties, liabilities or financial condition of the Borrower, (ii) that the representations and warranties contained in Article IV hereof are true and correct in all material respects on the Effective Date and (iii) no event has occurred and is continuing, or would result from entry into this Agreement or any of the Loan Documents, which would constitute a Default or Event of Default;

(viii)    an executed United States Internal Revenue Service Form W-9 with respect to the Borrower;

(ix)      the executed Loan Notice delivered to the Bank at least two (2) Business Days prior to the Borrowing Date; and

(x)       a written description of all actions, suits or proceedings pending or threatened against the Borrower in any court or before any arbitrator of any kind or before or by any Governmental Authority and such other statements, certificates, agreements, documents and information with respect thereto as the Bank may reasonably request.

(b)      The Bank shall have received, on or before advancing the initial Borrowing or the issuance the initial Letter of Credit hereunder, executed copies of the Security Agreement, PPA Account Control Agreement and the Account Control Agreement and the establishment of the Lockbox Account, Operating Fund Account and Operating Reserve Fund and opinions of counsel covering such documents, in each case, in form and substance satisfactory to the Bank in its sole discretion, it being acknowledged and agreed that the Bank shall not be obligated to issue any Letters of Credit hereunder or advance any Loans hereunder until the satisfaction of this condition.

(c)      On or prior to the date of the advance of the initial Loan or initial issuance of a Letter of Credit, the Bank shall have received reimbursement (or direct payment) of the Bank's fees and expenses (including the reasonable legal fees and expenses of McDermott Will & Emery LLP, in the amount of $53,000), fees of legal counsel to the Bank in connection with the review and negotiation of the documents required under clause (b) of this Section and any other reasonable fees incurred in connection with the transaction contemplated by this Agreement and the Loan Documents; and

-31-

EXHIBIT 2    PAGE 71

(d)      All other legal matters pertaining to the execution and delivery of this Agreement and the Loan Documents shall be satisfactory to the Bank and its counsel, and the Bank shall have received such other statements, certificates, agreements, documents and information with respect to the Borrower and matters contemplated by this Agreement as the Bank may reasonably request.

**Section 3.02   Conditions Precedent to each Subsequent Loan**.  The obligation of the Bank to advance each subsequent Loan is subject to the further conditions precedent that:

(a)      The Bank shall have received the executed Loan Notice at least three (3) Business Days prior to the Borrowing Date;

(b)      The Bank shall have received, on or before the Borrowing Date, in form and substance as is satisfactory to the Bank, a certificate dated the Borrowing Date and executed by an Authorized Officer certifying (i) that the representations and warranties contained in Article IV hereof are true and correct in all material respects on the Borrowing Date and (ii) no event has occurred and is continuing, or would result from issuance of the requested Loan, which would constitute a Default or Event of Default;

(c)      The principal amount of such Loan shall not exceed the Available Commitment on the date such Loan is to be advanced and that after giving effect to any Borrowing, the (x) Total Outstandings shall not exceed the Commitment, subject to any reductions thereof pursuant to the terms hereof, and (y) the Outstanding Amount of the Loans shall not exceed the Loan Sublimit;

(d)      The Loan Facility Scheduled Termination Date shall not have occurred on or prior to the Borrowing Date; and

(e)      If the Loan is being requested prior to the Launch Date, the proceeds of such Loan shall only be used for the purpose of acquiring power or providing collateral in connection with the acquisition of power.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Borrower makes the following representations and warranties to the Bank as of the date hereof:

**Section 4.01   Existence and Power**.  The Borrower (i) is a joint powers agency created pursuant to the Act, (ii) has full power and authority to own its properties and carry on its business as now conducted, and (iii) has full power and authority to execute (or adopt, if applicable), deliver and perform its obligations under this Agreement and the Loan Documents and to borrow hereunder.  The Borrower is an "Electric Service Provider" under the Community Energy Aggregation Act and has full power and authority to offer electrical service to customers within its service territory.

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 72

Section 4.02   **Regulatory Authority**.  The Borrower is duly authorized to conduct its business and activities under all applicable laws, rulings, regulations and ordinances and the departments, agencies and political subdivisions governing it or regulating its business and activities, and the Borrower has obtained all material and requisite approvals of the State and of federal, regional and local governmental bodies required to be obtained in connection with the execution and delivery of this Agreement and the other Loan Documents prior to the date of the execution and delivery of this Agreement and the Loan Documents.

Section 4.03   **Noncontravention**.  The execution and delivery by the Borrower of this Agreement and the Loan Documents and the performance of its obligations hereunder and thereunder, does not and will not violate any existing law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Borrower or any of its assets, or result in a breach of any of the terms of, or constitute a default under or result in the creation or imposition of any lien on, any indenture, mortgage, deed of trust, lease or other agreement or instrument to which the Borrower is a party or by which it or any of its property is bound or the Act, its bylaws (if any), or any of the rules or regulations applicable to it or its property or any decree or order of any court or other governmental body.

Section 4.04   **Due Authorization**.  The execution, delivery and performance by the Borrower of this Agreement and the Loan Documents are within its corporate power and authority, and have been duly authorized by all necessary action and will not contravene any provision of the Act or its bylaws (if any).

Section 4.05   **Valid and Binding Obligations**.  This Agreement and each of the Loan Documents is a valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

Section 4.06   **Power Purchase Agreement.**  Each Power Purchase Agreement shall constitute a legal, valid and binding agreement of the Borrower, enforceable against the Borrower according to its terms except as enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to equitable principles in the event that equitable remedies are sought.

Section 4.07   **Pending Litigation and Other Proceedings**.  There is no action, suit or proceeding by or before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, pending (which has been served to the extent required to be served) or, to the Borrower's knowledge, threatened action or proceeding affecting or involving the Borrower or any of its business, properties, revenues or assets before any court, governmental agency or arbitrator which, if adversely determined, could result in a Material Adverse Effect (in the reasonable judgment of the Borrower), or otherwise adversely affect (A) the validity or enforceability of this Agreement or any of the Loan Documents, or (B) the status of the Borrower as a joint powers agency created pursuant to sections 6500 et seq. of the California Government Code, validly existing under the laws of the State.

Section 4.08   **Insurance.**  The Borrower currently maintains insurance with respect to its business, operations, assets and properties against such risks, in such amounts, with such companies and with such deductibles as is customarily carried by and insures against such risks

-33-

as are customarily insured against by entities with business, operations, assets and properties of like size, location and character to those of the Borrower.

Section 4.09   **Financial Projections.**   The projected balance sheet of the Borrower as provided to the Bank on September 12, 2019 and the related statement of revenues and expenses fairly present the Borrower's expectation of its future financial condition, changes in financial position and results of operations at such dates and for such periods as set forth therein.  Since September 12, 2019 there has been no material adverse change (in the reasonable judgment of the Borrower) in the business, assets, revenues, properties, condition (financial or otherwise) or operations, present or prospective, of the Borrower not otherwise disclosed to the Bank in writing prior to the Effective Date.

Section 4.10   **Complete and Correct Information**.  All information, reports and other papers and data with respect to the Borrower furnished to the Bank or its counsel by the Borrower were, taken in the aggregate and at the time the same were so furnished, complete and correct in all material respects.  No fact is known to the Borrower which materially and adversely affects or in the future may materially and adversely affect the business, revenues, properties, assets or liabilities, financial condition, results of operations of the Borrower, or any of its business prospects which has not been set forth in the financial statements referred to in Section 4.08 hereof or in such information, reports, papers and data or otherwise disclosed in writing to the Bank by the Borrower.  When taken in the aggregate, no document furnished or statement made by the Borrower in connection with the negotiation, preparation or execution of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading.

Section 4.11   **Pending Legislation and Decisions**.  There is no amendment, or to the current knowledge of the Borrower, proposed amendment to the Constitution of the State or any State law or any administrative interpretation of the Constitution of the State or any State law, or any legislation that has passed either house of the legislature of the State, or any judicial decision interpreting any of the foregoing, which would materially adversely affect the Borrower's obligations under this Agreement or the Loan Documents, or the Borrower's ability to pay when due its obligations under this Agreement.

Section 4.12   **Default**.  No Default or Event of Default has occurred and is continuing with respect to the Borrower.

Section 4.13   **Employee Benefit Plan Compliance**.  The Borrower has no funding deficiency with respect to any employee benefit plan and is otherwise in compliance with terms of any such plan in which the Borrower or any of its employees participate in.  Neither the Borrower nor any employee benefit plan maintained by the Borrower is subject to the Employee Retirement Income Security Act of 1974, as amended.

Section 4.14   **Operating Reserve Fund.**   The Borrower has created the Operating Reserve Fund and such account is and shall at all times be maintained and segregated from all other funds and accounts of the Borrower.

-34-

EXHIBIT 2    PAGE 74

**Section 4.15    Sovereign Immunity**.  The Borrower is not entitled to immunity from legal proceedings to enforce this Agreement or any other Loan Document to which the Borrower is a party (including, without limitation, immunity from service of process or immunity from jurisdiction of any court otherwise having jurisdiction) and is subject to claims and suits for damages in connection with this Agreement or any other Loan Document to which the Borrower is a party.

**Section 4.16    Usury**.   The terms of this Agreement regarding the calculation and payment of interest and fees do not violate any applicable usury laws.  The obligations of the Borrower hereunder are not subject to any limitations as to maximum rate of interest payable to regulated financial institutions.

**Section 4.17    Federal Reserve Board Regulations**.  The Borrower will not use any part of the proceeds of the Loans or Letters of Credit and has not incurred any indebtedness to be reduced, retired or purchased by the Borrower out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the Borrower does not own and will not acquire any such Margin Stock.

**Section 4.18    Investment Company Act**.   The Borrower is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

**Section 4.19    No Proposed Legal Changes**.  To the best knowledge of the Borrower, there is no proposed amendment to the Constitution of the State or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the State legislature, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to result in a Material Adverse Change.

**Section 4.20    No Outstanding Indebtedness.**    The Borrower has no outstanding Indebtedness.

**Section 4.21    Loan Documents**.  Each of the Loan Documents is (or upon execution and delivery on even date herewith will be) in full force and effect.  No Event of Default and no event which, with the giving of notice, the passage of time or both, would constitute an Event of Default, presently exists under any of the Loan Documents.  Neither the Borrower nor any other party under the Loan Documents has waived or deferred performance of any material obligation under any such Loan Document.

**Section 4.22    Incorporation of Representations and Warranties**.   The Borrower hereby makes to the Bank the same representations and warranties made by the Bank in each Loan Document, which representations and warranties, together with the related definitions of terms contained therein, are hereby incorporated by reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety.  No amendment to or waiver of such representations and warranties or definitions made pursuant to

-35-

EXHIBIT 2    PAGE 75

the relevant Loan Documents shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Bank.

Section 4.23   **Parties to the Joint Powers Agreement**.  Each of the entities identified on Exhibit D hereto is currently a Member Agency (as defined in the Joint Powers Agreement).

Section 4.24   **ERISA.**  The Borrower does not maintain or contribute to, and has not maintained or contributed to, any "employee benefit plans" that are subject to Title IV of ERISA.

Section 4.25   **Anti-Terrorism Laws**.  The Borrower is not in violation of any Laws relating to terrorism or money laundering ("*Anti-Terrorism Laws*"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "*Executive Order*"), and the Patriot Act;

(a)      The Borrower is not any of the following:

(i)      a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)      a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with which the Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)      a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)      a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("*OFAC*") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(b)      The Borrower does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (a)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

**ARTICLE V**

**COVENANTS**

-36-

EXHIBIT 2    PAGE 76

As long as this Agreement is in effect, and until all amounts payable hereunder are paid in full, the Borrower will perform and observe the covenants set forth below, unless the Bank shall otherwise consent in writing:

**Section 5.01   Compliance With Laws and Regulations**.  The Borrower shall comply with all laws, ordinances, orders, rules and regulations of duly constituted public authorities which may be applicable to it, its revenues, assets or properties.

**Section 5.02   Reporting Requirements**.  The Borrower shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Borrower on a consolidated or combined basis in accordance with generally accepted accounting principles consistently applied.  The Borrower will deliver to the Bank either in hard copy or by electronic mail to xramunicipalcovenant@barclayscapital.com (or such other email address as shall be directed from time to time by the Bank):

(a)     *Annual Financial Statements*.  As soon as available, and in any event within two hundred seventy (270) days after the close of each Fiscal Year of the Borrower, commencing with the Fiscal Year ending June 30, 2019, the complete audited financial statements of the Borrower including the balance sheet as of the end of such Fiscal Year and the related statements of revenues, expenses and cash flows and changes in fund balance for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the preceding Fiscal Year all in reasonable detail, certified and prepared by an independent certified public accountant in accordance with generally accepted accounting principles, consistently applied.

(b)     *Quarterly Financial Statements*.  As soon as available, and in any event within forty-five (45) days after the last day of each of each quarter of each Fiscal Year of the Borrower, the unaudited financial statements of the Borrower including the balance sheet as of the end of such quarter and a statement of income and expenses, all in reasonable detail and certified, subject to year-end adjustment, by an Authorized Officer of the Borrower and a statement of customer count and usage as of such date.

(c)     *Certificate of Compliance*.  Simultaneously with the delivery of each set of financial statements referred to in Section 5.02(a) hereof, a certificate signed by an Authorized Officer of the Borrower stating that (i) under his/her supervision the Borrower has made a review of its activities during the preceding annual period for the purpose of determining whether or not the Borrower has complied with all of the terms, provisions and conditions of this Agreement and each Loan Document and (ii) to the best of his/her knowledge no Default or Event of Default has occurred with respect to the Borrower in the performance or observance of any of the terms, covenants, provisions or conditions of this Agreement or any Loan Document, or if a Default or Event of Default shall have occurred with respect to the Borrower, such certificate shall specify each such Default or Event of Default, the nature and status thereof and any remedial steps taken or proposed to correct each such Default or Event of Default.

(d)     *Financial Covenant Compliance*.  The Borrower shall deliver to the Bank within thirty (30) days after each Financial Covenant Determination Date, a certificate of an Authorized Officer of the Borrower certifying, in form and substance acceptable to the Bank, the Borrower's

-37-

EXHIBIT 2    PAGE 77

Operating Reserve Fund balance and Debt Service Coverage Ratio as of such Financial Covenant Determination Date, and providing the basis for such calculation.

(e) *Amendments*.  Promptly after the adoption thereof, copies of any amendments of or supplements to any Loan Document, the Joint Powers Agreement, any Financing Document or any bylaws of the Borrower.

(f) *Parties to Joint Powers Agreement*.  Promptly after any entity ceases to be a Party (as defined in the Joint Powers Agreement), notice thereof and copies of any notices or documents provided by or to the Borrower in connection therewith.

(g) *Power Purchase Agreement Defaults*.  Promptly upon any Authorized Officer obtaining knowledge of the occurrence of (i) an event of default or notice thereof or (ii) any condition or event which, with the giving of notice or lapse of time, or both, would, unless cured or waived, become an event of default, in each case, caused by the Borrower under any Power Purchase Agreements, and in any event within five (5) days thereafter, the Borrower will provide to the Bank the written statement of an Authorized Officer setting forth the reasonable detail of such event and the action which the Borrower proposes to take with respect thereto.

(h) *Operating Reserve*.  Within fifteen (15) days after the end of each calendar month after March 31, 2021, the Borrower shall provide the Bank with a statement indicating the amount of funds on deposit in the Operating Reserve Fund.

(i) *Other Reports*.  Promptly upon request by the Bank, copies of any financial statement or report furnished to any other holder of long term securities of the Borrower pursuant to the terms of any long-term indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Bank pursuant to any other clause of this Section 5.02.

(j) *Financing Documents.*  Promptly after the execution thereof, copies of any of the Financing Documents.

(k) *Other Information*.  Such other information with respect to the business, properties, revenues, assets or the condition or operations, financial or otherwise, of the Borrower as the Bank may from time to time reasonably request.

**Section 5.03   Notices.**  (a) As promptly as practical (but in no event more than five (5) days) after the date the Borrower shall have obtained knowledge of the occurrence of an Event of Default or breach of this Agreement, the Borrower shall provide notice of the same to the Bank and, in either case, provide to the Bank the written statement of the Borrower setting forth the details of each such event and the action which the Borrower proposes to take with respect thereto.

(b) *Offering Circulars and Material Event Notices*.  The Borrower shall, within ten (10) days after the filing of a material event notice or the issuance by the Borrower of any indebtedness or other obligation with respect to which a final official statement or other offering circular has been prepared by the Borrower, provide the Bank with a copy of such notice, official statement or offering circular, as applicable.

-38-

EXHIBIT 2    PAGE 78

**Section 5.04    Further Assurances**.  The Borrower shall, upon the request of the Bank, from time to time, execute and deliver and, if necessary, file, register and record such further financing statements, amendments, confirmation statements and other documents and instruments and take such further action as may be reasonably necessary to effectuate the provisions of this Agreement and each Loan Document.  Except to the extent it is exempt therefrom, the Borrower will pay or cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Agreement and each Loan Document and such instruments of further assurance.

**Section 5.05    Right of Entry**.    The Borrower shall permit the duly authorized representatives of the Bank during normal business hours and upon reasonable notice to enter the premises of the Borrower, or any parts thereof, to examine and copy the Borrower's financial and corporate books, records and accounts, and to discuss the affairs, finances, business and accounts of the Borrower with the Borrower's officers and employees.

**Section 5.06    Payment of Obligations; Removal of Liens**.  The Borrower shall pay (a) all indebtedness and obligations of the Borrower in accordance with the terms thereof and (b) all assessments or other governmental charges as the same respectively become due, all taxes, assessments (general or special) and governmental charges of any kind whatsoever that may be at any time lawfully assessed or levied against or with respect to any of its or its businesses, property, revenues and assets or any interest thereon and promptly discharge or cause to be discharged all liens, encumbrances and charges on such businesses, property, revenues and assets.  Nothing contained in this Section 5.06 will require Borrower to make any payment (other than amounts owed under this Agreement) that it disputes or has offset in good faith with respect to any payee or will prevent Borrower from challenging any tax, assessment or charge in good faith, provided, however, that such non-payment or challenge does not have a Material Adverse Effect on the Borrower.

**Section 5.07    Related Obligations**.    The Borrower shall promptly pay all amounts payable by it under this Agreement and under the other Loan Documents according to the terms hereof or thereof and shall duly observe, perform and fulfill each of its obligations under this Agreement and under the provisions of each of the other Loan Documents.  Such provisions of such other Loan Documents, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety without giving effect to any expiration, amendment, supplement or termination of the Loan Documents to which the Bank has not given its express written consent.

**Section 5.08    Insurance**.    The Borrower will at all times maintain insurance with respect to its business, operations, assets and properties against such risks, in such amounts, with such companies and with such deductibles as is customarily carried by and insures against such risks as are customarily insured against by entities with business, operations, assets and properties of like size, location and character to those of the Borrower.

-39-

**Section 5.09    Employee Benefit Plan Compliance**.  The Borrower shall, in a timely fashion, comply in all material respects with all requirements under any employee benefit plan in which the Borrower or any of its employees participate.

**Section 5.10    Disclosure of Participants**.  The Borrower permits the Bank to disclose any information received by the Bank in connection herewith to any Participant, including without limitation the financial information described in Section 5.02 hereof.

**Section 5.11    Sovereign Immunity**.  The Borrower irrevocably agrees that it will not assert the defense of any future right of sovereign immunity in a legal proceeding to enforce or collect upon the obligations of the Borrower under this Agreement, the Loan Documents or the transactions contemplated hereby and thereby.

**Section 5.12    Notice of Adverse Change**.  The Borrower shall provide to the Bank written notice as soon as possible of (i) the filing of actions, suits and proceedings before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, against the Borrower, where the amount claimed is in excess of two million Dollars ($2,000,000), (ii) any action, suit, proceeding, inquiry or investigation before or by any court, public board or body pending or threatened wherein an unfavorable decision, ruling or finding could result in a Material Adverse Change or (iii) any other event which, in the reasonable judgment of the Borrower, is likely to result in a Material Adverse Change.

**Section 5.13    Taxes and Liabilities**.  The Borrower shall pay all its indebtedness and other obligations promptly and in accordance with their terms and pay and discharge or cause to be paid and discharged promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, which default could result in a Material Adverse Change.

**Section 5.14    Compliance With Laws, Etc**.  The Borrower shall not violate any laws, rules, regulations, or governmental orders to which it is subject and of which it is aware after diligent inquiry, which violation involves a reasonable likelihood of resulting in a Material Adverse Change.

**Section 5.15    Preservation of Existence, Ownership, Etc**.  The Borrower shall (a) preserve and maintain its corporate existence, right (charter and statutory) and franchises, trade names and licenses, (b) qualify and remain qualified to do business in each jurisdiction in which such qualification is necessary in view of the Borrower's business or operations and (c) preserve all of the property of the Borrower used or useful in the conduct of the Borrower's business or operations and keep the same in good repair, working order and condition, and from time to time make, or cause to be made, all needful and proper repairs, renewals and replacements, betterments and improvements thereto, so that the business carried in connection therewith may be properly and advantageously conducted at all times.

**Section 5.16    Certain Information**.  The Borrower shall not include in an offering document for any Indebtedness any information concerning the Bank that is not supplied in

-40-

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 80

writing, or otherwise approved, by the Bank expressly for inclusion therein, which supply or approval shall not be unreasonably withheld.

**Section 5.17   Disposition of Assets**.  The Borrower shall not dissolve nor shall it sell, lease, assign, transfer or otherwise dispose of all or a substantial portion of its properties and assets.

**Section 5.18   Consolidation or Merger**.  The Borrower shall not consolidate with or merge into another Person or permit one or more other Persons to consolidate with or merge into it or acquire all or substantially all of the property and assets of any other Person without the consent of the Bank; provided, that nothing in this Section 5.18 is intended to preclude the addition of new Members to the Borrower in accordance with the Joint Powers Agreement.

**Section 5.19   Proceeds of Loans**.  The proceeds of the Loans will be used by the Borrower solely for purposes consistent with the Act and the purposes of the Borrower as set forth in the Joint Powers Agreement, including for purposes consistent with the community choice aggregation program established by Borrower pursuant to California Public Utilities Code Section 366.2.  The Borrower shall use Credit Extensions (i) in the case of Letters of Credit, to secure payments due under Power Purchase Agreements, and (ii) in the case of Loans, to purchase energy for the community choice aggregation program and to secure payments due under Power Purchase Agreements.  The Borrower shall use the proceeds of any Loan requested prior to the Launch Date solely for the purpose of acquiring power or providing collateral in connection with the acquisition of power.

**Section 5.20   Disclosure in Financial Statements**.  The Borrower shall reflect the indebtedness evidenced by this Agreement in any statement of assets and liabilities prepared by or for the Borrower.

**Section 5.21   Liens**.  The Borrower will not create, incur or permit to exist any lien of any kind on any Property of the Borrower senior to or on parity with the lien on Pledged Revenues in favor of the Bank.  The Borrower will not create, incur or permit to exist any lien of any kind on any Property of the Borrower on a basis subordinate to the lien on Pledged Revenues in favor of the Bank.

**Section 5.22   Burdensome Contracts With Members**.  The Borrower will not enter into any contract, agreement or business arrangement with any of its Members on terms and conditions which are less favorable to the Borrower than would be usual and customary in similar contracts, agreements or business arrangements between unrelated persons transacting with each other on an arm's length basis.

**Section 5.23   Indebtedness**.  The Borrower shall not create, incur, assume or suffer to exist any Indebtedness except (i) Loans hereunder, (ii) any Power Purchase Agreements, (iii) Trade Obligations in an aggregate amount not in excess of $500,000 and (iv) any other Indebtedness consented to by the Bank.

**Section 5.24   Use of Pledged Revenues**.  The Borrower shall not spend, disburse, apply, lend or otherwise dispose of monies constituting Pledged Revenues except for purposes consistent with the purpose of the Borrower as set forth in the Joint Powers Agreement,

-41-

EXHIBIT 2    PAGE 81

including for purposes consistent with the community choice aggregation program established by Borrower pursuant to California Public Utilities Code Section 366.2; provided that, following the occurrence of an Event of Default hereunder, the Borrower shall apply all Pledged Revenues solely to the payment of Obligations hereunder.

**Section 5.25   Amendments**.  The Borrower shall not amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Loan Documents, the Joint Powers Agreement or the Financing Documents or its bylaws, if any, without the prior written consent of the Bank; provided, that nothing in this Section 5.25 is intended to preclude (a) the addition of new Members to the Borrower in accordance with the Joint Powers Agreement or (b) any amendment to the Joint Powers Agreement which does not materially adversely affect the rights of the Bank hereunder.

**Section 5.26   Incorporation by Reference.**  From and after the date hereof and so long as this Agreement is in effect, except to the extent compliance in any case or cases is waived in writing by the Bank, the Borrower shall perform, observe, fulfill and comply with, abide by, and be restricted by the provisions of the Financing Documents to which it is a party, so long as any Obligations remain outstanding hereunder, which agreements, covenants, obligations and undertakings together with the related definitions, exhibits and ancillary provisions are incorporated herein by reference, mutatis mutandis, and made a part hereof to the same extent and with the same force and effect as if the same had been herein set forth in their entirety.  No amendment to any such covenants or defined terms shall be effective to amend such covenants and defined terms as incorporated by reference herein without the prior written consent of the Bank.

**Section 5.27   Debt Service Coverage Ratio and Operating Reserve Fund Balance**. (a) As of each Financial Covenant Determination Date commencing on April 1, 2021, the Debt Service Coverage Ratio of the Borrower shall be not less than the Debt Service Coverage Ratio Requirement; provided that, for the Financial Covenant Determination Dates occurring on April 1, 2021 and July 1, 2021, such calculation shall be determined based on Income Available for Debt Service and interest (but not principal) for the prior twelve months.

(b)      If the Debt Service Coverage Ratio of the Borrower is less than the Debt Service Coverage Ratio Requirement as of any Financial Covenant Determination Date (a "*Noncompliance Date*"), the Borrower shall (A) notify the Bank within one (1) Business Day thereof and (B) at its own expense, retain a Consultant within thirty (30) days of such Financial Covenant Determination Date, to make recommendations with respect to the rates, fees and charges of the Borrower and the Borrower's methods of operation and other factors affecting its financial condition in order to increase the Debt Service Coverage Ratio of the Borrower above the Debt Service Coverage Ratio Requirement.  Such Consultant shall be selected by the Borrower and shall be acceptable to the Bank and shall deliver its report and recommendations within forty-five (45) days of its appointment.

(c)      A copy of the Consultant's report and recommendations shall be provided to the Bank.  The Borrower shall consider the recommendations of the Consultant to the extent commercially reasonable in the exercise of their business judgment, subject at all times to the legislative authority of the governing board of the Borrower and to the extent permitted by law.

-42-

EXHIBIT 2    PAGE 82

If the Borrower shall, for any reason, not implement or comply with the recommendations of the consultant, such event shall be an Event of Default under this Agreement. In addition, if the Debt Service Coverage Ratio of the Borrower on the date which is six months after the Borrower retains the Consultant pursuant to clause (b) above (which date shall be considered a Financial Covenant Determination Date under this Agreement) or any subsequent Financial Covenant Determination Date thereafter is less than the Debt Service Coverage Ratio Requirement, such event shall be an Event of Default under this Agreement.

(d)     The balance in the Operating Reserve Fund of the Borrower shall be not less than: (i) from and including April 1, 2021 to but excluding July 1, 2021, twenty percent (20%) of the Operating Reserve Fund Requirement, (ii) from and including July 1, 2021 to but excluding October 1, 2021, fifty percent (50%) of the Operating Reserve Fund Requirement, and (iii) from and including October 1, 2021 and as of each Financial Covenant Determination Date thereafter, one hundred percent (100%) of the Operating Reserve Fund Requirement, unless waived in writing by the Bank. The Borrower shall provide written evidence of its compliance with the requirements set forth in clauses (i), and (ii) on the last day of each such period and shall provide written evidence of its compliance with the requirements of clause (iii) above on October 1, 2021 and on each Financial Covenant Determination Date thereafter.

(e)     If, on any date, the balance in the Operating Reserve Fund of the Borrower shall be less than the amount required pursuant to clause (d) above, the Borrower shall, within thirty (30) days of such date, deposit sufficient additional funds into the Operating Reserve Fund to satisfy such requirement.

(f)     In addition to the obligations set forth above, if the Debt Service Coverage Ratio of the Borrower is less than the Debt Service Coverage Ratio Requirement as of any Financial Covenant Determination Date or the balance in the Borrower's Operating Reserve Fund is less than the Operating Reserve Fund Requirement, the Borrower shall, within thirty (30) days thereof, take all necessary action to convert the Operating Fund Account to a custodial account (the "*Custodial Operating Account*"), in form and substance acceptable to the Bank, reflecting the Bank's first priority security interest therein and in the Pledged Revenues, authorizing the Bank to issue a notice of exclusive control in respect thereof upon the occurrence of an Event of Default hereunder, and accompanied by such opinions of counsel to the Borrower as the Bank may reasonably request in respect thereof. Following the occurrence of an Event of Default, the Borrower shall, upon written notice from the Bank, transfer such Custodial Operating Account to a third party financial institution custodian reasonably satisfactory to the Bank.

**Section 5.28   Operating Reserve Fund**. The Borrower shall (i) maintain the Operating Reserve Fund at all times; (ii) deposit all Pledged Revenues into the Operating Reserve Fund to the extent necessary to comply with Section 5.27 hereof; and (iii) segregate the Operating Reserve Fund and amounts on deposit therein from all other funds and accounts of the Borrower. The Borrower shall not release any moneys, securities or entitlements held in the Operating Reserve Fund without the prior written consent of the Bank.

**Section 5.29   Power Purchase Agreements.** On or prior to thirty (30) days prior to the Launch Date, the Borrower shall provide evidence satisfactory to the Bank that the Borrower has executed at least two (2) Power Purchase Agreements.

-43-

EXHIBIT 2    PAGE 83

**Section 5.30   Payments to WRCOG.**  The Borrower shall not make any payments to Western Riverside Council of Governments prior to the later of (i) April 1, 2021 or (ii) the date on which the Borrower shall fund the Operating Reserve Fund to 100% of the Operating Reserve Fund Requirement and shall meet the Debt Service Coverage Ratio required by Section 5.27 above.

**Section 5.31   Rate Covenant.**  The Borrower shall establish and maintain fees, rates, rents, charges and surcharges sufficient so that Revenues reasonably expected to be produced during such period will be at least equal to the sum of (i) the aggregate of the payments required to be made during such period in respect of principal (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on all outstanding Indebtedness of the Borrower and (ii) the amount necessary to pay all other payment expenses of the Borrower for such period, including, but not limited to, all Expenses, as shown on the most recent financial pro-forma provided to the Bank or the operating budget adopted by the governing board of the Borrower.

<div align="center">

**ARTICLE VI**

**EVENTS OF DEFAULT, REMEDIES**

</div>

**Section 6.01   Events of Default and Remedies**.  If any of the following events shall occur, each such event shall be an "*Event of Default*":

(a)      (i) the Borrower shall fail to pay the principal of or interest on any Loan or Unreimbursed Amount when due or (ii) the Borrower shall fail to pay any other Obligation within five (5) days of the date when due;

(b)      any representation or warranty made by or on behalf of the Borrower in this Agreement or any Loan Document or in any certificate or statement delivered hereunder or thereunder shall be incorrect or untrue in any material respect when made or deemed to have been made or delivered; or

(c)      the Borrower shall default in the due performance or observance of any of the covenants set forth in Section 5.11, 5.17, 5.18, 5.19, 5.23, 5.24, 5.25, 5.26, 5.27, 5.28, 5.29, 5.30 or 5.31 hereof; or

(d)      the Borrower shall default in the due performance or observance of any other term, covenant or agreement contained in this Agreement or any Loan Document and such default, if capable of being remedied shall remain unremedied for a period of thirty (30) days or more; or

(e)      the occurrence of any of the events set forth in Section 5.27(c) hereof which are designated as an Event of Default; or

(f)      one or more final, unappealable judgments against the Borrower for the payment of money, which, individually or in the aggregate, equal or exceed $1,000,000, shall remain unpaid, unstayed, undischarged, unbonded or undismissed for a period of sixty (60) days; or

<div align="center">-44-</div>

EXHIBIT 2    PAGE 84

(g)    an Event of Insolvency shall have occurred with respect to the Borrower; or

(h)    this Agreement or any Loan Document or any material provision hereof or thereof shall at any time for any reason cease to be valid and binding on the Borrower as a result of a ruling or finding by a court or a Governmental Authority with competent jurisdiction or shall be declared by any court with competent jurisdiction to be null and void, invalid, or unenforceable, or the validity or enforceability thereof shall be contested by the Borrower or any agent or trustee on their behalf or the Borrower or any agent or trustee on their behalf shall in writing repudiate or otherwise deny that it has any further liability or obligation with respect thereto; or

(i)    (i) (A) default by the Borrower in the payment of any amount due in respect of any Indebtedness owed to the Bank, as and when the same shall become due or (B) default by the Borrower in the payment of any amount due in respect of any Indebtedness of the Borrower (excluding any amount due to any PPA Provider) in an aggregate amount in excess of $100,000, as and when the same shall become due and subject to any applicable cure period, or (ii) the occurrence of any default, event of default or other similar condition or event (however described) under any Loan Document or any mortgage, agreement or other instrument under or pursuant to which any Indebtedness of the Borrower (excluding any amount due to any PPA Provider) having an aggregate principal amount in excess of $100,000 is incurred or issued, and continuance of such default beyond the period of grace, if any, allowed with respect thereto; or

(j)    default by the Borrower in the payment of any amount due to any PPA Provider, subject to any applicable cure period, unless such obligation is being contested in good faith by the Borrower through appropriate action; or

(k)    a senior officer of the Borrower shall (i) claim in writing that this Agreement or any Loan Document or any material provision herein or therein is not legal, valid or enforceable or (ii) repudiate in writing its obligations under this Agreement or any Loan Document or under any Indebtedness of the Borrower; or

(l)    the Borrower or any Governmental Authority with jurisdiction over the Borrower shall initiate any legal proceedings to seek an adjudication that this Agreement or any Loan Document or the obligation to pay or repay any Loan or any other Indebtedness of the Borrower is not valid or not binding on the Borrower; or

(m)    there shall be appointed or designated with respect to the Borrower, an entity such as an organization, board, commission, authority, agency or body to monitor or declare a financial emergency or similar state of financial distress with respect to it or there shall be declared by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

(m)    SCE shall default in the performance of the SCE Agreement and the Borrower shall have failed, within thirty (30) days after the occurrence of such default, to exercise the remedies available to it under the SCE Agreement; or

(n)    a Material Adverse Effect shall occur with respect to the community choice aggregation program operated by the Borrower or the Borrower's ability to repay Obligations under this Agreement; or

-45-

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 85

(o)     dissolution or termination of the existence of the Borrower or the community choice aggregation program operated by the Borrower.

**Section 6.02   Remedies**.  Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the interest rate on the Loans and all other outstanding Obligations hereunder shall immediately and without further action convert to the Default Rate and the Bank at its option may take any one or more of the following actions:

(a)     declare the Commitment and the obligation of the Bank to make Credit Extensions to be terminated, whereupon such Commitment and obligation shall be terminated;

(b)     by written notice to the Borrower, declare the outstanding amount of the Obligations and all other obligations of the Borrower under this Agreement to be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue;

(c)     require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the Minimum Collateral Amount with respect thereto);

(d)     at the expense of the Borrower, cure any Event of Default or event of nonperformance hereunder or under any other Financing Document; provided, however, that the Bank shall have no obligation to effect such a cure; and

(e)     exercise, or cause to be exercised, any and all remedies as it may have under the Financing Documents and as otherwise available at Law and at equity;

(f)     exercise its rights under any Custodial Operating Account or pursuant to any account control agreement or other agreement relating thereto; and/or

(g)     pursue any action available at law or in equity.

**Section 6.03   Remedies Cumulative; Solely for the Benefit of the Bank**.  To the extent permitted by, and subject to the mandatory requirements of, applicable Law, each and every right, power and remedy herein specifically given to the Bank shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Bank, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Bank specified herein are for the sole and exclusive benefit, use and protection of the Bank, and the Bank is entitled, but shall have no duty or obligation to the Borrower or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Bank hereunder or under any Loan Document.

-46-

EXHIBIT 2    PAGE 86

# ARTICLE VII

# MISCELLANEOUS

**Section 7.01  Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing signed by the Bank and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  In the case of any such waiver or consent relating to any provision hereof, any Default or Event of Default so waived or consented to shall be deemed to be cured and not continuing, but no such waiver or consent shall extend to any other or subsequent Default or Event of Default or impair any right consequent thereto.

**Section 7.02  Notices; Effectiveness; Electronic Communication**.  (a)  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax transmission or e-mail transmission to the address, fax number or e-mail address specified for such Person on Schedule I, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number specified for such Person on Schedule I.  Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (c).

(b)  *Electronic Communications*.  Notices and other communications to the Bank hereunder may be delivered or furnished by electronic communication (including e-mail) pursuant to procedures approved by the Bank.  The Bank or the Borrower, in its discretion, agrees to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it provided that the approval of such procedures may be limited to particular notices or communications.

(c)  Unless the Bank otherwise prescribes, notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient following the sender's receipt of an acknowledgment from the intended recipient.

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 87

(d)    *Change of Address, Etc.*  Each of the Borrower and the Bank may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(e)    *Reliance by the Bank.*  The Bank shall be entitled to rely and act upon any notices (including telephonic or electronic notices) purportedly given by or on behalf of the Borrower by an Authorized Officer even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Bank from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower; provided that the Borrower shall not be required to indemnify the Bank for any losses, costs, expenses or liabilities, to the extent, but only to the extent, caused by the willful misconduct or gross negligence of the Bank.  All telephonic notices to and other telephonic communications with the Bank may be recorded by the Bank, and each of the parties hereto hereby consents to such recording.

**Section 7.03    No Waiver; Cumulative Remedies**.  No failure by the Bank to exercise, and no delay by the Bank in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided and provided under the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**Section 7.04    Costs and Expenses; Damage Waiver**.  (a)  The Borrower shall pay (i) all reasonable out of pocket expenses incurred by the Bank and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Bank in the amount of $53,000) in connection with the preparation, negotiation, execution, and delivery of this Agreement and the Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out of pocket expenses incurred by the Bank (including the fees, charges and disbursements of any counsel for the Bank), and all fees and time charges for attorneys who may be employees of the Bank, in connection with the enforcement or protection of its rights in connection with this Agreement or the Loan Documents, including its rights under this Section, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such purchase.

(b)    *Indemnification by the Borrower.*  To the extent permitted by law, in addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, the Borrower hereby agrees to indemnify and hold harmless each of the Bank, each Participant and their respective officers, directors, employees and agents (each an "Indemnitee") from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an Indemnitee may incur (or which may be claimed against an Indemnitee by any Person whatsoever) that arises out of the transactions contemplated by this Agreement or the Loan Documents, including, without limitation, (i) the execution and delivery or transfer of, or payment or failure to pay under, this

-48-

EXHIBIT 2    PAGE 88

Agreement or the Loan Documents; and (ii) the use of the proceeds of the Loan; provided that the Borrower shall not be required to indemnify any Indemnitee for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by the willful misconduct or gross negligence of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.  If any proceeding shall be brought or threatened against any Indemnitee by reason of or in connection with the events described in (i) or (ii), the Bank shall promptly notify the Borrower in writing and the Borrower shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.  The Borrower will not settle or compromise any such action or claim without the prior written consent of the relevant Indemnitee if the settlement or compromise involves any performance by or adverse admission of such Indemnitee.  Notwithstanding the preceding sentence, if the interests of the Borrower and an Indemnitee are, in the reasonable judgment of the Indemnitee, in material conflict, an Indemnitee shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of the Borrower.

(c)     *Waiver of Consequential Damages, Etc*.  To the fullest extent permitted by law, the Borrower shall not assert, and hereby waives, and acknowledges that no other Person has or shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, the Loans, the Letters of Credit or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)     *Payments*.  All amounts due under this Section shall be payable not later than thirty (30) days after demand therefor.

(e)     *Survival*.  The agreements in this Section shall survive the payment in full of the Loans and Unreimbursed Amounts, the repayment, satisfaction or discharge of all other Obligations and the termination of this Agreement.

**Section 7.05   Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Bank, and such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential or required (including pursuant to any settlement entered into by the Bank in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

**Section 7.06   Successors and Assigns**.

-49-

EXHIBIT 2     PAGE 89

(a)    *Successors and Assigns Generally*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted by this Section.  The Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Bank.

(b)    The Bank may at any time, without the consent of, or notice to, the Borrower, assign or otherwise transfer any of its rights or obligations hereunder to (i) an entity which is affiliated with the Bank or (ii) a funding entity or other special purpose arrangement established by the Bank or an Affiliate of the Bank.  The Bank may at any time, with the written consent of the Borrower (such consent not to be unreasonably withheld or delayed), assign or otherwise transfer any of its rights or obligations hereunder to any other bank, institutional investor or other entity which, in each case, customarily purchases or holds loans.

(c)    *Participations*.  The Bank may at any time, without the consent of, or notice to, the Borrower, sell participations to any Person (other than a natural Person or the Borrower) (each, a "Participant") in all or a portion of the Bank's rights and/or obligations under this Agreement (including all or a portion of the Loans or Unreimbursed Amounts) and any such Participant, and any investors in any such Participant if such Participant is a funding vehicle, such as a tender option trust or similar vehicle, shall be entitled to receive from the Bank any information provided by the Borrower to the Bank; provided that (i) the Bank's obligations under this Agreement shall remain unchanged, (ii) the Bank shall remain solely responsible to the Borrower for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations under this Agreement; and provided however, that (A) no such Participant shall be entitled to receive payment hereunder of any amount greater than the amount which would have been payable had the Bank not granted a participation to such Participant; (B) no Participant shall be entitled to receive directly from the Borrower any notice required to be given by the Borrower to the Bank hereunder; and (C) no Participant shall be entitled to request or receive directly from the Borrower any other information required to be provided to the Bank hereunder.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Sections 2.12, 2.13, 2.14 and 7.04 as though it were the Bank.

(d)    *Certain Pledges*.  The Bank may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of the Bank, including any pledge or grant to secure obligations to a Federal Reserve Bank; provided that no such pledge or grant shall release the Bank from any of its obligations hereunder or substitute any such pledgee or grantee for the Bank as a party hereto.

**Section 7.07  Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 3.01, this Agreement shall become effective when it shall have been executed by the Bank and when the Bank shall have received counterparts hereof that, when taken together, bear the signatures of the other party hereto.  Delivery of an executed counterpart of a signature page of this Agreement by fax

-50-

EXHIBIT 2    PAGE 90

transmission or e-mail transmission (e.g., "*pdf*" or "*tif*") shall be effective as delivery of a manually executed counterpart of this Agreement. Without limiting the foregoing, to the extent a manually executed counterpart is not specifically required to be delivered under the terms of this Agreement, upon the request of any party, such fax transmission or e-mail transmission shall be promptly followed by such manually executed counterpart.

   **Section 7.08   Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other document delivered pursuant hereto or in connection herewith shall survive the execution and delivery hereof. Such representations and warranties have been or will be relied upon by the Bank, regardless of any investigation made by the Bank or on its behalf and notwithstanding that the Bank may have had notice or knowledge of any Default at the time of making the Loans or issuing Letters of Credit hereunder, and shall continue in full force and effect as long as any other Obligation hereunder shall remain unpaid or unsatisfied.

   **Section 7.09   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

   **Section 7.10   Governing Law; Jurisdiction; Etc**.  (a)   This Agreement will be governed by and construed in accordance with the laws of the State of New York.

   (b)   *Submission to Jurisdiction*.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of any State or Federal court in the State of New York in the County of New York, in any action or proceeding arising out of or relating to this Agreement, the Loan Documents or any other related document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court in the County of New York or in such Federal court in the State of New York in the County of New York. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

   (c)   Each of the parties hereto irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement, the Loan Documents or any other related document in any court referred to in paragraph (b) of this section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

-51-

**Section 7.11  Waiver of Jury Trial**.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 7.12  Extension of Loan Facility Scheduled Termination Date or Scheduled Termination Date**.  The Loan Facility Scheduled Termination Date or Scheduled Termination Date may be extended from time to time by agreement in writing between the Bank and the Borrower.  If no Event of Default has occurred and is continuing, the Borrower may request in writing to the Bank, in the form of Exhibit E to this Agreement not earlier than one hundred eighty (180) days prior to the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, that the Bank extend the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable.  The Borrower has no obligation to request an extension of the Loan Facility Scheduled Termination Date or Scheduled Termination Date and the Bank has no obligation to agree to an extension of the Loan Facility Scheduled Termination Date or Scheduled Termination Date, and all terms of the extension (including the term, commitment and other fees, interest rates, amortization terms and other provisions) shall be mutually acceptable to the Bank and the Borrower.  The Bank agrees to respond to a written extension request by the Borrower within thirty (30) days of receipt of such request by the Bank. If the Bank fails to respond to the Borrower within thirty (30) days of receipt of the Borrower's request or the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable shall have occurred, the Bank shall be deemed to have denied such request. If the Bank and the Borrower agree to an extension of the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, the Bank shall give written notice, in the form of a Notice of Extension substantially in the form of Exhibit F hereto (a "Notice of Extension") of its determination to extend the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, to the Borrower.  If the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, is extended, the Borrower shall, except as otherwise agreed to in writing by the Bank, be deemed to have made the representations and warranties contained herein on and as of the date on which the Loan Facility Scheduled Termination Date or Scheduled Termination Date, as applicable, is so extended.

**Section 7.13  No Advisory or Fiduciary Relationship**.  In connection with all aspects of each transaction contemplated hereby or by the Loan Documents (including in connection with any amendment, waiver or other modification hereof or thereof), the Borrower acknowledges and agrees that:  (a) (i) the services regarding this Agreement provided by the Bank and any Affiliate thereof are arm's-length commercial transactions between the Borrower, on the one hand, and the Bank and its Affiliates, on the other hand, (ii) the Borrower has

-52-

EXHIBIT 2    PAGE 92

consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby or by the Loan Documents; (b) (i) the Bank and its Affiliates each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, or any other Person and (ii) neither the Bank nor any of its Affiliates has any obligation to the Borrower with respect to the transactions contemplated hereby or by the Loan Documents except those obligations expressly set forth herein and therein; and (c) the Bank and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, and neither the Bank nor any of its Affiliates has any obligation to disclose any of such interests to the Borrower.  To the fullest extent permitted by law, the Borrower, hereby waives and releases any claims that it may have against the Bank or any of its Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

**Section 7.14   Electronic Execution of Certain Documents**.  The words "execute," "execution," "signed," "signature," and words of like import in this Agreement or any other document related hereto (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Bank, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 7.15   USA Patriot Act**.  The Bank is subject to the Patriot Act and hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Bank to identify the Borrower in accordance with the Patriot Act.  The Borrower shall, promptly following a request by the Bank, provide all documentation and other information that the Bank requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**Section 7.16   Reserved**.

**Section 7.17   Entire Agreement**.  This Agreement and the Loan Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements among the parties.

**Section 7.18   Further Assurances**.  From time to time upon the request of either party hereto, the other shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the requesting party may in its reasonable discretion deem necessary or desirable to confirm this Agreement or the Loan Documents to carry out the purpose and intent hereof and thereof or to enable the requesting party to enforce any of its rights

-53-

hereunder and thereunder.  At any time, and from time to time, upon request by the Bank, the Borrower will, at the Borrower's expense, correct any defect, error or omission which may be discovered in the form or content of this Agreement or the Loan Documents.  Upon any failure by the Borrower to do so, the Bank may make, execute and record any and all such instruments, certificates and other documents for and in the name of the Borrower, all at the sole expense of the Borrower, and the Borrower hereby appoints the Bank the agent and attorney in fact of the Borrower to do so, this appointment being coupled with an interest and being irrevocable.  In addition, at any time, and from time to time, upon request by the Bank, the Borrower will, at the Borrower's expense, provide any and all further instruments, certificates and other documents as may, in the opinion of the Bank, be necessary or desirable in order to verify the Borrower's identity and background in a manner satisfactory to the Bank.

**Section 7.19   Right of Setoff**.  Upon the occurrence of an Event of Default, the Bank and its Affiliates may, at any time and from time to time, without notice to the Borrower or any other Person (any such notice being expressly waived), set off and appropriate and apply, against and on account of, any obligations and liabilities of the Borrower to the Bank or its Affiliates arising under or connected with this Agreement or the Loan Documents, without regard to whether or not the Bank shall have made any demand therefor, and although such obligations and liabilities may be contingent or unmatured, any and all deposits (general or special, including but not limited to indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other indebtedness or other payment obligation at any time held or owing by the Bank or its Affiliates to or for the credit or the account of the Borrower.

**Section 7.20   Bail-In Action Acknowledgment**.   The Borrower acknowledges and agrees that notwithstanding any other term of this Agreement or any other agreement, arrangement or understanding with the Bank, any liability arising under or in connection with this Agreement may be subject to Bail-In Action, and accept to be bound by the effect of:

(a)   any Bail-In Action in relation to such liability, including (without limitation):

(i)   a reduction, in full or in part, of any amount due in respect of any such liability;

(ii)   a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, you; and

(iii)   a cancellation of any such liability; and

(b)   a variation of any term of this Agreement to the extent necessary to give effect to Bail-In Action in relation to any such liability.

"Bail-In Action" means the exercise by a resolution authority of any write-down or conversion power existing from time to time (including, without limitation, any power to amend or alter the maturity of eligible liabilities of an institution under resolution or amend the amount of interest payable under such eligible liabilities or the date on which interest becomes payable, including by suspending payment for a temporary period and together with any power to terminate and value transactions) under, and exercised in compliance with, any laws, regulations, rules or

-54-

EXHIBIT 2    PAGE 94

requirements in effect in the United Kingdom relating to the transposition of the Bank Recovery and Resolution Directive, as amended from time to time, including but not limited to, the Banking Act 2009 as amended from time to time, and the instruments, rules and standards created thereunder, pursuant to which our obligations (or those of the Bank's affiliates) can be reduced (including to zero), cancelled or converted into shares, other securities, or other obligations of the Bank or any other person.

**Section 7.21  No Recourse Against Constituent Members of Borrower or Individuals**.  Borrower is organized as a Joint Powers Authority in accordance with the Joint Exercise of Powers Act of the State of California (Government Code Section 6500 et seq.) pursuant to the Joint Powers Agreement and is a public entity separate from its constituent Members.  Borrower shall be solely responsible for all debts, obligations and liabilities accruing and arising out of this Agreement and the Loans and the other Loan Documents.  None of this Agreement, the Loans or any other Obligations or any other Loan Document shall constitute a debt, liability or obligation of any of the constituent Members of the Borrower.  The Bank shall not make any claims, take any actions or assert any remedies against any of the Borrower's constituent Members in connection with any payment default by Borrower under this Agreement or any other Loan Document.

It is hereby recognized and agreed that no member of the Board of Directors, no officer, employee or agent of the Borrower, no member of the governing body or officer of the constituent Members of the Borrower shall be individually liable for the payment of the Loans or other Obligations hereunder or in respect of any undertakings by the Borrower under this Loan Agreement or the other Loan Documents.

**Section 7.22  No Third Party Rights**.  Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Borrower, the Bank, any successors and assigns thereof, or any Participant, any legal or equitable right, remedy or claim under or in respect of this Agreement, which is intended for the sole and exclusive benefit of the aforementioned parties.

[SIGNATURE PAGE FOLLOWS.]

-55-

DM_US 159094637-10.071370.0787

EXHIBIT 2     PAGE 95

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date.

**WESTERN COMMUNITY ENERGY**

By _____

Name: _____

Title: _____

Approved as to form:

By _____

Steven DeBaun, Partner

Best Best & Krieger LLP

**BARCLAYS BANK PLC**

By _____

Name: R. Cassandra Bolz

Title: Authorized Signatory for and on behalf of Barclays Bank PLC

EXHIBIT 2  PAGE 96

## SCHEDULE I

### ADDRESSES

The Borrower:                      Western Community Energy
                                   3390 University Ave., Suite 200
                                   Riverside, CA  92501
                                   Attention:   Chief Financial Officer
                                   Telephone: (951) 405-6700
                                   E-mail: aruiz@wrcog.us


The Bank:                          For a Loan Notice and for billing and payment purposes:

                                   Barclays Bank PLC
                                   1301 6th Avenue
                                   New York, New York 10019
                                   Attention: Loan Operations
                                   Telephone: (212) 320-7564
                                   Fax: (917) 522-0569
                                   Email: XrausLoanOps5@barcap.com and
                                   liquiditydraw@barclayscapital.com

                                   For all other purposes:

                                   Barclays Bank PLC
                                   745 Seventh Avenue, 19th Floor
                                   New York, New York  10019
                                   Attention:      R. Cassandra Bolz
                                   Facsimile:      (646) 758-1419
                                   Telephone:      (212) 526-3974
                                   Email:  cassandra.bolz@barclays.com

A-1

**EXHIBIT A**

**FORM OF NOTE**

Principal Amount Not to exceed $16,000,000                    March 12, 2020

FOR VALUE RECEIVED, the undersigned WESTERN COMMUNITY ENERGY (the *"Borrower"*), hereby promises to pay to BARCLAYS BANK PLC, or its registered assigns (the *"Bank"*), in accordance with the provisions of the Agreement (as hereinafter defined), the principal outstanding amount of all Unreimbursed Amounts related to Letters of Credit and each Loan from time to time made by the Bank to the Borrower, in each case under that certain Revolving Credit Agreement, dated as of March 12, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the *"Agreement;"* the terms defined therein being used herein as therein defined), between the Borrower and the Bank, in accordance with the terms of the Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Loan and Unreimbursed Amount from the date of such Loan or Honor Date, as applicable, until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement.  All payments of principal and interest shall be made to the Bank in Dollars in immediately available funds at the Bank's Lending Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  The Loans made by the Bank and Unreimbursed Amounts shall be evidenced by one or more loan accounts or records maintained by the Bank in the ordinary course of business. The Bank may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loans and Unreimbursed Amounts and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

A-2

Delivery of an executed counterpart of a signature page of this Note by fax transmission or other electronic mail transmission (*e.g.*, "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Note.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

WESTERN COMMUNITY ENERGY

By:_____
    Name: _____
    Title: _____

A-3

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 99

**LOANS AND PAYMENTS WITH RESPECT THERETO**

| DATE | AMOUNT OF LOAN MADE | AMOUNT OF PRINCIPAL OR INTEREST PAID THIS DATE | OUTSTANDING PRINCIPAL BALANCE THIS DATE | NOTATION MADE BY |
|------|------|------|------|------|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

A-4

DM_US 159094637-10.071370.0787

EXHIBIT 2     PAGE 100

**EXHIBIT B**

**FORM OF LOAN NOTICE**

Date: _____, 201_

To:   Barclays Bank PLC

     745 Seventh Avenue, 19th Floor

     Attention:  Cassandra Bolz

     Telephone:  212-526-3974

     Email:  Cassandra.bolz@barclays.com

Ladies and Gentlemen:

Reference is made to that certain Revolving Credit Agreement, dated as of March 12, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the *"Agreement"*) (the terms defined therein being used herein as defined in the Agreement), between Western Community Energy (the *"Borrower"*), and Barclays Bank PLC (the "*Bank*").

The undersigned hereby requests a Borrowing of Loan:

1.   On _____ (a Business Day).

2.   In the amount of $_____.

3.   The proceeds of the Borrowing shall be applied to:

        **[Start-Up Costs (only permitted prior to June 1, 2020)]**

        **[purchase energy for the Community Energy Program]**

        **[secure payments due under Power Purchase Agreements]**

4.   To the account set forth below in the Agreement.

The Borrowing requested herein complies with the proviso to the first sentence of Section 2.01 of the Agreement.

Borrower hereby represents and warrants that the conditions specified in Section 3.02 of the Agreement shall be satisfied on and as of the date of the Borrowing requested herein.

B-1

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 101

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic mail transmission (*e.g.*, "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.


WESTERN COMMUNITY ENERGY


By:_____
    Name: _____
    Title: _____

B-2

DM_US 159094637-10.071370.0787

EXHIBIT 2     PAGE 102

**EXHIBIT C**

**FORM OF NOTICE OF LOAN PREPAYMENT**

TO:        Barclays Bank PLC, as lender (the *"Bank"*)

RE:    Revolving Credit Agreement, dated as of March 12, 2020, by and between Western Community Energy (the *"Borrower")* and the Bank (as amended, modified, extended, restated, replaced, or supplemented from time to time, the *"Credit Agreement"*; capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement)

DATE:        [Date]

_____

The Borrower hereby notifies the Bank that on _____[1] pursuant to the terms of Section 2.04 (Prepayments) of the Credit Agreement, the Borrower intends to optionally prepay the Loan in the following amount(s):  $_____[2]

---

[1]    Specify date of such prepayment.

[2]    Any prepayment shall be in a principal amount of at least $250,000 (or if less, the entire principal amount thereof outstanding).

C-1

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic mail transmission (e.g. "*pdf*" or "*tif*") shall be effective as delivery of a manually executed counterpart of this notice.

WESTERN COMMUNITY ENERGY

By:_____
Name: _____
Title: _____

C-2

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 104

# EXHIBIT D

## CURRENT PARTIES TO JOINT POWERS AGREEMENT

City of Norco

City of Perris

City of Wildomar

City of Jurupa Valley

City of Hemet

City of Eastvale

City of Canyon Lake

EXHIBIT 2      PAGE 105

## EXHIBIT E

## FORM OF REQUEST FOR EXTENSION

## REQUEST FOR EXTENSION

Barclays Bank PLC
[*ADDRESS*]
Attention:

Ladies and Gentlemen:

  Reference is hereby made to that certain Revolving Credit Agreement dated as of March 12, 2020 (the "Agreement"), between Western Community Energy (the "Borrower") and Barclays Bank PLC (the "Bank").  All capitalized terms contained herein which are not specifically defined shall be deemed to have the definition set forth in the Agreement.  The Borrower hereby requests, pursuant to Section 7.12 of the Agreement, that the _____ for the Agreement be extended by [*IDENTIFY APPROPRIATE PERIOD*], subject to such other terms as shall be mutually acceptable to the Bank and the Borrower.  Pursuant to Section 7.12 of the Agreement, we have enclosed along with this request the following information:

  1.  The nature of any and all Defaults and Events of Default;

  2.  Confirmation that all representations and warranties of the Borrower as set forth in Article IV of the Agreement are true and correct as though made on the date hereof and that no Event of Default has occurred and is continuing on the date hereof except as referenced in paragraph 2 above; and

  3.  Any other pertinent information previously requested by the Bank.

  The Bank is requested to notify the Borrower of its decision with respect to this request for extension within thirty (30) days of the date of receipt hereof.  If the Bank fails to notify the Borrower of its decision within such thirty (30) day period, the Bank shall be deemed to have rejected such request.

       Very truly yours,

       WESTERN COMMUNITY ENERGY

       By_____
       Name_____
       Title_____

C-4

EXHIBIT 2    PAGE 106

## EXHIBIT F

### NOTICE OF EXTENSION

[*DATE*]

Western Community Energy
1111 Broadway Floor 3
Oakland, CA 94607

Ladies and Gentlemen:

Reference is hereby made to that certain Revolving Credit Agreement dated as of March 12, 2020 (the "Agreement"), between Western Community Energy (the "Borrower") and Barclays Bank PLC (the "Bank").

The undersigned, a duly authorized signatory of the Bank hereby advises you, with reference to the above-referenced Agreement (any capitalized term used herein and not defined shall have its respective meaning as set forth in the Agreement), that [Complete as Appropriate]:

1.    On [date], the Borrower delivered to the Bank, pursuant to Section 7.12 of the Agreement, a Request For Extension requesting that the date referenced in the definition of "_____" in the Agreement (as such date may have been extended previously from time to time) be extended to _____.

2.    At the request and for the account of the Borrower, we hereby extend the date referenced in the definition of "_____" in the Agreement (as such date may have been extended previously from time to time) to _____.

3.    Except as specifically provided in paragraph (1) above, all of the terms and conditions of the Agreement remain unchanged and in full force and effect.

4.    This Notice of Extension is an integral part of the Agreement.

5.    [Specify such other terms (including the term, commitment and other fees, interest rates, amortization terms and other provisions) as mutually agreed upon between the Bank and the Borrower.]

[The _____ will not be extended at this time.]

EXHIBIT 2    PAGE 107

IN WITNESS WHEREOF, the undersigned, on behalf of the Bank, has executed and delivered this Notice of Extension as of the \_\_\_\_ day of _____.

BARCLAYS BANK PLC

By_____

Name_____

Title_____

DM_US 159094637-10.071370.0787

EXHIBIT 2    PAGE 109

# EXHIBIT 3

**<u>Exhibit B</u>**

**Security Agreement**

EXHIBIT 3     PAGE 110

# SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "<u>**Agreement**</u>") dated as of February 12, 2020, is entered into between WESTERN COMMUNITY ENERGY, a California joint powers authority, as pledgor ("<u>**WCE**</u>"), and RIVER CITY BANK, a California corporation, not in its individual capacity, but solely as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "<u>**Collateral Agent**</u>"), for the benefit of the PPA Providers (as defined below), as Secured Creditors (as defined below).

## RECITALS:

A.    WCE intends to enter into a Power Purchase Agreement (as defined below) with multiple power providers (each, a "<u>**PPA Provider**</u>" and collectively, the "<u>**PPA Providers**</u>"), pursuant to which WCE will agree to purchase the Product (as defined below) from each such PPA Provider;

B.    WCE shall sell the Product purchased from PPA Providers to WCE's customers at rates established by WCE from time to time;

C.    WCE's customers are billed by Southern California Edison ("<u>**SCE**</u>") amounts they owe for the Product provided by WCE;

D.    As of the date hereof, WCE has directed SCE to remit all present and future collections on accounts receivable now or hereafter billed by SCE on behalf of WCE to Collateral Agent, for remittance to the Lockbox Account (as defined below) maintained by Collateral Agent, which direction is irrevocable unless both Collateral Agent, at the direction of the Required Secured Creditors (as defined below), and WCE direct SCE otherwise;

E.    WCE desires herein to pledge to Collateral Agent, for the benefit of the PPA Providers as Secured Creditors, a first priority continuing security interest in and to the Collateral (defined below);

F.    The PPA Providers and WCE will enter into the Intercreditor Agreement (as defined below) wherein the PPA Providers will appoint the Collateral Agent to act on their behalf regarding the administration, collection and allocation of the proceeds of the Collateral; and

G.    WCE and Collateral Agent desire to enter into this Agreement to evidence the pledge of the Collateral and to set forth their agreements regarding the Collateral and the application of the Collateral to the Obligations (as defined below).

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

EXHIBIT 3    PAGE 111

**Section 1.**      **Definitions, Etc.**

1.01    <u>Defined Terms</u>.  The following terms shall have the meanings assigned to them in this <u>Section 1.01</u> or in the provisions of this Agreement referred to below:

"**Applicable Law**" means any applicable law, including without limitation any: (a) federal, state, territorial, county, municipal or other governmental or quasi-governmental law, statute, ordinance, rule, regulation, requirement or use or disposal classification or restriction, whether domestic or foreign; (b) judicial, administrative or other governmental or quasi-governmental order, injunction, writ, judgment, decree, ruling, interpretation, finding or other directive, whether domestic or foreign; (c) common law or other legal or quasi-legal precedent; (d) arbitrator's or mediator's or referee's decision, finding, award or recommendation; or (e) charter, rule, regulation or other organizational or governance document of any national securities exchange or market or other self-regulatory organization.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, and the rules promulgated thereunder, as the same may be in effect from time to time.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in the United States are required or authorized to close.

"**Collateral**" means the following, whether now existing or hereafter arising: (a) the Receivables; (b) the Lockbox Account; (c) all cash, cash equivalents, securities, Investment Property (as such term is defined in the UCC), Security Entitlements (as such term is defined in the UCC), checks, money orders and other items of value now or hereafter that are required to be, or that are, paid, deposited, credited or held (whether for collection, provisionally or otherwise) in or with respect to the Lockbox Account or otherwise in the possession or under the control of, or in transit to, the Collateral Agent or the Depositary Bank for credit or with respect to the Lockbox Account and all interest accumulated thereon; and (d) all Proceeds (as such term is defined in the UCC) of any or all of the foregoing.  The term "Collateral" shall not include any amounts distributed to WCE pursuant to <u>Section 6.02(v)</u>.

"**Collateral Agent**" has the meaning given to such term in the Preamble hereof.

"**Control**" has the meaning given to such term in Section 9-104 of the UCC.

"**Control Agreements**" means the Lockbox Account Control Agreement, and any other agreements entered into among WCE, Collateral Agent and Depositary Bank which shall designate the Lockbox Account as a blocked account under the Control of Collateral Agent, for the benefit of Secured Creditors, as provided in the UCC, as each such agreement may be amended, supplemented, restated or replaced from time to time.

"**Credit Rating**" means for a Qualified Institution the respective ratings then assigned to such entity's unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement) by S&P, Moody's or other specified rating

- 2 -

EXHIBIT 3    PAGE 112

agency or agencies or, if such entity does not have a rating for its unsecured, senior long-term debt or deposit obligations, then the rating assigned to such entity as its "corporate credit rating" by S&P.

"**Customer**" means any customer of WCE who purchases the Product from WCE but is invoiced by SCE, and any other obligor(s) responsible for payment of a Receivable.

"**Depositary Bank**" means River City Bank, a California corporation, in its capacity as depositary bank and its successors and assigns.

"**Direction Letter**" means that certain letter, a copy of which has been delivered to the Collateral Agent, from WCE to SCE pursuant to which WCE has directed SCE to remit all of the Proceeds on the Receivables collected by SCE from Customers to the Lockbox Account specified therein for application to the Obligations, unless and until both Collateral Agent, at the direction of the Required Secured Creditors, and WCE jointly instruct SCE to terminate or change such direction and any written amendments, modifications, restatements, extensions or supplements thereto or replacements thereof and any similar letter or written direction provided to SCE.

"**Discharge Date**" means that date on which: (a) any and all outstanding Obligations under the Transaction Agreements have been fully satisfied, and (b) there are no continuing obligations by WCE under any Transaction Agreements (other than for any provisions which are intended to survive the termination of the Transaction Agreements).

"**Distribution Date**" means the twenty-fifth (25) day of each month.

"**Distribution Date Certificate**" means a certificate prepared and submitted by WCE in accordance with Section 6.03.

"**Event of Default**" has the meaning set forth in the applicable Master Agreement or Power Purchase Agreement.

"**Intercreditor Agreement**" means the Intercreditor and Collateral Agency Agreement, dated as of even date herewith, among Collateral Agent, the Secured Creditors from time to time party thereto and WCE, as amended, supplemented, restated or replaced from time to time.

"**Lender**" means Barclays Bank PLC.

"**Letter of Credit**" means one or more irrevocable, transferable standby letters of credit, in a form acceptable to the Secured Creditors and issued by a Qualified Institution.

"**Lien**" means any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien (statutory or other), assignment, charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any sale governed by Article 9 of the UCC, any conditional sale or title retention agreement, or any capital lease having substantially the same economic effect as any of the foregoing).

- 3 -

31249.00001\32544457.2

EXHIBIT 3    PAGE 113

"**Lockbox Account**" means the deposit account no. [*account number* ], which is maintained in the name of WCE and is under the Control of Collateral Agent, for the benefit of the Secured Creditors, at Depositary Bank, and any replacement account, in each case, pursuant to the Lockbox Account Control Agreement.

"**Lockbox Account Control Agreement**" means the Account Control Agreement, dated as of the date hereof, among Depositary Bank, WCE and Collateral Agent and any other agreements entered into among Depositary Bank, WCE and Collateral Agent which shall designate the Lockbox Account as a blocked account under the Control of Collateral Agent, for the benefit of Secured Creditors, as provided in the UCC, as each such agreement may be amended, supplemented, restated or replaced from time to time.

"**Master Agreements**" means the Master Power Purchase Agreements entered into between WCE and PPA Providers, a current list of which is set forth on **Exhibit "B"**, as the same may be modified from time to time.

"**Moody's**" means Moody's Investor Services, Inc.

"**Obligations**" means all of the obligations and liabilities of WCE to each PPA Provider, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereinafter arising under or in respect of one or more of the Transaction Agreements, including all payments, fees, purchases, mark-to-market exposure, commitments for reimbursement, indemnifications, interest, damages and Termination Payments, if any. The term "Obligations" also includes all of WCE's other present and future obligations to each PPA Provider under the Transaction Agreements, including the repayment of (a) any amounts that Collateral Agent (or a PPA Provider) may advance or spend for the maintenance or preservation of the Collateral and (b) any other expenditure that Collateral Agent (or PPA Provider) may make under the provisions of the Transaction Agreements for the benefit of WCE. For the avoidance of doubt, the term "Obligations" includes any of the foregoing that arises after the filing of a petition by or against WCE under any bankruptcy or insolvency statute, even if the Obligations do not accrue because of any statutory automatic stay or otherwise.

"**Operating Account Control Agreement**" means the Operating Account Control Agreement, dated as of the date hereof, among Depositary Bank, WCE and Lender, for the benefit of Lender, as provided in the UCC, as each such agreement may be amended, supplemented, restated or replaced from time to time.

"**Operating Funds Flow Account**" means the deposit account no. [*account number*], which is maintained in the name of WCE, for the benefit of Lender, at Depositary Bank, and any replacement account, in each case, pursuant to the Operating Account Control Agreement

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

31249.00001\32544457.2

EXHIBIT 3    PAGE 114

"**Power Purchase Agreement**" means each agreement, including the Master Agreements, together with the exhibits, schedules, transactions, confirmations (including confirmations entered into after the date hereof), and any written amendments, modifications, restatements, extensions or supplements thereto or replacements thereof, pursuant to which a PPA Provider sells the Product to WCE on behalf of WCE, as amended, modified, supplemented, restated, extended or replaced from time to time.

"**PPA Provider**" means each seller of Product under a Power Purchase Agreement that is made a party to the Intercreditor Agreement, and its respective successors and assigns.

"**Product**" means one or more of the following: energy, renewable energy attributes, capacity attributes, resource adequacy benefits, or any other similar or related products contemplated in the Master Agreements.

"**Qualified Institution**" means a commercial bank organized under the laws of the United States or a political subdivision thereof having at the applicable time (a) a Credit Rating of (i) A- or better from Standard & Poor's, or (ii) A3 or better from Moody's, or (iii) if such bank has a Credit Rating at such time from both Standard & Poor's and Moody's, A- or better from Standard & Poor's and A3 or better from Moody's and (b) assets of at least Ten Billion Dollars ($10,000,000,000).

"**Receivable**" means an Account evidencing WCE's rights to payment for Product, billed in an invoice sent to a Customer by SCE, together with all late fees and other fees which SCE and WCE agree are to be charged in such invoice to the Customer by SCE on behalf of WCE.

"**Regular Charges**" means, as of any date of determination, amounts then due and owing to such PPA Provider for the Product delivered by such PPA Provider, without giving effect to any Supplemental Payment owing to such PPA Provider.

"**Regular Sharing Percentage**" means, as of any date of determination, with respect to each PPA Provider as calculated by WCE in a commercially reasonable manner, the percentage equivalent of a fraction, (i) the numerator of which is the amount of the Regular Charges due and owing to such PPA Provider, as of such date, and (ii) the denominator of which is the amount of the Regular Charges due and owing to all PPA Providers, as of such date.

"**Required Secured Creditors**" has the meaning given to such term in the Intercreditor Agreement.

"**Reserve Amount**" means an amount of [_____] Dollars ($_____). If WCE is not subject to an Event of Default, the total Reserve Amount shall automatically be reduced by Twenty Percent (20%) annually, upon the annual anniversary of the date on which this Agreement was entered into (or next Business Day if the anniversary date is not a Business Day).

31249.00001\32544457.2

EXHIBIT 3    PAGE 115

"**Secured Creditors**" means each PPA Provider party to the Intercreditor Agreement, WCE, and their respective successors and assigns.

"**Standard & Poor's**" means Standard & Poor's Rating Group (a division of McGraw-Hill, Inc.).

"**Supplemental Payment**" means, as of any date of determination, all Obligations owing by WCE to each PPA Provider, excluding, however, the Regular Charges owed to such PPA Provider. Supplemental Payments include, but are not limited to, all out-of-pocket losses such as indemnity claims arising under the Transaction Agreements to the extent such losses were incurred by such PPA Provider, all late payment charges due under a Power Purchase Agreement, and all Obligations arising upon a default or Termination Event, such as Termination Payments.

"**Supplemental Sharing Percentage**" means, as of any date of determination, with respect to each PPA Provider, the percentage equivalent of a fraction, (y) the numerator of which is the outstanding amount of the Supplemental Payments due and owing to such PPA Provider, as of such date, and (z) the denominator of which is the sum of the outstanding amount of the Supplemental Payments due and owing to all PPA Providers, as of such date.

"**Termination Event**" means, with respect to any Power Purchase Agreement, the termination and/or acceleration thereof in accordance with the terms of such Power Purchase Agreement.

"**Termination Payment**" has the meaning given to such term in the Intercreditor Agreement.

"**Transaction Agreements**" means the Master Agreements, any other Power Purchase Agreements, the Control Agreements, the Intercreditor Agreement, this Agreement and all other agreements, instruments or documents to which WCE is a party and which are executed and delivered from time to time in connection with or as security for WCE's obligations under the Master Agreements, any other Power Purchase Agreements, as the same may be amended, restated, modified, replaced, extended or supplemented from time to time.

"**UCC**" means the Uniform Commercial Code in effect in the State of California from time to time.

1.02    Certain Uniform Commercial Code Terms.  As used herein, the terms "**Account**", "**Investment Property**", and "**Proceeds**" have the respective meanings set forth in Article 9 of the UCC.  The terms "**Security**" and "**Security Entitlements**" have the respective meanings set forth in Article 8 of the UCC.

1.03    Other Interpretive Provisions.  References to "Sections" shall be to Sections of this Agreement unless otherwise specifically provided.  For purposes hereof, "including" is not limiting and "or" is not exclusive.  All capitalized terms defined in the UCC and not otherwise defined herein or in the Security Agreement shall have the respective

- 6 -

EXHIBIT 3    PAGE 116

meanings provided for by the UCC.  Any of the terms defined in this Agreement may, unless the context otherwise requires, be used in the singular or the plural depending on the reference.  References to any instrument, agreement or document shall include such instrument, agreement or document as supplemented, modified, amended or restated from time to time to the extent permitted by this Agreement.  References to any Person include the successors and permitted assigns of such Person.  References to any statute, act or regulation shall include its related current version and all amendments and any successor statutes, acts and regulations.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.

Section 2.      **Grant of Security Interest.**

As collateral security for the payment and performance in full of the Obligations when due, whether at stated maturity, by acceleration or otherwise, WCE hereby assigns, pledges and grants to Collateral Agent, for the benefit of the Secured Creditors, a first priority continuing security interest in and continuing lien on all of WCE's right, title and interest in and to the Collateral, including the following:

(a)      the prompt and complete payment, when due and payable, of all Obligations;

(b)      the timely performance and observance by WCE of all covenants, obligations and conditions contained in the Transaction Agreements; and

(c)      without limiting the generality of the foregoing and to the fullest extent permitted under Applicable Law, the payment of all amounts, including interest which constitute part of the Obligations and would be owed by WCE to the Secured Creditors under the Transaction Agreements but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving WCE.

The collateral assignment evidenced by this Agreement is a continuing one and is irrevocable by WCE so long as any of the Obligations are outstanding.

Section 3.      **Representations and Warranties.**

WCE represents and warrants to Collateral Agent that:

3.01    Title.  It is the sole beneficial owner of the Collateral and such Collateral is free and clear of all liens, except liens in favor of Collateral Agent created hereunder.

3.02    Formation.  As of the date hereof, WCE is a joint powers authority duly formed and validly existing under the laws of the State of California to implement a Community Choice Aggregation Program for its member entities, which are all public agencies and municipalities in the State of California.  WCE's primary office is located at 3390 University Avenue in the City of Riverside, State of California.

- 7 -

31249.00001\32544457.2

EXHIBIT 3    PAGE 117

3.03    <u>Changes in Circumstances</u>.  WCE has not: (a) within the period of four (4) months prior to the date hereof, changed its location (as defined in Article 9 of the UCC); (b) within the period of five (5) years prior to the date hereof, changed its name; or (c) within the period of four (4) months prior to the date hereof, become a "new debtor" (as defined in Article 9 of the UCC) with respect to a currently effective security agreement previously entered into with any other Person.

3.04    <u>Security Interests</u>.  The Liens granted by this Agreement have attached and constitute a perfected first priority continuing security interest in the Collateral.  WCE owns good and marketable title to the Collateral free and clear of all Liens other than such Liens established under this Agreement, and neither the Collateral nor any interest in the Collateral has been transferred to any other Person.  WCE has full right, power and authority to grant a first-priority security interest in the Collateral to Collateral Agent in the manner provided in this Agreement, free and clear of any other Liens, adverse claims and options and without the consent of any other person or entity or if consent is required, such consent has been obtained. No other Lien, adverse claim or option has been created by WCE or is known by WCE to exist with respect to the Collateral.  At the time the security interest in favor of Collateral Agent attaches, good and indefeasible title to all after-acquired property included within the Collateral, free and clear of any other Liens, adverse claims or options shall be vested in WCE. All consents for the assignment of Collateral to Collateral Agent, if any, required to be obtained by WCE have been obtained.

Section 4.      <u>Covenants</u>.

WCE hereby stipulates and agrees with the Collateral Agent as follows:

4.01    <u>Perfection by Control</u>.  WCE shall not be permitted to withdraw funds from the Lockbox Account until the Discharge Date and this Agreement has been terminated. Collateral Agent shall have the exclusive authority to withdraw, or (other than as set forth herein) direct the withdrawal of, funds from the Lockbox Account.  The Control Agreement for the Lockbox Account shall give the Collateral Agent the sole power to direct Depositary Bank regarding the Lockbox Account, and thus Collateral Agent shall Control the Lockbox Account within the meaning of the UCC.  Collateral Agent shall make distributions from the Lockbox Account only in accordance with <u>Section 6</u> of this Agreement.

4.02    <u>Further Assurances</u>.  Upon the request of Collateral Agent, WCE shall promptly from time to time give, execute, deliver, file, record, authorize or obtain all such financing statements, continuation statements, notices, documents, agreements or other papers as may be necessary in the judgment of Collateral Agent to create, preserve, perfect, maintain the perfection of or validate the security interest granted pursuant hereto or to enable Collateral Agent to exercise and enforce its rights hereunder with respect to such security interest, and without limiting the foregoing, shall:

(a)      take such other action as Collateral Agent may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in the Collateral;

- 8 -

EXHIBIT 3      PAGE 118

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 122 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 10 of 24

(b)    promptly from time to time enter into such Control Agreements, each in form and substance reasonably acceptable to Collateral Agent, as may be required to perfect the security interest created hereby;

(c)    keep full and accurate books and records relating to the Collateral, and stamp or otherwise mark such books and records in such manner as Collateral Agent may reasonably require in order to reflect the security interests granted by this Agreement; and

(d)    permit representatives of Collateral Agent, upon reasonable notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral, and to be present at WCE's places of business to receive copies of communications and remittances relating to the Collateral, and forward copies of any notices or communications received by WCE with respect to the Collateral, all in such manner as Collateral Agent may reasonably require.

4.03    No Other Liens.    WCE is and shall be the owner of or have other transferable rights in the Collateral free from any right or claim of any other Person or any other Lien and WCE shall defend the same against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Collateral Agent.    WCE shall not (a) grant, or permit to be granted, any Lien with respect to any of the Collateral in which Collateral Agent is not named as the sole secured party, (b) file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to any of the Collateral in which Collateral Agent is not named as the sole secured party, or (c) cause or permit any Person other than Collateral Agent to have Control of the Lockbox Account.

4.04    Locations; Names, Etc.    Without at least thirty (30) days' prior written notice to the Collateral Agent, WCE shall not: (a) change its location (as defined in Article 9 of the UCC), (b) change its legal name, or (c) agree to or authorize any modification of the terms of any item of the Collateral if the effect thereof would be to result in a loss of perfection of, or diminution of priority for, the security interests created hereunder in such item of Collateral, or the loss of control (within the meaning of Article 9 of the UCC) by Collateral Agent over such item of Collateral.

4.05    Perfection and Recordation.    WCE authorizes Collateral Agent to file Uniform Commercial Code financing statements describing the Collateral (provided that no such description shall be deemed to modify the description of Collateral set forth in Section 2).    The Collateral Agent, in accordance with Section 4.02 hereof, hereby requests and instructs WCE to, and WCE hereby agrees, at its sole cost and expense to, prepare and file such Uniform Commercial Code financing and continuation statements describing the Collateral as may be necessary to perfect and continue the security interest granted herein.    WCE shall deliver to the Collateral Agent a file stamped copy of all such filings, which the Collateral Agent shall make available to any PPA Provider upon request.

**Section 5.        Remittance of Collections to Collateral Agent.**

5.01    Irrevocable Direction.    WCE has, pursuant to the Direction Letter, irrevocably instructed SCE to remit to Collateral Agent all payments due or to become due in

- 9 -

EXHIBIT 3    PAGE 119

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document      Page 123 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 11 of 24

respect of the Receivables unless and until both Collateral Agent, at the direction of the Required Secured Creditors, and WCE direct otherwise in writing. WCE shall periodically take such additional measures as may be commercially reasonable to cause SCE to make all payments due to WCE into the Lockbox Account. WCE shall provide Collateral Agent with such proof of compliance with this <u>Section 5.01</u> as Collateral Agent may reasonably request from time to time. Without the prior written consent of Collateral Agent (acting at the written direction of the Required Secured Creditors), WCE shall not (a) terminate, amend, revoke or modify such payment instructions to SCE or Customers or (b) direct or cause, directly or indirectly, SCE or any Customer to make any payments except in accordance with such payment instructions. The parties agree that if any such payments, or any other Proceeds of Collateral, are received by WCE, (i) they shall be held in trust by WCE for the benefit of the Collateral Agent, (ii) WCE shall as promptly as possible remit or deliver same to Collateral Agent for application as provided herein, (iii) WCE shall take such commercially reasonable steps as necessary to require SCE to make any future remittances into the Lockbox Account and (iv) such activity shall be reported promptly to Collateral Agent following WCE's receipt of such funds. Collateral Agent thus has the right to all collections on the Collateral remitted to it by SCE until the Discharge Date.

      5.02    <u>Application of Proceeds</u>. The Proceeds of any collection or realization of all or any part of the Collateral shall be applied by Collateral Agent as provided for in <u>Section 6</u> below. Collateral Agent waives all rights under the UCC to enforce rights in the Collateral by means of a sale or other foreclosure action; the Collateral shall be collected by Collateral Agent from SCE pursuant to the Direction Letter.

      5.03    <u>Deficiency</u>. If the Proceeds of the collection of the Collateral are insufficient to pay in full the Obligations, WCE remains liable to Collateral Agent and Secured Creditors for any deficiency.

      5.04    <u>Attorney-in-Fact</u>. Collateral Agent is hereby appointed the attorney-in-fact of WCE to receive, endorse and collect all checks made payable to the order of WCE representing any payment or other distribution in respect of the Collateral.

**Section 6.**      **<u>Establishment of and Distributions From Lockbox Account</u>.**

      6.01    <u>Establishment of Lockbox Account</u>. WCE shall establish the Lockbox Account in WCE's name at Depositary Bank and shall fund the Reserve Amount into the Lockbox Account. The deposits into the Lockbox Account and all interest accumulated thereon shall be held and disbursed by the Depositary Bank in accordance with the terms and conditions of the Control Agreements. The Lockbox Account is subject to the sole dominion, control and discretion of Collateral Agent until the Discharge Date. Until the Discharge Date, neither WCE nor any person or entity claiming on behalf of or through WCE shall have any right or authority, whether express or implied, to make use of, withdraw or transfer any funds or to give instructions with respect to disbursement of the Accounts other than Collateral Agent. Until the Discharge Date, subject to Section 6.02, Collateral Agent shall be entitled to exercise any and all rights in respect of or in connection with the Lockbox Account including (i) the right to specify the amount of payments to be made from the Lockbox Account, (ii) when such payments are to be made out of the Lockbox Account and (iii) the right to withdraw funds for the payment of

31249.00001\32544457.2

EXHIBIT 3    PAGE 120

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 124 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 12 of 24

Obligations which are due and payable from the Lockbox Account. Collateral Agent shall accept all funds remitted to the Lockbox Account under this Agreement, and credit such funds as provided for in Section 6.02 below.

6.02    Priority of Distributions of Collateral. Proceeds of Collateral shall be allocated in accordance with this Section 6.02. On each Distribution Date, Collateral Agent shall distribute all funds in the Lockbox Account or otherwise received on the Collateral in accordance with the following priority:

(i)    *first*, to each PPA Provider in payment of any Regular Charges, according to its Regular Sharing Percentage;

(ii)    *second*, to each PPA Provider in payment of any Supplemental Payment owing to it according to its Supplemental Sharing Percentage;

(iii)    *third,* to the California Independent System Operator for all amounts currently due and payable by WCE;

(iv)    *fourth,* to the Collateral Agent (as such and in its individual capacity) in respect of its reasonable out-of-pocket fees and expenses incurred under this Agreement, the Intercreditor Agreement or the Control Agreements that have been invoiced to WCE, including, without limitation, payment of expenses incurred by the Collateral Agent which indemnity shall include the reasonable out of pocket attorneys' fees of outside counsel to the Collateral Agent; and

(v)    *fifth*, unless an Event of Default shall exist as to WCE, the balance, if any, after retention in the Lockbox Account of the Reserve Amount, shall be deposited for the benefit of WCE, free and clear of the lien of this Agreement, to the Operating Funds Flow Account, provided, however, that if the Collateral Agent has been notified of a dispute in accordance with Section 6.06, the portion of the balance, if any, up to such disputed amount shall be retained in the Lockbox Account and WCE shall only receive the amount of the balance, if any, that is in excess of such disputed amount until such time as the Collateral Agent receives written notice from the relevant PPA Provider and WCE that the dispute pursuant to Section 6.06 has been resolved. No distribution will be made pursuant to this Section 6.02(v) to any deposit account other than the Operating Funds Flow Account, without the express written consent of Lender.

Collateral Agent shall rely, and shall be fully protected in relying, on a Distribution Date Certificate submitted to it by WCE in making the above calculations, without any requirement that Collateral Agent verify the accuracy of such Distribution Date Certificate, subject to revision in the event of disputes resolved under Section 6.06.

6.03    Distribution Date Certificate. On or before three (3) Business Days before each Distribution Date, WCE shall remit to Collateral Agent and each PPA Provider a certificate in substantially the form of Exhibit A hereto (the "**Distribution Date Certificate**") prepared by WCE itemizing each of the payments to be remitted under Section 6.02 above. The PPA Providers may share such Distribution Date Certificates with their respective accountants, legal counsel and other advisors.

- 11 -

31249.00001\32544457.2

EXHIBIT 3    PAGE 121

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 125 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 13 of 24

6.04    <u>Replenishing the Reserve Amount; No Waiver</u>.  Subject to Section 6.05, if at any time the balance in the Lockbox Account is less than the Reserve Amount, then (a) the Collateral Agent shall within two (2) Business Days after the Collateral Agent has actual knowledge thereof provide WCE with written notice thereof, and (b) WCE shall deposit such shortfall amount into the Lockbox Account not later than ten (10) Business Days after its receipt of such notice from Collateral Agent.  The Collateral Agent shall have no duty or obligation to monitor or oversee WCE's replenishment of the Reserve Amount, and shall have no duty or obligation under this Section 6.04 other than to deliver the written notice required pursuant to 6.04(a).  Nothing contained herein shall impair or otherwise limit WCE's obligations to timely make the payments required pursuant to any of the Transaction Agreements.  It is expressly understood and agreed that the Collateral Agent shall have no liability for its failure to deliver any amounts required to be delivered by it pursuant to this Agreement or any other Transaction Agreement to the extent that such amounts are not then available in the Lockbox Account.

6.05    <u>Release of Reserve Amount</u>.  Except following and during the continuance of an Event of Default, if WCE and all Secured Creditors confirm in writing to the Collateral Agent that no such Event of Default exists or is continuing and provides the Collateral Agent with a Letter of Credit for the benefit of the PPA Providers in an amount equal to the Reserve Amount, WCE may request in writing and, upon receipt of such request, Collateral Agent shall instruct the Depositary Bank to release and distribute the Reserve Amount to WCE.  All of the fees, costs and expenses associated with the Letter of Credit shall be borne by WCE.  WCE shall thereafter cause the Letter of Credit to be maintained in full force and effect through the Discharge Date.  If at any time the issuer of the Letter of Credit is no longer a Qualified Institution, then WCE shall, within five (5) Business Days of such occurrence, either (a) provide Collateral Agent with a replacement Letter of Credit for the benefit of the PPA Providers issued by a Qualified Institution in an amount equal to the Reserve Amount or (b) fund the applicable Reserve Amount into the Lockbox Account.

6.06    <u>Disputes</u>.  If a PPA Provider advises WCE and Collateral Agent in writing that the calculations in any Distribution Date Certificate are in its opinion materially incorrect, then WCE and such PPA Provider shall attempt to resolve the discrepancy in good faith.  If the parties are able to reach an agreement with respect to such discrepancy in advance of the relevant Distribution Date, WCE shall remit to Collateral Agent and each PPA Provider a revised Distribution Date Certificate reflecting the agreed upon amounts, and the Collateral Agent shall disburse funds in accordance with such revised Distribution Date Certificate on the applicable Distribution Date, provided, however, that the Collateral Agent shall have no liability whatsoever for any failure to disburse funds in accordance with a revised Distribution Date Certificate to the extent that it has not received such revised Distribution Date Certificate sufficiently in advance of the scheduled distribution.  If the parties are unable to agree, they shall resolve such dispute in accordance with the dispute resolution provision of the Power Purchase Agreement between such PPA Provider and WCE.  In the interim, the Distribution Date Certificate originally submitted by WCE shall be relied upon by Collateral Agent for purposes of making distributions from the Lockbox Account of all undisputed amounts in accordance with <u>Section 6.02</u>, and the Collateral Agent shall make no distribution in respect of any disputed amount until such time as it has received a revised Distribution Date Certificate.  Notwithstanding the above, no dispute shall prevent any other PPA Provider from receiving its distributions from the Lockbox Account, even if such distributions would result in a shortfall of

- 12 -

31249.00001\32544457.2

EXHIBIT 3    PAGE 122

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 126 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 14 of 24

the disputed amount. However, WCE shall not be entitled to receive any funds if such distribution to WCE would result in a shortfall of the disputed amount.

6.07    <u>Earnings on Lockbox Account</u>.    WCE shall establish the Lockbox Account as a non-interest bearing account.

6.08    <u>Rights and Remedies</u>.    If an Event of Default shall have occurred and is continuing, Collateral Agent, without any other notice to or demand upon WCE, shall, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located; it being understood and agreed that the Collateral Agent would be exercising any such rights and remedies in its capacity as collateral agent for the benefit of the PPA Providers, as Secured Creditors.    In addition, **WCE HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE TO A JUDICIAL HEARING IN ADVANCE OF THE ENFORCEMENT OF COLLATERAL AGENT'S RIGHTS AND REMEDIES HEREUNDER, INCLUDING ITS RIGHT FOLLOWING AN EVENT OF DEFAULT TO TAKE IMMEDIATE POSSESSION OF THE COLLATERAL AND TO EXERCISE ITS RIGHTS AND REMEDIES WITH RESPECT THERETO.**    Collateral Agent shall only act at the written instruction of the Required Secured Creditors in (a) taking any action under this Agreement, the Intercreditor Agreement or any Control Agreement with respect to the Collateral following an Event of Default and (b) asserting any claim under this Agreement, the Intercreditor Agreement or any Control Agreement.    Notwithstanding the foregoing, if Collateral Agent deems it prudent to take reasonable actions, without the instruction of a Secured Creditor, to protect the Collateral, it may (but shall be under no obligation to) do so and thereafter provide written notice to all the Secured Creditors of such actions, and no provision of this Agreement shall restrict Collateral Agent from exercising such rights and no liability shall be imposed on Collateral Agent for omitting to exercise such rights. Notwithstanding anything herein or elsewhere, unless and until the Collateral Agent has received written notice from WCE or a Secured Creditor that an Event of Default has occurred or is continuing, the Collateral Agent shall assume, and shall be fully protected in assuming, that no Event of Default exists or is continuing.

6.09    <u>No Waiver by Collateral Agent.</u>    Collateral Agent shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be made in writing and signed by Collateral Agent (acting at the written direction of the Required Secured Creditors).    No delay or omission on the part of Collateral Agent in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy.    A waiver on any occasion shall not be construed as a bar to or a waiver of any right or remedy on any future occasion.    All rights and remedies of Collateral Agent with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, may be exercised by Collateral Agent (acting at the written direction of the Required Secured Creditors), shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Collateral Agent (acting at the written direction of the Required Secured Creditors) deems expedient.

6.10    <u>Waivers by WCE</u>.    To the extent permitted by applicable law, WCE hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans

- 13 -

31249.00001\32544457.2

EXHIBIT 3    PAGE 123

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 127 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 15 of 24

made, credit extended, collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description.

6.11    <u>Marshalling</u>.  **TO THE EXTENT THAT IT LAWFULLY MAY, WCE HEREBY AGREES THAT IT WILL NOT INVOKE ANY LAW RELATING TO THE MARSHALLING OF COLLATERAL WHICH MIGHT CAUSE DELAY IN OR IMPEDE THE ENFORCEMENT OF COLLATERAL AGENT'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR UNDER ANY OTHER INSTRUMENT CREATING OR EVIDENCING ANY OF THE OBLIGATIONS OR UNDER WHICH ANY OF THE OBLIGATIONS IS OUTSTANDING OR BY WHICH ANY OF THE OBLIGATIONS IS SECURED OR PAYMENT THEREOF IS OTHERWISE ASSURED, AND, TO THE EXTENT THAT IT LAWFULLY MAY, WCE HEREBY IRREVOCABLY WAIVES THE BENEFITS OF ALL SUCH LAWS.**

### Section 7.  <u>Miscellaneous</u>.

7.01    <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, consents and waivers and other communications made or required to be given pursuant to this Agreement shall be in writing and shall be delivered by hand, mailed by registered or certified mail or prepaid overnight air courier, or by electronic mail, addressed to the relevant party as provided below their signatures to this Agreement or at such other address for notice as WCE or Collateral Agent shall last have furnished in writing to the Person giving the notice.  A notice addressed as provided herein that (i) is delivered by hand or overnight courier is effective upon delivery, (ii) that is sent by electronic mail is effective if when confirmed by the recipient, and (iii) that is sent by registered or certified mail is effective on the earlier of acknowledgement of receipt as shown on the return receipt or three (3) Business Days after mailing.

7.02    <u>No Waiver</u>.  No failure on the part of the Collateral Agent to exercise, and no course of dealing with respect to, and no delay in exercising, any right or power hereunder shall operate as a waiver thereof.

7.03    <u>Amendments.</u>  The terms of this Agreement may be waived, altered or amended only by an instrument in writing duly executed by WCE and Collateral Agent.

7.04    <u>Expenses</u>.  If WCE fails to do so, Collateral Agent may, upon receipt from the Required Secured Creditors of written direction and such sums as may be necessary in connection therewith, discharge taxes and any other Liens or encumbrance at any time levied or placed on any of the Collateral.  WCE agrees to reimburse Collateral Agent on demand for any such expenditures made by Collateral Agent, and the Collateral Agent promptly upon receipt thereof shall remit such reimbursed sums to the Required Secured Creditors.  For the avoidance of doubt, it is expressly understood and agreed that the Collateral Agent shall not use or expend its own funds in connection with such taxes, Liens or encumbrances.  Collateral Agent shall have no obligation to make any such expenditure nor shall the making thereof be construed as a waiver or cure of any Event of Default.  WCE agrees to reimburse Collateral Agent (as such and in its individual capacity) for all reasonable costs and expenses incurred by it (including the reasonable fees and expenses of legal counsel) in connection with (i) the performance by Collateral Agent of its duties under this Agreement, the Intercreditor Agreement or the Control

- 14 -

EXHIBIT 3    PAGE 124

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document      Page 128 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 16 of 24

Agreements, (x) protecting, defending or asserting rights and claims of the Collateral Agent in respect of the Collateral, (y) litigation relating to the Collateral, and (z) workout, restructuring or other negotiations or proceedings, and (ii) the enforcement of this <u>Section 7.04</u>, and all such reasonable costs and expenses shall be Obligations entitled to the benefits of the collateral security provided pursuant to <u>Section 2</u>.

7.05    <u>Duty of Care; Earnings</u>.  Collateral Agent shall have no duty or obligation with respect to the Collateral except for its contractual obligations under this Agreement, the Intercreditor Agreement or a Control Agreement.  The Collateral Agent shall have no duty or obligation as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against any Person, beyond the safe custody of any Collateral in the Collateral Agent's possession or control.  Without limiting the generality of the foregoing, Collateral Agent shall have no duty (a) other than to instruct WCE as set forth in <u>Section 4.05</u> hereof, to see to any recording or filing of any financing statement evidencing a security interest in the Collateral, or to see to the maintenance of any such recording or filing, (b) to see to the payment or discharge of any tax, assessment or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against any part of the Collateral, (c) to confirm or verify the contents of any reports or certificates delivered to Collateral Agent believed by it to be genuine and to have been signed or presented by the proper party or parties, or (d) to ascertain or inquire as to the performance of observance by any other Person of any representations, warranties or covenants.  Collateral Agent may require an officer's certificate or an opinion of counsel before acting or refraining from acting, and Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or an opinion of counsel.

7.06    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of WCE, the Secured Creditors, and the Collateral Agent (provided that WCE shall not assign, transfer or delegate its rights or obligations hereunder without the prior written consent of Collateral Agent) and Collateral Agent shall only transfer or assign its rights hereunder in connection with a resignation or removal from its capacity as Collateral Agent in accordance with the terms of the Intercreditor Agreement). This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect in accordance with <u>Section 7.12</u>, and be binding upon WCE, its successors and assigns, and inure, together with the rights of Collateral Agent hereunder, to the benefit of the Collateral Agent and its successors, transferees and assigns.

7.07    <u>Counterparts</u>.  This Agreement and any related amendment or waiver may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, but all of which together shall constitute one instrument.  In proving this Agreement it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.  A facsimile of a signature page hereto shall be as effective as an original signature.

7.08    <u>GOVERNING LAW; JURISDICTION</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND ENFORCED UNDER, THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF SUCH STATE.  EACH PARTY TO THIS

- 15 -

EXHIBIT 3    PAGE 125

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document        Page 129 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 17 of 24

AGREEMENT HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE BROUGHT IN THE COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF CALIFORNIA OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE COURTS OF THE STATE OF CALIFORNIA AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. EACH PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS NOTICE ADDRESS APPLICABLE TO THIS AGREEMENT, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING.

7.09    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER, OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.

7.10    **<u>CONSENT TO INJUNCTIVE RELIEF</u>. WITHOUT LIMITING ANY OTHER RIGHTS OR REMEDIES THAT COLLATERAL AGENT MAY HAVE, WCE ACKNOWLEDGES THAT ITS VIOLATION OF <u>SECTION 5.01</u> WOULD RESULT IN IRREPARABLE INJURY TO COLLATERAL AGENT FOR WHICH NO ADEQUATE REMEDY AT LAW WOULD BE AVAILABLE. ACCORDINGLY, WCE HEREBY (I) CONSENTS TO THE ENTRY OF AN IMMEDIATE EX-PARTE INJUNCTION, TEMPORARY RESTRAINING ORDER, AND/OR PERMANENT INJUNCTION TO ENFORCE THE PROVISIONS OF <u>SECTION 5.01</u>, IN ADDITION TO ANY OTHER REMEDIES AVAILABLE AT LAW OR IN EQUITY AND (II) WAIVES ANY DEFENSE THAT ADEQUATE REMEDIES ARE AVAILABLE AT LAW AND ANY REQUIREMENT THAT A BOND OR ANY OTHER SECURITY BE POSTED IN CONNECTION WITH THE ENTRY OF ANY RESTRAINING ORDER OR INJUNCTION.**

7.11    <u>Captions</u>.    The captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

7.12    <u>Termination</u>.    Unless earlier terminated in writing by the parties hereto, this is a continuing security agreement and the grant of a security interest under this Agreement shall remain in full force and effect and all the rights, powers and remedies of Collateral Agent hereunder shall continue to exist until: (a) the Obligations are paid in full as the same becomes due and payable; (b) the PPA Providers have no further obligation to deliver products or render services (including credit support services) to, or on behalf of, WCE; (c) WCE has no further obligations to the PPA Providers under any of the Transaction Agreements; and (d) the PPA Providers, upon request of WCE, have executed and delivered to each of WCE and the Collateral Agent a written termination statement, and Collateral Agent has reassigned to WCE, without

- 16 -

31249.00001\32544457.2

EXHIBIT 3    PAGE 126

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 130 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 18 of 24

recourse, the Collateral and all rights conveyed hereby and returned possession of the Collateral to WCE.  Furthermore, it is contemplated by the parties that there may be times when no Obligations are owing; but notwithstanding such occurrences, unless the PPA Providers have executed a written termination under clause (d) above, this Agreement shall remain valid and shall be in full force and effect as to subsequent Obligations, provided Collateral Agent has not executed a written agreement terminating this Agreement.  This Agreement shall continue irrespective of the fact that the liability of any other obligor may have ceased, or irrespective of the validity or enforceability of the Transaction Agreements, to which any other obligor may be a party,  and notwithstanding the reorganization or bankruptcy of WCE, or any other event or proceeding affecting WCE or any other obligor.  At WCE's request, Collateral Agent shall, at WCE's reasonable expense, instruct Depositary Bank to release all assets credited to the Lockbox Account to WCE, and Collateral Agent shall also execute such other documentation as shall be reasonably requested by WCE to effect the termination and release of the liens on the Collateral, including notice to SCE that the Direction Letter is terminated.

7.13    <u>Severability</u>.    The provisions of this Agreement are intended to be severable.  If for any reason any of the provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

7.14    <u>Disclosure of Information</u>.  WCE hereby consents to the disclosure by any PPA Provider or Collateral Agent of any information provided by or relating to WCE as may be required or reasonably necessary for the administration of this Agreement, the Intercreditor Agreement or the Control Agreements, or the enforcement or protection of any of the rights of the Collateral Agent or the PPA Providers hereunder.

[Signatures on following page]

- 17 -

EXHIBIT 3    PAGE 127

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 131 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 19 of 24

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as an instrument under seal by their authorized representatives as of the date first written above.

WESTERN COMMUNITY ENERGY, a California joint powers authority, as Pledgor

By: _Rick Bishop_
Name: RICK BISHOP
Title: EXECUTIVE DIRECTOR

Notice Address:

Western Community Energy
Attention: Andrew Ruiz, Chief Financial Officer
3390 University Ave., Suite 200
Riverside, CA 92501
Phone: (951) 405-6740
Email: aruiz@wrcog.us
Facsimile: (951) 223-9720

RIVER CITY BANK, a California corporation, not in its individual capacity, but solely as Collateral Agent

By: _____
Name: _____
Title: _____

Notice Address:

River City Bank
Attention: Cash Management
2485 Natomas Park Drive
Sacramento, CA 95833
Telephone: 916-567-2660
Email: CashMgmt@rivercitybank.com
Facsimile: 916-567-2779

31249.00001\32544457.2

EXHIBIT 3    PAGE 128

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 132 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 20 of 24

LOCKBOX SECURITY AGREEMENT
WESTERN COMMUNITY ENERGY

APPROVED AS TO FORM:

Best Best & Krieger LLP

By: _____
Steven DeBaun, Partner

EXHIBIT 3    PAGE 129

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document    Page 133 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 21 of 24

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as an instrument under seal by their authorized representatives as of the date first written above.

WESTERN COMMUNITY ENERGY, a California joint powers authority, as Pledgor

By: _____
Name: _____
Title: _____

Notice Address:

Western Community Energy
Attention: Andrew Ruiz, Chief Financial Officer
3390 University Ave., Suite 200
Riverside, CA  92501
Phone: (951) 405-6740
Email: aruiz@wrcog.us
Facsimile: (951) 223-9720

RIVER CITY BANK, a California corporation, not in its individual capacity, but solely as Collateral Agent

By: _Kinzie Niehols_
Name: _Kinzie Niehols_
Title: _Cash Management Manager VP_

Notice Address:

River City Bank
Attention: Cash Management
2485 Natomas Park Drive
Sacramento, CA 95833
Telephone: 916-567-2660
Email: CashMgmt@rivercitybank.com
Facsimile: 916-567-2779

EXHIBIT 3    PAGE 130

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document      Page 134 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 22 of 24

Exhibit A

Form of Distribution Date Certificate

The undersigned, [INSERT NAME], the [INSERT NAME OF OFFICE HELD] of WESTERN COMMUNITY ENERGY, a California joint powers authority ("**WCE**"), hereby certifies, with reference to that certain Security Agreement dated as of [_____], 2020 (capitalized terms used herein shall have the same meaning as set forth in the Security Agreement) between WCE and RIVER CITY BANK, a California corporation, as collateral agent ("**Collateral Agent**"), to Collateral Agent as follows:

This certificate is being delivered to Collateral Agent on or before the date that is three (3) Business Days before the Distribution Date of [_____ , 20__].

No Event of Default exists as of the date of this certificate and WCE does not anticipate that an Event of Default will exist as of the Distribution Date set forth in paragraph 1 above.

The funds that are on deposit in the Lockbox Account shall be disbursed on the Distribution Date as follows:

1.    [To [INSERT NAME OF APPLICABLE PPA PROVIDER], for payment of its Regular Charges, an aggregate amount equal to [_____ Dollars ($_____)]; [*Include this paragraph for each PPA Provider*]

2.    [To [INSERT NAME OF APPLICABLE PPA PROVIDER], for payment of any Supplemental Payment owing in an aggregate amount equal to [_____ Dollars ($_____)]; [*Include this paragraph for each PPA Provider*]

3.    To the California Independent System Operator for payment of amounts due and owing from WCE in an aggregate amount equal to [_____ Dollars ($_____)];

4.    To Collateral Agent, in respect of Collateral Agent's reasonable out-of-pocket fees and expenses incurred under the Security Agreement or the Intercreditor Agreement that have been invoiced to WCE, an aggregate amount equal to [_____ Dollars ($_____)]; and

5.    The remaining funds, if any, that are on deposit, after retention of the Reserve Amount, are to be disbursed to WCE into the account designated by WCE.

[Signatures on following page]

31249.00001\32544457.2

EXHIBIT 3      PAGE 131

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document      Page 135 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 23 of 24

I hereby certify, in my capacity as [_____], that this Distribution Date Certificate is true and complete in all material respects.

_____

By:     _____
Name:  _____
Title:   _____
Date:   _____

31249.00001\32544457.2

EXHIBIT 3     PAGE 132

Case 6:21-bk-12821-SY    Doc 230    Filed 12/16/21    Entered 12/16/21 17:38:51    Desc
Main Document      Page 136 of 208

Case 6:21-ap-01128-SY    Doc 1-2    Filed 11/30/21    Entered 11/30/21 19:38:10    Desc
Exhibit B - Security Agreement    Page 24 of 24

EXHIBIT B

MASTER AGREEMENTS

Power Purchase Agreements in effect as of February 13, 2020:

1.    Edison Electric Institute Master Power Purchase and Sale Agreement dated February 13, 2020, between WCE and BP Energy Company;

2.    Edison Electric Institute Master Power Purchase and Sale Agreement dated February 13, 2020, between WCE and Morgan Stanley Capital Group, Inc.;

31249.00001\32544457.2

EXHIBIT 3      PAGE 133

# EXHIBIT 4

**<u>Exhibit C</u>**

**Promissory Note**

EXHIBIT 4    PAGE 134

PROMISSORY NOTE

Principal Amount Not to exceed $16,000,000                                      March 12, 2020

FOR VALUE RECEIVED, the undersigned WESTERN COMMUNITY ENERGY (the *"Borrower"*), hereby promises to pay to BARCLAYS BANK PLC, or its registered assigns (the *"Bank"*), in accordance with the provisions of the Agreement (as hereinafter defined), the principal outstanding amount of all Unreimbursed Amounts related to Letters of Credit and each Loan from time to time made by the Bank to the Borrower, in each case under that certain Revolving Credit Agreement, dated as of March 12, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the *"Agreement;"* the terms defined therein being used herein as therein defined), between the Borrower and the Bank, in accordance with the terms of the Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Loan and Unreimbursed Amount from the date of such Loan or Honor Date, as applicable, until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest shall be made to the Bank in Dollars in immediately available funds at the Bank's Lending Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. The Loans made by the Bank and Unreimbursed Amounts shall be evidenced by one or more loan accounts or records maintained by the Bank in the ordinary course of business. The Bank may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loans and Unreimbursed Amounts and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

Delivery of an executed counterpart of a signature page of this Note by fax transmission or other electronic mail transmission (*e.g.*, "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Note.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

WESTERN COMMUNITY ENERGY

By: _Barbara C Spoonhour_
Name: _Barbara Spoonhour_
Title: _Deputy Executive Director - Ops._

EXHIBIT 4    PAGE 135

Promissory Note for Barclays Bank PLC – Revolving Credit Agreement

Approved as to form:

By: _____
    Steven DeBaun

EXHIBIT 4    PAGE 136

# EXHIBIT 5

1 | WEILAND GOLDEN GOODRICH LLP
David M. Goodrich, State Bar No. 208675
2 | dgoodrich@wgllp.com
Ryan W. Beall, State Bar No. 313774
3 | rbeall@wgllp.com
650 Town Center Drive, Suite 600
4 | Costa Mesa, California 92626
Telephone    714-966-1000
5 | Facsimile    714-966-1002

6 | Counsel for Debtor
Western Community Energy

7

**FILED & ENTERED**

**JUN 07 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY potier    DEPUTY CLERK

**CHANGES MADE BY COURT**

8

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **RIVERSIDE DIVISION**

12 | In re

13 | WESTERN COMMUNITY ENERGY,

14 | Debtor.

Case No. 6:21-bk-12821-SY

Chapter 9

15

16 | **INTERIM ORDER GRANTING, IN PART, MOTION TO DETERMINE ADEQUACY OF ADEQUATE PROTECTION TO RIVER CITY BANK FOR THE BENEFIT OF PPA PROVIDERS**

17

18 | DATE:    June 1, 2021
TIME:    1:30 p.m.
19 | PLACE:    3420 Twelfth Street
Riverside, California 92501
20 | Courtroom 302

21

22

23 | On June 1, 2021 at 1:30 p.m. a hearing was held on the Emergency Motion to

24 | Determine Adequacy of Adequate Protection to River City Bank for the Benefit of PPA

25 | Providers ("Motion")[1] [Docket No. 11] filed by Western Community Energy ("Debtor"),

26 | _____

27 | [1] Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.
28 | 1329056.1

*Weiland Golden Goodrich LLP*
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1166547.2F

EXHIBIT 5    PAGE 137

1  debtor in the above-captioned chapter 9 bankruptcy case. Appearances were as noted on

2  the record. The court having reviewed the Motion, the notice of the Motion, the evidence

3  submitted in support of the Motion and related pleadings, including any responses or

4  oppositions thereto, and the arguments of counsel at the hearing on the Motion, and the

5  declaration of Debtor's counsel regarding the disputes as to the form of this order filed on

6  June 7, 2021 [Docket No. 32], and finding service proper and good cause appearing,

7      **IT IS HEREBY ORDERED** as follows:

8      1.     The Motion is granted, in part, on an interim basis.

9      2.     For purposes of this interim order only and not as an adjudication of any

10  rights or interests:

11          A.    the collections on Debtor's accounts on deposit in the Lockbox

12  Account (as defined in the "Security Agreement" dated February 12, 2020 and the

13  Account Control Agreement dated February 13, 2020) at River City Bank, as

14  Collateral Agent for certain PPA Providers, are property of the Debtor.

15          B.    Debtor has consented to the court's jurisdiction over its revenues for

16  purposes of this Motion.

17      3.     The Debtor's revenues are subject to the automatic stays of 11 U.S.C.

18  §§ 362(a) and 922(a).

19      4.     The automatic stays are modified and adequate protection is ordered as

20  provided herein.

21      5.     All remittances received by Southern California Edison Company on behalf

22  of Debtor shall continue to be deposited into the Lockbox Account.

23      6.     Notwithstanding the terms of the applicable agreements with River City

24  Bank, pursuant to the direction of Debtor, River City Bank shall make payments from the

25  Lockbox Account only for amounts due and payable on or before June 22, 2021 to the

26  California Independent System Operator (CAISO) for payments due June 8, 2021 and

27  June 15, 2021 and to BP Energy Company, Morgan Stanley Capital Group, Inc. and

28

2

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1166547.2F

EXHIBIT 5    PAGE 138

1    TransAlta Energy Marketing (U.S.) Inc. who are PPA Providers delivering post-petition

2    hedged energy to Debtor on an ongoing basis.  Direction by Debtor to River City Bank

3    shall be by means of the Form of Distribution Date Certificate, with a copy immediately

4    sent to the above PPA Providers.  Of those persons authorized to be paid by Debtor

5    under this order, Debtor shall identify to River City Bank the authorized person and the

6    specific amount to be paid from the Lockbox Account, and River City Bank may fully rely

7    on the instructions of Debtor.  For purposes of clarity, if there are insufficient funds in the

8    Lockbox Account at the time River City Bank receives any direction from Debtor, River

9    City Bank is excused from complying with the directions of Debtor made under this interim

10   order. Debtor shall direct no other payments from the Lockbox Account during this interim

11   period. No transfer from the Lockbox Account shall occur to another Debtor account,

12   including, without limitation, the Operating Account, the Operating Reserve Account and

13   the Operating Funds Flow Account.

14          7.      River City Bank is entitled to distribute from the Lockbox Account to itself, as

15   Collateral Agent, an amount equal to its reasonable out of pocket fees and expenses

16   incurred, including reasonable attorneys' fees, pursuant to Section 6.02 (iv) of the Security

17   Agreement. The fees and expenses distributed to River City Bank during the pendency of

18   this case are subject to review and claw back by the court. If Debtor or any other party in

19   interest contests the reasonableness of River City Bank's fees and expenses, it may file a

20   motion and request that this court determine the reasonableness of such fees and

21   expenses.

22          8.      To provide adequate protection, River City Bank is granted and provided

23   with a replacement lien in all cash, receivables, including future receivables, and other

24   property of the type constituting collateral under the Security Agreement, which

25   replacement lien shall have the same extent, validity, scope, and priority as the prepetition

26   lien held by River City Bank. Nothing herein shall prevent River City Bank or any PPA

27   Provider from seeking additional adequate protection or other relief. The replacement lien

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

3

1166547.2F

EXHIBIT 5     PAGE 139

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  will be in addition to all security interests and liens existing in favor of River City Bank as

2  of the petition date.

3      9.      If the proposed adequate protection fails, River City Bank and any PPA

4  Provider may file a request for an administrative expense claim under Section 922(c) to

5  the extent of the diminution of the value of the collateral as result of Debtor's use thereof

6  and River City Bank and the PPA Providers retain all rights arising under the Bankruptcy

7  Code.

8      10.     The Debtor may not pay any PPA Provider on prepetition claims from the

9  Lockbox Account unless further ordered by this court.

10     11.     This interim order shall be sufficient and conclusive evidence of the

11  extent, validity, perfection, and priority of the replacement liens granted to River City Bank.

12  River City Bank, in its discretion, shall be entitled to file a certified copy of this interim

13  order in any filing or recording office in any jurisdiction in which Debtor conducts its

14  businesses or possesses any personal property and, in such event, the filing or

15  recording officer is authorized and directed to file or record such certified copy of this

16  Interim Order.

17     12.     All rights and interests of River City Bank, the PPA Providers and Debtor

18  are reserved. The court retains jurisdiction over this interim order and the subject matter

19  of this interim order including to resolve any dispute in connection with the rights and

20  duties specified hereunder.

21     13.     If any or all of the provisions of this interim order are hereafter reversed,

22  modified, vacated, or stayed, such reversal, modification, vacation, or stay shall not affect

23  the validity, priority, or enforceability of any provision of this interim order occurring prior to

24  the effective date of such reversal, modification, vacation, or stay, which occurrences shall

25  be governed by this interim order.  The adequate protection provided to River City Bank

26  under this order shall survive any dismissal of this bankruptcy case.

27     14.     Nothing in this order is or shall be deemed to be a determination as to

28

<div align="center">4</div>

1166547.2F

EXHIBIT 5     PAGE 140

1 whether or not Sections 556 or 561 of the Bankruptcy Code are applicable to any power

2 purchase agreement or similar contract to which the Debtor is a party, such issues being

3 expressly reserved, with no party waiving any rights or arguments with respect thereto.

4      15.    The fourteen-day stay period provided by Federal Rules of Bankruptcy

5 Procedure Rule 4001(a)(3) is waived and this interim order is effective immediately.

6      16.    A further hearing on the Motion is scheduled for June 22, 2021 at 10:00 a.m.

7 in Courtroom 302 of this court.

8                                                ###

Date: June 7, 2021

Scott H. Yun
United States Bankruptcy Judge

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

5

1166547.2F

EXHIBIT 5    PAGE 141

# EXHIBIT 6

1  WEILAND GOLDEN GOODRICH LLP
   David M. Goodrich, State Bar No. 208675
2  dgoodrich@wgllp.com
   Ryan W. Beall, State Bar No. 313774
3  rbeall@wgllp.com
   650 Town Center Drive, Suite 600
4  Costa Mesa, California 92626
   Telephone    714-966-1000
5  Facsimile    714-966-1002

6  Counsel for Debtor
   Western Community Energy
7

FILED & ENTERED

JUL 06 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY potier       DEPUTY CLERK

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 RIVERSIDE DIVISION

11  In re                              Case No. 6:21-bk-12821-SY

12  WESTERN COMMUNITY ENERGY,          Chapter 9

13                    Debtor.

14                                     **FINAL ORDER GRANTING, IN PART,
                                       MOTION TO DETERMINE ADEQUACY OF**
15                                     **ADEQUATE PROTECTION TO RIVER
                                       CITY BANK FOR THE BENEFIT OF PPA**
16                                     **PROVIDERS**

17                                     Hearing:
                                       Date:     June 22, 2021
18                                     Time:     10:00 A.M.
                                       Place:    3420 Twelfth Street
19                                               Riverside, California 92501
                                               Courtroom 302
20

21

22         On June 22, 2021 at 10:00 a.m. a further hearing was held on the Emergency

23  Motion to Determine Adequacy of Adequate Protection to River City Bank for the Benefit

24  of PPA Providers ("Motion")[1] filed by Western Community Energy ("Debtor"), debtor in the

25  above-captioned chapter 9 bankruptcy case. Appearances were as noted on the record.

26  _____

27  [1] Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the
    Motion.
28  1329056.1

1166547.2F

EXHIBIT 6    PAGE 142

1    The court having reviewed the Motion, the notice of the Motion, the evidence submitted in

2    support of the Motion, and related pleadings, including any responses or oppositions

3    thereto, the stipulation entered into by Southern California Edison Company and the

4    Debtor filed on June 18, 2021 [Dkt No. 74], and the arguments of counsel at the hearing

5    on the Motion, and finding service proper and for good cause appearing, and after

6    entering an interim order on June 7, 2021 granting the Motion on an interim basis, in part

7    [Dkt. No. 34] ("Interim Order"),

8        **IT IS HEREBY ORDERED** as follows:

9        1.    The Motion is granted, in part, on a final basis.

10       2.    For purposes of this order only and not as an adjudication of any rights or

11   interests,

12           A.    the collections on Debtor's accounts on deposit in the Lockbox

13   Account (as defined the "Security Agreement" dated February 12, 2020 and the

14   Account Control Agreement dated February 13, 2020) at River City Bank, as

15   Collateral Agent for certain PPA Providers, are property of the Debtor.

16           B.    Debtor has consented to the court's jurisdiction over its revenues for

17   purposes of this Motion.

18       3.    The Debtor's revenues are subject to the automatic stays of 11 U.S.C.

19   §§ 362(a) and 922(a).

20       4.    The automatic stays are modified and adequate protection is ordered as

21   provided herein.

22       5.    All remittances received by Southern California Edison Company on behalf

23   of Debtor shall continue to be deposited to the Lockbox Account.

24       6.    Notwithstanding the terms of the applicable agreements with River City Bank

25   and consistent with the court's Interim Order, pursuant to the direction of Debtor, River

26   City Bank shall make payments from the Lockbox Account only for amounts due and

27   payable on or before June 22, 2021 to the California Independent System Operator

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

2

1166547.2F

EXHIBIT 6    PAGE 143

1  (CAISO) for payments due June 8, 2021 and June 15, 2021 and to BP Energy Company,

2  Morgan Stanley Capital Group, Inc. and TransAlta Energy Marketing (U.S.) Inc. who are

3  PPA Providers delivering post-petition hedged energy to Debtor on an ongoing basis.

4  Direction by Debtor to River City Bank shall be by means of the Form of Distribution Date

5  Certificate, with a copy immediately sent to the above PPA Providers.  Of those persons

6  authorized to be paid by Debtor under this order, Debtor shall identify to River City Bank

7  the authorized person and the specific amount to be paid from the Lockbox Account, and

8  River City Bank may fully rely on the instructions of Debtor. For purposes of clarity, if there

9  are insufficient funds in the Lockbox Account at the time River City Bank receives any

10  direction from Debtor, River City Bank is excused from complying with the directions of

11  Debtor made under this order. Debtor shall direct no other payments from the Lockbox

12  Account under this order. No transfer from the Lockbox Account shall occur to another

13  Debtor account including, without limitation, the Operating Account, the Operating

14  Reserve Account and the Operating Funds Flow Account.

15      7.      River City Bank is entitled to distribute from the Lockbox Account to itself, as

16  Collateral Agent, an amount equal to its reasonable out of pocket fees and expenses

17  incurred, including reasonable attorneys' fees, pursuant to Section 6.02 (iv) of the Security

18  Agreement. The fees and expenses distributed to River City Bank during the pendency of

19  this case are subject to review and claw back by this court. If Debtor or any other party in

20  interest contests the reasonableness of River City Bank's fees and expenses, it may file a

21  motion and request that this court determine the reasonableness of such fees and

22  expenses.

23      8.      To provide adequate protection, River City Bank is granted and provided

24  with a replacement lien in all cash, receivables, including future receivables, and other

25  property of the type constituting collateral under the Security Agreement, which

26  replacement lien shall have the same extent, validity, scope, and priority as the prepetition

27  lien held by River City Bank. Nothing herein shall prevent River City Bank or any PPA

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

3

1166547.2F

EXHIBIT 6    PAGE 144

1  Provider from seeking additional adequate protection or other relief. The replacement lien

2  will be in addition to all security interests and liens existing in favor of River City Bank as

3  of the petition date.

4      9.      If the proposed adequate protection fails, River City Bank and any PPA

5  Provider may file a request for an administrative expense claim under Section 922(c) to

6  the extent of the diminution of the value of the collateral as result of Debtor's use thereof

7  and River City Bank and the PPA Providers retain all rights arising under the Bankruptcy

8  Code.

9      10.     The Debtor may not pay any PPA Provider on prepetition claims from the

10  Lockbox Account unless further ordered by this court.

11      11.     The Interim Order and this final order shall be sufficient and conclusive

12  evidence of the extent, validity, perfection, and priority of the replacement liens granted to

13  River City Bank.  River City Bank, in its discretion, shall be entitled to file a certified copy

14  of the Interim Order and this final order in any filing or recording office in any jurisdiction in

15  which Debtor conducts its businesses or possesses any personal property and, in

16  such event, the filing or recording officer is authorized and directed to file or record

17  such certified copy of the Interim Order and this final order.

18      12.     All rights and interests of River City Bank, the PPA Providers and Debtor

19  are reserved. The court retains jurisdiction over the Interim Order and this final order and

20  the subject matter of each including to resolve any dispute in connection with the rights

21  and duties specified hereunder.

22      13.     If any or all of the provisions of the Interim Order or this final order are

23  hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or

24  stay shall not affect the validity, priority or enforceability of any provision of the Interim

25  Order or this final order occurring prior to the effective date of such reversal, modification,

26  vacation or stay, which occurrences shall be governed by the Interim Order or this final

27

28

4

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1166547.2F

EXHIBIT 6    PAGE 145

1  order.  The adequate protection provided to River City Bank under the Interim Order and

2  this final order shall survive any dismissal of this bankruptcy case.

3      14.    Nothing in the Interim Order or this final order is or shall be deemed to be a

4  determination as to whether or not Sections 556 or 561 of the Bankruptcy Code are

5  applicable to any power purchase agreement or similar contract to which the Debtor is a

6  party, such issues being expressly reserved, with no party waiving any rights or

7  arguments with respect thereto.

8      15.    The fourteen (14) day stay period provided by Federal Rules of Bankruptcy

9  Procedure, Rule 4001(a)(3) is waived and this final order is effective immediately.

10                                     ###

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  Date: July 6, 2021

Scott H. Yun
United States Bankruptcy Judge

27

28

                                     5

1166547.2F

EXHIBIT 6    PAGE 146

# EXHIBIT 7

1  WEILAND GOLDEN GOODRICH LLP
   David M. Goodrich, State Bar No. 208675
2  dgoodrich@wgllp.com
   Ryan W. Beall, State Bar No. 313774
3  rbeall@wgllp.com
   650 Town Center Drive, Suite 600
4  Costa Mesa, California 92626
   Telephone    714-966-1000
5  Facsimile    714-966-1002

6  Counsel for Debtor
   Western Community Energy

7

**FILED & ENTERED**

**JUN 11 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY potier    DEPUTY CLERK

8              **UNITED STATES BANKRUPTCY COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION**

10  In re                              Case No. 6:21-bk-12821-SY

11  WESTERN COMMUNITY ENERGY,          Chapter 9

12              Debtor.                **ORDER APPROVING STIPULATION FOR
                                       MODIFICATION OF AUTOMATIC STAYS
13                                     OF 11 U.S.C. §§ 362(a) AND 922(a) AND
                                       TEMPORARY RESTRAINING ORDER**
14

15                                     [No Hearing Requested]

16

17      The court having reviewed and considered the *Stipulation for Modification of*

18  *Automatic Stays of 11 U.S.C. §§ 362(a) and 922(a) and Temporary Restraining Order*

19  filed June 10, 2021 as Dkt. 49 ("Stipulation"),[1] between Western Community Energy, the

20  debtor in the above-captioned case ("WCE" or "Debtor"), by and through its counsel, and

21  Southern California Edison Company, a California corporation ("SCE"), by and through its

22  counsel, the record in this case, and good cause appearing,

23      IT IS HEREBY ORDERED:

24      1.      The Stipulation is approved.

25      2.      The automatic stays of 11 U.S.C. §362(a) and 922(a) are modified to the

26  extent they apply and to the extent necessary to allow SCE to (a) cease performance

27  _____

28      [1] Capitalized terms have the same meaning or definition as the capitalized terms in the Stipulation.

EXHIBIT 7    PAGE 147

1   under the RA Agreement and the EEI Agreement as of June 10, 2021, and to implement

2   and effectuate the termination of the RA Agreement and EEI Agreement, including by way

3   of setoff of any moneys deposited or letters of credit provided under those agreements

4   (other than setoff against remittances to WCE of revenue of WCE customers under the

5   CCA Agreement) to the extent those agreement are not already terminated and closed

6   out, (b) offset the $147,000 from WCE that is on deposit with SCE as security for an

7   involuntary transfer of WCE customers under applicable tariffs and agreements, and (c)

8   initiate, execute, and complete the process to transfer customers from WCE to SCE's

9   generation service pursuant to the de-registration by WCE and CCA program termination,

10  any applicable tariffs, and any direction from the CPUC or agreement with WCE regarding

11  the transfer.

12          3.      The "Cutover Date" shall be the earlier of (a) the date on which SCE

13  switches a WCE customer's service account to SCE's generation service pursuant to its

14  tariffs or (b) the date on which SCE assumes Scheduling Coordinator responsibility for

15  such customer service account by written agreement among SCE and WCE, or otherwise.

16  Subject to the terms of the temporary restraining order, as it may be amended, SCE shall

17  continue to collect and remit WCE customer revenue to WCE in accordance with the

18  terms of the CCA Agreement to the extent it relates to WCE services provided to a WCE

19  customer's service account before its Cutover Date.  Revenue for services provided on or

20  after a WCE customer's service account's Cutover Date shall be retained by SCE as

21  revenue of SCE's generation customers and shall not be subject to any claim of WCE or

22  any WCE creditor (other than SCE and its parent), WCE shareholder, WCE member, or

23  WCE affiliate.

24          4.      The temporary restraining order is modified or amended to dissolve the

25  court's temporary restraining order to the extent it enjoins SCE from any item set forth in

26  Paragraphs 2 or 3.

27          5.      WCE and SCE may proceed to take any action set forth in the Stipulation.

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

2

EXHIBIT 7    PAGE 148

6.      Nothing in this order, and nothing in the temporary restraining order, shall limit the ability of the CPUC or the California Independent System Operator from taking any action consistent with the provisions of the Stipulation and this order or necessary to implement the provisions of the Stipulation and this order.

7.      The 14-day stay prescribed by FRBP 4001(a)(3) is waived; and

8.      Except as provided in the Stipulation and this order, all other rights of WCE and SCE are reserved regarding WCE's and SCE's respective rights, claims, defenses or positions in the case, the Adversary Proceeding, and the TRO Application, and unless expressly provided herein or in the Stipulation, the Stipulation and this order do not act as an admission of fact or waiver of right of WCE or SCE.

###

Date: June 11, 2021

Scott H. Yun
United States Bankruptcy Judge

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

3

EXHIBIT 7    PAGE 149

# EXHIBIT 8

THOMAS WALPER (State Bar. No. 96667)
Thomas.walper@mto.com
SETH GOLDMAN (State Bar. No. 223428)
Seth.goldmant@mto.com
BRADLEY R. SCHNEIDER (State Bar No. 235296)
Bradley.schneider@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Southern California Edison
Company

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No. 6:21-bk-12821-SY |
| WESTERN COMMUNITY ENERGY, | Chapter 9 |
| Debtor. | **STIPULATION REGARDING SOUTHERN CALIFORNIA EDISON COMPANY'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
| | [No Hearing Requested] |

**TO THE HONORABLE SCOTT H. YUN, UNITED STATES BANKRUPTCY JUDGE**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

Southern California Edison Company ("SCE"), by and through its counsel, Western

Community Energy, the debtor in the above captioned case ("WCE" or "Debtor"), by and through

its counsels and the other undersigned parties to this stipulation (the "Stipulation"), by and through

their respective counsel (together with SCE and the Debtor, the "Parties"), hereby stipulate and

agree with respect to the following:

EXHIBIT 8    PAGE 150

**<u>RECITALS</u>**

1.       WCE is a joint powers authority that was formed on August 23, 2018, pursuant to a joint powers agreement.  WCE is a community choice aggregator formed for the purpose of purchasing electrical services for customers within its jurisdictional boundaries.

2.       On February 26, 2019, WCE and SCE entered into a Community Choice Aggregator (CCA) Service Agreement ("Service Agreement") pursuant to which SCE provided certain services to WCE.

3.       SCE asserts it has pre-petition and post-petition claims against WCE for amounts owed under the Service Agreement as well as amounts owed under that *Agreement Between Southern California Edison Company and Western Community Energy Regarding WCE Implementation and Resource Adequacy Compliance for 2020, 2021 and 2022* (as amended, the "RA Agreement:").

4.       On May 24, 2021, the Debtor filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code initiating the instant bankruptcy case ("Case").

5.       On May 28, 2021, WCE filed a complaint for (1) declaratory relief, (2) enforcement of the automatic stay, and (3) injunctive relief against SCE and DOES 1 through 20 ("Adversary Proceeding").

6.       On May 28, 2021, WCE filed an application for a temporary restraining order in the Adversary Proceeding seeking, inter alia, an injunction preventing SCE from withholding funds due to WCE from WCE's customers (the "TRO Application").

7.       On June 1, 2021, the Court granted the TRO Application, in part, and issued an oral ruling.

8.       On June 11, 2021, the Court entered a written order granting the TRO Application, in part (the "TRO Order"), which order enjoined SCE from withholding revenues from Debtor's customers, subject to certain adequate protection.

9.       On June 14, 2021, SCE filed a Notice of Motion and Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 [Doc. 59] ("SCE Stay Relief Motion").

EXHIBIT 8    PAGE 151

10.    By the SCE Stay Relief Motion, SCE seeks relief from the automatic stay in order to effect a setoff, pursuant to applicable law and 11 U.S.C. § 553, of the Debtor's alleged pre-petition obligations to SCE against customer payments that SCE is collecting and remitting pursuant to the Service Agreement.

11.    The SCE Stay Relief Motion is currently set for hearing on June 22, 2021 at 10 a.m.

12.    By a stipulation dated June 16, 2021, SCE agreed to extend the time of certain parties to respond to the SCE Stay Relief Motion from June 15, 2021 to June 18, 2021.

13.    The Parties have agreed to a temporary standstill of any litigation over the SCE Stay Relief Motion to allow, among other things, the parties time to discuss a consensual resolution of the SCE Stay Relief Motion and to allow the Debtor to pursue a potential consensual plan of adjustment and resolution of the SCE Stay Relief Motion.

## **STIPULATION**

Based upon the foregoing recitals, the Parties hereby stipulate and agree as follows:

A.    SCE shall continue remitting customer payments pursuant to the Service Agreement to River City Bank for deposit into the Lockbox Account, subject to the terms of this stipulation and the order approving this stipulation.

B.    All WCE customer payments remitted by SCE after June 22, 2021 (without prejudice to SCE's right to seek an earlier date), pursuant to the Service Agreement and deposited into the Lockbox Account shall be deemed subject to a replacement lien provided by the TRO Order as adequate protection of SCE's alleged setoff rights, if any, as of the Petition Date, except that such replacement lien shall apply only to the funds deposited in the Lockbox Account after June 17, 2021.  The replacement lien in favor of River City Bank, as collateral agent for the benefit of the PPA Providers, provided pursuant to the order on the adequate protection motion (Doc. No. 34), shall continue to apply to funds in the Lockbox Account to the same extent, validity, and priority as of River City Bank's lien as of the Petition Date.

C.    All WCE customer payments that are remitted by SCE for deposit into the Lockbox Account after June 22, 2021 (without prejudice to SCE's right to later seek an earlier date), shall

EXHIBIT 8    PAGE 152

1  be subject to (i) any right of setoff or recoupment SCE would have against such funds and (ii) any

2  lien or security interest River City Bank would have against such funds, in each case in the

3  absence of such remittance to the same extent as if SCE had retained the funds in its possession.

4      D.      Subject to Paragraphs B and C, Parties' rights with respect to the extent and priority

5  of SCE's right of setoff or recoupment against WCE customer remittances are expressly reserved.

6      E.      SCE will not setoff or recoup any obligations of the Debtor to SCE against WCE

7  customer revenue absent further order of the Court.

8      F.      No payments or other transfers will be made from or out of the Lockbox Account

9  absent further order of the Court except as authorized in the order on the adequate protection

10 motion (Doc. No. 34).

11     G.      SCE's alleged rights of setoff or recoupment with respect to WCE revenue already

12 remitted by SCE pursuant to the TRO Order are expressly reserved; provided, however, nothing

13 herein shall modify the extent of the replacement lien granted by the TRO Order or extend the

14 replacement lien granted to SCE by the TRO Order to customer funds deposited in the Lockbox

15 Account during the period from the Petition Date through June 22, 2021 (without prejudice to

16 SCE's right to seek an earlier date).

17     H.      Except with respect to paragraphs 3a, 4, and 5 of the TRO Order, which are

18 expressly preserved herein and modified as set forth in paragraph B of this stipulation, the TRO

19 Order is dissolved and the Debtor withdraws its request for a preliminary injunction.

20     I.      The hearing on the SCE Stay Relief Motion will be taken off calendar for June 22,

21 2021.

22     J.      The Debtor will provide a list of total assets and liabilities to the Parties by no later

23 than June 23, 2021.  Such list shall include separate line items stating (a) the current balances held

24 in the Lockbox Account and WCE's general operating account, and (b) the estimated amount, by

25 PPA Provider, of each termination payment to which WCE is or may be entitled to receive or

26 obligated to pay.  WCE shall provide an updated balance sheet on July 9, 2021, and provide it to

27 the Parties to facilitate discussions between and among them regarding a consensual WCE plan of

28 adjustment.

K.      The Stay Relief Motion will be scheduled for briefing and hearing on regular notice

if the Parties are unable to reach agreement on the disposition of customer remittances by July 15,

2021; provided, however, this Stipulation shall not constitute a determination or agreement that

the extent of setoff rights or the validity or priority of the setoff rights and River City Bank's lien

can be determined through the Stay Relief Motion rather than through an adversary proceeding.

AGREED TO BY:

Dated: June 18, 2021

_/s/ Bradley R. Schneider_
Thomas Walper
Seth Goldman
Bradley R. Schneider
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email: thomas.walper@mto.com
seth.goldman@mto.com
bradley.schneider@mto.com

*Attorneys for Southern California Edison Company*

_____
Thomas G. Mouzes
Mark Gorton
Bashar Ahmad
BOUTIN JONES INC.
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
Phone: 916.321.4444
Fax: 916.441.7597
Email: tmouzes@boutinjones.com
mgorton@boutinjones.com
bahmad@boutinjones.com

*Attorneys for River City Bank, as Collateral Agent*

_____
David M. Goodrich
Ryan W. Beall
WEILAND GOLDEN GOODRICH LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002
Email: dgoodrich@wgllp.com
rbeall@wgllp.com

*Counsel for Debtor Western Community Energy*

_____
Nahal Zarnighian
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400
Facsimile: 424.204.4350
Email: zarnighiann@ballardspahr.com

Vincent J. Marriott III*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone 215.665.8500
Facsimile: 215.864.8999
Email: marriott@ballardspahr.com

1    K.    The Stay Relief Motion will be scheduled for briefing and hearing on regular notice

2    if the Parties are unable to reach agreement on the disposition of customer remittances by July 15,

3    2021; provided, however, this Stipulation shall not constitute a determination or agreement that

4    the extent of setoff rights or the validity or priority of the setoff rights and River City Bank's lien

5    can be determined through the Stay Relief Motion rather than through an adversary proceeding.

6    AGREED TO BY:

7    Dated: June 18, 2021

8    _____
     Thomas Walper
9    Seth Goldman
     Bradley R. Schneider
10   MUNGER, TOLLES & OLSON LLP
     350 South Grand Avenue, Fiftieth Floor
11   Los Angeles, CA 90071-3426
     Telephone: (213) 683-9100
12   Facsimile: (213) 687-3702
     Email: thomas.walper@mto.com
13   seth.goldman@mto.com
     bradley.schneider@mto.com
14
15   *Attorneys for Southern California Edison
16   Company*

17
     _____
18   Thomas G. Mouzes
     Mark Gorton
19   Bashar Ahmad
     BOUTIN JONES INC.
20   555 Capitol Mall, Suite 1500
     Sacramento, CA 95814
21   Phone: 916.321.4444
     Fax: 916.441.7597
22   Email: tmouzes@boutinjones.com
     mgorton@boutinjones.com
23   bahmad@boutinjones.com
24
25   *Attorneys for River City Bank,*
     *as Collateral Agent*
26

27

28

_____
David M. Goodrich
Ryan W. Beall
WEILAND GOLDEN GOODRICH LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002
Email: dgoodrich@wgllp.com
rbeall@wgllp.com

*Counsel for Debtor Western Community Energy*

_____
Nahal Zarnighian
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400
Facsimile: 424.204.4350
Email: zarnighiann@ballardspahr.com

Vincent J. Marriott III*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone 215.665.8500
Facsimile: 215.864.8999
Email: marriott@ballardspahr.com

EXHIBIT 8    PAGE 155

Matthew G. Summers*
Chantelle D. McClamb*
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: 302.252.4428
Facsimile: 410.361.8930
Email: summersm@ballardspahr.com
mcclambc@ballardspahr.com

*admission Pro Hac Vice pending
*Attorneys for Exelon Generation Company,
LLC*

_____
James A. Wright III
Buck Endemann
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: (617) 261-3193
Facsimile: (617) 261-3175
Email: james.wright@klgates.com
buck.endemann@klgates.com

*Attorneys for TransAlta Energy Marketing
(U.S.) Inc.*

_____
Sara M. Keith*
SHELL ENERGY NORTH AMERICA
(US), L.P.
1000 Main Street, Level 12
Houston, TX 77002
Email: sara.keith@shell.com

*licensed in Texas
*In-house counsel for Shell Energy North
America (US), L.P.*

David L. Neale, Esq.
LEVENE, NEALE, BENDER, YOO &
BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067 -and-
Keith Cunningham
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Telephone: (207) 791-1187
Facsimile: (207) 791-1350
Email: kcunningham@pierceatwood.com

*Attorneys for California Independent System
Operator*

1    K.    The Stay Relief Motion will be scheduled for briefing and hearing on regular notice

2  if the Parties are unable to reach agreement on the disposition of customer remittances by July 15,

3  2021; provided, however, this Stipulation shall not constitute a determination or agreement that

4  the extent of setoff rights or the validity or priority of the setoff rights and River City Bank's lien

5  can be determined through the Stay Relief Motion rather than through an adversary proceeding.

6  AGREED TO BY:

7  Dated: June 18, 2021

8

9  Thomas Walper
   Seth Goldman
10  Bradley R. Schneider
   MUNGER, TOLLES & OLSON LLP
11  350 South Grand Avenue, Fiftieth Floor
   Los Angeles, CA 90071-3426
12  Telephone: (213) 683-9100
   Facsimile: (213) 687-3702
13  Email: thomas.walper@mto.com
   seth.goldman@mto.com
14  bradley.schneider@mto.com

15
   *Attorneys for Southern California Edison
16  Company*

17

18  Thomas G. Mouzes
   Mark Gorton
19  Bashar Ahmad
   BOUTIN JONES INC.
20  555 Capitol Mall, Suite 1500
   Sacramento, CA 95814
21  Phone: 916.321.4444
   Fax: 916.441.7597
22  Email: tmouzes@boutinjones.com
   mgorton@boutinjones.com
23  bahmad@boutinjones.com

24
   *Attorneys for River City Bank,*
25  *as Collateral Agent*

26

27

28

David M. Goodrich
Ryan W. Beall
WEILAND GOLDEN GOODRICH LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002
Email: dgoodrich@wgllp.com
rbeall@wgllp.com

*Counsel for Debtor Western Community
Energy*

Nahal Zarnighian
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400
Facsimile: 424.204.4350
Email: zarnighiann@ballardspahr.com

Vincent J. Marriott III*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone 215.665.8500
Facsimile: 215.864.8999
Email: marriott@ballardspahr.com

EXHIBIT 8    PAGE 157

1    K.    The Stay Relief Motion will be scheduled for briefing and hearing on regular notice

2  if the Parties are unable to reach agreement on the disposition of customer remittances by July 15,

3  2021; provided, however, this Stipulation shall not constitute a determination or agreement that

4  the extent of setoff rights or the validity or priority of the setoff rights and River City Bank's lien

5  can be determined through the Stay Relief Motion rather than through an adversary proceeding.

6  AGREED TO BY:

7  Dated: June 18, 2021

8  _____

9  Thomas Walper
   Seth Goldman
10  Bradley R. Schneider
   MUNGER, TOLLES & OLSON LLP
11  350 South Grand Avenue, Fiftieth Floor
   Los Angeles, CA 90071-3426
12  Telephone: (213) 683-9100
   Facsimile: (213) 687-3702
13  Email: thomas.walper@mto.com
   seth.goldman@mto.com
14  bradley.schneider@mto.com

15  *Attorneys for Southern California Edison*
16  *Company*

17  _____

18  Thomas G. Mouzes
   Mark Gorton
19  Bashar Ahmad
   BOUTIN JONES INC.
20  555 Capitol Mall, Suite 1500
   Sacramento, CA 95814
21  Phone: 916.321.4444
   Fax: 916.441.7597
22  Email: tmouzes@boutinjones.com
   mgorton@boutinjones.com
23  bahmad@boutinjones.com

24
25  *Attorneys for River City Bank,*
   *as Collateral Agent*

26

27

28

_____

David M. Goodrich
Ryan W. Beall
WEILAND GOLDEN GOODRICH LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002
Email: dgoodrich@wgllp.com
rbeall@wgllp.com

*Counsel for Debtor Western Community*
*Energy*

_____

Nahal Zarnighian
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400
Facsimile: 424.204.4350
Email: zarnighiann@ballardspahr.com

Vincent J. Marriott III*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone 215.665.8500
Facsimile: 215.864.8999
Email: marriott@ballardspahr.com

Matthew G. Summers*
Chantelle D. McClamb*
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Telephone: 302.252.4428
Facsimile: 410.361.8930
Email: summersm@ballardspahr.com
mcclambc@ballardspahr.com

*admission Pro Hac Vice pending
Attorneys for Exelon Generation Company,
LLC.

James A. Wright III
Buck Endemann
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: (617) 261-3193
Facsimile: (617) 261-3175
Email: james.wright@klgates.com
buck.endemann@klgates.com

Attorneys for TransAlta Energy Marketing
(U.S.) Inc.

Sara M. Keith*
SHELL ENERGY NORTH AMERICA
(US), L.P.
1000 Main Street, Level 12
Houston, TX 77002
Email: sara.keith@shell.com

*licensed in Texas
In-house counsel for Shell Energy North
America (US), L.P.

David L. Neale, Esq.
LEVENE, NEALE, BENDER, YOO &
BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067-and-
Keith Cunningham
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Telephone: (207) 791-1187
Facsimile: (207) 791-1350
Email: kcunningham@pierceatwood.com

Attorneys for California Independent System
Operator

-6-

Case No. 6:21-bk-12821-SY

STIPULATION REGARDING SCE MOTION FOR RELIEF FROM STAY

EXHIBIT 8    PAGE 159

# EXHIBIT 9

THOMAS WALPER (State Bar. No. 96667)
Thomas.walper@mto.com
SETH GOLDMAN (State Bar. No. 223428)
Seth.goldmant@mto.com
BRADLEY R. SCHNEIDER (State Bar No. 235296)
Bradley.schneider@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Southern California Edison
Company

**FILED & ENTERED**

**JUN 22 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Mason    DEPUTY CLERK

**CHANGES MADE BY COURT**

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No. 6:21-bk-12821-SY |
| WESTERN COMMUNITY ENERGY, | Chapter 9 |
| Debtor. | **ORDER APPROVING STIPULATION REGARDING SOUTHERN CALIFORNIA EDISON COMPANY'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY** |
| | [No Hearing Requested] |

The court having reviewed and considered the *Stipulation Regarding Southern California Edison Company's Motion for Relief from the Automatic Stay* (the "Stipulation")[1], the record in this case, and good cause appearing,

IT IS HEREBY ORDERED, that:

1.    The stipulation is approved.

---

[1] All capitalized terms not defined in this order shall have the same meaning as defined in the Stipulation.

-1-                                                      Case No. 6:21-bk-12821-SY

13306716.1

EXHIBIT 9    PAGE 160

1    2.    SCE shall continue remitting customer payments pursuant to the Service

2  Agreement to River City Bank for deposit into the Lockbox Account, subject to the terms of this

3  order.

4    3.    All WCE customer payments remitted by SCE after June 22, 2021 (without

5  prejudice to SCE's right to seek an earlier date) pursuant to the Service Agreement and deposited

6  into the Lockbox Account shall be deemed subject to a replacement lien provided by the TRO

7  Order as adequate protection of SCE's alleged setoff rights, if any, as of the Petition Date, except

8  that such replacement lien shall apply only to the funds deposited in the Lockbox Account after

9  June 22, 2021.  The replacement lien in favor of River City Bank, as collateral agent for the

10  benefit of the PPA Providers, provided pursuant to the order on the adequate protection motion

11  (Doc. No. 34) shall continue to apply to funds in the Lockbox Account to the same extent,

12  validity, and priority as of River City Bank's lien as of the Petition Date.

13    4.    All WCE customer payments that are remitted by SCE for deposit into the Lockbox

14  Account after June 22, 2021 (without prejudice to SCE's right to seek an earlier date), shall be

15  subject to (i) any right of setoff or recoupment SCE would have against such funds and (ii) any

16  lien or security interest River City Bank would have against such funds, in each case in the

17  absence of such remittance to the same extent as if SCE had retained the funds in its possession.

18    5.    Subject to Paragraphs 3 and 4, Parties' rights with respect to the extent and priority

19  of SCE's right of setoff or recoupment against WCE customer remittances are expressly reserved.

20    6.    SCE will not setoff or recoup any obligations of the Debtor to SCE against WCE

21  customer revenue absent further order of the court.

22    7.    No payments or other transfers will be made from or out of the Lockbox Account

23  absent further order of the court except as authorized in the order on the adequate protection

24  motion (Doc. No. 34).

25    8.    SCE's alleged rights of setoff or recoupment with respect to WCE revenue already

26  remitted by SCE pursuant to the TRO Order are expressly reserved; provided, however, nothing

27  herein shall modify the extent of the replacement lien granted by the TRO Order or extend the

28  replacement lien granted to SCE by the TRO Order to customer funds deposited in the Lockbox

13306716.1

EXHIBIT 9    PAGE 161

Account during the period from the Petition Date through June 22, 2021 (without prejudice to SCE's right to seek an earlier date).

9.      Except with respect to paragraphs 3a, 4, and 5 of the TRO Order, which are expressly preserved herein and modified as set forth in paragraph 3 of this order, the TRO Order is dissolved and the Debtor withdraws its request for a preliminary injunction.

11.     The Debtor will provide a list of total assets and liabilities to the Parties by no later than June 23, 2021.  Such list shall include separate line items stating (a) the current balances held in the Lockbox Account and WCE's general operating account, and (b) the estimated amount, by PPA Provider, of each termination payment to which WCE is or may be entitled to receive or obligated to pay. WCE shall provide an updated balance sheet on July 9, 2021, and provide it to the Parties to facilitate discussions between and among them regarding a consensual WCE plan of adjustment.

12.     The hearing on the SCE Stay Relief Motion is continued to August 5, 2021 at 1:30 p.m. If the Parties are unable to reach agreement on the disposition of customer remittances by July 15, 2021, the Parties shall brief the issues relevant to the SCE Stay Relief Motion by July 22, 2021; provided, however, the Stipulation shall not constitute a determination or agreement that the extent of setoff rights or the validity or priority of the setoff rights and River City Bank's lien can be determined through the Stay Relief Motion rather than through an adversary proceeding.

<div align="center">###</div>

Date: June 22, 2021

Scott H. Yun
United States Bankruptcy Judge

-3-                                    Case No. 6:21-bk-12821-SY

13306716.1

EXHIBIT 9    PAGE 162

# EXHIBIT 10

1  **WEILAND GOLDEN GOODRICH LLP**
   David M. Goodrich, State Bar No. 208675
2  dgoodrich@wgllp.com
   Ryan W. Beall, State Bar No. 313774
3  rbeall@wgllp.com
   650 Town Center Drive, Suite 600
4  Costa Mesa, California 92626
   Telephone    714-966-1000
5  Facsimile    714-966-1002

6  Counsel for Debtor
   Western Community Energy
7

8             **UNITED STATES BANKRUPTCY COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10                   **RIVERSIDE DIVISION**

11 In re                                  Case No. 6:21-bk-12821-SY

12 WESTERN COMMUNITY ENERGY,              Chapter 9

13              Debtor.

14                                         **STIPULATION RESOLVING DEBTOR'S
                                           MOTION FOR RELIEF FROM AUTOMATIC
15                                         STAY**

16                                         Hearing Date, Time and Location:

17                                         Date:  September 22, 2021
                                           Time:  1:30 p.m.
18                                         Ctrm:  302

19

20

21       **TO THE HONORABLE SCOTT H. YUN, UNITED STATES BANKRUPTCY JUDGE**

22 **FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

23        Western Community Energy, the debtor in the above-captioned case ("WCE" or

24 "Debtor"), by and through its counsel, Southern California Edison Company ("SCE"), by and

25 through its counsel, and Barclays Bank PLC ("Barclays"), by and through its counsel, hereby

26 stipulate and agree with respect to the following:

27        1.    WCE is a joint powers authority that was formed on August 23, 2018, pursuant

28

1182854.2

EXHIBIT 10    PAGE 163

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   to a joint powers agreement.  WCE is a community choice aggregator formed for the

2   purpose of delivering electrical services to customers.

3       2.      On May 24, 2021, the Debtor filed a voluntary petition for relief under Chapter

4   9 of the Bankruptcy Code initiating the instant bankruptcy case ("Case").

5       3.      Prior to filing the Case, the Debtor was a party to certain agreements with

6   River City Bank including, without limitation, the Intercreditor And Collateral Agency

7   Agreement  dated as of February 13, 2020 ("Collateral Agency Agreement"), the Security

8   Agreement dated as of February 12, 2020 ("Security Agreement"), and the Account Control

9   Agreement dated as of February 13, 2020 ("Control Agreement") (the Collateral Agency

10  Agreement, the Security Agreement and the Control Agreement collectively, the "Lockbox

11  Agreements").

12      4.      On February 26, 2019, WCE and SCE entered into a Community Choice

13  Aggregator (CCA) Service Agreement ("Service Agreement") pursuant to which SCE

14  provided certain services to WCE.

15      5.      Prior to filing the Case, the Debtor directed SCE to remit all collections of

16  WCE's customer revenue under the Service Agreement to an account (the "Lockbox

17  Account") with River City Bank.

18      6.      Under the Lockbox Agreements, River City Bank serves as Collateral Agent

19  for the benefit of power providers (each a "PPA Provider" or "Secured Creditor") who enter

20  into power purchase agreements with WCE and become party by joinder to the Collateral

21  Agency Agreement.  WCE granted to River City Bank a first priority security interest in,

22  among other assets, all Receivables (WCE's customer revenue) deposited into the Lockbox

23  Account ("Collateral").  River City Bank claims its lien is secured against additional collateral

24  of WCE; WCE disputes such claim as it pertains to certain collateral.  This dispute, however,

25  does not affect River City Bank's Collateral to be disposed of under this stipulation.

26      7.      The Collateral secures, among other things, WCE's obligations and liabilities

27  to each PPA Provider. (See Security Agreement, §1.01, §2 and §7.04.)

28      8.      The PPA Providers consisting of Exelon Generation Company LLC ("Exelon"),

<div style="writing-mode: vertical">Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002</div>

2

1182854.2

EXHIBIT 10      PAGE 164

1   Shell Energy North America (US), L.P. ("SENA"), and TransAlta Energy Marketing (U.S.),

2   Inc. ("TransAlta") are owed from the Debtor the following:   SENA the amount of

3   $426,000.00;  TransAlta the amount of $95,035.00; and Exelon the amount of

4   $3,699,464.00.

5       9.      SCE asserts it has pre-petition and post-petition claims against WCE for

6   amounts owed under the Service Agreement as well as amounts owed under that

7   *Agreement Between Southern California Edison Company and Western Community Energy*

8   *Regarding WCE Implementation and Resource Adequacy Compliance for 2020, 2021 and*

9   *2022* (as amended, the "RA Agreement").  SCE further assets that these claims are secured

10  by a right of offset against customer payments remitted to the Lockbox Account pursuant to

11  the Service Agreement, which right of offset has priority over any competing claim or interest

12  to the funds in the Lockbox Account.

13      10.     Under a Credit Agreement with Barclays, Barclays agreed to make loans to

14  the Debtor and issue letters of credit for the Debtor's benefit prior to the commencement of

15  the Case. The Debtor's obligations under the Credit Agreement are secured by a pledge of

16  "Pledged Revenues," and funds transferred from the Lockbox Account to the "Operating

17  Reserve Fund" and "Operating Fund Account" (each as defined under the Credit

18  Agreement).  In connection with the Credit Agreement, the Debtor, Barclays, and River City

19  Bank entered into two Deposit Account Control Agreements dated March 12, 2020 (the

20  "DACAs"). Under the DACAs, the Debtor granted Barclays a security interest in the Debtor's

21  Operating Fund Account and the Operating Reserve Fund at River City Bank.

22      11.     On June 7, 2021 the Court entered an Interim Order Granting in Part, Motion

23  to Determine Adequacy of Adequate Protection to River City Bank for the Benefit of the PPA

24  Providers was entered on June 7, 2021 [Docket No. 34]. The Final Order Granting, in Part,

25  Motion to Determine Adequacy of Adequate Protection to River City Bank for the Benefit of

26  PPA Providers was entered on July 6, 2021 (the "Adequate Protection Order").

27      12.     On June 11, 2021, the Court entered a Temporary Retaining Order that

28  granted, *inter alia*, a replacement lien to SCE in all post-petition revenue from the Debtor's

3

1182854.2

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

EXHIBIT 10     PAGE 165

1  customers for any diminution in value of SCE's purported secured rights in the Debtor's

2  customer receivables that occurred after the petition date.    [AP Dkt No. 12].    SCE's

3  replacement lien does not extend to any other assets of the Debtor.

4    13.    On June 18, 2021, the Debtor agreed to provide adequate protection of SCE's

5  alleged secured interest in customer payments deposited into the Lockbox Account,

6  including a replacement lien. [Dkt. No. 74].  On June 22, 2021, the Court approved the June

7  18, 2021 stipulation ("SCE Order"). [Dkt. No. 86].  The adequate protection provided to SCE

8  did not extend beyond the customer receivables. [Dkt. Nos. 74 and 86].

9    14.    Prior to filing the Case, the Debtor was a party to contracts with Morgan

10  Stanley Capital Group Inc. ("Morgan Stanley") and BP Energy Company ("BP") pursuant to

11  which the Debtor agreed to acquire from Morgan Stanley and BP, and Morgan Stanley and

12  BP agreed to sell to the Debtor, energy, resource adequacy, and/or renewable energy

13  credits.

14    15.    After the Petition Date, Morgan Stanley and BP terminated their respective

15  contracts with the Debtor and calculated that under the terms of their respective contracts

16  with the Debtor, termination payments were due and owing to the Debtor.

17    16.    Pursuant to their calculations of the termination payments owed under their

18  respective contracts with the Debtor, both BP and Morgan Stanley informed the Debtor they

19  intended to pay termination payments to the Debtor (collectively, the "Termination

20  Payments").

21    17.    On June 24, 2021, a Stipulation Regarding Deposit Of Early Termination

22  Payments And Reservation of Rights And Interests ("Stipulation") [Docket 94] between the

23  Debtor and River City Bank, was filed regarding Termination Payments to be paid to the

24  Debtor by Morgan Stanley and BP.  The Stipulation authorizes the deposit of Termination

25  Payments into the Debtor's Operating Account.  The Debtor's Operating Account is an

26  account that is separate and distinct from the Debtor's Operating Fund Account and the

27  Debtor's Operating Reserve Fund held at River City Bank.

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

4

1182854.2

EXHIBIT 10    PAGE 166

18.     On June 29, 2021, the Court entered an Order Approving Stipulation Regarding Deposit Of Early Termination Payments And Reservation of Rights And Interests ("Termination Order") [Docket 101].

19.     Shortly thereafter, Morgan Stanley and BP wired the Termination Payments to the Debtor's Operating Account at River City Bank.

20.     The amount on deposit in the Operating Account exceeds $14,000,000.

21.     The amount on deposit in the Lockbox Account exceeds $15,000,000.

22.     On August 27, 2021, the Debtor filed a Motion for Relief from the Automatic ("MFR") stay seeking an order to terminate or modify the automatic stays of §§ 362(a) and 922(a) to pay funds held in the Lockbox Account to River City Bank and the PPAs on their secured claims. The Debtor also requested the Court modify the Adequate Protection Order and terminate or vacate the Termination Order.

23.     The Debtor, SCE and Barclays agree, subject to Court approval and the terms of this stipulation, that the automatic stays of 11 U.S.C. §362(a) and §922(a), shall all be modified, to the extent they apply, and the Debtor is authorized to make the payments from the Lockbox Account as provided in this stipulation.

24.     The Debtor, SCE and Barclays further agree, subject to Court approval and the terms of this stipulation, that the Adequate Protection Order and SCE Order shall all be modified so that the Debtor is authorized to make the payments from the Lockbox Account as provided in this stipulation.

25.     The Debtor, SCE and Barclays further agree, subject to Court approval and the terms of this stipulation, that the Termination Order is vacated.

26.     The Debtor, SCE and Barclays further agree that the Debtor may use funds in the Debtor's Operating Account, up to $3,000,000 in the aggregate, for post-petition expenses of the Debtor.

27.     The Debtor, SCE and Barclays further agree that any use of funds in the Debtor's Operating Account beyond the amounts authorized in Paragraph 26 shall only be permitted upon further agreement of the Debtor, SCE and Barclays or, should it be

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

5

1182854.2

EXHIBIT 10      PAGE 167

1    necessary, an order of the Court modifying, amended, terminating or vacating any order

2    approving this stipulation.

3        28.    Any other applicable stay, including the 14-day stay provided by the

4    Bankruptcy Rules, may be waived and the Order approving this stipulation may be effective

5    immediately.

6        29.    This stipulation is subject to the approval of the Bankruptcy Court. If not

7    approved by the Bankruptcy Court, this stipulation shall be void and of no effect.

8        30.    This stipulation is without prejudice to the rights, contentions, security interest,

9    or liens of the Debtor, Barclays, and SCE, which are expressly reserved.

10        31.    The Bankruptcy Court shall retain jurisdiction to interpret and resolve any and

11    all disputes relating to this stipulation and any order entered in connection with this

12    stipulation.

13    Dated: September 30, 2021          WEILAND GOLDEN GOODRICH LLP

14

15                        By: /s/ David M. Goodrich

16                          David M. Goodrich

17              WEILAND GOLDEN GOODRICH LLP
                650 Town Center Drive, Suite 600

18              Costa Mesa, California 92626
                Telephone: 714-966-1000

19              Facsimile: 714-966-1002
                Email: dgoodrich@wgllp.com

20

21              *Counsel for Chapter 9 Debtor*

22              *Western Community Energy*

23    Dated: September 29, 2021

24

25              By:

26              Thomas Walper
          Seth Goldman

27              Bradley R. Schneider
          MUNGER, TOLLES & OLSON LLP

28              350 South Grand Avenue, 50th Floor

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

6

EXHIBIT 10    PAGE 168

Los Angeles, CA 90071-3426
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702
Email:  Thomas.walper@mto.com
seth.goldman@mto.com
Bradley.schneider@mto.com

*Attorneys for Southern California Edison
Company*

Dated: September 29, 2021

By: _____
Jason D. Strabo
2049 Century Park East, Suite 3200
Los Angeles, California 90067-3218
Telephone:  (310) 788-4125
Facsimile:  (310) 277-4730
Email:  jstrabo@mwe.com

and

Kristin K. Going (pro hac vice application pending)
One Vanderbilt Ave.
New York, NY 10017
Telephone: 212-547-5429
Email: kgoing@mwe.com

*Attorneys for Barclays Bank PLC*

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

7

EXHIBIT 10    PAGE 169

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 600**
**Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*): Stipulation Resolving Debtor's Motion for Relief from Automatic Stay will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 30, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) September 30, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Scott H. Yun
United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 345 / Courtroom 302
Riverside, CA 92501-3819

Western Community Energy
3390 University Avenue, Suite 200
Riverside, CA 92501-3314
Debtor

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) September 30, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 9/30/2021 | Gloria Estrada | *Gloria Estrada* |
| Date | Printed Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                 **F 9013-3.1.PROOF.SERVICE**

EXHIBIT 10     PAGE 170

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**
Bashar Ahmad    bahmad@boutinjones.com, cdomingo@boutinjones.com
Abram Feuerstein    abram.s.feuerstein@usdoj.gov
Beth Gaschen    bgaschen@wgllp.com,
kadele@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com;lbracken@wgllp.com;bgaschen@ecf.courtdrive.com;gestrada@wgllp.com
Seth Goldman    seth.goldman@mto.com
David M Goodrich    dgoodrich@wgllp.com,
kadele@wgllp.com;lbracken@wgllp.com;wggllp@ecf.courtdrive.com;gestrada@wgllp.com
Everett L Green    everett.l.green@usdoj.gov
Anna Gumport    agumport@sidley.com, laefilingnotice@sidley.com;anna-gumport-6608@ecf.pacerpro.com
Chad V Haes    chaes@marshackhays.com,
chaes@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com;kfrederick@ecf.courtdrive.com
Brian D Huben    hubenb@ballardspahr.com, carolod@ballardspahr.com;rev_jarushewskyj@ballardspahr.com
Mark T Jessee    jesseelaw@aol.com, marktjessee@gmail.com
Lindsey E Kress    lkress@lockelord.com, hayli.holmes@lockelord.com
Peter W Lianides    plianides@wghlawyers.com, jmartinez@wghlawyers.com;mweinberg@wghlawyers.com
Richard A Marshack    rmarshack@marshackhays.com,
lbuchananmh@ecf.courtdrive.com;rmarshack@ecf.courtdrive.com
Ali Matin    ali.matin@usdoj.gov, carolyn.k.howland@usdoj.gov
Thomas G Mouzes    tmouzes@boutinjones.com, cdomingo@boutinjones.com
David L. Neale    dln@lnbyb.com
Valerie Bantner Peo    vbantnerpeo@buchalter.com
Cameron C Ridley    Cameron.Ridley@usdoj.gov
Brandy A Sargent    brandy.sargent@klgates.com, litigation.docketing@klgates.com
Bradley R Schneider    bradley.schneider@mto.com
Clifford W Stevens    dsupnet@neumiller.com
Jason D Strabo    jstrabo@mwe.com, cgreer@mwe.com
United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov
Joseph M VanLeuven    joevanleuven@dwt.com, katherinehardee@dwt.com;pdxdocket@dwt.com
Marc J Winthrop    mwinthrop@wghlawyers.com, jmartinez@wghlawyers.com
Nahal Zarnighian    zarnighiann@ballardspahr.com

EXHIBIT 10    PAGE 171

# EXHIBIT 11

WEILAND GOLDEN GOODRICH LLP
David M. Goodrich, State Bar No. 208675
dgoodrich@wgllp.com
Ryan W. Beall, State Bar No. 313774
rbeall@wgllp.com
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone    714-966-1000
Facsimile    714-966-1002

Counsel for Debtor
Western Community Energy

**FILED & ENTERED**

**OCT 13 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY potier      DEPUTY CLERK

**CHANGES MADE BY COURT**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION**

| | |
|---|---|
| In re | Case No. 6:21-bk-12821-SY |
| WESTERN COMMUNITY ENERGY, | Chapter 9 |
| Debtor. | **ORDER APPROVING STIPULATION RESOLVING DEBTOR'S MOTION FOR RELIEF FROM AUTOMATIC STAY** |
| | Hearing: |
| | Date:  September 30, 2021<br>Time:  1:30 p.m.<br>Ctrm:  302 |

The court having duly considered the *Stipulation Resolving Debtor's Motion for Relief from Automatic Stay* filed on September 30, 2021 as Docket No. 169 ("Stipulation"),[1] and for good cause shown,

///

///

_____

[1] Capitalized terms have the same meaning or definition as the capitalized terms in the Stipulation.

EXHIBIT 11    PAGE 172

**IT IS ORDERED:**

1.      The Stipulation is approved.

2.      Pursuant to the Stipulation, the Termination Order [Docket No. 101] is

vacated on a prospective basis.

###

Date: October 13, 2021

Scott H. Yun
United States Bankruptcy Judge

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

2

EXHIBIT 11    PAGE 173

# EXHIBIT 12

**Fill in this information to identify the case:**

Debtor 1 ___Western Community Energy___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the:  Central District of California

Case number  __6:21-bk-12821-SY__

---

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Barclays Bank PLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Barclays Bank PLC, Attn Kelly McDonald<br>Name | Barclays Bank PLC, Attn Robin Criscione<br>Name |
| 745 Seventh Avenue<br>Number    Street | 745 Seventh Avenue<br>Number    Street |
| New York          NY          10019<br>City          State          ZIP Code | New York          NY          10019<br>City          State          ZIP Code |
| Contact phone (212) 526-7000 | Contact phone (212) 526-7000 |
| Contact email kelly.mcdonald@barclays.com | Contact email robin.criscione@barclays.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) _22_

Filed on __10/01/2021__
        MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Official Form 410                     **Proof of Claim**                     page 1

EXHIBIT 12      PAGE 174

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

7. **How much is the claim?**     $ _See Addendum Attached_____

**Does this amount include interest or other charges?**
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Money Loaned - See Addendum_____

9. **Is all or part of the claim secured?**

☐ No
☑ Yes.    The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☑ Other. Describe:    _See Attached Addendum_____

**Basis for perfection:**    _See Attached Addendum_____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**    $_____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

☐ No
☑ Yes. Identify the property: _See attached addendum_____

---

Official Form 410                                  **Proof of Claim**                                  page 2

EXHIBIT 12    PAGE 175

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No | |
|---|---|---|
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☒ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    11/24/2021
                    MM / DD / YYYY

/s/  Amit Trehan (original signature on following page)
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Amit Trehan | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Director | | |
| Company | Barclays Bank PLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 745 Seventh Avenue | | |
| | Number          Street | | |
| | New York | NY | 10019 |
| | City | State | ZIP Code |
| Contact phone | (212) 526-7000 | Email | amit.trehan@barclays.com |

EXHIBIT 12    PAGE 176

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

---

**Part 3:  Sign Below**

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|
| | ☐ I am the creditor. |
| | ☑ I am the creditor's attorney or authorized agent. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date    11/24/2021

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Amit Trehan | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Director | | |
| Company | Barclays Bank PLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 745 Seventh Avenue | | |
| | Number    Street | | |
| | New York | NY | 10019 |
| | City | State | ZIP Code |
| Contact phone | (212) 526-7000 | Email | amit.trehan@barclays.com |

Official Form 410                    **Proof of Claim**                    page 3

EXHIBIT 12    PAGE 177

# EXHIBIT 13

## SETTLEMENT AGREEMENT
## AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims (this **"Agreement"**) is made, executed and entered into effective as of December 16, 2021 (the **"Execution Date"**), by and between:

Western Community Energy, a joint powers authority and the debtor (**"Debtor"**) in the chapter 9 bankruptcy case pending before the United States Bankruptcy Court for the Central District of California, Riverside Division (the **"Bankruptcy Court"**), as Bankruptcy Case No. 6:21-bk-12821-SY (the **"Bankruptcy Case"**); and

Barclays Bank PLC (**"Barclays"**);

(each, individually, a **"Party"**, and all, collectively, the **"Parties"**), with respect to the following facts, circumstances, understandings and beliefs (collectively, **"Recitals"**):

## R E C I T A L S:

**A.**    Section 1.1 sets forth the words and phrases which, when capitalized and used in this Agreement, have specifically assigned meanings for purposes of this Agreement.

**B.**    Barclays purports to hold a duly perfected first priority lien against all assets of the Debtor, including, but not limited to, all accounts receivable and all cash on deposit in the Debtor's bank accounts held at River City Bank ("**RCB**").

**C.**    Barclays filed a proof of claim in the Debtor's case asserting a secured claim of against all assets of the Debtor as claim number 22, which was subsequently amended on November 26, 2021 [Claim No. 22-3].  Barclays also asserts claims pursuant to the financing arrangements for interest and attorneys' fees which continue to accrue post-petition.

**D.**    Barclays filed a complaint ("**Barclays Complaint**") against the Debtor and Southern California Edison, a California corporation ("**SCE**") on November 30, 2021 for declaratory relief (case no.: 6:21-ap-01128 SY) asserting, among other things, it holds a first priority lien in substantially all of the Debtor's assets and that SCE holds no security interest in funds held in a lockbox account at RCB (the "**Lockbox Account**").

**E.**    The Debtor disputes the allegations in the Barclays Complaint.

**F.**    Subject to Bankruptcy Court approval, as discussed in Article 2, the Parties desire to once and forever compromise, settle and release, on the terms and conditions set forth in this Agreement, each and all of their respective Claims against each other, as more fully set forth in this Agreement.

**THEREFORE,** in consideration of the covenants of the Parties set forth below and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, desiring to be legally bound by this Agreement, hereby covenant, agree, warrant, represent and declare as follows:

**ARTICLE 1**
**DEFINITIONS, CONVENTIONS AND CONSTRUCTION**

**1.1**    <u>**Definitions**</u>.    The following words and phrases, when capitalized and used in this Agreement, will have the meaning assigned below, unless the context in which the word or phrase is used reasonably prohibits the application of such meaning:

"<u>**Adversary Proceeding**</u>" is defined in <u>Recital "D"</u>.

"<u>**Agreement**</u>" is defined in the Preamble, and for purposes of further clarity, means this Settlement Agreement and Release of Claims.

"<u>**Appeal**</u>" means and will be construed broadly to include any appeal or motion for reconsideration of an entered order, or any other motion seeking to reverse, vacate, set aside, modify, or remand for further action, an entered order.

"<u>**Approval Motion**</u>" is defined in <u>Section 2.2</u>.

"<u>**Approval Order**</u>" is defined in <u>Section 2.1</u>.

"<u>**Bank Accounts**</u>" is defined in <u>Section 3.1</u>.

"<u>**Bankruptcy Case**</u>" is defined in the Preamble.

"<u>**Bankruptcy Code**</u>" means Title 11 of the United States Code.

"<u>**Bankruptcy Court**</u>" is defined in the Preamble.

"<u>**Barclays**</u>" is defined in the Preamble.

"<u>**Breach**</u>" is defined in <u>Section 5.7</u>.

"<u>**Claim**</u>" has the meaning set forth in 11 U.S.C. § 101(5).

"<u>**Credit Agreement**</u>" means that certain Revolving Credit Agreement dated March 12, 2020, pursuant to which Barclays agreed to make Loans to the Debtor and issue Letters of Credit for the Debtor's benefit.

"<u>**Debtor**</u>" is defined in the Preamble.

"<u>**Default**</u>" is defined in <u>Section 5.8</u>.

"<u>**Execution Date**</u>" is defined in the Preamble.

"<u>**Final Order**</u>" means an order entered by a court of competent jurisdiction, including the Bankruptcy Court, that has not been reversed, vacated or remanded

for further action, and: (a) is not on Appeal; or (b) is on Appeal but is not subject to a stay of enforcement.

**"Interest"** means and will be construed broadly to include any directly or indirectly held right, title, interest, ownership, indicia of title, indicia of ownership, right of possession, or other legal, equitable or possessory interest of any kind, including as defined in the Bankruptcy Code.

**"Law"** means and will be construed broadly to include any statute, code, ordinance, regulation, rule, common law principal, order or other law that is binding upon the Property or any Party, as amended from time to time.

**"Lien"** means and will be construed broadly to include any encumbrance, pledge, hypothecation, mortgage, deed of trust, security interest, judgment lien, statutory lien, equitable lien, equitable interest, community property interest, purchase option, right of first refusal, condition, restriction, notice of pending action or other lien of any kind, including as defined in the Bankruptcy Code.

**"Notice"** means and will be construed broadly to include any notice, inquiry, request, demand, acknowledgement, approval, consent, acceptance, ratification, determination, admission, waiver, disapproval, refusal, rejection, objection, denial or other communication required, desired or intended pursuant to the Agreement.

**"Notice Receipt Date"** means the date upon which a Notice to a Party is deemed to have been received by the Party pursuant to <u>Section 5.14</u>.

**"Party"** and **"Parties"** are defined in the Preamble.

**"Preamble"** means the first (i.e., introductory) paragraph of this Agreement.

**"Recitals"** is defined in the Preamble.

**"SCE"** is defined in the Preamble.

**"Settlement"** means and will be construed broadly to include all aspects of the compromise and settlement of disputes and waiver and release of Claims described in this Agreement.

**"Settlement Payment"** is defined in <u>Section 3.2</u>.

**1.2    Conventions.** This Agreement incorporates the following conventions:

**(a)** The words **"include"**, **"includes"** and **"including"** will be deemed and construed to be immediately followed by the words **"without limitation"**.

**(b)** The words **"will"**, **"shall"** and **"must"** refer to a mandatory act or obligation, and not a mere expression of interest or intent, unless the context in which the word is used reasonably prohibits the application of this convention.

EXHIBIT 13    PAGE 180

**(c)**      The word **"person"** includes and will be construed broadly to include humans, trusts, estates, receiverships, corporations, limited liability companies, partnerships, joint ventures, agencies, labor unions and federal, state and other governmental entities, authorities and agencies of competent jurisdiction, including legislative, judicial, executive, police, regulatory and taxing authorities, and includes, with respect to any person, the person's successors and assigns.

**(d)**      The word **"Dollars"** and the symbol **"$"** refer to the lawful currency of the United States of America.

**(e)**      The phrase **"business day"** means any day other than a Saturday, Sunday or generally recognized national holiday upon which a majority of federally insured banks within the State of California are open for business, and unless otherwise stated, all references to **"days"** will mean calendar days rather than business days, and all references to **"years"** will mean calendar years.

**(f)**      Words or phrases denoting the singular will include the plural, those denoting the plural will include the singular, and those denoting gender will include all genders, unless the context in which the word or phrase is used reasonably prohibits the application of this convention.

**1.3**    <u>**Construction.**</u>    This Agreement will be logically construed to govern the Settlement.  Article and Section headings are for organizational convenience and will not be given undue consideration in resolving questions of construction or interpretation. Each Party is deemed to have had equal bargaining strength in the negotiation of this Agreement and equal responsibility for the preparation of this document, such that neither this Agreement, nor any uncertainty or ambiguity herein, will be arbitrarily construed or resolved against any Party pursuant to any rule of construction or Law to the effect that ambiguities in documents are to be construed or resolved against the Party who drafted the document.

### ARTICLE 2
### BANKRUPTCY COURT APPROVAL

**2.1**    <u>**Approval Requirement.**</u>    The settlement of disputes and releases of Claims set forth in <u>Article 3</u> (defined in <u>Section 1.1</u> as the **"Settlement"**), are subject to and contingent upon the entry in the Bankruptcy Case of a Final Order (the **"Approval Order"**), in form and substance reasonably acceptable to Barclays, approving this Agreement and the Settlement and authorizing the Settlement Payment to be made with funds on deposit in accounts maintained by Debtor at RCB.  The Approval Order shall be entered by the Bankruptcy Court not later than January 13, 2022, unless such date is extended by Barclays in its sole discretion in writing (which may be in the form of email from Barclays' counsel).

**2.2**    <u>**Approval Motion.**</u>    On or before December 16, 2021, Debtor will file with the Bankruptcy Court a motion (the **"Approval Motion"**), which shall be in form and substance reasonably acceptable to Barclays, seeking approval of the Settlement and entry of the Approval Order in the Bankruptcy Case pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. The Debtor agrees the Approval Motion will be scheduled

for hearing, subject to the Bankruptcy Court's earliest availability, on January 6, 2022 at 1:30 p.m. (Pacific Time). The Debtor further agrees it will prosecute the Approval Motion in good faith, shall not withdraw or modify the Approval Motion without the written consent of Barclays, and shall not adjourn the hearing on the Approval Motion. For the avoidance of doubt, the Approval Motion and Approval Order shall be in form and substance reasonably acceptable to Barclays. The Approval Motion shall include as an exhibit a copy of the Approval Order. The Approval Order shall be entered by the Court not later than January 13, 2022, unless such date is extended by Barclays in its sole discretion.

**2.3  Termination Events**. The obligations of Barclays under this Agreement shall terminate automatically if (a) the Debtor does not file the Approval Motion by December 16, 2021 and set the Bankruptcy Settlement Motion Hearing for January 6, 2022, in each case unless Barclays in its sole discretion agrees to extend such deadlines (which writing may be an email from Barclays' counsel); (b) the hearing on the Approval Motion is not held on January 6, 2022, unless Barclays in its sole discretion agrees to a later hearing date in writing (which writing may be an email from Barclays' counsel); (c) the Debtor adjourns the hearing on the Approval Motion or withdraws or modifies the Approval Motion once filed, in each case without Barclays' prior written consent in Barclays' sole discretion (which writing may be an email from Barclays' counsel); (d) the Approval Order is not entered by the Bankruptcy Court by January 13, 2022, unless Barclays in its sole discretion agrees to extend such deadline (which writing may be an email from Barclays' counsel); and/or (e) the Debtor does not pay Barclays the Settlement Amount by January 15, 2022, unless Barclays in its sole discretion agrees to extend such deadline (which writing may be an email from Barclays' counsel).

**2.4    Cooperation Regarding Approval Order.**  The Parties will promptly, diligently and in good faith perform all acts reasonably requested by the other Party or required by the Bankruptcy Court to cause the Approval Order to be entered in the Bankruptcy Case and become a Final Order, including, for the avoidance of doubt, prosecuting and obtaining the dismissal of any Appeal with respect to the Approval Order and/or the Agreement, as well as providing any declarations, documents and information reasonably requested by such Party or required by the Bankruptcy Court in connection therewith, and by appearing at any related hearings before the Bankruptcy Court or Bankruptcy Appellate Panel. Unless and until the Bankruptcy Court denies the Approval Motion, the Parties will refrain from committing, authorizing, permitting, enabling, or assisting with the commission of, any acts in frustration or contravention of this Agreement. Notwithstanding anything to the contrary herein, if the Approval Order and/or Barclays Settlement Motion is subject to an Appeal, Barclays shall, in its sole discretion, be entitled to terminate this Agreement.

**2.5    SCE Settlement.**  The Parties acknowledge that: (a) Barclays and SCE assert competing Claims against various assets of Debtor; (b) Barclays and SCE dispute various Claims of the other, including Claims against various assets of Debtor contemplated to fund the Settlement Payment; and (c) the Parties are attempting, in good faith, to settle both: (x) all Claims of Barclays between Barclays and the Debtor, pursuant to this Agreement, and (y) all Claims of SCE between SCE and the Debtor. A true and accurate copy of the proposed SCE settlement terms, annexed to the Barclays Material Terms of Settlement as Annex A, was provided to and reviewed by Barclays on or before the Execution Date (the "**SCE Settlement**"). The Debtor agrees it will not propose or agree

EXHIBIT 13    PAGE 182

to any settlement with SCE or file any motion to approve such settlement, including, without limitation, by way of modification or amendment of the SCE Settlement or SCE Settlement motion unless (i) such settlement and motion contain the same material and economic terms of the draft of the proposed SCE Settlement, and (ii) there no terms inconsistent with those terms; provided, however, the Debtor and SCE may amend the motion to approve the settlement with SCE described in the Material Terms of SCE Settlement (x) in a manner less favorable to SCE than those terms in order to resolve any objections, or (y) in order to remedy or resolve any inconsistent term(s) identified by Barclays.

**2.6**    **Payment Instruction.**  On or before the date of the entry of the Approval Order in the Bankruptcy Case, Barclays will provide Debtor with written wire transfer instructions. The Settlement Payment is to be made to Barclays by wire transfer.

## ARTICLE 3
## SETTLEMENT OF DISPUTES AND RELEASE OF CLAIMS

**3.1**    **Termination of Bank Account Lien Claims.**  The Parties contemplate that Debtor will make the Settlement Payment to Barclays and any settlement payment payable to SCE pursuant to the SCE Settlement Agreement with funds on deposit in four (4) accounts maintained by Debtor at RCB (the **"Bank Accounts"**).  Pursuant to the Bankruptcy Court's orders, funds held in the Lockbox Account and the Debtor's operating accounts are frozen, subject to further authorization of the parties or order of the Bankruptcy Court.[1]  Accordingly, as part of the Approval Motion, Debtor will request that the Approval Order authorize the Debtor's use of funds in the Lockbox Account and operating accounts to make both: (a) the Settlement Payment payable by Debtor to Barclays; and (b) the settlement payable by Debtor to SCE pursuant to the SCE Settlement agreement if and when the SCE Settlement agreement is executed by Debtor and SCE and approved by the Bankruptcy Court.  In furtherance of this intent, upon entry of the Approval Order and payment of the Settlement Payment by the Debtor to Barclays, Barclays will be deemed to have withdrawn all Lien Claims against the bank accounts at RCB.

**3.2**    **Settlement Payment.**  Within two (2) business days following the date of the entry of the Approval Order by the Bankruptcy Court, Debtor will pay or cause to be paid to Barclays in accordance with the payment instruction referenced in Section 2.5, the total cash sum of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) (the **"Settlement Payment"**).

**3.3**    **Dismissal of Objection/Adversary Proceeding.**  Upon entry of the Approval Order and payment of the Settlement Payment by the Debtor to Barclays, Barclays shall, within 5 business days, (i) dismiss its lawsuit against the Debtor and SCE, with prejudice, and (ii) withdraw the objection to claims of SCE (proofs of claim 18-21) with prejudice, in each case provided the Debtor is not in breach of its obligations under this Agreement (such date, the "**Dismissal/Withdrawal Date**"). For the avoidance of doubt, if the Debtor breaches its obligations under this Agreement following the Dismissal/Withdrawal Date,

---

[1] *See* Interim Order Granting, in Part, Motion to Determine Adequacy of Adequate Protection to River City Bank for the Benefit of PPA Providers [Docket No. 34]; Order Approving Stipulation Regarding Southern California Edison Company's Motion for Relief from the Automatic Stay [Docket No. 86].

then Barclays shall, notwithstanding the dismissal of its lawsuit and withdrawal of the claim objection referenced above, be entitled to refile such lawsuit and claim objection.

**3.4     Assignment of Accounts Receivable**.  Barclays consents to the assignment of the Debtor's accounts receivable (estimated to be $1,800,000) to SCE  for the purpose of SCE submitting an application to the California Arrearage Payment Program (CAPP) and receiving CAPP funds (expected to be $1,800,000) free and clear of any lien, security interest, interest, claim, or encumbrance of any kind, provided that the Debtor will grant Barclays a replacement lien in funds on deposit in the Debtor's RCB operating account equal to the amount of accounts receivable transferred to SCE with such replacement lien providing the same extent and priority of Barclays' lien that existed pre-petition.  A separate agreement or stipulation between the Debtor and Barclays will be prepared with the form and substance of such agreement or stipulation reasonably acceptable to Barclays.  The agreement or stipulation providing adequate protection to Barclays must be approved by the Bankruptcy Court pursuant to an order reasonably acceptable in form and substance to Barclays. Any replacement lien granted to Barclays shall be released immediately upon payment of the Settlement Amount in accordance with paragraph 3.2 above.

**3.5     Release of Claims by Debtor.**  Except for the obligations of Barclays set forth in this Agreement and Claims resulting from or arising by reason of a Breach or Default of this Agreement or the Approval Order by Barclays, each of which will survive this release of Claims, following the entry of the Approval Order and effective upon receipt of the Settlement Payment by Barclays, Debtor, for and on behalf of itself, and its respective successors and assigns, will forever waive and release, and for all purposes will be deemed to have forever waived and released (a) all Claims of Debtor against Barclays and the successors and assigns of Barclays; and (b) all Claims of Debtor against the present and former principals, shareholders, members, directors, officers, managers, employees, agents, representatives, attorneys and accountants of Barclays, and their successors and assigns, which relate to, result from, or arise in connection with: (i) negotiations regarding this Agreement and related chapter 9 bankruptcy case, including any appeal; (ii) Barclays' claim objection and Adversary Proceeding referenced in section 3.3 above; (iii) all other actions taken by Barclays in connection herewith and therewith; (iv) and all actions and negotiations relating to or arising from the Credit Agreement and the other related financing documents between Barclays and the Debtor; and will covenant and for all purposes will be deemed to have covenanted to never file, prosecute or participate in the filing or prosecution of any lawsuit, appeal or other action seeking to enforce against any such released persons any such released Claims.

**3.6     Release of Claims by Barclays.**  Except for the obligations of Debtor set forth in this Agreement and Claims resulting from or arising by reason of a Breach or Default of this Agreement or the Approval Order by Debtor, each of which will survive this release of Claims, following the entry of the Approval Order and effective upon receipt of the Settlement Payment by Barclays, Barclays, for and on behalf of itself and its successors and assigns, will forever waive and release, and for all purposes will be deemed to have forever waived and released (a) all Claims of Barclays against Debtor and its respective successors and assigns solely relating to the Credit Agreement and the other related financing documents between Barclays and the Debtor; and (b) all Claims of Barclays against the present and former principals, shareholders, members, directors, officers,

EXHIBIT 13     PAGE 184

managers, employees, agents, representatives, attorneys and accountants of Debtor, and its respective successors and assigns, which relate to, result from, or arise in connection with the Credit Agreement and the other related financing documents between Barclays and the Debtor; and will covenant and for all purposes will be deemed to have covenanted to never file, prosecute or participate in the filing or prosecution of any lawsuit, appeal or other action seeking to enforce against any such released persons any such released Claims.

**3.7**     **California Civil Code Section 1542 Waiver.**  Each Party hereby represents to the other that it read California Civil Code Section 1542 and understands the potential effects of waiving the rights and benefits intended by that provision of the Law, and nonetheless hereby waives all rights and benefits conferred or intended pursuant to that provision of the Law, which states as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASING PARTY.

**ARTICLE 4**
**REPRESENTATIONS, WARRANTIES, DISCLAIMERS,**
**WAIVERS, AND LIMITATIONS ON LIABILITY**

**4.1**     **Binding Agreement.**  Each Party warrants and represents to the other Party that, except as set forth in <u>Section 2.1</u>, it has the requisite power, authority and legal capacity to make, execute, enter into and deliver this Agreement and to perform all of its obligations under this Agreement, and that neither this Agreement nor the performance by the Party of any obligation under this Agreement will violate any article, by-law, covenant, contract, agreement, restriction or order by which the Party is bound.  For the avoidance of doubt, the Debtor represents that its board of directors has duly authorized entry into this Agreement.

**4.2**     **Advice of Counsel.**  Each Party warrants and represents to the other Party that it acted pursuant to the advice of its own independent legal counsel in connection with the negotiation, preparation and execution of this Agreement, or was advised to obtain such advice, had reasonable time and opportunity to obtain such advice, or declined to obtain such advice.

**4.3**     **No Undisclosed Inducements.**  Each Party warrants and represents to the other Party that it entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts, circumstances and relevant Law, and that no covenants, promises, representations or assurances, other than those set forth in this Agreement, were made to induce the Party to enter into this Agreement.

**4.4**     **No Evidence of Wrongdoing**. Nothing in this Agreement is intended, or will be construed to evidence, infer or suggest any wrongdoing by any Party to this Agreement.

EXHIBIT 13     PAGE 185

**4.5** __No Prior Assignments__.  Each Party warrants and represents to each of the other Parties that the Party has not pledged, transferred or assigned any Claim, any basis for any Claim, or any defense or offset to any Claim, purportedly being settled or released by the Party pursuant to this Agreement.

**4.6** __Material Consideration; Truth and Accuracy; and Indemnification__.  The representations and warranties of each Party set forth in this Agreement constitute bargained for material consideration for this Agreement intended by the Party making the representation and warrant to induce the other Party to enter into this Agreement.  Each Party will cause its representations and warranties set forth in this Agreement to be true and accurate in all material respects, at all times relevant to the execution, Bankruptcy Court approval, and performance of this Agreement.

**4.7** __Survival__.  The representations, warranties, disclaimers, waivers and limitations (if any) on liability set forth in this Agreement will survive the execution, delivery, approval by the Bankruptcy Court, and performance of this Agreement, and any Breach or Default of this Agreement. For the avoidance of doubt, the releases set forth in Article 3 above will not survive termination of this Agreement so long as this Agreement is terminated as authorized herein.

## ARTICLE 5
## GENERAL TERMS AND PROVISIONS

**5.1** __Integration__.  This Agreement sets forth the entire agreement of the Parties regarding the Settlement, and supersedes all prior or contemporaneous discussions, negotiations and agreements among the Parties, oral or written, regarding such matters.

**5.2** __Amendment__.  No modification of, deletion from, or addition to this Agreement will be effective unless made in writing and executed by each Party.

**5.3** __Further Assurances__.  Each Party will promptly take all actions and execute and deliver all documents reasonably required of such Party to effectuate the Settlement.

**5.4** __No Third Party Obligations__.  This Agreement will not confer any rights upon any person not a Party, or obligate any Party to any person not a Party, provided, however, that this provision will not limit the effect of the Approval Order on persons not a Party to this Agreement.

**5.5** __Performance__.  Except as otherwise expressly set forth in this Agreement, each Party will bear all of its own costs of performance and its own attorneys' fees and costs incurred in connection with the negotiation and documentation of this Agreement.

**5.6** __Time of the Essence__.  Time is of the essence.  Each Party will perform all acts required of it pursuant to this Agreement by the date or within the time period required pursuant to this Agreement; provided, however, that if the date by which or upon which any obligation otherwise must be performed pursuant to this Agreement, or any Notice otherwise must be given pursuant to this Agreement, occurs on a day other than a business day, then the date by which or upon which such obligation must be performed or the Notice must be given is deemed extended until the next business day.

EXHIBIT 13    PAGE 186

**5.7**    **Breach**.  A Party will be in breach (**"Breach"**) upon: (a) any failure by the Party to make any payment or perform any act required of the Party pursuant to this Agreement by the time the payment or performance is due, unless otherwise agreed to in writing by the Parties; (b) the commission by the Party of any act prohibited by this Agreement; or (c) any failure of any warranty or representation by the Party set forth in this Agreement to be true and correct in all material respects at all times relevant to this Agreement.

**5.8**    **Default**.  Debtor will be in default (**"Default"**) if Debtor fails, for any reason other than a Breach or Default by Barclays or the Approval Order not being entered by the Bankruptcy Court in the Bankruptcy Case, to make the Settlement Payment to Barclays by the date required in Section 3.2.  Furthermore, a Party will be immediately in Default if a Breach occurs, or, with respect to the Debtor, a Termination Event occurs, unless otherwise agreed by the non-breaching Party with respect to any Breach in writing or by Barclays with respect to any Termination Event in writing.

**5.9**    **Governing Law, Jurisdiction and Venue**.  This Agreement is made under and will be construed in accordance with and governed by the substantive laws of the State of California, without giving effect to principles of conflicts of law.  The Parties consent to the jurisdiction of the United States Bankruptcy Court for the Central District of California, for the purpose of resolving any controversy relating to this Agreement, and absent a refusal by the Bankruptcy Court to hear and determine the controversy, it will be a material Breach to seek to resolve the controversy or disagreement in any other forum.

**5.10**    **Severability**.  If any provision of this Agreement is held by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, then the other provisions this Agreement will nonetheless remain enforceable.

**5.11**    **Waiver**.  The failure by any Party to enforce any provision of this Agreement will not constitute a waiver of the right to enforce the same provision, or any other provision, thereafter.  No waiver of any provision of this Agreement will be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

**5.12**    **Enforcement**.  Each Party will have the right to enforce by proceedings at law or in equity the provisions of this Agreement, including the right to prosecute proceedings at law or in equity against any Person who violates or attempts to violate such provisions, to enjoin any such Person from doing so, to cause such violation to be remedied, and to recover damages for such violation.

**5.13**    **Litigation Costs**.  If any Party brings legal proceedings against the other Party to enforce this Agreement or to declare any rights or obligations under this Agreement, then the prevailing Party will recover from the losing Party its costs of suit, including reasonable attorneys' fees, as will be determined by the court in such proceeding.

**5.14**    **Notices**.  A Notice must be made (i) by email and (ii) in writing and delivered to the address indicated below, until Notice of a change of address is given by the recipient Party, after which the Notice will be delivered to the address set forth in the recipient Party's most recent change of address Notice.  Notices by personal service, including by FedEx, will be deemed received upon delivery.  Notices by first class mail, postage

Settlement Agreement                    - 10 of 12 -

EXHIBIT 13    PAGE 187

prepaid, addressed as required by this Section, will be deemed received [15] business days following deposit with the United States Post Office.  Rejection of a Notice, refusal to accept a Notice, or inability to deliver a Notice because of a failure to give Notice of a change of address, will constitute delivery.  Notwithstanding the foregoing, except with respect to a Notice of a Breach or Default, unless and until a Party gives Notice in accordance with the forgoing requirements declaring a Beach or Default, or demanding that all future Notices be made in accordance with the foregoing provisions, Notices may be given by email correspondence to the email address indicated below, until Notice of a change of email address is given by the recipient Party, and thereafter, to the recipient Party's most recent change of email address.

**Debtor:**        Weiland Golden Goodrich LLP
           Attention: David M. Goodrich
           650 Town Center Drive - Suite 650
           Costa Mesa, California 92626
           E-Mail: dgoodrich@wgllp.com

**Barclays:**       Barclays Bank PLC
           Attention: Kelly McDonald
                 Amit Trehan
                 Kevin Sullivan
           745 Seventh Avenue
           New York, NY 10019
           E-Mail: Kelly.mcdonald@barclays.com
                 amit.trehan@barclays.com;
                 kevin.sullivan2@barclays.com

**with a copy to:**    Shearman & Sterling LLP
           Attention: Joel Moss
           599 Lexington Avenue
           New York, NY 10022
           and
           535 Mission St. 25th Floor
           San Francisco, CA 94105
           E-Mail: joel.moss@shearman.com

**5.15** **Execution.** This Agreement may be executed in any number of identical counterparts, each of which is an original and all of which together constitute one and the same agreement.  The delivery of an executed counterpart of a signature page to this Agreement by telecopy, electronic facsimile transmission, email transmittal, will be as effective as the physical delivery of an executed counterpart of this Agreement.

**5.16** **Inurement.** This Agreement will inure to the benefit of and be binding upon the Parties and their respective heirs, beneficiaries, successors, assigns, grantees, executors, administrators, and receivers.

<div align="center">[SIGNATURE PAGE(S) ATTACHED]</div>

**THE UNDERSIGNED PARTIES** made, executed, entered into and delivered this Agreement effective as of the Execution Date set forth in the Preamble.

**Debtor:**              Western Community Energy,
                         a California municipality


By:    _____
       (signature)

       Todd Rigby_____
       (typed or printed name)

Its:   Chairman of the Board_____
       (title or capacity)

**Barclays:**            Barclays Bank PLC


By:    _____
       (signature)

       _____
       (typed or printed name)

Its:   _____
       (title or capacity)

EXHIBIT 13     PAGE 189

# EXHIBIT 14

1  **WEILAND GOLDEN GOODRICH LLP**
   David M. Goodrich, State Bar No. 208675
2  dgoodrich@wgllp.com
   Ryan W. Beall, State Bar No. 313774
3  rbeall@wgllp.com
   650 Town Center Drive, Suite 600
4  Costa Mesa, California 92626
   Telephone     714-966-1000
5  Facsimile     714-966-1002

6  Counsel for Debtor
   Western Community Energy
7

8              **UNITED STATES BANKRUPTCY COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION**

10  In re                                    Case No. 6:21-bk-12821-SY

11  WESTERN COMMUNITY ENERGY,                 Chapter 9

12                          Debtor.          **ORDER GRANTING MOTION FOR ORDER
                                             APPROVING SETTLEMENT BETWEEN**
13                                           **DEBTOR AND BARCLAYS BANK PLC**
                                             **PURSUANT TO FEDERAL RULE OF**
14                                           **BANKRUPTCY PROCEDURE 9019**

15                                           Hearing Date, Time and Location:
                                             Date:     January 6, 2022
16                                           Time:     1:30 p.m.
                                             Place:    3420 Twelfth Street
17                                                     Courtroom 302
                                                       Riverside, CA 92501
18

19          On January 6, 2022, at 1:30 p.m., a hearing was held on the *Motion for Order*

20  *Approving Settlement Between Debtor and Barclays Bank PLC Pursuant to Federal Rule*

21  *of Bankruptcy Procedure 9019* [Dkt. No. ____] ("Motion")[1] filed by Western Community

22  Energy ("Debtor"), debtor in the above-captioned chapter 9 bankruptcy case.

23  Appearances were as noted on the record.  The Court having reviewed the Motion of the

24  Debtor seeking Court approval of the Agreement pursuant to Rule 9019 of the Federal

25  Rules of Bankruptcy Procedure, the notice of the Motion, all judicially noticeable facts and

26  all evidence submitted in support of the Motion, the related pleadings, and the arguments

27  _____

28      [1] Capitalized terms have the same meaning or definition as the capitalized terms in the Motion.

EXHIBIT 14    PAGE 190

of counsel at the hearing on the Motion; and the Court having found that the Agreement was negotiated in good faith and is reasonable, fair, and equitable; and finding service proper and for good cause appearing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

1. The Motion is granted.

2. The Agreement, a copy of which is attached to the Motion, is approved in all respects and the Debtor is authorized to enter into the Agreement.

3. The Debtor is authorized to perform all obligations under the Agreement, execute any documents, and take any actions reasonably necessary to effectuate the terms of the Agreement.

4. The Debtor is authorized to use funds in the RCB lockbox and operating accounts to make the Settlement Payment.

5. The Order is effective immediately upon entry.

6. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

<div align="center">###</div>

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

<div align="center">2</div>

EXHIBIT 14    PAGE 191

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 600
Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*): <u>Motion For Order Approving Settlement Between Debtor And Barclays Bank PLC Pursuant To Federal Rule Of Bankruptcy Procedure 9019; And Declarations Of Andrew Ruiz And David M. Goodrich In Support Thereof</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>December 16, 2021</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) <u>December 16, 2021</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Scott H. Yun
United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 345 / Courtroom 302
Riverside, CA 92501-3819

Western Community Energy
3390 University Avenue, Suite 200
Riverside, CA 92501-3314

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) <u>December 16, 2021</u>, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY EMAIL:**
Joel Moss - joel.moss@shearman.com
Kelly McDonald - Kelly.mcdonald@barclays.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 12/16/2021 | Gloria Estrada | *Gloria Estrada* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Abram Feuerstein     abram.s.feuerstein@usdoj.gov
Beth Gaschen     bgaschen@wgllp.com,
kadele@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com;lbracken@wgllp.com;bgaschen@ecf.courtdrive.com;gestrada@wgllp.com
Seth Goldman     seth.goldman@mto.com
David M Goodrich     dgoodrich@wgllp.com,
kadele@wgllp.com;lbracken@wgllp.com;wgallp@ecf.courtdrive.com;gestrada@wgllp.com
Everett L Green     everett.l.green@usdoj.gov
Anna Gumport     agumport@sidley.com, laefilingnotice@sidley.com;anna-gumport-6608@ecf.pacerpro.com
Chad V Haes     chaes@marshackhays.com,
chaes@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com;kfrederick@ecf.courtdrive.com
Brian D Huben     hubenb@ballardspahr.com, carolod@ballardspahr.com;rev_jarushewskyj@ballardspahr.com
Mark T Jessee     jesseelaw@aol.com, marktjessee@gmail.com
Lindsey E Kress     lkress@lockelord.com, hayli.holmes@lockelord.com
Peter W Lianides     plianides@wghlawyers.com, jmartinez@wghlawyers.com;mweinberg@wghlawyers.com
Richard A Marshack     rmarshack@marshackhays.com,
lbuchananmh@ecf.courtdrive.com;rmarshack@ecf.courtdrive.com
Ali Matin     ali.matin@usdoj.gov, carolyn.k.howland@usdoj.gov
David L. Neale     dln@lnbyg.com
Valerie Bantner Peo     vbantnerpeo@buchalter.com
Cameron C Ridley     Cameron.Ridley@usdoj.gov
Brandy A Sargent     brandy.sargent@klgates.com, litigation.docketing@klgates.com
Bradley R Schneider     bradley.schneider@mto.com
Clifford W Stevens     dsupnet@neumiller.com
Jason D Strabo     jstrabo@mwe.com, cgreer@mwe.com
United States Trustee (RS)     ustpregion16.rs.ecf@usdoj.gov
Joseph M VanLeuven     joevanleuven@dwt.com, katherinehardee@dwt.com;pdxdocket@dwt.com
Marc J Winthrop     mwinthrop@wghlawyers.com, jmartinez@wghlawyers.com
Robert J Wood     robert.wood@rivercitybank.com
Nahal Zarnighian     zarnighiann@ballardspahr.com

**SERVED BY UNITED STATES MAIL**:
ACES
4140 West 99th Street
Carmel, IN 46032-7731

Best Best & krieger LLP
3390 University Avenue, 5th Floor
Riverside, CA 92501-3369

EES Consulting
Attn: Gary Saleba
1601 Carmen Drive, Suite 215H
Camarillo, CA 93010-3105

Exelon Generation Company, LLC
1310 Point Street
8th Floor
Baltimore, MD 21231-3380

Nextera Energy Marketing, LLC
Attn: Mark Palanchian
700 Universe Blvd.
North Palm Beach, FL 33408-2657

PFM Financial Advisors, LLC
601 S. Figueroa Street
Suite 4500
Los Angeles, CA 90017-5703

Pilot Power Group
AttN: Denis Vermette
8910 University Center Lane
San Diego, CA 92122-1026

PowerEx Corp., Attn: Mgr. Contracts
666 Burrard Street, Suite 1300
Vancouver, BC V6c 2X8
Canada

Southern California Edison
Energy Contract Management
2244 Walnut Grove Ave.
Rosemead, CA 91770-3714

BP Energy Company
Attn: Rob H. Gorski
201 Helios Way

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

Houston, TX 77079-2678

Calpine Energy Solutions
Attn: Josh Brock
401 W A Street, #500
San Diego, CA 92101-7991

Elk Hills Power
4026 Sky Line Road
PO Box 460
Tupman, CA 93276-0460
RETURNED MAIL 7/12/21

Morgan Stanley Capital Group
Attn: Commodities Department
1585 Broadway, 3rd Floor
New York, NY 10036-8293

OhmConnect, Inc.
Attn: Matt Duesterberg
610 16th Street, Suite M20
Oakland, CA 94612-1282

PIP Printing
4093 Market Street
Riverside, CA 92501-3542

River City Bank
2485 Natomas Park Drvie
Riverside, CA 95833-2975

The Creative Bar
Attn: Justine Lawler
38750 Sky Canyon Drive, Suite C
Murrieta, CA 92563-2564

Riverside Division
3420 Twelfth Street,
Riverside, CA 92501-3819

Barclays Bank PLC
Attn: Cassandra Bolz
1301 6th Avenue
New York, NY 10019-6022

Constellation
1310 Point Street, 8th Floor
Baltimore, MD 21231-3380

Endersponse, Inc.
Attn: Emily McPhail
2901 West Coast Highway, Suite 200
Newport Beach, CA 92663-4045

NRG Power Marketing LLC
Attn: Joseph A. Holtman
804 Cernegie Center

Princeton, NJ 08540-6023

OneEnergy, Inc.
Attn: Bill Eddie
2003 Western Avenue, Suite 225
Seattle, WA 98121-2178

Pacific Gas and Electric Company
Attn: Ted Yuba
245 Market Street
San Francisco, CA 94105-1702

Pioneer Community Energy
804 Carnegie Ctr.
Princeton, NJ 08540-6023

Shell Energy North America (USA)
Contract North America
1000 Main Street, Level 12
Houston, TX 77002-6336

The Energry Authority, Inc.
Attn: Daren Anderson
301 W. Bay Street, Suite 2600
Jacksonville, FL 32202-5103

TransAlta
110-12 Avenue SW
Calgary, Alberta T2P 2MI
Canada

WRCOG
3390 University Ave., Suite 200
Riverside, CA 92501-3315

United States Trustee (RS)
3801 University Avenue, Suite 720
Riverside, CA 92501-3255

Tullett Prebon Americas Corp.
32123 Lindero Canyon Road
Westlake Village, CA 91361-4204
MAIL RETURNED 9/2/21

Pilot Power Group, Inc.
Attn: Contract Administration
8910 University Center Lane, Suite
San Diego, CA 92122-1026
MAIL RETURNED 9/24/21

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**